ACCEPTED
05-17-01421-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
1/30/2018 5:10 PM
LISA MATZ
CLERK

NO. 05-17-01421-CV

IN THE COURT OF APPEALS
FOR THE FIFTH JUDICIAL DISTRICT

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
1/30/2018 5:10:27 PM
LISA MATZ
Clerk

**In Re Enterprise Crude Oil, LLC**

Original Proceeding from Cause No. DC-17-7264,
101st Judicial District Court, Dallas County
Hon. Staci Williams, Presiding

**REAL PARTY IN INTEREST'S RESPONSE TO
AMENDED PETITION FOR WRIT OF MANDAMUS
AND APPENDIX**

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**GABLEGOTWALS**

David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Dr., Ste 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

**Attorneys for
Real Party in Interest,
MAGELLAN CRUDE OIL
PIPELINE COMPANY, L.P.**

{1789105;}

# PARTIES AND COUNSEL

**A. Relator**:

Enterprise Crude Oil, LLC

E. Leon Carter
lcarter@carterscholer.com
J. Robert Arnett II
barnett@carterscholer.com
Linda R. Stahl
lstahl@carterscholer.com
Joshua J. Bennett
jbennett@carterscholer.com
**CARTER SCHOLER PLLC**
8150 N. Central Expy., Ste. 500
Dallas, Texas 75206

**B. Real Party in Interest**:

Magellan Crude Oil
Pipeline Co., L.P.

David L. Bryant
dbryant@gablelaw.com
**GableGotwals**
113 Pleasant Valley Dr., Ste 204
Boerne, Texas 78006
Lisa T. Silvestri
lsilvestri@gablelaw.com
**GableGotwals**
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103

Bill E. Davidoff
bill.davidoff@figdav.com
Amanda Sotak
amanda.sotak@figdav.com
**Figari + Davenport, LLP**
901 Main Street, Suite 3400
Dallas, Texas 75202

**C. Respondent**

The Honorable Staci Williams
101st Judicial District Court
600 Commerce Street, 6th Floor West
Dallas, Texas 75202

{1789105;}

i

# TABLE OF CONTENTS

PARTIES AND COUNSEL.......................................................................i

TABLE OF CONTENTS .......................................................................ii

INDEX OF AUTHORITIES ...................................................................iv

ISSUES PRESENTED .........................................................................x

INTRODUCTION .................................................................................1

STATEMENT OF FACTS .....................................................................6

    I.    Explosive Growth in Eagle Ford Production Leads to
        Agreements Between Competitors ...........................................8

    II.   In 2011, Enterprise and Enterprise Pipeline Enter Into
        Additional Agreements with Magellan for Distribution of
        Eagle Ford Crude Oil to Houston Area Destinations............10

    III.  After Inducing Magellan to Invest Heavily in New
        Facilities, Enterprise Refuses to Utilize Them as Agreed ....13

    IV.  Enterprise Rebuffs Magellan's Attempts to Audit
        Enterprise Pursuant to Magellan's Contract Audit Rights ..15

    V.   Enterprise Attempts to Block All Magellan Discovery
        in the Action ........................................................................21

ARGUMENT........................................................................................24

    I.    Enterprise Has Not Shown Any Right to Mandamus Relief
        On the Ground That The Trial Court Compelled Discovery
        Pursuant to Overbroad Requests ..........................................24

        A.   None of Magellan's Requests to Enterprise are
             Overbroad.....................................................................29

        B.   None of the Subpoenas are Overbroad.........................34

II. The Trial Court Did Not Abuse Its Discretion By Overruling Enterprise's "Trade Secrets" Objection.............. 36

    A. To Support Its Trade Secret Objections, Enterprise Bore the Burden to Prove That the Specific Information Sought by Magellan Qualifies as Trade Secret ................................................... 37

    B. All Compelled Discovery is Within the Scope of Magellan's Contract Right to Audit Enterprise, and Thus Cannot Constitute Trade Secrets Enterprise is Privileged to Withhold from Magellan .......................... 38

    C. In Any Event, Enterprise Presented No Prima Facie Proof That Any Information Responsive to Magellan's Discovery Requests is Trade Secret, as Required ........ 44

    D. Enterprise Waived Any Potential Trade Secret Privilege as to Magellan ................................................. 50

    E. Though Not Required, Magellan Showed a Reasonable Necessity for the Discovery .......................................... 51

    F. The Protective Order Fully Protects Any Information That May Be Trade Secret and is Not an Abuse of Discretion ..................................................................... 55

III. The Trial Court Did Not Err, or Abuse Its Discretion, by Compelling Discovery of Any Information Enterprise Labels as "Parol Evidence" ................................................................. 63

CONCLUSION ................................................................................. 72

CERTIFICATION AND VERIFICATION ...................................... 74

CERTIFICATE OF COMPLIANCE WITH RULE 9.4 ................... 75

CERTIFICATE OF SERVICE .......................................................... 76

# INDEX OF AUTHORITIES

**Cases**

*Arrow Chem. Corp. v. Anderson,*
386 S.W.2d 309 (Tex. Civ. App.—Dallas 1965, writ ref'd n.r.e.)........38

*Axelson v. McIlhany,*
798 S.W.2d 550 (Tex. 1990) ...............................................................24

*Babcock & Wilcox Co. v. Areva NP, Inc.,*
788 S.E.2d 237 (Va. 2016)..................................................................40

*Bailey v. State,*
469 S.W.3d 762 (Tex. App.—Houston [1st Dist.] 2015) .....................50

*Banker v. Breaux,*
133 Tex. 183, 128 S.W.2d 23 (1939) ...................................................65

*Basic Capital Mgmt., v. Dynex Commercial, Inc.,*
348 S.W.3d 894 (Tex. 2011) ...............................................................66

*Brigham Young Univ. v. Pfizer, Inc.,*
861 F.Supp.2d 1320 (D. Utah 2012)....................................................48

*C & A Invs., Inc. v. Bonnet Res. Corp.,*
959 S.W.2d 258 (Tex. App.—Dallas 1997, writ denied) .....................71

*CSR Ltd. v. Link,*
925 S.W.2d 591 (Tex. 1996) ...............................................................26

*Deloitte & Touche, LLP v. Fourteenth Court of Appeals,*
951 S.W.2d 394 (Tex. 1997) ...............................................................26

*Dillard Dept. Stores, Inc. v. Hall,*
909 S.W.2d 491 (Tex. 1995) .........................................................25, 33

*DRC Parts & Accessories, LLC v. VM Motori, S.P.A.*,
112 S.W.3d 854 (Tex. App.—Houston [14th Dist.] 2003,
pet. denied) ...............................................................................71

*First Bank v. Brumitt*,
519 S.W.3d 95 (Tex. 2017) ......................................................65

*Ford Motor Co. v. Castillo*,
279 S.W.3d 656 (Tex. 2009) .............................................24, 70

*Gordon v. Blackmon*,
675 S.W.2d 790 (Tex. App.—Corpus Christi 1984)
(orig. proceeding) ....................................................................26

*Gordon v. Interstate Hotels & Resorts, Inc.*,
250 S.W.3d 196 (Tex. App.—Dallas 2008, no pet.) ...............26

*In re Am. Optical Corp.*,
988 S.W.2d 711 (Tex. 1998) (orig. proceeding) .....................33

*In re Bass*,
113 S.W.3d 735 (Tex. 2003) (orig. proceeding) .....................37

*In re Colonial Pipeline Co.*,
968 S.W.2d 938 (Tex. 1998) (orig. proceeding) .....................25

*In re Comm'l Metals Co.*,
2017 WL 3712169 (Tex. App.—Dallas Aug. 29, 2017)
(orig. proceeding) ....................................................................63

*In re Cont'l Gen. Tire, Inc.*,
979 S.W.2d 609 (Tex. 1998) (orig. proceeding) .............37, 38

*In re CSX Corp.*,
124 S.W.3d 149 (Tex. 2003) (orig. proceeding) ........25, 26, 28

*In re Deere & Co.*,
299 S.W.3d 819 (Tex. 2009) (orig. proceeding) .....................28

*In re Exmark Mfg. Co., Inc.,*
299 S.W.3d 519 (Tex. App.—Corpus Christi 2009)
(orig. proceeding)................................................................24, 25

*In re Goodyear Tire & Rubber Co.,*
437 S.W.3d 923 (Tex. App.—Dallas 2014) (orig. proceeding) ............27

*In re Graco Children's Prods., Inc.,*
210 S.W.3d 598 (Tex. 2006) (orig. proceeding) ...................................33

*In re Islamadora Fish Co. Texas, L.L.C.,*
319 S.W.3d 908 (Tex. App.—Dallas 2010) (orig. proceeding) ............67

*In re Master Flo Valve Inc.,*
485 S.W.3d 207, 213 (Tex. App.—Houston [14th Dist.] 2016)
(orig. proceeding)..................................................................................27

*In re McAllen Med. Ctr., Inc.,*
275 S.W.3d 458 (Tex. 2008) (orig. proceeding) ...................................67

*In re Nat'l Lloyds Ins. Co.,*
507 S.W.3d 219 (Tex. 2016) (orig. proceeding) ...................................36

*In re Nolle,*
265 S.W.3d 487 (Tex. App.—Houston [1st Dist.] 2008)
(orig. proceeding)..................................................................................27

*In re Ooida Risk Retention Grp, Inc.,*
475 S.W.3d 905 (Tex. App.—Fort Worth 2015) (orig. proceeding) .....67

*In re Rockafellow,*
2013 WL 1836451 (Tex. App.—Amarillo Apr. 30, 2013)
(orig. proceeding)..................................................................................54

*In re State Farm Lloyds,*
2016 WL 902864 (Tex. App.—Corpus Christi Mar. 9, 2016)
(orig. proceeding)..................................................................................67

*In re Union Pac. R.R. Co.,*
294 S.W.3d 589 (Tex. 2009) (orig. proceeding) .............................. 46, 52

*In re Waste Mgmt. of Texas, Inc.,*
392 S.W.3d 861 (Tex. App.—Texarkana 2013) (orig. proceeding) ...... 25

*In re Weekly Homes, L.P.,*
295 S.W.3d 309 (Tex. 2009) (orig. proceeding) .................................... 28

*ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.,*
234 S.W.3d 711 (Tex. App.—Eastland 2007, pet. denied)................... 69

*J.C. Kinley Co. v. Haynie Wire Line Serv., Inc.,*
705 S.W.2d 193 (Tex. App.—Houston [1st Dist.] 1985,
writ ref'd n.r.e.) ................................................................................. 39

*Jostens, Inc. v. Nat'l Comput. Sys., Inc.,*
318 N.W.2d 691 (Minn. 1982)............................................................. 49

*Lake v. Cravens,*
488 S.W.3d 867 (Tex. App.—Fort Worth 2016, no pet.) ..................... 71

*Life Techs. Corp. v. Biosearch Techs., Inc.,*
2011 WL 1157860 (E.D. Tex. Mar. 29, 2011)..................................... 62

*Matsushita Elec. Indus. Co. v. U.S.,*
929 F.2d 1577 (Fed. Cir. 1991) .......................................................... 63

*Miller Glob. Props., LLC v. Marriott Int'l, Inc.,*
418 S.W.3d 342 (Tex. App.—Dallas 2013, pet. denied) ...................... 71

*Millet v. Crump,*
687 So.2d 132 (La. App. 5 Cir. 1996)............................................. 39, 40

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.,*
907 S.W.2d 517 (Tex. 1995) ............................................................... 70

*Probado Techs. Corp. v. Smartnet, Inc.*,
   No. CIV.A. C-09-349, 2010 WL 2232831 (S.D. Tex. June 2, 2010) ..... 69

*Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*,
   682 F. Supp. 20 (D. Del. 1988) ........................................................... 63

*Sun Oil Co. (Del.) v. Madeley*,
   626 S.W.2d 726 (Tex. 1981) ................................................................ 66

*Texaco, Inc. v. Sanderson*,
   898 S.W.2d 813 (Tex. 1995) ........................................................ 25, 34

*Trevino & Assocs. Mech., L.P. v. Frost Nat'l. Bank*,
   400 S.W.3d 139 (Tex. App.—Dallas 2013, no pet.) ............................ 69

*U.S. Steel Corp. v. United States*,
   730 F.2d 1465 (Fed. Cir. 1984) ........................................................... 63

*VFD Consulting, Inc. v. 21st Servs.*,
   425 F.Supp.2d 1037 (N.D. Cal. 2006) ................................................. 48

*Walker v. Packer*,
   827 S.W.2d 833 (Tex. 1992) ................................................... 27, 28, 71

*Waste Mgmt. of Texas, Inc. v. Abbott*,
   406 S.W.3d 626 (Tex. App.—Eastland 2013, pet. denied) ............. 38, 39

*Zoecon Indus. v. Am. Stockman Tag Co.*,
   713 F.2d 1174 (5th Cir.1983) .............................................................. 38

## Statutes and Rules

Tex. Civ. Prac. & Rem. Code § 134A.002 ............................................... 38

Tex. R. Civ. P. 192.3 ............................................................. 24, 54

Tex. R. Evid. 507 ............................................................... 37, 54

Texas Rule of Evidence 511 ..................................................... xi, 50

## Other Authorities

1 *McCormick on Evidence* § 93 (7th ed. 2013) ........................................ 51

# ISSUES PRESENTED

1.  A discovery request is overbroad when it covers matters beyond those at issue in the case, and a central consideration in determining overbreadth is whether the request could have been more narrowly tailored and still obtain pertinent information. In determining whether a trial court clearly abused its discretion in regard to a discovery order, a reviewing court may not substitute its judgment for the trial court's, and the relator must show that the trial court could reasonably have reached only one decision. Even if that is shown, the relator must also show that the remedy afforded by ordinary appeal is inadequate, by showing that the discovery burdens the producing party far out of proportion to any benefit the requesting party may obtain. Has Enterprise shown that the trial court clearly abused its discretion by ordering discovery pursuant to requests which are truly overbroad, and if so, has Enterprise shown that it lacks an adequate remedy by ordinary appeal?

2.  The party asserting a trade secret privilege as to information sought in discovery bears the burden to prove that the information is trade secret. Information which another party may obtain by proper

means, such as by contractually-authorized audit, cannot constitute a trade secret as to that party. Also, under Texas Rule of Evidence 511(a), any trade secret privilege is waived by voluntary disclosure or consent to disclosure of any significant part of the privileged matter, unless such disclosure itself is privileged. Even when trade secret status is shown, discovery is appropriate when the requesting party demonstrates that discovery is reasonably necessary for a fair adjudication of the case, which turns on assessment of the particular circumstances. Here, where Enterprise expressly granted Magellan a contract right to audit and examine all records necessary to determine Enterprise's compliance with or breach of its contractual obligations to Magellan, and where Enterprise disclosed to Magellan some but not all information of the kinds it claims a privilege to withhold as trade secret, did Enterprise meet its burden of proof, and if so, did Magellan show reasonable necessity for the discovery? Relatedly, did the trial court clearly abuse its discretion by overruling Enterprise's trade secret objections to production of the information actually encompassed by Magellan's requests, or by approving the form of Protective Order it entered on January 8, 2018?

3.       Magellan's claims include, among others, breach of contract, fraud, and promissory estoppel. A court must construe a written contract in light of all surrounding facts and circumstances, and may consider them as an aid in construction even when the court concludes that the language of the contract is unambiguous. Here, the trial court has denied motions in which Enterprise argued that the contract is unambiguous, but has made no finding on that issue thus far. Nor has the trial court determined the merits of any claims Magellan asserts, including breach of contract, fraud, and promissory estoppel. Under these circumstances, did the trial court clearly abuse its discretion by compelling Enterprise to produce any of the information Enterprise characterizes as parol evidence? And if so, has Enterprise also shown, as required, that such discovery burdens Enterprise far out of proportion to any benefit Magellan may obtain, such that Enterprise has no adequate remedy by ordinary appeal?

# INTRODUCTION

The claims Magellan alleges against Enterprise revolve around the parties' Crude Oil Distribution Agreement dated October 31, 2011 ("Distribution Agreement"), two related agreements between Magellan and Enterprise's co-managed pipeline affiliate, Enterprise Crude Pipeline LLC ("Enterprise Pipeline"), and representations Enterprise made to Magellan in connection with those agreements.

In the Distribution Agreement, Enterprise committed to "exclusively utilize" Magellan's Houston area crude oil distribution facilities, for ten years, with respect to crude oil Enterprise markets from certain "Origin Point" locations in the Eagle Ford Shale to certain "Destination Points" in the Houston area refining market. Enterprise made that long-term commitment for the express purpose of inducing Magellan, its competitor, to invest heavily in expansion of Magellan's distribution system.

In reliance on the Enterprise commitment set forth in the Distribution Agreement, Magellan spent over $20 million to expand and improve its distribution facilities as necessary to handle the volumes of crude oil expected to be delivered by Enterprise. But instead of delivering

on its commitment, Enterprise has employed various schemes designed to circumvent and evade its obligations to Magellan, causing damages estimated to be $50 million or more to date.

Magellan bargained for and obtained, in the Distribution Agreement, the right to periodically audit all records necessary to determine whether and to what extent Enterprise is in compliance with or in breach of its contractual obligations. On two occasions prior to suit, Magellan sought to do so, but in each instance Enterprise provided only some of the documents and information required for a full audit. Enterprise claimed any other information regarding its shipments of Eagle Ford crude oil is "irrelevant" to an assessment of contract compliance.

This is because, in Enterprise's professed view of the Distribution Agreement, Enterprise's *commitment* to exclusively utilize the Magellan distribution system is only triggered if and when (1) Enterprise chooses to retain ownership of crude oil after shipping it from one of the relevant Eagle Ford "Origin Points" specified in the Distribution Agreement, and (2) Enterprise also chooses to deliver such crude oil to the Magellan "Connection Point" at Genoa Junction, the location where the

Distribution Agreement specifies that crude oil *must* be delivered in order to enter into Magellan's Houston area crude oil distribution system. *See* MR082-158, Pet., p. 4. In other words, according to Enterprise, the Distribution Agreement means that Enterprise is **not committed** to exclusively utilize Magellan's facilities at all.

What is more, as further discussed below, the operating methods Enterprise claims it is currently using (and may have been using all along) frustrate efforts to audit contract compliance because they make it hard to identify which barrels of crude oil came from a relevant Origin Point, and trace where they wound up after Enterprise moved the barrels to its ECHO Terminal or another intermediate location downstream from the Origin Point.

Shortly after answering Magellan's Original Petition with a general denial, Enterprise filed a summary judgment motion in which it urged the trial court to enter judgment against Magellan on all claims, based on Enterprise's contract interpretation, which it argued is the only reasonable construction of the contract on its face. In its opposition, Magellan explained why Enterprise's interpretation is not the only reasonable one, and indeed is unreasonable since it turns Enterprise's

long-term "commitment" into a *unilateral option* for Enterprise to use its competitor's facilities whenever it chooses, rendering the "commitment" illusory and worthless to Magellan. SR073-340.[1] After extensive briefing and oral argument, the trial court rejected Enterprise's contention that its construction of the Distribution Agreement is the only reasonable one, and thus denied the motion for summary judgment. The trial court contemporaneously denied Enterprise's motion to stay all discovery pursuant to the document production requests Magellan had already served on Enterprise, and the document subpoenas it had issued to three non-parties, clearing the path for discovery to proceed.

Undeterred, however, Enterprise refused to produce any documents requested by Magellan and filed a second motion to quash Magellan's subpoenas. Following more rounds of briefing and oral argument on Enterprise's second motion to quash, and Magellan's motion to compel Enterprise, the trial court denied the motion to quash and granted in major part Magellan's motion to compel. Still undeterred, Enterprise produced only the same information previously provided for pre-suit

---

[1] The supplemental mandamus record is filed with this response and cited as "SR001."

audits, and filed its Petition for Writ of Mandamus seeking relief preventing the vast majority of the discovery the trial court ordered. On January 16, 2018, Enterprise filed its Amended Petition for Writ of Mandamus.[2]

Mandamus is an extraordinary remedy appropriately reserved for exceptional cases where the relator demonstrates a clear abuse of the trial court's discretion and the lack of an adequate remedy by ordinary appeal. Enterprise has made no such showing here. Enterprise grossly exaggerates the scope of Magellan's discovery requests to Enterprise and the subpoenaed non-parties. In truth, all of them are carefully tailored to obtain information relevant to the subject matter of the action as alleged in Magellan's Original Petition. None of the discovery now compelled or allowed by the trial court's discovery orders is overbroad or amounts to impermissible discovery of parol evidence.

In the trial court, Enterprise failed to meet its burden to show that any information actually responsive to Magellan's discovery requests, as written, is trade secret information Enterprise could be presumptively

---

[2] The Amended Petition supersedes the original petition and is hereafter cited as "Pet."

privileged to withhold *from Magellan.* It does not, because all such information is within the scope of the audit right Enterprise granted *to Magellan*, and thus cannot be kept secret *from Magellan.* Additionally, though it was not required, Magellan showed a reasonable necessity for discovery of responsive information, *if any*, that might qualify as trade secret information outside the scope of Magellan's audit right.

In this Court, Enterprise fails to demonstrate that any aspect of the trial court's discovery orders is a clear abuse of the trial court's broad discretion in matters of discovery, and also fails to show the lack of an adequate remedy by appeal, as required to warrant mandamus in any case.

## STATEMENT OF FACTS

Magellan is an affiliate of Magellan Midstream Partners, L.P., a publicly traded partnership that primarily transports, stores and distributes petroleum products including crude oil. Magellan owns and operates pipelines and related facilities for transportation and distribution of crude oil, including facilities in the Houston, Texas area, through which crude oil is transported and distributed to refineries or

other destinations on the Houston ship channel, in Texas City, or at other locations on the Texas Gulf Coast. MR001.

Enterprise is a crude oil marketing company which purchases crude oil from third parties and generates revenues from marketing, storing and transporting such crude oil in Texas and Oklahoma. As a crude oil marketing company, Enterprise purchases crude oil produced by third parties and ships it on pipelines Enterprise selects, to destinations Enterprise selects. In Texas, Enterprise purchases and markets crude oil produced in, among other regions, the South Texas production region known as the Eagle Ford Shale. MR002.

Enterprise Pipeline, an affiliate of Enterprise, owns or operates numerous pipeline facilities in Texas including an Eagle Ford-to-Houston area pipeline system through which much of the Eagle Ford crude oil production purchased and marketed by Enterprise is transported and ultimately delivered to various Gulf Coast refineries and terminals including ones located along the Houston Ship Channel or in Texas City, Texas. MR002.

Enterprise and Enterprise Pipeline, as constituents of Enterprise Products Partners L.P. ("EPP")—which is one of the largest publicly

traded midstream energy partnerships in the United States—are jointly managed by Enterprise Crude GP LLC. MR003.

## I. EXPLOSIVE GROWTH IN EAGLE FORD PRODUCTION LEADS TO AGREEMENTS BETWEEN COMPETITORS

By 2010, midstream energy companies like Enterprise and Magellan foresaw rapid growth in Eagle Ford Shale crude oil production, and thus also needs and opportunities for expansions of pipelines and other midstream distribution systems to move increasing volumes of Eagle Ford crude oil to refining markets in or near Houston. MR007. In 2010, Magellan acquired more than 100 miles of Houston area pipeline assets that greatly increased its capacity to deliver crude oil to Houston Ship Channel refineries and refineries located in Texas City. MR008. At about the same time in 2010, EPP announced plans to construct a large new pipeline which would originate in the Eagle Ford Shale and be capable of transporting Eagle Ford crude oil to Houston area refining markets by connecting to Enterprise Pipeline's existing Rancho Pipeline, which extended directly to the Genoa Junction connection point with Magellan's Houston area distribution system. MR008.

In December 2010, Enterprise Pipeline and Magellan entered into an agreement to combine, under a single transportation tariff, a 40-mile

segment of Enterprise Pipeline's Rancho Pipeline with the 26-mile segment of Magellan's Genoa Junction-to-Texas City pipeline. MR012. EPP's public announcement noted that this agreement "represents an important first step towards working together on future opportunities designed to improve market access" and "complements our Eagle Ford Shale crude oil strategy that includes Enterprise's recently announced plans to construct a new crude oil storage facility and pipelines in southeast Houston that will receive deliveries from the Rancho system and provide the capability to deliver into the nearby Magellan pipeline." MR012.

The planned "new crude oil facility and pipelines," which EPP publicly disclosed to be part of its Eagle Ford crude oil strategy, referred to (1) the new Enterprise terminal facility known as ECHO Terminal, located approximately three miles southeast of Magellan's Genoa Junction connection point, and (2) two new pipelines that would provide bi-directional transportation of crude oil between ECHO Terminal and Magellan's facilities originating at Genoa Junction. MR009-011.

## II. IN 2011, ENTERPRISE AND ENTERPRISE PIPELINE ENTER INTO ADDITIONAL AGREEMENTS WITH MAGELLAN FOR DISTRIBUTION OF EAGLE FORD CRUDE OIL TO HOUSTON AREA DESTINATIONS

During the first half of 2011, as EPP was proceeding to enlarge its footprint in the Eagle Ford Shale, Magellan was also considering further expansion and improvement of its Houston area crude oil distribution system, subject to securing a long-term contractual commitment assuring the commercial viability of such a capital-intensive project. MR013-014.

Around mid-year, Magellan and Enterprise began exploring a possible agreement that would benefit both companies by utilizing their complementary assets for marketing, transportation and distribution of Eagle Ford crude oil to Houston area destinations. MR015. At the time, Enterprise was rapidly growing its business of purchasing crude oil produced in the Eagle Ford Shale play and marketing it to refineries in the Houston area, whereas Magellan had recently acquired Houston area pipelines and related facilities that increased its capacity to distribute, to area refineries, crude oil entering into Magellan's distribution system at Genoa Junction. *See* illustrations at MR009, MR012. Notwithstanding several public announcements about its strategic plans to expand its own facilities (MR009-012), Enterprise represented to Magellan that

Enterprise had a need and desire to use *Magellan's* Houston area crude oil distribution facilities in order to deliver burgeoning volumes of Eagle Ford production to destinations in the Houston area refining markets. MR015.

Following several months of contract negotiations, Magellan entered into: (1) the Distribution Agreement with Enterprise, (2) the Joint Tariff Agreement with Enterprise Pipeline, and (3) the Connection Agreement with Enterprise Pipeline. MR018-022.

In the Distribution Agreement, Enterprise made a 10-year "commitment" to "exclusively utilize" Magellan's Houston area crude oil transportation and distribution facilities for transportation of certain "Product"[3] Enterprise buys in the Eagle Ford Shale and markets to Houston area refineries. MR018-019. Specifically, under Section 4.1 of the Distribution Agreement, Enterprise committed that for all Product Enterprise owns or controls at any defined Eagle Ford "Origin Point" and transports on its affiliate's Eagle Ford-to-Houston area pipeline system for ultimate marketing (delivery) to any defined Houston area

---

[3] The Distribution Agreement defines "Product" as "crude oil and condensate meeting the specifications provided for in the Joint Tariff, as such tariff may be supplemented, amended or reissued from time to time." MR042.

"Destination Point," Enterprise would "exclusively utilize" Magellan's new and improved Houston area crude oil distribution system, pursuant to the agreed "joint tariff" (transportation fee). MR044.

The Distribution Agreement specifically referred to and incorporated the Joint Tariff Agreement between Enterprise Pipeline and Magellan, providing that "[t]ransportation services under this Agreement are subject to, and the Parties are required to comply with, the provisions of the Joint Tariff." MR041, MR043. The Joint Tariff Agreement expressed Enterprise's transportation commitment as follows: "[T]he shipper [Enterprise] agrees to ship under the Joint Tariff all crude owned or controlled by it from an Origin Point through the Connection Point to a Destination Point." MR041, MR043.

To implement the transportation commitment Enterprise made to Magellan under the Distribution Agreement, it was necessary for Enterprise Pipeline and Magellan to construct certain new or improved connections between their respective distribution systems. So, under the Connection Agreement, Enterprise Pipeline agreed to construct facilities which would enable it to deliver Product from Enterprise Pipeline's new ECHO-to-Genoa Junction pipelines into Magellan's distribution system

originating at the Genoa Junction connection point; and Magellan agreed to construct facilities which would enable it to receive such deliveries from Enterprise Pipeline, at either of the two Genoa Junction interconnection points included in the definition of "Connection Point" set forth in the Distribution Agreement and the Joint Tariff Agreement. MR021-022.

## III. AFTER INDUCING MAGELLAN TO INVEST HEAVILY IN NEW FACILITIES, ENTERPRISE REFUSES TO UTILIZE THEM AS AGREED

The Distribution Agreement expressly stated that the purpose of Enterprise's long-term commitment to make "exclusive use" of Magellan's distribution system was to "facilitate" (*i.e.*, induce) Magellan's costly expansion of its facilities as necessary for Magellan to handle the Eagle Ford crude oil transportation business Enterprise committed to Magellan. MR039. Following execution of the parties' 2011 agreements, and in reliance upon them, Magellan invested over $20 million to construct the "New Magellan Facilities" described in the Distribution Agreement, and did all of the connection work necessary to receive the anticipated Enterprise deliveries of Product from Enterprise Pipeline's Rancho Pipeline and ECHO-to-Genoa Junction pipelines into Magellan's expanded Houston area distribution system originating at Magellan's

Genoa Junction Connection Point with those pipelines. MR023. Magellan's facilities were connected and capable of receiving Enterprise Product at the specified Genoa Junction Connection Point as of July 1, 2013, the duly noticed "In-Service Date" on which Enterprise's 10-year commitment to "exclusively utilize" the Magellan facilities began. MR023.

However, from the In-Service Date to the present, Enterprise has failed and refused to "exclusively utilize" Magellan's facilities in accordance with the terms of the Distribution Agreement. MR024. Although the parties disagree about the meaning of the transportation commitment Enterprise made in the Distribution Agreement, and thus the scope of Eagle Ford Product covered by Enterprise's obligation to make exclusive use of Magellan's facilities, there is no dispute that from the In-Service Date to present Enterprise has purchased and marketed hundreds of millions of barrels of Eagle Ford Product which were not transported through Magellan's Houston area distribution system to a specified Destination Point. MR029.

## IV. ENTERPRISE REBUFFS MAGELLAN'S ATTEMPTS TO AUDIT ENTERPRISE PURSUANT TO MAGELLAN'S CONTRACT AUDIT RIGHTS

No rational company in Magellan's position would invest tens of millions of dollars to expand and improve its facilities, on the strength of a major competitor's long-term contractual commitment to exclusively utilize those facilities (in lieu of, for example, similar facilities the competitor owns or has publicly announced its intention to develop), without obtaining a robust right to audit the competitor as necessary to fully determine and fully verify the competitor's compliance with or breach of its commitment. Magellan bargained for and obtained that very right.

In Section 4.4 of the Distribution Agreement, Enterprise agreed that "Magellan shall have the right to audit Shipper's records ***necessary to verify Shipper's compliance with the provisions of Section 4.1 [the transportation commitment] and 4.2 [transportation commitment exceptions].***" MR045 (emphasis added). This bargained-for audit right is quite broad, and necessarily so. For one thing, under Section 4.1 of the Distribution Agreement, Enterprise (the Shipper) not only committed itself to "exclusively utilize" the Magellan Facilities but also committed to "use best efforts to cause Shipper's Affiliates [*e.g.*,

Enterprise Pipeline] to exclusively utilize the Magellan Facilities." MR044. In addition, Enterprise's transportation commitment hinges on certain variables, such as: whether and what "Product" the Shipper, or an "Affiliate" of the Shipper, either owns or controls, at an Eagle Ford "Origin Point;" whether such Product is transported on the "Enterprise Pipeline" or some other pipeline; and whether and to what extent such Product is transported for ultimate delivery to any "Destination Point." MR044. Consequently, properly auditing and verifying compliance with or breach of such a commitment is an inevitably complex process which could and does require access to and examination of many different types and sources of documents and data which Enterprise maintains in or through methods and systems unknown or unfamiliar to Magellan, and which can change over time.

Under such circumstances, it is hardly surprising that Enterprise voluntarily granted Magellan such a broadly-worded right to audit.[4] Nor is it surprising, although it is important, that the audit right Enterprise

---

[4] Although Section 4.4 of the Distribution Agreement is titled "Magellan's Limited Right to Audit and Penalty," the stated limitations concern only the timing, location, and costs of audits, not the scope of the information Magellan is entitled to examine for purposes of auditing Enterprise's compliance with its transportation commitment to Magellan. *See* MR045.

expressly granted Magellan does ***not*** exclude or exempt from audit ***any*** particular types or categories of documents or information, such as documents or information Enterprise may deem to be confidential or even "***trade secret***." What is surprising, and alarming, is how Enterprise responded to Magellan's two pre-suit attempts to audit Enterprise's contract compliance, and how (as discussed below) it has responded to Magellan's requests for discovery in this action.

In the spring of 2015, Magellan sought its first contract compliance audit. This audit revealed that immediately after Enterprise signed the Distribution Agreement with Magellan, Enterprise began replacing its Eagle Ford *marketing* contracts—under which Enterprise controlled or would control Product distribution and delivery from end-to-end of the transport from Origin Point to Destination Point—with *buy-sell* contracts, under which Enterprise buys volumes of crude oil at the Origin Point, transports it to Enterprise's ECHO Terminal, and resells the same volumes to the same customers once the crude oil reaches ECHO Terminal. MR026. The first audit also revealed other operating methods Enterprise uses to complicate tracing and fully accounting for the transportation and ultimate delivery of all Eagle Ford Product

Enterprise owns or controls at an Origin Point. For example: (1) Enterprise batches a common stream barrel at the Origin Point and resells a common stream barrel at a downstream destination such as ECHO Terminal, but says it does not tie the barrels Enterprise owns at the Origin Point to the barrels it resells to the same customer at the downstream location;[5] and (2) Enterprise says that after reselling Eagle Ford barrels to a customer at ECHO Terminal or another intermediate location downstream from the Origin Point, Enterprise does not track the customer's subsequent transportation to a Destination Point or any other final destination. MR090-091, MR243, SR378, SR489-533.[6]

For Magellan's first audit, Enterprise provided only **part** of the information needed to fully audit its compliance with or breach of the Distribution Agreement, *e.g.*, only three of its Eagle Ford buy-sell

---

[5] As Enterprise puts it: "Crude is not segregated at ECHO based on the crude's origin; it is aggregated there based on quality with crude from various sources, and **there is no way to determine whether any particular batch of crude purchased at ECHO was produced from an Origin Point**." SR378 (emphasis added).

[6] However, Enterprise has also made assertions inconsistent with the above. For instance, it has claimed that certain barrels were delivered through Enterprise facilities (not Magellan facilities) based on transportation nominations made by Enterprise's customers, and that some Product was transported by a customer from ECHO Terminal to a designated Destination Point, but not through the Magellan facilities, allegedly because that was "not the most direct routing" (which, even if true, does not exempt the barrels from Enterprise's commitment). SR489-533.

contracts (and only one of the related marketing contracts replaced with the buy-sell contract), and only certain incomplete or indecipherable transactional reports regarding Eagle Ford Product Enterprise owned or controlled at an Origin Point and transported to its ECHO Terminal. MR322.

In 2017, Magellan attempted a second audit, regarding Enterprise's contract compliance during 2016. For purposes of this audit, Magellan requested records which, in light of what was learned through the first audit, were plainly required in order to thoroughly and completely audit and determine the extent of Enterprise's compliance or breach of its obligations under the Distribution Agreement. This included complete transactional data regarding transportation and delivery of Eagle Ford Product Enterprise ***owned or controlled at an Origin Point*** (not any other Enterprise-owned crude oil) and records showing whether Enterprise replaced its pre-Distribution Agreement ***Eagle Ford*** marketing contracts with post-Distribution Agreement buy-sell contracts for good faith business reasons or in a bad faith effort to evade its obligation to make exclusive use of Magellan's facilities. MR353-356.

In response, Enterprise provided essentially the same kinds of transaction data (for 2016 Product shipments) it had provided for Magellan's first audit, with the same limitations and gaps preventing Magellan from identifying and tracing the transportation and delivery of all volumes of crude oil Enterprise owned or controlled and transported from an Eagle Ford Origin Point to a final destination beyond ECHO Terminal or a similar intermediate location. Enterprise also refused to provide any of its other Eagle Ford marketing agreements, buy-sell agreements, or transportation agreements. MR322.

The reason Enterprise gave for refusing to provide Magellan with all records "necessary to verify Shipper's compliance" was ***not*** that any such records constitute "trade secrets" that, despite the broad audit right Enterprise granted in the Distribution Agreement, Enterprise is privileged to withhold from Magellan. MR322. In fact, although Enterprise provided information under a confidentiality agreement—one that permits the information to be reviewed by any Magellan representative who has "a legitimate need to review and evaluate the Confidential Information to assist Recipient [Magellan] in connection with the Audit" and permits Magellan to use Confidential Information

for *any* "purposes *related to* the Audit" (MR468)—Enterprise *never* claimed (and *still* does not claim) that any of the "Confidential Information" it actually provided for audit is Enterprise "trade secret" information. MR319, MR322. Instead, based on the same erroneous interpretation of the Distribution Agreement that Enterprise's subsequent motion for summary judgment unsuccessfully urged the trial court to adopt as a matter of law, Enterprise claimed that the rest of the information Magellan sought for audit is simply *irrelevant*.

## V.    ENTERPRISE ATTEMPTS TO BLOCK ALL MAGELLAN DISCOVERY IN THE ACTION

On June 19, 2017, Magellan filed its factually detailed 36-page Original Petition, alleging claims for (among other things) breach of the Distribution Agreement, promissory estoppel, and fraud. MR001-078. Shortly after Enterprise answered with a general denial (MR079-081), Magellan served its first document requests to Enterprise (MR271) and issued subpoenas to the three non-parties who were counterparties to the three Eagle Ford buy-sell contracts Enterprise disclosed during Magellan's first audit (MR196-236). The requests to Enterprise sought documents relevant to the subject matter of the action, including documents relevant to Enterprise's liability for all claims alleged in the

Original Petition, and to a determination of Magellan's damages. The non-party subpoenas sought all relevant "Eagle Ford Product" [7] contracts with Enterprise (including those Enterprise claimed not to have), relevant communications with Enterprise regarding those contracts, and the non-parties' *own* basic transactional data regarding the purchase, sale, transportation and delivery of Eagle Ford Product sold to Enterprise at an Origin Point and/or bought back from Enterprise pursuant to a buy-sell contract. SR341-366.

Enterprise then launched, and for five months has maintained, a withering campaign to stop Magellan's suit in its tracks, without *any* meaningful discovery from Enterprise or anyone else. Specifically, Enterprise: (1) sought summary judgment on all of Magellan's claims, based on Enterprise's faulty interpretation of the Distribution Agreement (MR082-158) (motion denied); (2) moved to stay all discovery pending determination of its summary judgment motion (SR001-072)

---

[7] The non-party subpoenas clearly and carefully defined "Eagle Ford Product," to be *limited* to crude oil and/or condensate the non-party sold to Enterprise, or delivered to Enterprise for transportation, *at one of the Eagle Ford Origin Points* specified in the Distribution Agreement. Ironically, Enterprise scoffs that this and other definitions Magellan included in its subpoenas or its requests to Enterprise—all of which were carefully designed to avoid confusion or overbreadth—were "made-up" by Magellan. Pet., pp. 7, 12.

(motion denied); (3) after those two motions were denied, (a) objected to every one of Magellan's discovery requests and refused to produce *anything* to Magellan (MR287), and (b) filed another motion to quash the non-party subpoenas (MR160-236) (motion denied); (4) opposed Magellan's motion to compel Enterprise to produce documents responsive to Magellan's requests (MR390-473) (motion granted in major part); (5) on the eve of the hearing on Magellan's motion to compel, served amended objections and responses in which Enterprise asserted new objections and substantially altered others (SR426-516) (objections overruled); (6) moved for entry of a protective order containing draconian provisions that, unlike the audit-related Confidentiality Agreement discussed above, would preclude *any* Magellan personnel from reviewing any information Enterprise is compelled to produce but claims is trade secret or "highly confidential" (MR474-575); and (7) filed its Petition for Writ of Mandamus.

Enterprise's relentless efforts to prevent this case from moving forward have failed, and with good reason. The trial court's rulings to date—though not yet effective in breaking Enterprise's unilateral

embargo on discovery—have been well-considered and lawful, and by no means an abuse of discretion in any respect.

## ARGUMENT

**I. ENTERPRISE HAS NOT SHOWN ANY RIGHT TO MANDAMUS RELIEF ON THE GROUND THAT THE TRIAL COURT COMPELLED DISCOVERY PURSUANT TO OVERBROAD REQUESTS**

Texas Rule of Civil Procedure 192.3 entitles a party to obtain discovery "regarding any matter that is not privileged and is relevant to the subject matter of the pending action," whether or not the information will be admissible at trial, as long as the information sought "appears reasonably calculated to lead to the discovery of admissible evidence." Tex. R. Civ. P. 192.3(a). The phrases "relevant to the subject matter" and "reasonably calculated to lead to admissible evidence" are liberally construed to allow litigants to obtain the fullest knowledge of the facts and issues prior to trial. *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 664 (Tex. 2009); *Axelson v. McIlhany*, 798 S.W.2d 550, 553 (Tex. 1990); *In re Exmark Mfg. Co., Inc.*, 299 S.W.3d 519, 526 (Tex. App.—Corpus Christi 2009) (orig. proceeding). The scope of discovery is largely within the trial court's discretion. *In re Colonial Pipeline Co.*, 968 S.W.2d 938, 941 (Tex.

1998) (orig. proceeding) (citing *Dillard Dept. Stores, Inc. v. Hall*, 909 S.W.2d 491, 492 (Tex. 1995)).

A discovery request is overbroad only when it covers "time periods, products, or activities *beyond those at issue in the case.*" *In re Waste Mgmt. of Texas, Inc.*, 392 S.W.3d 861, 871 (Tex. App.—Texarkana 2013) (orig. proceeding) (emphasis added). "A specific request for discovery reasonably tailored to include only matters relevant to the case is not overbroad merely because the request may call for some information of doubtful relevance. Parties must have some latitude in fashioning proper discovery requests." *Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995). That is, "[a] central consideration in determining overbreadth is whether the request could have been more narrowly tailored to avoid including tenuous information and still obtain the necessary, pertinent information." *In re CSX Corp.*, 124 S.W.3d 149, 153 (Tex. 2003) (orig. proceeding). And "[w]hen it is not self-evident that the discovery order is overly broad, the party resisting the discovery bears the burden of offering evidence to prove its objections." *In re Exmark Mfg. Co., Inc.,* 299 S.W.3d at 524 (citations omitted)).

Since "[m]andamus is an extraordinary proceeding, encompassing an extraordinary remedy," appellate courts exercise mandamus power "sparingly and deliberately" and only where the decision is "a clear abuse of discretion devoid of any guiding principles of law." *Deloitte & Touche, LLP v. Fourteenth Court of Appeals*, 951 S.W.2d 394, 396 (Tex. 1997). A trial court commits an abuse of discretion when its action is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *In re CSX Corp.*, 124 S.W.3d at 151 (*quoting CSR Ltd. v. Link*, 925 S.W.2d 591, 596 (Tex. 1996)). *See Gordon v. Interstate Hotels & Resorts, Inc.*, 250 S.W.3d 196, 199 (Tex. App.—Dallas 2008, no pet.) (same). The party resisting discovery has the heavy burden to show an abuse of discretion under this stringent standard. *In re CSX Corp.*, 124 S.W.3d at 151.

Regarding discovery orders in particular, "the discretionary nature of discovery and the amorphous notion of relevancy most often counsels against appellate court intervention into the discovery process." *Gordon v. Blackmon*, 675 S.W.2d 790, 793 (Tex. App.—Corpus Christi 1984) (orig. proceeding) (citation omitted) (internal quotation marks omitted). Specifically, "[i]n considering whether a trial court has clearly abused its discretion with regard to a discovery order, the reviewing court may not

substitute its judgment for that of the trial court and the relator must establish that the trial court could reasonably have reached only one decision." *In re Goodyear Tire & Rubber Co.*, 437 S.W.3d 923, 927 (Tex. App.—Dallas 2014) (orig. proceeding) (citations and internal quotation marks omitted). *See In re Master Flo Valve Inc.*, 485 S.W.3d 207, 213 (Tex. App.—Houston [14th Dist.] 2016) (orig. proceeding) (same). Finally, "[i]n determining whether the trial court abused its discretion, we are mindful that the ultimate purpose of discovery is to seek the truth, so that disputes may be decided by what the facts reveal, not by what facts are concealed." *In re Nolle*, 265 S.W.3d 487, 491 (Tex. App.—Houston [1st Dist.] 2008) (orig. proceeding) (citing cases).

Even when the party seeking mandamus relief meets the heavy burden of showing a clear abuse of discretion, it must also demonstrate that the remedy afforded by ordinary appeal is inadequate. *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992). And importantly, "an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ." *Id*. To establish inadequate remedy, the party seeking mandamus relief from a discovery order compelling production must prove that the order "compels the production

of patently irrelevant or duplicative documents, ***such that*** it clearly constitutes harassment or imposes *a **burden** on the producing party **far out of proportion** to any **benefit*** that may obtain to the requesting party." *Id.* at 843 (emphasis added). In other words, contrary to Enterprise's contention, even proof that a discovery order compels production of "patently irrelevant" documents (which Enterprise has not shown) does not *automatically* satisfy the inadequate remedy requirement; the relator must also demonstrate that the order constitutes harassment or burdens the producing party far out of proportion to the benefit to the requesting party.[8]

---

[8] Enterprise relies (Pet., p. 20) on a quotation from *In re CSX Corp.* that for such an order, there is no adequate remedy on appeal "*because* the order 'imposes a burden on the party far out proportion to the benefit that may obtain to the requesting party.'" *In re CSX Corp.*, 124 S.W.3d at 153 (emphasis added) (citing and internally quoting *Walker*). But *Walker* does not support the view that any order compelling production of "patently irrelevant" documents *necessarily* imposes such a burden far out of proportion to the benefit. Rather, *Walker* shows, and logically so, that in such cases the assessment of adequate remedy involves a case-by-case balancing of demonstrated burden versus benefit. In *In re CSX Corp.*, the burden far outweighed the benefit because the plaintiff's interrogatories at issue sought names and addresses of all safety personnel the defendants employed over a 30-year period, extending 25 years beyond the plaintiff's employment period. *Id. Cf. In re Deere & Co.*, 299 S.W.3d 819, 821 (Tex. 2009) (orig. proceeding) (inadequate remedy shown in products liability case where reviewing court found discovery ordered as to 30 product lines was overbroad and could require production of documents "going back decades"); *In re Weekly Homes, L.P.*, 295 S.W.3d 309, 323 (Tex. 2009) (orig. proceeding) (citing *Walker*, and finding remedy by appeal would be inadequate because burden of producing employees' computer hard drives far outweighed benefit of discovery).

## A. NONE OF MAGELLAN'S REQUESTS TO ENTERPRISE ARE OVERBROAD

Enterprise leads its argument by pointing to Magellan's Request No. 10—which it says "typifies the overbreadth" (Pet., p. 22) of Magellan's requests—asserting that the documents sought have "no apparent connection" to the issues in the case. (Pet., p. 23). That is plainly wrong.

Magellan alleges that, consistent with Enterprise's representations, the Enterprise transportation commitment set forth in the Distribution Agreement applies to all Product (crude oil and condensate) which is owned by Enterprise at any of the defined Origin Points, transported on its Eagle Ford-to-Houston pipeline system, and delivered to any of the defined Destination Points in the Houston area market. MR001. Based on information it discovered through pre-suit audit, Magellan also alleges that Enterprise is deliberately skirting its contractual commitment, in various ways (*e.g.*, replacing pre-contract marketing agreements with post-contract buy-sell agreements, and idling its Rancho I pipeline and using its Rancho II pipeline to bypass the Magellan's Connection Point[9]) which not only breach the contract but

---

[9] *See* SR074 for illustration.

also indicate that Enterprise never intended to perform its obligation to "exclusively utilize" Magellan's Houston area distribution system originating at the Genoa Junction Connection Point.

Request No. 10 calls for Enterprise business plans, projections, statistics and the like regarding its marketing, transportation or delivery of "Eagle Ford Product" *only*, *i.e.*, only Product which Enterprise owns or controls at a specified Origin Point and is subject to the transportation commitment contained in the Distribution Agreement. Enterprise's complaint that Request No. 10 references items pertaining to marketing or delivery of Eagle Ford Product to ECHO Terminal, Genoa Junction, or other Houston Area Destinations is unfounded, and ironic, because such specific references reasonably limit the scope of the request so that it does not seek information pertaining to *any* Eagle Ford Product that does *not* move to Houston on the Eagle Ford-to-Houston pipeline and, therefore, is not subject to the Distribution Agreement. The requested information is also reasonably limited to the time period during which Distribution Agreement has been in effect.

Documents responsive to Request No. 10 are highly relevant to multiple issues in the case, such as: whether Enterprise misled Magellan

about Enterprise's purported need, desire, and intent to make exclusive use of Magellan's facilities; whether Enterprise ever planned or expected to do so; whether, at the time Enterprise induced Magellan to invest in expanded facilities and new connections between the competitors' respective facilities, Enterprise was already using or planning to use operating methods designed to evade its commitment and/or frustrate Magellan's ability to audit compliance with that commitment; and whether, when and why Enterprise's needs, plans or expectations changed after it signed the Distribution Agreement (*e.g.*, whether changes were made in order to evade the transportation commitment, which the law forbids (*see* MR253)).

Next, Enterprise contends that Request Nos. 17-23 are overbroad because they seek information about "every customer contract for Eagle Ford Crude." (Pet., p. 24). That is also incorrect. First, given the scope-limiting definitions used, all of these requests pertain *only* to contracts covering crude oil or condensate purchased, sold or transported from one of the Origin Points identified in the Distribution Agreement. Second, they are all reasonably limited in time, to the period from 2011 (when

Enterprise began entering into the marketing agreements it later replaced with buy-sell agreements) to present.

Documents responsive to Request Nos. 17-23 are relevant to the same issues and matters discussed above, in particular whether the contracts resulted from customer demands (as Enterprise claims, see MR090-091, SR489-533) or from Enterprise's own bad faith attempts to structure deals so as to evade its commitment to make exclusive use of Magellan's facilities, and instead promote the use of Enterprise's facilities. Enterprise acknowledged the relevance of such contracts when it provided three buy-sell agreements and one of the related marketing agreements it replaced with a buy-sell agreement.

Last, Enterprise claims that Request Nos. 24-26 and 28-29 are overbroad on the ground that they seek information about "Future Destination Points" (a term defined in the Distribution Agreement) "that Magellan has never put into service." (Pet., p. 24). However, Enterprise has not proved that assertion, and cannot because it is false. It is true that Request Nos. 28-29 seek information about crude transportation from ECHO Terminal to any Destination Point or Future Destination Point, but do not tie that to barrels which came from an Origin Point.

However, that is only because Enterprise states that the barrels it transports from an Origin Point are being batched, are not tied or matched to the barrels it resells at ECHO Terminal, and thus cannot be specifically identified or traced from ECHO Terminal to the ultimate delivery point. MR090-091, MR243, SR378, SR489-533. In this circumstance, the information sought by Request Nos. 28-29 is obviously relevant to identify and quantify, by some appropriate means, the Product Enterprise should have delivered through Magellan's facilities.

None of Enterprise's arguments about overbreadth and abuse of discretion are valid, and all of the cases Enterprise relies on are factually distinguishable. *See, e.g.*, *In re Am. Optical Corp.*, 988 S.W.2d 711 (Tex. 1998) (orig. proceeding) (overbroad requests for every document ever produced relating to asbestos, over fifty-year period); *Dillard Dep't Stores, Inc.*, 909 S.W.2d at 492 (overbroad requests for every incident between 1985 and 1990 in 227 stores nationwide); *In re Graco Children's Prods., Inc.*, 210 S.W.3d 598, 600 (Tex. 2006) (orig. proceeding) (overbroad request for 20 categories of documents regarding products and defects different from product and defect alleged in suit); *Texaco, Inc.*,

898 S.W.2d at 815 (overbroad requests for documents regarding substances to which plaintiffs never alleged exposure).

Furthermore, Enterprise has not shown that it lacks an adequate remedy by appeal. Magellan has shown a reasonable expectation of obtaining substantial benefit from the compelled discovery. By contrast, Enterprise has not given this Court *any* specifics showing that compliance will impose a significant burden on Enterprise, much less one "far out of proportion" to the benefit Magellan may gain.

## B. NONE OF THE SUBPOENAS ARE OVERBROAD

Enterprise's argument about alleged overbreadth of Magellan's subpoenas to the three non-parties mostly just rehashes the same invalid arguments refuted above.

Magellan's subpoenas contain the same scope-limiting definitions used in Magellan's requests to Enterprise, so the subpoenas *only* seek information about crude oil and condensate sold at or transported from one of the relevant Origin Points, and *only* during the period relevant to the case.

The requested contracts with Enterprise, and related communications with Enterprise, are relevant to the issues in the case,

for the same reasons discussed above. Each subpoena also requests the non-party's own transactional data, as available, showing what Eagle Ford Product was purchased, sold or delivered under those agreements, on what terms, and how and where the barrels were transported to a final destination. That information is relevant to determine whether Enterprise provided incentives aimed at steering product transportation around Magellan's distribution system, and to quantify the extent of Enterprise's breach of its commitment to exclusively utilize Magellan's facilities. And obtaining the non-party's own transactional data is necessary, especially since Enterprise claims not to know or be able to determine how or where the barrels were delivered to a final destination after Enterprise transported them from an Origin Point to ECHO Terminal and then sold them back to the non-party.

Enterprise offers no proof of any significant duplication between the documents the subpoenaed non-party must provide (if available) and those Enterprise is compelled to provide (if available). In fact, Enterprise has said it does not have all of the relevant contracts with the non-parties and probably does not have much of the related inter-party communications (MR240, MR371-372, MR376-377), and by definition,

Enterprise does not have the *non-party's* transactional records. In any event, the possibility of some duplication, depending on what Enterprise may *eventually* produce, does not render the subpoenas overbroad.

Neither are the subpoenas overbroad merely because they do not identify the non-party custodians whose records may need to be searched. Magellan has no way to know who the relevant custodians are. The only case Enterprise cites as support for its assertion that the subpoenas are "facially unreasonable and overbroad" for failure to identify custodians and supply email search terms (Pet., p. 26), does not even address any such issue. *See In re Nat'l Lloyds Ins. Co.*, 507 S.W.3d 219 (Tex. 2016) (orig. proceeding).

Moreover, neither Enterprise nor any subpoenaed non-party has shown that Magellan's subpoena imposes on the non-party a heavy burden that far outweighs the benefit to Magellan.

## II. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY OVERRULING ENTERPRISE'S "TRADE SECRETS" OBJECTION

The trial court did not abuse its discretion when it overruled Enterprise's trade secret objections to Magellan's discovery requests, because: (1) all discovery the trial court compelled Enterprise to produce is within the scope of Magellan's contract audit right because it is

reasonably necessary to determine whether and to what extent Enterprise has breached the Distribution Agreement, and thus cannot constitute trade secret information Enterprise is privileged to withhold *from Magellan*; (2) in any event, Enterprise made no *prima facie* showing that any *particular* information responsive to Magellan's requests is a trade secret; (3) Enterprise waived any trade secret protection as to all compelled discovery; and (4) though not required, Magellan established that all compelled discovery is material and necessary for a fair adjudication of Magellan's claims, including its fraud claim as well as its breach of contract claim.

**A.  TO SUPPORT ITS TRADE SECRET OBJECTIONS, ENTERPRISE BORE THE BURDEN TO PROVE THAT THE SPECIFIC INFORMATION SOUGHT BY MAGELLAN QUALIFIES AS TRADE SECRET**

A party who asserts a trade secret privilege as to information sought in discovery bears the burden to prove that the information is trade secret. *In re Bass*, 113 S.W.3d 735, 737 (Tex. 2003) (orig. proceeding); *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 612–13 (Tex. 1998) (orig. proceeding). *See* Tex. R. Evid. 507. Only if and when such party establishes the trade secret character of the information does the burden shift to the requesting party to show that discovery of the

information is necessary for a fair adjudication of its claims. *In re Bass*, 113 S.W.3d at 738; *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d at 610.

When a party like Enterprise challenges the trial court's finding that information is *not* a trade secret, the appellate court is "bound by the trial court's finding unless the evidence conclusively establishes, as a matter of law, that the information was a trade secret." *Waste Mgmt. of Texas, Inc. v. Abbott,* 406 S.W.3d 626, 631 (Tex. App.—Eastland 2013, pet. denied). And when the evidence is conflicting, an appellate court must not substitute its judgment for that of the trial court, and thus may not find that the trial court abused its discretion in finding that information is not trade secret. *Arrow Chem. Corp. v. Anderson*, 386 S.W.2d 309, 313 (Tex. Civ. App.—Dallas 1965, writ ref'd n.r.e.).

**B. ALL COMPELLED DISCOVERY IS WITHIN THE SCOPE OF MAGELLAN'S CONTRACT RIGHT TO AUDIT ENTERPRISE, AND THUS CANNOT CONSTITUTE TRADE SECRETS ENTERPRISE IS PRIVILEGED TO WITHHOLD FROM MAGELLAN**

Texas law requires that a trade secret be "secret", *i.e.*, that it be neither generally known by others in the same business nor readily ascertainable by "proper means," such as by contractually-authorized audit. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(4), (6); *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983); *J.C. Kinley*

*Co. v. Haynie Wire Line Serv., Inc.*, 705 S.W.2d 193, 198 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

Information which a company (Enterprise) grants its competitor (Magellan) a contract right to review for purposes of auditing compliance with the parties' contract, cannot qualify as trade secret information that the first company is privileged to withhold from *the other contracting party,* even though the information may still constitute a trade secret *as to others.*[10] This principle is clearly illustrated by *Millet v. Crump*, 687 So.2d 132 (La. App. 5 Cir. 1996). In that case, the plaintiff sought to prevent the defendant from reviewing the customer accounts of the insurance business the plaintiff had bought from the defendant. In their contract, the seller (defendant Crump) agreed that all information pertaining to the customer accounts "is confidential and to be regarded as Trade Secrets." *Id.* at 135. However, the contract also provided that the seller "shall have the right to audit all Crump Ins. accounts on a monthly basis." *Id.* Thus, the court held that since the parties' contract

---

[10] *See Waste Mgmt. of Texas, Inc.* 406 S.W.3d at 635 (holding that although Waste Management provided pricing and volume information to Williamson County under a contract granting the county the right to access such information for audit purposes, Waste Management did not thereby waive trade secret protection as to a *third party* who sought disclosure via open records request).

"allowed [Crump] access to these files in order to conduct her audit," "these files were not treated as confidential or as trade secrets" as between the contracting parties. *Id.* at 136.[11]

In connection with Magellan's pre-suit audits, Enterprise provided *some* of its Eagle Ford contracts with its customers; *some* transaction reports identifying Eagle Ford Product purchase/sale transactions by date, customer, location, and volume; and *some* information regarding Enterprise's operations and methods with respect to transportation and delivery of Product Enterprise purchases and owns at a specified Eagle Ford Origin Point. Consistent with the law discussed above, Enterprise has never claimed that any of the selective information it provided to Magellan for audit, pursuant to Section 4.4 of the Distribution Agreement, constitutes a trade secret vis-a-vis Magellan. However,

---

[11] *See also Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 260 (Va. 2016) (holding that there can be no misappropriation of a trade secret where acquisition of the information is expressly authorized by contract, because acquisition by contract right constitutes a proper means).

Enterprise asserted a trade secret objection to 20 out of 33 Magellan requests. *See* MR287.[12]

The trial court did not abuse its discretion by overruling Enterprise's trade secrets objections, because all 20 of the requests at issue seek information which, like the limited information Enterprise provided during Magellan's pre-suit audits, is also reasonably necessary to determine whether and to what extent Enterprise has breached the Distribution Agreement. The compelled discovery is within the scope of Magellan's bargained-for right to audit Enterprise and, therefore, cannot constitute trade secret information Enterprise is privileged to withhold.

This includes requests for documents pertaining to the terms of the contracts between Magellan and Enterprise or Enterprise Pipeline (Request Nos. 1-3); the reasons why Enterprise and its affiliate pursued the contracts with Magellan (Request Nos. 4-6); and Enterprise's plans,

---

[12] Enterprise did not assert, in its original responses (MR287) or its amended responses (SR461), a trade secret objection to Request No. 32, the request for documents Enterprise provided to Magellan in connection with Magellan's audits. The only other requests to which Enterprise did *not* object on trade secret grounds were Nos. 7-9 (authorizations to enter into the agreements between Magellan and Enterprise or Enterprise Pipeline); No. 11 (inter-party communications about those agreements); Nos. 12-16 (Enterprise documents commenting on the meaning or effect of, or referring to, the parties' agreements); Nos. 30-31 (inter-party communications and Enterprise internal communications regarding Magellan's audits; and No. 33 (documents supporting Enterprise's credit/offset defense).

goals, projections, etc. regarding the marketing or transportation of its Eagle Ford Product to its ECHO Terminal, Magellan's Genoa Junction connection, or other Houston area destinations (Request No. 10). The contents of those documents reflect circumstances surrounding the Distribution Agreement, which may properly inform as to the intent and meaning of the contract, and thus are pertinent to evaluation of contract compliance or breach.

Magellan's right to audit also encompasses marketing, buy-sell, and transportation agreements pertaining to Eagle Ford Product, between Enterprise and an affiliate or a customer (*e.g.*, other agreements of the type Enterprise previously provided), related communications between the contracting parties, and other documents showing which party initiated the contract discussions and why (Request Nos. 17-23). All such information is necessary to evaluate whether the agreements were made for good faith business reasons, or in a bad faith effort to evade Enterprise's obligation to make exclusive use of Magellan's facilities, which the law forbids. *See* MR253.

Information within the scope of Magellan's audit right also includes any transactional reports and data available to Enterprise, which permit

identification, quantification, and tracing of the ownership, transportation, distribution and ultimate delivery of Eagle Ford Product Enterprise owned or controlled at any designated Origin Point (Request Nos. 24-26, 28-29). Magellan's need for such information results, in no small part, from the operating methods Enterprise has adopted with respect to ownership, transportation and delivery of the Product it owns at an Origin Point—methods like batching Product at the Origin Point, selling it back to the producer before it reaches Magellan's distribution system, not tying or tracking an Origin Point barrel to a barrel sold at an intermediate location such as ECHO Terminal, and allegedly failing to track further transportation to any final destination including a designated Destination Point.

In essence, Enterprise is using methods which allow it to claim that the Product Enterprise owns at an Origin Point is not covered by the exclusive-use commitment set forth in the Distribution Agreement because the Product loses its identity and enters a black box once Enterprise transports it to its ECHO Terminal and resells it to the producer. To fully and fairly audit and evaluate contract compliance or breach, Magellan is entitled to examine all available documents which

may enable it not only to identify and quantify 100% of the Product volumes Enterprise owned at an Origin Point, but also to trace how and where all such Product was ultimately delivered. It is preposterous for Enterprise to contend, as it does, that all Magellan really needs to know is the volume of Product Enterprise owned at an Origin Point and the volume Enterprise transported through Magellan's distribution system to a designated Destination Point.

In sum, none of the information the trial court compelled Enterprise to produce can qualify as an Enterprise trade secret, at least not as to Magellan, because all of it falls within the scope of Magellan's contract audit right and is not secret at all.

C.    IN ANY EVENT, ENTERPRISE PRESENTED NO *PRIMA FACIE* PROOF THAT ANY INFORMATION RESPONSIVE TO MAGELLAN'S DISCOVERY REQUESTS IS TRADE SECRET, AS REQUIRED

As its "proof" that the information Magellan seeks from Enterprise and/or the subpoenaed non-parties is Enterprise trade secret information, Enterprise relies entirely on the Affidavit of Brent Secrest,

dated August 10, 2017 ("Secrest Aff.").[13] But that affidavit falls far short of sufficient proof.

The Secrest Affidavit is fundamentally flawed not only because it fails to address the impact of the audit right Enterprise expressly granted to Magellan, but also because it fails to show that any specific information actually responsive to Magellan's discovery requests would qualify as trade secret in the absence of Magellan's audit right. Although ¶ 10 of the Secrest Affidavit recites the factors relevant to a trade secret determination, none of the factors can be evaluated or applied in a vacuum, without identification of the specific information in question. That is, the specified factors presuppose that the party claiming trade secret protection from discovery has identified "*the information*" actually at issue. Indeed, Enterprise effectively concedes this burden of proof when it states that "[o]nce Enterprise establishes that *the information*

---

[13] Although the Secrest Affidavit is titled "Affidavit of Brent Secrest in Support of Enterprise Crude Oil, LLC's Motion for Protective Order," is dated the same date (August 10, 2017) that Enterprise filed its first motion for protective order/stay of discovery, and makes assertions in language virtually identical to that motion, Enterprise did not submit the affidavit at that time. Enterprise submitted this affidavit in support of its October 18, 2017 Amended Motion to Quash (MR160), its November 28, 2017 Response to Magellan's Motion to Compel (MR390), and its November 28, 2017 Motion for Entry of a Protective Order Governing the Production of Confidential Information (MR474).

*Magellan is demanding* is trade secret, *such information* cannot be produced until Magellan establishes that such information is necessary for a fair trial." Pet., p. 27-28 (emphasis added). But Enterprise made no such showing. This is why Enterprise's argument—that the Secrest Affidavit proves its trade secret claim—finds no support in the lone case Enterprise cites on this point, *In re Union Pac. R.R. Co.*, 294 S.W.3d 589, 592 (Tex. 2009) (orig. proceeding) (per curiam).[14]

Instead of identifying any specific information sought by Magellan, and presenting evidence detailing the reasons why that information is trade secret, Enterprise has taken a fundamentally different (and fatally

---

[14] *In re Union Pac. R. R. Co.* was a train wreck case where the plaintiff claimed injury from inhaling chlorine gas released when Union Pacific's train failed to stop at a signal, collided with another train, and derailed, releasing toxic chlorine gas. The plaintiff alleged that the railroad should have positioned the chlorine car farther toward the rear of the train. In discovery, the plaintiff sought disclosure of *three years of specific rates* Union Pacific charged for handling the shipping customer's chlorine chemicals as compared to the rates it charged for handling non-hazardous materials. The Supreme Court noted that a trial court must first determine "whether *the requested production* constitutes a trade secret," and that the issue for decision was whether the trial court abused its discretion by ordering Union Pacific to produce "confidential 'rate structures' which include formulas to determine shipping rates charged to customers." 294 S.W.2d at 590, 591 (emphasis added). Unlike Enterprise, Union Pacific provided two affidavits specifically "explaining why *this rate information*" constituted a trade secret. *Id.* at 592. For that reason, and because the plaintiff did not dispute that the requested rate structures were trade secrets, the Supreme Court concluded that Union Pacific had established its trade secrets claim. *Id.* On its facts and its face, *In re Union Pac. R. R. Co.* does not support Enterprise's argument that "parties with as (or less) detailed affidavits have obtained relief to protect their trade secrets." Pet., p. 32.

flawed) approach in its quest to block discovery on trade secret grounds. First, before the trial court, and even here, Enterprise makes sweeping assertions to the effect that virtually all of its business information is trade secret, except to the extent Enterprise decided to disclose it in Magellan's audits.[15] Second, Enterprise falsely claims that Magellan's discovery requests to Enterprise and the subpoenaed non-parties *must* invade Enterprise's trade secret information because they encompass virtually all such confidential business information—*e.g.*, that Magellan's requests seek "detailed information about *the entirety of Enterprise's crude oil business in Eagle Ford and South Texas*" (MR478, emphasis added), its "business plans, proposals, goals, projections, budgets, estimates, statistics, and histories *for its entire Gulf Coast operations*" (Pet., p. 9, emphasis added), "Enterprise's *full playbook* of trade secrets *for the Gulf Coast region*" (Pet., p. 16, emphasis added); and "*nearly every document concerning Enterprise's Gulf Coast operations*" (Pet., p. 29, emphasis added). Third, bootstrapping on such false claims,

---

[15] For example, in its Petition Enterprise asserts that all of its "confidential business information" constitutes "Enterprise's trade secrets … which Enterprise has spent many years developing… ." Pet., p. 13. This can also be seen in Enterprise's trade secret objection to the great majority of Magellan's requests.

Enterprise asserts that the Secrest Affidavit proved that "the breadth of Magellan's requests and customer subpoenas *necessarily* seek discovery of Enterprise's trade secrets." Pet., pp. 28-30. In reality, the Secrest Affidavit contains four short paragraphs that merely parrot Enterprise's gross mischaracterizations of the scope of Magellan's requests, never specifically identifying a single request, much less explaining how the information actually sought by that request is trade secret. MR407.[16]

This explains why Enterprise's fallback argument is that all the information it seeks to withhold qualifies as trade secret in combination or compilation. *See* Pet., p. 29. However, that argument fails for the same reasons discussed above. *See Brigham Young Univ. v. Pfizer, Inc.*, 861 F.Supp.2d 1320, 1323–24 (D. Utah 2012) (to prove trade secret by compilation of elements, "[s]imply pointing to a large amount of information and claiming it is secret will not do"); *VFD Consulting, Inc. v. 21st Servs.*, 425 F.Supp.2d 1037, 1049 (N.D. Cal. 2006) (denying a

---

[16] The closest Enterprise ever comes to identifying a particular request claimed to invade its trade secrets is when it says the trial court compelled production of trade secret documents "such as those responsive to Request for Production No. 10." Pet., p. 31. But the Secrest Affidavit never identifies any specific Enterprise documents which are actually responsive to that scope-limited request. *See* discussion above. Furthermore, any such responsive documents that may exist are within the scope of Magellan's audit right and, therefore, cannot be "trade secret" as to Magellan.

compilation trade secret claim because plaintiff had failed to show "with any particularity, how [plaintiff] organized or combined the materials in a manner that rises to the level of a legally protectable trade secret"); *Jostens, Inc. v. Nat'l Comput. Sys., Inc.*, 318 N.W.2d 691, 699 (Minn. 1982) (denying compilation trade secret claim, noting: "[W]e are plagued with the elasticity of plaintiff's claim. Simply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status.")

The problem with all of that—aside from the fact that Enterprise has made contradictory representations to the trial court and this Court[17]—is that Enterprise's mischaracterization of the breadth of Magellan's discovery requests is far beyond mere hyperbole; in fact, it is patently false. As shown in the preceding section of Magellan's argument, Magellan's discovery requests are ***nowhere near*** that broad but are, in

---

[17] Here, Enterprise represents that "[t]he trial court compelled Enterprise to respond to requests that would encompass *volumes* of proven trade secrets." Pet., p. 27 (emphasis added). But in the trial court, to support its request to hamstring Magellan with a protective order allowing Enterprise to designate all of its "trade secret" information for "Outside Attorney's Eyes Only," Enterprise represented that its trade secret documents comprise only a "*select group* of highly sensitive information." MR474 (emphasis added), SR403.

fact, carefully tailored and reasonably limited in scope to information directly relevant to Magellan's claims and damages.

## D. ENTERPRISE WAIVED ANY POTENTIAL TRADE SECRET PRIVILEGE AS TO MAGELLAN

To reiterate, during Magellan's audits Enterprise never claimed that any of the information it disclosed was trade secret, nor did it assert a trade secret objection to Magellan's subsequent discovery request for the same information. Yet when it has suited Enterprise, Enterprise has *implied* that the data it provided for audit *is* (or was) trade secret: "disclosure of some trade-secret information subject to a confidentiality agreement does not mean that Magellan is entitled to disclosure of *all* such information." MR397 (italics original). But in fact, it does mean that.

Texas Rule of Evidence 511(a) provides that "[a] person upon whom these rules confer a privilege against disclosure waives the privilege if … the person … voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged." Tex. R. Evid. 511(a). In other words, "a privilege may not be waived selectively to disclose only such evidence as may be beneficial to the party holding the privilege." *Bailey v. State*, 469 S.W.3d 762, 774 (Tex. App.—Houston [1st Dist.] 2015)). *See* 1 *McCormick on Evidence* §

93 (7th ed. 2013) ("Waiver may be found … from conduct such as partial disclosure which would make it unfair for the client to invoke the privilege thereafter.").

There is no doubt that the information Enterprise provided for audit was a significant (albeit incomplete) part of the universe of *compelled* discovery Enterprise *claims* is trade secret, and that the prior disclosure, pursuant to Section 4.4 of the Distribution Agreement, was not itself privileged as to Magellan. Enterprise cannot have it both ways. If the data disclosed during audit was not trade secret vis-a-vis the contracting party holding a voluntarily granted contract right to audit, then neither is the data Enterprise was ordered to produce. On the other hand, if Enterprise disclosed trade secret information, then it waived any potential trade secret privilege as to the rest of the information the trial court compelled Enterprise to produce.

E. **THOUGH NOT REQUIRED, MAGELLAN SHOWED A REASONABLE NECESSITY FOR THE DISCOVERY**

When the party asserting trade secret protection meets its burden of proof, which Enterprise failed to do, the requesting party's burden is merely to show a "reasonable necessity" for the information, which "depends on whether the trade secret's production is material and

necessary to the litigation." *In re Bass*, 113 S.W.3d at 738, 743 (citation

and internal quotation marks omitted). "We have not stated conclusively

what would or would not be considered necessary for a fair adjudication,

indicating instead that the application of the test would depend on the

circumstances presented. The degree to which information is necessary

in a case depends on the nature of the information and the context of the

case." *In re Union Pac. R. R. Co.*, 294 S.W.3d at 592 (per curiam) (citation

omitted) (alterations omitted) (internal quotation marks omitted).[18]

Though it was not required, Magellan showed reasonable necessity

through testimony of its lead auditor, who explained that to fully and

fairly verify the extent of Enterprise's breach of its commitment to make

exclusive use of Magellan's facilities—especially in light of the black box

operating methods Enterprise revealed in audits—Magellan needs to

---

[18] In *In re Union Pac. R. R. Co.,* the Court found a failure to show reasonable necessity, but the case is clearly distinguishable on its facts. There, the plaintiff claimed she needed discovery of certain Union Pacific rate structures, to rebut the railroad's claim that placing hazmat rail cars in the back of the train would be cost-prohibitive, and to argue that higher rates for hazardous materials handling were an acknowledgment of a greater duty to take precautions. But two considerations led the Court to conclude that the plaintiff had failed to show reasonable necessity. First, Union Pacific admitted that it was financially able to reposition the railcars, so discovery of specific rates was unnecessary to rebut the railroad's "cost-prohibitive" argument. Second, Union Pacific admitted that it charged higher rates to ship hazardous materials versus non-hazardous materials. Therefore, said the Court, "it is unclear to us, and [plaintiff] has not explained, why she needs the *specific* rate structures to advance this negligence theory." *Id.* at 593 (emphasis in original).

discover information Enterprise refused to provide for audit, including information showing where all of the Eagle Ford Product Enterprise owned at an Origin Point was ultimately delivered, how it was transported to those destinations, and why Enterprise did not utilize Magellan's facilities. MR322-327.

In addition, Magellan showed that the other information Enterprise was compelled to produce is material and necessary (1) to debunk the contract interpretation Enterprise asserts and has previously used as an excuse to refuse Magellan's requests for the all of the transactional data needed for a full and fair audit, (2) to corroborate that Enterprise deceived Magellan when it represented that Enterprise wanted and needed to utilize Magellan's facilities (as opposed to the ones Enterprise owned or was planning to develop), and when it represented that Enterprise intended to make exclusive use of Magellan's facilities for delivery all of Enterprise's marketing volumes of Eagle Ford Product from an Origin Point to a Destination Point (without revealing any Enterprise plans to circumvent that use in the ways Enterprise is now known to have done); (3) to corroborate that Enterprise never intended to perform the 10-year exclusive use commitment it made to induce

Magellan's expenditure of tens of millions of dollars on expansion and improvement of its distribution facilities; and (4) to corroborate that Enterprise's complete failure to utilize Magellan's facilities is due not to good faith business reasons but to bad faith efforts to evade Enterprise's transportation commitment to its competitor, Magellan. And none of that material information is available from another source.[19]

Due to extensive motion practice, briefing, and arguments on the merits of the case as well as the discovery issues, the trial court is steeped in the context of the case and the nature of the information material and necessary to the litigation. Thus, the trial court was in the best position to weigh the conflicting evidence and determine whether Enterprise sufficiently proved any valid trade secret privilege—including whether, under Tex. R. Evid. 507(a), no such privilege exists because "non-disclosure will tend to conceal fraud or otherwise work injustice")—and even if so, whether Magellan also showed reasonable necessity for the discovery. And there is simply nothing to support Enterprise's argument

---

[19] *Cf. In re Rockafellow*, 2013 WL 1836451, at *10 (Tex. App.—Amarillo Apr. 30, 2013) (orig. proceeding) (balancing claimed need for defendant's customer list against potential harm of disclosure, and finding inadequate showing of need where evidence indicated requester could obtain the information from other sources).

that the trial court abused its discretion when it overruled Enterprise's trade secret objections and compelled production.

### F. THE PROTECTIVE ORDER FULLY PROTECTS ANY INFORMATION THAT MAY BE TRADE SECRET AND IS NOT AN ABUSE OF DISCRETION

Nothing in Enterprise's Amended Petition supports its argument that the trial court's approval of the Protective Order (SR534-543) amounts to a clear abuse of discretion warranting mandamus relief. The Protective Order strikes an appropriate balance between the parties' competing interests in discovery of any trade secret information, providing more than adequate protection for any real trade secret information that Enterprise, Magellan, or any non-party may produce.

Enterprise's objections to the Protective Order concern its restrictions on review of Enterprise-produced "Attorneys Eyes Only" ("AEO") information by Magellan's in-house counsel, or by Enterprise's own current or former employees, and the purported risk associated with such review. None of those objections have merit.

The Protective Order strictly limits access to any confidential or trade secret information. As Enterprise requested, the trial court ordered two-tiered protection allowing any producing party or non-party to

designate any "Classified Information" as either "Confidential" or AEO. SR534-535. The only Magellan representatives authorized to see any AEO information produced by Enterprise or a non-party are: (1) Magellan's outside counsel in this case; (2) Magellan in-house counsel who (a) *manage litigation,* (b) are *actively involved* in assisting Magellan's outside counsel in this action, and (c) *do not make or participate in competitive business decisions;* (3) Magellan auditors who (a) are *actively involved* in assisting Magellan's outside counsel in this action, and (b) *do not make or participate in competitive business decisions*; and (4) independent experts or consultants. *Id.* Before they can see any AEO information, any qualified in-house counsel, auditors, and experts/consultants must also sign a document agreeing to be bound by the Protective Order, which also provides that recipient's *use* of AEO or any other "Classified Information" produced by another party or non-party must be "solely for" this litigation and "for no other purpose." SR538. Thus, the Protective Order is far more restrictive than the parties' audit-related confidentiality agreement which, as noted above, allowed the same kinds of information to be reviewed by any Magellan representative with a "legitimate need." MR468.

It is true that for eligible in-house counsel who may review another party's AEO information, the Protective Order does not disqualify them from participating in business decisions for a specified period after this litigation is concluded. *See* Pet., p. 39. However, Enterprise conveniently fails to mention that it never sought such a limitation on in-house counsel. To the contrary, in fact, Enterprise forcefully advocated ***against*** it. MR837. Enterprise is in no position to reverse course and claim, before this Court, that the trial court abused its discretion by "failing" to require that in-house counsel avoid participation in any business decisions for a specified time following this litigation.

In any event, Enterprise provides no support for its argument that access by Magellan's in-house litigation counsel carries a significant risk that Magellan will inadvertently disclose or deliberately misuse AEO information, in violation of the Protective Order. Brent Secrest's latest affidavit, dated December 21, 2017, contains certain general assertions about "flat" organizational structures and associated risks that information learned by an in-house attorney will be disclosed or used in violation of a court's protective order. *See* MR728-729. As it relates to Magellan, however, Mr. Secrest's assertions and conclusions are sheer

speculation; he does not even claim to have any personal knowledge about Magellan's in-house litigation counsel or Magellan's internal structures and processes. *Id.* Mr. Secrest's affidavit also mischaracterizes the pending proceedings before the Federal Energy Regulatory Commission ("FERC"), and speculates that information Magellan's in-house counsel learn through discovery in this unrelated case will inevitably "bleed over" into the FERC proceeding. MR729. That assertion, which impugns the integrity and professional ethics of Magellan's in-house counsel, is baseless and false.

Equally specious is Enterprise's claim that the Protective Order lacks adequate protection with respect to Enterprise-produced AEO information that may be shown to Enterprise's *own* current or former employees. *See* Pet., pp. 39-40. The Protective Order permits AEO information to be disclosed only to *certain* of Enterprise's current or former employees, and only under *certain conditions.* Specifically, under paragraph 2(a)(iv), only those current or former Enterprise employees who are "reasonably believed to have knowledge or information relevant to the litigation" may see Enterprise-produced AEO information; for former employees, the person must have been employed by Enterprise

when the information was generated; and all current and former employees must sign a document agreeing to be bound by the Protective Order. SR535.

In all probability, the only Enterprise employees who have relevant knowledge, and thus will be eligible to see Enterprise-produced AEO information, are or were senior executives or managerial-level personnel in Enterprise's crude oil marketing business. By Enterprise's admission, all of those people have or had access to the kinds of business information Enterprise is compelled to produce pursuant to Magellan's requests. In his affidavit dated August 10, 2017, Brent Secrest testified that "[n]o one *outside of Enterprise's senior executives and the crude marketing group* have access to comprehensive business and strategic information" of the type Magellan seeks to discover. MR178 (emphasis added). Tellingly, none of Mr. Secrest's affidavits identify a single current or former employee who is knowledgeable about the case and is someone who does not or did not have access to Enterprise's "comprehensive business and strategic information." In other words, all of Enterprise's assertions about its internal compartmentalization of sensitive business information are misleading diversions. Enterprise has never asserted

(much less proved) that any sensitive business information sought by Magellan is or ever was off-limits to any current or former employee who may be a witness in this case.

Enterprise also mischaracterizes the competing interests that must be appropriately balanced in a protective order. First, Enterprise understates Magellan's interest in discovery of Enterprise's business plans, methods and practices regarding marketing and delivery of Product Enterprise purchases and moves from an Eagle Ford Origin Point. Magellan's interest is not merely a "highly generalized" (Pet., p. 39) interest in prosecuting its claims. Rather, for all the reasons discussed above, the discovery at issue goes to the heart of Magellan's claims for breach of contract and fraud, and quantification of damages despite Enterprise's attempts to camouflage relevant Product movements to the point they become untraceable and unauditable.

Second, Enterprise greatly overstates any "competitive harm" it could conceivably suffer in the highly unlikely event any of the few Magellan attorneys or Enterprise employees who may review its so-called "trade secret" information—none of which is actually trade secret vis-a-vis Magellan—were to use or disclose it in direct violation of the

Protective Order they will have committed (in writing) to follow. The truth is that before this suit was filed, Enterprise provided to Magellan, without the strict protections contained in the Protective Order, much of what Enterprise now claims to be trade secret information regarding its crude oil marketing and transportation agreements, methods and practices. *See* SR493-511. In addition, Enterprise's public filings in this action describe those agreements, methods and practices in substantial detail. *See* MR082-158. Given all of the allegedly confidential information Enterprise has publicly disclosed, or provided for review by any Magellan employee with a "legitimate need," its claims about the "competitive harm" that could result from unauthorized use or disclosure of any other information Enterprise must produce—which, of course, the Protective Order strictly prohibits—is not credible and provides no basis to conclude that the trial court committed an abuse of discretion.

Finally, none of the cases Enterprise cites support its position that the Protective Order constitutes a clear abuse of the trial court's discretion in light of the facts of this case and the competing interests to be balanced. Every case Enterprise relies on turned on its own peculiar facts, and involved discovery of highly sensitive if not ultra-sensitive

information where the potential harm was different in kind and more serious in nature than any present here, and where the risk of improper disclosure was not purely speculative (as it is here).[20] Enterprise's cases do not, either individually or collectively, establish any immutable rule that a protective order must include any protections more stringent than those contained in the Protective Order the trial court entered in this case.

Indeed, many courts have approved protective orders containing the same or lesser protections than those found in this Protective Order. *See, e.g.*, *Life Techs. Corp. v. Biosearch Techs., Inc.*, 2011 WL 1157860 at *2-3 (E.D. Tex. Mar. 29, 2011) (permitting two of plaintiff's in-house counsel to review materials designated "highly confidential—outside counsel's eyes only, noting that denying such access would impair the plaintiff's ability to prosecute its claims); *U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1469 (Fed. Cir. 1984) (permitting review by in-house counsel despite the possibility in-house counsel might move into

---

[20] Several of the cases Enterprise cites (Pet., pp. 35-38) are intellectual property cases involving ultra-sensitive information, or employment-related cases where Texas courts have understandably enjoined or placed strict limits on an employee's use or disclosure of trade secrets obtained from a former employer. Again, Enterprise has acknowledged that none of the "trade secret" information it is compelled to produce is "ultra-sensitive." MR538.

other positions); *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*, 682 F. Supp. 20, 22-23 (D. Del. 1988) (permitting defendant's in-house counsel to review plaintiff's confidential materials, noting that "defendant has represented to this Court that its in-house counsel involved in this litigation neither conduct scientific research nor prosecute patents"); *Matsushita Elec. Indus. Co. v. U.S.*, 929 F.2d 1577, 1580 (Fed. Cir. 1991) (reversing injunction preventing company's General Counsel, Senior Vice President and Secretary from accessing competitor's confidential information—"[T]he standard" is not 'regular contact' with other corporate officials who make 'policy,' or even competitive decisions, but 'advice and participation' in 'competitive decisionmaking.'"); *In re Comm'l Metals Co.*, 2017 WL 3712169 (Tex. App.—Dallas Aug. 29, 2017) (orig. proceeding) (finding no abuse of discretion where protective order authorized review by opposing party's president as a surrogate for in-house counsel).

### III. THE TRIAL COURT DID NOT ERR, OR ABUSE ITS DISCRETION, BY COMPELLING DISCOVERY OF ANY INFORMATION ENTERPRISE LABELS AS "PAROL EVIDENCE"

Enterprise's "parol evidence" assault on the trial court's order compelling production responsive to Magellan Request Nos. 1-6 and 12-

16 hinges entirely on its argument that the Distribution Agreement is "facially unambiguous." Pet., p. 41. This is the very same argument, practically verbatim, that Enterprise made in its unsuccessful motion for summary judgment. *See* MR082-158.

In that motion, Enterprise argued that there is only one reasonable interpretation of the 10-year commitment it made in the Distribution Agreement—that Enterprise is obligated to make exclusive use of Magellan's distribution facilities only *if* Enterprise **chooses** to retain ownership of its Eagle Ford crude oil at all times and places along its transport from an Origin Point to a Destination Point and Enterprise also **chooses** to deliver the crude **to Magellan's Connection Point** on its way to a Destination Point. *See* MR082. But as Magellan explained to the trial court in its opposition to Enterprise's summary judgment motion, Enterprise's interpretation renders illusory the commitment it made for the express purpose of inducing Magellan to invest heavily in expansion and improvement of its distribution system, is inconsistent with the overall purpose of the contract, and certainly is not the *only reasonable* interpretation of the contract language when read in context and as a whole. *See* SR073.

Although the trial court denied Enterprise's summary judgment motion following extensive briefing and oral argument (MR159), nothing in the record supports Enterprise's assertion (Pet., p. 42) that the trial court has finally determined whether the Distribution Agreement is or is not ambiguous as it relates to Enterprise's commitment. What *is* clear is that the trial court rejected Enterprise's argument that the only reasonable interpretation of the Distribution Agreement, on its face, is the one Enterprise advocates.

Given the applicable rules of contract construction, it is clearly within a trial court's discretion to permit discovery into the facts and circumstances surrounding a contract *before* the court decides whether the contract is ambiguous, or what it must or may mean. A court must construe a written agreement in light of all the surrounding facts and circumstances. *See First Bank v. Brumitt*, 519 S.W. 3d 95, 109-10 (Tex. 2017); *Banker v. Breaux*, 133 Tex. 183, 128 S.W.2d 23, 24 (1939) (stating that the contracting parties' intention, which is of controlling importance, must be ascertained from their agreement "in the light of the attending circumstances"). This includes consideration of "the undisputed evidence regarding [the contract's] negotiation and purpose." *Basic Capital Mgmt.,*

*Ind. v. Dynex Commercial, Inc.,* 348 S.W.3d 894, 901 (Tex. 2011). Indeed, even when a court concludes that the contract is unambiguous, it may still consider the surrounding facts and circumstances to "aid in the construction of the contract's language." *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). "In other words, the parol-evidence rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *First Bank*, 519 S.W.3d at 110 (internal quotation marks omitted).

Despite this settled law, Enterprise is on a mission to put the cart before the horse, to force the trial court to construe the Distribution Agreement in Enterprise's favor without knowing the surrounding facts and circumstances and without their benefit as an aid in construction of the contract language, at the very least. Enterprise's attack on this aspect of the trial court's discovery order must be seen for what it is: a thinly-disguised and improper request for mandamus relief from the trial court's denial of Enterprise's unmeritorious summary judgment motion. "Mandamus is generally unavailable when a trial court denies summary judgment, no matter how meritorious the motion." *In re Ooida Risk Retention Grp., Inc.*, 475 S.W.3d 905, 913 (Tex. App.—Fort Worth 2015)

(orig. proceeding) (denying mandamus relief on denial of motion for summary judgment); *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 465 (Tex. 2008) (orig. proceeding) (noting that "parties are not 'entitled' to summary judgment" and therefore mandamus is generally unavailable). Only "extraordinary circumstances will justify mandamus review of orders denying summary judgment," and even "[t]he fact that there could potentially be a waste in time and money in proceeding to trial without correction of the alleged error" is insufficient to warrant mandamus relief. *In re State Farm Lloyds*, 2016 WL 902864, at *3 (Tex. App.— Corpus Christi Mar. 9, 2016) (orig. proceeding).

Moreover, despite what Enterprise contends, this is not a case like *In re Islamadora Fish Co. Texas, L.L.C.*, 319 S.W.3d 908 (Tex. App.— Dallas 2010) (orig. proceeding), where after denying summary judgment the trial court ordered discovery that was not relevant under *any theory* asserted in the case. *Id.* at 912 (finding that *by statute*, punitive damages were not recoverable in the case, and concluding that "when punitive damages clearly are not recoverable, information about net worth is not relevant and, as a result, not discoverable").

The information Enterprise claims is wholly *undiscoverable* "parol evidence" concerns the representations Enterprise made about why it was interested in pursuing a contract committing it to exclusively use a competitor's facilities for ten years, what its actual plans and intentions were in respect of that commitment, and other facts and circumstances surrounding the Distribution Agreement. This includes: (1) drafts of the Distribution Agreement and related agreements, and internal or party-to-party communications about the agreements (Request Nos. 1-3), and (2) other documents referencing the agreements, such as ones discussing Enterprise's motivation for entering into the agreements or its view of what the agreements required of Enterprise (Request Nos. 4-6 and 12-16).

While such information is relevant to Magellan's breach of contract claim, it is also relevant and discoverable as to other alleged claims. Take the fraud claim. Enterprise argues that the Distribution Agreement's merger clause bars discovery of anything and everything Enterprise labels as "parol evidence." But it does not. "A merger clause can be disregarded upon pleading and proof of ambiguity, ***fraud***, or accident." *ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711,

719–20 (Tex. App.—Eastland 2007, pet. denied) (emphasis added); *see also Probado Techs. Corp. v. Smartnet, Inc.*, No. CIV.A. C-09-349, 2010 WL 2232831, at *6 (S.D. Tex. June 2, 2010) ("A court may disregard an integration clause and look to prior agreements if there is evidence of ambiguity, fraud, or accident in the written contract."). Here, too, Enterprise stands the law on its head by arguing that the merger clause bars discovery of the very evidence showing why the merger clause should be disregarded.

Or consider Magellan's promissory estoppel claim, another claim on which Enterprise sought summary judgment but lost. If, as Enterprise contends (but Magellan disputes), the Distribution Agreement does not embody the promise Magellan alleges Enterprise actually made regarding exclusive use of Magellan's facilities, Magellan has a claim for promissory estoppel. *See Trevino & Assocs. Mech., L.P. v. Frost Nat'l. Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.) ("promissory estoppel will apply to a promise outside a contract"). Information corroborating the promise Enterprise made, which may well be found in documents responsive to these requests, is also relevant to the promissory fraud claim.

None of the cases Enterprise cites support the argument that the trial court abused its discretion by compelling production responsive to these requests. For example, Enterprise's heavy reliance on *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517 (Tex. 1995) is misplaced. The court in *CBI Indus.* specifically held that "[e]xtrinsic evidence may, indeed, be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, *i.e.*, to 'interpret' contractual terms." *Id.* at 521. Based on the unique facts of that case, the trial court simply concluded that the record was sufficiently developed to warrant summary judgment, and the appellate court affirmed. *Id.* at 522. *See Ford Motor Co.*, 279 S.W.3d at 664 (Tex. 2009) (noting that discovery was unnecessary in *CBI Industries* because "the facts in [that case] were sufficiently developed and all the relevant information was at hand" (alterations omitted) (internal quotation marks omitted)). Here, though, the trial court was within its discretion to find the contrary and permit discovery to proceed.

None of the other cases Enterprise relies on were decided in a discovery context, and all of them involved actual consideration of evidence similar to what Magellan seeks to discover. *See Lake v. Cravens*,

488 S.W.3d 867, 896 (Tex. App.—Fort Worth 2016, no pet.) (reviewing a jury verdict, discussing evidence of agreements exchanged before execution of the contract at issue); *Miller Glob. Props., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 348-49 (Tex. App.—Dallas 2013, pet. denied) (reviewing summary judgment, discussing evidence of pre-contract communications and representations by defendant); *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858-59 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering evidence in the context of summary judgment review); *C & A Invs., Inc. v. Bonnet Res. Corp.,* 959 S.W.2d 258, 260 (Tex. App.—Dallas 1997, writ denied) (considering pre-closing communications between the parties, in the context of summary judgment review).

Finally, but importantly, Enterprise has not shown, as it must for mandamus relief, that discovery of the information it characterizes as parol evidence will burden Enterprise far out of proportion to the benefit Magellan may gain. *See Walker*, 827 S.W.2d at 843.

## CONCLUSION

For the reasons stated above, the Amended Petition for Writ of Mandamus should be denied. Based on the Amended Petition and this Response, Magellan does not believe that oral argument is necessary.

DATED: January 30, 2018     Respectfully submitted,

**GABLEGOTWALS**

s/David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Dr., Ste 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for**
**Real Party in Interest,**
**MAGELLAN CRUDE OIL**
**PIPELINE COMPANY, L.P.**

# CERTIFICATION AND VERIFICATION

STATE OF TEXAS     §
                       §
KENDALL COUNTY  §

BEFORE ME, the undersigned authority, on this day personally appeared David L. Bryant, who, being known to me and duly sworn, stated on his oath the following:

"My name is David L. Bryant. I am over twenty-one years of age, am of sound mind, and am competent to make this verification and to testify to the facts stated here. I am one of the lawyers assisting in the representation of the Real Party in Interest."

"I hereby certify under Texas Rule of Appellate Procedure 52.3(j) that I have reviewed the Response and concluded that every factual statement in the Response is supported by competent evidence, which is included either in the Mandamus Record or in the Supplemental Mandamus Record."

_David Bryant_
David L. Bryant

SWORN TO AND SUBSCRIBED before me on January 30, 2018, to certify which, witness my hand and seal of office.



STEPHANIE M. CARRANZA
Notary Public, State of Texas
Comm. Expires 12-03-2019
Notary ID 130457101

Notary Public

{1789105;}

74

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 9.4</u>

Certificate of Compliance with the Type-Volume Limitation, |
Typeface Requirements, and Type-Style Requirements

1.      This brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(e)(i)(2)(B). According to the word count function available through Microsoft Word 2016, the Response to Petition for Writ of Mandamus contains 14,238 words on pages, excluding the parts exempted by Texas Rule of Appellate Procedure 9.4(e)(i)(1).

2.      This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e). The Response was prepared in Century Schoolbook, a proportionally spaced typeface, using Microsoft Word 2016 in 14-point font for the text, and 12-point font in footnotes.

/s/David L. Bryant
David L. Bryant

## CERTIFICATE OF SERVICE

This is to certify that on January 30, 2018, a true, correct and complete copy of this filing has been served on all counsel of record via a court-approved electronic filing system or by certified mail, return receipt requested. A copy of the filing was also mailed to Respondent by certified mail, return receipt requested to 600 Commerce Street, 6th Floor West, Dallas, Texas 75202.

/s/ David L. Bryant
David L. Bryant

NO. 05-17-01421-CV

IN THE COURT OF APPEALS
FOR THE FIFTH JUDICIAL DISTRICT

**In Re Enterprise Crude Oil, LLC**

Original Proceeding from Cause No. DC-17-7264,
101st Judicial District Court, Dallas County
Hon. Staci Williams, Presiding

INDEX OF SUPPLEMENTAL MANDAMUS RECORD
FILED BY REAL PARTY IN INTEREST

| **Page No.** | **Document Description** |
| --- | --- |
| SR1-72 | 2017-08-10 Defendant's Motion for Protection and to Stay Discovery Pending Resolution of Defendant's Dispositive Motion |
| SR73-340 | 2017-09-18 Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment (w/exhibits) |
| SR341-366 | 2017-09-20 Plaintiff's Response in Opposition to Motion for Protection and to Stay Discovery Pending Resolution of Defendant's Dispositive Motion (w/exhibits) |

{1775032;2}

| Page No. | Document Description |
|---|---|
| SR367-397 | 2017-09-20 Defendant's Reply in Support of Motion for Summary Judgment |
| SR398-488 | 2017-12-27 Plaintiff's Supplement to Response to Defendant's Motion for Entry of Protective Order Governing the Production of Confidential Information (w/exhibits) |
| SR489-533 | 2018-01-02 Plaintiff's Second Supplement to Response to Defendant's Motion for Entry of Protective Order, Filing Exhibit 5 in Redacted Form (w/exhibits) |
| SR534-543 | 2018-01-08 Protective Order |

DATED: January 9, 2018      Respectfully submitted,

**GABLEGOTWALS**

s/David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Dr., Ste 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for
Real Party in Interest,
MAGELLAN CRUDE OIL
PIPELINE COMPANY, L.P.**

{1775032;2}

3

# VERIFICATION

STATE OF TEXAS    §
                       §
KENDALLCOUNTY   §

BEFORE ME, the undersigned authority, on this day personally appeared David L. Bryant, who, being known to me and duly sworn, state on his oath the following:

"My name is David L. Bryant. I am over twenty-one years of age, am of sound mind, and am competent to make this verification and to testify to the facts stated here. I am one of the lawyers assisting in the presentation of Real Party in Interest, Magellan Crude Oil Pipeline Company, L.P."

"The documents contained in SR1-543 are true and correct copies of original documents that were filed in the underlying action and are material to the relief sought in this proceeding."



_____
David L. Bryant

SWORN TO AND SUBSCRIBED before me on January 9, 2018, to certify which, witness my hand and seal of office.

STEPHANIE M. CARRANZA
Notary Public, State of Texas
Comm. Expires 12-03-2019
Notary ID 130457101

_____
Notary Public

{1775032;2}

4

## CERTIFICATE OF SERVICE

This is to certify that on January 9, 2018, a true, correct and complete copy of this filing has been served on all counsel of record via a court-approved electronic filing system or by certified mail, return receipt requested. A copy of the filing was also mailed to Respondent by certified mail, return receipt requested to 600 Commerce Street, 6th Floor West, Dallas, Texas 75202.

/s/ David L. Bryant
David L. Bryant

NO. DC-17-07264

| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | 101st JUDICIAL DISTRICT |
| | § | |
| ENTERPRISE CRUDE OIL LLC, | § | |
| | § | |
| *Defendant*. | § | DALLAS COUNTY, TEXAS |

## <u>MOTION FOR PROTECTION AND TO STAY DISCOVERY PENDING RESOLUTION OF DEFENDANT'S DISPOSITIVE MOTION</u>

Defendant Enterprise Crude Oil LLC ("Enterprise") moves for an order protecting it against abusive and harassing discovery during the pendency of Enterprise's case-ending motion for summary judgment. This motion is brought pursuant to Rule 192.6 of the Texas Rules of Civil Procedure, and to give effect to Rule 1 which provides that the objective of the rules is to obtain a just, fair, equitable and impartial adjudication of the rights of the parties with as great expedition and dispatch and the **least expense** to the parties.

### I.     SUMMARY OF ARGUMENT

This Court should issue an Order staying discovery pending resolution of the threshold legal issues raised in Enterprise's Traditional Motion for Summary Judgment filed on August 4, 2017. Enterprise's summary judgment motion argues that the plain and unambiguous language of the parties' agreement precludes all of Magellan's claims a matter of law. Because the Court need not and indeed cannot consider any extraneous evidence in determining the threshold legal issue raised in Enterprise's motion for summary judgment, discovery at this juncture is unnecessary, premature and would only serve to increase the burden and expense of litigation.

Not only is the discovery Magellan seeks from Enterprise and its customers unnecessary to resolve Enterprise's summary judgment motion, the requests are abusive in that they far exceed the scope of issues raised in the four corners of Magellan's Petition and Enterprise's Answer. Indeed, the sensitive business information Magellan seeks from both Enterprise in its Requests for Production and from Enterprise's customers in Magellan's third-party subpoenas show that Magellan's discovery requests are not meant to discover relevant facts, but rather to harass and impose undue burdens on Enterprise and its customers in an attempt to improve Magellan's bargaining position in the case. The Court should therefore enter an order protecting Enterprise from having to respond to Magellan's requests and quash the non-party subpoenas.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Enterprise and Magellan are parties to a Crude Oil Distribution Agreement[1] that provides as follows:

> 4.1 **Transportation Commitment.** Following the In-Service Date, Shipper agrees:
>
> A. to exclusively utilize the Magellan Facilities for all deliveries of Product that are Owned or Controlled by Shipper; and
>
> B. to use best efforts to cause Shipper's Affiliates to exclusively use the Magellan Facilities for all deliveries of Product that are Owned or Controlled by any of its Affiliates;
>
> provided, that such deliveries are made from an Origin Point and are either:
>
> (i) transported on the Eagle Ford Pipeline System through Echo Terminal to the Connection Point and delivered to any of the Destination Points, or
>
> (ii) transported on the Eagle Ford Pipeline System to the Connection Point and delivered to any of the Destination Points.

---

[1] The Distribution Agreement is Exhibit A to Plaintiff's Original Petition.

2

SR2

The Distribution Agreement defines each of the capitalized terms within Section 4.1 of the Distribution Agreement, including "Owned", "Controlled", "Origin Point", "Destination Point", and "Connection Point."

Applying the plain language of the Distribution Agreement, the transportation commitment applies only to crude oil volumes that do all of the following:

(a) begin at an Origin Point;

(b) flow through one of two Magellan-owned flanges located at Genoa Junction, which connect Magellan's pipeline facilities to either Enterprise's Eagle Ford pipeline facilities or to ECHO Terminal;

(c) arrive at a Destination Point; and

(d) have not been sold to an unaffiliated third-party at any time prior to reaching a Destination Point.

The Distribution Agreement imposes no restrictions on Enterprise's expansion of its crude oil storage and distribution system, nor does it prohibit the sale of crude to third parties at any point along the distribution system. Consistent with the plain language of the Distribution Agreement, Enterprise has spent hundreds of millions of dollars building its own crude oil distribution assets.

Beginning in 2015, Magellan commenced a series of audits seeking to force Enterprise to divulge its customer information and other data unnecessary to confirm payment of the agreed tariffs for crude meeting the criteria set out in the Distribution Agreement. Magellan's rights to audit under the Distribution Agreement are limited to documents necessary to determine whether barrels subject to the agreement have been treated properly. Thus, the only information Enterprise was required to provide Magellan was documentation sufficient to show the disposition of crude that came from an Origin Point up to the time when it ceased to be Owned or Controlled by Enterprise. As to any crude that Enterprise Owned or Controlled from Origin

Point to a Destination Point, and that also went through the Connection Point, Enterprise was required to demonstrate that the tariff was paid.[2]

Nevertheless, Magellan claimed that it was entitled to see data for all volumes coming from the Origin Points regardless whether the crude went through the Connection Point or whether the point of sale was a Destination Point as defined by the Distribution Agreement. As the audit progressed, it became apparent that although the Distribution Agreement specified precise criteria for what crude was subject to the Distribution Agreement, Magellan's position was that the criteria set out in Section 4.1 should be disregarded in favor of a supposed "intent" expressed nowhere within the four corners of the contract. To that end, Magellan demanded that Enterprise provide every contract or title transfer document for all product Enterprise owned at any Origin Point, and that Enterprise include all details about the transferee, the date and place of transfer, and volumes. Magellan then demanded that Enterprise identify all volumes shipped from any Origin Point on systems *other than* the Eagle Ford pipeline, as well as detailed explanations of *other systems* Enterprise used to transport crude, as well as the reasons those systems were used.[3]

The parties continued with the audit of years 2014 and 2015 for several months, and on June 6, 2017, Magellan commenced an audit for year 2016. By this time, Magellan had already instituted the dispute resolution procedure set out in the Distribution Agreement. Thereafter, on June 19, 2017, Magellan filed the instant lawsuit alleging breach of contract, reformation, declaratory judgment, promissory estoppel, and fraud.[4]

Enterprise maintains that the Distribution Agreement means only what the parties agreed it says: that crude starting at an Origin Point that goes through the Connection Point must travel

---

[2] *See* Def.'s Mot. for S. J., at 12 & Ex. 2-C (filed August 4, 2017).
[3] *Id.* at Ex. 2-C.
[4] *See generally*, Pl's Orig. Pet.

on Magellan pipelines if it is Owned or Controlled by Enterprise and going to a Destination Point. If, however, crude oil never gets to the Connection Point under Enterprise's ownership or control—whether because it is sold to a third party or is transported on a different pipeline—the Distribution Agreement's conditions are not met, and such transmissions are outside the agreement's scope.

Because the unambiguous language of the Distribution Agreement bars Magellan's claims as a matter of law, on August 4, 2017, Enterprise filed its motion for summary judgment. The hearing on Enterprise's motion is set for August 29, 2017.

Nevertheless, Magellan seeks through discovery in this suit detailed information about the entirety of Enterprise's crude oil business in Eagle Ford and South Texas, without limitation to crude subject to the Distribution Agreement. It seeks communications and drafts of agreements between Enterprise and its customers, revealing Enterprise's negotiating strategies with respect to the same customers Magellan seeks. It seeks market analyses and data that would reveal Enterprise's entire business plans and strategies for these regions, and details about its operations outside the routes that are the subject of the Distribution Agreement. Its requests encompass attorney work-product and attorney-client communications, as well as parol evidence that the Court cannot consider in interpreting the unambiguous terms of the Distribution Agreement. And it seeks this information from both Enterprise and from non-parties with whom Enterprise is currently doing business.[5]

---

[5] Magellan's First Request for Production of Documents by Defendant Enterprise Crude Oil LLC is attached as **Exhibit A**. Magellan's third-party subpoenas are attached as **Exhibits B through D**.

### III. ARGUMENT

**A.     The Court Should Stay all Discovery Until it Resolves the Threshold Issue of Whether the Parties' Agreements Are Unambiguous.**

Because the resolution of a pending, threshold issue of contractual interpretation stands to dispose of the entire case and moot any need for factual discovery, the Court should enter an order staying all discovery until that threshold issue is resolved. Indeed, this case turns on a purely legal issue of contract interpretation and the discovery Magellan seeks is unnecessary to resolve this question. Trial courts have been given "broad discretion to schedule and define the scope of discovery," and should "limit discovery when 'the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.'" *Id.* (quoting Tex. R. Civ. P. 192.4(b)). Such discovery limitations are especially appropriate pending resolution of important threshold issues that may moot the need for further discovery, such as jurisdictional issues, *id.*; or issues of contract interpretation, *see, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

In *CBI Industries*, the Texas Supreme Court affirmed a trial court's judgment awarding summary judgment to the defendant-insurers on the plaintiff's declaratory judgment and breach of contract claims, even though the trial court granted the motion before allowing the plaintiff any discovery. *Id.* at 520–21. The plaintiff in *CBI Industries* sued various insurance companies for declaratory relief and breach of contract after the insurers denied plaintiff coverage for claims arising out of a toxic spill. *Id.* at 519. Before plaintiff had conducted any discovery, the insurers moved for summary judgment against the plaintiff's claims, arguing that they were entitled to judgment as a matter of law because an unambiguous policy exclusion exempted plaintiff's

insurance claims from coverage. *Id.* The trial court agreed and granted the insurers' motion. *Id.* On appeal, the court of appeals reversed the trial court's judgment because, in the court of appeals' view, the trial court could not decide the insurers' summary judgment motion without first giving the plaintiff "'sufficient time to make reasonable attempts to discover evidence on the issue of applying the contract to the subject matter with which it deals, and thereby raise a fact issue on latent ambiguity.'" *Id.* at 520 (quoting *CBI Indus.*, 860 S.W.2d 662, 666 (Tex. App.—Houston [1st Dist.] 1993)). The Texas Supreme Court disagreed with the court of appeals' reasoning, however, and reversed its decision. *Id.* at 520–21.

The Texas Supreme Court examined the language of the insurance agreement at issue and agreed with the trial court that such language unambiguously excluded the plaintiff's insurance claims from coverage. *Id.* The Court therefore held that there were no factual issues meriting discovery, and that the court of appeals erred in requiring the trial court to give the plaintiff a chance to obtain discovery from the insurers in the hopes of manufacturing contractual ambiguity with inadmissible parol evidence. *Id.* at 522; *see also In re Am. Home Assur. Co.*, 88 S.W.3d 370, 376–77 (Tex. App.—Texarkana 2002, no pet.) (holding that, on remand, the trial court should not permit plaintiff to obtain discovery of either the insurers' deliberations in drafting plaintiffs' insurance policy, or the insurers' communications with state insurance regulators regarding the policy, without first deciding whether the contract was ambiguous and therefore susceptible to the use of such parol evidence).

Like the defendants in *CBI Industries*, Enterprise has argued in its summary judgment motion that the plain and unambiguous language of the parties' agreements precludes Magellan from obtaining any of the relief it seeks.[6] If Enterprise's arguments are correct (and they are), then, as in *CBI Industries*, there are no factual issues meriting discovery, and therefore no reason

---

[6] Def.'s Mot. for S. J. at 14-31.

either to give Magellan a chance to manufacture an ambiguity based on inadmissible parol evidence through discovery, or to impose upon Enterprise the heavy burden of responding to Magellan's very broad discovery requests. The Court should therefore enter an order protecting Enterprise from the burden of having to respond to Magellan's discovery requests until the Court decides this threshold issue.

**B. The Court Should Protect Enterprise from Magellan's Requests Seeking Inadmissible Parol Evidence Because the Information Sought is Not Relevant.**

Several of Magellan's requests seek parol evidence that has no legitimate bearing on the parties' dispute in light of the legal arguments raised in Enterprise's summary judgment motion. Discovery requests that seek production of patently irrelevant information are overbroad because such requests "impose[] a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." *In re CSX Corp.*, 124 S.W.3d 149, 153 (Tex. 2003). Moreover, because overbroad requests for irrelevant information are improper whether they are burdensome or not, a responding party is not required to detail what burdens such requests might encompass. *In re Allstate County Mut. Ins. Co.*, 227 S.W.3d 667, 670 (Tex. 2007). Nor is a responding party required to assert claims of privilege in response to overbroad discovery requests; assertions of privilege are required only after a party has served ***proper*** discovery requests and overbroad requests are ***improper*** by definition. *See Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995).

Parol evidence is inadmissible to alter the meaning of an unambiguous contract. Texas law prohibits "fishing expeditions" like those attempted by Magellan in the absence of a finding by the court that a contract is ambiguous. *CBI Industries, Inc.,* 907 S.W.2d at 520, 522 (Tex. 1995) (awarding summary judgment prior to any discovery because insurance contract was not ambiguous). Where, as here, a contract is ambiguous, discovery into prior drafts and other parol

evidence is improper. *See Tenneco Inc. v. Enter. Prod. Co.,* 925 S.W.2d 640, 647 (Tex. 1996) (holding trial court acted properly in denying additional discovery regarding unambiguous contract and granting summary judgment); *Executive Risk Indemnity, Inc. v. Integral Equity, L.P.,* No. 3:03-CV-0269, 2004 WL 438936, at \*9 (N.D. Tex. March 10, 2004) (Appendix ("App.") at 12) (denying discovery into interpretation of "Related Claims" provision in insurance policy, because provision not ambiguous).

Despite these well-settled principles, Magellan has requested prior drafts, communications between itself and Enterprise, and Enterprise's internal communications leading up to three contracts between the parties.[7] Similarly, it seeks "all documents" that "contain an actual reference (in any form)" to the three contracts,[8] as well as "all documents" identifying "business or commercial considerations" contributing to Enterprise's interest in the three contracts and "any similar agreement."[9] It also requests Enterprise's internal evaluations of the Distribution Agreement's meaning (including by Enterprise's attorneys).[10] Because all of the information Magellan seeks in these requests constitute parole evidence which the Court may not consider in interpreting an unambiguous contract, it is patently irrelevant. The Court should not permit such discovery unless and until the Court has determined that the parties' agreement is ambiguous and requires extraneous evidence to determine its meaning and the parties' intent.

**C.     The Court Should Protect Enterprise from Magellan's Blatant Attempt to Invade Enterprise's Trade Secrets in Order to Gain a Competitive Advantage**

Courts are expressly empowered to issue protective orders to "'protect the [replying party] from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights.'" *In re Alford Chevrolet-Geo*, 997 S.W.2d at 180. A

---

[7] **Exhibit A** (Magellan RFP Nos. 1-3).
[8] *Id.*, Nos. 14-16.
[9] *Id.*, Nos. 4-6.
[10] *Id.*, Nos. 12-13.

---

protective order is particularly appropriate here, where the requests are overly broad and invasive of Enterprise's proprietary business information and trade secrets. *See id.* at 181 (quoting Tex. R. Civ. P. 192.6(b)).

The vast majority of Magellan's requests seek information about Enterprise's business operations and strategies in the Gulf Coast region. This information constitutes trade secrets belonging to Enterprise. For example, the requests seek information about transportation and distribution of crude oil to any "Future Destination Point" – facilities it is undisputed that Magellan *never* constructed.[11] In their totality, the requests would require Enterprise to disclose its entire distribution network and pricing structure,[12] and lay open all of its customer arrangements in the region.[13]

The particulars of Enterprise's business plans and strategies, the terms of its contracts, and the routing of product through its distribution system are not known outside the business, except for the individual participants in a transaction. No one outside of Enterprise has a 360-degree view of the company's operations, which is what Magellan seeks here. Enterprise does not even make such information generally available to its employees. Only Enterprise's senior executives and the individuals within Enterprise participating in the transaction have access to customer contract terms, which also include confidentiality provisions. Only senior executives and the crude marketing group at Enterprise are privy to the company's business plans, and only executives charged with developing strategy and those employees executing them have access to such comprehensive information about the operations of Enterprise's crude oil business in this

---

[11] *E.g.*, **Exhibit A** (RFP Nos. 28-29).

[12] *Id.*, No. 10 (seeking "plans, proposals, goals, projections, budgets, estimates, statistics or histories" of marketing, transportation or delivery of crude); 24 (seeking "all existing Enterprise reports or analyses" relating to Eagle Ford crude, regardless of destination point), 25-26 (seeking information providing Magellan with same assessment and tracing capabilities as Enterprise maintains for its own internal use); 17-23 (documents relating to contracts between Enterprise and its customers, including Enterprise's own negotiating strategies; 27 (charges for crude transported out of ECHO terminal).

[13] *Id.*, Nos. 17-23, 27.

region. Enterprise has invested substantial man-hours and capital in developing its contractual relations and operational systems, knowledge of which would give a competitor as substantial advantage in the Eagle Ford market. For this reason, Enterprise secures its information by maintaining tight security and visitor controls in its buildings, password protecting its computer system, including confidentiality clauses in its contracts, conditioning any joint venture on a nondisclosure agreement, and sharing information internally on a need-to-know basis. Enterprise's competitors are not able to recreate this information from public sources. *See In re Union Pac. R.R.*, 294 S.W.3d 589, 592 (Tex.2009) (orig. proceeding) (per curiam) (citing *In re Bass*, 113 S.W.3d 735, 739 (Tex.2003) (orig. proceeding)).

Because the information sought are trade secrets of Enterprise, Magellan bears the burden of establishing that the information is necessary for a fair adjudication of its claims. *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732–34 (Tex. 2003) (orig. proceeding); *In re Cont'l Gen. Tire*, 979 S.W.2d 609, 610, 613 (Tex. 1998). General assertions of unfairness or relevance are insufficient to demonstrate necessity. *See In re Union Pac. R.R.*, 294 S.W.3d at 592–93; *In re Bridgestone/Firestone*, 106 S.W.3d at 732–33 (unfairness); *In re Cont'l Gen. Tire*, 979 S.W.2d at 613–14 (relevance). The requesting party "must demonstrate with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *In re Goodyear Tire & Rubber*, 392 S.W.3d 687, 696 (Tex. App.—Dallas 2010, orig. proceeding) (quoting *In re Bridgestone/Firestone*, 106 S.W.3d at 732–33). A trial court abuses its discretion if it orders disclosure of trade secrets when the requesting party has not carried its burden to show the information is necessary for a fair adjudication of its claim. *In re Bridgestone/Firestone*, 106 S.W.3d at 734; *In re Cont'l Gen. Tire*, 979 S.W.2d at 615.

None of the information sought by Magellan is necessary to the resolution of this case, and its disclosure would invade the property rights of Enterprise over its trade secrets. "Intrusive discovery measures . . . require, at a minimum, that the benefits of the discovery measure outweigh the burden imposed upon the discovered party." *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322 (Tex. 2009) (orig. proceeding); *In re CSX Corp.*, 124 S.W.3d at 153 (holding relator lacked adequate remedy by appeal where discovery order compelled production of "patently irrelevant" documents); *Tilton v. Marshall*, 925 S.W.2d 672, 683 (Tex. 1996) (orig. proceeding) (mandamus relief may be justified when burden on producing party is far out of proportion to any benefit to requesting party). Enterprise should not be required to lay open its entire operations and strategies within the Eagle Ford region in response to Magellan's fishing expedition.

**D.      The Court Should Protect Enterprise from Magellan's Subpoenas to Enterprise Customers Containing Unduly Burdensome and Duplicative Requests.**

While the discovery rules are intended to make litigation fair, the pragmatic reality is that discovery is often used as "a weapon capable of imposing large and unjustifiable costs on one's adversary." *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 180 (Tex. 1999) (internal quotation marks omitted). Indeed, "[b]ecause costs of compliance [with a requesting party's discovery requests] are usually borne solely by the replying party, a requesting party improves its bargaining position by maximizing those costs." *Id.* Thus it is often the case that "[l]itigants with weak cases . . . heap costs on the adverse party," in the hopes that "these higher costs lead[] the other side to settle on favorable terms." *Id.* (internal quotation marks omitted).

Consistent with its efforts to increase litigation costs and thus its bargaining position, Magellan served substantively identical subpoenas on three of Enterprise's customers.[14] The

---

[14] *See generally* **Exhibits B-D**.

SR12

subpoenas seek all drafts and correspondence relating to agreements with Enterprise involving Eagle Ford crude; granular information about volumes and sales under those agreements; and negotiations leading up to those agreements—the same irrelevant, improper, and trade secret information Magellan has sought from Enterprise. For all the reasons stated above, a protective order is warranted.

Protection is additionally warranted as to the subpoenas because Enterprise's customers are strangers to this litigation. A party causing a subpoena to be served is required to take reasonable steps to avoid imposing undue burden or expense on the entity served. TEX. R. CIV. P. 176.7. The Texas rule, like its federal counterpart, "afford[s] nonparties special protection against the time and expense of complying with subpoenas." *Exxon Shipping Co. v. U.S. Dept. of Interior*, 34 F.3d 774, 780 (9th Cir. 1994). Indeed, the Texas rules require subpoenas to be curtailed if the discovery sought is: (i) unreasonably cumulative or duplicative; (ii) obtainable from some other source that is more convenient, less burdensome, or less expensive; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit. *See* TEX. R. CIV. P. 192.4. "[T]he word 'should' in Rule 192.4 is a directive to the trial court to limit discovery when either subsection is satisfied." *See In re Arras*, 24 S.W.3d 862, 864 (Tex. App.--El Paso 2000, orig. proceeding). Magellan's third-party subpoenas suffer from at least three of the infirmities listed in Rule 192.4.

What is more, the requests are duplicative and seek information obtainable from another source – i.e., Enterprise. A responding party is entitled to a protective order if a party's discovery requests require "the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." *Walker v. Packer*, 827

S.W.2d 833, 843 (Tex. 1992). Instead of first attempting to obtain the information from Enterprise, Magellan's served subpoenas containing identical request for production to Enterprise's non-party customers. The fact that Magellan seeks the very same information from Enterprise as it does from these non-parties demonstrates that the information may be obtained from a less burdensome source. Accordingly, the Court should issue an order quashing the non-party subpoenas until Enterprise has been given a full opportunity to object and respond to the same requests for production, which in any event should be after the Court has resolved Enterprise's pending motion for summary judgment.

## IV. CONCLUSION

Because the Court need not consider any extraneous evidence apart from the parties' unambiguous agreement in resolving this dispute, all discovery should be stayed until the Court has resolved the threshold issue raised in Enterprise's Motion for Summary Judgment. Moreover, despite the requirements that discovery requests be reasonably tailored to include only relevant matters and not used to fish for information, Magellan served facially overbroad and otherwise improper discovery requests on Enterprise and its customers that seek far more information than is relevant and fits the needs of this case. The Court should therefore enter a protective order absolving Enterprise of its burden to respond to Magellan's improper requests, and quash the non-party subpoenas.

Date: <u>August 10, 2017</u>                    Respectfully submitted,

/s/ *Courtney Barksdale Perez*
E. Leon Carter
Texas Bar No. 03914300
lcarter@carterscholer.com
J. Robert Arnett II
Texas Bar No. 01332900
barnett@carterscholer.com
Joshua J. Bennett
Texas Bar No. 24059444
jbennett@carterscholer.com
Courtney Barksdale Perez
Texas Bar No. 24061135
cperez@carterscholer.com
**CARTER SCHOLER PLLC**
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206
Telephone: 214-550-8188
Facsimile: 214-550-8185

**ATTORNEYS FOR DEFENDANT
ENTERPRISE CRUDE OIL LLC**

<u>**CERTIFICATE OF CONFERENCE**</u>

I certify that on August 7, 2017, counsel for defendants conferred telephonically with David Bryant, counsel for plaintiff, regarding the relief sought in this motion. No agreement on the relief sought could be reached.

*/s/ E. Leon Carter*

## CERTIFICATE OF SERVICE

This is to certify that on August 10, 2017, a true, correct and complete copy of the foregoing document has been served on all counsel of record electronically via a court-approved electronic filing system, in accordance with Rule 21a of the Texas Rules of Civil Procedure.

*/s/ Courtney Barksdale Perez*

**EXHIBIT A**

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., a Delaware limited partnership, | ) ) ) ) | |
| Plaintiff, | ) ) ) | IN THE DISTRICT COURT OF |
| vs. | ) ) ) | DALLAS COUNTY, TEXAS |
| ENTERPRISE CRUDE OIL LLC, a Texas limited liability company, | ) ) ) | 101st JUDICIAL DISTRICT |
| Defendant. | ) ) ) ) | |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS BY DEFENDANT ENTERPRISE CRUDE OIL LLC

TO:     Defendant Enterprise Crude Oil LLC, by and through its counsel, E. Leon Carter, CARTER SCHOLER, 8150 N. Central Expressway, Suite 500, Dallas, Texas 75206.

Plaintiff, Magellan Crude Oil Pipeline Company, L.P. ("Plaintiff" or "Magellan"),

pursuant to Rule 196 of the Texas Rules of Civil Procedure, serves the following requests to be

answered in accordance with the Texas Rules of Civil Procedure.

### Definitions

The following definitions apply to all discovery requests stated below.

1.     **"COD Agreement"** means the Crude Oil Distribution Agreement, dated October 31, 2011, by and between Enterprise Crude Oil LLC and Magellan Pipeline Company, L.P., a copy of which is attached to the Original Petition as Exhibit A.

2.     **"Communication"** means a conveyance, in any form and by any means, of information between two or more persons.

3.     **"Connection Agreement"** means the Connection Agreement, dated December 16, 2011, by and between Enterprise Crude Pipeline, LLC and Magellan Pipeline Company, L.P., a copy of which is attached to the Original Petition as Exhibit C.

4.     **"Connection Point"** means the point of interconnection, at Genoa Junction, between any Magellan Facilities and any Enterprise crude oil transportation or distribution facilities.

{1718212;}

5.  **"Defendant," "You"** and **"Your"** mean and refer to Enterprise Crude Oil LLC.

6.  **"Destination Point"** means one or more of the following points:

    A.  Valero's Houston Refinery;
    B.  BP's Texas City Refinery;
    C.  Enterprise Pipeline's Anahuac Junction;
    D.  Shell's Deer Park Refinery

7.  **"Document"** is intended to be as broad and inclusive as permitted by the Texas Rules of Civil Procedure, and includes without limitation printed and electronically stored data and information, writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained. However, for purposes of the requests made below, "Document" does <u>not</u> include any item filed with the U.S. Securities and Exchange Commission.

8.  **"Eagle Ford Expansion Pipeline"** means all or any portion of the crude oil pipeline system extending from Gardendale (LaSalle County, Texas) to a connection point with other Enterprise pipeline facilities at Sealy Station (Austin County, Texas).

9.  **"Eagle Ford Product"** means crude oil and/or condensate which You owned, controlled, purchased, sold, delivered, or took delivery of, at any Origin Point, at any time during the Relevant Period.

10. **"Eagle Ford Crude Oil Purchase Agreement"** means a written agreement providing for Enterprise to purchase Eagle Ford Product.

11. **"Eagle Ford Crude Oil Sale Agreement"** means a written agreement providing for Enterprise to sell Eagle Ford Product.

12. **"Eagle Ford Crude Oil Buy/Sell Agreement"** means a written agreement providing for Enterprise to purchase Eagle Ford Product from another party and to sell crude oil to the same party or an affiliate of that party.

13. **"Eagle Ford Crude Oil Transportation Agreement"** means a written agreement providing for Enterprise to transport Eagle Ford Product on the Eagle Ford Expansion Pipeline.

14. **"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

15. **"Enterprise"** means Enterprise Crude Oil LLC and except when expressly stated otherwise includes any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

16. **"Future Destination Point"** means any one or more of the following points, as known in 2011 and regardless of any change in name or ownership occurring after 2011:

    A. Marathon's Texas City Refinery;
    B. Valero's Texas City Refinery;
    C. Seaway Crude Pipeline Company's Texas City Terminal;
    D. Seaway Crude Pipeline Company's Galena Park Terminal;
    E. Houston Fuel Oil Terminal Company's Houston Terminal;
    F. Oil Tanking's Houston Terminal;
    G. Houston Refining LP's Houston Refinery;
    H. Pasadena Refining, Inc.'s Houston Refinery;
    I. Pasadena Refining, Inc.'s Red Bluff Tank Farm;
    J. Magellan Terminal Holdings, L.P.'s Galena Park Terminal

17. **"Genoa Junction"** means the pipeline junction/hub by that name, located in the Houston, Texas area.

18. **"Houston Area Destination"** means and includes:

    A. Any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    B. Any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between ECHO Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

    C. Any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

19. **"In-Service Date"** has the meaning set forth in Section 2.1 of the COD Agreement.

20. **"Joint Tariff Agreement"** means the letter agreement, dated November 1, 2011, by and between Enterprise Crude Pipeline, LLC and Magellan Pipeline Company, L.P., a copy of which is attached to the Original Petition as Exhibit B.

21. **"Lawyer Employee"** means an employee who, at the time of any relevant act, omission or statement, was a licensed attorney employed within the legal department of a corporate employer.

22. **"Magellan"** means Magellan Crude Oil Pipeline Company, L.P., and except when expressly stated otherwise, includes any and all of its affiliates or predecessors in interest including Magellan Pipeline Company, L.P.

23. **"Magellan Audit"** means any audit process or procedure Magellan undertook or sought to undertake regarding the COD Agreement, including those described in paragraphs 54, 57, and 61 of the Original Petition.

24. **"Magellan Facilities"** has the meaning set forth in the second paragraph of the recitals contained in the COD Agreement.

25. **"New Magellan Facilities"** has the meaning set forth in the second paragraph of the recitals contained in the COD Agreement.

26. **"Non-Lawyer Employee"** means an employee who, at the time of any relevant act, omission or statement, was not a licensed attorney employed within the legal department of a corporate employer.

27. **"Original Answer"** means Defendant's Original Answer filed in the action on July 17, 2017.

28. **"Original Petition"** means Plaintiff's Original Petition filed in this action on June 19, 2017.

29. **"Origin Point"** means one or more of the following points on the Eagle Ford Expansion Pipeline: Gardendale (LaSalle County, Texas); Lyssy (Wilson County, Texas); Marshall (Gonzales County, Texas); Milton (Karnes County, Texas).

30. **"Plaintiff"** means Magellan Crude Oil Pipeline Company, L.P. and its predecessor in interest Magellan Pipeline Company, L.P.

31. **"Regarding"** means concerning, pertaining to, or relating to in any way.

32. **"Relevant Period"** means the period from January 1, 2011 to present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

You are requested to produce, within the time prescribed by Rule 196.2 of the Texas Rules of Civil Procedure and at any one of the offices of Plaintiff's attorneys as shown below, all non-identical copies of all of the following Documents within the possession, custody or control of "Enterprise" as defined above.

These requests seek responsive data existing in any electronic form, such as emails, text files, instant messages, word processing files, spreadsheet files (*e.g.*, Microsoft Excel), and database files. Plaintiff requests that all responsive electronic data be produced in its native format, including all associated metadata, if and to the extent reasonably available.

Unless otherwise noted in a particular request, these requests seek Documents which were created during the Relevant Period or contain information regarding the Relevant Period.

Unless otherwise noted in a particular request, these requests do not seek any inter-party Communications sent by, to, or between, any outside counsel for Plaintiff or Defendant.

Plaintiff has expended considerable effort to exceed the Rule 196.1(b) requirement that requested documents be described with "reasonable particularity." In fact, Plaintiff has sought to describe the requested documents with exceptional clarity and precision under the circumstances. This includes, in some instances, concrete examples of responsive information or other specifics about the intended meaning or scope of a particular request. Such examples or comments are provided to foster clear communication and understanding, to promote good faith cooperation, and to avoid strained interpretations or unwarranted objections which delay discovery and drive up costs.

REQUEST FOR PRODUCTION NO. 1.    Regarding the COD Agreement, the following Documents created or generated on or before October 31, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

REQUEST FOR PRODUCTION NO. 2.    Regarding the Joint Tariff Agreement, the following Documents created or generated on or before November 1, 2011: (a) all drafts of said

agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

REQUEST FOR PRODUCTION NO. 3.     Regarding the Connection Agreement, the following Documents created or generated on or before December 16, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

REQUEST FOR PRODUCTION NO. 4.     All Documents, whether created before or after the COD Agreement, identifying any business or commercial considerations which led Enterprise Crude Oil LLC to enter into the COD Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

REQUEST FOR PRODUCTION NO. 5.     All Documents, whether created before or after the Joint Tariff Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

REQUEST FOR PRODUCTION NO. 6.     All Documents, whether created before or after the Connection Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Connection Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

REQUEST FOR PRODUCTION NO. 7. All Documents regarding authorization for Enterprise Crude Oil LLC to enter into the COD Agreement.

REQUEST FOR PRODUCTION NO. 8. All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement.

REQUEST FOR PRODUCTION NO. 9. All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Connection Agreement.

REQUEST FOR PRODUCTION NO. 10. Regarding the marketing, transportation and/or delivery of Eagle Ford Product to ECHO Terminal, to Genoa Junction, or to any other Houston Area Destination(s), all Documents containing or reporting upon any Enterprise plans, proposals, goals, projections, budgets, estimates, statistics, or histories thereof. This request is not limited to Documents which focus exclusively on Eagle Ford Product as defined above; any Document containing information applicable in whole or part to Eagle Ford Product, is included. For example, this request includes memos, reports or analyses regarding the intended, expected or actual utilization of the Rancho pipeline system and/or the Rancho II pipeline system for such purposes.

REQUEST FOR PRODUCTION NO. 11. All Documents which constitute, or reflect, Communications between Magellan and Enterprise, regarding (i) the construction of any New Magellan Facilities, (ii) the In-Service Date, (iii) the use or non-use of the Magellan Facilities by Enterprise following the In-Service Date, (iv) the disconnection of Enterprise facilities from Magellan facilities at Anahuac Junction, (v) the meaning, effect, or impact of the COD Agreement, the Joint Tariff Agreement or the Connection Agreement, and/or (vi) any dispute between Magellan and Enterprise arising from the COD Agreement, the Joint Tariff Agreement or the

**23**

SR23

Connection Agreement. For clarity, recordings and notes of any phone calls or meetings between Magellan and Enterprise, regarding any of the above matters, are included. However, this request is not intended to include inter-party Communications specifically regarding any Magellan Audit, as those are the subject of a separate request.

REQUEST FOR PRODUCTION NO. 12.   All Documents which were authored by any Non-Lawyer Employee(s) of Enterprise, at any time during the Relevant Period, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Non-Lawyer Employee of Enterprise, about whether or how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

REQUEST FOR PRODUCTION NO. 13.   All Documents which were authored by any Lawyer Employee of Enterprise, at any time prior to February 16, 2017, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Lawyer Employee of Enterprise, about whether or

how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

REQUEST FOR PRODUCTION NO. 14. All other Documents which contain any reference (whether specific or general) to the COD Agreement or to any party's rights or obligations under the COD Agreement. For clarity, this request does not broadly request or require You to search for each and every Document that might arguably "relate" to the COD Agreement in some way. Rather, this request narrower: its object is to discover any Documents (not duplicative of Documents produced in response to one of the preceding requests) that contain an actual reference (in any form) to the COD Agreement or to a party's rights or obligations thereunder.

REQUEST FOR PRODUCTION NO. 15. All other Documents which contain any reference (whether specific or general) to the Joint Tariff Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

REQUEST FOR PRODUCTION NO. 16. All other Documents which contain any reference (whether specific or general) to the Connection Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

REQUEST FOR PRODUCTION NO. 17. All Eagle Ford Crude Oil Purchase Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar

**25**

SR25

agreements: Crude Oil Purchase Agreement between Enterprise and Petrohawk Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and GeoSouthern Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and Chesapeake Energy Corporation, dated April 28, 2011.

REQUEST FOR PRODUCTION NO. 18. All Eagle Ford Crude Oil Sale Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned.

REQUEST FOR PRODUCTION NO. 19. All Eagle Ford Crude Oil Buy/Sell Agreements, and all modifications, amendments or replacements of such agreements. This request includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether the agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar agreements: First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Chesapeake Energy Corporation, dated January 31, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Petrohawk Energy Corporation, dated June 29, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and GeoSouthern Energy Corporation, dated June 29, 2012.

REQUEST FOR PRODUCTION NO. 20.    All Documents which discuss or mention the business or commercial motivation(s) that led Enterprise Crude Oil LLC to enter into any Eagle Ford Buy/Sell Agreement.

REQUEST FOR PRODUCTION NO. 21.    All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Purchase Agreement, any Eagle Ford Crude Oil Sale Agreement, or any Eagle Ford Crude Oil Buy/Sell Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

REQUEST FOR PRODUCTION NO. 22.    All Eagle Ford Crude Oil Transportation Agreements, including but not limited to any such agreements between or among Enterprise entities.

REQUEST FOR PRODUCTION NO. 23.    All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Transportation Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

REQUEST FOR PRODUCTION NO. 24.    All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution routing, and/or final

SR27

destination or delivery points. For clarity, this request seeks production of reports or analyses already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

REQUEST FOR PRODUCTION NO. 25.    All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution routing, and/or final destination or delivery points. For clarity, this request seeks Documents sufficient to give Magellan the same assessment and reporting capability Enterprise has with respect to Eagle Ford Product.

REQUEST FOR PRODUCTION NO. 26.    All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of Eagle Ford Product from any Origin Point to its final destination or delivery point, including by date, volume, shipper, transportation or distribution routing, and final destination or delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to Eagle Ford Product.

REQUEST FOR PRODUCTION NO. 27.    All Documents showing any Enterprise tariffs, fees, charges or incentives for transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point.

REQUEST FOR PRODUCTION NO. 28.    All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize actual transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point. For clarity, this request seeks production of reports or analyses

already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

REQUEST FOR PRODUCTION NO. 29.  All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point, including by date, volume, shipper, transportation or distribution routing, and/or final destination or delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to deliveries of crude oil from ECHO Terminal to any Destination Point or Future Destination Point.

REQUEST FOR PRODUCTION NO. 30.  All Documents which constitute, or reflect, Communications between any Non-Lawyer Employee(s) of Magellan and any Non-Lawyer Employee(s) of Enterprise, regarding any Magellan Audit.

REQUEST FOR PRODUCTION NO. 31.  All Documents which constitute, or reflect, Communications between Non-Lawyer Employees of Enterprise, regarding any Magellan Audit.

REQUEST FOR PRODUCTION NO. 32.  All Documents Enterprise provided to Magellan in connection with any Magellan Audit.

REQUEST FOR PRODUCTION NO. 33.  All Documents You do or may use or rely on to support the following affirmative defense alleged in ¶ 3 of Your Original Answer: "3. ECO is entitled to a credit or offset for any monies Plaintiff has received for the transport of crude that Plaintiff contends is subject to the Distribution Agreement, to the extent tariffs were paid by any third-party purchaser of such crude for transportation through the Magellan distribution system."

This includes all Enterprise Documents purporting to show that Magellan received any such monies.

Dated July 21, 2017.

<div align="right" style="width:55%; margin-left:45%;">

Respectfully submitted,

**GABLEGOTWALS**

By: /s/ David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 21, 2017, the foregoing document was served upon the following

counsel of record by email, pursuant to Texas Rule of Civil Procedure 21a(a)(2):


**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com

CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

**Attorneys for Defendant**


<u>/s/ David L. Bryant</u>
David L. Bryant

FILED
DALLAS COUNTY
7/31/2017 11:14 AM
FELICIA PITRE
DISTRICT CLERK

/s/ Carla Gilkey



# THE STATE OF TEXAS

## SUBPOENA DUCES TECUM

### PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176 AND 205

CAUSE NO. DC-17-07264     IN THE 101ST JUDICIAL DISTRICT COURT OF DALLAS COUNTY, TEXAS

MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., Plaintiff vs. ENTERPRISE CRUDE OIL LLC, Defendant

TO WITNESS:          **Justin Stuhldreher**
**Associate General Counsel**
**BHP Billiton Petroleum**
**1360 Post Oak Blvd., Suite 150**
**Houston, TX 77056-3030**

THE ABOVE NAMED WITNESS IS HEREBY COMMANDED to produce, at **9:30 a.m. on August 31, 2017**, at the offices of the above named Plaintiff, 1111 Bagby Street, Suite 2330, Houston, TX 77002, the following books, papers, documents, or other tangible things:

**SEE EXHIBIT A, ATTACHED**

RULE 176.8(a) OF THE TEXAS RULES OF CIVIL PROCEDURE:

**(a) Contempt.** Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

{1709127;}          1

ISSUED July 31, 2017, by the undersigned attorney, as an officer of the Court, on behalf of Plaintiff, Magellan Crude Oil Pipeline Company, L.P.

Respectfully submitted,

**GABLEGOTWALS**

By: /s/David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

33

SR33

## SUBPOENA DUCES TECUM RETURN

This Subpoena Duces Tecum was served upon the above named Witness by U.S. certified mail, return receipt requested, addressed to its registered agent for service of process, _____, on _____, 2017, with Witness Fee of _____ pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 22.004.

By:_____
Person who is not a party to the suit, and is not less than 18 years of age.

OR

### ACCEPTANCE OF SERVICE BY WITNESS PER TEX.R.CIV.P. 176.5(b)(1)

I, the undersigned Custodian of Records of the Witness named in the Subpoena acknowledge receipt of a copy thereof, and hereby accept service of said Subpoena on behalf of said Witness.

_____

Printed Name:

DATE SIGNED: _____

## CERTIFICATE OF SERVICE

I certify that on July 31, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

35

SR35

## Definitions

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

(a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

(b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

(i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

(ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

**36**

SR36

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii)     any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1.     All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2.     All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3.     With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4.     With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

(a)     For each sale by You: date, volume, product type, price, and point of sale.

(b)     For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5.     With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

FILED
DALLAS COUNTY
7/21/2017 2:58 PM
FELICIA PITRE
DISTRICT CLERK

Carmen Moorer

CAUSE NO. DC-17-07264

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
            )
      Plaintiff, )   IN THE DISTRICT COURT OF
            )
vs. )   DALLAS COUNTY, TEXAS
            )
ENTERPRISE CRUDE OIL LLC, )   101st JUDICIAL DISTRICT
a Texas limited liability company, )
            )
            )
      Defendant. )
            )

## PLAINTIFF'S NOTICE OF SUBPOENA DUCES TECUM
## TO BHP BILLITON PETROLEUM

TO:  **Custodian of Records**
    **BHP Billiton Petroleum**
    **1360 Post Oak Blvd., Suite 150**
    **Houston, TX 77056-3030**

PLEASE TAKE NOTICE that pursuant to Texas Rule of Civil Procedure 205.1(d), 10 days after service of this Notice the above named Plaintiff will serve the attached Subpoena Duces Tecum to BHP Billiton Petroleum, compelling it to produce to Plaintiff the items described in the Subpoena Duces Tecum, at **9:30 a.m. on August 31, 2017**, at the offices of Plaintiff, 1111 Bagby Street, Suite 2330, Houston, TX 77002.

Exhibit B

{1717539;}

**38**

Respectfully submitted,

**GABLEGOTWALS**

By: /s/ David L. Bryant

David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

39

SR39

## CERTIFICATE OF SERVICE

I certify that on July 21, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

40

SR40

# THE STATE OF TEXAS

## SUBPOENA DUCES TECUM

### PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176 AND 205

CAUSE NO. DC-17-07264        IN THE 101ST JUDICIAL DISTRICT COURT OF DALLAS COUNTY, TEXAS

MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., Plaintiff vs. ENTERPRISE CRUDE OIL LLC, Defendant

TO WITNESS:          **Custodian of Records**
**BHP Billiton Petroleum**
**1360 Post Oak Blvd., Suite 150**
**Houston, TX 77056-3030**

THE ABOVE NAMED WITNESS IS HEREBY COMMANDED to produce, at **9:30 a.m. on August 31, 2017,** at the offices of the above named Plaintiff, 1111 Bagby Street, Suite 2330, Houston, TX 77002, the following books, papers, documents, or other tangible things:

**SEE EXHIBIT A, ATTACHED**

RULE 176.8(a) OF THE TEXAS RULES OF CIVIL PROCEDURE:

> **(a) Contempt.** Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

{1709127;}          1

41

SR41

ISSUED _____, 2017, by the undersigned attorney, as an officer of the Court, on behalf of Plaintiff, Magellan Crude Oil Pipeline Company, L.P.

Respectfully submitted,

GABLEGOTWALS

By: _____
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

FIGARI + DAVENPORT, LLP

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,
Magellan Crude Oil Pipeline Company, L.P.**

42

SR42

## SUBPOENA DUCES TECUM RETURN

This Subpoena Duces Tecum was served upon the above named Witness by U.S. certified mail, return receipt requested, addressed to its registered agent for service of process, _____, on _____, 2017, with Witness Fee of _____ pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 22.004.

By:_____

Person who is not a party to the suit, and is not less than 18 years of age.

OR

## ACCEPTANCE OF SERVICE BY WITNESS PER TEX.R.CIV.P. 176.5(b)(1)

I, the undersigned Custodian of Records of the Witness named in the Subpoena acknowledge receipt of a copy thereof, and hereby accept service of said Subpoena on behalf of said Witness.

_____

Printed Name:

DATE SIGNED: _____

## CERTIFICATE OF SERVICE

I certify that on _____, 2017, the foregoing document was served upon the

following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

_____
David L. Bryant

**EXHIBIT A**
**PLAINTIFF'S SUBPOENA DUCES TECUM**

**Definitions**

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

    (a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

    (b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

    (i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    (ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii)  any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1.  All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2.  All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3.  With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4.  With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

    (a)  For each sale by You: date, volume, product type, price, and point of sale.

    (b)  For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5.  With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

FILED
DALLAS COUNTY
7/31/2017 11:14 AM
FELICIA PITRE
DISTRICT CLERK
/s/ Carla Gilkey

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
)
        Plaintiff, )
)
vs. )
)
)
ENTERPRISE CRUDE OIL LLC, )
a Texas limited liability company, )
)
)
)
        Defendant. )

**EXHIBIT C**

Cause No. DC-17-07264

In the District Court of Dallas County, Texas, 101st Judicial District

## PLAINTIFF'S SUBPOENA DUCES TECUM

TO:   **Jim Webb**
**EVP an General Counsel**
**Chesapeake Energy Corporation**
**6100 N. Western Ave.**
**Oklahoma City, OK 73118**

GREETINGS:

On behalf of the above named Plaintiff, in the above referenced action pending in the District Court of Dallas County, Texas, 101st Judicial District, You are commanded to produce and permit inspection and copying of the documents described in the attached **Exhibit A**, at **9:30 a.m. on August 31, 2017**, at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, Oklahoma 73102-7101, attorneys for the above named Plaintiff.

In order to allow objections to the production of the documents and things to be filed, you should not produce them until the date specified in this subpoena, and if an objection is filed, until the court rules on the objection.

{!709266;}

**47**

SR47

This Subpoena is authorized and issued pursuant to 12 O.S. § 2004.1(A)(2)(b). Pursuant to Texas law, advance notice of service hereof has been provided to You and to the above named Defendant, as set forth on the attached **Exhibit B**.

Issued July 31, 2017.

<div align="right">

Respectfully submitted,

**GABLEGOTWALS**

</div>

By:    /s/ David L. Bryant
              David L. Bryant
              OBA No. 1262
              Texas Bar No. 24084344
              dbryant@gablelaw.com
              113 Pleasant Valley Drive, Suite 204
              Boerne, Texas 78006
              Telephone: (830) 336-4810
              Facsimile: (918) 595-4990

              Lisa T. Silvestri
              OBA No. 19239
              Texas Bar No. 00797967
              lsilvestri@gablelaw.com
              100 W. Fifth St., Suite 1100
              Tulsa, Oklahoma 74103
              Telephone: (918) 595-4800
              Facsimile: (918) 595-4990

              **Attorneys for Plaintiff,**
              **Magellan Crude Oil Pipeline Company, L.P.**

SR48

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 31, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

**EXHIBIT A**
**PLAINTIFF'S SUBPOENA DUCES TECUM**

**Definitions**

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

(a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

(b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

(i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

(ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

{1709141;3}                                    1

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii) any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1. All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2. All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3. With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4. With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

   (a) For each sale by You: date, volume, product type, price, and point of sale.

   (b) For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5. With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

FILED
DALLAS COUNTY
7/21/2017 2:58 PM
FELICIA PITRE
DISTRICT CLERK

Carmen Moorer

## CAUSE NO. DC-17-07264

MAGELLAN CRUDE OIL PIPELINE    )
COMPANY, L.P., a Delaware limited partnership,  )
   )
         Plaintiff,    )
   )
vs.    )
   )
ENTERPRISE CRUDE OIL LLC,    )
a Texas limited liability company,    )
   )
   )
         Defendant.    )
   )

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

101st JUDICIAL DISTRICT

### PLAINTIFF'S NOTICE OF SUBPOENA DUCES TECUM
### TO CHESAPEAKE ENERGY CORPORATION

TO:   **Custodian of Records**
     **Chesapeake Energy Corporation**
     **6100 N. Western Ave.**
     **Oklahoma City, OK 73118**

PLEASE TAKE NOTICE that pursuant to Texas Rule of Civil Procedure 205.1(d), 10 days after service of this Notice the above named Plaintiff will serve the attached Subpoena Duces Tecum to Chesapeake Energy Corporation, compelling it to produce to Plaintiff the items described in the Subpoena Duces Tecum, at **9:30 a.m. on August 31, 2017,** at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, OK 73102.

<div align="center">Exhibit B</div>

{1717533;}

**52**

SR52

Respectfully submitted,

**GABLEGOTWALS**

By:    /s/ David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

53

# CERTIFICATE OF SERVICE

I certify that on July 21, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
)
Plaintiff, )
)           Cause No. DC-17-07264
vs. )
)           In the District Court of Dallas County,
ENTERPRISE CRUDE OIL LLC, )           Texas, 101st Judicial District
a Texas limited liability company, )
)
)
)
Defendant. )

## PLAINTIFF'S SUBPOENA DUCES TECUM

TO:     **Custodian of Records**
        **Chesapeake Energy Corporation**
        **6100 N. Western Ave.**
        **Oklahoma City, OK 73118**

GREETINGS:

On behalf of the above named Plaintiff, in the above referenced action pending in the District Court of Dallas County, Texas, 101st Judicial District, You are commanded to produce and permit inspection and copying of the documents described in the attached **Exhibit A**, at **9:30 a.m. on August 31, 2017**, at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, Oklahoma 73102-7101, attorneys for the above named Plaintiff.

In order to allow objections to the production of the documents and things to be filed, you should not produce them until the date specified in this subpoena, and if an objection is filed, until the court rules on the objection.

{1709266;}

This Subpoena is authorized and issued pursuant to 12 O.S. § 2004.1(A)(2)(b). Pursuant to Texas law, advance notice of service hereof has been provided to You and to the above named Defendant, as set forth on the attached **Exhibit B**.

Issued _____, 2017.

Respectfully submitted,

**GABLEGOTWALS**

By: _____

David L. Bryant
OBA No. 1262
Texas Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
OBA No. 19239
Texas Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

{1709266;} 2

SR56

## CERTIFICATE OF SERVICE

I certify that on _____, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

David L. Bryant

**EXHIBIT A**
**PLAINTIFF'S SUBPOENA DUCES TECUM**

## Definitions

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

    (a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

    (b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

    (i)    any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    (ii)    any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

{1709141;3}             1

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii)  any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1.  All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2.  All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3.  With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4.  With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

    (a)  For each sale by You: date, volume, product type, price, and point of sale.

    (b)  For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5.  With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

{1709141;3}                                          2

59

SR59

FILED
DALLAS COUNTY
7/31/2017 11:14 AM
FELICIA PITRE
DISTRICT CLERK
/s/ Carla Gilkey

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., a Delaware limited partnership, | ) ) ) | **EXHIBIT D** |
| Plaintiff, | ) ) | |
| vs. | ) ) | Cause No. DC-17-07264 |
| ENTERPRISE CRUDE OIL LLC, a Texas limited liability company, | ) ) ) | In the District Court of Dallas County, Texas, 101st Judicial District |
| Defendant. | ) ) ) ) | |

**PLAINTIFF'S SUBPOENA DUCES TECUM**

TO:   **Custodian of Records**
      **Devon Energy Corporation**
      **333 West Sheridan Avenue**
      **Oklahoma City, OK 73102-5015**

GREETINGS:

On behalf of the above named Plaintiff, in the above referenced action pending in the District Court of Dallas County, Texas, 101st Judicial District, You are commanded to produce and permit inspection and copying of the documents described in the attached **Exhibit A**, at **9:30 a.m. on August 31, 2017,** at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, Oklahoma 73102-7101, attorneys for the above named Plaintiff.

In order to allow objections to the production of the documents and things to be filed, you should not produce them until the date specified in this subpoena, and if an objection is filed, until the court rules on the objection.

{1709289;}

**60**

SR60

This Subpoena is authorized and issued pursuant to 12 O.S. § 2004.1(A)(2)(b). Pursuant to Texas law, advance notice of service hereof has been provided to You and to the above named Defendant, as set forth on the attached **Exhibit B**.

Issued July 31, 2017.

Respectfully submitted,

**GABLEGOTWALS**

By: /s/ David L. Bryant
David L. Bryant
OBA No. 1262
Texas Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
OBA No. 19239
Texas Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

**Attorneys for Plaintiff,
Magellan Crude Oil Pipeline Company, L.P.**

## CERTIFICATE OF SERVICE

I certify that on July 31, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

**EXHIBIT A**
**PLAINTIFF'S SUBPOENA DUCES TECUM**

**Definitions**

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

    (a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

    (b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

    (i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    (ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii)  any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1.  All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2.  All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3.  With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4.  With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

    (a)  For each sale by You: date, volume, product type, price, and point of sale.

    (b)  For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5.  With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

FILED
DALLAS COUNTY
7/21/2017 2:58 PM
FELICIA PITRE
DISTRICT CLERK

Carmen Moorer

## CAUSE NO. DC-17-07264

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
                                         )
           Plaintiff, )
                                         )
vs.                                       )
                                       )
ENTERPRISE CRUDE OIL LLC, )
a Texas limited liability company, )
                                       )
                                       )
          Defendant. )
                                       )

IN THE DISTRICT COURT OF

DALLAS COUNTY, TEXAS

101st JUDICIAL DISTRICT

## PLAINTIFF'S NOTICE OF SUBPOENA DUCES TECUM
## TO DEVON ENERGY CORPORATION

TO:   **Custodian of Records**
       **Devon Energy Corporation**
       **333 West Sheridan Avenue**
       **Oklahoma City, OK 73102-5015**

PLEASE TAKE NOTICE that pursuant to Texas Rule of Civil Procedure 205.1(d), 10 days after service of this Notice the above named Plaintiff will serve the attached Subpoena Duces Tecum to Devon Energy Corporation, compelling it to produce to Plaintiff the items described in the Subpoena Duces Tecum, at **9:30 a.m. on August 31, 2017**, at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, OK 73102.

Exhibit B

{1717531;}

**65**

SR65

Respectfully submitted,

**GABLEGOTWALS**

By:    /s/ David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,
Magellan Crude Oil Pipeline Company, L.P.**

66

SR66

## CERTIFICATE OF SERVICE

I certify that on July 21, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

67

SR67

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
                              )
                Plaintiff, )
                              )     Cause No. DC-17-07264
vs. )
                              )     In the District Court of Dallas County,
ENTERPRISE CRUDE OIL LLC, )     Texas, 101st Judicial District
a Texas limited liability company, )
                              )
                              )
                Defendant. )

## PLAINTIFF'S SUBPOENA DUCES TECUM

TO:    **Custodian of Records**
       **Devon Energy Corporation**
       **333 West Sheridan Avenue**
       **Oklahoma City, OK 73102-5015**

GREETINGS:

On behalf of the above named Plaintiff, in the above referenced action pending in the District Court of Dallas County, Texas, 101st Judicial District, You are commanded to produce and permit inspection and copying of the documents described in the attached **Exhibit A**, at **9:30 a.m. on August 31, 2017,** at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, Oklahoma 73102-7101, attorneys for the above named Plaintiff.

In order to allow objections to the production of the documents and things to be filed, you should not produce them until the date specified in this subpoena, and if an objection is filed, until the court rules on the objection.

{1709289;}

**68**

This Subpoena is authorized and issued pursuant to 12 O.S. § 2004.1(A)(2)(b). Pursuant to Texas law, advance notice of service hereof has been provided to You and to the above named Defendant, as set forth on the attached **Exhibit B**.

Issued _____, 2017.

Respectfully submitted,

GableGotwals

By: _____

David L. Bryant
OBA No. 1262
Texas Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
OBA No. 19239
Texas Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

## CERTIFICATE OF SERVICE

I certify that on _____, 2017, the foregoing document was served upon

the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

David L. Bryant

70

SR70

**EXHIBIT A**
**PLAINTIFF'S SUBPOENA DUCES TECUM**

## Definitions

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

"**Crude Oil Sales Agreement**" means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

"**Crude Oil Buy/Sell Agreement**" means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

"**Crude Oil Transportation Agreement**" means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

"**Eagle Ford Product**" means crude oil and/or condensate which, at any time during the Relevant Period, You either:

    (a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

    (b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

"**ECHO Terminal**" means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

"**Enterprise**" means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

"**Document**" means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

"**Houston Area Destination**" means and includes:

    (i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    (ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii)     any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1.     All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2.     All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3.     With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4.     With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

(a)     For each sale by You: date, volume, product type, price, and point of sale.

(b)     For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5.     With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

{1709141;3}                                                  2

**72**

SR72

## CAUSE NO. 2017-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., a Delaware limited partnership, | ) ) ) | |
| Plaintiff, | ) ) | IN THE DISTRICT COURT OF |
| vs. | ) ) | DALLAS COUNTY, TEXAS |
| ENTERPRISE CRUDE OIL LLC, a Texas limited liability company, | ) ) ) ) | 101st JUDICIAL DISTRICT |
| Defendant. | ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Magellan Crude Oil Pipeline Company, L.P. ("Magellan") submits this response in opposition to the no-evidence Motion for Summary Judgment ("Motion") filed by Defendant Enterprise Crude Oil LLC ("Enterprise") on August 4, 2017. This case arises from the parties' Crude Oil Distribution Agreement dated October 31, 2011 ("COD Agreement"), in which Enterprise made a 10-year "commitment" to "exclusively utilize" Magellan's Houston-area distribution facilities in connection with the transportation of crude oil from the south Texas Eagle Ford Shale play to certain destinations in Houston and the Texas gulf area. However Enterprise has purposely refused to honor that commitment. As a result, Magellan alleges breach of contract, fraud, and other related claims against Enterprise, and seeks an estimated $50 million or more in damages suffered to date.

Based primarily on a faulty, unreasonable interpretation of the COD Agreement, Enterprise asks this Court to determine all claims, on the merits, against Magellan, barely three months after the suit was filed and before Magellan has had any discovery whatsoever. The Motion should be denied, because Enterprise's arguments are meritless, and its no-evidence Motion is premature and improper in any event.

SR73

# I.    SUMMARY OF ARGUMENT

The COD Agreement at the center of the case contains Enterprise's express 10-year "commitment" to exclusively utilize Magellan's Houston-area crude oil transportation and distribution facilities for transportation of crude oil Enterprise that buys in the Eagle Ford Shale and markets to Houston-area refineries. The COD Agreement expressly states that Enterprise made its long-term exclusive-use commitment to induce Magellan's costly expansion of its facilities, including (among other things) installation of new connections between the two companies' respective pipelines, as necessary for Magellan to handle the Eagle Ford crude oil transportation business Enterprise committed to Magellan.

Enterprise admits that it has *not* exclusively utilized Magellan's facilities since they were completed and placed in operation four years ago, and admits that it has attempted to avoid its contractual obligation by purposely circumventing the Magellan facilities in the very ways alleged in Magellan's Original Petition,[1] such as by:

(i)     moving Enterprise-owned Eagle Ford crude oil on a *new* segment of the Eagle Ford-to-Houston pipeline, which no longer extends directly to Magellan's facilities (Rancho I) but *skirts around the Magellan connection* (Rancho II) and runs straight to Enterprise's ECHO Terminal just beyond the Magellan connection (as depicted below):



---

[1]   *See Original Petition* ¶¶ 52-60. Until it has discovery, Magellan will not know whether Enterprise has circumvented Magellan in other ways, too.

and

(ii)     at Enterprise's ECHO Terminal, selling the crude oil back to the same customer who sold the crude oil to Enterprise at one of the Eagle Ford Origin Points— pursuant to a buy-sell agreement which was made ***after*** the COD Agreement ***and*** which ***replaced an Enterprise crude oil purchase-only agreement (i.e., a marketing agreement) in place before the COD Agreement***.

Specifically, Enterprise argues that under Section 4.1 of the COD Agreement, its "commitment" to "exclusively utilize" Magellan's facilities is "conditioned" upon certain circumstances or events that have never occurred, namely (i) Enterprise's continuous ownership or control of crude oil from end-to-end of the transport from an "Origin Point" (as defined) to a "Destination Point" (as defined), and (ii) Enterprise's delivery of the crude oil to Magellan's Genoa Junction "Connection Point" (as defined). Of course, those matters are within Enterprise's exclusive control. Nevertheless, Enterprise claims that the "plain language" of the COD Agreement permits Enterprise to *guarantee* that the purported "conditions" never occur, and thereby avoid the commitment it made to Magellan. That is not what Section 4.1 says or may reasonably be interpreted to mean. Furthermore, under the well-established law discussed below, Enterprise is prohibited from avoiding its commitment in this manner..

For the Motion to succeed, as to Magellan's claim for breach of contract, Enterprise must demonstrate that its interpretation of the COD Agreement is correct as a matter of law—that the contract is unambiguous and subject to *no other* reasonable interpretation. It cannot do so. By law, the contract language at issue must be read and construed in light of the surrounding circumstances and purposes of the contract, taking into account the whole agreement, and avoiding if possible any construction that would make other provisions meaningless or make a party's promise illusory. Also, for summary judgment purposes, all reasonable inferences must be drawn in favor of the non-movant (Magellan). When the COD Agreement is construed

according to these well-settled rules, Enterprise's view of the meaning and intent of the language used in the "transportation commitment" section (Section 4.1) of the COD Agreement is not reasonable, and certainly is not the *only* reasonable interpretation.

First, the language in Section 4.1 which Enterprise characterizes as a "condition" upon its obligation to make exclusive use of the Magellan Facilities—the words "provided, that such deliveries … are … transported to the Connection Point"—do not constitute a "condition" upon Enterprise's transportation commitment to make exclusive use of the Magellan facilities. Rather, those words merely *identify the specific location* (the Magellan "Connection Point" at Genoa Junction) where Enterprise agrees to deliver crude into Magellan's distribution system *in fulfillment* of the commitment to make exclusive use of the "Magellan Facilities" as defined. In other words, that language constitutes an Enterprise *covenant*, not a condition precedent to Enterprise's obligation to make exclusive use of the Magellan Facilities.

Second, the COD Agreement contains *no express requirement* that Enterprise must continuously own or control the crude oil, from end-to-end of the transport from an Eagle Ford "Origin Point" (as defined) to a Houston-area "Destination Point" (as defined), for Enterprise's transportation commitment to apply. Viewing the agreement in its entirety, as required, strongly supports Magellan's position that *Enterprise's ownership or control of the crude at any Eagle Ford Origin Point is sufficient* to satisfy the ownership/control requirement.

Third, even if Enterprise's interpretation of Section 4.1 were correct, the Motion would fail. Under settled contract law, Enterprise cannot avoid its transportation commitment by purposely causing any "conditions" within its control *not* to occur, whether by deliberately bypassing the Magellan Connection Point, by manipulating crude ownership/control downstream from an Origin Point where the crude was owned or controlled by Enterprise, or by other means.

This is true regardless of whether, as Enterprise contends, the COD Agreement is similar to an "output/requirements" contract; the applicable contract law is the same.

Similarly, Enterprise is not entitled, at this early stage, to summary judgment on any of the four other claims alleged in Magellan's Original Petition. Enterprise's attack on those claims is largely founded on its *erroneous* interpretation of the COD Agreement and thus fails for the reasons noted above. In any event, all of those claims are viable, justiciable, and supported by currently available evidence and reasonable inferences sufficient to withstand the Motion.

Finally, but importantly, the Enterprise Motion is a no-evidence motion for summary judgment that is premature and improper, because Magellan has had no discovery, let alone the "adequate time for discovery" that Rule 166a(i) requires. Tex. R. Civ. P. 166a(i). All of Enterprise's arguments are misguided and wrong on the merits, so *denial of the Motion here and now is appropriate*. However, if the Court were inclined to believe that there could be some merit in an argument made in the Motion, then pursuant to Rule 166a(g) the Court should defer any ruling and continue the Motion as needed to give Magellan adequate time and opportunity to conduct discovery essential to resolution of the Motion—discovery Enterprise has thus far blocked.

## II. RESPONSE TO MOVANT'S STATEMENT OF UNDISPUTED FACTS

Many of the assertions in Enterprise's statement of undisputed "facts" are legal arguments, contentions or conclusions, not facts. Magellan responds to such legal contentions and conclusions in its argument below. To the extent the Enterprise statement asserts actual facts not specifically disputed below, Magellan reserves all rights to dispute at trial (after adequate discovery) the truth, relevance and/or admissibility of such facts.

1.      Paragraph 5: Magellan disputes Enterprise's legal conclusion as to what the "plain language" of the COD Agreement means.

2.      Paragraphs 6-10: To the extent these paragraphs accurately reflect the express terms of the COD Agreement, Magellan does not dispute them. However, Magellan disputes all Enterprise characterizations of the contract's express terms and their meaning or effect.

3.      Paragraph 14: This is a statement of law, not fact. To the extent facts are stated, Magellan disputes Enterprise's assertion that the consideration for Magellan's work and services consisted of a mere commitment by Enterprise to make exclusive use of the Magellan Facilities in lieu of using the facilities owned by *other* non-Enterprise parties and originating at or near the location known as Genoa Junction. As shown on the face of the COD Agreement, the material consideration Magellan bargained for (and got) was Enterprise's promise to exclusively use facilities owned by Magellan, not those owned by *anyone* else including *Enterprise or its affiliates*, to move Eagle Ford crude oil from any Origin Point to any Destination Point as those terms are defined in the COD Agreement.

4.      Paragraph 15: This statement is misleading. At the time Enterprise and Magellan entered into the COD Agreement, Magellan was *considering* whether to build the New Magellan Facilities. To the extent Enterprise's statement suggests that even without Enterprise's long-term exclusive use commitment, Magellan would have invested the many millions of dollars it did invest to expand its Houston-area crude oil distribution system as described in the COD Agreement, the statement is false.

5.      Paragraph 16: Magellan disputes this statement. Enterprise has not "performed as required." To the extent any Eagle Ford crude that Enterprise owned at an Origin Point has ever moved on the Magellan Facilities, it was not transported on the Magellan Facilities "pursuant to"

SR78

the COD Agreement. Since September 2013, Enterprise has purchased and marketed an estimated 175,000,000 barrels (or more) of Eagle Ford crude oil to Houston-area destinations, yet none of those barrels were transported to or through the Magellan Facilities pursuant to and as required by the COD Agreement. Enterprise has not gone out of business, nor has it ceased shipping crude oil from the Origin Points to the Destination Points. Rather, it has merely decided to use other facilities—especially its own facilities—to move its Eagle Ford crude oil between Origin Points and Destination Points. This is a clear breach of Enterprise's exclusive-use commitment to Magellan.

6.      Paragraph 19: Magellan disputes all legal conclusions and factual characterizations in paragraph 19. Magellan agrees with Enterprise's assessment of the utility of ECHO Terminal. The utility of this facility was not lost on Magellan. Indeed, that is precisely why Magellan insisted on Enterprise's firm commitment that it would use the Magellan Facilities, not its own, for all crude oil deliveries from any Origin Point to any Destination Point.

7.      Paragraph 20: Magellan disputes this statement. Although this statement may have some truthful elements, without the benefit of the discovery to which it is entitled, Magellan cannot adequately assess the truth or otherwise respond to Enterprise's assertions.

8.      Paragraph 21: This is a conclusion of law, not a statement of fact. To the extent facts are stated, Magellan disputes Enterprise's assertion that the COD Agreement permits Enterprise to defeat its performance obligation either by refusing to deliver crude to the Magellan Connection Point or by manipulating ownership of crude downstream from an Origin Point where Enterprise owned it. Not only does the COD Agreement, construed as a whole, prohibit such conduct, but well-settled law prohibits Enterprise from engaging in such conduct. At the

very least, Enterprise's own statements raise issues that would require discovery before its assertions could be validly tested and addressed, thus precluding summary judgment.

9. Paragraph 22: Magellan does not dispute that Enterprise publicly disclosed its construction of the Rancho II pipeline, and Magellan does not claim to have "objected." However, the inference drawn by Enterprise is false. Magellan had no reason to object because Magellan had already secured Enterprise's firm commitment that it would "*exclusively* utilize the Magellan Facilities" to deliver its crude oil from any Origin Point to any Destination Point, regardless. As the non-movant, Magellan is entitled to have all inferences drawn in its favor. All other statements in paragraph 22 are disputed. In addition, Enterprise asserts facts outside the four corners of the COD Agreement that it claims are material to its Motion, yet seeks to prohibit Magellan from conducting discovery as to those very factual allegations. Without the benefit of the discovery to which it is entitled, Magellan cannot adequately assess the truth or otherwise respond to Enterprise's assertions.

10. Paragraph 23: Magellan does not dispute that Enterprise acquired Oiltanking Partners, L.P. in 2014, nor does Magellan claim that it sought to "enjoin" that acquisition. However, the inference drawn by Enterprise is false. Magellan had no reason to seek any such injunction because Magellan had already secured Enterprise's firm commitment that it would "*exclusively* utilize the Magellan Facilities" to deliver its crude oil from any Origin Point to any Destination Point, regardless. As the non-movant, Magellan is entitled to have all inferences drawn in its favor. All other statements in paragraph 22 are disputed. Again, to support its Motion, Enterprise relies on its own factual allegations about matters outside the four corners of the COD Agreement, but seeks to deny Magellan discovery as to facts Enterprise apparently believes to be essential to a decision on the issues presented in its Motion. Without the benefit of

SR80

the discovery to which it is entitled, Magellan cannot adequately assess the truth or otherwise respond to Enterprise's assertions.

11.     <u>Paragraphs 25–26:</u> Magellan does not dispute the authenticity the document identified as Exhibit 2-C to Enterprise's Motion. Magellan does, however, dispute Enterprise's slanted characterization of the email exchange reflected therein. The document speaks for itself. Moreover, Enterprise's reliance on the statements contained in Exhibit 2-C contradicts its contention that the Court must construe the COD Agreement by examining only the four corners of the contract and nothing else (which is not the law in any event).

## III.     PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS AND SUMMARY JUDGMENT EVIDENCE

In opposition to the Motion, Magellan submits the following evidence supporting the facts set forth below:

**Exhibit 1:     Affidavit of Mark E. Daggett ("Daggett Aff.")**

Exhibit 1-A:    Jake Everett Email to Mark Daggett, Oct. 18, 2011

Exhibit 1-B:    Crude Oil Distribution Agreement, Oct. 31, 2011

Exhibit 1-C:    Joint Tariff Agreement, Nov. 1, 2011

Exhibit 1-D:    Connection Agreement, Dec. 16, 2011

Exhibit 1-E:    Crude Oil Purchase Agreement, April 29, 2011 (redacted), and First Amended and Restated Crude Oil Purchase and Sale Agreement, Jan. 31, 2011 (redacted)

Exhibit 1-F:    Enterprise Pipeline Local Tariff, July 1, 2017

**Exhibit 2:     Affidavit of David L. Bryant ("Bryant Aff.")**

Exhibit 2-A:    Plaintiff's Request for Disclosure, June 21, 2017

Exhibit 2-B:    Plaintiff's First Request for Production of Documents, July 21, 2017

Exhibit 2-C:    Plaintiff's Subpoena Duces Tecum to Chesapeake, July 31, 2017

Exhibit 2-D:   Plaintiff's Subpoena Duces Tecum to Devon, July 31, 2017

Exhibit 2-E:   Plaintiff's Subpoena Duces Tecum to BHP Billiton, July 31, 2017

Exhibit 2-F:   Enterprise Motion for Protection and to Stay Discovery Pending Resolution of Defendant's Dispositive Motion, Aug. 10, 2017

Exhibit 2-G:   Rule 11 agreement, Aug. 11, 2017

1.     Magellan owns and operates pipelines and related facilities for the transportation and distribution of crude oil. Magellan's facilities in and around the Houston area distribute crude oil to refineries and other locations across the Texas Gulf Coast. Those facilities can be accessed through a point of connection Magellan maintains at a southeast Houston location known as Genoa Junction. Daggett Aff. ¶ 2.

2.     Enterprise is a crude oil marketing company. It purchases crude oil from third parties and generates revenues by marketing, storing, and transporting the same. In Texas, Enterprise purchases and markets crude oil produced in, among other regions, a south Texas production area known as the Eagle Ford Shale. Daggett Aff. ¶ 3.

3.     Enterprise Crude Pipeline LLC ("Enterprise Pipeline") is an affiliate of Enterprise. Enterprise Pipeline owns or operates numerous pipeline facilities in Texas. Those facilities include a 24-inch diameter crude oil pipeline extending from locations in the Eagle Ford Shale, to Enterprise Pipeline's facilities in Sealy, Texas, to destinations in the Houston, Texas area, and the facility known as ECHO Terminal, which is located a few miles southeast of Genoa Junction. Daggett Aff. ¶¶ 2, 4.

4.     In 2011, Magellan's existing facilities in the Houston area included (i) a 26-inch diameter pipeline extending from Genoa Junction to BP's Texas City Refinery in Galveston County and (ii) a 24-inch diameter pipeline extending from Speed Junction to Valero's Houston

Refinery. In the COD Agreement, those were referred to collectively as the "Existing Magellan Facilities." Daggett Aff. ¶ 5.

5.     In the spring of 2011, Magellan was considering whether to construct new pipeline facilities in the Houston area in order to expand and improve its facilities for distribution of crude oil from the Eagle Ford Shale to refineries and other destinations in the Houston area. In the COD Agreement, those were collectively described as the "New Magellan Facilities," and together with the Existing Magellan Facilities, were described as the "Magellan Facilities." Daggett Aff. ¶ 6.

6.     The anticipated cost of construction for the New Magellan Facilities was significant. For that reason, Magellan determined that it would not proceed with the project without first obtaining a long-term contract that would provide revenues sufficient to assure the project's commercial and financial viability. Daggett Aff. ¶ 7.

7.     In mid-2011, Magellan entered into discussions with Enterprise to determine Enterprise's interest in utilizing the Magellan Facilities. Specifically, Magellan explored Enterprise's willingness to provide, in consideration of incentive tariff rates to be charged by Magellan, a binding commitment to exclusively utilize the Magellan Facilities with respect to transportation of Eagle Ford crude oil that Enterprise or its affiliates owned or controlled at points of origin along Enterprise Pipeline's Eagle Ford-to-Houston pipeline system, and for distribution and delivery to various Houston-area refineries or other destinations served or to be served by the Magellan Facilities. In the parties' discussions, Enterprise expressed both a need and a desire to utilize the Magellan Facilities for such purposes. Daggett Aff. ¶ 8.

8.     Based on Enterprise's expression of interest, Magellan and Enterprise proceeded to negotiate—over a period of approximately four months, from July 2011 through October

2011—the terms of an agreement providing for Enterprise's long-term commitment to exclusively utilize the Magellan Facilities. Through such negotiations, the parties reached an agreement that for 10 years after the New Magellan Facilities were completed and operational, and for all crude oil that Enterprise or its affiliates owned or controlled at any of four agreed-upon Eagle Ford "Origin Points" and transported on Enterprise Pipeline's Eagle Ford-to-Houston pipeline system, Enterprise would exclusively utilize (and use "best efforts" to cause its affiliates to exclusively utilize) the Magellan Facilities in order to deliver such crude oil to any of several agreed-upon "Destination Points." That is, the parties agreed that such crude oil could not be delivered to any such Destination Point without utilizing Magellan's Houston-area crude oil distribution system, accessible at Genoa Junction. Daggett Aff. ¶ 9.

9.      On October 18, 2011, near the end of the parties' documentation of their agreement, Magellan's principal contract negotiator, Mark Daggett, received an email from one of the Enterprise negotiators, Jake Everett, proposing to modify the COD Agreement's definition of the term "Controlled." In his message, Mr. Everett explained Enterprise's understanding of the parties' agreement, and its reason for requesting the modification. In relevant part, Mr. Everett's email stated:

> We would like to revise the definition of "Control" to eliminate the clause on legal authorization to transport. Our affiliate, Enterprise Crude Oil Pipeline will be transporting crude for 3rd parties under transportation agreement rather than a marketing agreement so only the 3rd party will have authority to determine the ultimate destination.
>
> **I believe the intent of the agreement was for all of the marketing volume to move through these [Magellan] connections and that is our intent**, but as soon as a 3rd party requests a delivery outside of this agreement, we don't want to be in default. Please let me know if you disagree with our interpretation.

Daggett Aff. ¶ 10, Ex. 1-A (emphasis added).

10.     On the same date, October 18, 2011, Mr. Everett and Mr. Daggett discussed Enterprise's proposed modification by phone. In that conversation, Mr. Everett reaffirmed Enterprise's agreement that all crude oil Enterprise owned or controlled at any time at any specified Origin Point (*i.e.*, all Enterprise "marketing volume") and transported via Enterprise Pipeline's Eagle Ford-to-Houston pipeline system would be delivered into Magellan's Houston-area distribution system if such crude oil was to be distributed and delivered to any specified Destination Point. Mr. Everett also reaffirmed that the sole reason for Enterprise's request to modify the definition of "Control" was to distinguish between (i) on the one hand, Enterprise's "marketing volumes" of crude oil—i.e., crude oil Enterprise (the marketing company) purchased from third parties and owned or controlled at an Eagle Ford origin point—all of which would be transported exclusively to and through the Magellan Facilities if destined for any of the Destination Points, and (ii) on the other hand, Enterprise Pipeline's "transportation volumes"—*i.e.*, crude oil owned by third parties (not by Enterprise) that Enterprise Pipeline would be transporting on its Eagle Ford-to-Houston pipeline system in the name and for the account of a third party and delivering to a destination point according to the third party's independent direction—which volumes would not be subject to Enterprise's commitment to exclusively utilize the Magellan Facilities. Mr. Everett did not state or imply that those "transportation volumes" excluded from Enterprise's commitment to "exclusively utilize" Magellan's facilities could, would, or might also include crude oil that Enterprise had previously owned or controlled. Further, he did not state or imply that Enterprise desired or intended to have an agreement which provided Enterprise a mere option, as opposed to a binding commitment, to transport its "marketing volumes" of Eagle Ford crude oil to and through the Magellan Facilities prior to being delivered to a specified Destination Point. Finally, Mr. Everett did not state or imply that

SR85

after Enterprise entered into the agreement with Magellan, Enterprise or Enterprise Pipeline could, would, or might modify the existing Eagle Ford-to-Houston pipeline system in order to bypass the Genoa Junction connection point into Magellan's Houston-area distribution system. Daggett Aff. ¶ 11.

11. The next day, October 19, 2011, Enterprise presented to Magellan a modified draft of the parties' written agreement, in which Enterprise had altered the prior definitions of "Controlled" and "Owned" by adding the provisos underscored below:

> 1.6 "Controlled" shall mean, when referring to Product, Product that Shipper or its Affiliates, as the case may be, has the legal right to transport; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute Control.

> 1.32 "Owned" shall mean Product to which Shipper or its Affiliate holds title; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute being Owned.

Daggett Aff. ¶ 12.

12. Magellan accepted as true, and relied upon, Enterprise's representations that by suggesting such alterations, Enterprise was not attempting to change the substance or effect of the parties' agreement, *i.e.*, that Enterprise was committing to move through the Magellan Facilities all of the Enterprise "marketing volume" of crude oil, consisting of all crude oil which Enterprise (the marketing company) owned or controlled ***at any time***. Magellan also accepted as true, and relied upon, Enterprise's representation that the "transportation volumes" being excluded from the scope of the parties' agreement referred only to third-party-owned crude oil that Enterprise Pipeline would be transporting from Eagle Ford origins under bona fide transportation agreements which gave such third parties (not Enterprise) the sole legal right to determine where and how their crude oil would be delivered. Unaware of the buy-sell scheme

SR86

Enterprise began to employ soon after it signed the COD Agreement (as discussed below), Magellan also relied upon the absence of any disclosure by Enterprise that such excluded "transportation volumes" could, would, or might include crude oil that Enterprise (the marketing company) ever owned or controlled. Accordingly, Magellan accepted and agreed to Enterprise's proposed modifications of the contract definitions of "Controlled" and "Owned" as described above. Daggett Aff. ¶ 13.

13.     Enterprise and Magellan executed the COD Agreement, effective October 31, 2011. Daggett Aff. ¶ 14; Ex. 1-B.

14.     On November 1, 2011, Enterprise Pipeline and Magellan executed a letter agreement (the "Joint Tariff Agreement") concerning the joint tariff for transportation of crude oil as contemplated by the COD Agreement. Daggett Aff. ¶ 15, Ex. 1-C. The COD Agreement specifically refers to and incorporates the Joint Tariff Agreement. *See* COD Agreement, Ex. 1-B, Section 3.1 at 5. The Joint Tariff Agreement expresses Enterprise's commitment as follows:

> [T]he shipper agrees to ship under the Joint Tariff all crude owned or controlled by it from an Origin Point *through the Connection Point* to a Destination Point.

Ex. 1-C (emphasis added).

15.     To facilitate and implement the delivery of crude oil to and through the Magellan Facilities, in accordance with the commitment Enterprise made under the COD Agreement, Magellan and Enterprise Pipeline also negotiated and entered into a new pipeline connection agreement effective December 16, 2011 (the "Connection Agreement"). Daggett Aff. ¶ 16.

16.     In reliance upon the representations and commitments Enterprise made to Magellan, and the parties' resulting agreements, as described above, Magellan proceeded to

construct the New Magellan Facilities. Construction of the New Magellan Facilities took approximately 18 months, at a cost of $20 million or more. Daggett Aff. ¶ 17.

17.     At no time during this construction did Enterprise inform Magellan that Enterprise desired to amend its contractual commitment to exclusively utilize the Magellan Facilities, or that Enterprise viewed the COD Agreement as giving Enterprise an option, but no obligation, to exclusively utilize the Magellan Facilities. Daggett Aff. ¶ 18.

18.     On June 3, 2013, Magellan provided written notice to Enterprise that the New Magellan Facilities would be operational and ready for service on July 1, 2013. Pursuant to Section 2.1 of the COD Agreement, the "In-Service Date" occurred on July 1, 2013. Pursuant to Section 2.1 of the COD Agreement, Enterprise's 10-year commitment to exclusively utilize the Magellan Facilities began on July 1, 2013 and extends to July 1, 2023. Daggett Aff. ¶ 19.

19.     Following the In-Service Date, Enterprise failed and refused to make crude oil shipments to or through the Magellan Facilities, pursuant to the terms of the COD Agreement. The limited data Enterprise has provided to date in response to Magellan's audit requests indicates that since September 2013, Enterprise has purchased and marketed over 175,000,000 barrels of Eagle Ford crude oil that did not move through the Magellan Facilities. Daggett Aff. ¶ 20.

20.     When the parties entered into the COD Agreement in 2011, and when the In-Service Date occurred in 2013, Enterprise Pipeline's Eagle Ford-to-Houston pipeline system extended, via Enterprise Pipeline's Rancho pipeline, directly to the Genoa Junction connection point with Magellan's Houston-area distribution system. After signing the COD Agreement, however, Enterprise Pipeline constructed a new crude oil pipeline dubbed the "Rancho II," consisting of approximately 88 miles of 36-inch diameter pipeline extending from Sealy directly

to ECHO Terminal. Unlike the preexisting Rancho pipeline from Sealy to Houston, which Enterprise Pipeline renamed as "Rancho I," the Rancho II pipeline completely bypasses the Genoa Junction connection point with Magellan's Houston-area crude oil distribution system. Daggett Aff. ¶ 21.

21. In April 2015, Magellan invoked it rights, pursuant to Section 4.4 of the COD Agreement, to conduct an audit of Enterprise's compliance with the COD Agreement. During the course of that audit, Magellan uncovered evidence that, shortly after signing the COD Agreement, Enterprise began using third-party buy-sell contracts to circumvent its obligations under the COD Agreement. Specifically, Magellan discovered that Enterprise had, for at least three different third-party producers, replaced its preexisting third-party marketing contract, which provided only for Enterprise's purchase of the third-party's Eagle Ford crude oil production, with new buy-sell contracts which allowed Enterprise to buy the third-party's Eagle Ford crude oil production and then resell the same volume of crude oil back to the third-party producer downstream of the Eagle Ford Origin Point but before the crude oil reached the Magellan Connection Point at Genoa Junction. Daggett Aff. ¶ 22; Ex. 1-E.

22. Enterprise began utilizing that buy-sell scheme no later than January 2012. During this time, Enterprise never told Magellan that it was replacing its Eagle Ford crude oil purchase agreements with buy-sell agreements. Daggett Aff. ¶ 23.

23. In December 2015, while Magellan's audit was pending, Enterprise Pipeline physically disconnected its facilities at Anahuac Junction from Magellan's Genoa Junction-to-Texas City pipeline. Daggett Aff. ¶ 24. The severance of the connection at Anahuac Junction between Magellan's facilities and Enterprise Pipeline's facilities occurred over Magellan's objection and made it impossible for Magellan to deliver crude oil into Enterprise Pipeline's

SR89

pipeline at Anahuac Junction, which is one of the four initial Destination Points specified in the COD Agreement. *Id*. The severance of that connection was in breach of Enterprise Pipeline's obligations under the Connection Agreement.

24.     In or about May 2017, Enterprise Pipeline posted a new tariff for transportation of crude oil moving from ECHO Terminal to Magellan's facilities at Genoa Junction. Under the new tariff, effective as of July 1, 2017, Enterprise Pipeline has essentially doubled the local tariff an Enterprise customer must pay in order to transport crude oil (including crude oil the customer sold to Enterprise at an Eagle Ford Origin Point and bought back from Enterprise at ECHO Terminal) from ECHO Terminal to Magellan's facilities at Genoa Junction, on Enterprise Pipeline's ECHO-to-Genoa Junction pipeline. By that means, Enterprise or its affiliates have dramatically increased the cost, and correspondingly decreased the economic incentive, for shippers to transport crude oil via Magellan's Houston-area distribution system (instead of the Enterprise system) to any of the Destination Points specified in the COD Agreement. Daggett Aff. ¶ 25.

25.     Magellan has served discovery requests to Enterprise and subpoenas duces tecum to three non-parties. Bryant Aff. ¶¶ 3, 5-6. The evidence Magellan has sought to discover through the above-described discovery requests is relevant to the claims Magellan asserts in this action, material to the resolution of the Motion, and potentially essential to the resolution of issues presented by the Motion. *Id*., ¶¶ 10-13. However, as a result of the Enterprise Motion for Protection and to Stay Discovery Pending Resolution of Defendant's Dispositive Motion, and the parties' subsequent Rule 11 agreement, Magellan has not had any discovery in this action and has not had adequate time or opportunity to obtain any discovery. *Id*. ¶¶ 8-9, 14. The Rule 11

agreement is "without prejudice to any argument of any party in connection with the motion for summary judgment and/or the Stay Motion." Ex. 2-G.

## IV. SUMMARY JUDGMENT STANDARDS

Rule 166a provides for two different types of summary judgment motions by a defendant—a "traditional" motion and a "no-evidence" motion—each with its own rules, requirements, and procedures. Tex. R. Civ. P. 166a(c), (i). Whether a summary judgment motion is a traditional motion or a no-evidence motion depends on "its substance, not its title or caption." *Cohen v. Landry's Inc.*, 442 S.W.3d 818, 823 (Tex. App.—Houston [14th Dist] 2014, pet. denied); *Texas Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 375 (Tex. App.—Dallas 2009, pet. denied). The reviewing court must determine the nature of a movant's summary judgment motion as a threshold matter. *Davis v. Canyon Creek Estates Homeowners Ass'n*, 350 S.W.3d 301, 307 (Tex. App.—San Antonio 2011, pet. denied). A motion seeking relief on the ground that the plaintiff cannot produce any evidence to establish an essential element of one or more of its claims is properly viewed as a no-evidence motion under Rule 166a(i). *See Marts ex rel. Marts v. Transportation Ins. Co.*, 111 S.W.3d 699, 702 (Tex. App.—Fort Worth 2003, pet. denied).

A no-evidence summary judgment motion "is essentially a motion for a pretrial directed verdict." *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). A no-evidence motion seeks "summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence." Tex R. Civ. P. 166a(i). "To defeat a no-evidence motion, the non-movant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements." *Lightning Oil Co. v.*

*Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). The court must review such evidence "in the light most favorable to the non-movant," and indulge "every reasonable inference … in that party's favor." *Id.* A party may move for no-evidence summary judgment only "[a]fter adequate time for discovery." Tex R. Civ. P. 166a(i).

"With a traditional motion for summary judgment, the movant has the initial burden of showing that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *City of Anahuac v. Morris*, 484 S.W.3d 176, 179–80 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). When the defendant moves for traditional summary judgment on a plaintiff's claims, the defendant must "conclusively negate[] at least one of the essential elements of each of the plaintiff's causes of action." *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). A matter is conclusively established "only if reasonable people could not differ in their conclusions." *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the defendant makes this showing, "the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact." *Kaplan v. City of Sugar Land*, No. 14-15-00381-CV, 2017 WL 1287994, at *2 (Tex. App.—Houston [14th Dist.] Apr. 6, 2017, no pet.). Evidence raises a genuine issue of fact if "reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented." *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007). "When reviewing a traditional motion for summary judgment, [the court must] review the evidence in the light most favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts against the motion." *Lightning Oil Co.*, 520 S.W.3d at 45.

## V.  ARGUMENT AND AUTHORITIES

### A.  ENTERPRISE IS NOT ENTITLED TO SUMMARY JUDGMENT ON MAGELLAN'S BREACH OF CONTRACT CLAIM

#### 1)  Applicable Rules of Contract Interpretation

The parties agree that well-settled rules of contract interpretation must guide the Court's analysis of the issues presented by the Motion. However, contrary to Enterprise's assertion, construing the COD Agreement in accordance with the applicable rules of contract interpretation does *not* support the interpretation Enterprise urges the Court to adopt as a matter of law, and thus does *not* support its Motion for summary judgment as to *any* of Magellan's claims.

"When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). "In discerning the parties' intent, [the court] must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012) (internal quotation marks omitted). That is, "[n]o single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). An important corollary rule dictates that a court "construe [the] contract[] from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper." *Id.* (internal quotation marks omitted).

To that end, the circumstances surrounding a written agreement must be considered by the court, because they may assist the court in construing the language the parties used. *See First Bank v. Brumitt*, No. 15-0844, 2017 WL 1968830, at *10 (Tex. May 12, 2017); *Banker v.*

*Breaux*, 128 S.W.2d 23, 24 (Tex. 1939) (stating that the contracting parties' intention, which is of controlling importance, must be ascertained from their agreement "in the light of the attending circumstances"). This includes consideration of "the undisputed evidence regarding [the contract's] negotiation and purpose." *Basic Capital Management v. Dynex Commercial*, 348 S.W.3d 894, 899 (Tex. 2011). Indeed, even when a court concludes that the parties' contract is unambiguous, it may still consider the surrounding "facts and circumstances" as an "aid in the construction of the contract's language." *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981). "In other words, the parol-evidence rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *First Bank*, 2017 WL 1968830, at \*10 (internal quotation marks omitted).[2]

Determining whether a contract is ambiguous is a legal question for the court. *Kachina Pipeline Co., Inc. v. Lillis,* 471 S.W.3d 445, 449 (Tex. 2015). A contract is ambiguous if it "is subject to two or more reasonable interpretations *after applying the pertinent rules of construction*." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (emphasis added). For example, the question of "[w]hether a contract is ambiguous … must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011) (internal quotation marks omitted). Conversely, a contract is unambiguous only if,

---

[2]  Relatedly, Enterprise is incorrect when it asserts that the parol evidence rule "precludes enforcement of prior or contemporaneous agreements" (Motion at 15) and "preclude[s] [Magellan] from asserting fraud on this basis" (Motion, n. 38 at 27), based on the fact that the COD Agreement contains a "merger" or "integration" clause. The parol evidence rule has *no* such effect when, as here, there is evidence of *ambiguity*, *fraud*, *or accident* in the written contract. *See ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719–20 (Tex. App.—Eastland 2007, pet. denied) ("A merger clause can be disregarded upon pleading and proof of ambiguity, fraud, or accident."); *Probado Techs. Corp. v. Smartnet, Inc.*, No. CIV.A. C-09-349, 2010 WL 2232831, at \*6 (S.D. Tex. June 2, 2010) ("A court may disregard an integration clause and look to prior agreements if there is evidence of ambiguity, fraud, or accident in the written contract."). *See also* 49 Tex. Prac., Contract Law § 8.9 ("Even a merger clause will not bar parol evidence, however, if the agreement is incomplete or ambiguous on its face.").

after applying such rules of construction, it is susceptible to "only one reasonable interpretation." *N. PlaiShore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 604 (Tex. 2016).

When the court concludes that the agreement as written is ambiguous, the parties' intent becomes a fact issue. *Kachina,* 471 S.W.3d at 449. At that point, the court may "consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011) (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008)).

### 2) The Pertinent Surrounding Circumstances and Four Corners of the Contract

The COD Agreement is a fairly lawyerly contract, full of key definitions and the like, between two big competitors who know the midstream energy business inside and out. For anyone less familiar with the territory, understanding what the transportation commitment set forth in Section 4.1 really means requires examination of the whole agreement (the full four corners), and interpretation of the contract language "in light of the circumstances present when the contract was entered,"[3] viewed from a "utilitarian" (practical, common sense) standpoint "bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions."[4]

#### — *The Context of the Contract* —

As shown by the parties' respective fact statements, at least some of the material circumstances surrounding the COD Agreement are not in dispute. For example, Enterprise is a crude oil marketing company which purchases its customers' crude oil on location in a producing region (*e.g*., Eagle Ford Shale) and then transports or "markets" it, via pipelines and distribution

---

[3] *Anglo-Dutch Petroleum Int'l, Inc.*, 352 S.W.3d at 449–50.

[4] *Plains*, 473 S.W.3d at 305.

systems owned by Enterprise Pipeline, to refineries or other final destinations (*e.g.*, Houston-area refineries).

There is no dispute that when the parties entered into the COD Agreement, crude oil production in the Eagle Ford Shale was growing rapidly, creating a need for expanded transportation and distribution facilities to move Eagle Ford crude oil to Houston-area destinations. Magellan already had a substantial crude oil transportation and distribution system that was directly connected and capable of delivering crude oil to multiple refineries in or near Houston, but was considering expansion of its Houston-area transportation and distribution facilities. Enterprise Pipeline was also in the process of developing its Houston-area crude oil terminal facility known as ECHO Terminal, that could eventually compete with Magellan's Houston-area crude oil distribution system. However, at the time, Enterprise Pipeline had a pipeline system that originated in the Eagle Ford Shale and extended (via Rancho I pipeline) to a point of connection into Magellan's Houston-area distribution system at Genoa Junction.

Thus, Enterprise expressed to Magellan an immediate need and desire to utilize Magellan's Houston-area systems, if and when Magellan completed an expansion that would accommodate the volume of Eagle Ford crude oil Enterprise anticipated marketing and delivering to the Houston area. Enterprise and Magellan proceeded to negotiate the terms of the COD Agreement over a period of about four months.

In the final stages of the parties' documentation of their agreement, one of the Enterprise negotiators represented to Magellan's representative, in writing, that "I believe **the intent of the agreement was for all of the marketing volume to move through these [Magellan] connections and that is our [Enterprise's] intent**. . . ."[5] And as reflected in COD Agreement,

---

[5] Ex. 1-A (emphasis added).

the parties contemplated that Enterprise would deliver all such crude oil into the Magellan distribution system **at Genoa Junction**, by one of two possible routes between an Origin Point and the Magellan connection point at Genoa Junction, *i.e.*, either (i) directly from the existing Eagle Ford-to-Houston pipeline (via Rancho I), or (ii) if Enterprise first moved the crude oil past Magellan's Genoa Junction connection point to Enterprise's nearby ECHO Terminal, then back to the Magellan connection point on an ECHO-to-Genoa Junction pipeline being constructed by Enterprise Pipeline.

## — *The Four Corners of the Contract* —

The COD Agreement begins with a series of recitals. Regarding the existing Enterprise facilities, one of the recitals states:

> Enterprise Pipeline owns the 24-inch diameter crude oil pipeline facility (**"Eagle Ford Pipeline System"**) that extends from the Origin Points (as hereafter defined) in south Texas to the Connection Point (as hereafter defined) with Magellan's Genoa Junction and owns the Webster-area terminal located south of Genoa Junction (the **"Echo Terminal"**);[6]

The final recital in the COD Agreement states the essential purpose of the contract, as follows:

> WHEREAS, Shipper, to facilitate Magellan's construction of the New Magellan Facilities, is willing to provide the commitment described in this Agreement.[7]

That is, Enterprise made its long-term exclusive-use commitment for the express purpose of inducing Magellan's costly construction of the New Magellan Facilities.

Then, the preamble states the parties' mutual intention to be legally bound to perform their respective promises:

---

[6] Ex. 1-B at 1(bold original, underscore added).

[7] Ex. 1-B at 1(underscore added).

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and agreements contained herein, and of other good and valuable consideration the receipt, adequacy and sufficiency of which are acknowledged, and <u>intending to be legally bound hereby</u>, Magellan and Shipper agree as follows:[8]

The 10-year term of contract is set forth in Section 2.1, which states in relevant part:

**2.1 Term**. The term of this Agreement ("**Term**") shall commence on the Effective Date and shall continue until the tenth (10th) anniversary of the **In-Service Date** (as hereinafter defined).[9]

The Shipper's (Enterprise's) transportation commitment is set forth in Section 4.1.

Capitalized terms are defined elsewhere in the contract (as discussed more fully below):

**4.1 Transportation Commitment.** Following the In-Service Date, Shipper agrees:

A. to <u>exclusively utilize the Magellan Facilities</u> for <u>all deliveries of Product that are Owned or Controlled by Shipper</u>; and

B. to use best efforts to cause Shipper's Affiliates to exclusively use the Magellan Facilities for all deliveries of Product that are Owned or Controlled by any of its Affiliates;

provided, that such deliveries are <u>made from an Origin Point</u> and are either:

(i) transported on the Eagle Ford Pipeline System <u>through Echo Terminal</u> to the Connection Point and <u>delivered to any of the Destination Points</u>, or

(ii) transported on the Eagle Ford Pipeline System to the Connection Point and <u>delivered to any of the Destination Points</u>.[10]

*— The Crux of the Summary Judgment Dispute —*

Again, the issue before the Court is not whether Enterprise is deliberately bypassing Magellan altogether—it admittedly IS. Rather, the crux of the summary judgment issue is

---

[8] Ex. 1-B at 1 (underscore added).

[9] Ex.1-B at 4 (bold original).

[10] Ex. 1-B at 6 (bold original, underscore added).

whether (as Enterprise contends) the *only* reasonable interpretation of Section 4.1 is one that permits Enterprise to manipulate events solely within its control and thereby render the "commitment" set forth in Section 4.1 inapplicable.

As support for its position, Enterprise asserts that certain "requirements" (*i.e.*, conditions) must be met or must occur to trigger its commitment to exclusively utilize Magellan's facilities. The Motion puts it this way:

> Enterprise is bound to exclusively utilize Magellan's distribution system under the Distribution Agreement provided that **all** of the following requirements are met: (1) the crude is either **owned** or **controlled** by Enterprise (or its Affiliates); (2) the crude **originates** from one of the four specifically identified **Origin Points** on the Eagle Ford pipeline; (3) the crude flows to Magellan's connection valve at **Genoa Junction**, and (4) the crude reaches four specifically identified **Destination Points**.[11]

Magellan does not dispute that the exclusive-use commitment only applies to Product being transported from any one of the specified Origin Points to any one of the specified Destination Points. However, Enterprise is flatly wrong when it says that under the "plain language" of the contract, Enterprise can wash its hands of the commitment simply by (i) *choosing* to bypass the Magellan Connection Point instead of delivering Product to that Connection Point, or (ii) taking Product Enterprise purchases from a marketing customer and owns at an Origin Point, transporting the Product (in Enterprise's own name and for its own account) directly to Enterprise's ECHO Terminal, and then *choosing* to sell the crude back to the same customer at ECHO Terminal.

Indeed, the Enterprise interpretation of its **"commitment"** to **"exclusively utilize"** Magellan's facilities could be restated as follows:

> "Shipper has the *option*, but not the obligation, to utilize the Magellan Facilities for transportation and delivery, to a Destination Point, of any

---

[11] Motion at 17 (all emphasis in original).

Product that Shipper owns or controls at an Origin Point; provided, that Shipper reserves the right, in its sole discretion, to exclusively utilize its own facilities for all such deliveries."

What Enterprise actually gave in Section 4.1, however, was a "commitment," which means a "promise or pledge to do something," not an option.[12] To "exclusively utilize" also has specific meaning, and does not suggest "optional" use of the Magellan Facilities. Had Enterprise so intended, it could have negotiated for an option to utilize Magellan's facilities *or not*, at its whim. However, the COD Agreement contains no such "option" language. The Joint Tariff also confirms Enterprise's commitment "to ship under the Joint Tariff all crude owned or controlled by it from an Origin Point ***through the Connection Point*** to a Destination Point."[13] And not surprisingly, Enterprise offers no explanation or logical reason why Magellan or any other rational business in its position would have invested tens of millions of dollars based on they type of hollow and worthless "commitment" Enterprise claims it made. In any case, the Motion must fail because Enterprise's currently professed view of Section 4.1's "plain language" is not a reasonable interpretation, let alone the only reasonable interpretation.

### 3) Section 4.1 Cannot be Construed, As a Matter of Law, to Either:

**(i) "Condition" the Enterprise Commitment on delivery of crude to a Designated Magellan Connection Point, or**

**(ii) Permit Enterprise to Avoid Its Commitment By Causing Product Not to Be Delivered to the Magellan Connection Point**

Enterprise argues that, as a matter of law, it has not breached the COD Agreement because the Section 4.1 language—"provided, that such deliveries … are … transported to the Connection Point" with the Magellan Facilities—creates a "condition" precedent to Enterprise's

---

[12] *Webster's New International Dictionary* 539 (2d ed. 1945).

[13] Ex. 1-C (emphasis added).

obligation to make exclusive use of the Magellan Facilities, and that "condition" has never occurred.[14] Properly construed, however, the language introduced by the words "provided, that" does not make Enterprise's delivery of Product to the designated Magellan Connection Point a "condition" of the Enterprise commitment to use the Magellan Facilities originating there. Further, if Enterprise's commitment was truly conditioned on its delivery of Product to the designated Magellan Connection Point, by law Enterprise could not avoid the commitment to use the Magellan Facilities by causing the delivery condition not to occur, such as by choosing to deliver Product to its own facilities instead.

a) <u>The language Enterprise relies on does **not** create a condition precedent to Enterprise's obligation to make exclusive use of the Magellan Facilities</u>

"A condition precedent is an act or event that must take place before performance of a contractual obligation is due." *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007). Under Texas law, conditions precedent are strongly disfavored. Indeed, Texas Supreme Court authority teaches that:

> In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition. Because of their harshness in operation, conditions are not favorites of the law.

*Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990) (internal citations omitted); *accord Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976) ("[W]here the intent of the parties is doubtful or where a condition would impose an absurd or impossible result then the agreement will be interpreted as creating a *covenant* rather

---

[14] *See* Motion at 17-18.

than a condition." (emphasis added)); *Amir v. Int'l Bank of Commerce*, 419 S.W.3d 687, 692 (Tex. App.—Houston [1st Dist.] 2013, no. pet.) (same).

Texas courts "resolve whether a contractual provision is a covenant or a condition precedent by examining *the entire contract* to determine the parties' intent." *Arbor Windsor Court, Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 136 (Tex. App.—Houston (14th Dist.] 2015, pet. denied) (emphasis added). That principle bears directly here, partly because the "entire contract" includes the Joint Tariff Agreement incorporated into the COD Agreement.[15] Notably, unlike Section 4.1 of the COD Agreement, in describing Enterprise's exclusive-use commitment the Joint Tariff Agreement does not use any "provided that" language and does not refer to Product deliveries "transported … to the Connection Point." Instead, the Joint Tariff expresses that commitment as follows:

> [T]he shipper agrees to ship under the Joint Tariff all crude owned or controlled by it from an Origin Point ***through*** the Connection Point to a Destination Point.[16]

Further, the word "provided," as used in Section 4.1 of the COD Agreement, is not a magic word that invariably introduces or creates a condition precedent. Rather, such language's "true office and its general purpose is" merely "make clear the meaning of that which has gone before." *Knight v. Chicago Corp.*, 188 S.W.2d 564, 567 (Tex. 1945). In short, it introduces a clarification.[17] So then, if the words "provided, that" do not introduce conditions upon

---

[15]  Under Texas law, all writings that pertain to the same transaction must be interpreted together and, to the extent possible, consistently. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005).

[16]  Ex. 1-C (emphasis added).

[17]  *See id.; see also Stanley v. Colt*, 72 U.S. 119, 166 (1866) ("It is true that the word 'proviso' is an appropriate one to constitute a common law condition in a deed or will, but this is not the fixed and invariable meaning attached to it by the law in these instruments. On the contrary, it gives way to the intent of the parties as gathered from an examination of the whole instrument, and has frequently been thus explained and applied as expressing simply a covenant or limitation in trust.").

Enterprise's obligation to make exclusive use of the Magellan Facilities (as Enterprise contends), what do they accomplish? The answer is simple.

First, the words following "provided, that" **_define_** and **_clarify_** the scope of the Eagle Ford transportation business both parties intended to be included in the Enterprise transportation commitment, which subparts A and B of Section 4.1 very broadly state but do _not_ specifically define. The Court will note that neither subparts A and B, nor the defined terms embedded therein, specifically tie the exclusive-use commitment to _Eagle Ford_ crude, or to the specified _Origin Points_, or to the _Destination Points_. Those gaps are filled—the intended scope of the commitment is defined and clarified—by the words following "provided, that."

Second, the words "transported … to the Connection Point" **_simply identify the specific location where Enterprise must deliver crude into Magellan's distribution system in order to fulfill its commitment as defined._** As the contract's definition of "Connection Point" makes clear,[18] delivery into Magellan's system must occur at one of two points of connection with the Magellan valve located at Genoa Junction, as distinguished from any other location within the vast complex of the "Magellan Facilities" as defined in the agreement. Thus, the words "transported … to the Connection Point" constitute a _covenant_ that in fulfilling its commitment Enterprise will deliver crude to the specified location (not somewhere else), not a "condition" on the Enterprise commitment to make exclusive use of the Magellan Facilities. That is why "transported ... to the Connection Point" is included, and that is all it means.

In other words, the phrase "transported … to the Connection Point" is not surplus and does have meaning, but not the meaning Enterprise puts on it. In fact, Enterprise's spin on that language makes circular nonsense out of Section 4.1, as though it meant: "Shipper agrees to

---

[18] _See_ Ex. 1-B at 2, Section 1.5.

exclusively utilize the Magellan Facilities only *IF* Shipper delivers Product to the Magellan Facilities," as it *must* (at *some* location) in order to utilize the Magellan Facilities at all.

Enterprise's take on Section 4.1's "transported … to the Connection Point" language also violates another canon of construction, to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless or superfluous.[19] The first "Commitment Exception" set forth in Section 4.2 of the COD Agreement states that if Enterprise "requires more capacity than Magellan has available," then Enterprise "may utilize third party facilities to transport such excess Product until such time that Magellan has capacity available."[20] If, as Enterprise claims, it had no binding obligation to deliver *any* crude to the Magellan Connection Point, what would be the point of including such an exception? None.

Additionally, Magellan's interpretation of the "to the Connection Point" language preserves the reality of Enterprise's exclusive use commitment, whereas Enterprise's interpretation makes the commitment illusory, in violation of another time-honored rule of construction. *See El Paso Field Servs. L.P.*, 389 S.W.3d at 805; *Texas Gas Utilities Co. v. Barrett*, 460 S.W.2d 409, 412 (Tex. 1970) ("A contract will be construed in favor of mutuality."). Enterprise tries to paper over that problem, arguing that its interpretation of Section 4.1 does not make its commitment illusory because Enterprise gave consideration by forfeiting a right to use *third party facilities* which, like Magellan's, have connection points at or near Genoa Junction. That is hogwash.

While it is true that Enterprise committed not to use such third parties' facilities unless the volume of Product in transport exceeded Magellan's capacity to handle, that was not the

---

[19]  *El Paso Field Servs., L.P.*, 389 S.W.3d at 805.

[20]  Ex. 1-B at 6, Section 4.2.

material consideration for the deal. The material consideration Magellan bargained for (and got) was Enterprise's promise to exclusively use facilities owned by Magellan, *instead of Enterprise's own competing facilities* at ECHO Terminal or elsewhere. That fundamental aspect of the bargain is plainly reflected in Section 4.2, which (in the exceptional circumstances described) expressly allows Enterprise to use "third party" facilities **but not its own**. Enterprise committed Eagle Ford crude transportation business to Magellan, free from any interference by Enterprise or its affiliates, including any interference that might come from the ongoing expansion of their facilities at the nearby ECHO Terminal.

In sum, Enterprise's contention that Section 4.1 must be construed to "condition" its commitment upon delivery of Product to the Magellan Connection Point—to mean, in effect, that Enterprise will make exclusive use of Magellan's distribution facilities only IF Enterprise decides to deliver Product to the Connection Point with Magellan's system—is clearly wrong and should be rejected.

> b) <u>In any event, Enterprise cannot escape its transportation "commitment" by choosing **not** to transport Product "to the Connection Point"</u>

It is hornbook contract law that a party whose obligation is conditioned upon the occurrence of an event within that party's control cannot escape its obligation by purposely causing the event not to occur. *See*, *e.g.*, *Clear Lake City Water Auth. v. Friendswood Dev. Co.*, 344 S.W.3d 514, 519 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("Generally, a party who prevents or makes impossible the occurrence of a condition precedent upon which its liability under a contract depends cannot rely on the nonoccurrence to escape liability." (internal quotation marks omitted)); *II Deerfield Ltd. P'ship v. Henry Bldg., Inc.*, 41 S.W.3d 259, 265 (Tex. App.—San Antonio 2001, pet. denied) ("It is elementary that one who prevents or makes impossible the performance of a condition precedent upon which his liability under a contract is

made to depend cannot avail himself of its nonperformance."); *SLT Dealer Grp., Ltd. v. AmeriCredit Fin. Servs., Inc.*, 336 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("While Alliance seeks to avoid its own obligations to perform under the Dealer Agreement by relying on its own failure to perfect a security interest in AmeriCredit's favor, … one who prevents or makes impossible the performance of a condition precedent upon which his liability under a contract is made to depend cannot avail himself of its nonperformance." (internal quotation marks omitted)). 13 Richard A. Lord, *Williston on Contracts* § 39:7 (4th ed. 2013) ("A party that prevents the occurrence of a condition may be said to be estopped from benefiting from the fact that the condition precedent to its obligation failed to occur."). This basic and completely logical principle of contract law, sometimes called the "doctrine of prevention," constitutes "a principle of fundamental justice." *In re Deepwater Horizon*, 786 F.3d 344, 361 (5th Cir. 2015).

Thus, when a contract conditions one party's obligations upon the occurrence of something within that party's control, that party (Enterprise) has an implied duty not to prevent the condition from occurring. *See Clement v. Producers' Ref. Co.*, 277 S.W. 634, 635–36 (Tex. Comm. App. 1925) ("[I]f the act to be done by the party binding himself can be done only upon a corresponding act being done or allowed by the other party, an obligation by the latter to do or allow to be done the act or things necessary for the completion of the contract will necessarily be implied."); *Holguin v. Twin Cities Servs., Inc.*, 750 S.W.2d 817, 819 (Tex. App.—El Paso 1988, no writ) ("[W]here one person obligates himself to perform services for another as here, an obligation on the part of the other party to supply the subject matter of the contract will be implied." (internal quotation marks omitted)); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 850 (Tex. 2009) ("In other words, when it is clear that performance

expressly promised by one party is such that it cannot be accomplished until a second party has first performed, the law will deem the second party to have impliedly promised to perform the necessary action."); *In re: KSRP, Ltd*, No. 10-7001, 2011 WL 13096691, at *7 (Bankr. S.D. Tex. Aug. 17, 2011) ("When the contract gives a party discretion regarding the extent of its performance, courts consider the purposes and nature of the contract and frequently impose a 'good-faith' requirement on the terms of the contract."); 14 Tex. Jur. 3d Contracts § 326 ("Where a contract is to be performed on the happening of a future event, the law will impute to the promisor a promise that it will in no way act to prevent the happening of the event, and that it will hold itself in constant readiness to cooperate where cooperation is necessary to achieve the occurrence of the event; if the promisor, in violation of this implied covenant, does something to prevent the occurrence of the event, the contract will then become just as absolute as if the event had actually taken place.").[21]

This implied duty is imposed on the party whose obligation is conditioned upon an event within its control to ensure that the contract is not illusory. *Mann Frankfort*, 289 S.W.3d at 850 ("[I]f one party makes an express promise that cannot reasonably be performed absent some type of performance by the other party, courts may imply a return promise so the dealings of the

---

[21] *See also* Catherine M.A. McCauliff, *Corbin on Contracts* § 40.19, at 598 (Rev. ed. 1999) ("A contractor whose promissory duty is subject to a condition eliminates that condition by unjustly preventing its fulfillment, even though the contractor has made no *express* promise not to prevent fulfillment." (emphasis added)); *id.* at 599 ("In a good many cases, however, the promisor's prevention of the fulfillment of the condition is itself regarded as a breach of contract. The court finds that the promisor has made an implied promise not to prevent or make the performance of the condition more difficult."); 13 Richard A. Lord, *Williston on Contracts* § 38:15 (4th ed. 2013) ("When the occurrence of the condition is largely or exclusively within the control of one party, so that the other party is significantly or totally dependent on the controlling party, the express language of condition will typically give rise to an implied promise of one sort or another: either that the condition will occur or that the controlling party will make some effort—ranging from a minimal, subjective good faith effort to a substantial, objectively reasonable effort—to see that the conditioning event will occur. Generally speaking, the more control one party has over whether the condition will occur, the more likely a promise will be implied, and the more stringent or substantial the implied promise imposed on it will be.").

parties can be construed to mean something rather than nothing at all.").[22] Courts rightly avoid construing a written agreement in a way that renders it illusory, especially when (as here) the contract expresses the parties' mutual intention "to be legally bound hereby."[23] *See*, *e.g.*, 2 Joseph M. Perillo et al., *Corbin on Contracts* § 5.28, at 149 (Rev. ed. 1995) ("The tendency of the law is to avoid the finding that no contract arose due to an illusory promise when it appears that the parties intended a contract."). "When words are put in promissory form, courts are loath to give them an interpretation that makes them empty in fact and misleading to others." *Id*. § 5.32 at 179.

Thus, in arguing that it could (and did) purposely avoid using Magellan's Facilities, Enterprise has admitted its violation of this basic rule of contract construction as well as its breach of the implied duty to not prevent the occurrence of any so-called "condition" precedent to its performance. Without more, its Motion therefore fails.

---

[22] In an effort to excuse its deliberate failure to transport crude to the Magellan Connection Point, Enterprise argues that the COD Agreement is "a form of output/requirements contract." Motion at 19. Although the COD Agreement is not an "output/requirements" contract, even if it could be viewed as such, that would not matter. Requirements contract are merely one type of agreement in which a party's performance obligation is subject to a condition within that party's exclusive control. *See* Restatement (Second) of Contracts § 77 cmt d. The law discussed above equally applies to output/requirements contracts. Indeed, the very case Enterprise relies on stands for the proposition that the law imposes on requirements buyers an implied duty that prevents them from evading their contractual obligations by reducing their requirements. *See N. Nat. Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 608 (Tex. 1998); *see also Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1339–41 (7th Cir. 1988).

[23] Ex. 1-B at 1.

**4) Section 4.1 Contains <u>No</u> Clear and Unambiguous Language That Either:**

    **(i)    Limits The Commitment To Crude Enterprise Continuously Owns/Controls From <u>End-To-End</u> Of The Transport From Origin Point-To-Destination Point, or**

    **(ii)    Permits Enterprise To Avoid Its "Commitment" By <u>Reselling Product At A Location Downstream</u> From The Origin Point Where It Was Owned And Controlled By Enterprise**

Enterprise also argues that the only reasonable interpretation of Section 4.1, as written, is one that permits Enterprise to avoid its express commitment just by reselling its crude oil to its marketing customer(s) or someone else, at ECHO Terminal or somewhere else, downstream from the Origin Point where Enterprise owns the Product and begins transporting the Product in its own name and for its own account. That is also incorrect.

    a)    <u>Enterprise's interpretation of the ownership/control requirement is not reasonable, much less the only reasonable interpretation</u>

First and foremost, the COD Agreement has no "plain language" that unambiguously limits the commitment to crude Enterprise owns or controls continuously from end-to-end of the transport, from Origin Point to Destination Point. In fact, nothing in the contract expressly answers the question: *when* or *where* must the Eagle Ford crude be owned or controlled by Enterprise in order for its Magellan transportation commitment to apply?

Subparts A and B of Section 4.1 state that the Enterprise commitment applies to "all deliveries of Product that are Owned or Controlled by Shipper [or any Affiliate]," but they do not directly identify *any* particular time or place where Enterprise's ownership or control must exist in order for its exclusive use commitment to apply. Nor is that matter specifically addressed in the contract's definitions of the terms "Owned" or "Controlled." The term "Owned" is defined:

    1.32  "Owned" shall mean Product to which Shipper or its Affiliate holds title; provided, however, the custody of Product by an Affiliate of Shipper that is

transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute being Owned.[24]

The definition of "Controlled" is substantially the same.[25]

However, when the language of the COD Agreement is examined in full and in context, all signs point to the Origin Point, strongly indicating that Enterprise's ownership or control of crude at any Eagle Ford Origin Point is sufficient to satisfy Section 4.1's owned/controlled requirement. Eagle Ford Origin Points are the central focus of the whole COD Agreement. Further, the COD Agreement owes its very existence to crude oil *transportation business coming from Eagle Ford origins*, and the contract revolves around crude Enterprise *owns* and *markets from* certain *Eagle Ford Origin Points*. What is more, subparts A and B of Section 4.1 tie Enterprise's commitment to "*all deliveries* of Product that are Owned or Controlled by Shipper [or any Affiliate]." This clear and plain reference to *"all"* deliveries indicates that Enterprise's ownership of Product at the Origin Point or at any time or place along the route between Origin Point and Destination Point is sufficient. Unlike the Enterprise interpretation, this view harmonizes all provisions of the COD Agreement and is consistent with the mutual intent and purpose of the agreement— as Enterprise put it, "the intent of the agreement was for all of the marketing volume to move through these [Magellan] connections, and that is our intent…."[26]

Magellan submits that its interpretation of the ownership/control requirement is the only reasonable interpretation of Section 4.1 when construed in the manner required by well-established principles discussed above. Enterprise's interpretation, on the other hand, is wholly

---

[24] Ex. 1-B at 2, Section 1.32.

[25] Ex. 1-B at 2, Section 1.6.

[26] Ex. 1-A.

unreasonable because it would allow Enterprise to switch its commitment off or on at will. A cardinal rule of contract interpretation is to avoid, if possible, any such unreasonable construction of the language used. *See Plains*, 473 S.W.3d at 305.

At a minimum, Magellan's interpretation is a reasonable construction consistent with the circumstances under which the COD Agreement was made, the purpose for which it was made, the contract as a whole, and the express language used in Section 4.1. This precludes summary judgment based on Enterprise's argument that the COD Agreement unambiguously requires Enterprise to own or control its Eagle Ford crude continuously from end-to-end of the transport from an Origin Point to a Destination Point.

> b) <u>Regardless, Enterprise cannot avoid its commitment by manipulating Product ownership/control downstream from an Origin Point</u>

Just as delivery of Product to Magellan's Connection Point is within the sole control of Enterprise, so is ownership or control of Product at all times and locations between an Origin Point and a Connection Point into Magellan's distribution system. Enterprise is not compelled by any law or regulation to sell its Eagle Ford crude after it leaves an Origin Point but before it reaches the Magellan Facilities. Instead, and as far as is currently known, pursuant to buy-sell agreements it made after executing the COD Agreement Enterprise is voluntarily reselling to a customer, at ECHO Terminal, the same volume of crude Enterprise purchases from the customer and thus owns at an Origin Point.

As discussed above, when a contracting party's obligation is actually conditioned upon the occurrence of an event or subject to a requirement within that party's own control, the law prevents the party from avoiding its obligation by causing the condition or requirement not to be fulfilled. That principle applies to the contract requirement of Product ownership or control by Enterprise. The contract requirement is satisfied if Enterprise purchases and owns crude at an

Origin Point, and no subsequent transfer of ownership can defeat Enterprise's transportation commitment to Magellan.[27]

For all of these reasons, the no-evidence Motion for summary judgment on Magellan's breach of contract claim should be denied.

**B.** **ENTERPRISE IS NOT ENTITLED TO SUMMARY JUDGMENT ON MAGELLAN'S CONTRACT REFORMATION CLAIM (SECOND CLAIM, IN THE ALTERNATIVE)**

Enterprise next contends that Magellan's reformation claim fails because Magellan cannot demonstrate the existence of a mutual mistake. In particular, Enterprise argues that "[e]vidence of mistake must be clear, exact and satisfactory" and that "Magellan cannot make this showing."

For Enterprise to make this argument, at this stage, is ironic. Enterprise filed the Motion less than two months into the case, and then moved to block all the discovery Magellan had commenced. To then argue that Magellan has no evidence sufficient to prove its reformation claim, as will be required at trial, takes "gumption" to say the least.

"A party should not be able to abuse the discovery process by withholding key evidence from a party opponent and then use that lack of evidence to win a judgment." *McInnis v. Mallia*, 261 S.W.3d 197, 204 (Tex. App.—Houston [14th Dist.] 2008, no pet.). "Parties are entitled to full, fair discovery and to have their cases decided on the merits." *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 663 (Tex. 2009). It is a clear abuse of discretion to terminate a party's claim on

---

[27] Because it cannot point this Court to any contract provision which states that for crude to be subject to Enterprise's transportation commitment it must be owned/controlled by Enterprise not only at an Origin Point but all at all times and points along the transportation route to a Destination Point, Enterprise resorts to arguing that nothing in the contract expressly obligates Enterprise to "ensure that the crude oil *remains owned* by Enterprise or its affiliates at all stages of the transport." Motion at 20 (emphasis added). That argument misses the point. Regardless of whether the COD Agreement requires Enterprise to maintain ownership of Product all the way from Origin Point to a Connection Point with the Magellan Facilities, it does require Enterprise to ensure that the commitment to exclusively utilize Magellan's facilities is honored and fulfilled even if ownership of Product is transferred to another at some stage of the Product's transport from an Origin Point.

the merits, for lacking sufficient evidence, before any discovery has taken place. *See id.* That is precisely what Enterprise is asking the Court to do here. The request should be denied.

But regardless of its obvious prematurity, Enterprise's argument is meritless. Even without the benefit of any discovery, Magellan has presented sufficient evidence to raise a genuine issue of fact regarding its reformation claim. "[R]eformation requires two elements: (1) an original agreement and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing." *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 379 (Tex. 1987). Magellan has offered ample evidence of both. Mark Daggett negotiated the COD Agreement on Magellan's behalf. As Mr. Daggett explains in his affidavit, *both* parties expressed, in writing, their understanding that Enterprise was agreeing to exclusively utilize the Magellan Facilities for all deliveries of Enterprise "marketing" volume of crude oil moving from the Origin Points to the Destination Points. Thus, assuming the parties' true agreement is not faithfully embodied in Section 4.1 of the COD Agreement (and, again, it is), then Magellan has, at the very least, presented sufficient evidence that the COD Agreement, as written, is the result of a mutual mistake in reducing the parties' actual agreement to writing. Summary judgment at this stage is, therefore, both premature and entirely improper.

## C. ENTERPRISE IS NOT ENTITLED TO SUMMARY JUDGMENT ON MAGELLAN'S DECLARATORY JUDGMENT CLAIM (THIRD CLAIM)

Enterprise argues that Magellan's declaratory judgment claim duplicates Magellan's breach of contract claim and, therefore, is not justiciable. That is incorrect. The declaratory judgment claim concerns more than Enterprise's past breach of the COD Agreement; it also concerns Enterprise's legal obligation for future performance of the transportation commitment over the remaining four years of the COD Agreement's term. Accordingly, the declaratory judgment claim is justiciable.

Although declaratory relief "is not available to settle disputes already pending before [the] court," this rule does *not* apply where the declaratory relief sought "has greater ramifications than the original suit." *BHP Petroleum Co. Inc. v. Millard*, 800 S.W.2d 838, 841–42 (Tex. 1990) (internal quotation marks omitted). This most often occurs where, as here, "the requested declaratory relief reaches beyond the pending suit to future events arising out of the ongoing and continuing relationship between the parties." *Cont'l Homes of Texas, L.P. v. City of San Antonio*, 275 S.W.3d 9, 21 (Tex. App.—San Antonio 2008, pet. denied). Thus, in a breach of contract case, if the requested declaratory relief seeks "an interpretation of the … contract, which would have the effect of defining the obligations of the parties under that contract for the foreseeable future," then that relief is *not* barred or non-justiciable merely because of a pending breach of contract claim seeking past damages.[28] *BHP Petroleum Co. Inc.*, 800 S.W.2d at 842; *accord Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 702 (Tex. App.—Houston 2007, no pet.).

In sum, the motion for summary judgment on Magellan's declaratory judgment claim fails because the law permits Magellan to pursue a "monetary award … for *past* damages suffered as a result of [the defendant's] breach" and simultaneously obtain "declaratory [relief] … intended to prevent *future* damages." *Halliburton Energy Servs., Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 263 (Tex. App.—Dallas 2014, no pet.) (emphasis added).

---

[28] All of the cases Enterprise cites are distinguishable on this basis. In all of them, the declaratory relief sought involved backward-looking relief, between parties with no ongoing contractual relationship. *See Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 727 (Tex. App.—Dallas 2015, no pet.); *Hydroscience Techs., Inc. v. Hydroscience, Inc.*, 401 S.W.3d 783, 801–02 (Tex. App.—Dallas 2013, pet. denied); *Heritage Life Ins. Co. v. Heritage Grp. Holding Corp.*, 751 S.W.2d 229, 235 (Tex. App.—Dallas 1988, writ denied); *Boatman v. Lites*, 970 S.W.2d 41, 43 (Tex. App.—Tyler 1998, no pet.).

**D.** **ENTERPRISE IS NOT ENTITLED TO SUMMARY JUDGMENT ON MAGELLAN'S PROMISSORY ESTOPPEL CLAIM (FOURTH CLAIM, IN THE ALTERNATIVE)**

Enterprise contends that, as a matter of law, the parties' written agreement bars Magellan's Fourth Claim, its alternative claim for promissory estoppel. That is also incorrect.

Although "[p]romissory estoppel is not applicable to a promise covered by a valid contract between the parties," "promissory estoppel *will* apply to a promise *outside* a contract." *Trevino & Assocs. Mech., L.P. v. Frost Nat. Bank*, 400 S.W.3d 139, 146 (Tex. App.—Dallas 2013, no pet.) (emphasis added). In other words, the existence of a written agreement does not bar a promissory estoppel claim if (1) the written agreement is invalid, or (2) the promise relied on is not part of the parties' written agreement. *See id.*; *see also Transcon. Realty Inv'rs, Inc. v. John T. Lupton Tr.*, 286 S.W.3d 635, 648 (Tex. App.—Dallas 2009, no. pet) ("If the elements of promissory … estoppel are met, then a promise may enforce an otherwise unenforceable contract"); *Harris Const. Co., LTD. v. GGP-Bridgeland, L.P.*, 698 F. Supp. 2d 723, 730 (S.D. Tex. 2010) (holding that a party's oral promise that "materials and work furnished under [a] Contract would be of good quality, free from faults and defects and in conformance with the Contract" was a "promise outside the parties' contract" and thus enforceable by a promissory estoppel claim). For these reasons, promissory estoppel is often described as "a viable alternative to breach of contract." *Trevino*, 400 S.W.3d at 146.

Here, Magellan has pled a promissory estoppel claim, *in the alternative* to its breach of contract claim. Magellan's promissory estoppel claim seeks to recover on the promise Enterprise made to Magellan on October 18, 2011,[29] that Enterprise would exclusively use the Magellan Facilities for all Origin Point-to-Destination Point deliveries of Enterprise's "marketing" volumes of crude oil—that is, crude Enterprise owns and markets from an Origin Point, as

---

[29] Ex. 1-A.

distinguished from crude others own and merely transport in their own names and for their own accounts, on an Enterprise pipeline. Magellan believes that Enterprise's promise is synonymous with the Enterprise transportation commitment as expressed in Section 4.1 of the parties' written agreement. However, if the Court should determine that Enterprise's interpretation of Section 4.1 of the COD Agreement is the *only* reasonable interpretation of its transportation "commitment" as expressed in the written contract (which it should not), then Magellan would have an actionable promissory estoppel claim based on Enterprise's promise. This is so for at least two reasons.

First, under Enterprise's construction of the Section 4.1, its promise would fall outside of the parties' written contract and thus provide a basis for an independent promissory estoppel claim. *See Harris Const. Co., LTD.*, 698 F. Supp. 2d at 730. Second, if Section 4.1 of the COD Agreement means what Enterprise says, then its exclusive-use commitment is illusory and unenforceable. Without a valid agreement, promissory estoppel provides an available remedy. *See Transcon. Realty Inv'rs, Inc.*, 286 S.W.3d at 648.

In other words, Enterprise cannot have it both ways. If the promise at issue is embodied in Section 4.1 of the COD Agreement (which it is), then Magellan is entitled to pursue and recover damages under its breach of contract claim. If, on the other hand, the Court endorses the Enterprise interpretation of Section 4.1 as a matter of law, then Magellan has a viable claim for promissory estoppel.

E.  **ENTERPRISE IS NOT ENTITLED TO SUMMARY JUDGMENT ON MAGELLAN'S FRAUD CLAIM (FIFTH CLAIM)**

As Magellan alleged in its Original Petition,[30] when it approved and signed the COD Agreement as written, Magellan accepted as true and relied upon various Enterprise misrepresentations or material omissions including the following:

- Enterprise's representation that for all of its "marketing volume" of Eagle Ford crude oil—which Magellan understood to mean crude oil Enterprise would purchase from Eagle Ford customers and would have the legal right to transport from the Eagle Ford Shale to Houston-area destination points—Enterprise intended to use the Magellan Facilities and was legally binding itself to transport the crude through the Magellan Facilities.

- Enterprise's representation that by suggesting certain changes in the contract definitions of "Owned" and "Controlled," Enterprise was *not* attempting to change the substance or effect of the parties' actual agreement regarding Enterprise's exclusive use of the Magellan Facilities.

- Enterprise's representation that the "transportation volumes"—the Eagle Ford crude being excluded from the scope of Enterprise's transportation commitment to Magellan—were limited to customer-owned (not Enterprise-owned) crude that Enterprise Pipeline would be transporting from an Eagle Ford location to a final destination as directed by those customers pursuant to bona fide transportation agreements between the pipeline company and its customers.

- The lack of any disclosure that, in fact, Enterprise was planning to replace existing marketing agreements with buy/sell agreements and claim that once the crude was resold to the marketing customer Enterprise's commitment to make exclusive use of the Magellan Facilities no longer applied.

Magellan's Original Petition also alleges that Enterprise's misrepresentations or concealments of material information continued *after* the parties signed the COD Agreement - misleading Magellan to believe that Enterprise really intended to make exclusive use of the Magellan Facilities being developed at great cost, not that Enterprise viewed its "commitment"

---

[30]  *See* Original Petition ¶¶ 30-35.

as nothing more than an option to use Magellan's facilities if/when Enterprise chose not to use its own.[31] Such conduct by Enterprise clearly supports Magellan's claim of fraud.[32]

The no-evidence Motion does not challenge the admissibility or sufficiency of Magellan's evidence in support of its fraud claim, and for good reason. The no-evidence Motion is premature, as Magellan has not had any discovery. The currently available evidence presented by Magellan is clearly admissible; the parol evidence rule does not apply to a fraud claim.[33] Finally, even if the Motion were not premature, Magellan's burden would only be to present a *scintilla* of evidence which could support its fraud claim, giving Magellan the benefit of all reasonable inferences. *Lightning Oil Co.*, 520 S.W.3d at 45.

Enterprise's summary judgment argument rests on (i) an *assumption* that Enterprise's interpretation of the COD Agreement is correct as a matter of law, and (ii) an assertion that if the Court agrees with Enterprise's interpretation of the contract as written, Magellan's reliance on Enterprise's misrepresentations was unjustifiable as a matter of law, because Magellan must have known it was being lied to. Neither of those is correct.

---

[31] *See* Original Petition ¶¶ 45-49.

[32] A claim for fraudulent inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation. *See Haase v. Glazner*, 62 S.W.3d 795, 798–99 (Tex. 2001). To prevail on a fraudulent inducement claim, a plaintiff must show (1) that the defendant knowingly made a false representation, (2) intending to induce the plaintiff to enter into an agreement, and (3) that the plaintiff relied on the misrepresentation to its detriment. *See Hoffman v. L & M Arts*, 838 F.3d 568, 576 (5th Cir. 2016). In addition, "[a] contractual promise made with no intention of performing may give rise to an action for fraudulent inducement." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

[33] *See Santos v. Mid-Continent Refrigerator Co.*, 471 S.W.2d 568, 569 (Tex. 1971); *In re Border Steel, Inc.*, 229 S.W.3d 825, 835 n.12 (Tex. App.—El Paso 2007, orig. proceeding) (Despite the general rule that extrinsic evidence is inadmissible to vary or add to the terms of an unambiguous agreement, such "evidence is admissible in cases where there are allegations of fraudulent inducement."); *Dallas Farm Mach. Co. v. Reaves*, 307 S.W.2d 233, 239 (Tex. 1957) (noting that the fraud exception to parol evidence rule applies even if the written contract contains a merger clause).

First, for all the reasons discussed above, Enterprise's construction of the COD Agreement is not the only reasonable construction, or even *a* reasonable construction. For this reason alone, the motion for summary judgment on Magellan's fraud claim should be denied.

Second, even if the Court accepted Enterprise's interpretation of the contract as written, that would not defeat the fraud claim as a matter of law. In this regard, Enterprise cites various cases for the proposition that reliance on a misrepresentation is unjustified and unjustifiable if the matter misrepresented "is directly contradicted by the express, unambiguous terms of a written agreement." *See, e.g.*, *H2O Sols., Ltd. v. PM Realty Grp., LP*, 438 S.W.3d 606, 624 (Tex. App.— Houston [1st Dist.] 2014, pet. denied) (emphasis added). However, to defeat a claim of reliance on fraudulent misrepresentation, Texas law requires *direct* contradiction in *express* terms. *Id.* at 624–25.[34] As the cases cited by Enterprise make clear, the mere fact that a court, upon applying applicable rules of contract interpretation, may determine a contract to be unambiguous, does not necessarily mean that a party who relied on misrepresentations about the agreement must have known they were misrepresentations. An agreement that lacks clarity may nonetheless be found to be technically "unambiguous." *See Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 746 (Tex. 2003) ("Lack of clarity does not create an ambiguity….").

---

[34] All of the cases Enterprise cites satisfied this basic requirement and thus are readily distinguishable. *See, e.g.*, *Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 424 (Tex. 2015) (holding that a plaintiff's reliance on the defendant's oral promise to pay $1 million was unjustified because the contract expressly limited total compensation to $500,000); *H2O Sols., Ltd.*, 438 S.W.3d at 625 ("[A]ny alleged misrepresentations concerning these issues [asserted by plaintiff] are contradicted by the express terms of the contract … ."); *Miller Glob. Properties, LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 348 (Tex. App.—Dallas 2013, pet. denied) (holding that an investor's reliance on the defendant's oral representations that plans for a resort were complete was unjustified because the schedules attached to the parties' agreement clearly "demonstrated that the construction plans required extensive additions"); *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that a retailer's reliance on a manufacturer's oral representation that the distributor would have the "exclusive right" to sell the manufacturer's product was unjustified where the contract expressly stated that the retail's right to distribute was "non-exclusive").

This most often occurs when a provision is unclear on its face and yet, "after applying the pertinent rules of contract interpretation," can still be given a certain or definite meaning. *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 258 (Tex. 2017). For this reason, to defeat a claim of reliance on a fraudulent misrepresentation, Texas law requires proof that the written contract "*directly* contradict[s]" the defendant's oral misrepresentation in "*express … terms.*" *H2O Sols., Ltd.*, 438 S.W.3d at 624 (emphasis added).

Here, whatever may be said for Enterprise's interpretive arguments, the COD Agreement does not *directly* contradict Enterprise's misrepresentations, in *express* terms. The contract does direct or expressly state that Enterprise can defeat its exclusive-use obligation by transferring title to crude downstream from an Origin Point or by refusing to deliver crude oil to the Magellan Connection Point. Indeed, Enterprise's argument is that the COD Agreement permits such things because it does not specifically or expressly prohibit them.[35]

Accordingly, the Motion for summary judgment on Magellan's fraud claim should be denied.

F.  **BECAUSE THE MOTION IS PREMATURE IN ANY EVENT, IT COULD NOT BE GRANTED BEFORE MAGELLAN HAS HAD ADEQUATE TIME TO CONDUCT RELEVANT DISCOVERY**

The Enterprise Motion constitutes a no-evidence motion for summary judgment under Rule 166a(i). *See* Tex. R. Civ. P. 166a(i). A no-evidence motion may be filed *only* "[a]fter adequate time for discovery." *Id*. Magellan has had no discovery or opportunity for discovery, let alone the "adequate time for discovery" that Rule 166a(i) requires before a no-evidence motion for summary judgment may be filed. Indeed, immediately after it filed the no-evidence Motion, Enterprise moved to *stay* any and all discovery by Magellan,[36] thus ensuring that Magellan could

---

[35]  Motion at 11, SOF ¶ 21.

[36]  *See* Ex. 2-F.

not have "adequate time for discovery" and compounding the impropriety of the premature no-evidence Motion. It is no answer to argue, as Enterprise has in its stay motion, that ***discovery*** is "premature" and "unnecessary" because the Court "need not and indeed cannot consider any extraneous evidence in determining the threshold legal issue raised in Enterprise's motion for summary judgment."[37] Enterprise has it backwards: what is premature is its no-evidence Motion, not the discovery Enterprise has effectively blocked for the time being.[38]

By filing its no-evidence Motion at the virtual outset of the case, prior to *any* opportunity for discovery by Magellan, Enterprise seeks to have the Court decide the whole case (all five claims) against Magellan before Plaintiff's case gets off the blocks—that is, before Magellan (and the Court) learn anything more about what the Enterprise personnel who *actually negotiated* the contract with Magellan understood Enterprise's "commitment" to mean and require; what Enterprise actually intended with respect to its future performance or non-performance; all the ways and means Enterprise has used or is using to circumvent its commitment; the scope and magnitude of Magellan's damages, and other matters essential to prove Magellan's claims at trial.

Magellan is plainly entitled to discovery on its breach of contract claim. "Whether a contract is ambiguous … must be decided by examining the contract as a whole ***in light of the circumstances present when the contract was entered***." *Anglo-Dutch Petroleum Int'l, Inc.*, 352 S.W.3d at 449–50 (emphasis added). Magellan has a right to discovery regarding all such

---

[37]  Motion at 1.

[38]  Ironically, Enterprise itself asserts and relies on many alleged facts that are far beyond the four corners of the COD Agreement, including facts relating to intent (or lack thereof), opportunity, motives for entering into the COD Agreement, Magellan's alleged mindset in not objecting to certain of Enterprise's actions, and the like. Apparently, Enterprise does not believe its own legal argument that the Court must wear blinders when it interprets the COD Agreement, examining the four corners of the document and nothing else.

circumstances, including evidence going to the parties' respective intentions, purposes, and understandings of their agreement. The Court should reject Enterprise's invitation to decide the "threshold legal issue" in a vacuum devoid of all discoverable evidence of such circumstances.

Moreover, even if the Court were persuaded that Enterprise's interpretation of the contract is the only reasonable one, that would not defeat Magellan's claims for contract reformation, promissory estoppel, and/or fraud. Magellan would still be entitled to discovery into, at a minimum, whether the contract resulted from a mutual mistake in reducing the parties' actual agreement to writing, what Enterprise's own records show about the representations and promises it made to Magellan, and whether Enterprise had an intent not to perform when it entered into the contract or otherwise intentionally misled Magellan.[39]

For all the reasons discussed above, the Motion is misguided on all counts and should be denied across the board, here and now. However, if the Court is inclined to believe that on some element of a claim for which Magellan will have the burden of proof at trial, the evidence currently before the Court, along with all reasonable inferences favorable to Magellan, may not supply the *scintilla* of evidence necessary to withstand a summary judgment motion, then pursuant to Rule 166a(g) Magellan moves the Court to defer ruling and continue the Motion as needed to give Magellan adequate time and opportunity to conduct discovery essential to resolution of the Motion.

## VI.  CONCLUSION

For the reasons set forth above, the no-evidence Motion for summary judgment should be denied in its entirety.

---

[39]  If, despite the representations Enterprise made to Magellan when the COD Agreement was executed, Enterprise intended all along to ensure that any purported "conditions" on its commitment never occurred, then Enterprise both breached its agreement and committed fraud.

Respectfully submitted,

**GABLEGOTWALS**

By:    /s/ David L. Bryant
      David L. Bryant
      State Bar No. 24084344
      dbryant@gablelaw.com
      113 Pleasant Valley Drive, Suite 204
      Boerne, Texas 78006
      Telephone: (830) 336-4810
      Facsimile: (918) 595-4990

      Lisa T. Silvestri
      State Bar No. 00797967
      lsilvestri@gablelaw.com
      100 W. Fifth St., Suite 1100
      Tulsa, Oklahoma 74103
      Telephone: (918) 595-4800
      Facsimile: (918) 595-4990

      And

      **FIGARI + DAVENPORT, LLP**

      Bill E. Davidoff
      State Bar No. 00790565
      bill.davidoff@figdav.com
      Amanda Sotak
      State Bar No. 24037530
      amanda.sotak@figdav.com
      901 Main Street, Suite 3400
      Dallas, Texas 75202
      Telephone: (214) 939-2000
      Facsimile: (214) 939-2090

      **ATTORNEYS FOR PLAINTIFF,
      MAGELLAN CRUDE OIL
      PIPELINE COMPANY, L.P.**

SR123

## CERTIFICATE OF SERVICE

I certify that on September 18, 2017, I forwarded a true and correct copy of the foregoing

document to the following counsel via EFile:


**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

**Attorneys for Defendant**
**Enterprise Crude Oil LLC**


/s/ David L. Bryant
David L. Bryant

SR124

# Exhibit 1
# Affidavit of Mark E. Daggett

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited )
partnership, )
          )
          )      IN THE DISTRICT COURT OF
        Plaintiff, )
          )      DALLAS COUNTY, TEXAS
vs. )
          )      101ST JUDICIAL DISTRICT
ENTERPRISE CRUDE OIL LLC, )
a Texas limited liability company, )
          )
          )
        Defendant. )

## AFFIDAVIT OF MARK E. DAGGETT

STATE OF TEXAS       )
                     ) ss.
COUNTY OF HARRIS    )

     Mark E. Daggett, of lawful age, being first duly sworn upon his oath, states the following:

     1.      I am Director of Crude Oil Business Development at Magellan Midstream Partners, L.P., the parent company of Magellan Pipeline Company, L.P. ("Magellan"). In this capacity, I served as the lead negotiator on Magellan's behalf during the negotiation and drafting of the Crude Oil Distribution Agreement ("COD Agreement") between Magellan and Enterprise Crude Oil LLC ("Enterprise"), dated October 31, 2011. I have personal knowledge of the matters set forth in this Affidavit.

     2.      Magellan owns and operates pipelines and related facilities for the transportation and distribution of crude oil. Magellan's facilities in and around the Houston area distribute crude oil to refineries and other locations across the Texas Gulf Coast. Those facilities can be accessed through a point of connection Magellan maintains at a location known as Genoa Junction, in southeast Houston, Texas. I am also familiar with crude oil pipelines, storage facilities and

{1739519;}

distribution systems that competitors of Magellan, including Enterprise and its affiliate Enterprise Crude Pipeline LLC ("Enterprise Pipeline"), own and operate in the Houston area.

3.  Enterprise is a crude oil marketing company. It purchases crude oil from third parties and generates revenues by marketing, storing, and transporting the same. In Texas, Enterprise purchases and markets crude oil produced in, among other regions, a south Texas production area known as the Eagle Ford Shale.

4.  Enterprise Pipeline owns or operates numerous pipeline facilities in Texas. Those facilities include a 24-inch diameter crude oil pipeline extending from locations in the Eagle Ford Shale, to Enterprise Pipeline's facilities in Sealy, Texas, to destinations in the Houston, Texas area, and a facility known as ECHO Terminal, which is located a few miles southeast of Genoa Junction.

5.  In 2011, Magellan's existing facilities in the Houston area included (i) a 26-inch diameter pipeline extending from Genoa Junction to BP's Texas City Refinery in Galveston County and (ii) a 24-inch diameter pipeline extending from Speed Junction to Valero's Houston Refinery. In the COD Agreement, those were referred to collectively as the "Existing Magellan Facilities."

6.  In the spring of 2011, Magellan was considering whether to construct new pipeline facilities in the Houston area in order to expand and improve its facilities for distribution of crude oil from the Eagle Ford Shale to refineries or other destinations in the Houston area. The new facilities under consideration included:

- a new 24-inch diameter pipeline from Genoa Junction to Magellan's then-existing facilities at Speed Junction;

- a new 24-inch diameter pipeline from Speed Junction to Deer Park, Texas; and

- construction of or improvements to existing Magellan crude oil delivery points at Houston Refining LP's Refinery, Pasadena Refining Systems, Inc.'s Houston Refinery and Red Bluff Tank Farm, Shell's Deer Park Refinery, and Enterprise Pipeline's pipeline at Anahuac Junction.

In the COD Agreement, those were collectively described as the "New Magellan Facilities," and together with the Existing Magellan Facilities, were described as the "Magellan Facilities."

7. The anticipated cost of construction for the New Magellan Facilities was significant. For that reason, Magellan determined that it would not proceed with the project without first obtaining a long-term contract that would provide revenues sufficient to assure the project's commercial and financial viability.

8. In mid-2011, Magellan entered into discussions with Enterprise to determine Enterprise's interest in utilizing the Magellan Facilities. Specifically, Magellan explored Enterprise's willingness to provide, in consideration of incentive tariff rates to be charged by Magellan, a binding commitment to exclusively utilize the Magellan Facilities with respect to Eagle Ford crude oil production that Enterprise or its affiliates owned or controlled at points of origin along Enterprise Pipeline's Eagle Ford-to-Houston pipeline system, for distribution and delivery to various Gulf Coast refineries or other destinations served or to be served by the Magellan Facilities. In the parties' discussions, Enterprise expressed both a need and a desire to utilize the Magellan Facilities for such purposes.

9. Based on Enterprise's expression of interest, Magellan and Enterprise proceeded to negotiate—over a period of approximately four months, from July 2011 through October 2011—the terms of an agreement providing for Enterprise's long-term commitment to exclusively utilize the Magellan Facilities. Through such negotiations, the parties reached an agreement that for 10

*Affidavit of Mark E. Daggett*
{1739519;}

3

years after the New Magellan Facilities were completed and operational, and for all crude oil that Enterprise or its affiliates owned or controlled at any of four agreed-upon Eagle Ford "Origin Points" and transported on Enterprise Pipeline's Eagle Ford-to-Houston pipeline system, Enterprise would exclusively utilize (and use "best efforts" to cause its affiliates to exclusively utilize) the Magellan Facilities in order to deliver such crude oil to any of several agreed-upon "Destination Points." That is, the parties agreed that such crude oil could not be delivered to any such Destination Point without utilizing Magellan's Houston area crude oil distribution system, accessible at Genoa Junction.

10. On October 18, 2011, near the end of the parties' documentation of their agreement, I received an email from Enterprise representative Jake Everett, proposing to modify the COD Agreement's definition of the term "Controlled." In his message, Mr. Everett explained Enterprise's understanding of the parties' agreement, and its reason for requesting the modification. In relevant part, Mr. Everett's email stated as follows:

> We would like to revise the definition of "Control" to eliminate the clause on legal authorization to transport. Our affiliate, Enterprise Crude Oil Pipeline will be transporting crude for 3rd parties under transportation agreement rather than a marketing agreement so only the 3rd party will have authority to determine the ultimate destination.
>
> I believe the intent of the agreement was for all of the marketing volume to move through these [Magellan] connections and that is our intent, but as soon as a 3rd party requests a delivery outside of this agreement, we don't want to be in default. Please let me know if you disagree with our interpretation.

A true copy of Mr. Everett's email message is attached hereto as Exhibit 1-A.

11. On the same date, October 18, 2011, Mr. Everett and I discussed Enterprise's proposed modification by phone. In that conversation, Mr. Everett reaffirmed that Enterprise agreed that all crude oil Enterprise owned or controlled at any time at any specified Origin Point (*i.e.*, all Enterprise "marketing volume") and transported via Enterprise Pipeline's Eagle Ford-to-

Houston pipeline system would be delivered into Magellan's Houston-area distribution system if such crude oil was to be distributed and delivered to any specified Destination Point. Mr. Everett also reaffirmed that the sole reason for Enterprise's request to modify the definition of "Control" was to distinguish between (i) on the one hand, Enterprise's "marketing volumes" of crude oil— *i.e.*, crude oil Enterprise (the marketing company) purchased from third parties and owned or controlled at an Eagle Ford Origin Point—all of which would be transported exclusively to and through the Magellan Facilities if destined for any of the Destination Points, and (ii) on the other hand, Enterprise Pipeline's "transportation volumes"—*i.e.*, crude oil owned by third parties (not by Enterprise) that Enterprise Pipeline would be transporting on its Eagle Ford-to-Houston pipeline system in the name and for the account of a third party and delivering to a destination point according to the third party's independent direction—which volumes would not be subject to Enterprise's commitment to exclusively utilize the Magellan Facilities. Mr. Everett did not state or imply that those "transportation volumes" excluded from Enterprise's exclusive-use commitment could, would, or might also include crude oil that Enterprise had previously owned or controlled. Further, he did not state or imply that Enterprise desired or intended to have an agreement which provided Enterprise a mere option, as opposed to a binding commitment, to transport its "marketing volumes" of Eagle Ford crude oil to and through the Magellan Facilities prior to being delivered to a specified Destination Point. Finally, Mr. Everett did not state or imply that after Enterprise entered into the agreement with Magellan, Enterprise or Enterprise Pipeline could, would, or might modify the existing Eagle Ford-to-Houston pipeline system in order to bypass the Genoa Junction connection point into Magellan's Houston-area distribution system.

*Affidavit of Mark E. Daggett*
{1739519;}

5

12. The next day, October 19, 2011, Enterprise presented to Magellan a modified draft of the parties' written agreement, in which Enterprise had altered the prior definitions of "Controlled" and "Owned" by adding the provisos underscored below:

1.6 "Controlled" shall mean, when referring to Product, Product that Shipper or its Affiliates, as the case may be, has the legal right to transport; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute Control.

1.32 "Owned" shall mean Product to which Shipper or its Affiliate holds title; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute being Owned.

13. Magellan accepted as true, and relied upon, Enterprise's representations that by suggesting such alterations, Enterprise was not attempting to change the substance or effect of the parties' actual agreement, i.e., that Enterprise was committing to move through the Magellan Facilities all of the Enterprise "marketing volume" of crude oil, consisting of all crude oil which Enterprise (the marketing company) owned or controlled at any time. Magellan also accepted as true, and relied upon, Enterprise's representation that the "transportation volumes" being excluded from the scope of the parties' agreement referred only to third-party-owned crude oil that Enterprise Pipeline would be transporting from Eagle Ford origins under bona fide transportation agreements which gave such third parties (not Enterprise) the sole legal right to determine where and how their crude oil would be delivered. Magellan also relied upon the absence of any disclosure by Enterprise that such excluded "transportation volumes" could, would, or might include crude oil that Enterprise (the marketing company) ever owned or controlled. Accordingly, Magellan accepted and agreed to Enterprise's proposed modifications of the contract definitions of "Controlled" and "Owned" as described above.

*Affidavit of Mark E. Daggett*
{1739519;}

6

14. Enterprise and Magellan executed the COD Agreement, effective October 31, 2011. A true copy of the COD Agreement is attached hereto as Exhibit 1-B.

15. On November 1, 2011, Enterprise Pipeline and Magellan executed a letter agreement (the "Joint Tariff Agreement") concerning the joint tariff for transportation of crude oil as contemplated by the COD Agreement. A true copy of the Joint Tariff Agreement is attached hereto as Exhibit 1-C.

16. To facilitate and implement the delivery of crude oil to and through the Magellan Facilities, in accordance with the commitment Enterprise made under the COD Agreement, Magellan and Enterprise Pipeline also negotiated and entered into a new pipeline connection agreement effective December 16, 2011 (the "Connection Agreement"). A true copy of the Connection Agreement is attached hereto as Exhibit 1-D.

17. In reliance upon the representations and commitments Enterprise made to Magellan, and the parties' resulting agreements, as described above, Magellan proceeded to construct the New Magellan Facilities. Construction of the New Magellan Facilities took approximately 18 months, at a cost of $20 million or more.

18. At no time during this construction did Enterprise inform Magellan that Enterprise desired to amend its contractual commitment to exclusively utilize the Magellan Facilities, or that Enterprise viewed the COD Agreement as giving Enterprise an option, but no obligation, to exclusively utilize the Magellan Facilities.

19. On June 3, 2013, Magellan provided written notice to Enterprise that the New Magellan Facilities would be operational and ready for service on July 1, 2013. Pursuant to Section 2.1 of the COD Agreement, the "In-Service Date" occurred on July 1, 2013. Pursuant to Section

*Affidavit of Mark E. Daggett*
{1739519;}

7

2.1 of the COD Agreement. Enterprise's 10-year commitment to exclusively utilize the Magellan Facilities began on July 1, 2013 and extends to July 1, 2023.

20. The limited data Enterprise has provided to date in response to Magellan's audit requests indicates that since September 2013, Enterprise has purchased and marketed over 175,000,000 barrels of Eagle Ford crude oil that was not moved through Magellan's facilities.

21. When the parties entered into the COD Agreement in 2011, and when the In-Service Date occurred in 2013, Enterprise Pipeline's Eagle Ford-to-Houston pipeline system extended, via Enterprise Pipeline's Rancho pipeline, directly to the Genoa Junction connection point with Magellan's Houston-area distribution system. After signing the COD Agreement, however, Enterprise Pipeline constructed a new crude oil "loop pipeline" dubbed the "Rancho II," consisting of approximately 88 miles of 36-inch diameter pipeline extending from Sealy directly to ECHO Terminal. Unlike the preexisting Rancho pipeline from Sealy to Houston, which Enterprise Pipeline renamed as "Rancho I," the Rancho II pipeline completely bypasses the Genoa Junction connection point with Magellan's Houston-area crude oil distribution system.

22. In April 2015, Magellan invoked it rights, pursuant to Section 4.4 of the COD Agreement, to conduct an audit of Enterprise's compliance with the COD Agreement. During the course of that audit, Magellan uncovered evidence that, shortly after signing the COD Agreement, Enterprise began using third-party buy-sell contracts to circumvent its obligations under the COD Agreement. Specifically, Magellan discovered that Enterprise had, for at least three different third-party producers, replaced its preexisting third-party marketing contract, which provided only for Enterprise's purchase of the third-party's Eagle Ford crude oil production, with new buy-sell contracts which allowed Enterprise to buy the third-party's Eagle Ford crude oil production and then resell the same volume of crude oil back to the third-party producer downstream of the Eagle

Ford Origin Point but before the crude oil reached a Genoa Junction Connection Point into the Magellan Facilities. A true copy of one such buy-sell contract along with the marketing contract it replaced (with the third-party producer's name and identifying information redacted) is attached hereto as Exhibit 1-E.

23.     As shown by Exhibit 1-E, Enterprise began utilizing that buy/sell scheme no later than January 2012. During this time, Enterprise never told Magellan that it was replacing its Eagle Ford crude oil purchase agreements with buy-sell agreements.

24.     In December 2015, while Magellan's audit was pending, Enterprise Pipeline physically disconnected its facilities at Anahuac Junction from Magellan's Genoa Junction-to-Texas City pipeline. The severance of that connection occurred despite Magellan's objection. The severance of the connection at Anahuac Junction between Magellan's facilities and Enterprise Pipeline's facilities made it impossible for Magellan to deliver crude oil into Enterprise Pipeline's pipeline at Anahuac Junction, which is one of the four initial Destination Points specified in the COD Agreement.

25.     In or about May 2017, Enterprise Pipeline posted a new tariff for transportation of crude oil moving from ECHO Terminal to Magellan's facilities at Genoa Junction. Under the new tariff, effective as of July 1, 2017, Enterprise Pipeline has essentially doubled the local tariff an Enterprise customer must pay in order to transport crude oil (including crude oil the customer sold to Enterprise at an Eagle Ford Origin Point and bought back from Enterprise at ECHO Terminal) from ECHO Terminal to Magellan's facilities at Genoa Junction, on Enterprise Pipeline's ECHO-to-Genoa Junction pipeline. *See* attached Exhibit 1-F. By that means, Enterprise or its affiliates have dramatically increased the cost, and correspondingly decreased the economic incentive, for

*Affidavit of Mark E. Daggett*                    9
{1739519;}

shippers to transport crude oil via Magellan's Houston area distribution system (instead of the Enterprise system) to any of the Destination Points specified in the COD Agreement.

FURTHER AFFIANT SAYETH NOT.



Mark E. Daggett

Subscribed and sworn to before me, by Mark E. Daggett, on this 14th day of September, 2017.

Notary Public

My commission number is: 128443095

My commission expires: 11/08/2018

[S E A L]

NOTARY PUBLIC
PEDRO MARIO DURAN JR
My Commission Expires
November 8, 2018
STATE OF TEXAS

*Affidavit of Mark E. Daggett*
{1739519;}

10

Exhibit 1-A
Jake Everett Email to Mark Daggett, Oct. 18, 2011

**From:** Everett, Jake [mailto:JKEverett@eprod.com]
**Sent:** Tuesday, October 18, 2011 1:21 PM
**To:** Daggett, Mark E
**Cc:** McMurry, Pat; Moore, Kenneth
**Subject:** Revision to the dist agreement

Mark,

Pat asked me to get in touch with you about a revision to the distribution agreement. We would like to revise the definition of "Control" to eliminate the clause on legal authorization to transport. Our affiliate, Enterprise Crude Oil Pipeline will be transporting crude for 3rd parties under transportation agreement rather than a marketing agreement so only the 3rd party will have authority to determine the ultimate destination.

I believe the intent of the agreement was for all of the marketing volume to move through these connections and that is our intent, but as soon as a 3rd party requests a delivery outside of this agreement, we don't want to be in default. Please let me know if you disagree with our interpretation.

Our legal folks are revising the statement and I'll forward to you, if that is acceptable. If you would rather have your folks revise and forward to us, please let me know. The attached doc has NOT been revised, but I've included it anyway for review.

**Jake Everett, P.E.**
**Manager, Onshore Business Development**
**Enterprise Crude Pipeline**
**713-381-3060**
**832-331-2201 Cell**

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

# Exhibit 1-B
# Crude Oil Distribution Agreement, Oct. 31, 2011

# CRUDE OIL DISTRIBUTION AGREEMENT

This Crude Oil Distribution Agreement ("**Agreement**") is made and entered into this 31ˢᵗ day of October, 2011(the "**Effective Date**") by and between Enterprise Crude Oil LLC, a Texas limited liability company ("**Shipper**"), and Magellan Pipeline Company, L.P., a Delaware limited partnership ("**Magellan**"). Shipper and Magellan are sometimes hereinafter referred to individually as a "**Party**" or collectively as the "**Parties**".

## RECITALS:

WHEREAS, Magellan owns and operates certain crude oil pipeline facilities in the Houston, Texas area, including pipeline facilities that extend from Genoa Junction to BP's Texas City Refinery in Galveston County (via an approximately 26.3 mile long, 26-inch diameter pipeline) and from Speed Junction to Valero's Houston Refinery (via an approximately 1.09 mile long, 24-inch diameter pipeline) (hereinafter collectively referred to as the "**Existing Magellan Facilities**");

WHEREAS, Magellan is contemplating the construction of a new 24-inch pipeline from Genoa Junction to Speed Junction, a new 24-inch pipeline from Speed Junction to Deer Park and construction of or improvements to other existing delivery points at Houston Refining LP's Refinery, Pasadena Refining System, Inc.'s Houston Refinery and Red Bluff Tank Farm, Shell's Deer Park Refinery and Enterprise Crude Pipeline LLC's ("**Enterprise Pipeline**") pipeline at Anahuac Junction (hereinafter collectively referred to as the "**New Magellan Facilities**", and, together with the Existing Magellan Facilities, the "**Magellan Facilities**");

WHEREAS, Enterprise Pipeline owns the 24-inch diameter crude oil pipeline facility ("**Eagle Ford Pipeline System**") that extends from the Origin Points (as hereinafter defined) in south Texas to the Connection Point (as hereinafter defined) with Magellan's Genoa Junction and owns the Webster-area terminal located south of Genoa Junction (the "**Echo Terminal**"); and

WHEREAS, Shipper, to facilitate Magellan's construction of the New Magellan Facilities, is willing to provide the commitment described in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and agreements contained herein, and of other good and valuable consideration the receipt, adequacy and sufficiency of which are acknowledged, and intending to be legally bound hereby, Magellan and Shipper agree as follows:

1. DEFINITIONS. In addition to the definitions set forth in the foregoing preamble, the following terms shall have the definitions set forth below for the purposes of this Agreement:

   1.1 "**Affiliate**" means, in relation to a Party, any entity that (A) directly or indirectly controls such Party; (B) is directly or indirectly controlled by such Party; or (C) is directly or indirectly controlled by an entity that directly or indirectly controls such Party. For purposes of this definition, the term "control", including the terms "controlling" and "controlled by", means the possession, directly or indirectly, of

I

the power to direct or cause the direction of the management and policies of an entity.

1.2    "**Agreement**" has the meaning set forth in the first paragraph of this Agreement.

1.3    "**Barrel**" means forty-two (42) U.S. Gallons (each being 231 cubic inches) temperature corrected to sixty (60) degrees Fahrenheit.

1.4    "**Commitment Exceptions**" has the meaning set forth in Section 4.2(B).

1.5    "**Connection Point**" means each of the following points at which the Magellan Facilities are connected and capable of receiving Product as of the In-Service Date:

    A. Point of interconnection between the Magellan Facilities and Enterprise Pipeline's Eagle Ford Pipeline System at or near Genoa Junction; and

    B. Point of interconnection between the Magellan Facilities and Enterprise Pipeline's Echo Terminal at or near Genoa Junction.

1.6    "**Controlled**" shall mean, when referring to Product, Product that Shipper or its Affiliates, as the case may be, has the legal right to transport; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute Control.

1.7    "**Default Termination**" has the meaning set forth in Section 2.2.

1.8    "**Destination Point**" means the following points:

    A. Valero's Houston Refinery;
    B. BP's Texas City Refinery;
    C. Enterprise Pipeline's Anahuac Junction; and
    D. Shell's Deer Park Refinery.

Magellan may, but shall have no obligation to, construct additional points at which the Magellan Facilities will be connected and capable of delivering Product during the Term of this Agreement, including, without limitation, the following: Marathon's Texas City Refinery, Valero's Texas City Refinery, Seaway Crude Pipeline Company's Texas City Terminal, Seaway Crude Pipeline Company's Galena Park Terminal, Houston Fuel Oil Terminal Company's Houston Terminal, Oil Tanking's Houston Terminal, Houston Refining LP's Houston Refinery, Pasadena Refining, Inc.'s Houston Refinery, Pasadena Refining, Inc.'s Red Bluff Tank Farm and/or Magellan Terminal Holdings, L.P.'s Galena Park Terminal (the "**Future Destination Points**"). If connected, these Future Destination Points will be deemed added to this definition of Destination Points.

1.9    "**Dispute**" has the meaning set forth in Section 9.9.

1.10    "**Dispute Notice**" has the meaning set forth in Section 9.9.

2

SR140

1.11    "Eagle Ford Pipeline System" has the meaning set forth in the recitals.

1.12    "Echo Terminal" has the meaning set forth in the recitals.

1.13    "Effective Date" has the meaning set forth in the first paragraph of this Agreement.

1.14    "Enterprise Pipeline" has the meaning set forth in the recitals.

1.15    "Enterprise Pipeline Local Tariff Rate" means the rate charged by Enterprise Pipeline under the Joint Tariff.

1.16    "Existing Magellan Facilities" has the meaning set forth in the recitals.

1.17    "Force Majeure" has the meaning set forth in Section 6.1.

1.18    "Future Destination Points" has the meaning set forth in Section 1.8.

1.19    "Governmental Authority" means any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality, and any tribunal, court or arbitrator of competent jurisdiction.

1.20    "In-Service Date" has the meaning set forth in Section 2.1.

1.21    "Incentive Program Rate" means the rate in the Joint Tariff for shippers that qualify for the incentive program as set forth in the Joint Tariff.

1.22    "Initial Incentive Magellan Rate" means $0.2853.

1.23    "Joint Tariff" means that certain joint tariff (Texas Railroad Commission Tariff No. ____) together with all applicable rules and regulations, as each may be supplemented, amended or reissued from time to time.

1.24    "Law" means all applicable local, state and federal constitutions, laws (including common law), treaties, statutes, orders, decrees, rules, regulations, codes, and ordinances issued by any Governmental Authority, and including judicial or administrative orders, consents, decrees, and judgments, and determinations by, or interpretations of any of the foregoing by any Governmental Authority having jurisdiction over the matter in question and binding on a given Party.

1.25    "Liabilities" has the meaning set forth in Section 8.1.

1.26    "Magellan" has the meaning set forth in the first paragraph of this Agreement.

1.27    "Magellan Facilities" has the meaning set forth in the recitals.

1.28    "Minimum Volume Threshold" means 20,000 barrels per day per month.

3

1.29 **"New Magellan Facilities"** has the meaning set forth in the recitals.

1.30 **"Oil Pipeline Index"** has the meaning set forth in Section 3.3A.

1.31 **"Origin Point"** means the following points on the Eagle Ford Pipeline System:

    A. Gardendale (LaSalle County, Texas);
    B. Lyssy (Wilson County, Texas);
    C. Marshall (Gonzales County, Texas); and
    D. Milton (Karnes County, Texas).

1.32 **"Owned"** shall mean Product to which Shipper or its Affiliate holds title; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute being Owned.

1.33 **"Party"** and **"Parties"** have the meanings set forth in the first paragraph of this Agreement.

1.34 **"Product"** means crude oil and condensate meeting the specifications provided for in the Joint Tariff, as such tariff may be supplemented, amended or reissued from time to time.

1.35 **"Shipper"** has the meaning set forth in the first paragraph of this Agreement.

1.36 **"Tariff Escalation"** has the meaning set forth in Section 3.3(A).

1.37 **"Term"** has the meaning set forth in Section 2.1.

2. **CONTRACT TERM AND DEFAULT**

2.1 **Term.** The term of this Agreement ("**Term**") shall commence on the Effective Date and shall continue until the tenth (10th) anniversary of the In-Service Date (as hereinafter defined). Transportation services contemplated hereunder shall be available on the first day of the first calendar month after Magellan provides written notice to Shipper that the New Magellan Facilities are operational (the "**In-Service Date**"). Such notice must be provided at least fifteen (15) days prior to the In-Service Date. The In-Service Date is estimated to be approximately fourteen (14) months after the Effective Date.

2.2 **Default.** A Party shall be in default under this Agreement if it: (A) defaults in the payment or performance of any obligation in this Agreement; and/or (B) files or has filed against it a petition in bankruptcy, for reorganization, or for appointment of a receiver or trustee, which is not dismissed or withdrawn within sixty (60) days of filing. Unless a default under this section has been cured to the reasonable satisfaction of the non-defaulting Party within ten (10) days of the defaulting Party's receipt of written notice from the non-defaulting Party of such asserted default, then, in addition to all other available rights and remedies all of which are cumulative, this Agreement may be immediately terminated at the option of the

4

SR142

non-defaulting Party by delivery of written notice of termination to the defaulting Party (a "**Default Termination**").

3.   **JOINT TARIFF AND INCENTIVE PROGRAM RATES**

   3.1   **Joint Tariff.** Transportation services under this Agreement are subject to, and the Parties are required to comply with, the provisions of the Joint Tariff.

   3.2   **Incentive Program Rate.** Subject to Section 3.3, during the Term of this Agreement, Magellan agrees that the Incentive Program Rate under the Joint Tariff will be equal to or less than the Enterprise Pipeline Local Tariff Rate plus the Initial Incentive Magellan Rate.

   3.3   **Initial Incentive Magellan Rate Escalation and Adjustment.**

   A.   The Initial Incentive Magellan Rate may be increased by Magellan beginning on July 1, 2012, and each July 1st of thereafter during the Term (the "**Tariff Escalation**"); provided, however, that (A) any Tariff Escalation will not exceed the amount of any increase permitted in accordance with the indexing methodology set forth in 18 C.F.R. §342.3, or any successor thereto (the "**Oil Pipeline Index**") and (B) the Initial Incentive Magellan Rate will not decrease during the Term.

   B.   In the event Magellan elects not to increase its Initial Incentive Magellan Rate in any given year of the Term, Magellan reserves the right to increase its Initial Incentive Magellan Rate in any subsequent year during the Term by the allowable cumulative percentage increase foregone by Magellan in prior years.

   C.   In addition to and not subject to the limitations set forth above, in the event Magellan is required by a change from the Law as it existed on the Effective Date to: (i) make significant improvements to all or any portion of the Magellan Facilities or (ii) to incur significant additional expenses for public safety, pollution control or for any other reason with respect to the Magellan Facilities, and the effect of the cost and expense thereof to Magellan is not reflected in the Oil Pipeline Index, Magellan may increase the Initial Incentive Magellan Rate to reflect the effect of such costs and expenses incurred by Magellan to comply with such change in Law. Magellan shall notify Shipper, not less than ninety (90) days prior to the implementation of any increase in the Initial Incentive Magellan Rate under this Section 3.3(C), of the amount of such proposed increase, the reason for such increase and the method of calculating such increase. Shipper shall have the right to notify Magellan within thirty (30) days after Shipper receives Magellan's notice, of Shipper's decision not to pay such increase. If Shipper fails to timely notify Magellan of its decision, then it shall be deemed for purposes of this Agreement that Shipper accepts and approves such increase. If Shipper notifies Magellan that it will not accept such increase then such increase shall be null and void, but Magellan shall have the right to terminate this Agreement within thirty (30) days after Magellan receives Shipper's notice in which case neither Party shall have any further obligations to the other Party hereunder except as to obligations already accrued. Magellan

may, in its sole discretion, elect whether or not to request any such increase or fee allowed under this paragraph.

## 4. SHIPPER COMMITMENTS, EXCEPTIONS, AUDIT RIGHTS AND PENALTY

4.1 **Transportation Commitment.** Following the In-Service Date, Shipper agrees:

A.  to exclusively utilize the Magellan Facilities for all deliveries of Product that are Owned or Controlled by Shipper; and

B.  to use best efforts to cause Shipper's Affiliates to exclusively use the Magellan Facilities for all deliveries of Product that are Owned or Controlled by any of its Affiliates;

provided, that such deliveries are made from an Origin Point and are either:

(i)  transported on the Eagle Ford Pipeline System through Echo Terminal to the Connection Point and delivered to any of the Destination Points, or

(ii) transported on the Eagle Ford Pipeline System to the Connection Point and delivered to any of the Destination Points.

4.2 **Transportation Commitment Exceptions.**

A.  If, at any point during the Term hereof, Shipper requires more capacity than Magellan has available, Shipper may utilize third party facilities to transport such excess Product until such time that Magellan has capacity available; and

B.  If a third party connects to a Future Destination Point before Magellan, and Magellan later connects to such Future Destination Point, then Magellan must offer Shipper a tariff rate to such Future Destination Point equal to or less than the third party tariff rate at such Future Destination Point or such Future Destination Point shall not be considered a Destination Point under Section 1.8 (the exceptions in Section 4.2(A) and (B) are hereinafter collectively referred to as the "**Commitment Exceptions**").

4.3 **Payments.** Subject to Section 3.3 and in accordance with the Joint Tariff, in any month that Shipper transports the Minimum Volume Threshold, or more than the Minimum Volume Threshold, Shipper will pay the Initial Incentive Magellan Rate for the volumes transported in such month. If Shipper fails to transport the Minimum Volume Threshold in a month, Shipper will pay the base rate under the Joint Tariff for the volumes transported in such month; provided, however, if Shipper nominates capacity in excess of the Minimum Volume Threshold, but Magellan is unable to provide the nominated capacity in such month, Shipper will pay the Initial Incentive Magellan Rate for the volumes actually transported in such month even if less than the Minimum Volume Threshold. All payments due by Shipper under this Agreement shall be made in accordance with the terms of the Joint Tariff.

6

4.4　**Magellan's Limited Right to Audit and Penalty.** Magellan shall have the right to audit Shipper's records necessary to verify Shipper's compliance with the provisions of Sections 4.1 and 4.2. This audit must be conducted during normal business hours, at a reasonable time and reasonable location and must be conducted within one (1) year after December 31st of each calendar year for such previous year's transportation services. The cost of such audit shall be borne by Magellan if Shipper is found to be in compliance with Section 4.1 and 4.2. If such audit concludes that Shipper is not in compliance with Sections 4.1 or 4.2, the cost of such audit shall be borne by Shipper, and Shipper shall pay to Magellan an amount equal to the Initial Incentive Magellan Rate multiplied by (A) the number of Barrels of Product Shipper transported during such calendar year on a third party pipeline minus (B) the number of Barrels of Product Shipper transported during such calendar year on a third party pipeline due to the Commitment Exceptions, as concluded by such audit.

5.　**ASSIGNMENT AND SUCCESSION.** Neither Party may assign this Agreement, or any of its rights or obligations hereunder, without the prior written consent of the other Party, such consent not to be unreasonably withheld, delayed or conditioned. Subject to the foregoing provision, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns and legal representatives of the Parties.

6.　**FORCE MAJEURE**

6.1　**Defined.** The term "Force Majeure" means any cause, event or circumstance of whatever nature which is not within the reasonable control of the Party claiming to be adversely affected thereby including, but not limited to, acts of God or public enemy, the elements, fire, accident, explosions, freezing, breakdowns, strikes, other industrial, civil or public disturbance, inability to obtain permits, materials, equipment or labor, or any laws, rules, regulations, acts, prohibition or restraints of any government or governmental body or authority, civil or military. Neither Party will be entitled to the benefit of Force Majeure under any of the following circumstances: (A) to the extent the failure was caused by the gross negligence of the Party claiming relief; (B) to the extent the failure was caused by the Party claiming relief having failed to remedy the condition and to resume performance with reasonable dispatch; (C) the ability of either Party to obtain better consideration or lower cost for performance; or (D) economic hardship.

6.2　**Notice and Termination.** If any condition of Force Majeure should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall (A) state the date that the Force Majeure began, (B) describe the Force Majeure and (C) provide an estimate of the date the condition of Force Majeure will cease. The Party experiencing the condition of Force Majeure will not be in default and will not be liable for any failure to perform while a condition of Force Majeure exists to the extent such failure is caused by the Force Majeure. At the conclusion of the condition of Force Majeure, the Party claiming Force Majeure will promptly notify the other Party that the condition of Force Majeure has concluded and provide the date of such conclusion. Any commitments within the Agreement will be suspended during the period of Force Majeure and at the conclusion of the Force Majeure period all commitments under the Agreement

7

will be reestablished and the Term will be extended by the same number of days as the Force Majeure was in effect. If an event of Force Majeure prevents a Party from the performance of its obligations hereunder for a period of at least 120 consecutive days, then the other Party may elect to terminate this Agreement with no further future obligation to the other Party; provided, however, that (i) Magellan must, to the extent not prevented by Force Majeure or the terms of the Joint Tariff, complete the transportation and delivery of any Product that was delivered by Shipper to Magellan at the Connection Point on or prior to such termination, and (ii) Shipper must pay any transportation charges due under the Joint Tariff as may have accrued prior to the occurrence of the condition of Force Majeure.

7.    **NOTICES.** Notices under this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the Party, or if sent by facsimile or electronic mail with a hard copy mailed on the same day, or if sent by confirmed overnight courier, in each case addressed to the Party as set forth below or to such other address as one Party may have directed in writing to the other Party prior to the delivery of any such notice.

If to Magellan:

Magellan Pipeline Company, L.P.
One Williams Center
P.O. Box 22186
Tulsa, Oklahoma 74121
Attention:    Scott Devers
Phone:        (918) 574-7712
Fax:          (918) 574-7264
E-mail:       scott.devers@magellanlp.com

If to Shipper:

Enterprise Crude Oil LLC
1100 Louisiana, Suite 1800
Houston, Texas 77002
Attention:    Senior Vice President – Crude Oil & Offshore
Phone:        (713) 381-6679
Fax:
E-mail:

8.    **INDEMNIFICATION**

8.1    MAGELLAN SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS SHIPPER, ITS PARENTS AND AFFILIATES, AND ITS AND THEIR RESPECTIVE MEMBERS, MANAGERS, OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, AGENTS AND OTHER REPRESENTATIVES FROM AND AGAINST ANY CLAIMS, ACTIONS, JUDGMENTS, LIABILITIES, LOSSES, COSTS, DAMAGES, FINES, PENALTIES AND EXPENSES (COLLECTIVELY "LIABILITIES") ARISING IN CONNECTION WITH THIS AGREEMENT BUT ONLY AS TO THE EXTENT OF: (A) THE NEGLIGENCE OR WILLFUL MISCONDUCT OF MAGELLAN, ITS

8

EMPLOYEES, AGENTS, CONTRACTORS AND OTHER REPRESENTATIVES, OR (B) THE FAILURE OF MAGELLAN TO COMPLY WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT.

8.2 SHIPPER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS MAGELLAN, ITS PARENTS AND AFFILIATES, AND ITS AND THEIR RESPECTIVE MEMBERS, MANAGERS, OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, AGENTS AND OTHER REPRESENTATIVES FROM AND AGAINST ANY LIABILITIES ARISING IN CONNECTION WITH THIS AGREEMENT BUT ONLY TO THE EXTENT OF: (A) THE NEGLIGENCE OR WILLFUL MISCONDUCT OF SHIPPER, ITS EMPLOYEES, AGENTS, CONTRACTORS AND OTHER REPRESENTATIVES, OR (B) THE FAILURE OF SHIPPER TO COMPLY WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT.

8.3 THE INDEMNITIES EXPRESSED IN SECTIONS 8.1 AND 8.2 OF THIS AGREEMENT SHALL SURVIVE THE EXPIRATION OR TERMINATION OF THIS AGREEMENT.

9. GENERAL PROVISIONS

9.1 **Changes and Waiver.** Neither this Agreement nor any term or provision hereof may be changed, waived, discharged or terminated except by an instrument in writing signed by the Party against which enforcement of such change, waiver, discharge or termination is sought.

9.2 **Governing Law.** THIS AGREEMENT, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW.

9.3 **Confidentiality.** Each Party recognizes and acknowledges the other Party's proprietary interest in this Agreement, and agrees not to divulge any of the contents hereof to any other person, firm, corporation or other entity. Each party agrees to be responsible for enforcing the confidentiality of this Agreement and agrees to take such action as necessary to prevent any disclosure by any of its agents or employees. This Section 9.3 shall survive the termination of this Agreement for a period of two (2) years.

9.4 **No Third Party Beneficiary.** Nothing in this Agreement shall be considered or construed as conferring any right or benefits on persons not a party to this Agreement.

9.5 **Severability.** Both Parties expressly agree that it is not the intention of either Party to violate public policy or state or federal statutory or common laws and that if any sentence, paragraph, clause or combination thereof in this Agreement is in violation of the same, such paragraph, clause or sentence, or combination of the same shall be inoperative and the remainder of this Agreement shall remain binding upon the

9

Parties hereto, provided that the reasonable expectation of each Party at the time it entered into this Agreement is not materially impaired.

9.6 **Limitation of Liability.** Except as otherwise set forth herein, in no event shall either Party be liable to the other for any special, punitive, exemplary, consequential, incidental, indirect or similar losses or damages in respect of this Agreement howsoever caused (including, but not limited to, loss of revenue, loss of profits or loss of present or future opportunities), whether or not foreseeable, other than such damages as are awarded or paid to third parties and which an indemnified person is legally compelled to pay to such third parties and entitled to indemnification hereunder.

9.7 **Entirety.** This Agreement between the Parties comprises the entire agreement between the Parties with respect to the subject matter hereof, and there are no agreements, understandings, requirements, warranties or representations, oral or written, expressed or implied, that are not merged herein or superseded hereby, other than as set forth in the Joint Tariff.

9.8 **Records Retention.** Each Party agrees to maintain all records related to this Agreement for a period of at least sixty (60) months from the entry of such record.

9.9 **Dispute Resolution.** In the event of a dispute, controversy or claim arising out of or relating to this Agreement ("Dispute"), the Parties shall first undertake to settle their Dispute by good faith negotiations. Either Party may commence this process by serving the other Party with a written notice ("Dispute Notice") that concisely describes the nature of the Dispute and the relief or remedy requested. The Party receiving such Dispute Notice shall, within fifteen (15) days of its receipt thereof, provide the giver of the Dispute Notice a concise written response setting forth the responder's position with respect to the asserted Dispute. If for any reason whatsoever the Dispute has not been settled within thirty (30) days of service of the Dispute Notice, then the Parties agree to submit the Dispute to non-binding mediation with a neutral mediator selected by the Parties. If the Parties cannot agree on a mediator or if the Dispute cannot be settled by mediation within one hundred twenty (120) days of service of the Dispute Notice, then either Party may submit the Dispute to any state or federal court sitting in Dallas County, Texas. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH PROCEEDING AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY ACTION OR PROCEEDING IN ANY SUCH COURT, ANY OBJECTION TO VENUE WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF THE PLACE OF RESIDENCE OR DOMICILE OF EITHER PARTY. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO A DISPUTE UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

10

9.10 **Remedies Cumulative.** Each Party's rights and remedies under this Agreement shall be in addition to, and not in limitation or exclusion of, any other rights or remedies to which such Party may otherwise be entitled (whether by agreement, operation of law or otherwise).

9.11 **Course of Dealing, etc.** Neither course of performance, nor course of dealing, nor usage of trade shall be used to qualify, explain or supplement any of the terms of this Agreement.

9.12 **Headings and Sections.** All references to "Sections" herein pertain to Sections of this Agreement, unless expressly stated otherwise. Headings are for purposes of reference only and shall not be used to construe the meaning of this Agreement.

9.13 **No Interpretation Against Draftsman.** The Parties acknowledge and agree that the language used in this Agreement shall be deemed to be chosen by the joint action of the Parties hereto to express their mutual intent, and no rule of strict construction against any one Party shall be applied hereto. No implications or inferences shall be drawn from the deletion or addition to terms of previous drafts or versions of this Agreement. Each Party acknowledges for itself that it has had the opportunity to participate in the preparation of this Agreement, and that, therefore, in the event of any ambiguity in, or controversy with respect to, the meaning of any term or provision contained in this Agreement, no presumption or inference shall be drawn against either Party's interpretation or construction of this Agreement by reason of such Party's or its counsel's participation in the drafting of this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**Magellan Pipeline Company, L.P.**
By: Magellan Pipeline GP, LLC, its general partner

By: _Michael Mears_

Name: _Michael Mears_

Title: _CEO_

**Enterprise Crude Oil LLC**
By: Enterprise Crude GP LLC, its Sole Manager

By: _____

Name: Mark A. Hurley

Title: SVP, Crude and Offshore

11

Plf Resp in Opp to Motion for Summary Judgment 77

# Exhibit 1-C
# Joint Tariff Agreement, Nov. 1, 2011

November 1, 2011


Mr. Mark Hurley
Senior Vice President Crude Oil and Offshore
Enterprise Crude Pipeline LLC
1100 Louisiana, Suite 1800
Houston, Texas 77002

> Re: Magellan Pipeline Company, L.P. ("Magellan") and Enterprise Crude Pipeline
> LLC ("Enterprise") Joint Tariff on East Houston Distribution System and Eagle
> Ford Pipeline System

Dear Mark:

The purpose of this letter is to confirm the agreement between Magellan and Enterprise to enter into a joint tariff for crude oil transportation from certain Origin Points (as hereinafter defined) in south Texas on Enterprise's Eagle Ford Pipeline System through the Connection Point (as hereinafter defined) and to a Destination Point (as hereinafter defined) (the "Joint Tariff"). Magellan and Enterprise agree to maintain the Joint Tariff for ten (10) years from the In-Service Date (as hereinafter defined). The Joint Tariff rate shall be the sum of the Enterprise local tariff and the Magellan local tariff.

Magellan and Enterprise agree to offer an incentive program under the Joint Tariff to shippers that enter into a ten (10) year agreement with Magellan pursuant to which the shipper agrees to ship under the Joint Tariff all crude oil owned or controlled by it from an Origin Point through the Connection Point and to a Destination Point. The Joint Tariff rate under the incentive program will be equal to or less than the sum of the Enterprise local tariff and the Initial Incentive Magellan Rate (as hereinafter defined). The Initial Incentive Magellan Rate may be escalated based on certain conditions. In any month that a shipper transports the Minimum Volume Threshold (as hereinafter defined), or more than the Minimum Volume Threshold, the shipper will pay the Initial Incentive Magellan Rate for the volumes transported in such month. If the shipper fails to transport the Minimum Volume Threshold in a month, the shipper will pay the base rate under the Joint Tariff for the volumes transported in such month.

The form of the Joint Tariff will be substantially similar to that certain Joint Tariff (TRRC No. 113) effective February 1, 2011. The incentive program to be offered under the Joint Tariff will be substantially similar to form attached hereto as Exhibit A.

For purposes of this letter agreement, the following definitions shall apply:

> "Connection Point" means (i) the point of interconnection between Magellan's facilities and Enterprise Pipeline's Eagle Ford Pipeline System at or near Genoa Junction, and (ii)

the point of interconnection between the Magellan's facilities and Enterprise Pipeline's Echo Terminal at or near Genoa Junction.

"Destination Point" means the following points:

A. Valero's Houston Refinery;
B. BP's Texas City Refinery;
C. Enterprise Pipeline's Anahuac Junction; and
D. Shell's Deer Park Refinery.

Magellan may, but shall have no obligation to, construct additional points at which Magellan's facilities will be connected during the term of the Joint Tariff, including, without limitation, the following: Marathon's Texas City Refinery, Valero's Texas City Refinery, Seaway Crude Pipeline Company's Texas City Terminal, Seaway Crude Pipeline Company's Galena Park Terminal, Houston Fuel Oil Terminal Company's Houston Terminal, Oil Tanking's Houston Terminal, Houston Refining LP's Houston Refinery, Pasadena Refining, Inc.'s Houston Refinery, Pasadena Refining, Inc.'s Red Bluff Tank Farm and/or Magellan Terminal Holdings, L.P.'s Galena Park Terminal (the "Future Destination Points"). If connected, these Future Destination Points will be deemed added to this definition of Destination Point.

"In-Service Date" means the first day of the first calendar month after Magellan provides written notice to Enterprise that the New Magellan Facilities (as hereinafter defined) are operational.

"Initial Incentive Magellan Rate" means $0.2853.

"Minimum Volume Threshold" means 20,000 barrels per day per month.

"New Magellan Facilities" means the following facilities to be built by Magellan:

A. a new 24-inch pipeline from Genoa Junction to Speed Junction;
B. a new 24-inch pipeline from Speed Junction to Deer Park; and
C. construction of or improvements to other existing delivery points at Houston Refining LP's Refinery, Pasadena Refining System, Inc.'s Houston Refinery and Red Bluff Tank Farm, Shell's Deer Park Refinery and Enterprise's pipeline at Anahuac Junction.

"Origin Points" means the following points on the Eagle Ford Pipeline System:

Gardendale (LaSalle County, Texas)          Milton (Karnes County, Texas)
Lyssy (Wilson County, Texas)                Marshall (Gonzales County, Texas)


If the foregoing accurately sets forth our agreement concerning the Joint Tariff, please so signify by signing in the space provided below and returning an executed copy to my attention.

Sincerely,
Magellan Pipeline Company, L.P.
By:     Magellan Pipeline GP, LLC,
        its General Partner


By: _____
Name: ~~Robb L. Barnes~~ *Mike Mears*
Title: ~~Vice President~~ *CEO*

Accepted and agreed to this ___ day
of November, 2011:

**Enterprise Crude Pipeline LLC**

By: _____
Name: Mark Hurley
Title: Senior Vice President

## Exhibit A

### [Form of Incentive Program under Joint Tariff]

Plf Resp in Opp to Motion for Summary Judgment 82

SR154

**Exhibit A**

**[Form of Incentive Program under Joint Tariff]**

# MAGELLAN PIPELINE COMPANY, L.P.

## JOINT INCENTIVE PIPELINE TARIFF

APPLYING ON THE TRANSPORTATION OF

### CRUDE PETROLEUM

TO POINTS NAMED HEREIN

Governed, except as otherwise provided herein, by rules and regulations published in Magellan Pipeline Company, L.P.'s R.C.T No. XYZ supplements thereto and reissues thereof.

The rates named in this Tariff are expressed in cents a barrel of 42 U.S. Gallons and are subject to change as provided by law.

The matter published herein will have no adverse effect on the quality of the human environment.

## EFFECTIVE:

Issued & Compiled By: Tina R. Granger, Pipeline Tariffs
MAGELLAN PIPELINE COMPANY, L.P.
One Williams Center – MD 31-1
Tulsa, Oklahoma 74172
(918) 574-7415

Plf Resp in Opp to Motion for Summary Judgment 84

SR156

## PIPELINE INCENTIVE PROGRAM

| ITEM NO. | 10-YEAR MARKET COMMITMENT INCENTIVE PROGRAM<br><br>From: Origin Points on the Enterprise Eagle Ford Pipeline System<br>To: BP Texas City Refinery; Enterprise Pipeline's Anahuac Jct; Valero Houston Refinery and Shell Deer Park Refinery |
|---|---|
| **100** | 1. Rates set forth in this Item apply to deliveries of Crude Petroleum from the Incentive Rate Origins defined as Origin Points on the Enterprise Eagle Ford Pipeline System, Texas to the Incentive Destinations defined in paragraph 4 of this Item.<br><br>Any Shipper desiring to avail itself of the Incentive Rates as set forth herein must satisfy all of the following provisions to be a "Participating Shipper"<br>• Shippers must enter into a prior written crude oil distribution agreement with MPL.<br>• The term of the crude oil distribution agreement shall be at least one hundred twenty (120) months.<br>• To receive the Incentive Rate, the shipper must meet or exceed a Minimum Volume Threshold of 20,000 barrels per day per month to be transported from an Incentive Origin Point to an Incentive Destination Point.<br><br>2. In addition to the terms and conditions contained in this Item, all applicable rules and regulations in MPL's R.C.T. No. XX, supplements thereto and reissues thereof, also apply.<br><br>3. **Market Commitment Incentive Rates** |

| FROM<br>(Incentive Origin) | TO<br>(Incentive Destinations) | Market Commitment Incentive Rate<br>(cents per barrel) |
|---|---|---|
| Enterprise's Eagle Ford Pipeline System Origins | BP Texas City Refinery | xxx |
| | Enterprise Pipeline's Anahuac Jct | xxx |
| | Valero Houston Refinery | xxx |
| | Shell Deer Park Refinery | xxx |

Escalation of the Incentive Rate will be in accordance with the written crude oil distribution agreement.

4. All volumes to which the Participating Shipper holds title in its name, or has the legal right to ship, from an Incentive Origin for delivery to an Incentive Destination will apply toward the monthly Minimum Volume Threshold.

5. Carrier will invoice the Participating Shipper at the rates set out in Paragraph 4 of this Item at the time of delivery. Participating Shipper will bear all other applicable charges in the applicable rules and regulations in MPL's R.C.T. No. XXX and any supplements thereto and reissues thereof.

6. In the event the Participating Shipper ships less than the Minimum Volume Threshold in any month, then Participating Shipper shall pay the applicable base rate for volumes transported in such month; provided, however, if Participating Shipper nominates capacity in excess of the Minimum Volume Threshold, but Magellan is unable to provide the nominated capacity in such month, Participating Shipper will pay the Incentive Rate for the volumes actually transported in such month even if less than the Minimum Volume Threshold.

| Participating Carrier | Enterprise Crude Pipeline LLC |
|---|---|

Plf Resp in Opp to Motion for Summary Judgment 85

SR157

# Exhibit 1-D
# Connection Agreement, Dec. 16, 2011

Plf Resp in Opp to Motion for Summary Judgment 86

SR158

# CONNECTION AGREEMENT

THIS CONNECTION AGREEMENT ("Agreement") is made and entered into this 16th day of December, 2011 (the "Effective Date"), by and between ENTERPRISE CRUDE PIPELINE, LLC, a Texas Limited Liability Company ("ENTERPRISE"), and MAGELLAN PIPELINE COMPANY, L.P., a Delaware limited partnership ("MPL"). ENTERPRISE and MPL are sometimes hereinafter referred to individually as "Party" and collectively as "Parties."

## WITNESSETH:

WHEREAS, ENTERPRISE and MPL were successor-in-interests to that certain Connection Agreement dated April 29, 2009 by and between TEPPCO Crude Pipeline, LLC and BP Pipelines (North America) Inc. and now desire to terminate such agreement and replace it in its entirety with this new Agreement; and

WHEREAS, ENTERPRISE owns a twenty-four inch (24") crude oil pipeline extending from ENTERPRISE's Katy Station in Katy, Texas to Genoa Junction in Houston, Texas ("Genoa Junction") (the "ENTERPRISE Katy Pipeline"); and

WHEREAS, ENTERPRISE will construct and own two (2) twenty-four inch (24") bi-directional crude oil pipelines extending from Genoa Junction to ENTERPRISE's Echo Terminal in Houston, Texas (the "ENTERPRISE Echo Pipelines"); and

WHEREAS, ENTERPRISE owns an eighteen inch (18") crude oil pipeline extending from Anahuac Junction in Webster, Texas ("Anahuac Junction") to Morgan's Point, Texas (the "ENTERPRISE 18" Pipeline"); and

WHEREAS, MPL owns a twenty-four inch (24") bi-directional crude oil pipeline extending from Genoa Junction to Speed Junction in Pasadena, TX with various destination points as established in MPL's local pipeline tariff (as may be amended from time to time) (the "Existing MPL 24" Pipeline"), and may construct and own a new twenty-four inch (24") crude oil pipeline from Genoa Junction to Speed Junction (the "New MPL 24" Pipeline")(the "Existing MPL 24" Pipeline and the New MPL 24" Pipeline are herein collectively referred to as the "Magellan 24" Pipelines"); and

WHEREAS, MPL owns a twenty-six inch (26") crude oil pipeline extending from Genoa Junction to the BP Texas City Refinery in Texas City, Texas (the "MPL 26" Pipeline"); and

WHEREAS, the ENTERPRISE Katy Pipeline and ENTERPRISE Echo Pipelines will be connected to the MPL 24" Pipelines and the MPL 26" Pipeline at Genoa Junction with such connection electrically isolated from the MPL 24" Pipelines and MPL 26" Pipeline by one or more insulating flange gaskets that will be owned and operated by MPL (the "Genoa Insulating Flanges"); and

WHEREAS, the ENTERPRISE 18" Pipeline will be connected to the MPL 26"

Page 1 of 12

Plf Resp in Opp to Motion for Summary Judgment 87

SR159

Pipeline at Anahuac Junction with such connection electrically isolated from the ENTERPRISE 18" Pipeline by an insulating flange gasket that is owned and operated by ENTERPRISE (the "Anahuac Insulating Flange"); and

WHEREAS, ENTERPRISE shall own and operate the connection facilities and equipment on the ENTERPRISE side of the Genoa Insulating Flanges and the Anahuac Insulating Flange (collectively the "ENTERPRISE Connection Facilities") and MPL shall own and operate the connection facilities and equipment on the MPL side of the Genoa Insulating Flanges and the Anahuac Insulating Flange (collectively the "MPL Connection Facilities"), all as more fully illustrated in Exhibit "A-1", "A-2" and "A-3" as attached, or to be attached, and incorporated herein (the ENTERPRISE Connection Facilities and the MPL Connection Facilities herein collectively referred to as the "Connection Facilities"); and

WHEREAS, ENTERPRISE and MPL desire to set forth the terms and conditions whereby crude oil will be transported on each Party's respective pipelines as herein identified through the operation of the Connection Facilities, respectively.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, ENTERPRISE and MPL hereby agree as follows:

1.     **Agreement.** Each Party agrees to operate their respective Connection Facilities under the terms and conditions of this Agreement. Upon either Party's written request, the other Party shall confirm its agreement to appropriate governmental authorities.

2.     **Construction Obligations and Ownership.**

   a) **Compliance and Timing.** Each Party shall use its commercially reasonable efforts to construct, own, operate and maintain its respective pipelines and Connection Facilities as provided herein this Agreement and at all times, in compliance with all applicable laws and regulations, and applicable engineering, safety, and generally-accepted industry standards, and as otherwise agreed herein.

   b) **ENTERPRISE Construction Obligations.**

      i) ENTERPRISE shall, at its sole cost and expense, perform the construction work as more fully designated in Exhibit "B-1" as attached and incorporated herein, in order to connect the ENTERPRISE 18" Pipeline to the MPL 26" Pipeline at Anahuac Junction.  As part of the connection work, ENTERPRISE shall perform the work and install a custody meter and prover in accordance with the design and procedures as provided in Exhibit "B-1", unless otherwise agreed to by the Parties in writing.

      ii) ENTERPRISE shall, at its sole cost and expense, perform the construction work as more fully designated in Exhibit "B-2" as attached and incorporated herein, in order to connect the ENTERPRISE Echo Pipelines to the MPL 24" Pipelines and the MPL 26" Pipeline at Genoa Junction. .

Plf Resp in Opp to Motion for Summary Judgment 88

SR160

c) **MPL Construction Obligations.**

   i) MPL shall, at its sole cost and expense, perform the construction work designated in <u>Exhibit "C-1"</u> as MPL's responsibility in order to accommodate the connection of the ENTERPRISE 18" Pipeline at Anahuac Junction, and such work shall be performed in accordance with the design and procedures as provided in <u>Exhibit "C-1"</u>, unless otherwise agreed to by the Parties in writing.

   ii) MPL shall, at its sole cost and expense, perform the construction work designated in <u>Exhibit "C-2"</u> as MPL's responsibility in order to accommodate the connection of the ENTERPRISE Echo Pipelines at Genoa Junction, and such work shall be performed in accordance with the design and procedures as provided in <u>Exhibit "C-2"</u>, unless otherwise agreed to by the Parties in writing. As part of the connection work, MPL shall perform the work and install a custody meter and prover.

d) The Parties shall cooperate and provide reasonable access as needed by the other Party at Genoa Junction and Anahuac Junction to allow for completion of the work as designated in Exhibits "B" and Exhibits "C", and as otherwise reasonably needed for maintenance and operation thereafter of the Connection Facilities.

e) <u>Completion of Work.</u> Upon completion of its respective obligations as outlined above in b) and c), each Party shall give written notice to the other Party of completion (the **"Notice of Completion"**). As used herein, the terms "complete" and "completion" shall mean that a Party has executed completely and fully, without deviation herefrom, their respective obligations for connection at Genoa Junction or Anahuac Junction as hereby undertaken by that Party, or that a Party's obligations have been substantially completed and any deviations from the provisions hereof have been waived in writing by the Party receiving Notice of Completion.

3. **Operation and Maintenance.**

a) Each Party hereby warrants that it shall at all times operate its respective Connection Facilities in a prudent and safe manner and shall maintain its Connection Facilities in a structurally fit and safe condition, and that upon discovery of wear, deterioration or structural failure, it shall take such action as may be reasonably necessary to remedy the same. Notwithstanding this obligation, each Party shall have the unilateral right at any time to inspect the other Party's Connection Facilities and equipment, that is, the ENTERPRISE Connection Facilities and the MPL Connection Facilities respectively, upon advance notice and with a representative present, and to request the other Party to take such actions and make such repairs as are reasonably necessary, in the requesting Party's reasonable opinion, for the continued safe and accurate operation of the other Party's Connection Facilities and equipment. The advance notice requirement does not apply when and where on-site inspection is required by any Party due to an emergency situation which is either threatening or is likely

to threaten life, property or the environment.

b) Supervisory control and line integrity equipment has been installed at Genoa Junction and Anahuac Junction on the respective sides of the Genoa Insulating Flanges and the Anahuac Insulating Flange by both Parties, respectively, and, upon reasonable request, each Party will provide, or make available, data on valve status, pressure and temperature to the other Party. The cost of communicating the data to the respective Party will be the responsibility of the Party requesting the data.

c) Line surveillance data in the form of volume data from the MPL meter banks located at Genoa Junction shall be provided, or made available, by MPL to ENTERPRISE. The cost of communicating the data to ENTERPRISE will be the responsibility of ENTERPRISE.

d) Line surveillance data in the form of volume data from the ENTERPRISE meter banks located at Genoa Junction or Anahuac Junction shall be provided, or made available, by ENTERPRISE to MPL. The cost of communicating the data to MPL will be the responsibility of MPL.

e) Magellan agrees to provide reasonable electrical power up to a maximum of 45 KVa for ENTERPRISE at Anahuac Junction to operate ENTERPRISE's pumps and equipment as necessary for the operation of the Anahuac Junction connection. Such electrical power shall be provided at no cost to ENTERPRISE.

4. **Maximum Allowable Operating Pressure.** The maximum allowable operating pressure ("MAOP") shall be as follows:

a) 698 psig for deliveries through the MPL Connection Facilities from the ENTERPRISE Katy Pipeline into the MPL 26" Pipeline at Genoa Junction.

b) 950 psig for deliveries through the MPL Connection Facilities from the ENTERPRISE Katy Pipeline into the Existing MPL 24" Pipeline, and 1440 psig for deliveries through the MPL Connection Facilities from the ENTERPRISE Katy Pipeline into the New MPL 24" Pipeline.

c) 950 psig for deliveries through the MPL Connection Facilities from the ENTERPRISE Echo Pipelines into the Existing MPL 24" Pipeline, and 1440 psig for deliveries through the MPL Connection Facilities from the ENTERPRISE Echo Pipeline into the New MPL 24" Pipeline.

d) 1440 psig for deliveries through the ENTERPRISE Connection Facilities from the MPL 24" Pipelines into the ENTERPRISE Echo Pipelines.

e) 698 psig for deliveries through the MPL Connection Facilities from the ENTERPRISE Echo Pipelines into the MPL 26" Pipeline.

f) 1440 psig for deliveries through the MPL Connection Facilities from the MPL 26" Pipeline into the Enterprise 18" Pipeline.

5. **Custody Transfer Measurement and Crude Oil Quality.**

a) For purposes herein, the Genoa Insulating Flanges and the Anahuac Insulating Flange are herein at times referred to collectively as the "Insulating Flanges". Risk of loss and transfer of custody shall take place where the crude oil passes the Insulating Flanges, that is, ENTERPRISE shall have custody of the crude oil and all obligations as to risk of loss of the crude oil that is in the ENTERPRISE Connection Facilities and MPL shall have custody of the crude oil and all obligations as to risk of loss of the crude oil that is in the MPL Connection Facilities.

b) The point of custody transfer shall be at the Insulating Flanges as stated above, however, volume and quality measurements between MPL and ENTERPRISE shall be determined at the designated points as follows:

   i) MPL Genoa Junction meter banks for crude oil transported to the MPL 26" Pipeline from the ENTERPRISE Katy Pipeline or the ENTERPRISE Echo Pipelines.

   ii) MPL Genoa Junction meter banks for crude oil transported to the MPL 24" Pipelines from the ENTERPRISE Katy Pipeline or the ENTERPRISE Echo Pipelines.

   iii) ENTERPRISE Genoa Junction meter banks for crude oil transported to the ENTERPRISE Echo Pipelines from the MPL 24" Pipelines.

   iv) ENTERPRISE Anahuac Junction meter banks for crude oil transported to the ENTERPRISE 18" Pipeline from the MPL 26" Pipeline.

c) The MPL Genoa Junction meter banks will be maintained and operated by MPL to meet or exceed the standards specified in the Manual of Petroleum Measurement Standards as published by the American Petroleum Institute ("API"), latest edition ("MPMS").

d) The ENTERPRISE Genoa Junction and Anahuac Junction meter banks will be maintained and operated by ENTERPRISE to meet or exceed the standards specified in the Manual of Petroleum Measurement Standards as published by the API, latest edition MPMS.

e) Each Party shall calibrate its meter banks with a National Institute of Standard Technology ("NIST") certified prover once per batch or when circumstances warrant a verification of the previously applied meter factor. Such proving shall only take place after line conditions have stabilized.

f) Each Party shall provide advance notice to the other Party of all meter proving activities and shall permit the other Party's representative to witness such meter proving activities. Data on custody transfer measurement at each Party's meter banks will be made available to the other Party.

g) A valid meter calibration for the custody transfer meter must fall within +/- 0.05% repeatability for five (5) consecutive runs. A meter factor variance shall not exceed 0.25% from the previously applied meter factor. The calculated meter factor shall be applied to all metered volumes of crude oil associated with the active batch.

h) The MPL measurement tickets and proving reports shall be the primary documents for custody transfer for crude oil transported to (a) the MPL 26" Pipeline from the ENTERPRISE Katy Pipeline or the ENTERPRISE Echo Pipelines at Genoa Junction; and (b) the MPL 24" Pipelines from the ENTERPRISE Katy Pipeline or the ENTERPRISE Echo Pipelines at Genoa Junction.

i) The ENTERPRISE measurement tickets and proving reports shall be the primary documents for custody transfer for crude oil transported to (a) the ENTERPRISE Echo Pipelines from the MPL 24" Pipelines at Genoa Junction; and (b) the ENTERPRISE 18" Pipeline from the MPL 26" Pipeline at Anahuac Junction.

6. **Access.** Each Party shall have the right of ingress and egress of its employees and agents to and from the property of the other Party as reasonably necessary to perform its obligations hereunder. To the extent any employees or agents of a Party are hereby or otherwise granted access to or across the other Party's property, then such personnel shall be subject to all such other Party's safety and operational rules and policies (as in effect at the time of access).

7. **Shut-In Rights, Scheduling and Operations.**

a) **Shut-In Rights.** Each Party shall have the right to shut-in their respective Connection Facilities at any time either Party reasonably believes that any person, property, or the environment is at risk of injury or damage. Each Party will use reasonable efforts to give the other Party 24-hour advance notice of a shutdown, except in the case of emergency when either Party may shut down immediately. If the situation allows, such Party will use reasonable efforts to notify the other Party prior to any such shut-in; however, such Party shall not be liable to the other Party for any cost or damage incurred as a result of such shut-in. The Connection Facilities that have been shut-in shall be reactivated as soon as the Party shutting in its Connection Facilities remedies any risks to persons, property or the environment.

b) **Scheduling.** The Parties will cooperate with each other to accommodate nominations made under the applicable tariffs for transportation of crude oil on the respective Parties' pipelines through the Connection Facilities.

c) **Batch Size and Line Fill.** Minimum batch size shall be 50,000 barrels unless otherwise agreed upon by the Parties. After deliveries are made through Anahuac Junction, ENTERPRISE shall subsequently receive any crude oil remaining in linefill in MPL's 26" Pipeline in a timely manner that minimizes disruption to the operation of MPL's 26" Pipeline. This linefill volume is estimated to be

approximately 37,000 barrels, and ENTERPRISE shall accommodate the delivery of this linefill immediately upon notice from MPL of the need to receive such a delivery.

d) Flow Rates.

   i)   Flow rates for deliveries and/or receipts by ENTERPRISE and MPL through Genoa Junction shall be no less than 8,000 barrels per hour for the first full 14 calendar months of the Term and 13,000 barrels per hour thereafter. Slower flow rates into the MPL Connection Facilities from ENTERPRISE shall be accommodated solely at MPL's discretion. Slower rates into an ENTERPRISE Connection Facilities shall be accommodated solely at ENTERPRISE's discretion. Notwithstanding the above, any deliveries received into the MPL Connection Facilities in Genoa Junction destined for delivery to Anahuac Junction must meet the flow rates as specified in ii) below for receipt through Genoa Junction.

   ii)  Flow rates for deliveries from MPL to ENTERPRISE at Anahuac Junction shall be no less than 8000 barrels per hour for the first full 12 calendar months of operation and 10,700 barrels per hour thereafter. Slower flow rates shall be accommodated solely at MPL's discretion.

   iii) For the purposes of establishing minimum flow rate requirements, the Parties will use the parameters of West Texas Intermediate crude oil, specifically, an API gravity of 40 (forty) degrees and a viscosity of 10 (ten) centistokes at 68 (sixty-eight) degrees Fahrenheit. As the API gravity and viscosity change, these minimum capacity requirements will be adjusted accordingly in a manner agreed upon by the Parties, i.e., as the API gravity decreases and viscosity increases, the minimum flow rate requirement will be reduced. For example, both ENTERPRISE and MPL must have the capability to deliver and/or receive crude oil of API gravity of 40 (forty) degrees and a viscosity of 10 (ten) centistokes at 68 (sixty-eight) degrees Fahrenheit through Genoa Junction at the flow rates described above in i).

8. **Indemnification.**

a) MPL Indemnity. To the extent permitted by law, MPL will indemnify, defend, and hold harmless ENTERPRISE and its affiliates and their respective representatives from and against any and all claims (including, but not limited to, claims for injury or death to persons, damage to property, and damage to the environment) arising out of this Agreement in connection with: (a) the installation, operation, maintenance, repair, and removal of the MPL Connection Facilities or any other equipment owned by MPL that is installed, maintained and operated by MPL as contemplated by this Agreement; or (b) the negligence or willful misconduct of MPL or its affiliates or their respective representatives. MPL intends this indemnity to apply except to the extent that any claims result from the negligence or willful misconduct of ENTERPRISE or its affiliates or their respective representatives. This indemnity will survive the termination of this Agreement.

b) ENTERPRISE Indemnity. To the extent permitted by law, ENTERPRISE will indemnify, defend, and hold harmless MPL and its affiliates and their respective representatives from and against any and all claims (including, but not limited to, claims for injury or death to persons, damage to property, and damage to the environment) arising out of this Agreement in connection with: (a) the installation, operation, maintenance, repair, and removal of the ENTERPRISE Connection Facilities or any other equipment owned by ENTERPRISE that is installed, maintained and operated by ENTERPRISE as contemplated by this Agreement; or (b) the negligence or willful misconduct of ENTERPRISE or its affiliates or their respective representatives. ENTERPRISE intends this indemnity to apply except to the extent that any claims result from the negligence or willful misconduct of MPL or its affiliates or their respective representatives. This indemnity will survive the termination of this Agreement.

c) Limitation of Liability. In no event will any Party be liable to the other Party for any incidental, special, indirect, exemplary, punitive, or consequential damages incurred by the other Party and resulting from or arising out of this Agreement, including, without limitation, loss of profits, lost business opportunities, or business interruptions, regardless of how they are caused, including by the negligence of such Party; provided, however, that this provision does not release a Party from incidental, special, indirect, exemplary, punitive, or consequential damages incurred by a third party (other than an affiliate or representative of a Party) for which that Party has assumed liability under the indemnities provided in this Agreement.

9. **Insurance.** During the term of this Agreement, each Party shall maintain or shall cause to be maintained insurance policies providing coverage as follows:

a) workers compensation coverage at statutory limits covering each of their respective operations and work being performed pursuant to this Agreement, and employers liability coverage in the minimum amount of One Million Dollars ($1,000,000) each accident, One Million Dollars ($1,000,000) disease – each employee and One Million Dollars ($1,000,000) disease – policy limit; and

b) commercial general liability coverage (or other liability coverage for the operations described herein), including products/completed operations, sudden and accidental pollution, and contractual liability coverage, in the minimum amount of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) aggregate; and

c) commercial auto liability covering owned, hired, rented and non-owned automotive equipment in the amount of One Million Dollars ($1,000,000) combined single limit; and

d) excess umbrella liability insurance coverage in excess of the terms and limits of insurance specified above with a combined limit of $10,000,000.

Any Party may carry insurance with deductibles and nonetheless be considered in

compliance with the foregoing insurance requirements. All insurance premiums, self-insurance claim expenses, loss and costs, deductibles, self insurance retention costs, captive reinsurance, fronting deductibles, or fronting arrangements, and similar self funded programs applicable to the insurance policies required herein, shall be the sole responsibility of the respective Party's account.

Any agreement with any contractor or subcontractor for the performance of any work hereunder shall use commercially reasonable efforts to require that such contractor or subcontractor maintain insurance policies providing coverage of the types and limits that are industry standard for the type and extent of work to be done. In all cases, such contractors or subcontractors will comply with regulatory insurance requirements.

10.    **Damage and Destruction.** If a Party's Connection Facilities are damaged or any part thereof is destroyed, that Party shall make a good faith determination as to whether the damaged or partially destroyed facilities can be repaired or restored at a cost that can be recovered. However, no Party shall be obligated to restore their respective Connection Facilities and if such Connection Facilities are not repaired or restored to an operable condition then that Party shall so notify the other Party in writing and this Agreement shall terminate as of the date of such notice solely in regards to the inoperable Connection Facilities.

11.    **Independent Contractor Status.** This Agreement will not be construed to form a partnership or a joint venture between the Parties or to grant any Party the right to act as an agent on behalf of any other Party. Should either Party perform work on behalf of the other Party pursuant to this Agreement, such Party shall perform in the status of an independent contractor and shall not be deemed to be an agent or employee of the other Party.

12.    **Term.** The initial term of this Agreement shall begin on the Effective Date and shall continue for ten (10) years from the first day of the first calendar month following MPL's last Notice of Completion for the last work completed in accordance with Section 2 c), and shall automatically extend thereafter for additional one (1) year periods, subject to the following termination option. Either Party may elect to terminate this Agreement by providing written notice of termination to the other Party at least six (6) months prior to the end of the then-current term, to be effective as of the end of such term.

The Parties further agree that, upon termination of this Agreement, ENTERPRISE may, at its sole option, permanently shut-in or disconnect the ENTERPRISE Connection Facilities and MPL may, at its sole option, permanently shut-in or disconnect the MPL Connection Facilities.

13.    **Compliance with Laws.** This Agreement is in all respects subject to all applicable federal, state and local laws, and all directives, regulations and orders issued or published by any federal, state, or local board, commission or agency.

14.    **Notices.** Notices will be in writing and delivered either: (A) by overnight courier to the address set forth below; or (B) by facsimile to the number set forth below confirmed within one (1) business day after being sent by facsimile by certified U.S. mail, return receipt requested, or by overnight courier, to the address set forth below. Any Party may

change its notice address or fax number upon notice to the other Parties.

Magellan Pipeline Company, L.P.
Attn: Director Crude Oil Transportation
One Williams Center, Ste. 3100
Tulsa, OK 74172
Facsimile: (918) 574-7264

Enterprise Crude Pipeline, LLC
Attn: VP Crude Pipeline and Storage
1100 Louisiana St.
Houston, TX 77002-5227
Facsimile: (713) 381-4039

15. **Force Majeure.** Each Party hereto shall be excused from the performance of its obligations hereunder, except the obligation to make monetary payments, when and to the extent that such performance is delayed or prevented by fire, explosion, act of God; breakdown of machinery or equipment; riots, strikes, labor disputes; voluntary or involuntary compliance with any law, order, regulation, request or recommendation of any governmental authority; or any cause, whether similar or dissimilar, reasonably beyond the control of the Party claiming suspension. Such Party shall notify the other Party as soon as practicable after the occurrence of the event of force majeure. Nothing herein shall be construed to require the Parties hereto to settle any strike or labor disputes. Each Party shall, to the extent it has the power to do so, exercise reasonable efforts to remedy a force majeure situation.

16. **Taxes.** Each Party shall respectively pay all of any ad valorem taxes assessed against its assets, including without limitation, all associated meters, provers, RTU's, other equipment, and the associated pipeline and rights-of-way and real estate.

17. **Default.** In case of a breach of this Contract by any Party, the non-breaching Party shall give the breaching Party notice of the breach and a reasonable period to cure under the circumstances, not less than thirty (30) nor more than two-hundred seventy (270) days. If such breach is not cured within the given cure period, the non-breaching Party may thereupon terminate this Agreement without limitation of its other rights and remedies.

18. **Counterparts.** This Agreement may be executed by facsimile and in counterparts, any of which shall constitute an original and be fully binding on the Party who executes same and all of which, when delivered, shall constitute a single Agreement.

19. **Severability.** Should any provision of this Agreement be found contrary to or in conflict with any applicable law, the same shall not affect the other terms or provisions of this Agreement or the whole of this Agreement and this Agreement and such provision shall be deemed modified to the extent necessary to comply with such applicable law, but only for the period of time such law is in effect.

20. **Waiver.** The waiver by or the failure of either Party to take action with respect to any breach of any term, covenant or condition of this Agreement shall not be deemed to constitute a waiver of such term, covenant or condition on any subsequent breach of the term, covenant or condition.

21. **Additional Rights.** The Parties expressly agree hereto that the execution of this Agreement and the performance of the service contemplated herein are without prejudice to any additional rights or obligations the Parties have to each other under separate and distinct agreements.

Plf Resp in Opp to Motion for Summary Judgment 96

SR168

22.     **Modifications.** This Agreement constitutes the entire agreement between the Parties with respect to the transactions contemplated herein, and it supersedes all prior discussions, understandings or agreements (oral or written) between the Parties with respect to the same. No amendment or modification of this Agreement shall be made except by the execution by MPL and ENTERPRISE or their duly authorized designees of written agreements that specifically refer to this Agreement.

23.     **Succession and Assignment of Rights.** Each of the Parties may freely assign any of its rights and obligations hereunder to an affiliate. Any company that shall succeed by purchase, merger, or consolidation to title to substantially all of the properties or assets of a Party to this Agreement utilized in the performance of this Agreement, shall be entitled to the rights and shall be subject to the obligations of its predecessor in title under this Agreement. Except as otherwise provided in this Section, no assignment of this Agreement or any of the rights or obligations hereunder shall be made by any Party unless such Party has obtained the prior written consent of the other Parties, which consent shall not be unreasonably withheld, delayed or conditioned. This Agreement and each of its covenants and obligations shall inure to the benefit of and be binding upon the Parties hereto and upon their respective successors and assigns.

24.     **Governing Law.** The interpretation and performance of this Agreement shall be governed by the laws of the State of Texas, without recourse to any principles of law governing the conflicts of law that might otherwise be applicable. The Parties will submit any disputes arising out of this Agreement to the exclusive jurisdiction of the U.S. District Court located in Houston, Texas, if federal jurisdiction is available, and to the courts of the State of Texas located in Harris County, Texas if federal jurisdiction is not available.

25.     **Business Practices.**

    a) Each Party hereto agrees to comply with all laws and lawful regulations applicable to any activities carried out in the name of or on behalf of the other Party under the provisions of this Agreement and/or any amendments to it.

    b) Each Party hereto agrees that all financial settlements, billings and reports rendered to the other Party as provided for in this Agreement and/or any amendments to it will to the best of its knowledge and belief reflect properly the facts about all activities and transactions related to this Agreement, which data may be relied upon as being complete and accurate in any further recording and reporting made by such other Party for whatever purpose.

    c) Each Party hereto agrees to notify the other Party promptly upon discovery of any instance where the notifying Party fails to comply with Part (a) of this Paragraph, or where the notifying Party has reason to believe data covered by Part (b) of this Paragraph is no longer accurate and complete.

26.     **Headings.** The headings of the paragraphs of this Agreement have been inserted for convenience of reference only and are not to be considered part of this Agreement and shall in no way affect the interpretation of any of the provisions of this Agreement.

27.     **Entirety.** This Agreement constitutes the entirety of the understanding between the Parties with respect to the subject matter dealt with herein, and replaces and supersedes all prior agreements, conditions, understandings, representations and warranties made between the Parties with respect to the subject matter hereof, whether written or oral.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth hereinabove.

ENTERPRISE CRUDE PIPELINE, LLC          MAGELLAN PIPELINE COMPANY, L.P.

By:     Enterprise Crude GP LLC,          By: Magellan Pipeline GP, LLC,
        Its Sole Manager                      Its General Partner



By:     _____          By: _____
Name:   Patrick L. McHenry  RM 19-11      Name: Jeff Selvidge
Title:  VP Pipeline Operations 12-19-11   Title: Sr. V.P. Trans. & Term.

Plf Resp in Opp to Motion for Summary Judgment 98

SR170



Exhibit A-1
System Overview



Exhibit A-2
Genoa Junction Site
Ownership Change and Custody Transfer

Plf Resp in Opp to Motion for Summary Judgment 100

SR172

**Exhibit A-3**
**Anahuac Jct Site Plan**
Ownership Change and Custody Transfer

**Exhibit B-1**
**Anahuac Jct Connection**
**Enterprise's Construction Responsibilities**

I.    **Objective**
The objective of this connection is to provide a pipeline route to access Enterprise's Morgan's Point Barge Facility located near LaPorte Texas. To accomplish this, Magellan will provide to Enterprise, a connection to Magellan's 26 Inch Genoa Jct. to Texas City Pipeline System. This connection will occur at a location near Webster, Texas known as Anahuac Jct. Enterprise has an 18 inch pipeline in the immediate vicinity of Anahuac Jct. and will connect per Magellan's requirements for construction, measurement and crude oil quality control.

II.   **Project Description**

Enterprise will:

1.  Install a skid mounted custody quality measurement facility capable of handling manline flow rates as described in 7(d) (II). The custody transfer measurement facility will be equipped with Coriolis flow meters, a stationery prover and a crude oil sampling system.
2.  Provide measurement and flow data to Magellan.
3.  Provide to Magellan an 18" double block & bleed takeoff valve which will include an insulating flange installed by Enterprise separating Enterprise and Magellan on the downstream side of the valve. Magellan will own and operate this valve.
4.  Provide a spool piece to be installed by Magellan between the two Magellan block valves at Anahuac Jct. The new spool piece will have the takeoff tee in it and the takeoff valve attached.
5.  Enterprise will locate its flow computer, RTU, and MCC inside Magellan's existing control building.
6.  Relocate the satellite dish to a new mounting pole installed by Enterprise.
7.  Coordinate with Magellan so downtime is minimized and much of the work can be done simultaneously during the downtime.

**Exhibit B-2**
**Genoa Jct Connection**
**Enterprise's Construction Responsibilities**

### I.    Objective

Enterprise is making certain modifications at it's Genoa Jct. Station to accommodate connections to its new ECHO Terminal via 2-24 inch pipelines. As part of these modifications at Genoa Jct. Enterprise will construct a distribution manifold that will provide connectivity to Magellan's 26 inch outbound pipeline, existing 24 inch pipeline and a future 24 inch pipeline for inbound crude oil receipts and outbound crude oil deliveries.

### II.    Project Description

Enterprise will:
1. Enterprise will construct 2-24 inch pipelines between the Enterprise Genoa Jct. Station and the new ECHO Terminal as shown on Exhibit A-2.
2. Enterprise will construct a new distribution manifold at Genoa to accommodate connectivity to Magellan's Genoa Jct. pipelines.
3. Provide custody transfer measurement for crude oil receipts from Magellan destined for ECHO Terminal
4. Capture measurement and flow data provided by Magellan from their new custody meter, as needed.
5. Provide measurement and flow data to Magellan from Enterprise's custody meter for receipts.

Retention: Life of Asset
Distribution: Project File

**Exhibit C-1**
**Anahuac Jct Connection**
**Magellan's Construction Responsibilities**

I.  **Objective**

Participate with Enterprise in the construction of a connection between the Magellan 26" pipeline from Genoa Jct to Texas City, TX and the Enterprise 18" Pipeline from Webster, TX to Morgan's Point, Texas at Magellan's Anahuac Jct station. This will enable Enterprise to deliver crude oil to Magellan at Genoa Jct for redelivery back to Enterprise at Anahuac Jct. The crude oil will then flow on to Enterprise's Morgan's Point facility.

II.  **Project Description**

Magellan will:
1.  Take ownership and operate the 18" DB&B takeoff valve to be furnished by Enterprise.
    a.  There will be an insulating flange installed by Enterprise separating Enterprise and Magellan on the downstream side of the valve.
2.  Install a spool to be constructed by Enterprise between the two Magellan block valves at Anahuac Jct.
    a.  The new spool will have the takeoff tee in it and the takeoff valve attached.
3.  Provide space in the existing controls building to allow Enterprise to locate their flow computer, RTU, and MCC.
4.  Relocate the satellite dish to a new mounting pole installed by Enterprise.
5.  Coordinate with Enterprise so downtime is minimized and much of the work can be done simultaneously during the downtime.
6.  Capture measurement and flow data provided by Enterprise.
7.  Construct a new SCADA screen for this location (it is currently called N. Clear Creek valve site).
8.  Provide 45KVa power.

**Exhibit C-2**
**Genoa Jct Connection**
**Magellan's Construction Responsibilities**

I. **Objective**

Construct a new manifold and custody transfer meter to accommodate new connections to Enterprise at Genoa Jct. The new connections will allow Magellan to receive deliveries from the Enterprise Katy Pipeline or from either of the two new Enterprise pipelines from ECHO Station.

II. **Project Description**

Magellan will:
1. Construct 24" connections to the two Enterprise pipelines between the Enterprise and Magellan station, as shown on Exhibit A-2.
2. Install a new ANSI 600# block manifold that will include headers for the two new incoming 24" lines from Enterprise.
3. Install a new custody transfer meter and prover to measure crude oil transported to Speed Jct. The meter and prover station will be ANSI 600# rated and capable of accommodating flowrates up to 15,000 barrels per hour.
4. Capture measurement and flow data provided by Enterprise from their custody meter, as needed.
5. Provide measurement and flow data to Enterprise from Magellan's new custody meter.

## Commercial Contract Summary for Cobblestone

1. **Magellan Business Unit**
   - ⬚ Transportation
   - ⬚ Marine
   - ☒ Crude Oil

   Approved by Legal _____

   Verified DOA \_\_\_\_\_

2. **Contract Type**
   - ⬚ Throughput (Pipeline & Terminalling)
   - ⬚ Storage (non-renewable fuels)
   - ⬚ Renewable Fuels (Ethanol & Biodiesel)
   - ☒ Joint Tariff/Connection Agreements
   - ⬚ Additive
   - ⬚ Confidentiality
   - ⬚ Purchase/Sale
   - ⬚ Consulting Services
   - ⬚ Ammonia / Joint Venture (Circle one)
   - ⬚ Other _____

3. **Customer**

   _Enterprise Crude Pipeline, LLC_

4. **Contract Name**

   _Connection Agreement_

5. **Commercial Owner**
   - Northern Region Mgr (Jim Johnston)
   - Central Region Mgr (Fred Neeley)
   - Southwest Region Mgr (Aaron Cissell)
   - Southeast Region Mgr (David Biggs)
   - Storage and Additive Services Mgr (Mike Ward)
   - Director, Crude Oil (Scott Devers)
   - Director, Marine (Aaron Milford)
   - Other _Jon M. Lawrence Mgr, TX & LA Crude Assets_

6. **Key Dates**
   - ☒ Contract Start Date (Effective Date) _12/16/11_   Commencement Date _____
   - ⬚ Contract End Date or End of Primary Term _10 year_
   - ⬚ Renewal Provisions _Year to Year_
   - ⬚ Escalation Provisions _____
   - ☒ Requested Notification Date from Cobblestone (i.e. 120 days prior to End Date _____
   - ⬚ Annual Review Provisions _____

7. **Brief Contract Description**

   _Crude Oil Connection Agreement - S Houston_
   _Crude System_ _(see pg 2)_

8. **Expiring Contract (if any)** _____

9. **Submitted by:** _Jon M. Lawrence_   **Date:** _7/20/12_

Plf Resp in Opp to Motion for Summary Judgment 106

Exhibit 1-E
Crude Oil Purchase Agreement, April 29, 2011
(redacted), andFirst Amended and Restated Crude Oil
Purchase and Sale Agreement, Jan. 31, 2011 (redacted)

EXECUTION VERSION

CRUDE OIL PURCHASE AGREEMENT

April 28, 2011

ENTERPRISE CRUDE OIL LLC

"Buyer"

And



"Producer"

1475561v.25 0022384/00132

# TABLE OF CONTENTS

PAGE

ARTICLE I  CERTAIN DEFINITIONS ........................................................................1

ARTICLE II  TERM ..............................................................................................10

ARTICLE III  CONSTRUCTION AND COMMENCEMENT DATE .........................11

3.1. Construction of the Eagle Ford Pipeline ...................................................11
3.2. Fee Lands, Easements and Rights-of-Way ................................................11
3.3. Commencement Date ..............................................................................11
3.4. Line Fill ..................................................................................................11

ARTICLE IV  PURCHASE AND SALE OF PRODUCER CRUDE OIL ......................11

4.1. Purchase by Buyer ..................................................................................11
4.2. Volume Limitations. ...............................................................................11
4.3. Pipeline System Rules and Regulations; Specifications .............................12
4.4. Scheduling. .............................................................................................13
4.5. Trucking Costs ........................................................................................13
4.6. Statements and Payments. .......................................................................13
4.7. Audit Rights ...........................................................................................13
4.8. Statement Errors. ....................................................................................14
4.9. Creditworthiness .....................................................................................14
4.10. Lien and Security Interest. .....................................................................14
4.11. Setoff and Recoupment. .........................................................................15
4.12. Option to Convert to Buy/Sell ..............................................................15
4.13. Reservation of Rights. ...........................................................................16
4.14. Measurement and Tests. ........................................................................16

ARTICLE V  REVENUE COMMITMENTS AND DEFICIENCY PAYMENTS .............17

5.1. Revenue Commitment .............................................................................17
5.2. Deficiency Payment ................................................................................17

ARTICLE VI  WARRANTY OF TITLE ....................................................................18

6.1. Title Warranty ........................................................................................18
6.2. Proceeds of Production ...........................................................................18
6.3. Indemnification .......................................................................................18
6.4. Title and Risk of Loss .............................................................................19

ARTICLE VII  WAIVER OF CERTAIN DAMAGES ..................................................19

ARTICLE VIII  FORCE MAJEURE .........................................................................19

8.1. Suspension of Obligations .......................................................................19
8.2. Definition of Force Majeure ....................................................................19
8.3. Strikes ....................................................................................................20
8.4. Interruption of Operations. ......................................................................20

14755561v.25 0022384/00132

Plf Resp in Opp to Motion for Summary Judgment 109

SR181

ARTICLE IX GOVERNING LAW; VENUE; DISPUTE RESOLUTION ............................20

9.1. Governing Law ........................................................................................20
9.2. Venue ....................................................................................................20
9.3. Negotiation.............................................................................................21

ARTICLE X TAXES...........................................................................................21

10.1. Taxes ...................................................................................................21
10.2. Reimbursement ....................................................................................21

ARTICLE XI ASSIGNMENT...............................................................................21

11.1. Assignment ..........................................................................................21
11.2. Notice of Assignment ...........................................................................22
11.3. Transfer of Seller's and Producer's Interests.........................................22

ARTICLE XII NOTICE AND STATEMENTS.........................................................23

12.1. Notice..................................................................................................23
12.2. Routine Communications.......................................................................25
12.3. Change of Address................................................................................25

ARTICLE XIII MISCELLANEOUS ......................................................................25

13.1. Amendments ........................................................................................25
13.2. Confidentiality. .....................................................................................25
13.3. Default..................................................................................................26
13.4. Waiver..................................................................................................28
13.5. No Third Party Beneficiaries ................................................................28
13.6. Rules and Regulations..........................................................................28
13.7. Hazard Communication ........................................................................28
13.8. No Partnership .....................................................................................28
13.9. Published Financial Data ......................................................................28
13.10. Headings ............................................................................................29
13.11. Rules of Construction .........................................................................29
13.12. Entire Agreement................................................................................29
13.13. Applicable Laws .................................................................................29
13.14. Severability ........................................................................................29
13.15. Joint Preparation ...............................................................................30
13.16. Further Assurances.............................................................................30
13.17. No Inducements .................................................................................30
13.18. Joint and Several Liability. ..................................................................30
13.19. Survival..............................................................................................30
13.20. Counterpart Execution ........................................................................30


EXHIBIT A................................................................................Points of Receipt

EXHIBIT B.................................................Example Calculation of Deficiency Payment

ii

## CRUDE OIL PURCHASE AGREEMENT

This Crude Oil Purchase Agreement (this "*Agreement*") is made and entered into this 28th day of April, 2011 (the "*Effective Date*"), by and between ENTERPRISE CRUDE OIL LLC, a Texas limited liability company ("*Buyer*"), and  (collectively, "*Seller*"), and, for the limited purposes set forth herein, (collectively, "*Producer*"). Buyer, Seller and Producer may be referred to individually as "*Party*," or collectively as the "*Parties*."

### WITNESSETH:

WHEREAS, Seller purchases, owns or controls barrels of crude oil produced from certain oil and gas wells of Producer located in the Eagle Ford Shale area of South Texas that the Parties desire for Buyer to purchase; and

WHEREAS, Buyer is a buyer and seller of crude oil, and is a shipper on the Pipeline System; and

WHEREAS, an Affiliate of Buyer is currently designing, engineering and constructing the Eagle Ford Pipeline; and

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, Producer Crude Oil on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, Seller, Producer and Buyer hereby covenant and agree as follows:

### ARTICLE I
### CERTAIN DEFINITIONS

Unless otherwise required by the context, the terms defined in this Article I shall have, for all purposes of this Agreement, the respective meanings set forth in this Article I:

1.1.   "*Affiliate*" shall mean any Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person. The term "control" (including its derivatives and similar terms) shall mean possessing the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract, or otherwise. Any Person shall be deemed to be an Affiliate of any specified Person if such Person owns fifty percent (50%) or more of the voting securities of the specified Person, or if the specified Person owns fifty percent (50%) or more of the voting securities of such Person, or if fifty percent (50%) or more of the voting securities of the specified Person and such Person are under common control.

1475561v.25 0022384/00132

1.2.    "*Agreement*" shall have the meaning given to such term in the preamble of this Agreement.

1.3.    "***Annual Transportation Revenue Commitment***" shall mean, with respect to each Contract Year in the Primary Term, the amount set forth for such Contract Year under the column entitled "Annual Transportation Revenue Commitment ($)" in the table in Section 5.1.

1.4.    "*API*" shall mean the American Petroleum Institute.

1.5.    "***Argus Posting Plus Price***"



1.6.    "*ASME*" shall mean the American Society of Mechanical Engineers.

1.7.    "*ASTM*" means the American Society for Testing Materials.

1.8.    "*Bankruptcy*" shall mean, with respect to any Person, (i) the filing by such Person of a petition, including, without limitation, a petition under the Bankruptcy Code, seeking to adjudicate such Person a bankrupt or an insolvent or otherwise commencing, authorizing, or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the commencement of an involuntary case or other proceeding against such Person seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition, or other relief with respect to such Person or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over such Person or any substantial part of its property, which involuntary case or other proceeding shall remain undismissed and unstayed for a period of fifteen (15) days; (iii) the making of an assignment or any general arrangement for the benefit of creditors; (iv) such Person's otherwise becoming bankrupt or insolvent (however evidenced); (v) such Person's generally being unable or admitting its inability to pay its debts as they fall due (or otherwise generally failing to pay its debts as they fall due); or (vi) such Person's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

1475561v.25 0022384/00132

2

1.9. "*Bankruptcy Code*" shall have the meaning given to such term in Section 13.3(d).

1.10. "*Barrel*" shall mean forty-two (42) gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit (60° F).

1.11. "*Base Price*"



1.12. "*Basis for Requesting Assurance*" shall have the meaning given to such term in Section 4.9.

1.13. "*BPD*" shall mean Barrels per Day.

1.14. "*Business Day*" shall mean any calendar day other than Saturdays and Sundays that commercial banks in Houston, Texas are open for business.

1.15. "*Buyer*" shall have the meaning given to such term in the preamble of this Agreement.

1.16. "*Central Clock Time*" shall mean Central Standard time, as adjusted for Central Daylight time.

1.17. "*Claims*" shall mean any and all claims, demands and causes of action of any kind and all losses, damages, liabilities, costs and expenses of whatever nature (including court costs and reasonable attorneys' fees).

1.18. "*CNOOC*" means OOGC America, Inc., a Delaware corporation and subsidiary of the China National Offshore Oil Corporation.

1.19. "*Commencement Date*" shall have the meaning given to such term in Section 3.3 of this Agreement.

1.20. "*Condensate*" shall mean those grade or grades of Crude Petroleum designated as "Condensate" pursuant to the Rules and Regulations. The current Rules and Regulations provide that Crude Petroleum with an API gravity between 51 and 90 inclusive is designated as "Condensate."

1.21. "*Condensate Rate*"

1.22. "*Contract Year*" shall mean a period commencing at 7:00 a.m., Central Clock Time, on the Commencement Date and ending at 7:00 a.m., Central Clock Time on the same day and calendar month of the following calendar year and thereafter for succeeding periods of twelve (12) consecutive Months each.

1475561v.25 0022384/00132

3

1.23.  "*Crude*" or "*Crude Oil*" or "*Crude Petroleum*" shall mean the grade or grades of direct liquid product of oil or gas wells meeting the specifications for either "Crude Petroleum" or "Condensate" as set forth in the applicable Rules and Regulations.

1.24.  "*Crude  Petroleum  Rate*" [redacted]

1.25.  "*Cumulative Transportation Revenue Commitment*" shall have the meaning given to such term in Section 5.2 of this Agreement.

1.26.  "*Cumulative Transportation Revenue Receipt*" shall have the meaning given to such term in Section 5.2 of this Agreement.

1.27.  "*Cushing Common Stream Domestic Sweet Crude Oil*" shall mean Domestic Sweet Crude Oil that is delivered in a common stream at Cushing Terminal.

1.28.  "*Cushing Terminal*" shall mean Enterprise Pipeline's terminal facilities on the Pipeline System at or near Cushing, Oklahoma.

1.29.  "*Day*" or "*Daily*" shall mean a period of twenty-four (24) hours, commencing at 7:00 a.m., Central Clock Time, on a calendar day and ending at 7:00 a.m., Central Clock Time, on the next succeeding calendar day.

1.30.  "*Defaulting Party*" shall have the meaning given to such term in Section 13.3(b) of this Agreement.

1.31.  "*Deficiency Payment*" shall have the meaning given to such term in Section 5.2 of this Agreement.

1.32.  "*Delivery Ticket*" shall mean a shipping/loading document or documents stating the type and quality of Crude Oil delivered, the volume delivered and method of measurement, the corrected specific gravity, temperature, and S&W content.

1.33.  "*Domestic Sweet Crude Oil*" shall mean a grade of Crude Oil, currently defined by the NYMEX as having an API gravity between 37 and 42 degrees and a sulfur content of less than forty-two hundredths of one percent (0.42%), as such specifications may be amended by the NYMEX from time to time.

1.34.  "*Due Date*" shall have the meaning given to such term in Section 4.6(b) of this Agreement.

1.35.  "*Eagle Ford Pipeline*" shall mean a crude oil pipeline and related facilities running from a location within the Eagle Ford Shale area in South Texas to Sealy Station, to be

Plf Resp in Opp to Motion for Summary Judgment 114

SR186

constructed by Enterprise Pipeline, which, when completed and operational, will become a part of the Pipeline System.

1.36. *"Eagle Ford Pipeline Common Stream"* shall mean the Crude Oil that is delivered in a common stream at the Houston Terminal from the Eagle Ford Pipeline.

1.37. *"Effective Date"* shall have the meaning given to such term in the preamble to this Agreement.

1.38. *"Enterprise Pipeline"* shall mean Enterprise Crude Pipeline LLC, a Texas limited liability company and an Affiliate of Buyer.

1.39. *"Event of Default"* shall have the meaning given to such term in Section 13.3(a) of this Agreement.

1.40. *"Extended Term"* shall have the meaning given to such term in Article II of this Agreement.

1.41. *"Fee Adjustment Multiplier"* shall mean, with respect to any date on which any fee or other amount hereunder is adjusted, the lesser of (i) 1.0400 or (ii) the FERC Index in effect as of such date. For the purposes of illustration only, the following example is provided to demonstrate the calculation of the annual adjustment of the Weighted Average Transportation Rate, using hypothetical values for the FERC Index:



1.42. *"FERC Index"* shall mean the "Multiplier to Use" as published by the Federal Energy Regulatory Commission under the title "Oil Pipeline Index," and is currently published in the month of July of each year on the Internet at http://www.ferc.gov/industries/oil/gen-info/pipeline-index.asp.

1.43. *"Force Majeure"* shall have the meaning given to such term in Section 8.2 of this Agreement.

1.44. *"Governmental Authority"* shall mean (i) the United States of America, (ii) any state, county, parish, municipality or other governmental subdivision within the United States of America, and (iii) any court or any governmental department, commission, board, bureau, agency or other instrumentality of the United States of America or of any state, county, municipality or other governmental subdivision within the United States of America.

1475561v.25 0022384/00132

Plf Resp in Opp to Motion for Summary Judgment 115

SR187

1.45. *"Gravity Adjustment Scale"* shall mean, with respect to any Month, the deduction instructions with respect to certain gravities of Crude Oil published with the WTI Price for such Month, under the heading "Gravity Adj. Scale."

1.46. *"Gross Proceeds"* shall have the meaning given to such term in Section 4.1 of this Agreement.

1.47. *"Houston Terminal"* shall mean Enterprise Pipeline's terminal facilities on the Pipeline System at or near Houston, Texas.

1.48. *"Insecure Party"* shall have the meaning given to such term in Section 4.11 of this Agreement.

1.49. *"Interest Rate"* shall mean an annual rate of interest equal to two percent (2%) above the prime rate published by the *Wall Street Journal* from time to time, or the maximum legal rate, whichever is the lesser.

1.50. *"Interests"* shall mean any right, title, or interest in lands, wells, or leases and the right to produce oil and/or gas therefrom whether arising from fee ownership, working interest ownership, mineral ownership, leasehold ownership, or arising from any pooling, unitization or communitization of any of the foregoing rights.

1.51. *"Liens"* shall have the meaning given to such term in Section 4.10(b) of this Agreement.

1.52. *"Losses"* shall mean any actual loss, cost, expense, liability, damage, demand, suit, sanction, claim, judgment, lien, fine or penalty, including reasonable attorney's fees, asserted by a third party not Affiliated with the Party incurring such, and which are incurred by the applicable indemnified Persons on account of injuries (including death) to any person or damage to or destruction of any property, sustained or alleged to have been sustained in connection with or arising out of the matters for which the indemnifying party has indemnified the applicable indemnified Persons.

1.53. *"Maximum Annual Volume"* shall have the meaning given such term in Section 4.2(b).

1.54. *"Maximum Cumulative Deficiency Payment Obligation"* shall have the meaning given such term in Section 5.2.

1.55. *"Maximum Daily Volume"* shall have the meaning given such term in Section 4.2(b).

1.56. *"Maximum Monthly Volume"* shall have the meaning given such term in Section 4.2(b).

1.57. *"Month"* or *"Monthly"* shall mean a period of time beginning at 7:00 a.m., Central Clock Time on the first day of a calendar month and ending at 7:00 a.m., Central Clock Time on the first day of the next succeeding calendar month.

1.58. "*MSDS*" shall have the meaning given such term in Section 13.7.

1.59. "*Non-Defaulting Party*" shall have the meaning given to such term in Section 13.3(b) of this Agreement.

1.60. "*NYMEX*" shall mean the New York Mercantile Exchange; provided, that in the event the NYMEX ceases to operate as a commodity futures exchange, then the Parties shall mutually agree to an alternative commodity futures exchange to use for purposes of this Agreement.

1.61. "*Off-Spec Crude Oil*" shall have the meaning given to such term in Section 4.3.

1.62. "*Parties*" shall have the meaning given to such term in the preamble of this Agreement.

1.63. "*Party*" shall have the meaning given to such term in the preamble of this Agreement.

1.64. "*Party Providing Assurance*" shall have the meaning given to such term in Section 4.9 of this Agreement.

1.65. "*Party Requesting Assurance*" shall have the meaning given to such term in Section 4.9 of this Agreement.

1.66. "*Performance Assurance*" shall have the meaning given to such term in Section 4.9 of this Agreement.

1.67. "*Person*" shall mean any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

1.68. "*Pipeline Points of Receipt*" shall mean the Crude Oil receiving facilities to be installed by Enterprise Pipeline on the Pipeline System at or near the locations indicated on **Exhibit A**, as such exhibit may be amended from time to time.

1.69. "*Pipeline System*" shall mean the crude oil pipeline system owned by Affiliates of Buyer, including, without limitation, the Eagle Ford Pipeline.

1.70. "*Points of Receipt*" shall mean, collectively, the Pipeline Points of Receipt and the Truck Points of Receipt.

1.71. "*Primary Term*" shall have the meaning given to such term in Article II of this Agreement.

1.72. "*Producer*" shall have the meaning given to such term in the preamble of this Agreement.

1.73.   *"Producer Crude Oil"* shall mean (i) all Crude Oil produced from or attributable to Interests owned by Producer, Seller and/or its Affiliates and (ii) with respect to wells in which Producer and/or any of its Affiliates is the operator, Crude Oil produced from such wells that is attributable to the Interests in such wells owned by other working interest owners and royalty owners which is not taken "in-kind" by such working interest owners and royalty owners and for which Producer, Seller and/or their Affiliates has the right and/or obligation to deliver such Crude Oil, but only for the period that Producer, Seller and/or their Affiliates has such right or obligation.  For the avoidance of doubt, except as described in (ii) above, Producer Crude Oil shall not include Crude Oil purchased by Producer, Seller and/or any of their Affiliates from third parties.

1.74.   *"Producer Force Majeure Credit"* shall mean, with respect to each Day that Buyer is unable to receive at the Points of Receipt, all or any portion of the Producer Crude Oil, up to the Maximum Daily Volume in effect for such Day, scheduled hereunder by or on behalf of Seller for such Day, due to an event of Force Majeure, a volume of Producer Crude Oil equal to the lesser of (x) the Maximum Daily Volume in effect for such Day, minus the volume (in Barrels) of Producer Crude Oil that was received hereunder at the Points of Receipt on such Day, or (y) a volume (in Barrels) of Producer Crude Oil equal to the average deliveries of Producer Crude Oil hereunder to the Points of Receipt during the thirty (30) Day period immediately preceding the first Day of such event of Force Majeure, minus the volume (in Barrels) of Producer Crude Oil that was received hereunder at the Points of Receipt on such Day; provided, however, there shall be no Producer Force Majeure Credit for the first five (5) Days of any such event of Force Majeure.

1.75.   *"Producer Force Majeure Credit Allowance"* shall mean, with respect to any Month, the product of (i) the total volume (in Barrels) of Producer Force Majeure Credits, if any, applicable to such Month multiplied by (ii) the Weighted Average Transportation Rate in effect for such Month.

1.76.   *"Producer Party"* shall have the meaning given to such term in Section 13.18(b).

1.77.   *"Purchase Price"*



1.78.   *"Purchase Price Condensate Component"*

1.79.   *"Purchase Price Crude Petroleum Component"*

1475561v.25 0022384/00132

8

1.80. *"Qualifying Interests"* shall have the meaning given to such term in Section 11.3(a) of this Agreement.

1.81. *"Qualifying Interests Agreement"* shall have the meaning given to such term in Section 11.3(b) of this Agreement.

1.82. *"Qualifying Interests Transferee"* shall have the meaning given to such term in Section 11.3(a) of this Agreement.

1.83. *"Rules and Regulations"* shall have the meaning given to such term in Section 4.3.

1.84. *"Sealy Station"* shall mean Enterprise Pipeline's facilities on the Pipeline System at or near Sealy, Austin County, Texas.

1.85. *"Seller"* shall have the meaning given to such term in the preamble of this Agreement.

1.86. *"Seller Party"* shall have the meaning given to such term in Section 13.18(a).



1.88. *"S&W"* shall mean sediment and water.

1.89. *"Taxes"* shall mean any or all current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

1.90. *"Term"* shall have the meaning given to such term in Article II of this Agreement.

1.91. *"Third Party Crude Oil"* shall mean, with respect to any Month, the volume (in Barrels) of Crude Oil other than Producer Crude Oil which is either (i) purchased during such Month by Buyer at the Third Party Crude Oil Points of Receipt from any Person other than a Party or its Affiliates or (ii) received at the Third Party Crude Oil Points of Receipt during such Month by Enterprise Pipeline from any Person other than a Party or its Affiliates for shipment on the Eagle Ford Pipeline.

1.92. *"Third Party Crude Oil Allowance"* shall mean, with respect to any Month, the product of (i) the total volume (in Barrels) of Third Party Crude Oil, if any, applicable to such Month multiplied by (ii) the Weighted Average Transportation Rate in effect for such Month.

1.93. *"Third Party Crude Oil Points of Receipt"* shall mean those certain Points of Receipt which are described as being a "Third Party Crude Oil Point of Receipt" in the table

1475561v.25 0022384/00132

9

captioned "Location of Pipeline Points of Receipt" or "Location of Truck Points of Receipt" in **Exhibit A**, as applicable, as such exhibit may be amended from time to time.

1.94. *"Total Cumulative Transportation Revenue Commitment"* shall have the meaning given to such term in Section 5.1 of this Agreement.

1.95. *"Truck Points of Receipt"* shall mean the Crude Oil receiving facilities to be installed by Seller or its designee at or near the locations indicated on **Exhibit A**, as such exhibit may be amended from time to time.

1.96. *"Trucking Costs"* shall mean, with respect to any Month, the product of (i) the volume of Producer Crude Oil delivered by Seller at the Truck Points of Receipt during such Month, multiplied by (ii) the Trucking Rate in effect for such Month.



1.97. *"Trucking Rate"*

1.98. *"Weighted Average Transportation Rate"*

1.99. *"WTI Price"*

## ARTICLE II
## TERM

The term of this Agreement shall commence on the Effective Date and unless sooner terminated as provided herein, shall remain in full force and effect until the end of the tenth (10th) Contract Year (the *"Primary Term"*); provided, however, at the option of Seller, provided that neither Seller nor Producer is in default at the end of the Primary Term or at the time of the notice of extension described below in this Article II, the term of this Agreement may be extended beyond the expiration of the Primary Term for a single period of five (5) Contract Years, extending until the end of the fifteenth (15th) Contract Year (the *"Extended Term,"* and, the Primary Term as may be extended by the Extended Term, the *"Term"*). To exercise such option to extend the Term, Seller shall deliver to Buyer a notice thereof no later than twelve (12) Months prior to the expiration of the Primary Term. Subject to Section 13.3(c), termination or cancellation of this Agreement shall not relieve the Parties from any obligation accruing or accrued prior to the date of such termination.

1475561v.25 0022384/00132

10

Plf Resp in Opp to Motion for Summary Judgment 120

SR192

## ARTICLE III
## CONSTRUCTION AND COMMENCEMENT DATE

3.1. <u>Construction of the Eagle Ford Pipeline</u>. Buyer shall, or shall cause Enterprise Pipeline to, design, engineer, modify, construct, and equip, the Eagle Ford Pipeline, including the Pipeline Points of Receipt, which shall include the equipment set forth in **Exhibit A** under the column captioned "Pipeline Equipment" in the table captioned "Equipment at Pipeline Points of Receipt." Seller shall, or shall cause its designee to, design, engineer, modify, construct, and equip, the Crude Oil storage and other facilities necessary to enable Seller to deliver Producer Crude Oil to Buyer (i) into the Eagle Ford Pipeline at the Pipeline Points of Receipt and (ii) into trucks at the Truck Points of Receipt, including, without limitation, the equipment for each type of Point of Receipt set forth in the applicable tables in **Exhibit A** under the columns captioned "Seller's Equipment."

3.2. <u>Fee Lands, Easements and Rights-of-Way</u>. Upon Buyer's request, Seller shall grant, convey, bargain, transfer and assign, or shall cause to be granted, conveyed, bargained, transferred and assigned, to Buyer or Enterprise Pipeline for purposes of constructing, owning, operating, repairing, replacing and maintaining the Eagle Ford Pipeline, (i) such fee lands owned by Seller and/or its Affiliates as are reasonably necessary for such purposes, (ii) such easements and rights-of-way over, across, and under lands owned by Seller and/or its Affiliates as are reasonably necessary for such purposes and (iii) such easements and rights-of-way owned by Seller and/or its Affiliates over, across and under lands owned by third parties as are reasonably necessary for such purposes. The form of the documents used to convey any such fee lands, easements and/or rights-of-way shall be mutually agreed to by Seller and Buyer or Enterprise Pipeline.

3.3. <u>Commencement Date</u>. The "*Commencement Date*" under this Agreement shall be the first day of the Month following the date Buyer notifies Seller that the Eagle Ford Pipeline is ready to commence commercial service with respect to the receipt, transportation, handling, and delivery of Producer Crude Oil hereunder.

3.4. <u>Line Fill</u>. As between the Parties, Buyer, as a shipper on the Pipeline System, shall be responsible for providing to the applicable carriers a pro-rated share of line fill based on the forecasted volumes of Producer Crude Oil to be sold and purchased hereunder.

## ARTICLE IV
## PURCHASE AND SALE OF PRODUCER CRUDE OIL

4.1. <u>Purchase by Buyer</u>. Upon the Commencement Date, pursuant to the terms and conditions of this Agreement, including the volume limitations in Section 4.2, Seller shall sell and deliver to Buyer, and Buyer shall purchase and receive from Seller, the volumes of Producer Crude Oil which have been scheduled and delivered by or on behalf of Seller to any of the Points of Receipt. With respect to each Month, Buyer shall pay Seller the Purchase Price for each Barrel of Producer Crude Oil purchased by Buyer during such Month (the "*Gross Proceeds*")

4.2. <u>Volume Limitations</u>.

1475561v.25 0022384/00132

11

(a)     Seller may, at its option, deliver volumes of Producer Crude Oil in excess of the Maximum Daily Volume, the Maximum Monthly Volume and/or the Maximum Annual Volume to Buyer pursuant to this Agreement; provided, however, Buyer shall never be obligated to purchase or receive (i) more than the Maximum Daily Volume on any Day, (ii) more than the Maximum Monthly Volume in any Month, and (iii) more than the Maximum Annual Volume in any Contract Year.

(b)     As used herein, "*Maximum Daily Volume*" shall mean, with respect to each Day during each Contract Year set forth in the table below, the Daily volume of Producer Crude Oil for such Contract Year as set forth in the column entitled "Maximum Daily Volume." "*Maximum Annual Volume*" shall mean, with respect to each Contract Year set forth in the table below, the volume of Producer Crude Oil for such Contract Year as set forth in the column entitled "Maximum Annual Volume." For any Month in any Contract Year, the "*Maximum Monthly Volume*" shall be the product of (i) the number of Days in such Month times (ii) the quotient of the Maximum Annual Volume for such Contract Year divided by 365.

| Contract Year | Maximum Daily Volume (BPD) | Maximum Annual Volume (in Barrels) |
|---|---|---|
| 1 | 50,000 | 18,250,000 |
| 2 | 75,000 | 27,375,000 |
| 3 | 75,000 | 27,375,000 |
| 4 | 100,000 | 36,500,000 |
| 5 | 100,000 | 36,500,000 |
| 6 | 100,000 | 36,500,000 |
| 7 | 100,000 | 36,500,000 |
| 8 | 100,000 | 36,500,000 |
| 9 | 100,000 | 36,500,000 |
| 10 | 100,000 | 36,500,000 |
| All remaining Contract Years | the lesser of (i) 110% of the average Daily volume of Producer Crude Oil actually purchased by Buyer from Seller hereunder during the immediately preceding Contract Year or (ii) the Maximum Daily Volume for such immediately preceding Contract Year. | the lesser of (i) 110% of the volume of Producer Crude Oil actually purchased by Buyer from Seller hereunder during the immediately preceding Contract Year or (ii) the Maximum Annual Volume for such immediately preceding Contract Year. |

4.3.     Pipeline System Rules and Regulations; Specifications. The Parties acknowledge that Buyer is a shipper on the Pipeline System and via truck transportation, and that all transportation of Crude Oil performed on the Pipeline System and via truck shall be subject to the rules and regulations in applicable tariffs in effect from time to time (as amended from time to time, the "*Rules and Regulations*"). Buyer shall never be required to purchase or accept Producer Crude Oil which does not meet the specifications set forth in the Rules and Regulations ("*Off-Spec Crude Oil*"). Seller agrees to indemnify, defend and hold Buyer harmless from any

1475561v.25 0022384/00132

12

and all Claims and Losses incurred in connection with, or in any manner whatsoever relating to Off-Spec Crude Oil and/or the handling thereof. This indemnity and defense obligation shall survive the termination of this Agreement for the applicable statutory limitations period. Seller warrants to Buyer that the Crude Oil delivered hereunder shall not be contaminated by chemicals foreign to virgin crude oil, including chlorinated and/or oxygenated hydrocarbons and lead. Buyer shall have the right, without prejudice to any other remedy available, to reject and return to Seller any quantities of Crude Oil which are found to be so contaminated even after delivery.

4.4.    Scheduling. At least five (5) Business Days prior to the Commencement Date and on or before the twenty fifth (25th) Day of each succeeding Month during the Term, Seller and Buyer shall mutually agree upon a forecasted amount of the volumes and grades of Producer Crude Oil to be sold and purchased hereunder at each Point of Receipt during the following Month. The Parties acknowledge that such forecasted amount is likely to be more accurate in the first weeks of the Month, and more of an estimate for the later weeks. Seller shall make commercially reasonable efforts to notify Buyer of any changes to such forecasted amount. Subject to Section 4.2, Buyer shall make commercially reasonable efforts to accommodate such changes.

4.5.    Trucking Costs

4.6.    Statements and Payments.

(a)    Statements. On or before the ninth (9th) Business Day after the end of each Month during the Term, Buyer shall render to Seller a detailed statement for the preceding Month setting forth the calculation of the Settlement Amount.

(b)    Payments. The Party owing the Settlement Amount shall pay such Settlement Amount in accordance with the wire transfer payment instructions set forth in Section 12.1 on or before the twentieth (20th) day of the Month following the Month of delivery (the "*Due Date*"); provided, however, (i) if the Due Date is on a Saturday or Texas bank holiday other than Monday, the Due Date shall be the preceding Business Day, and (ii) if the Due Date is on a Sunday or a Monday Texas bank holiday, the Due Date shall be the succeeding Business Day.

(c)    Late Payments. Any Settlement Amount not paid in full by the Due Date will be deemed delinquent and will accrue interest at the Interest Rate, such interest to be calculated from and including the Due Date but excluding the date the delinquent amount is paid in full.

(d)    Necessary Documents. Upon request, each Party agrees to furnish all substantiating documents incident to the delivery of Crude Oil hereunder, including a Delivery Ticket for each volume delivered.

4.7.    Audit Rights. Upon not less than thirty (30) days prior written notice to the other Parties, any Party or its agent shall have the right, at reasonable times during business hours and at its own expense, to audit the books and records of the other Party or Parties to the extent necessary to verify: (i) the accuracy of any statement, charge or computation made under or

1475561v.25 0022384/00132

13

Plf Resp in Opp to Motion for Summary Judgment 123

SR195

pursuant to this Agreement, (ii) the ownership of the Interests to which the Producer Crude Oil purchased and sold hereunder is produced from or attributable to, and/or (iii) whether any Interests sold, conveyed or transferred by Producer are Qualifying Interests; provided, however, no Party shall have the right to perform an audit pursuant to this Section 4.7 more than once during any twelve (12) Month period.

4.8. Statement Errors. In the event an error is discovered in the amount shown to be due on any statement rendered by Buyer hereunder, such error shall be adjusted without interest or penalty as soon as reasonably possible, but no later than thirty (30) Days after the discovery of the error. If a dispute arises as to the amount payable hereunder, the disputed statement shall nevertheless be paid in full, but payment shall not waive the payor's right to dispute such statement in accordance with this Section 4.8. Any invoice dispute or statement adjustment shall be in writing and shall state the basis for the dispute or adjustment. Upon the resolution of the dispute, any required payment shall be made within fifteen (15) Days after such resolution, along with interest accrued at the Interest Rate from and including the Due Date but excluding the date paid. All undisputed statements rendered hereunder shall be deemed to be final and not subject to audit two (2) years after the date on which the statement is rendered. The provisions of Section 4.7 and this Section 4.8 shall survive the termination of this Agreement for the later of (i) twenty-four (24) Months following the date on which such termination occurred, or (ii) until a dispute initiated with such twenty-four (24) Month period is finally resolved.

4.9. Creditworthiness. Should any Party have reasonable grounds for doubting the ability of any other Party to perform its obligations hereunder (as further defined below, the *"Basis for Requesting Assurance"*), the Party having the Basis for Requesting Assurance (*"Party Requesting Assurance"*) shall have the right to request and receive from such other Party (*"Party Providing Assurance"*) adequate assurance of performance (*"Performance Assurance"*) as provided herein. Such Performance Assurance shall be due no later than ten (10) Days after the written request of the Party Requesting Assurance and shall take one of the following forms, at the sole option and discretion of the Party Requesting Assurance: (i) a security interest in the Crude Oil to which the Party Providing Assurance has title, but which is in the possession of the Party Requesting Assurance; or (ii) a guarantee of all of the obligations hereunder of the Party Providing Assurance from a creditworthy party, as determined by the Party Requesting Assurance in its commercially reasonable discretion. Without limitation, a Basis for Requesting Assurance shall include any reasonable grounds for insecurity with respect to the performance of the Party Providing Assurance and/or any grounds that may constitute a basis for requesting adequate assurance of performance under Section 2-609 of the Uniform Commercial Code.

4.10. Lien and Security Interest.

(a) Buyer's Liens. Producer and Seller hereby acknowledge that Buyer has a possessory lien under applicable law in Producer Crude Oil in the possession of Buyer. Furthermore and in addition, Producer and Seller further grant Buyer a lien and security interest in all Producer Crude Oil in the possession of Buyer and proceeds thereof to secure any and all amounts owed by Seller under this Agreement. Producer and Seller acknowledge and agree that Buyer may perfect such security interest in Producer Crude Oil by possession or any other method by which such security interest may be perfected under applicable law. The security

1475561v.25 0022384/00132

14

interest hereby granted by Producer and Seller is in addition to, and not in lieu of, such liens as Buyer may have under applicable law.

(b)     Subordination of Liens. The Parties acknowledge that Producer, Seller and their respective Affiliates may hold or be entitled to certain liens (whether choate or inchoate) and/or security interests with respect to the Producer Crude Oil delivered hereunder, including, without limitation, a statutory lien as an oil and gas interest owner pursuant to Section 9.343 of the Texas Business and Commerce Code and an "operator's lien" or "non-operator's lien" pursuant to an operating agreement between some or all of such Persons (collectively, "*Liens*"). Producer and Seller, for themselves and for their respective Affiliates, hereby subordinate any and all of Liens in the Producer Crude Oil delivered hereunder to Buyer's rights under this Agreement.

4.11.   Setoff and Recoupment. Upon the occurrence of either or both of (i) an Event of Default on the part of any Party, or (ii) circumstances constituting a Basis for Requesting Assurance, the Non-Defaulting Party (as defined herein) and/or the Party Requesting Assurance, as the case may be (the "*Insecure Party*") shall have the right, in its sole discretion, to undertake any one or all of the following actions: (a) the Insecure Party may exercise recoupment by retaining, freezing, holding, and/or liquidating Crude Oil in the possession of the Insecure Party (or any proceeds held by the Insecure Party from the sale thereof), the Gross Proceeds, or any other amount that would be otherwise deliverable or payable to the other Party or Parties under this Agreement to satisfy and apply to any amounts owed by the Defaulting Party (as defined herein) and/or the Party Providing Assurance, as the case may be (referred to as the "other Party" in this Section 4.11, whether one or more), under this Agreement or applicable law as of the time of such recoupment or at any later time; and/or (b) the Insecure Party may exercise setoff by retaining, freezing, holding, and liquidating Crude Oil, the Gross Proceeds, or any other amount that would be otherwise deliverable or payable to the other Party under this Agreement as a setoff or offset against any amounts that are due or may become due from the other Party to the Insecure Party under this Agreement or applicable law as of the time of the setoff or offset or at any later time. Should the Insecure Party elect to exercise its rights under this Section 4.11, the Insecure Party shall notify the other Party in writing, within ten (10) days of such recoupment, setoff, and/or offset; provided, however, the Insecure Party shall not be required to provide the other Party with any advance notice whatsoever before exercising the rights of recoupment, setoff, and/or offset as set forth herein. Each Party does hereby agree to (i) a lifting of the automatic stay in bankruptcy under 11 U.S.C. § 362 and other applicable law to the extent necessary to allow for the recoupment, setoff, and/or offset provided for under this Agreement and (ii) not oppose a motion by an Insecure Party seeking authority to do same. Each Party further agrees that, without limiting the scope of any recoupment that may be exercised under the terms of this Section 4.11, that any recoupment exercised as provided for herein shall be considered to be within a single transaction. The rights granted to the Insecure Party pursuant to this Section 4.11 are in addition to any rights of recoupment, setoff, and/or offset against the other Party to which the Insecure Party may be otherwise entitled.

4.12.   Option to Convert to Buy/Sell. Seller shall have an option to request an amendment to this Agreement, to be effective no sooner than three (3) Months after providing written notice thereof, to provide for the Monthly purchase by Seller of volumes of either (x) Cushing Common Stream Domestic Sweet Crude Oil, with delivery to be made at Cushing Terminal, or (y) Eagle Ford Pipeline Common Stream Crude Oil of a like grade, with delivery to

1475561v.25 0022384/00132

15

be made at Houston Terminal, in either case, equal to the volumes of Producer Crude Oil sold by Seller to Buyer hereunder each Month, for a price equal to the Base Price (which price, in the case of Eagle Ford Pipeline Common Stream Crude Oil delivered at Houston Terminal, shall be adjusted in accordance with the Gravity Adjustment Scale for the gravity of such Eagle Ford Pipeline Common Stream Crude Oil delivered at Houston Terminal), subject to the terms and conditions in, and the form of, an amendment to this Agreement to be mutually agreed upon by the Parties, which amendment shall include, without limitation, (i) that a minimum of twenty-five percent (25%) of the Maximum Daily Volume, Maximum Monthly Volume, Maximum Annual Volume, Annual Transportation Revenue Commitment, Cumulative Transportation Revenue Commitment and the remaining Total Cumulative Transportation Revenue Commitment would be subject to the "buy-sell" structure set forth in such amendment, (ii) that the volumes of Cushing Common Stream Domestic Sweet Crude Oil to be purchased by Seller at Cushing Terminal would be deemed delivered at forty (40) degrees gravity, (iii) that Seller would be responsible for obtaining capacity at or downstream of the Cushing Terminal and/or the Houston Terminal, as applicable, for the further storage and/or shipment of Crude Oil purchased by Seller, (iv) the right for Seller, upon ninety (90) days advance written notice to Buyer, to either terminate such amendment (but not this Agreement) or, subject to the limitation in (i) above, change the volumes subject to the "buy-sell" structure set forth in such amendment, at any time after three (3) Months after the effective date of such amendment, and (v) such other amendments, ancillary agreements and/or additional provisions as are reasonably requested by any Party, including, without limitation, additional credit and Bankruptcy protection provisions and/or support to reflect the increased risk to Buyer. To exercise such option, Seller shall deliver to Buyer written notice thereof, and the Parties shall negotiate in good faith to agree upon the terms and conditions of such amendment; provided, however, if the Parties are unable to agree upon the terms and conditions of such amendment within ninety (90) days of Buyer's receipt of such notice from Seller, this Agreement shall continue in full force and effect un-amended for the remainder of the Term unless terminated earlier as provided herein.

4.13. <u>Reservation of Rights</u>. Each Party reserves to itself all rights, setoffs, counterclaims, and other defenses which it is or may be entitled to arising under this Agreement.

4.14. <u>Measurement and Tests</u>. All measurements hereunder shall be made from static tank gauges on 100 percent tank table basis or by positive displacement meters. All measurements and tests shall be made in accordance with the latest ASTM or ASME-API (Petroleum PD Meter Code) published methods then in effect, whichever apply. Volume and gravity shall be adjusted to 60 degrees Fahrenheit by the use of Table 6A and 5A of the Petroleum Measurement Tables ASTM Designation D1260 in their latest revision. Producer Crude Oil delivered hereunder shall be marketable and acceptable in the applicable common or segregated stream of the carriers involved but not to exceed 1% S&W. Full deduction for all free water and S&W content shall be made according to the API/ASTM Standard Method then in effect. Any Party shall have the right to have a representative witness all gauges, tests and measurements. In the absence of such Party's representative, such gauges, tests and measurements shall be deemed to be correct.

1475561v.25 0022384/00132

16

Plf Resp in Opp to Motion for Summary Judgment 126

SR198

## ARTICLE V
## REVENUE COMMITMENTS AND DEFICIENCY PAYMENTS

5.1. Revenue Commitment. Pursuant to the terms hereof, Seller agrees to sell to Buyer, during the Primary Term, at least sufficient volumes of Producer Crude Oil hereunder so as to generate a Cumulative Transportation Revenue Receipt hereunder in an amount not less than [REDACTED] as more particularly described in the table below (the "*Total Cumulative Transportation Revenue Commitment*"):

| Contract Year | Annual Volume Equivalent (in Barrels) | Adjusted Weighted Average Transportation Rate ($ per Barrel)* | Annual Transportation Revenue Commitment ($) | Cumulative Transportation Revenue Commitment ($) |
|---|---|---|---|---|
| 1 | 18,250,000 | | | |
| 2 | 27,375,000 | | | |
| 3 | 27,375,000 | | | |
| 4 | 36,500,000 | | | |
| 5 | 36,500,000 | | | |
| 6 | 36,500,000 | | | |
| 7 | 36,500,000 | | | |
| 8 | 36,500,000 | | | |
| 9 | 36,500,000 | | | |
| 10 | 36,500,000 | | | |
| Total Cumulative Transportation Revenue Commitment: | | | | |

* For the avoidance of doubt, the Parties acknowledge that (i) the amounts shown in the column entitled "Adjusted Weighted Average Transportation Rate ($ per Barrel)" in the table above are based upon the Weighted Average Transportation Rate, as adjusted each Contract Year by a multiplier of 1.04, (ii) such amounts in such column are used herein only for purposes of determining the Total Cumulative Transportation Revenue Commitment, and (iii) the actual Weighted Average Transportation Rate hereunder shall be based on the actual Fee Adjustment Multiplier in effect from time to time.

5.2. Deficiency Payment. If, as of the end of any Contract Year during the Primary Term, the amount set forth for such Contract Year under the column entitled "Cumulative Transportation Revenue Commitment ($)" in the table in Section 5.1 above (the "*Cumulative Transportation Revenue Commitment*") exceeds the sum, without duplication, of (v) the total cumulative Purchase Price Condensate Component for every Month as of the end of the sixth (6th) Month after the end of such Contract Year, plus (w) the total cumulative Purchase Price Crude Petroleum Component for every Month as of the end of the sixth (6th) Month after the end of such Contract Year, plus (x) the total cumulative Third Party Crude Oil Allowance for every Month during such Contract Year, plus (y) the total cumulative Producer Force Majeure Credit Allowance for every Month as of the end of such Contract Year, plus (z) the total cumulative

1475561v.25 0022384/00132

17

Plf Resp in Opp to Motion for Summary Judgment 127

SR199

amounts of any Deficiency Payment (hereinafter defined) which Seller has paid to Buyer pursuant to this Agreement as of the end of the immediately preceding Contract Year (such sum being the "*Cumulative Transportation Revenue Receipt*"), then Seller shall pay to Buyer, pursuant to a statement delivered pursuant to Section 4.6, an amount equal to the amount by which the Cumulative Transportation Revenue Commitment as of the end of such Contract Year exceeds the Cumulative Transportation Revenue Receipt applicable to such Contract Year (such difference being the "*Deficiency Payment*"); provided, however, (i) at such time, if ever, that the cumulative total of Deficiency Payments incurred and paid by Seller to Buyer hereunder equals or exceeds ▮▮▮▮▮▮▮ (the "*Maximum Cumulative Deficiency Payment Obligation*"), then Seller shall have no further obligation hereunder to pay any Deficiency Payment or portion thereof in excess of the Maximum Cumulative Deficiency Payment Obligation (provided that Seller shall not be relieved of the obligation to pay all unpaid Deficiency Payments up to the Maximum Cumulative Deficiency Payment Obligation), and (ii) notwithstanding anything in this Section 5.2 or elsewhere in this Agreement to the contrary, if the Term is not extended beyond the end of the Primary Term, then the total cumulative Purchase Price Condensate Component and the total cumulative Purchase Price Crude Petroleum Component used to calculate the Cumulative Transportation Revenue Receipt applicable to the tenth (10th) Contract Year shall be calculated as of the end of such Contract Year and not six (6) Months after the end of such Contract Year. An example calculation of the Deficiency Payment, using hypothetical values for the various components of the Cumulative Transportation Revenue Receipt, is attached as **Exhibit B**.

## ARTICLE VI
## WARRANTY OF TITLE

6.1.    Title Warranty.  Seller represents and warrants to Buyer that (i) Seller has title to and/or the right to sell all Producer Crude Oil delivered hereunder, free and clear of all royalties, liens, encumbrances and all applicable foreign, federal, state and local Taxes, and (ii) Seller has the right, power, title and authority to enter into this Agreement.  Producer represents and warrants to Buyer that Producer has the right, power, title and authority to enter into this Agreement.

6.2.    Proceeds of Production.  Seller agrees to make payment of all royalties, overriding royalties, production payments, and all other payments for interests attributable to Producer Crude Oil due to any Person under any leases or other documents in accordance with the terms thereof.

6.3.    Indemnification.  Seller agrees to indemnify, defend and hold Buyer harmless from any and all Claims and Losses incurred in connection with, or in any manner whatsoever relating to (i) any breach of the representations and warranties made by Seller pursuant to Section 6.1 above, and (ii) payment of royalties, overriding royalties, production payments, and all other payments for interests attributable to Producer Crude Oil.  Producer agrees to indemnify, defend and hold Buyer harmless from any and all Claims and Losses incurred in connection with, or in any manner whatsoever relating to any breach of the representations and warranties made by Producer pursuant to Section 6.1 above.  These indemnity and defense obligations shall survive the termination of this Agreement for the applicable statutory limitations period.

1475561v.25 0022384/00132

18

6.4.　Title and Risk of Loss.　Title to and risk of loss of the Producer Crude Oil purchased by Buyer from Seller hereunder shall pass from Seller to Buyer as such Producer Crude Oil passes the last permanent delivery flange and/or meter connecting Seller's and/or Producer's facilities into Buyer's facilities at the Points of Receipt.

## ARTICLE VII
## WAIVER OF CERTAIN DAMAGES

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY BE LIABLE TO ANY OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE OF THIS AGREEMENT FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT OR ANY BREACH HEREOF. THIS ARTICLE VII SHALL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT. NOTWITHSTANDING THE FOREGOING, LOSSES, DAMAGES AND COSTS INCURRED BY BUYER IN CONNECTION WITH OR CAUSED BY OFF-SPEC CRUDE OIL AND/OR HANDLING THEREOF, SHALL BE CONSIDERED DIRECT DAMAGES AND NOT CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES.

## ARTICLE VIII
## FORCE MAJEURE

8.1.　Suspension of Obligations.　If either Seller or Buyer is rendered unable, wholly or in part, by reason of Force Majeure, from carrying out its obligations under this Agreement (other than the obligation to make payment of amounts due hereunder, including any Deficiency Payment), then upon said Party's giving written notice and reasonably full particulars of such Force Majeure to the other Parties, which shall be done as soon as practicable after the occurrence of the cause relied on, the obligations of the Party giving such notice (other than the obligation to make payment of amounts due hereunder, including any Deficiency Payment), so far as they are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period, and such cause shall be remedied with all reasonable dispatch.

8.2.　Definition of Force Majeure.　The term "*Force Majeure*" shall mean acts of God, acts of federal, state or local government or any agencies thereof, compliance with rules, regulations or orders of any Governmental Authority or any office, department, agency or instrumentality thereof, strikes, lockouts or other industrial disturbances, acts of the public enemy, acts of terrorism, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, extreme temperatures, storms, hurricanes, floods, or other adverse weather conditions, washouts, arrests and restraint of rulers and people, civil disturbances, explosions, breakage or accident to machinery or lines of pipes, freezing of wells or lines of pipes, requisitions, directives, diversions, embargoes, priorities or expropriations of government or

Plf Resp in Opp to Motion for Summary Judgment 129

SR201

Governmental Authorities, legal or de facto, whether purporting to act under some constitution, decree, law or otherwise, failure of pipelines or other carriers to transport or furnish facilities for transportation, rules and regulations with regard to transportation by common carriers, failures, disruptions, or breakdowns of machinery or of facilities for production, manufacture, transportation, distribution, processing or consumption (including, but not by way of limitation, the Pipeline System), allocation or curtailment by third parties of downstream capacity, the necessity for making repairs, alterations, enlargements or connections to, or performing maintenance on, machinery or facilities of production, manufacture, transportation, distribution, processing or consumption (including, but not by way of limitation, the Pipeline System), inability to secure or delays in securing rights-of-way and permits, transportation embargoes or failures or delays in transportation or poor road conditions, partial or entire failure of crude oil supply or downstream pipeline market constraints, and, without limitation by enumeration, any other cause or causes, whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension, which, by the exercise of due diligence, such Party shall not have been able to avoid. The Party claiming Force Majeure shall not be entitled to the benefit of the provisions of Section 8.1 to the extent that the claimed condition (i) is within the reasonable control of such Party, (ii) is caused by the gross negligence, breach of default of such Party, or (iii) involves the payment of any amounts then owed hereunder by such Party. The Party claiming Force Majeure shall also take all commercially reasonable efforts to remedy, or mitigate the effects of, the claimed Force Majeure condition.

8.3.    Strikes.    The settlement of strikes or lockouts shall be entirely within the discretion of the Party having the difficulty. The requirement that any Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing party, when such is deemed inadvisable in the discretion of the Party having the difficulty.

8.4.    Interruption of Operations.    Buyer and/or its Affiliates may, without liability to Seller, interrupt the operations of their facilities for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements, but such interruption shall be for only such time as may be reasonable. Buyer shall give Seller advance written notice, except in case of emergency, of its intention to interrupt operations and of the estimated time thereof.

### ARTICLE IX
### GOVERNING LAW; VENUE; DISPUTE RESOLUTION

9.1.    Governing Law.    This agreement is entered into in the State of Texas and shall be governed, interpreted and construed in accordance with the laws of the State of Texas without regard to the conflicts of laws provisions thereof.

9.2.    Venue.    EXCLUSIVE VENUE FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT BY ANY PARTY IN CONNECTION WITH THIS AGREEMENT OR ARISING OUT OF THE TERMS OR CONDITIONS HEREOF SHALL BE IN HARRIS COUNTY, TEXAS. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT THEY MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THEY MAY NOW OR

Plf Resp in Opp to Motion for Summary Judgment 130

SR202

**HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IN THE STATE AND FEDERAL COURTS SITUATED IN THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS.**

9.3. Negotiation. Prior to submitting any dispute for resolution by a court, a Party shall provide written notice to the other of the occurrence of such dispute. If the Parties have failed to resolve the dispute within fifteen (15) Business Days after such notice was given, the Parties shall seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel shall endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within thirty (30) Business Days after the original notice of dispute was given, then any Party shall be entitled to pursue any remedies available at law or in equity; provided, however, this Section 9.3 shall not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 9.3 if application of such limitations would prevent a Party from filing a lawsuit or claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

## ARTICLE X
## TAXES

10.1. Taxes. Seller shall pay any and all Taxes levied on Producer Crude Oil or the transportation thereof, except for property Taxes assessed upon Producer Crude Oil purchased by Buyer in the Pipeline System. Buyer or its Affiliates shall pay any and all Taxes levied on the Pipeline System.

10.2. Reimbursement. In the event Buyer or any of its Affiliates pays or remits any Tax for or on behalf of Seller or Producer, including, without limitation, severance taxes on production, Seller shall reimburse Buyer for the same as part of the net amount due hereunder as shown on the Monthly statement described in Section 4.6. Seller hereby agrees to indemnify, defend and hold harmless Buyer and its Affiliates from and against any and all Claims and Losses arising out of or related to such Taxes. This indemnity and defense obligation shall survive the termination of this Agreement for the applicable statutory limitations period.

## ARTICLE XI
## ASSIGNMENT

11.1. Assignment. Notwithstanding anything in this Agreement to the contrary, this Agreement, and the rights and obligations created hereby, may be assigned, in whole but not in part, by any Party; provided, however, (i) this Agreement shall not be assigned by any Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed, and (ii) any such assignment shall expressly require that the assignee assume and agree to discharge the duties and obligations of its assignor under this Agreement. Notwithstanding the foregoing, any Party may assign any of its rights, or delegate any of its obligations, under this Agreement to one or more of its Affiliates without the consent of the other Parties, provided that no such assignment shall relieve the assignor Party from any of its obligations hereunder. No such assignment shall effect or operate to discharge accrued but unpaid obligations of the assignor under this Agreement. Notwithstanding anything to the

1475561v.25 0022384/00132

21

Plf Resp in Opp to Motion for Summary Judgment 131

SR203

contrary herein contained, if Seller is the assigning Party consent to assignment may be refused by Buyer if Buyer reasonably determines that (x) Seller's proposed assignee's financial condition is not sufficient to support the payment to Buyer of the Deficiency Payments that would come due hereunder if such assignee failed to deliver any Producer Crude Oil hereunder after the effective date of such assignment, or (y) the proposed assignee's financial condition renders the proposed assignee less creditworthy than Seller. Notwithstanding anything to the contrary herein contained, if Buyer is the assigning Party consent to assignment may be refused by Seller if Seller reasonably determines that Buyer's proposed assignee's financial condition is not sufficient to support such assignee's performance of this Agreement.

11.2. <u>Notice of Assignment</u>. No such assignment, nor any succession to the interest of any Party, shall be effective and binding until the other Parties are furnished with proper and satisfactory evidence of such assignment or succession.

11.3. <u>Transfer of Seller's and Producer's Interests</u>. Notwithstanding anything to the contrary in this Article XI, Seller and Producer may sell, convey or otherwise transfer any Qualifying Interests in accordance with the following:

(a) <u>Qualifying Interests</u>. For the purposes of this Agreement, (i) "*Qualifying Interests*" shall mean any of Seller and/or Producer's Interests which were acquired by Seller and/or Producer pursuant to a bona-fide, good-faith, arms-length transaction without the intent of reselling such Interests at the time of such acquisition, and (ii) a "*Qualifying Interests Transferee*" shall mean a third party who acquires Qualifying Interests from Seller and/or Producer.

(b) <u>Transfers of Qualifying Interests</u>. If (i) Seller and/or Producer sells, conveys, or otherwise transfers any Qualifying Interests to a Qualifying Interests Transferee, (ii) such Qualifying Interests Transferee desires to enter into a Crude Oil purchase agreement with Buyer and any necessary ancillary agreements (collectively, the "*Qualifying Interests Agreement*"), (iii) such Qualifying Interests Transferee is experienced and reputable, meets Buyer's reasonable credit requirements and is otherwise reasonably acceptable to Buyer, and (iv) such Qualifying Interests Transferee is not (and none of its Affiliates is) in material default under any other agreement with Buyer or any of its Affiliates, then (x) Buyer agrees to negotiate with such Qualifying Interests Transferee in good faith in an effort to agree upon and execute a Qualifying Interests Agreement with such Qualifying Interests Transferee on commercial terms acceptable to Buyer, and (y) Buyer, Seller and Producer agree to negotiate in good faith in an effort to agree upon and execute an amendment to this Agreement and any necessary ancillary agreements, which would provide for, without limitation, a reduction to the Maximum Daily Volume, Maximum Monthly Volume and Maximum Annual Volume (with a corresponding reduction to the Annual Transportation Revenue Commitment, Cumulative Transportation Revenue Commitment and Total Cumulative Transportation Revenue Commitment) in mutually agreeable amounts, which amounts shall take into account and be based upon any revenue and/or volume commitments made by such Qualifying Interests Transferee pursuant to the Qualifying Interests Agreement, and address all other issues potentially impacted by such transfer of Qualifying Interests

1475561v.25 0022384/00132

22

SR204

to the satisfaction of each of the Parties; provided, however, Buyer shall not be obligated to amend this Agreement if the Qualifying Interests Agreement is not executed.

(c) <u>Qualifying Interests Agreement Limitations</u>. Notwithstanding Section 11.3(b) above, it is acknowledged and agreed that (i) neither Buyer nor Enterprise Pipeline nor any of their Affiliates shall have any obligation to design, construct or install any new facilities or otherwise modify the Pipeline System or add any Points of Receipt to accommodate transfers of Qualifying Interests, (ii) neither Buyer nor its Affiliates are obligated to provide the same terms to a Qualifying Interests Transferee in a Qualifying Interests Agreement as are contained herein and/or in any ancillary agreement, (iii) Buyer's combined obligations under the Qualifying Interests Agreement and this Agreement, as amended as provided in Section 11.3(b) above, shall be no greater than Buyer's obligations under this Agreement before such amendment as if such transfer of Qualifying Interests had never occurred, and (iv) upon the execution of a Qualifying Interests Agreement, the Crude Oil produced from or attributable to such transferred Qualifying Interests shall no longer be considered Producer Crude Oil.

(d) <u>Transfer to CNOOC</u>. Notwithstanding Section 11.3(c)(ii) above, if (i) CNOOC is or becomes a Qualifying Interests Transferee and (ii) CNOOC is not (and none of its Affiliates is) in material default under any other agreement with Buyer or any of its Affiliates, then, subject to the other provisions of Section 11.3(c) above, Buyer agrees to enter into a Qualifying Interests Agreement with CNOOC on the same terms as are in this Agreement; provided, however, in connection with the execution of such Qualifying Interests Agreement with CNOOC, if CNOOC does not meet Buyer's reasonable credit requirements, then Buyer shall have the right to require that CNOOC provide to Buyer a guaranty of CNOOC's obligations under such Qualifying Interests Agreement from an entity, and in a form, reasonably acceptable to Buyer.

## ARTICLE XII
## NOTICE AND STATEMENTS

12.1. <u>Notice</u>. Any notice, statement, payment, claim or other communication required or permitted hereunder shall be in writing and shall be sent by: (i) facsimile transmission; (ii) delivered by hand; (iii) sent by United States mail with all postage fully prepaid; or (iv) by courier with charges paid in accordance with the customary arrangements established by such courier, in each of the foregoing cases addressed to the Party at the following addresses:

Buyer:     <u>NOTICES AND CORRESPONDENCE</u>:

Enterprise Crude Oil LLC
Attn: Vice President – Crude Oil Marketing
1100 Louisiana, Suite 1500
Houston, Texas 77002
Fax: 713-381-7870

<u>ACCOUNTING MATTERS</u>:

Plf Resp in Opp to Motion for Summary Judgment 133

SR205

Enterprise Crude Oil LLC
Attn:  Vice President – Crude Oil Marketing
1100 Louisiana, Suite 1500
Houston, Texas  77002
Fax:  713-381-7870

PAYMENT BY WIRE:

Enterprise Crude Oil LLC
Wells Fargo Bank, N.A., San Francisco, CA
ABA:  121000248
Account No.:  1018204331

Seller and Producer:     NOTICES AND CORRESPONDENCE:



ACCOUNTING MATTERS:



PAYMENT BY WIRE:



   Such notices, statements, payments, claims or other communications shall be deemed received as follows: (i) if delivered personally, upon delivery; (ii) if sent by United States mail, whether by express mail, registered mail, certified mail or regular mail, the notice shall be deemed to have been received on the day receipt is refused or is confirmed orally or in writing by

1475561v.25 0022384/00132

24

the receiving Party; (iii) if sent by a courier service, upon delivery; or (iv) if sent by facsimile, on the Business Day following the day on which it was transmitted and confirmed by transmission report or such earlier time as confirmed orally or in writing by the receiving Party.

12.2. Routine Communications. Notwithstanding the foregoing, routine communications between the Parties, including, but not limited to communications concerning scheduling and forecasts of the volumes of Crude Oil to be sold and purchased hereunder, may be conducted via telephone, facsimile and/or electronic mail.

12.3. Change of Address. Notices of change of address of any Party shall be given in writing to the other Parties in the manner aforesaid and shall be observed in the giving of all future notices, statements, payments, claims or other communications required or permitted to be given hereunder.

# ARTICLE XIII
# MISCELLANEOUS

13.1. Amendments. All modifications, amendments or changes to this Agreement, whether made simultaneously with or after the execution of this Agreement, shall be in writing, executed by Producer, Buyer and Seller.

13.2. Confidentiality.

(a) Confidentiality. Each Party agrees that it shall maintain all terms and conditions of this Agreement in strictest confidence, and that it shall not cause or permit disclosure of this Agreement or any provisions contained herein without the express written consent of the other Parties.

(b) Permitted Disclosures. Notwithstanding Section 13.2(a) of this Agreement, disclosures of any terms and provisions of this Agreement otherwise prohibited may be made by any Party (i) to the extent necessary for such Party to enforce its rights hereunder against any other Party; (ii) to the extent to which a Party is required to disclose all or part of this Agreement by a statute or by the order or rule of a court, agency, or other governmental body exercising jurisdiction over the subject matter hereof, by order, by regulations, or by other compulsory process (including, but not limited to, deposition, subpoena, interrogatory, or request for production of documents); (iii) to the extent required by the applicable regulations of a securities or commodities exchange; (iv) to a third Person in connection with a proposed sale or other transfer of a Party's interest in this Agreement, provided such third Person agrees in writing to be bound by the terms of this Section 13.2; (v) to its own directors, officers, employees, agents and representatives; (vi) to an Affiliate; or (vii) to a co-working interest owner or royalty owner of Producer Crude Oil delivered hereunder, provided such co-working interest owner or royalty owner agrees in writing to be bound by the terms of this Section 13.2.

(c) Notification. If any Party is or becomes aware of a fact, obligation, or circumstance that has resulted or may result in a disclosure of any of the terms and conditions of this Agreement authorized by Section 13.2(b)(ii), (iii) or (iv) above, it shall so notify in writing the other Parties promptly and shall provide documentation or an explanation of such disclosure as soon as it is available.

1475561v.25 0022384/00132

25

(d)     Party Responsibility. Each Party shall be deemed solely responsible and liable for the actions of its directors, officers, employees, agents, representatives and Affiliates for maintaining the confidentiality commitments of this Section 13.2.

(e)     Public Announcements. The Parties agree that prior to making any public announcement or statement with respect to this Agreement or the transaction represented herein, the Party desiring to make such public announcement or statement shall provide the other Parties with a copy of the proposed announcement or statement prior to the intended release date of such announcement. The other Parties shall thereafter consult with the Party desiring to make the release, and the Parties shall exercise their reasonable best efforts to (i) agree upon the text of a joint public announcement or statement to be made by such Parties or (ii) in the case of a statement to be made solely by one Party, obtain approval of the other Parties to the text of a public announcement or statement. Nothing contained in this Section 13.2 shall be construed to require any Party to obtain approval of the other Parties to disclose information with respect to this Agreement or the transaction represented herein to any Governmental Authority to the extent required by applicable law or necessary to comply with disclosure requirements of the Securities and Exchange Commission, New York Stock Exchange, or any other regulated stock exchange.

(f)     Survival. The provisions of this Section 13.2 shall survive any expiration or termination of this Agreement for a period of one (1) year.

13.3.     Default.

(a)     Events of Default. Each of the following shall constitute an event of default ("*Event of Default*"):

(i)     for reasons other than Force Majeure or Seller or Producer's material default or breach (including, without limitation, Seller's failure to timely meet its obligations pursuant to Section 3.1 and Section 3.2 above), (x) the Commencement Date has not occurred on or before April 1, 2014, which date may be extended by one Day for each Day during the continuance of an event of Force Majeure up to and including January 1, 2015, and (y) Buyer is not purchasing and accepting, on a Daily basis, at the Points of Receipt, Producer Crude Oil tendered by Seller to Buyer hereunder equal to at least the lesser of (A) eighty percent (80%) of the Maximum Daily Volume in effect for the first Contract Year hereunder, (B) the Daily volume of Producer Crude Oil that Seller can reasonably demonstrate that it has the ability to deliver to the Points of Receipt, or (C) the total volume of Producer Crude Oil tendered by Seller to Buyer hereunder; provided, however, after the Commencement Date has occurred, this Section 13.3(a)(i) shall be of no further force and effect;

(ii)     the Bankruptcy of any Party;

(iii)     the failure by any Party to make, when due, any undisputed payment under this Agreement required to be made by it if such failure is not remedied on or before the fifth (5th) Business Day after written notice of such failure is given to the Party; or

(iv)     the failure of any Party to provide, when due, Performance Assurance pursuant to Section 4.9.

1475561v.25 0022384/00132

26

Plf Resp in Opp to Motion for Summary Judgment 136

SR208

(b)     Remedies.

(i)     Upon the occurrence of an Event of Default of the type described in subparagraph (i) or (ii) of Section 13.3(a) above with respect to a Party or Parties under this Agreement (the "*Defaulting Party*") and prior to the cure thereof, Buyer, in the event that either Seller or Producer is the Defaulting Party, or Seller or Producer, in the event that Buyer is the Defaulting Party (the "*Non-Defaulting Party*"), shall be entitled in its sole discretion to suspend performance or terminate this Agreement and pursue such other remedy or remedies as may be available to it under this Agreement (including, without limitation, exercising the rights of recoupment, setoff, offset, and/or liquidation), at law or in equity, subject, however, to the limitations set forth in Article VII.

(ii)    Upon the occurrence of an Event of Default of the type described in subparagraphs (iii) or (iv) of Section 13.3(a) above with respect to the Defaulting Party and prior to the cure thereof, the Non-Defaulting Party shall be entitled in its sole discretion to suspend performance under (but not terminate) this Agreement and pursue such other remedy or remedies as may be available to it under this Agreement (including, without limitation, exercising the rights of recoupment, setoff, or offset), at law or in equity, subject, however, to the limitations set forth in Article VII.

(iii)   No election of remedies shall be required or implied as the result of a Party's decision to avail itself of a remedy hereunder.

(iv)    In addition to all other rights under this Agreement, upon the occurrence of an Event of Default in which Seller or Producer is the Defaulting Party and in which Buyer is entitled to terminate this Agreement, Buyer may, at its sole option, without notice or demand, (i) accelerate and declare due and payable the entire amount of all Deficiency Payments that would come due hereunder for the remaining Term of the Agreement if no Producer Crude Oil was delivered and there was no Third Party Crude Oil after the occurrence of such Event of Default, and/or (ii) to liquidate this Agreement by terminating the Agreement.

(c)     Effect of Termination.  At any time after the termination of this Agreement pursuant to this Section 13.3, the Parties shall have no further rights or obligations with respect to this Agreement, except as specifically set forth herein and except (x) in the event that Seller or Producer was the Defaulting Party, for the payment of the Deficiency Payments that would come due hereunder for the remaining Term of this Agreement based on the fact that no Producer Crude Oil will be delivered and there will be no Third Party Crude Oil after such termination or that have been accelerated and declared due and payable hereunder by Buyer pursuant to Section 13.3(b) above, and, without duplication, (y) the payment of any outstanding Settlement Amount by Buyer to Seller or Seller to Buyer, as applicable.

(d)     Bankruptcy Safe Harbor Provisions.  Without limiting the applicability of any other provision of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "*Bankruptcy Code*") (including without limitation Sections 362, 546, 553, 556, 560, 561 and 562 thereof and the applicable definitions in Section 101 thereof), the Parties acknowledge and agree that: (i) this Agreement and all transactions entered into hereunder constitute "forward

1475561v.25 0022384/00132

27

Plf Resp in Opp to Motion for Summary Judgment 137

SR209

contracts" and/or "swap agreements" and this Agreement constitutes a "master netting agreement" as defined in section 101 of the Bankruptcy Code; (ii) each Party is a "master netting agreement participant," a "forward contract merchant" and/or a "swap participant" as defined in the Bankruptcy Code; (iii) the rights of the Parties under this Section 13.3 constitute "contractual rights" to liquidate, terminate or accelerate, as applicable, this Agreement and the transactions entered into hereunder; (iv) any margin or collateral provided under any margin, collateral, security, or similar agreement related hereto and all payment obligations of any Party to any other Party hereunder constitute a "margin payment" or a "settlement payment" as defined in section 101 of the Bankruptcy Code; and (v) the Parties are entitled to the rights under, and protections afforded by, sections 362, 546, 553, 556, 560, 561 and 562 of the Bankruptcy Code.

13.4. <u>Waiver</u>. No waiver of any term, provision or condition of this Agreement shall be effective unless in writing signed by the Parties, and no such waiver shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of the Agreement, unless specifically so stated in such written waiver.

13.5. <u>No Third Party Beneficiaries</u>. Except for Persons indemnified hereunder, this Agreement is not for the benefit of any third party and nothing herein, expressed or implied, confers any right or remedy upon any Person not a party hereto.

13.6. <u>Rules and Regulations</u>. The terms, provisions and activities undertaken pursuant to this Agreement shall be subject to all applicable laws, orders and regulations of all Governmental Authorities. If applicable, the Parties agree to comply with all provisions (as amended) of the Equal Opportunity Clause prescribed in 41 C.F.R. 60-1.4; the Affirmative Action Clause for disabled veterans and veterans of the Vietnam Era prescribed in 41 C.F.R. 60-250,4; the Affirmative Action Clause for Handicapped Workers prescribed in 41 C.F.R. 60-741.4; 48 C.F.R. Chapter 1 Subpart 19.7 regarding Small Business and Small Disadvantaged Business Concerns; Executive Order 12138 and regulations thereunder regarding subcontracts to women-owned business concerns; Affirmative Action Compliance Program (41 C.F.R. 60-1.40); annually filing of SF-100 Employer Information Report (41 C.F.R. 60-1.7); 41 C.F.R. 60-1.8 prohibiting segregated facilities; and the Fair Labor Standards Act of 1938 as amended.

13.7. <u>Hazard Communication</u>. Seller shall provide its Material Safety Data Sheet ("*MSDS*") to Buyer. Each Party acknowledges the hazards and risks in handling and using Crude Oil. Each Party shall read the MSDS and advise its employees, its Affiliates, and third parties, who may purchase or come into contact with such Crude Oil, about the hazards of Crude Oil, as well as the precautionary procedures for handling such Crude Oil, which are set forth in such MSDS and any supplementary MSDS or written warnings which Seller may provide to Buyer from time to time.

13.8. <u>No Partnership</u>. It is not the intention of the Parties to create, nor is there created hereby, a partnership, trust, joint venture or association. The status of each Party hereunder is solely that of an independent contractor.

13.9. <u>Published Financial Data</u>. Unless expressly provided otherwise herein, in the event any published price, adjustment index, interest rate or other financial data referred to in

147556lv.25 0022384/00132

28

Plf Resp in Opp to Motion for Summary Judgment 138

SR210

this Agreement ceases to be published, the Parties shall mutually agree to an alternative published price, adjustment index, interest rate or other financial data representative of such data referred to in this Agreement.

13.10. <u>Headings</u>. The headings and captions in this Agreement have been inserted for convenience of reference only and shall not define or limit any of the terms and provisions hereof.

13.11. <u>Rules of Construction</u>. In construing this Agreement, the following principles shall be followed:

(a) examples shall not be construed to limit, expressly or by implication, the matter they illustrate;

(b) the word "includes" and its syntactical variants mean "includes, but is not limited to" and corresponding syntactical variant expressions;

(c) the plural shall be deemed to include the singular and vice versa, as applicable;

(d) all references in this Agreement to an "Article," "Section," "subsection," or "Exhibit" shall be to an Article, Section, subsection, or Exhibit of this Agreement, unless the context requires otherwise;

(e) unless the context otherwise requires, the words "this Agreement," "hereof," "hereunder," "herein," "hereby," or words of similar import shall refer to this Agreement as a whole and not to a particular Article, Section, subsection, clause or other subdivision hereof; and

(f) each Exhibit to this Agreement is attached hereto and incorporated herein as a part of this Agreement, but if there is any conflict or inconsistency between the main body of this Agreement and any Exhibit, the provisions of the main body of this Agreement shall prevail.

13.12. <u>Entire Agreement</u>. This Agreement contains the entire agreement between the Parties relating to the subject matter hereof and there are no oral promises, agreements or warranties affecting same.

13.13. <u>Applicable Laws</u>. This Agreement shall be subject to valid and applicable Federal, State and local laws and rules, orders or regulations, of any Governmental Authority having appropriate jurisdiction; provided however, nothing contained herein shall be construed as a waiver of any right to question or contest any such law, order, rule or regulation in any forum having appropriate jurisdiction.

13.14. <u>Severability</u>. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, (i) the validity, legality and/or enforceability of the remaining provisions shall not, in any way, be affected or impaired thereby and (ii) in lieu of such invalid, illegal or unenforceable provision, there shall be automatically added to this Agreement a provision as similar to such invalid, illegal or unenforceable provision as may be possible and be legal, valid and enforceable.

1475561v.25 0022384/00132

29

13.15. <u>Joint Preparation</u>.  Producer, Seller and Buyer acknowledge and mutually agree that this Agreement and all contents herein were jointly prepared by the Parties.

the )

13.16. <u>Further Assurances</u>.  Each Party shall take such acts and execute and deliver such documents as may be reasonably required to effectuate the purposes of this Agreement.

13.17. <u>No Inducements</u>.  No director, employee, or agent of any Party shall give or receive any commission, fee, rebate, gift, or entertainment of significant cost or value in connection with this Agreement.

13.18. <u>Joint and Several Liability</u>.

(a)    <u>Seller Parties</u>.  Each of ███████████████████████████ ██████████████ (each, a "*Seller Party*") shall be jointly and severally liable to Buyer in respect of all representations, warranties, covenants and agreements of Seller hereunder.  The Seller Parties shall be treated as one Party under this Agreement with respect to each Seller Party's liability hereunder. Without limiting the generality of the foregoing sentence, (i) all conditions related to either of the Seller Parties hereunder as "Seller" or as a "Party" shall mean that the condition has occurred in respect of either or both as applicable in the context, and (ii) all references to either of the Seller Parties as "Seller" or as a "Party" shall mean either or both of the Seller Parties as applicable in the context.

(b)    <u>Producer Parties</u>.  Each of ███████████████████████████ ████████ (each, a "*Producer Party*") shall be jointly and severally liable to Buyer in respect of all representations, warranties, covenants and agreements of Producer hereunder.  The Producer Parties shall be treated as one Party under this Agreement with respect to each Producer Party's liability hereunder. Without limiting the generality of the foregoing sentence, (i) all conditions related to either of the Producer Parties hereunder as "Producer" or as a "Party" shall mean that the condition has occurred in respect of either or both as applicable in the context, and (ii) all references to either of the Producer Parties as "Producer" or as a "Party" shall mean either or both of the Producer Parties as applicable in the context.

13.19. <u>Survival</u>.  The provisions of this Article 13 shall survive the termination of this Agreement.

13.20. <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts, each of which shall be considered an original, and all of which shall be considered one and the same instrument.  Any signature contained in a counterpart of this Agreement transmitted by facsimile or electronically shall be deemed to be an original signature.

[*Signature pages follow*]

Plf Resp in Opp to Motion for Summary Judgment 140

SR212

**BUYER:**

**ENTERPRISE CRUDE OIL LLC**

By: Enterprise Crude GP LLC
Its: Sole Manager

By: _____
    Mark A. Hurley
    Senior Vice President

Plf Resp in Opp to Motion for Summary Judgment 141

SR213

# EXHIBIT A

## POINTS OF RECEIPT

Location of Pipeline Points of Receipt:

| Name | County | X/Y Coordinates or Lat./Long. | Third Party Crude Oil Point of Receipt? |
|------|--------|-------------------------------|------------------------------------------|
| Gardendale | La Salle | TBD by Enterprise Pipeline | Yes |

Equipment at Pipeline Points of Receipt:

| SELLER'S EQUIPMENT<br><br>(To be installed, operated and maintained by Seller or its designee): | PIPELINE EQUIPMENT<br><br>(To be installed, operated and maintained by Buyer or its designee) |
|---|---|
| TBD by Enterprise Pipeline and Producer's designee | ACT- Automated Custody Transfer Meter |
|  | Storage tanks |

Location of Truck Points of Receipt:

| Name | County | X/Y Coordinates or Lat./Long. | Third Party Crude Oil Point of Receipt? |
|------|--------|-------------------------------|------------------------------------------|
| Gardendale | La Salle | TBD by Enterprise Pipeline | Yes |

Equipment at Truck Points of Receipt:

| SELLER'S EQUIPMENT<br><br>(To be installed, operated and maintained by Seller or its designee) |
|---|
| Storage tank(s) |
| Pump(s) |

1475561v.25 0022384/00132

Exhibit A

Plf Resp in Opp to Motion for Summary Judgment 142

SR214

| |
|---|
| Stabilization facilities |
| Truck rack and lease/well line interconnects |

1475561v.25 0022384/00132

Exhibit A – Page 2

EXHIBIT B

EXAMPLE CALCULATION OF DEFICIENCY PAYMENT



Exhibit B

1475561v.25 0022384/00132



Exhibit B – Page 2



147556 1v.25 0022384/00132



Plf Resp in Opp to Motion for Summary Judgment 146

# FIRST AMENDED AND RESTATED
# CRUDE OIL PURCHASE AND SALE AGREEMENT

January 31, 2012

ENTERPRISE CRUDE OIL LLC

"Enterprise"

And



"Producer"

1566924v.3 0022384/00132

# TABLE OF CONTENTS

PAGE

**ARTICLE I** CERTAIN DEFINITIONS .................................................................... 1

**ARTICLE II** TERM .......................................................................................... 11

**ARTICLE III** CONSTRUCTION AND COMMENCEMENT DATE ............................ 11

3.1. Construction of the Eagle Ford Pipeline ......................................... 11
3.2. Fee Lands, Easements and Rights-of-Way ...................................... 11
3.3. Commencement Date ..................................................................... 12
3.4. Line Fill ......................................................................................... 12

**ARTICLE IV** PURCHASE AND SALE OF PRODUCER CRUDE OIL ....................... 12

4.1. Purchase by Enterprise .................................................................. 12
4.2. Volume Limitations ........................................................................ 12
4.3. Purchase by ████████ .................................................................. 13
4.4. Pipeline Systems Rules and Regulations; Specifications .................. 13
4.5. Scheduling ..................................................................................... 14
4.6. Trucking Costs ............................................................................... 15
4.7. Statements and Payments .............................................................. 15
4.8. Audit Rights .................................................................................. 15
4.9. Statement Errors ........................................................................... 15
4.10. Creditworthiness ........................................................................... 16
4.11. Lien and Security Interest .............................................................. 16
4.12. Setoff and Recoupment ................................................................. 16
4.13. Reservation of Rights .................................................................... 17
4.14. Measurement and Tests ................................................................. 17

**ARTICLE V** REVENUE COMMITMENTS AND DEFICIENCY PAYMENTS ............. 17

5.1. Revenue Commitment .................................................................... 17
5.2. Deficiency Payment ....................................................................... 18

**ARTICLE VI** WARRANTY OF TITLE .................................................................. 19

6.1. Title Warranty ............................................................................... 19
6.2. Proceeds of Production .................................................................. 19
6.3. Indemnification ............................................................................. 19
6.4. Title and Risk of Loss .................................................................... 19

**ARTICLE VII** WAIVER OF CERTAIN DAMAGES ................................................ 20

**ARTICLE VIII** FORCE MAJEURE ........................................................................ 20

8.1. Suspension of Obligations .............................................................. 20
8.2. Definition of Force Majeure ........................................................... 20
8.3. Strikes ........................................................................................... 21
8.4. Interruption of Operations ............................................................. 21

i

1566924v.3 0022384/00132

# TABLE OF CONTENTS

PAGE

**ARTICLE IX  GOVERNING LAW; VENUE; DISPUTE RESOLUTION** ...... 21
- 9.1.  Governing Law ...... 21
- 9.2.  Venue ...... 21
- 9.3.  Negotiation ...... 22

**ARTICLE X  TAXES** ...... 22
- 10.1.  Taxes ...... 22
- 10.2.  Reimbursement ...... 22

**ARTICLE XI  ASSIGNMENT** ...... 22
- 11.1.  Assignment ...... 22
- 11.2.  Notice of Assignment ...... 23
- 11.3.  Transfer of ███████ and Producer's Interests ...... 23

**ARTICLE XII  NOTICE AND STATEMENTS** ...... 24
- 12.1.  Notice ...... 24
- 12.2.  Routine Communications ...... 26
- 12.3.  Change of Address ...... 26

**ARTICLE XIII MISCELLANEOUS** ...... 26
- 13.1.  Amendments ...... 26
- 13.2.  Confidentiality. ...... 26
- 13.3.  Default ...... 27
- 13.4.  Waiver ...... 29
- 13.5.  No Third Party Beneficiaries ...... 29
- 13.6.  Rules and Regulations ...... 29
- 13.7.  Hazard Communication ...... 29
- 13.8.  No Partnership ...... 30
- 13.9.  Published Financial Data ...... 30
- 13.10.  Headings ...... 30
- 13.11.  Rules of Construction ...... 30
- 13.12.  Entire Agreement ...... 30
- 13.13.  Applicable Laws ...... 30
- 13.14.  Severability ...... 31
- 13.15.  Joint Preparation ...... 31
- 13.16.  Further Assurances ...... 31
- 13.17.  No Inducements ...... 31
- 13.18.  Joint and Several Liability. ...... 31
- 13.19.  Original Agreement ...... 31
- 13.20.  Surviva ...... 32
- 13.21.  Counterpart Execution ...... 32

EXHIBIT A ...... Points of Receipt

EXHIBIT B ...... Example Calculation of Deficiency Payment

ii

1566924v 3 0022384/00132

# FIRST AMENDED AND RESTATED
## CRUDE OIL PURCHASE AND SALE AGREEMENT

This First Amended and Restated Crude Oil Purchase and Sale Agreement (this "*Agreement*") is made and entered into this 31st day of January, 2012 (the "*Effective Date*"), by and between ENTERPRISE CRUDE OIL LLC, a Texas limited liability company ("*Enterprise*"), and ███████████████████████████████████████ (collectively, "*Producer*"). Enterprise, ████████ and Producer may be referred to individually as "*Party*," or collectively as the "*Parties*."

## WITNESSETH:

WHEREAS, the Parties entered into that certain Crude Oil Purchase Agreement dated as of April 28, 2011 (the "*Original Agreement*"); and

WHEREAS, the Parties desire to amend and restate the Original Agreement in its entirety in accordance with the terms and conditions of this Agreement; and

WHEREAS, ████████ purchases, owns or controls barrels of crude oil produced from certain oil and gas wells of Producer located in the Eagle Ford Shale area of South Texas that the Parties desire for Enterprise to purchase; and

WHEREAS, Enterprise is a buyer and seller of crude oil, and is a shipper on the Pipeline System; and

WHEREAS, an Affiliate of Enterprise is currently designing, engineering and constructing the Eagle Ford Pipeline; and

WHEREAS, ████████ desires to sell to and purchase from Enterprise, and Enterprise desires to purchase from and sell to ████████, Crude Oil on the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, ████████ Producer and Enterprise hereby covenant and agree as follows:

## ARTICLE I
## CERTAIN DEFINITIONS

Unless otherwise required by the context, the terms defined in this Article I shall have, for all purposes of this Agreement, the respective meanings set forth in this Article I:

1.1. "*Affiliate*" shall mean any Person that directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with another Person. The term "control" (including its derivatives and similar terms) shall mean possessing the power to

1566924v.3 0022384/00132

any general arrangement for the benefit of creditors; (iv) such Person's otherwise becoming bankrupt or insolvent (however evidenced); (v) such Person's generally being unable or admitting its inability to pay its debts as they fall due (or otherwise generally failing to pay its debts as they fall due); or (vi) such Person's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above.

1.9.    "*Bankruptcy Code*" shall have the meaning given to such term in Section 13.3(d).

1.10.    "*Barrel*' shall mean forty-two (42) gallons of 231 cubic inches per gallon at sixty (60) degrees Fahrenheit (60° F).

1.11.    "*Base Price*" ███████████████████████████████████████

1.12.    "*Basis for Requesting Assurance*" shall have the meaning given to such term in Section 4.10.

1.13.    "*BPD*" shall mean Barrels per Day.

1.14.    "*Business Day*" shall mean any calendar day other than Saturdays and Sundays that commercial banks in Houston, Texas are open for business.

1.15.    "*Central Clock Time*" shall mean Central Standard time, as adjusted for Central Daylight time.

1.16.    '████████" shall have the meaning given to such term in the preamble of this Agreement.

1.17.    '████████*Gross Proceeds*" shall have the meaning given to such term in Section 4.1 of this Agreement.

1.18.    '████████ *Party*" shall have the meaning given to such term in Section 13.18(a).

1.19.    "████████ *Purchase Price*"


1.20.    "*Claims*" shall mean any and all claims, demands and causes of action of any kind and all losses, damages, liabilities, costs and expenses of whatever nature (including court costs and reasonable attorneys' fees).

1.21.    "*CNOOC*" means OOGC America, Inc., a Delaware corporation and subsidiary of the China National Offshore Oil Corporation.

1566924v.3 0022384/00132

3

Plf Resp in Opp to Motion for Summary Judgment 151

SR223

1.22. *"Commencement Date"* shall have the meaning given to such term in Section 3.3 of this Agreement.

1.23. *"Contract Year"* shall mean a period commencing at 7:00 a.m., Central Clock Time, on the Commencement Date and ending at 7:00 a.m., Central Clock Time on the same day and calendar month of the following calendar year and thereafter for succeeding periods of twelve (12) consecutive Months each.

1.24. *"Crude"* or *"Crude Oil"* or *"Crude Petroleum"* shall mean the grade or grades of direct liquid product of oil or gas wells meeting the specifications for either "Crude Petroleum" or "Condensate" as set forth in the applicable Rules and Regulations.

1.25. *"Crude Oil Revenue Allowance"* shall mean, with respect to any Month, the product of (i) the total volume of Producer Crude Oil that is sold and delivered by ▮▮▮▮▮ and purchased and accepted by Enterprise at the Points of Receipt hereunder in such Month multiplied by (ii) the ECHO Terminal Transportation Rate in effect for such Month.

1.26. *"Cumulative Transportation Revenue Commitment"* shall have the meaning given to such term in Section 5.2 of this Agreement.

1.27. *"Cumulative Transportation Revenue Receipt"* shall have the meaning given to such term in Section 5.2 of this Agreement.

1.28. *"Day"* or *"Daily"* shall mean a period of twenty-four (24) hours, commencing at 7:00 a.m., Central Clock Time, on a calendar day and ending at 7:00 a.m., Central Clock Time, on the next succeeding calendar day.

1.29. *"Defaulting Party"* shall have the meaning given to such term in Section 13.3(b) of this Agreement.

1.30. *"Deficiency Payment"* shall have the meaning given to such term in Section 5.2 of this Agreement.

1.31. *"Delivery Ticket"* shall mean a shipping/loading document or documents stating the type and quality of Crude Oil delivered, the volume delivered and method of measurement, the corrected specific gravity, temperature, and S&W content.

1.32. *"Due Date"* shall have the meaning given to such term in Section 4.7(b) of this Agreement.

1.33. *"Eagle Ford Pipeline"* shall mean a crude oil pipeline and related facilities running from a location within the Eagle Ford Shale area in South Texas to Sealy Station, to be constructed by Enterprise Pipeline, which, when completed and operational, will become a part of the Pipeline System.

1.34. *"Eagle Ford Pipeline Common Stream"* shall mean the Crude Oil that is delivered in a common stream at the ECHO Terminal or the Morgan's Point Terminal from the Eagle Ford Pipeline.

1566924v.3 0022384/00132

4

1.35. "*ECHO Terminal*" shall mean Enterprise Pipeline's Crude Oil terminal facilities on the Pipeline System near Houston, in southeastern Harris County, Texas.

1.36. "*ECHO Terminal Transportation Rate*" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1.37. "*Effective Date*" shall have the meaning given to such term in the preamble to this Agreement.

1.38. "*Enterprise*" shall have the meaning given to such term in the preamble of this Agreement.

1.39. "*Enterprise Gross Proceeds*" shall mean, with respect to any Month, the sum of (i) the product of (a) the volumes (in Barrels) of Crude Oil purchased by ▮▮▮▮▮▮▮ at the ECHO Terminal during such Month multiplied by (b) the applicable ▮▮▮▮▮ Purchase Price for such Month, and (ii) the product of (a) the volumes (in Barrels) of Crude Oil purchased by ▮▮▮▮▮▮ at the Morgan's Point Terminal during such Month multiplied by (b) the applicable ▮▮▮ Purchase Price for such Month.

1.40. "*Enterprise Pipeline*" shall mean Enterprise Crude Pipeline LLC, a Texas limited liability company and an Affiliate of Enterprise.

1.41. "*Enterprise Purchase Price*" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1.42. "*Event of Default*" shall have the meaning given to such term in Section 13.3(a) of this Agreement.

1.43. "*Extended Term*" shall have the meaning given to such term in Article II of this Agreement.

1.44. "*Fee Adjustment Multiplier*" shall mean, with respect to any date on which any fee or other amount hereunder is adjusted, the lesser of (i) 1.0400 or (ii) the FERC Index in effect as of such date. For the purposes of illustration only, the following example is provided to demonstrate the calculation of the annual adjustment of the ECHO Terminal Transportation Rate, using hypothetical values for the FERC Index:

1566924v.3 0022384/00132

5



1.45. "*FERC Index*" shall mean the "Multiplier to Use" as published by the Federal Energy Regulatory Commission under the title "Oil Pipeline Index," and is currently published in the month of July of each year on the Internet at http://www.ferc.gov/industries/oil/gen-info/pipeline-index.asp.

1.46. "*Force Majeure*" shall have the meaning given to such term in Section 8.2 of this Agreement.

1.47. "*Governmental Authority*" shall mean (i) the United States of America, (ii) any state, county, parish, municipality or other governmental subdivision within the United States of America, and (iii) any court or any governmental department, commission, board, bureau, agency or other instrumentality of the United States of America or of any state, county, municipality or other governmental subdivision within the United States of America.

1.48. "*Gravity Adjustment Scale*" ████████████████████████████████

1.49. "*Gross Proceeds*" shall mean either the ██████████ Gross Proceeds or the Enterprise Gross Proceeds, as applicable.

1.50. "*Insecure Party*" shall have the meaning given to such term in Section 4.12 of this Agreement.

1.51. "*Interest Rate*" shall mean an annual rate of interest equal to two percent (2%) above the prime rate published by the *Wall Street Journal* from time to time, or the maximum legal rate, whichever is the lesser.

1.52. "*Interests*" shall mean any right, title, or interest in lands, wells, or leases connected or serviced by Points of Receipt and the right to produce oil and/or gas therefrom whether arising from fee ownership, working interest ownership, mineral ownership, leasehold ownership, or arising from any pooling, unitization or communitization of any of the foregoing rights.

1.53. "*Liens*" shall have the meaning given to such term in Section 4.11(b) of this Agreement.

1566924v.3 0022384/00132

Plf Resp in Opp to Motion for Summary Judgment 154

SR226

1.54. "*Losses*" shall mean any actual loss, cost, expense, liability, damage, demand, suit, sanction, claim, judgment, lien, fine or penalty, including reasonable attorney's fees, asserted by a third party not Affiliated with the Party incurring such, and which are incurred by the applicable indemnified Persons on account of injuries (including death) to any person or damage to or destruction of any property, sustained or alleged to have been sustained in connection with or arising out of the matters for which the indemnifying party has indemnified the applicable indemnified Persons.

1.55. "*Maximum Annual Volume*" shall have the meaning given such term in Section 4.2(b).

1.56. "*Maximum Cumulative Deficiency Payment Obligation*" shall have the meaning given such term in Section 5.2.

1.57. "*Maximum Daily Volume*" shall have the meaning given such term in Section 4.2(b).

1.58. "*Maximum Monthly Volume*" shall have the meaning given such term in Section 4.2(b).

1.59. "*Month*" or "*Monthly*" shall mean a period of time beginning at 7:00 a.m., Central Clock Time on the first day of a calendar month and ending at 7:00 a.m., Central Clock Time on the first day of the next succeeding calendar month.

1.60. "*Morgan's Point Terminal*" shall mean Enterprise Pipeline's terminal facilities at or near Morgan's Point, Texas.

1.61. "*Morgan's Point Terminal Barge Loading Rate*"

1.62. "*Morgan's Point Terminal Transportation Rate*"

1.63. "*MSDS*" shall have the meaning given such term in Section 13.7.

1.64. "*Non-Defaulting Party*" shall have the meaning given to such term in Section 13.3(b) of this Agreement.

1.65. "*NYMEX*" shall mean the New York Mercantile Exchange; provided, that in the event the NYMEX ceases to operate as a commodity futures exchange, then the Parties shall mutually agree to an alternative commodity futures exchange to use for purposes of this Agreement.

1.66. "*Off-Spec Crude Oil*" shall have the meaning given to such term in Section 4.4.

Plf Resp in Opp to Motion for Summary Judgment 155

SR227

1.67. *"Other Interest Owners"* shall have the meaning given to such term in Section 6.2.

1.68. *"Parties"* shall have the meaning given to such term in the preamble of this Agreement.

1.69. *"Party"* shall have the meaning given to such term in the preamble of this Agreement.

1.70. *"Party Providing Assurance"* shall have the meaning given to such term in Section 4.10 of this Agreement.

1.71. *"Party Requesting Assurance"* shall have the meaning given to such term in Section 4.10 of this Agreement.

1.72. *"Performance Assurance"* shall have the meaning given to such term in Section 4.10 of this Agreement.

1.73. *"Person"* shall mean any individual, firm, corporation, trust, partnership, limited liability company, association, joint venture, other business enterprise or Governmental Authority.

1.74. *"Pipeline Points of Receipt"* shall mean the Crude Oil receiving facilities to be installed by Enterprise Pipeline on the Pipeline System at or near the locations indicated on Exhibit A, as such exhibit may be amended from time to time.

1.75. *"Pipeline System"* shall mean the crude oil pipeline system owned by Affiliates of Enterprise, including, without limitation, the Eagle Ford Pipeline.

1.76. *"Points of Receipt"* shall mean, collectively, the Pipeline Points of Receipt and the Truck Points of Receipt.

1.77. *"Primary Term"* shall have the meaning given to such term in Article II of this Agreement.

1.78. *"Producer"* shall have the meaning given to such term in the preamble of this Agreement.

1.79. *"Producer Crude Oil"* shall mean (i) all Crude Oil produced from or attributable to Interests owned by Producer, ███████ and/or its Affiliates and (ii) with respect to wells in which Producer and/or any of its Affiliates is the operator, Crude Oil produced from such wells that is attributable to the Interests in such wells owned by other working interest owners and royalty owners which is not taken "in-kind" by such working interest owners and royalty owners and for which Producer, ███████ and/or their Affiliates has the right and/or obligation to deliver such Crude Oil, but only for the period that Producer ███████ and/or their Affiliates has such right or obligation. For the avoidance of doubt, except as described in (ii) above, Producer Crude Oil shall not include Crude Oil purchased by Producer, ███████ and/or any of their Affiliates from third parties.

1566924v.3 0022384/00132

8

1.80. *"Producer Force Majeure Credit"* shall mean, with respect to each Day that Enterprise is unable to receive at the Points of Receipt, all or any portion of the Producer Crude Oil, up to the Maximum Daily Volume in effect for such Day, scheduled hereunder by or on behalf of ████████ for such Day, due to an event of Force Majeure, a volume of Producer Crude Oil equal to the lesser of (x) the Maximum Daily Volume in effect for such Day, minus the volume (in Barrels) of Producer Crude Oil that was received hereunder at the Points of Receipt on such Day, or (y) a volume (in Barrels) of Producer Crude Oil equal to the average deliveries of Producer Crude Oil hereunder to the Points of Receipt during the thirty (30) Day period immediately preceding the first Day of such event of Force Majeure, minus the volume (in Barrels) of Producer Crude Oil that was received hereunder at the Points of Receipt on such Day; provided, however, there shall be no Producer Force Majeure Credit for the first five (5) Days of any such event of Force Majeure.

1.81. *"Producer Force Majeure Credit Allowance"* shall mean, with respect to any Month, the product of (i) the total volume (in Barrels) of Producer Force Majeure Credits, if any, applicable to such Month multiplied by (ii) the ECHO Terminal Transportation Rate in effect for such Month.

1.82. *"Producer Party"* shall have the meaning given to such term in Section 13.18(b).

1.83. *"Qualifying Interests"* shall have the meaning given to such term in Section 11.3(a) of this Agreement.

1.84. *"Qualifying Interests Agreement"* shall have the meaning given to such term in Section 11.3(b) of this Agreement.

1.85. *"Qualifying Interests Transferee"* shall have the meaning given to such term in Section 11.3(a) of this Agreement.

1.86. *"Rules and Regulations"* shall have the meaning given to such term in Section 4.3.

1.87. *"Sealy Station"* shall mean Enterprise Pipeline's facilities on the Pipeline System at or near Sealy, Austin County, Texas.

1.88. *"Settlement Amount"* means the net amount due hereunder each Month by Enterprise to ████████ or ████████ to Enterprise, as the case may be, equal to the difference between (i) the ████████ Gross Proceeds and other amounts due from Enterprise to ████████ hereunder each Month, and (ii) the sum of (a) the Enterprise Gross Proceeds for such Month, (b) Trucking Costs incurred for such Month, and (c) any other amounts due from ████████ to Enterprise hereunder for such Month, including, without limitation, any Deficiency Payment and amounts paid or remitted by Enterprise pursuant to Section 10.2 of this Agreement.

1.89. *"S&W"* shall mean sediment and water.

1566924v.3 0022384/00132

9

1.90. *"Taxes"* shall mean any or all current or future taxes, fees, levies, charges, assessments and/or other impositions levied, charged, imposed, assessed or collected by any Governmental Authority having jurisdiction.

1.91. *"Term"* shall have the meaning given to such term in Article II of this Agreement.

1.92. *"Third Party Crude Oil"* shall mean, with respect to any Contract Year, the volume (in Barrels) of Crude Oil other than Producer Crude Oil which is either (i) purchased during such Contract Year by Enterprise at the Third Party Crude Oil Points of Receipt from any Person other than a Party or its Affiliates or (ii) received at the Third Party Crude Oil Points of Receipt during such Contract Year by Enterprise Pipeline from any Person other than a Party or its Affiliates for shipment on the Eagle Ford Pipeline.

1.93. *"Third Party Crude Oil Allowance"* shall mean (x) with respect to the first (1st) Contract Year hereunder, the product of (i) the total volume (in Barrels) of Third Party Crude Oil, if any, for such Contract Year in excess of 3,650,000 Barrels multiplied by (ii) the ECHO Terminal Transportation Rate in effect as of the end of such Contract Year; (y) with respect to each of the second (2nd) and third (3rd) Contract Years hereunder, the product of (i) the total volume (in Barrels) of Third Party Crude Oil, if any, for each such Contract Year in excess of 5,475,000 Barrels for each such Contract Year, multiplied by (ii) the ECHO Terminal Transportation Rate in effect as of the end of each such Contract Year; and (z) with respect to each of the fourth (4th) through the tenth (10th) Contract Years hereunder, the product of (i) the total volume (in Barrels) of Third Party Crude Oil, if any, for each such Contract Year multiplied by (ii) the ECHO Terminal Transportation Rate in effect as of the end of each such Contract Year.

1.94. *"Third Party Crude Oil Points of Receipt"* shall mean those certain Points of Receipt which are described as being a "Third Party Crude Oil Point of Receipt" in the table captioned "Location of Pipeline Points of Receipt" or "Location of Truck Points of Receipt" in **Exhibit A**, as applicable, as such exhibit may be amended from time to time.

1.95. *"Total Cumulative Transportation Revenue Commitment"* shall have the meaning given to such term in Section 5.1 of this Agreement.

1.96. *"Truck Points of Receipt"* shall mean the Crude Oil receiving facilities to be installed by ███████ or its designee at or near the locations indicated on **Exhibit A**, as such exhibit may be amended from time to time.

1.97. *"Trucking Costs"* shall mean, with respect to any Month, the product of (i) the volume of Producer Crude Oil delivered by ███████ at the Truck Points of Receipt during such Month, multiplied by (ii) the Trucking Rate in effect for such Month.

1.98. *"Trucking Rate"* ████████████████████

1566924v3 0022384/00132

10

1.99. *"WTI Price"*

## ARTICLE II
## TERM

The term of this Agreement shall commence on the Effective Date and unless sooner terminated as provided herein, shall remain in full force and effect until the end of the tenth (10th) Contract Year (the *"Primary Term"*); provided, however, at the option of ████████ provided that neither ████████ nor Producer is in default at the end of the Primary Term or at the time of the notice of extension described below in this Article II, the term of this Agreement may be extended beyond the expiration of the Primary Term for a single period of five (5) Contract Years, extending until the end of the fifteenth (15th) Contract Year (the *"Extended Term,"* and, the Primary Term as may be extended by the Extended Term, the *"Term"*). To exercise such option to extend the Term, ████████ shall deliver to Enterprise a notice thereof no later than twelve (12) Months prior to the expiration of the Primary Term. Subject to Section 13.3(c), termination or cancellation of this Agreement shall not relieve the Parties from any obligation accruing or accrued prior to the date of such termination.

## ARTICLE III
## CONSTRUCTION AND COMMENCEMENT DATE

3.1. Construction of the Eagle Ford Pipeline. Enterprise shall, or shall cause Enterprise Pipeline to, design, engineer, modify, construct, and equip, the Eagle Ford Pipeline, including the Pipeline Points of Receipt, which shall include the equipment set forth in **Exhibit A** under the column captioned "Pipeline Equipment" in the table captioned "Equipment at Pipeline Points of Receipt." ████████ shall, or shall cause its designee to, design, engineer, modify, construct, and equip, the Crude Oil storage and other facilities necessary to enable ████████ to deliver Producer Crude Oil to Enterprise (i) into the Eagle Ford Pipeline at the Pipeline Points of Receipt and (ii) into trucks at the Truck Points of Receipt, including, without limitation, the equipment for each type of Point of Receipt set forth in the applicable tables in **Exhibit A** under the columns captioned '████████ Equipment."

3.2. Fee Lands, Easements and Rights-of-Way. Upon Enterprise's request, ████████ shall grant, convey, bargain, transfer and assign, or shall cause to be granted, conveyed, bargained, transferred and assigned, to Enterprise or Enterprise Pipeline for purposes of constructing, owning, operating, repairing, replacing and maintaining the Eagle Ford Pipeline, (i) such fee lands owned by ████████ and/or its Affiliates as are reasonably necessary for such purposes, (ii) such easements and rights-of-way over, across, and under lands owned by ████████ and/or its Affiliates as are reasonably necessary for such purposes and (iii) such easements and rights-of-way owned by ████████ and/or its Affiliates over, across and under lands owned by third parties as are reasonably necessary for such purposes. The form of the documents used to convey any such fee lands, easements and/or rights-of-way shall be mutually agreed to by ████████ and Enterprise or Enterprise Pipeline.

1566924v.3 0022384/00132

11

3.3.  Commencement Date. The *"Commencement Date"* under this Agreement shall be the first day of the Month following the date Enterprise notifies ▮▮▮▮▮ that the Eagle Ford Pipeline is ready to commence commercial service with respect to the receipt, transportation, handling, and delivery of Producer Crude Oil hereunder.

3.4.  Line Fill. As between the Parties, Enterprise, as a shipper on the Pipeline System, shall be responsible for providing to the applicable carriers a pro-rated share of line fill based on the forecasted volumes of Producer Crude Oil to be sold and purchased hereunder.

## ARTICLE IV
## PURCHASE AND SALE OF PRODUCER CRUDE OIL

4.1.  Purchase by Enterprise. Upon the Commencement Date, pursuant to the terms and conditions of this Agreement, including the volume limitations in Section 4.2, ▮▮▮▮▮ shall sell and deliver to Enterprise, and Enterprise shall purchase and receive from ▮▮▮▮▮ the volumes of Producer Crude Oil which have been scheduled and delivered by or on behalf of ▮▮▮▮▮ to any of the Points of Receipt. With respect to each Month, Enterprise shall pay ▮▮▮▮▮ the Enterprise Purchase Price for each Barrel of Producer Crude Oil purchased by Enterprise at the Points of Receipt during such Month (the "▮▮▮▮▮ *Gross Proceeds"*).

4.2.  Volume Limitations.

(a)  ▮▮▮▮▮ may, at its option, deliver volumes of Producer Crude Oil in excess of the Maximum Daily Volume, the Maximum Monthly Volume and/or the Maximum Annual Volume to Enterprise pursuant to this Agreement; provided, however, Enterprise shall never be obligated to purchase or receive (i) more than the Maximum Daily Volume on any Day, (ii) more than the Maximum Monthly Volume in any Month, and (iii) more than the Maximum Annual Volume in any Contract Year.

(b)  As used herein, *"Maximum Daily Volume"* shall mean, with respect to each Day during each Contract Year set forth in the table below, the Daily volume of Producer Crude Oil for such Contract Year as set forth in the column entitled "Maximum Daily Volume." *"Maximum Annual Volume"* shall mean, with respect to each Contract Year set forth in the table below, the volume of Producer Crude Oil for such Contract Year as set forth in the column entitled "Maximum Annual Volume." For any Month in any Contract Year, the *"Maximum Monthly Volume"* shall be the product of (i) the number of Days in such Month times (ii) the quotient of the Maximum Annual Volume for such Contract Year divided by 365.

| Contract Year | Maximum Daily Volume (BPD) | Maximum Annual Volume (in Barrels) |
|---|---|---|
| 1 | 50,000 | 18,250,000 |
| 2 | 75,000 | 27,375,000 |
| 3 | 75,000 | 27,375,000 |
| 4 | 100,000 | 36,500,000 |
| 5 | 100,000 | 36,500,000 |
| 6 | 100,000 | 36,500,000 |
| 7 | 110,000 | 40,150,000 |

1566924v.3 0022384/00132

12

Plf Resp in Opp to Motion for Summary Judgment 160

SR232

| Contract Year | Maximum Daily Volume (BPD) | Maximum Annual Volume (in Barrels) |
|---|---|---|
| 8 | 110,000 | 40,150,000 |
| 9 | 110,000 | 40,150,000 |
| 10 | 110,000 | 40,150,000 |
| All remaining Contract Years | the lesser of (i) 110% of the average Daily volume of Producer Crude Oil actually purchased by Enterprise from ▓▓▓ hereunder during the immediately preceding Contract Year or (ii) the Maximum Daily Volume for such immediately preceding Contract Year. | the lesser of (i) 110% of the volume of Producer Crude Oil actually purchased by Enterprise from ▓▓▓ hereunder during the immediately preceding Contract Year or (ii) the Maximum Annual Volume for such immediately preceding Contract Year. |

4.3. Purchase by ▓▓▓. Subject to the provisions hereof, for every Month in which Enterprise purchases and receives Producer Crude Oil at the Points or Receipt hereunder, Enterprise shall sell and deliver to ▓▓▓, and ▓▓▓ shall purchase and receive from Enterprise, at the ECHO Terminal and/or the Morgan's Point Terminal, volumes (in Barrels) of Eagle Ford Pipeline Common Stream equal to the volumes and grades that were scheduled to be sold and delivered by Enterprise to ▓▓▓ hereunder at the ECHO Terminal and/or the Morgan's Point Terminal during such Month. ▓▓▓ shall pay Enterprise the ▓▓▓ Purchase Price for each such Barrel of Crude Oil. ▓▓▓ acknowledges that any Producer Crude Oil sold to Enterprise hereunder will likely be commingled with other Crude Oil and that the Crude Oil sold by Enterprise to ▓▓▓ at the ECHO Terminal or the Morgan's Point Terminal hereunder is not expected to be or include the identical Producer Crude Oil sold to Enterprise hereunder. Notwithstanding the foregoing, (i) ▓▓▓ is responsible for obtaining capacity at or downstream of the ECHO Terminal and the Morgan's Point Terminal for the further storage and/or shipment of Crude Oil purchased by ▓▓▓ hereunder, and (ii) Enterprise is not providing any storage to ▓▓▓ hereunder at the ECHO Terminal or the Morgan's Point Terminal.

4.4. Pipeline Systems Rules and Regulations; Specifications. The Parties acknowledge that Enterprise is a shipper on the Pipeline System, third party pipeline systems, and/or via truck transportation, and that all transportation of Crude Oil performed on the Pipeline System, third party pipeline systems and via truck shall be subject to the rules and regulations in applicable tariffs in effect from time to time (as amended from time to time, the "*Rules and Regulations*"). Enterprise shall never be required to purchase or accept Producer Crude Oil which does not meet the specifications set forth in the Rules and Regulations ("*Off-Spec Crude Oil*"). ▓▓▓ agrees to indemnify, defend and hold Enterprise harmless from any and all Claims and Losses incurred in connection with, or in any manner whatsoever relating to Off-Spec Crude Oil and/or the handling thereof. This indemnity and defense obligation shall survive the termination of this Agreement for the applicable statutory limitations period. ▓▓▓

1566924v.3 0022384/00132

13

Plf Resp in Opp to Motion for Summary Judgment 161

SR233

warrants to Enterprise that the Crude Oil delivered hereunder shall not be contaminated by chemicals foreign to virgin crude oil, including chlorinated and/or oxygenated hydrocarbons and lead. Enterprise shall have the right, without prejudice to any other remedy available, to reject and return to ███████ any quantities of Crude Oil which are found to be so contaminated even after delivery.

    4.5.    Scheduling.

    (a)    Producer Crude Oil. At least five (5) Business Days prior to the Commencement Date and on or before the twenty fifth (25th) Day of each succeeding Month during the Term, ███████ or its designee shall submit to Enterprise a schedule reflecting ███████ good faith forecast of the volumes and grades of Producer Crude Oil to be produced, sold and delivered by ███████ to Enterprise, and purchased and received by Enterprise from ███████ at each Point of Receipt during the following Month. The Parties acknowledge that such forecasted volumes and grades are likely to be more accurate in the first weeks of the Month, and more of an estimate for the later weeks. ███████ shall make commercially reasonable efforts to notify Enterprise of any changes to such forecasted volumes and grades. Subject to Section 4.2, Enterprise shall make commercially reasonable efforts to accommodate such changes.

    (b)    Deliveries to ECHO Terminal and Morgan's Point Terminal. At least five (5) Business Days prior to the Commencement Date and on or before the twenty fifth (25th) Day of each succeeding Month during the Term, ███████ and Enterprise shall mutually agree upon the schedule of volumes and grades of Eagle Ford Pipeline Common Stream to be sold and delivered by Enterprise to ███████ and purchased and received by ███████ from Enterprise, at the ECHO Terminal and/or the Morgan's Point Terminal during the following Month; provided, however, ███████ scheduled deliveries of Crude Oil hereunder to the Morgan's Point Terminal shall be limited to 5,000 BPD; provided, further that if Enterprise Pipeline expands the capacity of the Morgan's Point Terminal after the Effective Date and such expanded capacity is not committed to another Person, the Parties shall negotiate in good faith to agree upon an increase in such limitation. Notwithstanding the foregoing, nothing herein shall be construed as requiring Enterprise Pipeline or any of its Affiliates to undertake any such expansion. Such schedule shall reflect the volumes and grades forecast to be produced and delivered by ███████ to Enterprise pursuant to Section 4.5(a) and any adjustments necessary to make up imbalances for any previous Month between (x) volumes and grades produced, delivered and sold to Enterprise at the Points of Receipt during such Month, and (y) volumes and grades of Crude Oil delivered and sold to ███████ at the ECHO Terminal or the Morgan's Point Terminal during such Month.

    (c)    Balancing. The Parties shall work together and cooperate with each other in good faith to schedule and adjust purchases and sales of Crude Oil hereunder in such a manner so that the cumulative volumes and grades of Producer Crude Oil sold and delivered by ███████ to Enterprise at the Points of Receipt hereunder shall equal, as close as reasonably possible at all times, the cumulative volumes and grades of Crude Oil sold and delivered by Enterprise to ███████ hereunder.

1566924v.3 0022384/00132

14

Plf Resp in Opp to Motion for Summary Judgment 162

SR234

4.6. Trucking Costs. Each Month, as part of the net amount due hereunder shown in the statement described in Section 4.7, ▓▓▓▓▓▓ shall reimburse Enterprise for the Trucking Costs incurred by Enterprise for the transportation of Producer Crude Oil purchased hereunder from the Truck Points of Receipt to the Pipeline Points of Receipt.

4.7. Statements and Payments.

(a) Statements. On or before the ninth (9th) Business Day after the end of each Month during the Term, Enterprise shall render to ▓▓▓▓▓▓ a detailed statement for the preceding Month setting forth the calculation of the Settlement Amount.

(b) Payments. The Party owing the Settlement Amount shall pay such Settlement Amount in accordance with the wire transfer payment instructions set forth in Section 12.1 on or before the twentieth (20th) day of the Month following the Month of delivery (the "*Due Date*"); provided, however, (i) if the Due Date is on a Saturday or Texas bank holiday other than Monday, the Due Date shall be the preceding Business Day, and (ii) if the Due Date is on a Sunday or a Monday Texas bank holiday, the Due Date shall be the succeeding Business Day.

(c) Late Payments. Any Settlement Amount not paid in full by the Due Date will be deemed delinquent and will accrue interest at the Interest Rate, such interest to be calculated from and including the Due Date but excluding the date the delinquent amount is paid in full.

(d) Necessary Documents. Upon request, each Party agrees to furnish all substantiating documents incident to the delivery of Crude Oil hereunder, including a Delivery Ticket for each volume delivered.

4.8. Audit Rights. Upon not less than thirty (30) days prior written notice to the other Parties, any Party or its agent shall have the right, at reasonable times during business hours and at its own expense, to audit the books and records of the other Party or Parties to the extent necessary to verify: (i) the accuracy of any statement, charge or computation made under or pursuant to this Agreement, (ii) the ownership of the Interests to which the Producer Crude Oil purchased and sold hereunder is produced from or attributable to, and/or (iii) whether any Interests sold, conveyed or transferred by ▓▓▓▓▓▓ and/or Producer are Qualifying Interests; provided, however, no Party shall have the right to perform an audit pursuant to this Section 4.8 more than once during any twelve (12) Month period.

4.9. Statement Errors. In the event an error is discovered in the amount shown to be due on any statement rendered by Enterprise hereunder, such error shall be adjusted without interest or penalty as soon as reasonably possible, but no later than thirty (30) Days after the discovery of the error. If a dispute arises as to the amount payable hereunder, the disputed statement shall nevertheless be paid in full, but payment shall not waive the payor's right to dispute such statement in accordance with this Section 4.9. Any invoice dispute or statement adjustment shall be in writing and shall state the basis for the dispute or adjustment. Upon the resolution of the dispute, any required payment shall be made within fifteen (15) Days after such resolution, along with interest accrued at the Interest Rate from and including the Due Date but excluding the date paid. All undisputed statements rendered hereunder shall be deemed to be final and not subject to audit two (2) years after the date on which the statement is rendered. The

1566924v.3 0022384/00132

15

provisions of Section 4.8 and this Section 4.9 shall survive the termination of this Agreement for the later of (i) twenty-four (24) Months following the date on which such termination occurred, or (ii) until a dispute initiated with such twenty-four (24) Month period is finally resolved.

4.10. Creditworthiness. Should any Party have reasonable grounds for doubting the ability of any other Party to perform its obligations hereunder (as further defined below, the "*Basis for Requesting Assurance*"), the Party having the Basis for Requesting Assurance ("*Party Requesting Assurance*") shall have the right to request and receive from such other Party ("*Party Providing Assurance*") adequate assurance of performance ("*Performance Assurance*") as provided herein. Such Performance Assurance shall be due no later than ten (10) Days after the written request of the Party Requesting Assurance and shall take the form of a guarantee of all of the obligations hereunder of the Party Providing Assurance from a creditworthy party, as determined by the Party Requesting Assurance in its commercially reasonable discretion. Without limitation, a Basis for Requesting Assurance shall include any reasonable grounds for insecurity with respect to the performance of the Party Providing Assurance and/or any grounds that may constitute a basis for requesting adequate assurance of performance under Section 2-609 of the Uniform Commercial Code.

4.11. Lien and Security Interest.

(a) Enterprise's Liens. Producer and ███████ hereby grant Enterprise a lien and security interest in all Producer Crude Oil in the possession of Enterprise and proceeds thereof to secure any and all obligations and amounts owed by ███████ under this Agreement. Producer and ███████ acknowledge and agree that Enterprise may perfect such security interest in Producer Crude Oil by any method by which such lien and security interest may be perfected under applicable law.

(b) Subordination of Liens. The Parties acknowledge that Producer, ███████ and their respective Affiliates may hold or be entitled to certain liens (whether choate or inchoate) and/or security interests with respect to the Producer Crude Oil delivered hereunder, including, without limitation, a statutory lien as an oil and gas interest owner pursuant to Section 9.343 of the Texas Business and Commerce Code and an "operator's lien" or "non-operator's lien" pursuant to an operating agreement between some or all of such Persons (collectively, "*Liens*"). Producer, ███████ and their Affiliates are authorized to and hereby subordinate any and all of Liens in the Producer Crude Oil delivered hereunder to Enterprise's rights under this Agreement.

4.12. Setoff and Recoupment. Upon the occurrence of either or both of (i) an Event of Default on the part of any Party, or (ii) circumstances constituting a Basis for Requesting Assurance, the Non-Defaulting Party (as defined herein) and/or the Party Requesting Assurance, as the case may be (the "*Insecure Party*") shall have the right, in its sole discretion, to undertake any one or all of the following actions: (a) the Insecure Party may exercise recoupment by retaining, freezing, holding, and/or liquidating Crude Oil in the possession of the Insecure Party (or any proceeds held by the Insecure Party from the sale thereof), the Gross Proceeds, or any other amount that would be otherwise deliverable or payable to the other Party or Parties under this Agreement to satisfy and apply to any amounts owed by the Defaulting Party (as defined herein) and/or the Party Providing Assurance, as the case may be (referred to as the "other Party"

1566924v.3 0022384/00132

16

in this Section 4.12, whether one or more), under this Agreement or applicable law as of the time of such recoupment or at any later time; and/or (b) the Insecure Party may exercise setoff by retaining, freezing, holding, and liquidating Crude Oil, the Gross Proceeds, or any other amount that would be otherwise deliverable or payable to the other Party under this Agreement as a setoff or offset against any amounts that are due or may become due from the other Party to the Insecure Party under this Agreement or applicable law as of the time of the setoff or offset or at any later time. Should the Insecure Party elect to exercise its rights under this Section 4.12, the Insecure Party shall notify the other Party in writing, within ten (10) days of such recoupment, setoff, and/or offset; provided, however, the Insecure Party shall not be required to provide the other Party with any advance notice whatsoever before exercising the rights of recoupment, setoff, and/or offset as set forth herein. Each Party does hereby agree to (i) a lifting of the automatic stay in bankruptcy under 11 U.S.C. § 362 and other applicable law to the extent necessary to allow for the recoupment, setoff, and/or offset provided for under this Agreement and (ii) not oppose a motion by an Insecure Party seeking authority to do same. Each Party further agrees that, without limiting the scope of any recoupment that may be exercised under the terms of this Section 4.12, that any recoupment exercised as provided for herein shall be considered to be within a single transaction. The rights granted to the Insecure Party pursuant to this Section 4.12 are in addition to any rights of recoupment, setoff, and/or offset against the other Party to which the Insecure Party may be otherwise entitled.

4.13. **Reservation of Rights.** Each Party reserves to itself all rights, setoffs, counterclaims, and other defenses which it is or may be entitled to arising under this Agreement.

4.14. **Measurement and Tests.** All measurements hereunder shall be made from static tank gauges on 100 percent tank table basis or by positive displacement meters. All measurements and tests shall be made in accordance with the latest ASTM or ASME-API (Petroleum PD Meter Code) published methods then in effect, whichever apply. Volume and gravity shall be adjusted to 60 degrees Fahrenheit by the use of Table 6A and 5A of the Petroleum Measurement Tables ASTM Designation D1260 in their latest revision. Producer Crude Oil delivered hereunder shall be marketable and acceptable in the applicable common or segregated stream of the carriers involved but not to exceed 1% S&W. Full deduction for all free water and S&W content shall be made according to the API/ASTM Standard Method then in effect. Any Party shall have the right to have a representative witness all gauges, tests and measurements. In the absence of such Party's representative, such gauges, tests and measurements shall be deemed to be correct.

**ARTICLE V**
**REVENUE COMMITMENTS AND DEFICIENCY PAYMENTS**

5.1. **Revenue Commitment.** Pursuant to the terms hereof, ▮▮▮▮▮ agrees to sell to Enterprise, at the Points of Receipt, during the Primary Term, at least sufficient volumes of Producer Crude Oil hereunder so as to generate a Cumulative Transportation Revenue Receipt hereunder in an amount not less than ▮▮▮▮▮ as more particularly described in the table below (the "*Total Cumulative Transportation Revenue Commitment*"):

1566924v.3 0022384/00132

17



\* For the avoidance of doubt, the Parties acknowledge that (i) the amounts shown in the column entitled "Adjusted ECHO Terminal Transportation Rate ($ per Barrel)" in the table above are based upon the ECHO Terminal Transportation Rate, as adjusted each Contract Year by a multiplier of 1.04, (ii) such amounts in such column are used herein only for purposes of determining the Total Cumulative Transportation Revenue Commitment, and (iii) the actual ECHO Terminal Transportation Rate hereunder shall be based on the actual Fee Adjustment Multiplier in effect from time to time.

5.2.    Deficiency Payment.  If, as of the end of any Contract Year during the Primary Term, the amount set forth for such Contract Year under the column entitled "Cumulative Transportation Revenue Commitment ($)" in the table in Section 5.1 above (the "*Cumulative Transportation Revenue Commitment*") exceeds the sum, without duplication, of (w) the total cumulative Crude Oil Revenue Allowance for every Month as of the end of the sixth (6th) Month after the end of such Contract Year, plus (x) the Third Party Crude Oil Allowance for such Contract Year, plus (y) the total cumulative Producer Force Majeure Credit Allowance for every Month as of the end of such Contract Year, plus (z) the total cumulative amounts of any Deficiency Payment (hereinafter defined) which▮▮▮▮▮ has paid to Enterprise pursuant to this Agreement as of the end of the immediately preceding Contract Year (such sum being the "*Cumulative Transportation Revenue Receipt*"), then ▮▮▮▮▮ shall pay to Enterprise, pursuant to a statement delivered pursuant to Section 4.7, an amount equal to the amount by which the Cumulative Transportation Revenue Commitment as of the end of such Contract Year exceeds the Cumulative Transportation Revenue Receipt applicable to such Contract Year (such difference being the "*Deficiency Payment*"); provided, however, (i) at such time, if ever, that the cumulative total of Deficiency Payments incurred and paid by ▮▮▮▮▮ to Enterprise hereunder equals or exceeds ▮▮▮▮▮ (the "*Maximum Cumulative Deficiency Payment Obligation*"), then ▮▮▮▮▮ shall have no further obligation hereunder to pay any Deficiency Payment or portion thereof in excess of the Maximum Cumulative Deficiency Payment Obligation (provided that ▮▮▮▮▮ shall not be relieved of the obligation to pay all unpaid Deficiency Payments up to the Maximum Cumulative Deficiency Payment Obligation), and

1566924v.3 0022384/00132

18

Plf Resp in Opp to Motion for Summary Judgment 166

SR238

(ii) notwithstanding anything in this Section 5.2 or elsewhere in this Agreement to the contrary, if the Term is not extended beyond the end of the Primary Term, then the total cumulative Crude Oil Revenue Allowance used to calculate the Cumulative Transportation Revenue Receipt applicable to the tenth (10th) Contract Year shall be calculated as of the end of such Contract Year and not six (6) Months after the end of such Contract Year. An example calculation of the Deficiency Payment, using hypothetical values for the various components of the Cumulative Transportation Revenue Receipt, is attached as **Exhibit B**.

## ARTICLE VI
## WARRANTY OF TITLE

6.1. <u>Title Warranty</u>. ███████ represents and warrants to Enterprise that (i) ███████ has title to and/or the right to sell all Producer Crude Oil delivered hereunder, free and clear of all royalties, liens, encumbrances and all applicable foreign, federal, state and local Taxes, and (ii) ███████ has the right, power, title and authority to enter into this Agreement. Producer represents and warrants to Enterprise that Producer has the right, power, title and authority to enter into this Agreement.

6.2. <u>Proceeds of Production</u>. ███████ agrees to make payment of all royalties, overriding royalties, production payments, and all other payments for interests attributable to Producer Crude Oil due to any Person under any leases or other documents in accordance with the terms thereof (such Persons, the "*Other Interest Owners*").

6.3. <u>Indemnification</u>. ███████ agrees to indemnify, defend and hold Enterprise harmless from any and all Claims and Losses incurred in connection with, or in any manner whatsoever relating to (i) any breach of the representations and warranties made by ███████ pursuant to Section 6.1 above, and (ii) payment of royalties, overriding royalties, production payments, and all other payments for interests attributable to Producer Crude Oil. Producer agrees to indemnify, defend and hold Enterprise harmless from any and all Claims and Losses incurred in connection with, or in any manner whatsoever relating to any breach of the representations and warranties made by Producer pursuant to Section 6.1 above. These indemnity and defense obligations shall survive the termination of this Agreement for the applicable statutory limitations period.

6.4. <u>Title and Risk of Loss</u>. Title to and risk of loss of the Producer Crude Oil purchased by Enterprise from ███████ hereunder at the Points of Receipt shall pass from ███████ to Enterprise as such Producer Crude Oil passes the last permanent delivery flange and/or meter connecting ███████ and/or Producer's facilities into Enterprise's facilities at the Points of Receipt. Title to and risk of loss of the Crude Oil purchased by ███████ from Enterprise hereunder shall pass from Enterprise to ███████ as such Crude Oil passes the last permanent delivery flange and/or meter connecting Enterprise's and/or its Affiliate's facilities to ███████ carrier at the ECHO Terminal or the Morgan's Point Terminal.

1566924v.3 0022384/00132

19

## ARTICLE VII
### WAIVER OF CERTAIN DAMAGES

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, IN NO EVENT SHALL ANY PARTY BE LIABLE TO ANY OTHER PARTY, ANY SUCCESSORS IN INTEREST OR ANY BENEFICIARY OR ASSIGNEE OF THIS AGREEMENT FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES ARISING OUT OF THIS AGREEMENT OR ANY BREACH HEREOF. THIS ARTICLE VII SHALL APPLY NOTWITHSTANDING THE SOLE, JOINT OR CONCURRENT NEGLIGENCE, FAULT OR RESPONSIBILITY OF THE PARTY WHOSE LIABILITY IS WAIVED BY THIS PROVISION, OR ANY OTHER EVENT OR CONDITION, WHETHER ANTICIPATED OR UNANTICIPATED, AND REGARDLESS OF WHETHER PRE-EXISTING PRIOR TO THE DATE OF THIS AGREEMENT. NOTWITHSTANDING THE FOREGOING, LOSSES, DAMAGES AND COSTS INCURRED BY ENTERPRISE IN CONNECTION WITH OR CAUSED BY OFF-SPEC CRUDE OIL AND/OR HANDLING THEREOF, SHALL BE CONSIDERED DIRECT DAMAGES AND NOT CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, OR PUNITIVE DAMAGES.

## ARTICLE VIII
### FORCE MAJEURE

8.1.    **Suspension of Obligations.** If either █████████ or Enterprise is rendered unable, wholly or in part, by reason of Force Majeure, from carrying out its obligations under this Agreement (other than the obligation to make payment of amounts due hereunder, including any Deficiency Payment), then upon said Party's giving written notice and reasonably full particulars of such Force Majeure to the other Parties, which shall be done as soon as practicable after the occurrence of the cause relied on, the obligations of the Party giving such notice (other than the obligation to make payment of amounts due hereunder, including any Deficiency Payment), so far as they are affected by such Force Majeure, shall be suspended during the continuance of any inability so caused, but for no longer period, and such cause shall be remedied with all reasonable dispatch.

8.2.    **Definition of Force Majeure.** The term *"Force Majeure"* shall mean acts of God, acts of federal, state or local government or any agencies thereof, compliance with rules, regulations or orders of any Governmental Authority or any office, department, agency or instrumentality thereof, strikes, lockouts or other industrial disturbances, acts of the public enemy, acts of terrorism, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, extreme temperatures, storms, hurricanes, floods, or other adverse weather conditions, washouts, arrests and restraint of rulers and people, civil disturbances, explosions, breakage or accident to machinery or lines of pipes, freezing of wells or lines of pipes, requisitions, directives, diversions, embargoes, priorities or expropriations of government or Governmental Authorities, legal or de facto, whether purporting to act under some constitution, decree, law or otherwise, failure of pipelines or other carriers to transport or furnish facilities for transportation, rules and regulations with regard to transportation by common carriers, failures, disruptions, or breakdowns of machinery or of facilities for production, manufacture, transportation, distribution, processing or consumption (including, but not by way of limitation,

1566924v.3 0022384/00132

20

Plf Resp in Opp to Motion for Summary Judgment 168

SR240

the Pipeline System), allocation or curtailment by third parties of downstream capacity, the necessity for making repairs, alterations, enlargements or connections to, or performing maintenance on, machinery or facilities of production, manufacture, transportation, distribution, processing or consumption (including, but not by way of limitation, the Pipeline System), inability to secure or delays in securing rights-of-way and permits, transportation embargoes or failures or delays in transportation or poor road conditions, partial or entire failure of crude oil supply or downstream pipeline market constraints, and, without limitation by enumeration, any other cause or causes, whether of the kind herein enumerated or otherwise, not reasonably within the control of the Party claiming suspension, which, by the exercise of due diligence, such Party shall not have been able to avoid. The Party claiming Force Majeure shall not be entitled to the benefit of the provisions of Section 8.1 to the extent that the claimed condition (i) is within the reasonable control of such Party, (ii) is caused by the gross negligence, breach of default of such Party, or (iii) involves the payment of any amounts then owed hereunder by such Party. The Party claiming Force Majeure shall also take all commercially reasonable efforts to remedy, or mitigate the effects of, the claimed Force Majeure condition.

8.3. **Strikes.** The settlement of strikes or lockouts shall be entirely within the discretion of the Party having the difficulty. The requirement that any Force Majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing party, when such is deemed inadvisable in the discretion of the Party having the difficulty.

8.4. **Interruption of Operations.** Enterprise and/or its Affiliates may, without liability to ▮▮▮▮▮ interrupt the operations of their facilities for the purpose of performing inspections, pigging, maintenance, testing, alterations, modifications, expansions, connections, repairs or replacements, but such interruption shall be for only such time as may be reasonable. Enterprise shall give ▮▮▮▮▮dvance written notice, except in case of emergency, of its intention to interrupt operations and of the estimated time thereof.

## ARTICLE IX
## GOVERNING LAW; VENUE; DISPUTE RESOLUTION

9.1. **Governing Law.** This agreement is entered into in the State of Texas and shall be governed, interpreted and construed in accordance with the laws of the State of Texas without regard to the conflicts of laws provisions thereof.

9.2. **Venue.** EXCLUSIVE VENUE FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT BY ANY PARTY IN CONNECTION WITH THIS AGREEMENT OR ARISING OUT OF THE TERMS OR CONDITIONS HEREOF SHALL BE IN HARRIS COUNTY, TEXAS. THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT THEY MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION, OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY IN THE STATE AND FEDERAL COURTS SITUATED IN THE CITY OF HOUSTON, HARRIS COUNTY, TEXAS.

Plf Resp in Opp to Motion for Summary Judgment 169

SR241

9.3. <u>Negotiation</u>. Prior to submitting any dispute for resolution by a court, a Party shall provide written notice to the other of the occurrence of such dispute. If the Parties have failed to resolve the dispute within fifteen (15) Business Days after such notice was given, the Parties shall seek to resolve the dispute by negotiation between senior management personnel of each Party. Such personnel shall endeavor to meet and attempt to amicably resolve the dispute. If the Parties are unable to resolve the dispute for any reason within thirty (30) Business Days after the original notice of dispute was given, then any Party shall be entitled to pursue any remedies available at law or in equity; provided, however, this Section 9.3 shall not limit a Party's right to initiate litigation prior to the expiration of the time periods set forth in this Section 9.3 if application of such limitations would prevent a Party from filing a lawsuit or claim within the applicable period for filing lawsuits (e.g. statutes of limitation, prescription, etc.).

## ARTICLE X
## TAXES

10.1. <u>Taxes</u>. ████████ shall pay any and all Taxes levied on (i) Producer Crude Oil, or the transportation thereof, except for property Taxes assessed upon Producer Crude Oil purchased by Enterprise in the Pipeline System, and (ii) Eagle Ford Pipeline Common Stream purchased by ████████ hereunder or the purchase thereof. Enterprise or its Affiliates shall pay any and all Taxes levied on the Pipeline System.

10.2. <u>Reimbursement</u>. In the event Enterprise or any of its Affiliates pays or remits any Tax for or on behalf of ████████ or Producer, including, without limitation, severance taxes on production, ████████ shall reimburse Enterprise for the same as part of the net amount due hereunder as shown on the Monthly statement described in Section 4.7. ████████ hereby agrees to indemnify, defend and hold harmless Enterprise and its Affiliates from and against any and all Claims and Losses arising out of or related to such Taxes. This indemnity and defense obligation shall survive the termination of this Agreement for the applicable statutory limitations period.

## ARTICLE XI
## ASSIGNMENT

11.1. <u>Assignment</u>. Notwithstanding anything in this Agreement to the contrary, this Agreement, and the rights and obligations created hereby, may be assigned, in whole but not in part, by any Party; provided, however, (i) this Agreement shall not be assigned by any Party without the prior written consent of the other Parties, which consent shall not be unreasonably withheld, conditioned or delayed, and (ii) any such assignment shall expressly require that the assignee assume and agree to discharge the duties and obligations of its assignor under this Agreement. Notwithstanding the foregoing, any Party may assign any of its rights, or delegate any of its obligations, under this Agreement to one or more of its Affiliates without the consent of the other Parties, provided that no such assignment shall relieve the assignor Party from any of its obligations hereunder. No such assignment shall effect or operate to discharge accrued but unpaid obligations of the assignor under this Agreement. Notwithstanding anything to the contrary herein contained, if ████████ is the assigning Party consent to assignment may be refused by Enterprise if Enterprise reasonably determines that (x) ████████ proposed assignee's financial condition is not sufficient to support the payment to Enterprise of the

1566924v.3 0022384/00132

22

Deficiency Payments that would come due hereunder if such assignee failed to deliver any Producer Crude Oil hereunder after the effective date of such assignment, or (y) the proposed assignee's financial condition renders the proposed assignee less creditworthy than ███████ Notwithstanding anything to the contrary herein contained, if Enterprise is the assigning Party consent to assignment may be refused by ███████ if ███████ reasonably determines that Enterprise's proposed assignee's financial condition is not sufficient to support such assignee's performance of this Agreement.

11.2. Notice of Assignment. No such assignment, nor any succession to the interest of any Party, shall be effective and binding until the other Parties are furnished with proper and satisfactory evidence of such assignment or succession.

11.3. Transfer of ███████ and Producer's Interests. Notwithstanding anything to the contrary in this Article XI, ███████ and Producer may sell, convey or otherwise transfer any Qualifying Interests in accordance with the following:

(a) Qualifying Interests. For the purposes of this Agreement, (i) "*Qualifying Interests*" shall mean any of ███████ and/or Producer's Interests which were acquired by ███████ and/or Producer pursuant to a bona-fide, good-faith, arms-length transaction without the intent of reselling such Interests at the time of such acquisition, and (ii) a "*Qualifying Interests Transferee*" shall mean a third party who acquires Qualifying Interests from ███████ and/or Producer.

(b) Transfers of Qualifying Interests. If (i) ███████ and/or Producer sells, conveys, or otherwise transfers any Qualifying Interests to a Qualifying Interests Transferee, (ii) such Qualifying Interests Transferee desires to enter into a Crude Oil purchase agreement with Enterprise and any necessary ancillary agreements (collectively, the "*Qualifying Interests Agreement*"), (iii) such Qualifying Interests Transferee is experienced and reputable, meets Enterprise's reasonable credit requirements and is otherwise reasonably acceptable to Enterprise, and (iv) such Qualifying Interests Transferee is not (and none of its Affiliates is) in material default under any other agreement with Enterprise or any of its Affiliates, then (x) Enterprise agrees to negotiate with such Qualifying Interests Transferee in good faith in an effort to agree upon and execute a Qualifying Interests Agreement with such Qualifying Interests Transferee on commercial terms acceptable to Enterprise, and (y) Enterprise, ███████ and Producer agree to negotiate in good faith in an effort to agree upon and execute an amendment to this Agreement and any necessary ancillary agreements, which would provide for, without limitation, a reduction to the Maximum Daily Volume, Maximum Monthly Volume and Maximum Annual Volume (with a corresponding reduction to the Annual Transportation Revenue Commitment, Cumulative Transportation Revenue Commitment and Total Cumulative Transportation Revenue Commitment) in mutually agreeable amounts, which amounts shall take into account and be based upon any revenue and/or volume commitments made by such Qualifying Interests Transferee pursuant to the Qualifying Interests Agreement, and address all other issues potentially impacted by such transfer of Qualifying Interests to the satisfaction of each of the Parties; provided, however, Enterprise shall not be obligated to amend this Agreement if the Qualifying Interests Agreement is not executed.

1566924v.3 0022384/00132

23

(c)     Qualifying Interests Agreement Limitations.  Notwithstanding Section 11.3(b) above, it is acknowledged and agreed that (i) neither Enterprise nor Enterprise Pipeline nor any of their Affiliates shall have any obligation to design, construct or install any new facilities or otherwise modify the Pipeline System or add any Points of Receipt to accommodate transfers of Qualifying Interests, (ii) neither Enterprise nor its Affiliates are obligated to provide the same terms to a Qualifying Interests Transferee in a Qualifying Interests Agreement as are contained herein and/or in any ancillary agreement, (iii) Enterprise's combined obligations under the Qualifying Interests Agreement and this Agreement, as amended as provided in Section 11.3(b) above, shall be no greater than Enterprise's obligations under this Agreement before such amendment as if such transfer of Qualifying Interests had never occurred, and (iv) upon the execution of a Qualifying Interests Agreement, the Crude Oil produced from or attributable to such transferred Qualifying Interests shall no longer be considered Producer Crude Oil.

(d)     Transfer to CNOOC.  Notwithstanding Section 11.3(c)(ii) above, if (i) CNOOC is or becomes a Qualifying Interests Transferee and (ii) CNOOC is not (and none of its Affiliates is) in material default under any other agreement with Enterprise or any of its Affiliates, then, subject to the other provisions of Section 11.3(c) above, Enterprise agrees to enter into a Qualifying Interests Agreement with CNOOC on the same terms as are in this Agreement; provided, however, in connection with the execution of such Qualifying Interests Agreement with CNOOC, if CNOOC does not meet Enterprise's reasonable credit requirements, then Enterprise shall have the right to require that CNOOC provide to Enterprise a guaranty of CNOOC's obligations under such Qualifying Interests Agreement from an entity, and in a form, reasonably acceptable to Enterprise.

## ARTICLE XII
## NOTICE AND STATEMENTS

12.1.     Notice.  Any notice, statement, payment, claim or other communication required or permitted hereunder shall be in writing and shall be sent by: (i) facsimile transmission; (ii) delivered by hand; (iii) sent by United States mail with all postage fully prepaid; or (iv) by courier with charges paid in accordance with the customary arrangements established by such courier, in each of the foregoing cases addressed to the Party at the following addresses:

Enterprise:     NOTICES AND CORRESPONDENCE:

Enterprise Crude Oil LLC
Attn:  Vice President – Crude Oil Marketing
1100 Louisiana, Suite 1500
Houston, Texas  77002
Fax:  713-381-7870

1566924v.3 0022384/00132

24

SR244

ACCOUNTING MATTERS:

Enterprise Crude Oil LLC
Attn: Vice President    Crude Oil Marketing
1100 Louisiana, Suite 1500
Houston, Texas  77002
Fax:  713-381-7870

PAYMENT BY WIRE:

Enterprise Crude Oil LLC
Wells Fargo Bank, N.A., San Francisco, CA
ABA:  121000248
Account No.:  1018204331

 and Producer:    NOTICES AND CORRESPONDENCE:

ACCOUNTING MATTERS:



PAYMENT BY WIRE:

Comerica Bank, NA, Dallas, Texas


     Such notices, statements, payments, claims or other communications shall be deemed received as follows: (i) if delivered personally, upon delivery; (ii) if sent by United States mail,

1566924v.3 0022384/00132

25

whether by express mail, registered mail, certified mail or regular mail, the notice shall be deemed to have been received on the day receipt is refused or is confirmed orally or in writing by the receiving Party; (iii) if sent by a courier service, upon delivery; or (iv) if sent by facsimile, on the Business Day following the day on which it was transmitted and confirmed by transmission report or such earlier time as confirmed orally or in writing by the receiving Party.

12.2. Routine Communications. Notwithstanding the foregoing, routine communications between the Parties, including, but not limited to communications concerning scheduling and forecasts of the volumes of Crude Oil to be sold and purchased hereunder, may be conducted via telephone, facsimile and/or electronic mail.

12.3. Change of Address. Notices of change of address of any Party shall be given in writing to the other Parties in the manner aforesaid and shall be observed in the giving of all future notices, statements, payments, claims or other communications required or permitted to be given hereunder.

## ARTICLE XIII
## MISCELLANEOUS

13.1. Amendments. All modifications, amendments or changes to this Agreement, whether made simultaneously with or after the execution of this Agreement, shall be in writing, executed by Producer, Enterprise and ███████

13.2. Confidentiality.

(a) Confidentiality. Each Party agrees that it shall maintain all terms and conditions of this Agreement in strictest confidence, and that it shall not cause or permit disclosure of this Agreement or any provisions contained herein without the express written consent of the other Parties.

(b) Permitted Disclosures. Notwithstanding Section 13.2(a) of this Agreement, disclosures of any terms and provisions of this Agreement otherwise prohibited may be made by any Party (i) to the extent necessary for such Party to enforce its rights hereunder against any other Party; (ii) to the extent to which a Party is required to disclose all or part of this Agreement by a statute or by the order or rule of a court, agency, or other governmental body exercising jurisdiction over the subject matter hereof, by order, by regulations, or by other compulsory process (including, but not limited to, deposition, subpoena, interrogatory, or request for production of documents); (iii) to the extent required by the applicable regulations of a securities or commodities exchange; (iv) to a third Person in connection with a proposed sale or other transfer of a Party's interest in this Agreement, provided such third Person agrees in writing to be bound by the terms of this Section 13.2; (v) to its own directors, officers, employees, agents and representatives; (vi) to an Affiliate; or (vii) to a co-working interest owner or royalty owner of Producer Crude Oil delivered hereunder, provided such co-working interest owner or royalty owner agrees in writing to be bound by the terms of this Section 13.2.

(c) Notification. If any Party is or becomes aware of a fact, obligation, or circumstance that has resulted or may result in a disclosure of any of the terms and conditions of this Agreement authorized by Section 13.2(b)(ii), (iii) or (iv) above, it shall so notify in writing

1566924v.3 0022384/00132

26

the other Parties promptly and shall provide documentation or an explanation of such disclosure as soon as it is available.

(d) <u>Party Responsibility</u>. Each Party shall be deemed solely responsible and liable for the actions of its directors, officers, employees, agents, representatives and Affiliates for maintaining the confidentiality commitments of this Section 13.2.

(e) <u>Public Announcements</u>. The Parties agree that prior to making any public announcement or statement with respect to this Agreement or the transaction represented herein, the Party desiring to make such public announcement or statement shall provide the other Parties with a copy of the proposed announcement or statement prior to the intended release date of such announcement. The other Parties shall thereafter consult with the Party desiring to make the release, and the Parties shall exercise their reasonable best efforts to (i) agree upon the text of a joint public announcement or statement to be made by such Parties or (ii) in the case of a statement to be made solely by one Party, obtain approval of the other Parties to the text of a public announcement or statement. Nothing contained in this Section 13.2 shall be construed to require any Party to obtain approval of the other Parties to disclose information with respect to this Agreement or the transaction represented herein to any Governmental Authority to the extent required by applicable law or necessary to comply with disclosure requirements of the Securities and Exchange Commission, New York Stock Exchange, or any other regulated stock exchange.

(f) <u>Survival</u>. The provisions of this Section 13.2 shall survive any expiration or termination of this Agreement for a period of one (1) year.

13.3. <u>Default</u>.

(a) <u>Events of Default</u>. Each of the following shall constitute an event of default ("*Event of Default*"):

(i) for reasons other than Force Majeure or █████████ or Producer's material default or breach (including, without limitation, ████████ failure to timely meet its obligations pursuant to Section 3.1, Section 3.2, or Section 4.3 above), (x) the Commencement Date has not occurred on or before April 1, 2014, which date may be extended by one Day for each Day during the continuance of an event of Force Majeure up to and including January 1, 2015, and (y) Enterprise is not purchasing and accepting, on a Daily basis, at the Points of Receipt, Producer Crude Oil tendered by ████████ to Enterprise hereunder equal to at least the lesser of (A) eighty percent (80%) of the Maximum Daily Volume in effect for the first Contract Year hereunder, (B) the Daily volume of Producer Crude Oil that ███████ e can reasonably demonstrate that it has the ability to deliver to the Points of Receipt, or (C) the total volume of Producer Crude Oil tendered by ███████ to Enterprise hereunder; provided, however, after the Commencement Date has occurred, this Section 13.3(a)(i) shall be of no further force and effect;

(ii) the Bankruptcy of any Party;

Plf Resp in Opp to Motion for Summary Judgment 175

SR247

(iii)    the failure by any Party to make, when due, any undisputed payment under this Agreement required to be made by it if such failure is not remedied on or before the fifth (5th) Business Day after written notice of such failure is given to the Party;

(iv)    the failure of any Party to provide, when due, Performance Assurance pursuant to Section 4.10; or

(v)    the breach by [redacted] of its obligations under Section 6.2.

(b)    Remedies.

(i)    Upon the occurrence of an Event of Default of the type described in subparagraph (i) or (ii) of Section 13.3(a) above with respect to a Party or Parties under this Agreement (the "*Defaulting Party*") and prior to the cure thereof, Enterprise, in the event that either [redacted] or Producer is the Defaulting Party, or [redacted] or Producer, in the event that Enterprise is the Defaulting Party (the "*Non-Defaulting Party*"), shall be entitled in its sole discretion to suspend performance or terminate this Agreement and pursue such other remedy or remedies as may be available to it under this Agreement (including, without limitation, exercising the rights of recoupment, setoff, offset, and/or liquidation), at law or in equity, subject, however, to the limitations set forth in Article VII.

(ii)    Upon the occurrence of an Event of Default of the type described in subparagraphs (iii) or (iv) of Section 13.3(a) above with respect to the Defaulting Party and prior to the cure thereof, the Non-Defaulting Party shall be entitled in its sole discretion to suspend performance under (but not terminate) this Agreement and pursue such other remedy or remedies as may be available to it under this Agreement (including, without limitation, exercising the rights of recoupment, setoff, or offset), at law or in equity, subject, however, to the limitations set forth in Article VII.

(iii)    Upon the occurrence of an Event of Default of the type described in subparagraph (v) of Section 13.3(a) above, Enterprise shall have the right, but not the obligation, to make payment directly to Other Interest Owners out of the [redacted] Gross Proceeds and pursue such other remedy or remedies as may be available to Enterprise under this Agreement (including, without limitation, exercising the rights of recoupment, setoff, or offset), at law or in equity, subject, however, to the limitations set forth in Article VII.

(iv)    No election of remedies shall be required or implied as the result of a Party's decision to avail itself of a remedy hereunder.

(v)    In addition to all other rights under this Agreement, upon the occurrence of an Event of Default in which [redacted] or Producer is the Defaulting Party and in which Enterprise is entitled to terminate this Agreement, Enterprise may, at its sole option, without notice or demand, (i) accelerate and declare due and payable the entire amount of all Deficiency Payments that would come due hereunder for the remaining Term of the Agreement if no Producer Crude Oil was delivered and there was no Third

Plf Resp in Opp to Motion for Summary Judgment 176

SR248

Party Crude Oil after the occurrence of such Event of Default, and/or (ii) to liquidate this Agreement by terminating the Agreement.

(c) **Effect of Termination.** At any time after the termination of this Agreement pursuant to this Section 13.3, the Parties shall have no further rights or obligations with respect to this Agreement, except as specifically set forth herein and except (x) in the event that ▮▮▮▮▮▮ or Producer was the Defaulting Party, for the payment of the Deficiency Payments that would come due hereunder for the remaining Term of this Agreement based on the fact that no Producer Crude Oil will be delivered and there will be no Third Party Crude Oil after such termination or that have been accelerated and declared due and payable hereunder by Enterprise pursuant to Section 13.3(b) above, and, without duplication, (y) the payment of any outstanding Settlement Amount by Enterprise to ▮▮▮▮▮ or ▮▮▮▮▮▮ to Enterprise, as applicable.

(d) **Bankruptcy Safe Harbor Provisions.** Without limiting the applicability of any other provision of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "*Bankruptcy Code*") (including without limitation Sections 362, 546, 553, 556, 560, 561 and 562 thereof and the applicable definitions in Section 101 thereof), the Parties acknowledge and agree that: (i) this Agreement and all transactions entered into hereunder constitute "forward contracts" and/or "swap agreements" and this Agreement constitutes a "master netting agreement" as defined in section 101 of the Bankruptcy Code; (ii) each Party is a "master netting agreement participant," a "forward contract merchant" and/or a "swap participant" as defined in the Bankruptcy Code; (iii) the rights of the Parties under this Section 13.3 constitute "contractual rights" to liquidate, terminate or accelerate, as applicable, this Agreement and the transactions entered into hereunder; (iv) any margin or collateral provided under any margin, collateral, security, or similar agreement related hereto and all payment obligations of any Party to any other Party hereunder constitute a "margin payment" or a "settlement payment" as defined in section 101 of the Bankruptcy Code; and (v) the Parties are entitled to the rights under, and protections afforded by, sections 362, 546, 553, 556, 560, 561 and 562 of the Bankruptcy Code.

13.4. **Waiver.** No waiver of any term, provision or condition of this Agreement shall be effective unless in writing signed by the Parties, and no such waiver shall be deemed to be or construed as a further or continuing waiver of any such term, provision or condition or as a waiver of any other term, provision or condition of the Agreement, unless specifically so stated in such written waiver.

13.5. **No Third Party Beneficiaries.** Except for Persons indemnified hereunder, this Agreement is not for the benefit of any third party and nothing herein, expressed or implied, confers any right or remedy upon any Person not a party hereto.

13.6. **Rules and Regulations.** The terms, provisions and activities undertaken pursuant to this Agreement shall be subject to all applicable laws, orders and regulations of all Governmental Authorities.

13.7. **Hazard Communication.** ▮▮▮▮▮▮ shall provide its Material Safety Data Sheet ("*MSDS*") to Enterprise; and Enterprise shall provide its MSDS to ▮▮▮▮▮▮ Each Party acknowledges the hazards and risks in handling and using Crude Oil. Each Party shall read the MSDS and advise its employees, its Affiliates, and third parties, who may purchase or come into

1566924v.3 0022384/00132

29

Plf Resp in Opp to Motion for Summary Judgment 177

SR249

contact with such Crude Oil, about the hazards of Crude Oil, as well as the precautionary procedures for handling such Crude Oil, which are set forth in such MSDS and any supplementary MSDS or written warnings which ███████ may provide to Enterprise from time to time.

13.8. **No Partnership**. It is not the intention of the Parties to create, nor is there created hereby, a partnership, trust, joint venture or association. The status of each Party hereunder is solely that of an independent contractor.

13.9. **Published Financial Data**. Unless expressly provided otherwise herein, in the event any published price, adjustment index, interest rate or other financial data referred to in this Agreement ceases to be published, the Parties shall mutually agree to an alternative published price, adjustment index, interest rate or other financial data representative of such data referred to in this Agreement.

13.10. **Headings**. The headings and captions in this Agreement have been inserted for convenience of reference only and shall not define or limit any of the terms and provisions hereof.

13.11. **Rules of Construction**. In construing this Agreement, the following principles shall be followed:

(a)    examples shall not be construed to limit, expressly or by implication, the matter they illustrate;

(b)    the word "includes" and its syntactical variants mean "includes, but is not limited to" and corresponding syntactical variant expressions;

(c)    the plural shall be deemed to include the singular and vice versa, as applicable;

(d)    all references in this Agreement to an "Article," "Section," "subsection," or "Exhibit" shall be to an Article, Section, subsection, or Exhibit of this Agreement, unless the context requires otherwise;

(e)    unless the context otherwise requires, the words "this Agreement," "hereof," "hereunder," "herein," "hereby," or words of similar import shall refer to this Agreement as a whole and not to a particular Article, Section, subsection, clause or other subdivision hereof; and

(f)    each Exhibit to this Agreement is attached hereto and incorporated herein as a part of this Agreement, but if there is any conflict or inconsistency between the main body of this Agreement and any Exhibit, the provisions of the main body of this Agreement shall prevail.

13.12. **Entire Agreement**. This Agreement contains the entire agreement between the Parties relating to the subject matter hereof and there are no oral promises, agreements or warranties affecting same.

13.13. **Applicable Laws**. This Agreement shall be subject to valid and applicable Federal, State and local laws and rules, orders or regulations, of any Governmental Authority

1566924v.3 0022384/00132

30

having appropriate jurisdiction; provided however, nothing contained herein shall be construed as a waiver of any right to question or contest any such law, order, rule or regulation in any forum having appropriate jurisdiction.

13.14. <u>Severability</u>. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, (i) the validity, legality and/or enforceability of the remaining provisions shall not, in any way, be affected or impaired thereby and (ii) in lieu of such invalid, illegal or unenforceable provision, there shall be automatically added to this Agreement a provision as similar to such invalid, illegal or unenforceable provision as may be possible and be legal, valid and enforceable.

13.15. <u>Joint Preparation</u>. Producer, ███████ and Enterprise acknowledge and mutually agree that this Agreement and all contents herein were jointly prepared by the Parties.

13.16. <u>Further Assurances</u>. Each Party shall take such acts and execute and deliver such documents as may be reasonably required to effectuate the purposes of this Agreement.

13.17. <u>No Inducements</u>. No director, employee, or agent of any Party shall give or receive any commission, fee, rebate, gift, or entertainment of significant cost or value in connection with this Agreement.

13.18. <u>Joint and Several Liability</u>.

(a) ███████ <u>Parties</u>. Each of ███████ Energy Marketing, Inc. and ███████ Energy Corporation (each, a "███████ *Party*") shall be jointly and severally liable to Enterprise in respect of all representations, warranties, covenants and agreements of ███████ hereunder. The ███████ Parties shall be treated as one Party under this Agreement with respect to each ███████ Party's liability hereunder. Without limiting the generality of the foregoing sentence, (i) all conditions related to either of the ███████ Parties hereunder as ███████ or as a "Party" shall mean that the condition has occurred in respect of either or both as applicable in the context, and (ii) all references to either of the ███████ Parties as ███████" or as a "Party" shall mean either or both of the ███████ Parties as applicable in the context.

(b) <u>Producer Parties</u>. Each of ███████████████ ███████(each, a "*Producer Party*") shall be jointly and severally liable to Enterprise in respect of all representations, warranties, covenants and agreements of Producer hereunder. The Producer Parties shall be treated as one Party under this Agreement with respect to each Producer Party's liability hereunder. Without limiting the generality of the foregoing sentence, (i) all conditions related to either of the Producer Parties hereunder as "Producer" or as a "Party" shall mean that the condition has occurred in respect of either or both as applicable in the context, and (ii) all references to either of the Producer Parties as "Producer" or as a "Party" shall mean either or both of the Producer Parties as applicable in the context.

13.19. <u>Original Agreement</u>. The Original Agreement is hereby amended and restated in its entirety and replaced and superseded by this Agreement effective as of the Effective Date.

1566924v 3 0022384/00132

13.20. <u>Survival</u>. The provisions of this Article 13 shall survive the termination of this Agreement.

13.21. <u>Counterpart Execution</u>. This Agreement may be executed in any number of counterparts, each of which shall be considered an original, and all of which shall be considered one and the same instrument. Any signature contained in a counterpart of this Agreement transmitted by facsimile or electronically shall be deemed to be an original signature.

*[Signature pages follow]*

1566924v.3 0022384/00132

32

IN WITNESS WHEREOF, the Parties have executed this Agreement to be effective as of the Effective Date.



1566924v.3 0022384/00132

33

Plf Resp in Opp to Motion for Summary Judgment 181

SR253

**ENTERPRISE:**

**ENTERPRISE CRUDE OIL LLC**

By: Enterprise Crude GP LLC
Its: Sole Manager

By: _____
    Mark A. Hurley
    Senior Vice President

1566924v.3 0022384/00132

14

**EXHIBIT A**

**POINTS OF RECEIPT**

Location of Pipeline Points of Receipt:

| Name | County | X/Y Coordinates or Lat./Long. | Third Party Crude Oil Point of Receipt? |
|------|--------|-------------------------------|------------------------------------------|
| Gardendale | La Salle | TBD by Enterprise Pipeline | Yes |

Equipment at Pipeline Points of Receipt:

| ███████ EQUIPMENT (To be installed, operated and maintained by ██████ or its designee): | PIPELINE EQUIPMENT (To be installed, operated and maintained by Enterprise or its designee) |
|------|------|
| TBD by Enterprise Pipeline and Producer's designee | ACT- Automated Custody Transfer Meter |
| | Storage tanks |

Location of Truck Points of Receipt:

| Name | County | X/Y Coordinates or Lat./Long. | Third Party Crude Oil Point of Receipt? |
|------|--------|-------------------------------|------------------------------------------|
| Gardendale | La Salle | TBD by Enterprise Pipeline | Yes |

Equipment at Truck Points of Receipt:

| ███████ EQUIPMENT (To be installed, operated and maintained by ██████ or its designee) |
|------|
| Storage tank(s) |
| Pump(s) |
| Stabilization facilities |
| Truck rack and lease/well line interconnects |

1566924v.3 0022384/00132

Exhibit A

SR256



Enterprise Crude Oil LLC
1100 Louisiana Street, Suite 1000
Houston, Texas 77002
Attention: Mark A. Hurley

Re: First Amended and Restated Crude Oil Purchase and Sale Agreement (as amended, the "Agreement") dated January 31, 2012 by and between Enterprise Crude Oil LLC ("Enterprise") and █████████████████████████████████ (collectively, "Producer")



Dear Mark:

█████████ and Producer acknowledge that (i) Enterprise, as shipper, is negotiating a throughput agreement (the "Throughput Agreement") with Eagle Ford Pipeline LLC ("Eagle Ford"), as carrier, for transportation of crude oil from a point in or near Gardendale, Texas to a point in or near Lyssy, Texas, and (ii) that Plains Pipeline, L.P. and Enterprise Crude Pipeline LLC, an affiliate of Enterprise, are, or may become, members of Eagle Ford.

█████████ and Producer acknowledge that in connection with the Throughput Agreement, Enterprise may disclose to Eagle Ford and its members 1) the existence of the referenced Agreement and 2) the identity of the parties to the Agreement. Additionally, █████████ and Producer acknowledge Enterprise, at its sole risk, may agree to required crude oil deliver-or-pay obligations under the Throughput Agreement that substantially mirror, and are intended to facilitate performance of, Enterprise's corresponding take-or-pay obligations under the Agreement.



Plf Resp in Opp to Motion for Summary Judgment 185

# FIRST AMENDMENT TO FIRST AMENDED AND RESTATED CRUDE OIL PURCHASE AND SALE AGREEMENT

This First Amendment to First Amended and Restated Crude Oil Purchase and Sale Agreement (this "*First Amendment*") is made and entered into effective as of the 20th day of July, 2012 (the "*Effective Date*"), by and between ENTERPRISE CRUDE OIL LLC, a Texas limited liability company ("*Enterprise*"), and ███████████████████████████████ ████████████ and ████ █████████████████████████ ██ █ ████████████████████ (collectively, "*Producer*"). Enterprise, ████████ and Producer may be referred to individually as "*Party*," or collectively as the "*Parties.*"

WHEREAS, the Parties entered into that certain First Amended and Restated Crude Oil Purchase and Sale Agreement dated as of January 31, 2012 (the "*Amended Agreement*"); and

WHEREAS, the Parties desire to amend the Amended Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained ██████████ Producer and Enterprise hereby covenant and agree as follows:

1.  **Third Party Crude Oil**. Section 1.92 of the Amended Agreement, the definition of "Third Party Crude Oil," is hereby deleted in its entirety and replaced with the following:

    1.92.  "*Third Party Crude Oil*" shall mean, with respect to any Contract Year, the volume (in Barrels) of Crude Oil other than Producer Crude Oil which is either (i) purchased during such Contract Year by Enterprise from any Person other than a Party or its Affiliates and transported through the Eagle Ford Pipeline from the Third Party Crude Oil Points of Receipt (including any new points of receipt added to the Eagle Ford Pipeline either upstream of Gardendale or between Gardendale and Lyssy after the Effective Date) to any point of delivery at or downstream of Sealy Station, or (ii) received at the Third Party Crude Oil Points of Receipt (including any new points of receipt added to the Eagle Ford Pipeline either upstream of Gardendale or between Gardendale and Lyssy after the Effective Date) during such Contract Year by Enterprise Pipeline from any Person other than a Party or its Affiliates and transported through the Eagle Ford Pipeline to any point of delivery at or downstream of Sealy Station.

2.  **Defined Terms**. The following defined terms are hereby added to Article I of the Amended Agreement:

    1.XX.  "*Gardendale*" shall mean the Pipeline Point of Receipt named as "Gardendale" and further described in the table captioned "Location of Pipeline Points of Receipt" in **Exhibit A**.

1600646v.2 002238400132

1.XX.  **"*Lyssy*"** shall mean Enterprise or its Affiliate's crude oil receipt facilities on or adjacent to the Eagle Ford Pipeline, located in Wilson County, Texas.


3.  Ratification.  The Parties hereby ratify the Amended Agreement, as amended hereby, and represent and warrant to each other that the Amended Agreement, as amended hereby, is in full force and effect.


*[Signature page follows]*

1600646v.2 0022384/00132

?

IN WITNESS WHEREOF, the Parties have executed this First Amendment to be effective as of the Effective Date.



Plf Resp in Opp to Motion for Summary Judgment 188

SR260

**ENTERPRISE:**

**ENTERPRISE CRUDE OIL LLC**

By: Enterprise Crude GP LLC
Its: Sole Manager

By: _____  7/26/12
Mark A. Hurley
Senior Vice President

1600646v.2 0022384/00132

4

Plf Resp in Opp to Motion for Summary Judgment 189

SR261

# Exhibit 1-F
# Enterprise Pipeline Local Tariff, July 1, 2017

# ENTERPRISE CRUDE PIPELINE LLC

IN CONNECTION WITH PARTICIPATING CARRIERS SHOWN HEREIN

LOCAL PROPORTIONAL AND JOINT TARIFF

Containing

## RATES, RULES AND REGULATIONS

For

## THE SOUTH TEXAS SYSTEM

Governing

## THE GATHERING AND TRANSPORTATION

of

## CRUDE PETROLEUM AND PROCESSED CONDENSATE

by

## PIPELINE

## WITHIN THE STATE OF TEXAS

Operated by Enterprise Crude Pipeline LLC (P-5 #2531360) Under T-4 Permit Nos. 04568 and 09127

The provisions published herein will—if effective—not result in an effect on the quality of the human environment.

## EFFECTIVE    JULY 1, 2017

Issued and Compiled by:

Steve Miao
Enterprise Crude Pipeline LLC
1100 Louisiana Street, Suite 1000
Houston, Texas 77002-5227
(713) 381-4778
szmiao@eprod.com

Plf Resp in Opp to Motion for Summary Judgment 191

SR263

# SECTION 1
## RULES AND REGULATIONS OF RAILROAD COMMISSION OF TEXAS
## OIL AND GAS RULE §3.71, PIPELINE TARIFFS
### (The provisions of this §3.71 adopted to be effective August 25, 2003, 28 TexReg 6816)

**TITLE 16 OF THE TEXAS ADMINISTRATIVE CODE (TAC) Rule § 3.71, PARAGRAPHS (1) – (19)**

Every person owning, operating, or managing any pipeline, or any part of any pipeline, for the gathering, receiving, loading, transporting, storing, or delivering of crude petroleum as a common carrier shall be subject to and governed by the following provisions. Common carriers specified in this section shall be referred to as "pipelines," and the owners or shippers of crude petroleum by pipelines shall be referred to as "shippers."

(1) **All marketable oil to be received for transportation.** By the term "marketable oil" is meant any crude petroleum adapted for refining or fuel purposes, properly settled and containing not more than 1.0% of basic sediment, water, or other impurities above a point six inches below the pipeline connection with the tank.* Pipelines shall receive for transportation all such "marketable oil" tendered; but no pipeline shall be required to receive for shipment from any one person an amount exceeding 3,000 barrels of petroleum in any one day; and, if the oil tendered for transportation differs materially in character from that usually produced in the field and being transported therefrom by the pipeline, then it shall be transported under such terms as the shipper and the owner of the pipeline may agree or the commission may require.

*This deviates from TAC Rule § 3.71, Paragraph (1) in that the limit for basic sediment, water, and other impurities is 1.0 % rather than 2.0% as provided in the rule.*

(2) **Basic sediment, how determined—temperature.** In determining the amount of sediment, water, or other impurities, a pipeline is authorized to make a test of the oil offered for transportation from an average sample from each such tank, by the use of centrifugal machine, or by the use of any other appliance agreed upon by the pipeline and the shipper. The same method of ascertaining the amount of the sediment, water, or other impurities shall be used in the delivery as in the receipt of oil. A pipeline shall not be required to receive for transportation, nor shall consignee be required to accept as a delivery, any oil of a higher temperature than 90 degrees Fahrenheit, except that during the summer oil shall be received at any atmospheric temperature, and may be delivered at like temperature. Consignee shall have the same right to test the oil upon delivery at destination that the pipeline has to test before receiving from the shipper.

(3) **"Barrel" defined.** For the purpose of these sections, a "barrel" of crude petroleum is declared to be 42 gallons of 231 cubic inches per gallon at 60 degrees Fahrenheit.

(4) **Oil involved in litigation, etc.—indemnity against loss.** When any oil offered for transportation is involved in litigation, or the ownership is in dispute, or when the oil appears to be encumbered by lien or charge of any kind, the pipeline may require of shippers an indemnity bond to protect it against all loss.

(5) **Storage.** Each pipeline shall provide, without additional charge, sufficient storage, such as is incident and necessary to the transportation of oil, including storage at destination or so near thereto as to be available for prompt delivery to destination point, for five days from the date of order of delivery at destination.

(6) **Identity of oil, maintenance of oil.** A pipeline may deliver to consignee either the identical oil received for transportation, subject to such consequences of mixing with other oil as are incident to the usual pipeline transportation, or it may make delivery from its common stock at destination; provided, if this last be done, the delivery shall be of substantially like kind and market value.

(7) **Minimum quantity to be received.** A pipeline shall not be required to receive less than one tank car-load of oil when oil is offered for loading into tank cars at destination of the pipeline. When oil is offered for transportation for other than tank car delivery, a pipeline shall not be required to receive less than 500 barrels.

(8) **Gathering charges.** Tariffs to be filed by a pipeline shall specify separately the charges for gathering of the oil, for transportation, and for delivery.

(9) **Measuring, testing, and deductions (reference Special Order Number 20-63,098 effective June 18, 1973).**

(A) Except as provided in subparagraph (B) of this paragraph, all crude oil tendered to a pipeline shall be gauged and tested by a representative of the pipeline prior to its receipt by the pipeline. The shipper may be present or represented at the gauging or testing. Quantities shall be computed from correctly compiled tank tables showing 100% of the full capacity of the tanks.

Plf Resp in Opp to Motion for Summary Judgment 192

SR264

(B) As an alternative to the method of measurement provided in subparagraph (A) of this paragraph, crude oil and condensate may be measured and tested, before transfer of custody to the initial transporter, by:

    (i) lease automatic custody transfer (LACT) equipment, provided such equipment is installed and operated in accordance with the latest revision of American Petroleum Institute (API) Manual of Petroleum Measurement Standards, Chapter 6.1, or;

    (ii) any device or method, approved by the commission or its delegate, which yields accurate measurements of crude oil or condensate.

(C) Adjustments to the quantities determined by the methods described in subparagraphs (A) or (B) of this paragraph shall be made for temperature from the nearest whole number degree to the basis of 60 degrees Fahrenheit and to the nearest 5/10 API degree gravity in accordance with the volume correction Tables 5A and 6A contained in API Standard 2540, American Society for Testing Materials 01250, Institute of Petroleum 200, first edition, August 1980. A pipeline may deduct the basic sediment, water, and other impurities as shown by the centrifugal or other test agreed upon by the shipper and pipeline; and 1.0% for evaporation and loss during transportation. The net balance shall be the quantity deliverable by the pipeline. In allowing the deductions, it is not the intention of the commission to affect any tax or royalty obligations imposed by the laws of Texas on any producer or shipper of crude oil.

(D) A transfer of custody of crude between transporters is subject to measurement as agreed upon by the transporters.

(10) **Delivery and demurrage.** Each pipeline shall transport oil with reasonable diligence, considering the quality of the oil, the distance of transportation, and other material elements, but at any time after receipt of a consignment of oil, upon 24 hours' notice to the consignee, may offer oil for delivery from its common stock at the point of destination, conformable to paragraph (6) of this section, at a rate not exceeding 10,000 barrels per day of 24 hours. Computation of time of storage (as provided for in paragraph (5) of this section) shall begin at the expiration of such notice. At the expiration of the time allowed in paragraph (5) of this section for storage at destination, a pipeline may assess a demurrage charge on oil offered for delivery and remaining undelivered, at a rate for the first 10 days of $.001 per barrel; and thereafter at a rate of $.0075 per barrel, for each day of 24 hours or fractional part thereof.

(11) **Unpaid charges, lien for and sale to cover.** A pipeline shall have a lien on all oil to cover charges for transportation, including demurrage, and it may withhold delivery of oil until the charges are paid. If the charges shall remain unpaid for more than five days after notice of readiness to deliver, the pipeline may sell the oil at public auction at the general office of the pipeline on any day not a legal holiday. The date for the sale shall be not less than 48 hours after publication of notice in a daily newspaper of general circulation published in the city where the general office of the pipeline is located. The notice shall give the time and place of the sale, and the quantity of the oil to be sold. From the proceeds of the sale, the pipeline may deduct all charges lawfully accruing, including demurrage, and all expenses of the sale. The net balance shall be paid to the person lawfully entitled thereto.

(12) **Notice of claim.** Notice of claims for loss, damage, or delay in connection with the shipment of oil must be made in writing to the pipeline within 91 days after the damage, loss, or delay occurred. If the claim is for failure to make delivery, the claim must be made within 91 days after a reasonable time for delivery has elapsed.

(13) **Telephone-telegraph line--shipper to use.** If a pipeline maintains a private telegraph or telephone line, a shipper may use it without extra charge, for messages incident to shipments. However, a pipeline shall not be held liable for failure to deliver any messages away from its office or for delay in transmission or for interruption of service.

(14) **Contracts of transportation.** When a consignment of oil is accepted, the pipeline shall give the shipper a run ticket, and shall give the shipper a statement that shows the amount of oil received for transportation, the points of origin and destination, corrections made for temperature, deductions made for impurities, and the rate for such transportation.

(15) **Shipper's tanks, etc.--inspection.** When a shipment of oil has been offered for transportation the pipeline shall have the right to go upon the premises where the oil is produced or stored, and have access to any and all tanks or storage receptacles for the purpose of making any examination, inspection, or test authorized by this section.

Plf Resp in Opp to Motion for Summary Judgment 193

SR265

(16)  **Offers in excess of facilities.**  If oil is offered to any pipeline for transportation in excess of the amount that can be immediately transported, the transportation furnished by the pipeline shall be apportioned among all shippers in proportion to the amounts offered by each; but no offer for transportation shall be considered beyond the amount which the person requesting the shipment then has ready for shipment by the pipeline. The pipeline shall be considered as a shipper of oil produced or purchased by itself and held for shipment through its line, and its oil shall be entitled to participate in such apportionate.

(17)  **Interchange of tonnage.**  Pipelines shall provide the necessary connections and facilities for the exchange of tonnage at every locality reached by two or more pipelines, when the commission finds that a necessity exists for connection, and under such regulations as said commission may determine in each case.

(18)  **Receipt and delivery--necessary facilities for.**  Each pipeline shall install and maintain facilities for the receipt and delivery of marketable crude petroleum of shippers at any point on its line if the commission finds that a necessity exists therefor, and under regulations by the commission.

(19)  **Reports of loss from fires, lightning, and leakage.**

(A)  Each pipeline shall immediately notify the commission district office, electronically or by telephone, of each fire that occurs at any oil tank owned or controlled by the pipeline, or of any tank struck by lightning. Each pipeline shall in like manner report each break or leak in any of its tanks or pipelines from which more than five barrels escape. Each pipeline shall file the required information with the commission in accordance with the appropriate commission form within 30 days from the date of the spill or leak.

(B)  No risk of fire, storm, flood, or act of God, and no risk resulting from riots, insurrection, rebellion, war, or act of the public enemy, or from quarantine or authority of law or any order, requisition or necessity of the government of the United States in time of war, shall be borne by a pipeline, nor shall any liability accrue to it from any damage thereby occasioned. If loss of any crude oil from any such causes occurs after the oil has been received for transportation, and before it has been delivered to the consignee, the shipper shall bear a loss in such proportion as the amount of his shipment is to all of the oil held in transportation by the pipeline at the time of such loss, and the shipper shall be entitled to have delivered only such portion of his shipment as may remain after a deduction of his due proportion of such loss, but in such event the shipper shall be required to pay charges only on the quantity of oil delivered. This section shall not apply if the loss occurs because of negligence of the pipeline.

(C)  Common carrier pipelines shall mail (return receipt requested) or hand deliver to landowners (persons who have legal title to the property in question) and residents (persons whose mailing address is the property in question) of land upon which a spill or leak has occurred, all spill or leak reports required by the commission for that particular spill or leak within 30 days of filing the required reports with the commission. Registration with the commission by landowners and residents for the purpose of receiving spill or leak reports shall be required every five years, with renewal registration starting January 1, 1999. If a landowner or resident is not registered with the commission, the common carrier is not required to furnish such reports to the resident or landowner.

Plf Resp in Opp to Motion for Summary Judgment 194

SR266

## ITEM 1 – ABBREVIATIONS AND DEFINITIONS

"API" means American Petroleum Institute.

"ASTM" means American Society for Testing and Material.

"Barrel" means forty-two United States gallons.

"Carrier" means Enterprise Crude Pipeline LLC ("ECPL") and every other common carrier of Petroleum by pipeline that has entered into a joint rate tariff with ECPL and by reference therein has applied these rules and regulations to the transportation governed by such tariff.

"Common Grade(s)" as herein used means Petroleum moved through Carrier's pipeline and associated facilities which is commingled or intermixed with other Petroleum in said pipeline or facilities. Carrier's Common Grades and the characteristics of each shall be determined by the Carrier.

"Consignee" means the party to whom a Shipper has ordered the delivery of Petroleum.

"Crude Petroleum" means the grade or grades of the direct liquid product of oil or gas wells which Carrier has undertaken to gather or transport.

"Nomination," "Nominates" or "Tendered" as herein used means a written communication from a Shipper to a Carrier requesting that Carrier transport for Shipper in a given month a stated volume of a specified Petroleum from a specified origin or origins to a specified destination under the terms and conditions of this tariff.

"Petroleum" means Crude Petroleum and/or Processed Condensate.

"Processed Condensate" means a petroleum product derived from Condensate that: (i) has been adequately processed through a distillation tower at a stabilizer, splitter or other distillation facility; (ii) has remained segregated; (iii) has not been blended with other hydrocarbons since its distillation; and (iv) meets any and all federal, state and local legal, administrative and regulatory requirements necessary for such product to qualify for exportation as EAR99 under the Export Administration Regulations.

"Reid Vapor Pressure" means the vapor pressure of gasoline, volatile crude oil, or other volatile petroleum products at 100 degrees Fahrenheit as determined by the latest edition of ASTM D 323, Standard Method of Test for Vapor Pressure of Petroleum Products (Reid Method) or by ASTM D5191: Standard Test Method for Vapor Pressure of Petroleum Products (Mini Method) and D6378: Standard Test Method for Determination of Vapor Pressure (VPX) of Petroleum Products, Hydrocarbons, and Hydrocarbon-Oxygenate Mixtures (Triple Expansion Method), both of which determine total vapor pressure (TVP), which may be converted to Reid Vapor Pressure.

"Shipper(s)" means the party or parties who agrees with Carrier for transportation of Petroleum.

## ITEM 2 – ACCEPTANCE OF DELIVERY

After a shipment has had time to arrive at destination and on 24 hours' notice to Consignee, Carrier may begin delivery of such shipment to Consignee at its current rate of pumping. If all of such shipment cannot be received by Consignee, a demurrage charge of 0.50 cent per Barrel per 24 hours shall accrue, from the time said notice expires, on that part of such shipment which has not then been received by Consignee.

If a Consignee is not able to receive Petroleum from Carrier at the time when Carrier has scheduled a delivery and if Carrier has no means of withholding delivery of such Petroleum, then Carrier shall have the right to sell such Petroleum to the first available purchaser at the best price obtainable; to use the proceeds thereof to pay pipeline transportation charges which shall be due as if delivery had been made; and to hold the balance of such proceeds for whomsoever may be entitled thereto.

## ITEM 3 – CARRIER'S REMEDIES

The transportation of Petroleum may be refused or terminated if Carrier determines that the Petroleum does not meet the requirements established herein. Carrier shall have the right, at its sole discretion, to any remedy available, including but not limited to the right without notice of liability to return, divert, sell or dispose of Petroleum which does not conform to its items and regulations. Shipper shall reimburse Carrier for all costs and expenses incurred by Carrier in returning or otherwise disposing of such non-conforming Petroleum.

Plf Resp in Opp to Motion for Summary Judgment 195

SR267

## ITEM 4 – CHARGES FOR ENVIRONMENTAL RELATED MEMBERSHIPS AND FEES

To the extent Barrels transported over Carrier's facilities are the basis of a charge by any public or private agency or organization (such as the Marine Preservation Association), which charge is related to compliance with federal, state or local environment laws or regulations (such as the Oil Pollution Act of 1990), Carrier shall have the right to assess Shipper at a cost for any such charge attributable to that Shipper's Barrels, provided Carrier has first given 30days advance written notice to Shipper of its intention to make such assessment thereafter.

## ITEM 5 – CLAIMS, SUITS, TIME FOR FILING

As a condition precedent to recovery for loss, damage, injury or delay, claims must be filed in writing with the originating or delivering Carrier within 91days after a reasonable time for delivery of the Petroleum, or in case of failure to make delivery, then within 91 days after a reasonable time for delivery has elapsed; and suits shall be instituted against the Carrier only within two years and one day from the day when notice in writing is given by the Carrier to the claimant that the Carrier has disallowed the claim or any part of parts thereof specified in the notice. Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, the Carriers shall not be liable and such claims will not be paid.

## ITEM 6 – COMMON GRADE PETROLEUM-CONNECTING CARRIERS

When both receipts and deliveries of substantially the same grade of Petroleum are scheduled at the same location on Carrier's system, including, but not limited to, interconnections with connecting carriers, Carrier reserves the right to offset like volumes of such Common Grade Petroleum, in order to avoid the unnecessary use of energy that would be required to physically pump the offsetting volumes. The applicable tariff rate will be applied to such transactions. When this right is exercised, Carrier will make further deliveries for the Shipper involved from its Common Grade Petroleum.

## ITEM 7 – DESTINATION FACILITIES

Carrier will deliver Petroleum to a Shipper or its Consignee at destinations on its trunk lines. Petroleum will be delivered only into pipelines, tanks or other facilities that are provided by Shipper or Shipper's designee or Consignee or a connecting carrier. Carrier will determine and advise Shippers and Consignees of the size and capacity of pipelines, tanks or other facilities to be provided at point of delivery to meet the operating conditions of Carrier's facilities at such point. Carrier will not accept Petroleum for transportation unless such facilities have been provided.

## ITEM 8 – DISPATCHING

For each calendar month, Carrier will establish a sequence for pumping various grades of Petroleum through its trunk lines and will schedule the approximate time when Petroleum offered for shipment will be received by Carrier at origins and delivered by Carrier at destinations.

Carrier will inform each Shipper of the time within each calendar month when Petroleum will be received from such Shipper at origins and Carrier will inform each Consignee of the time within each calendar month when Petroleum will be delivered to such Consignee at destinations.

## ITEM 9 – DIVERSION OR RECONSIGNMENT

Diversion or reconsignment may be made without charge if requested by the Shipper prior to arrival at original destination, subject to the rates, rules, and regulations applicable from point of origins to the final destination, provided the then current pipeline operations of the Carrier will permit such diversion or reconsignment. Such request must be confirmed in writing.

Plf Resp in Opp to Motion for Summary Judgment 196

SR268

## ITEM 10 – ESTABLISHMENT OF GRADES

Carrier will from time to time determine which grades of Petroleum it will regularly gather from certain areas and which grades of Petroleum it will regularly transport as a Common Grade between particular origins and destinations on its trunk pipelines.

Carrier will inform all interested persons of such determination upon request by them and this will constitute the sole holding out of the Carrier in regard to the grades of Petroleum transported.

A Shipper may request a different grade to be shipped than those grades determined by Carrier. Carrier shall determine what additional storage or pumping infrastructure, if any, will be required to be supplied by Shipper to accommodate the shipment of that different grade.

Carrier may from time to time undertake to gather or transport other or additional grades of Petroleum and Carrier may from time to time, after giving reasonable notice to persons who may be affected, cease to gather or transport particular grades of Petroleum.


## ITEM 11 – GAUGING, TESTING AND VOLUME CORRECTIONS

All Petroleum tendered to the pipeline may be tested for basic or foreign sediment and water and other impurities and gauged or metered by Carrier's representative before or after acceptance into Carrier's facilities. In addition to the provision under Paragraph 15 of Section 1, Carrier shall have access to any and all vehicles used for shipment of oil to the pipeline for the purpose of making any examination, inspection, or test. Shipper shall have the right to witness all proving of meters used in such measurement. Carrier reserves the right to test and measure and/or witness the testing and measurement of all deliveries from its facilities.

Where the measurement is determined by tank gauge, such measurement shall be based upon tanks strapped and tables compiled in accordance with Chapter 2, "Tank Calibration", API Manual of Petroleum Measurement Standards, Latest Edition, indicating 100% full capacity. Volume measurements by temperature compensated meters shall be further corrected for meter factor and pressure in accordance with the latest edition of API Manual of Petroleum Liquid Hydrocarbons by Pipeline Displacement Meters.

Carrier shall deduct from the volume of Petroleum received into Carrier's facilities the actual amount of suspended basic or foreign sediment, water and other impurities as ascertained by centrifuge or other tests agreed upon.

Carrier shall retain 2/10 of 1% of the volumes of Petroleum received into Carrier's facilities to cover loss due to shrinkage and evaporation incident to transportation on Carrier's facilities, and the volumes delivered to Shipper from Carrier's facilities shall be net of such deduction ("Pipeline Loss Allowance").

The net calculated quantity at 60 degrees Fahrenheit less sediment and water and other impurities volume percentage shall be the quantity received or delivered by Carrier.

In addition to the Pipeline Loss Allowance set forth herein above, a volume shrinkage deduction shall be applied starting at 45.0° API at 60 degrees Fahrenheit with a 1% adjustment, with further adjustments made in increments of 0.03% for every 0.1 degree API. (For example 48.1° API = 1.93% deduction).

Except for arithmetic errors, all measurement and testing by Carrier shall be conclusive if a representative of the Shipper or its Consignee was not present during such measuring and testing.

Plf Resp in Opp to Motion for Summary Judgment 197

SR269

## ITEM 12 – INVENTORY REQUIREMENTS

Carrier shall require Shipper to supply a pro rata share of Petroleum and inventory necessary for pipeline and tankage fill to assure efficient operation of Carrier's pipeline system.

Petroleum furnished by a Shipper may be withdrawn from Carrier's pipeline system only after:

(1) Shipper has ceased shipments and Shipper has notified Carrier in writing to discontinue shipments in Carrier's pipeline system, and;

(2) Shipper inventory balances have been reconciled between Shipper and Carrier.

Carrier may require advance payment of transportation charges on the volumes to be delivered from Carrier's pipeline system, and any unpaid accounts receivable, before final delivery will be made. Carrier shall have a reasonable period of time after the receipt of said notice to complete administrative and operational requirements incident to Shipper's withdrawal of the Petroleum.

## ITEM 13 – LIABILITY OF CARRIER

Carrier will not be liable for any loss of Petroleum while in the possession of Carrier, or for any delay in receiving or delivering Petroleum if caused by an Act of God, the public enemy, quarantine, the authority of law, strikes, riots, the act or default of Shipper or Consignee, requisition by an agency of Government or any other cause not due to the negligence of Carrier.

If such loss occurs to Petroleum in a segregated shipment, then the Shipper and Consignee thereof shall bear the entire loss, damage or delay which occurs.

However, if such loss occurs to Petroleum which is not in a segregated shipment, then each Shipper of the grade of Petroleum so lost via the system in which the loss occurs shall share such loss in the proportion that the amount of such grade of Petroleum then in the custody of Carrier for the account of such Shipper in such system bears to the total amount of such grade of Petroleum then in the custody of Carrier in such system.

Carrier will be obligated to deliver only that portion of a Petroleum shipment remaining after deducting such loss. Transportation charges will be made only on quantities of Petroleum delivered.

If Petroleum is lost in transit while in the custody of Carrier due to causes other than those described in the first paragraph of this item, Carrier may obtain and deliver to Consignee thereof other Petroleum of the same quantity and grades as that which was lost, but Carrier shall not be obligated to do so; in the alternative, Carrier may compensate Shipper for such loss in money.

## ITEM 14 – ORIGINATION FACILITIES

Carrier will receive Petroleum from Shippers at stations on its gathering lines; at leases or plants to which its gathering lines connect; and at origins on its trunk lines. Petroleum will be received only from pipelines, tanks or other facilities that are provided by Shipper or Shipper's designee, or a connecting carrier, or a marketer of Petroleum. Carrier will determine and advise Shippers of the size and capacity of pipelines and tanks to be provided at the point of a receipt to meet the operating conditions of Carrier's facilities at such point. Carrier will not accept Petroleum for transportation, unless such facilities have been provided.

Plf Resp in Opp to Motion for Summary Judgment 198

SR270

## ITEM 15 – PAYMENT OF TRANSPORTATION AND OTHER CHARGES

Shipper or Consignee shall pay the transportation and all other charges accruing on Petroleum Nominated for shipment, adjusted to 60 degrees Fahrenheit and with all deductions herein provided for. Carrier shall have a lien on all Petroleum accepted for transportation to secure the payment of all charges, and may withhold said Petroleum from delivery until all of the said charges shall have been paid.

Shipper and Consignee shall be jointly and severally liable for the payment of gathering, transportation and demurrage charges upon Petroleum delivered by Carrier to Consignee or to a point on Carrier's lines by mutual agreement of Carrier, Shipper and Consignee.

Carrier will bill Shipper each month for gathering charges on Petroleum gathered for Shipper during the previous month. Carrier will bill Shipper each month for transportation and demurrage charges on Petroleum delivered to Consignee during the previous month. If such a bill is not paid within 10 days after date of invoice, Carrier shall have the right to assess a late charge at an annual interest rate equivalent to 125% of the prime rate of interest charged by Citibank N.A. of New York, New York on 90 day loans to substantial and responsible commercial borrowers as of the due date. In the event the late charge, as described in the preceding sentence, is greater than the maximum rate allowed by law, then the maximum rate allowed by law will be used. Such late charge shall accrue from 10 days after date of invoice until payment is made.

Carrier may require that all payments to Carrier for services pertaining to the transportation of Petroleum be wire transferred in accordance with the instructions on the Carrier's invoice to Shipper.

In the event Carrier determines that the financial condition of a Shipper of shipper's guarantor ( if any) is or has become impaired or unsatisfactory or Carrier determines it is necessary to obtain security from a Shipper, Carrier, upon notice to Shipper, will require any of the following prior to Carrier's delivery of Shipper's Products in Carrier's possession or prior to Carrier's acceptance of Shipper's Petroleum: (1) prepayment of all charges by wire transfer and shall be held by the Carrier without interest accruing thereon until credited to the Shipper, (2) a letter of credit at Shipper's expense in favor of Carrier in an amount sufficient to ensure payment of all such charges and, in a form, and from an institution acceptable to Carrier, or (3) a guaranty in an amount sufficient to ensure payment of all such charges, and in a form, and from a third party acceptable to Carrier. In the event Shipper fails to comply with any such requirement on or before the date supplied in Carrier's notice to Shipper, Carrier shall not be obligated to provide Shipper access to Carrier's facilities or provide services pursuant to this tariff until such requirement is fully met.

## ITEM 16 – QUALITY AND QUANTITY OF RECEIPTS AND DELIVERIES

Carrier will not make a delivery of less than 10,000 Barrels of Petroleum at any destinations on its trunk lines, except when necessitated by dispatching contingencies and except where a smaller delivery is authorized by an individual tariff, however, Carrier will deliver smaller quantities of Petroleum to destinations on its gathering lines.

Carrier will also accept for transportation a grade of Petroleum which does not meet the conditions of the first paragraph of this item, provided that:

(a) Carrier has available facilities to segregate such grade of Petroleum while it is in transit from all other grades of Petroleum; and

(b) Carrier shall not be liable to Shipper or Consignee for changes in the gravity or quality of such grade of Petroleum while it is in transit; and

(c) The Petroleum offered for transportation is made available at the origins of a shipment in a quantity which equals or exceeds the following minimum:

| Outside diameter Largest pipeline through which shipment will move | Minimum quantity of Petroleum which may be segregated |
|---|---|
| 12 ¾ inches or less | 10,000 barrels |
| 14 - 18 inches | 20,000 barrels |
| 20 - 24 inches | 35,000 barrels |

Carrier reserves the right to require an assay on Petroleum nominated, prior to accepting Barrels for transportation.

Plf Resp in Opp to Motion for Summary Judgment 199

SR271

## ITEM 17 – RATES APPLICABLE

The rate which shall apply to the transportation of Petroleum shall be the rate in effect on the date Petroleum is received by Carrier for transportation. Likewise, the rules and regulations which shall govern the transportation of Petroleum shall be the rules and regulations in effect on the date Petroleum is received by Carrier for transportation.

## ITEM 18 – RATES APPLICABLE FROM AND TO INTERMEDIATE POINTS

Petroleum received from a point on Carrier's lines which is not named in tariffs making reference to this tariff, but which point is intermediate to a point from which rates are published in tariffs making reference to this tariff, will be assessed the rate in effect to the next more distant point published in the tariff making reference to this tariff.

Petroleum delivered to a point on Carrier's lines which is not named in tariffs making reference to this tariff, but which point is intermediate to a point to which rates are published in tariffs making reference to this tariff, will be assessed the rate in effect to the next more distant point published in the tariff making reference to this tariff.

## ITEM 19 – SCHEDULING OF SHIPMENTS/ALLOCATION

All Shippers desiring to ship Petroleum through the lines of Carrier shall promptly provide Carrier in the form of a Nomination with all information needed by Carrier to schedule and dispatch each shipment of Petroleum which Shipper offers to make; to satisfy Carrier that offers to ship are in good faith; and to satisfy Carrier that shipments can be transported in conformance with Carrier's tariffs. Carrier may refuse to receive Petroleum for transportation until Shipper has provided Carrier with such information.

Except as set forth in the immediately following paragraph, Carrier shall not be obligated to accept Petroleum for transportation during any calendar month unless the Shipper shall, on or before the 15th day of the preceding calendar month, notify the Carrier in writing of the kind and quantity of such Petroleum which it desires to ship. If 15th day of the preceding calendar month is a non-business day, then such notification shall be due on the last business day immediately prior to the 15th day of the preceding month.

In the event Shippers offer to ship more Petroleum via a particular pipeline or segment of line during any period of time than can be pumped through such line or segment of line during such period, Carrier shall allocate available transportation capacity on a fair and equitable basis to all Shippers pursuant to Carrier's current proration policy. Carrier may, at the request of any upstream pipeline, conduct verification to determine whether or not allocation is necessary based on upstream nominations, pursuant to Carrier's then current policy and procedures. A copy of such document is available upon request.

## ITEM 20 – SEPARATE PIPELINE AGREEMENTS

Separate agreements, if applicable, in association with pipeline connections or other facilities ancillary to the Carrier's pipeline system and in accordance with this tariff shall be required of any Shipper or consignee before any obligation to provide transportation shall rise.

Plf Resp in Opp to Motion for Summary Judgment 200

SR272

## ITEM 21 – SPECIFICATIONS REQUIRED AS TO QUALITY

Carrier will determine the quality of Processed Condensate in accordance with the following test methods: API gravity, density and relative density by ASTM Standards D1298, D5002 and D287 at API 60 degrees Fahrenheit; vapor pressure by ASTM Standard D5191; and sediment and water by API MPMS Chapter 10.4.

Carrier will only accept Petroleum that does not contain any other excessive metals, chemicals, salts, or any other material which would adversely affect downstream markets or pipelines. No Petroleum will be accepted for transportation except merchantable Petroleum which is properly settled and contains not more than 1% of basic sediment, water, and other impurities, and has a temperature not in excess of 120 degrees Fahrenheit and its gravity, viscosity, pour point, and other characteristics are such that it will be readily susceptible to transportation through the Carrier's existing facilities, and will not materially affect the quality of other shipments or cause disadvantage to other Shippers and/or the Carrier. In addition, Carrier reserves the right to reject (any and all of, but not limited to) the following shipments:

(a) Petroleum having a Reid Vapor Pressure in excess of nine pounds per square inch absolute and/or an API gravity in excess of 80.0°; and

(b) Petroleum where the Shipper or Consignee has failed to comply with applicable laws, rules, and regulations made by government authorities regulating shipment of Petroleum. If Petroleum is accepted from tankage, settled bottoms in such tanks must not be above a point four inches below the bottom of the pipeline connection with the tank from which it enters Carrier's facilities.

Quality specifications of a connecting carrier may be imposed upon Carrier when such limits are less than that of Carrier, in which case the limitations of the connecting carrier will be applied.

Carrier may, from time to time, undertake to transport other or additional grades of Petroleum and if, in the opinion of Carrier, sufficient quantities are not nominated or facilities are not available to justify continued transportation of other or additional grades, Carrier may, after giving reasonable notice to Shippers who may be affected, cease transporting particular grades of Petroleum.

If, upon investigation, Carrier determines that a Shipper has delivered to Carrier's facilities Petroleum that has been contaminated by the existence of and/or excess amounts of impure substances, including but not limited to, chlorinated and/or oxygenated hydrocarbons, arsenic, lead and/or other metals, such Shipper will be excluded from further entry into applicable segments of the system until such time as quality specifications are met to the satisfaction of Carrier. Further, Carrier reserves the right to dispose of any contaminated Petroleum locking its system. Disposal thereof, if necessary, may be made in any reasonable commercial manner, and any liability associated with the contamination or disposal of any Petroleum shall be borne by the Shipper introducing the contaminated Petroleum into Carrier's system.

Carrier will from time to time determine which grades of Petroleum it will regularly transport as a Common Grade between particular receipt points and destination points on its pipeline systems. Carrier will inform all subscribers to tariffs for the system affected by such determination and this will constitute the sole holding out of the Carrier in regard to the grades of Petroleum transported.

Unless stated otherwise in written notice provided by Carrier to all subscribers to tariffs for the system affected, Carrier will not segregate Petroleum of a kind and/or quality not currently transported through Carrier's facilities.

## ITEM 22 – SPECIFICATIONS AS TO QUALITY AND LEGALITY OF SHIPMENTS

Carrier reserves the right to reject any and all Petroleum nominated where the Shipper or Consignee has failed to comply with all applicable laws, items and regulations made by any governmental authorities regulating shipments of Petroleum.

Plf Resp in Opp to Motion for Summary Judgment 201

SR273

## ITEM 23 – STORAGE IN TRANSIT

The Carrier has working tanks that are needed by Carrier to transport Petroleum but has no other tanks and, therefore, does not have facilities for rendering, nor does it offer, a storage service. Provisions for storage during transit in facilities furnished by Shipper at points on Carrier's system will be permitted to the extent authorized under individual tariffs.

## ITEM 24 – TITLES

The act of delivering Petroleum to Carrier for transportation shall constitute a warranty by Shipper that Shipper or Consignee has unencumbered title thereto and that the same was produced in accordance with law.

## SECTION 3
## LOCAL PROPORTIONAL RATES IN CENTS PER BARREL

### [U] All rates in this section are unchanged unless otherwise indicated.

| FROM | TO | |
|------|------------------------|-------------------------|
| | ECHO Terminal (Harris Co.) | [C]~~Genoa Junction~~ ~~(Harris Co.)~~ |
| Altair (Colorado Co.) | 249.25[1] | [C] |
| Hope (Lavaca Co.) | 249.25[1] | [C] |
| Katy (Fort Bend Co.) | 66.24 | [C] |
| Sealy (Austin Co.) | 249.25[1] | [C] |

FOOTNOTE:

(1) GATHERING RATE:
A gathering charge of 60.00 cents per Barrel will apply in addition to the transportation rate above for the denoted movement.

[C]~~(2) CONNECTION AT GENOA JUNCTION:~~
~~The denoted movement is only available for connection to Magellan Pipeline Company, L.P. 24 or 26 inch pipelines or ExxonMobil Pipeline Company 24 inch pipeline via ECHO Terminal.~~

~~(3) PUMPOVER FROM ECHO TERMINAL:~~
~~Rates include a pumpover fee of 10.46 cents per Barrel.~~

Plf Resp in Opp to Motion for Summary Judgment 202

SR274

# SECTION 4
## JOINT RATES IN CONNECTION WITH
## MAGELLAN PIPELINE COMPANY, L.P.

**[U] All rates in this section are unchanged.**

| FROM | TO | RATE IN CENTS PER BARREL | GATHERING RATE IN CENTS PER BARREL |
|---|---|---|---|
| Altair (Colorado Co.) Hope (Lavaca Co.) Sealy (Austin Co.) | Texas City Marathon Galveston Bay Refinery (Galveston Co.) | 302.63 291.76 [1] | 60.00 |
| | Morgan's Point (Harris Co.) | 344.18 333.32 [1] | 60.00 |
| Katy (Fort Bend Co.) | Texas City Marathon Galveston Bay Refinery (Galveston Co.) | 119.61 108.75 [1] | 60.00 |
| | Morgan's Point (Harris Co.) | 137.32 126.45 [1] | 60.00 |

**FOOTNOTE:**

(1) Any Shipper who ships and delivers, in their name, the Minimum Monthly Volume Requirement of 600,000 Barrels in any calendar month to Texas City Marathon Galveston Bay Refinery and/or Morgan's Point. Carrier will invoice the Shipper at the Incentive Rate.

If Shipper's initial delivery from the incentive origins to the incentive destination is not on the first day of any calendar month, the first month's Minimum Monthly Volume Requirement will be prorated for the number of days remaining in the initial month.

---

**Exception to Item No. 11, Section 2:**
GAUGING, TESTING AND DEDUCTIONS: - Carrier shall deduct 0.3 of 1% of the volumes of all Petroleum received into Carrier's system to cover evaporation and loss during transportation.

---

**Route:** ECPL to Genoa Junction (Harris County, Texas) via ECHO Terminal (Harris County, Texas); Magellan Pipeline Company, L.P. from Genoa Junction (Harris County, Texas) to Texas City Marathon Galveston Bay Refinery (Galveston County, Texas); ECPL from Anahuac Junction (Harris County, Texas) to Morgan's Point (Harris County, Texas).

---

## EXPLANATION OF REFERENCE MARKS

[C] Cancel. [U] Unchanged rate.

---

**PLEASE NOTE: IN THE EVENT OF ANY CONFLICT BETWEEN SECTION 1 AND SECTION 2 OF THIS TARIFF, SECTION 2 WILL GOVERN.**

Plf Resp in Opp to Motion for Summary Judgment 203

SR275

Exhibit 2
Affidavit of David L. Bryant

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., a Delaware limited partnership, | ) ) ) ) | |
| Plaintiff, | ) ) | IN THE DISTRICT COURT OF |
| vs. | ) ) | DALLAS COUNTY, TEXAS |
| ENTERPRISE CRUDE OIL LLC, a Texas limited liability company, | ) ) ) | 101ST JUDICIAL DISTRICT |
| Defendant. | ) ) ) | |

## AFFIDAVIT OF DAVID L. BRYANT

| | |
|---|---|
| STATE OF TEXAS | ) |
| | ) ss. |
| COUNTY OF KENDALL | ) |

David L. Bryant, of lawful age, being first duly sworn upon his oath, states the following:

1.      I am an attorney licensed to practice in the State of Texas and am counsel of record for Plaintiff Magellan Crude Oil Pipeline Company, L.P. ("Magellan") in the above-captioned matter. The matters stated herein are within my personal knowledge.

2.      On June 19, 2017, Magellan filed its 36-page Original Petition.

3.      On June 21, 2017, Magellan served on Enterprise, Plaintiff's Request for Disclosure pursuant to Rule 194 of the Texas Rules of Civil Procedure. A true copy thereof is attached as Exhibit 2-A.

4.      On July 17, 2017, Defendant Enterprise Crude Oil LLC ("Enterprise) filed a 2-page Answer to the Original Petition, containing a general denial.

5.      On July 31, 2017, Magellan served on Enterprise, Plaintiff's First Request for Production of Documents. A true copy thereof is attached as Exhibit 2-B.

*Affidavit of David L. Bryant*                                                                                           1
{1739261;}

6. On July 31, 2017, Magellan issued and promptly thereafter served subpoenas duces tecum to three non-parties. True copies thereof are attached as Exhibit 2-C, Exhibit 2-D, and Exhibit 2-E.

7. On August 4, 2017, Enterprise filed its Motion for Summary Judgment.

8. On August 10, 2017, Enterprise served its Motion for Protection and to Stay Discovery Pending Resolution of Defendant's Dispositive Motion ("Stay Motion"). A true copy thereof is attached as Exhibit 2-F.

9. To avoid needless wrangling and multiplication of proceedings, Magellan entered into a Rule 11 agreement with Enterprise on August 11, 2017. A true copy thereof is attached as Exhibit 2-G. In the Rule 11 agreement, Magellan agreed to hold its discovery requests in abeyance and serve no new requests until September 26, 2017, the day following a hearing on the Enterprise Motion for Summary Judgment and the Stay Motion. The Rule 11 agreement expressly and specifically provides that it is "without prejudice to any argument of any party in connection with the motion for summary judgment and/or the Stay Motion." *Id.*

10. Through its above-described discovery requests to Enterprise, Magellan has diligently sought and seeks to discover from Enterprise, *among other things*:

(1) Regarding the parties' Crude Oil Distribution Agreement ("COD Agreement") dated October 31, 2011, the related Joint Tariff Agreement dated November 1, 2011, and the related Connection Agreement dated December 16, 2011 (collectively, the "Agreement"), all (a) drafts of the Agreement, (b) Documents (as defined) constituting or reflecting communications between Magellan and Enterprise regarding the Agreement, and (c) Documents constituting or reflecting

Enterprise's internal communications regarding the Agreement (Ex. 2-B, Doc. Req. Nos. 1-3);

(2) All Documents identifying any business or commercial considerations which led Enterprise to enter into the Agreement or caused or contributed to its interest in pursuing the Agreement or any similar agreement with Magellan (Ex. 2-B, Doc. Req. Nos. 4-6);

(3) Regarding the marketing, transportation and/or delivery of Eagle Ford Product to ECHO Terminal, to Genoa Junction, or to any other Houston Area Destination(s), all Documents containing or reporting upon any Enterprise plans, proposals, goals, projections, budgets, estimates, statistics, or histories thereof (Ex. 2-B, Doc. Req. No. 10);

(4) All Documents which constitute, or reflect, communications between Magellan and Enterprise, regarding (i) the construction of any New Magellan Facilities, (ii) the In-Service Date, (iii) the use or non-use of the Magellan Facilities by Enterprise following the In-Service Date, (iv) the disconnection of Enterprise facilities from Magellan facilities at Anahuac Junction, (v) the meaning, effect, or impact of the Agreement, and/or (vi) any dispute between Magellan and Enterprise arising from the Agreement (Ex. 2-B, Doc. Req. No. 11);

(5) All Documents which were authored by any Non-Lawyer Employee(s) of Enterprise (at any time during the Relevant Period as defined) or any Lawyer Employee of Enterprise (prior to February 16, 2017), and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its

*Affidavit of David L. Bryant*
{1739261;}

3

provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions (Ex. 2-B, Doc. Req. Nos. 12 and 13);

(6)    All other Documents which contain any reference (whether specific or general) to the COD Agreement or to any party's rights or obligations under the Agreement (excluding Documents which merely "relate" in some way to the COD Agreement) (Ex. 2-B, Doc. Req. Nos. 14-16);

(7)    All Enterprise Eagle Ford Crude Oil Purchase Agreements, Enterprise Eagle Ford Crude Oil Sale Agreements, and Enterprise Eagle Ford Crude Oil Buy-Sell Agreements in existence during the Relevant Period, and all modifications, amendments or replacements of such agreements (Ex. 2-B, Doc. Req. Nos. 17-19); and

(8)    All Documents which discuss or mention the business or commercial motivation(s) that led Enterprise to enter into any Eagle Ford Buy-Sell Agreement, and all Documents reflecting internal Enterprise communications, or communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Purchase Agreement, any Eagle Ford Crude Oil Sale Agreement, or any Eagle Ford Crude Oil Buy-Sell Agreement (Ex. 2-B, Doc. Req. Nos. 20 and 21).

11.    By such discovery requests to Enterprise, Magellan seeks to discover, for example, what Enterprise's own records show about: the representations and promises it made to Magellan in connection with the Agreement; the Enterprise contract negotiators' understandings and intentions regarding the Enterprise commitment to Magellan set forth in the COD Agreement;

whether the COD Agreement, as written, resulted from a mutual mistake in reducing the parties' actual agreement to writing; the communications between Enterprise and its Eagle Ford crude oil customers revealing which party initiated the replacement of Enterprise's purchase agreements with buy-sell agreements and why; all the ways and means Enterprise has used to bypass Magellan; and whether Enterprise had an intent not to perform when it entered into the COD Agreement or otherwise intentionally misled Magellan.

12. Through its above-described subpoenas to non-parties currently known to Magellan, Magellan has diligently sought and seeks to discover from each of them, *among other things*: (i) all drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy-Sell Agreement, or Crude Oil Transportation Agreement, between the non-party and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product (and all amendments, supplements, assignments, terminations or cancellations thereof); and (ii) all correspondence (in any form, including email) between the non-party and Enterprise, regarding (a) a proposal to enter any contract of a kind described above, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract. *See* Exs. 2-C, 2-D, 2-E, at Exhibit A thereto.

13. The evidence Magellan has sought and seeks to discover through the above-described discovery requests to Enterprise and subpoenas to the non-parties currently known to Magellan, as well as other discovery Magellan intends to pursue when given adequate time and opportunity (*e.g.*, additional requests for documents, and deposition testimony by representatives of Enterprise and/or representatives of non-parties), is relevant to the claims Magellan asserts in this action, material to the resolution of the Enterprise no-evidence Motion for Summary Judgment

*Affidavit of David L. Bryant*
{1739261;}

5

filed on August 4, 2017, and potentially essential to the resolution of issues presented by that Motion, for the reasons discussed in Magellan's Response in Opposition to that Motion.

14. However, as a result of the Stay Motion and subsequent Rule 11 agreement, Magellan has not had any discovery in this action and has not had adequate time or opportunity to obtain any discovery.

This concludes my affidavit testimony.

David L. Bryant

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on the 18 day of September, 2017, to certify which witness my hand and official seal.

Notary Public

My commission number is: 8/27/19

My commission expires: 15008129

[S E A L] #15008129
EXP. 08/27/2019
PAMELA D. DAVIS
NOTARY PUBLIC
STATE OF OKLAHOMA

Exhibit 2-A
Plaintiff's Request for Disclosure

SR283

## CAUSE NO. DC-17-07264

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
                                      )
           Plaintiff, )       IN THE DISTRICT COURT OF
                                        )
vs. )       DALLAS COUNTY, TEXAS
                                        )
ENTERPRISE CRUDE OIL LLC, )
a Texas limited liability company, )       101st JUDICIAL DISTRICT
                                        )
                                        )
           Defendant. )

## PLAINTIFF'S REQUEST FOR DISCLOSURE

TO:     **Defendant Enterprise Crude Oil LLC**

Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Plaintiff Magellan Crude Oil

Pipeline Company, L.P., requests that Defendant Enterprise Crude Oil LLC disclose, within fifty

(50) days of service of this request, the information or material described in Rule 194.2 (a)-(i),

and (l).

{1706520;}

Respectfully submitted,

**GABLEGOTWALS**


By:  /s/ David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

## CERTIFICATE OF SERVICE

I certify that on June 21, 2017, the foregoing Request for Disclosure was served upon the above named defendant at the same time and in the manner as service of Citation with respect to Plaintiff's Original Petition in this action.

/s/ David L. Bryant
David L. Bryant

Plf Resp in Opp to Motion for Summary Judgment 214

SR286

Exhibit 2-B
Plaintiff's First Request for Production
of Documents by Defendant

|  |  |  |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., a Delaware limited partnership, | ) ) ) | |
| | ) ) | IN THE DISTRICT COURT OF |
| Plaintiff, | ) ) | |
| vs. | ) ) | DALLAS COUNTY, TEXAS |
| | ) ) | 101st JUDICIAL DISTRICT |
| ENTERPRISE CRUDE OIL LLC, a Texas limited liability company, | ) ) | |
| | ) ) | |
| Defendant. | ) | |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS BY DEFENDANT ENTERPRISE CRUDE OIL LLC

TO:     Defendant Enterprise Crude Oil LLC, by and through its counsel, E. Leon Carter, CARTER SCHOLER, 8150 N. Central Expressway, Suite 500, Dallas, Texas 75206.

Plaintiff, Magellan Crude Oil Pipeline Company, L.P. ("Plaintiff" or "Magellan"), pursuant to Rule 196 of the Texas Rules of Civil Procedure, serves the following requests to be answered in accordance with the Texas Rules of Civil Procedure.

## Definitions

The following definitions apply to all discovery requests stated below.

1.     **"COD Agreement"** means the Crude Oil Distribution Agreement, dated October 31, 2011, by and between Enterprise Crude Oil LLC and Magellan Pipeline Company, L.P., a copy of which is attached to the Original Petition as Exhibit A.

2.     **"Communication"** means a conveyance, in any form and by any means, of information between two or more persons.

3.     **"Connection Agreement"** means the Connection Agreement, dated December 16, 2011, by and between Enterprise Crude Pipeline, LLC and Magellan Pipeline Company, L.P., a copy of which is attached to the Original Petition as Exhibit C.

4.     **"Connection Point"** means the point of interconnection, at Genoa Junction, between any Magellan Facilities and any Enterprise crude oil transportation or distribution facilities.

{1718212;}

5.     **"Defendant," "You" and "Your"** mean and refer to Enterprise Crude Oil LLC.

6.     **"Destination Point"** means one or more of the following points:

   A. Valero's Houston Refinery;
   B. BP's Texas City Refinery;
   C. Enterprise Pipeline's Anahuac Junction;
   D. Shell's Deer Park Refinery

7.     **"Document"** is intended to be as broad and inclusive as permitted by the Texas Rules of Civil Procedure, and includes without limitation printed and electronically stored data and information, writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained. However, for purposes of the requests made below, "Document" does not include any item filed with the U.S. Securities and Exchange Commission.

8.     **"Eagle Ford Expansion Pipeline"** means all or any portion of the crude oil pipeline system extending from Gardendale (LaSalle County, Texas) to a connection point with other Enterprise pipeline facilities at Sealy Station (Austin County, Texas).

9.     **"Eagle Ford Product"** means crude oil and/or condensate which You owned, controlled, purchased, sold, delivered, or took delivery of, at any Origin Point, at any time during the Relevant Period.

10.    **"Eagle Ford Crude Oil Purchase Agreement"** means a written agreement providing for Enterprise to purchase Eagle Ford Product.

11.    **"Eagle Ford Crude Oil Sale Agreement"** means a written agreement providing for Enterprise to sell Eagle Ford Product.

12.    **"Eagle Ford Crude Oil Buy/Sell Agreement"** means a written agreement providing for Enterprise to purchase Eagle Ford Product from another party and to sell crude oil to the same party or an affiliate of that party.

13.    **"Eagle Ford Crude Oil Transportation Agreement"** means a written agreement providing for Enterprise to transport Eagle Ford Product on the Eagle Ford Expansion Pipeline.

14.    **"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

15.    **"Enterprise"** means Enterprise Crude Oil LLC and except when expressly stated otherwise includes any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

16. **"Future Destination Point"** means any one or more of the following points, as known in 2011 and regardless of any change in name or ownership occurring after 2011:

    A. Marathon's Texas City Refinery;
    B. Valero's Texas City Refinery;
    C. Seaway Crude Pipeline Company's Texas City Terminal;
    D. Seaway Crude Pipeline Company's Galena Park Terminal;
    E. Houston Fuel Oil Terminal Company's Houston Terminal;
    F. Oil Tanking's Houston Terminal;
    G. Houston Refining LP's Houston Refinery;
    H. Pasadena Refining, Inc.'s Houston Refinery;
    I. Pasadena Refining, Inc.'s Red Bluff Tank Farm;
    J. Magellan Terminal Holdings, L.P.'s Galena Park Terminal

17. **"Genoa Junction"** means the pipeline junction/hub by that name, located in the Houston, Texas area.

18. **"Houston Area Destination"** means and includes:

    A. Any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    B. Any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between ECHO Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

    C. Any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

19. **"In-Service Date"** has the meaning set forth in Section 2.1 of the COD Agreement.

20. **"Joint Tariff Agreement"** means the letter agreement, dated November 1, 2011, by and between Enterprise Crude Pipeline, LLC and Magellan Pipeline Company, L.P., a copy of which is attached to the Original Petition as Exhibit B.

21. **"Lawyer Employee"** means an employee who, at the time of any relevant act, omission or statement, was a licensed attorney employed within the legal department of a corporate employer.

Plf Resp in Opp to Motion for Summary Judgment 218

SR290

22. **"Magellan"** means Magellan Crude Oil Pipeline Company, L.P., and except when expressly stated otherwise, includes any and all of its affiliates or predecessors in interest including Magellan Pipeline Company, L.P.

23. **"Magellan Audit"** means any audit process or procedure Magellan undertook or sought to undertake regarding the COD Agreement, including those described in paragraphs 54, 57, and 61 of the Original Petition.

24. **"Magellan Facilities"** has the meaning set forth in the second paragraph of the recitals contained in the COD Agreement.

25. **"New Magellan Facilities"** has the meaning set forth in the second paragraph of the recitals contained in the COD Agreement.

26. **"Non-Lawyer Employee"** means an employee who, at the time of any relevant act, omission or statement, was not a licensed attorney employed within the legal department of a corporate employer.

27. **"Original Answer"** means Defendant's Original Answer filed in the action on July 17, 2017.

28. **"Original Petition"** means Plaintiff's Original Petition filed in this action on June 19, 2017.

29. **"Origin Point"** means one or more of the following points on the Eagle Ford Expansion Pipeline: Gardendale (LaSalle County, Texas); Lyssy (Wilson County, Texas); Marshall (Gonzales County, Texas); Milton (Karnes County, Texas).

30. **"Plaintiff"** means Magellan Crude Oil Pipeline Company, L.P. and its predecessor in interest Magellan Pipeline Company, L.P.

31. **"Regarding"** means concerning, pertaining to, or relating to in any way.

32. **"Relevant Period"** means the period from January 1, 2011 to present.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

You are requested to produce, within the time prescribed by Rule 196.2 of the Texas Rules of Civil Procedure and at any one of the offices of Plaintiff's attorneys as shown below, all non-identical copies of all of the following Documents within the possession, custody or control of "Enterprise" as defined above.

These requests seek responsive data existing in any electronic form, such as emails, text files, instant messages, word processing files, spreadsheet files (*e.g.*, Microsoft Excel), and database files. Plaintiff requests that all responsive electronic data be produced in its native format, including all associated metadata, if and to the extent reasonably available.

Unless otherwise noted in a particular request, these requests seek Documents which were created during the Relevant Period or contain information regarding the Relevant Period.

Unless otherwise noted in a particular request, these requests do not seek any inter-party Communications sent by, to, or between, any outside counsel for Plaintiff or Defendant.

Plaintiff has expended considerable effort to exceed the Rule 196.1(b) requirement that requested documents be described with "reasonable particularity." In fact, Plaintiff has sought to describe the requested documents with exceptional clarity and precision under the circumstances. This includes, in some instances, concrete examples of responsive information or other specifics about the intended meaning or scope of a particular request. Such examples or comments are provided to foster clear communication and understanding, to promote good faith cooperation, and to avoid strained interpretations or unwarranted objections which delay discovery and drive up costs.

REQUEST FOR PRODUCTION NO. 1.    Regarding the COD Agreement, the following Documents created or generated on or before October 31, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

REQUEST FOR PRODUCTION NO. 2.    Regarding the Joint Tariff Agreement, the following Documents created or generated on or before November 1, 2011: (a) all drafts of said

agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

REQUEST FOR PRODUCTION NO. 3. Regarding the Connection Agreement, the following Documents created or generated on or before December 16, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

REQUEST FOR PRODUCTION NO. 4. All Documents, whether created before or after the COD Agreement, identifying any business or commercial considerations which led Enterprise Crude Oil LLC to enter into the COD Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

REQUEST FOR PRODUCTION NO. 5. All Documents, whether created before or after the Joint Tariff Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

REQUEST FOR PRODUCTION NO. 6. All Documents, whether created before or after the Connection Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Connection Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

REQUEST FOR PRODUCTION NO. 7.    All Documents regarding authorization for Enterprise Crude Oil LLC to enter into the COD Agreement.

REQUEST FOR PRODUCTION NO. 8.    All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement.

REQUEST FOR PRODUCTION NO. 9.    All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Connection Agreement.

REQUEST FOR PRODUCTION NO. 10.    Regarding the marketing, transportation and/or delivery of Eagle Ford Product to ECHO Terminal, to Genoa Junction, or to any other Houston Area Destination(s), all Documents containing or reporting upon any Enterprise plans, proposals, goals, projections, budgets, estimates, statistics, or histories thereof. This request is not limited to Documents which focus exclusively on Eagle Ford Product as defined above; any Document containing information applicable in whole or part to Eagle Ford Product, is included. For example, this request includes memos, reports or analyses regarding the intended, expected or actual utilization of the Rancho pipeline system and/or the Rancho II pipeline system for such purposes.

REQUEST FOR PRODUCTION NO. 11.    All Documents which constitute, or reflect, Communications between Magellan and Enterprise, regarding (i) the construction of any New Magellan Facilities, (ii) the In-Service Date, (iii) the use or non-use of the Magellan Facilities by Enterprise following the In-Service Date, (iv) the disconnection of Enterprise facilities from Magellan facilities at Anahuac Junction, (v) the meaning, effect, or impact of the COD Agreement, the Joint Tariff Agreement or the Connection Agreement, and/or (vi) any dispute between Magellan and Enterprise arising from the COD Agreement, the Joint Tariff Agreement or the

Connection Agreement. For clarity, recordings and notes of any phone calls or meetings between Magellan and Enterprise, regarding any of the above matters, are included. However, this request is not intended to include inter-party Communications specifically regarding any Magellan Audit, as those are the subject of a separate request.

REQUEST FOR PRODUCTION NO. 12. All Documents which were authored by any Non-Lawyer Employee(s) of Enterprise, at any time during the Relevant Period, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Non-Lawyer Employee of Enterprise, about whether or how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

REQUEST FOR PRODUCTION NO. 13. All Documents which were authored by any Lawyer Employee of Enterprise, at any time prior to February 16, 2017, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Lawyer Employee of Enterprise, about whether or

{1718212;}                                  8

how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

REQUEST FOR PRODUCTION NO. 14. All other Documents which contain any reference (whether specific or general) to the COD Agreement or to any party's rights or obligations under the COD Agreement. For clarity, this request does not broadly request or require You to search for each and every Document that might arguably "relate" to the COD Agreement in some way. Rather, this request narrower: its object is to discover any Documents (not duplicative of Documents produced in response to one of the preceding requests) that contain an actual reference (in any form) to the COD Agreement or to a party's rights or obligations thereunder.

REQUEST FOR PRODUCTION NO. 15. All other Documents which contain any reference (whether specific or general) to the Joint Tariff Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

REQUEST FOR PRODUCTION NO. 16. All other Documents which contain any reference (whether specific or general) to the Connection Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

REQUEST FOR PRODUCTION NO. 17. All Eagle Ford Crude Oil Purchase Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar

agreements: Crude Oil Purchase Agreement between Enterprise and Petrohawk Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and GeoSouthern Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and Chesapeake Energy Corporation, dated April 28, 2011.

REQUEST FOR PRODUCTION NO. 18.    All Eagle Ford Crude Oil Sale Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned.

REQUEST FOR PRODUCTION NO. 19.    All Eagle Ford Crude Oil Buy/Sell Agreements, and all modifications, amendments or replacements of such agreements. This request includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether the agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar agreements: First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Chesapeake Energy Corporation, dated January 31, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Petrohawk Energy Corporation, dated June 29, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and GeoSouthern Energy Corporation, dated June 29, 2012.

REQUEST FOR PRODUCTION NO. 20. All Documents which discuss or mention the business or commercial motivation(s) that led Enterprise Crude Oil LLC to enter into any Eagle Ford Buy/Sell Agreement.

REQUEST FOR PRODUCTION NO. 21. All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Purchase Agreement, any Eagle Ford Crude Oil Sale Agreement, or any Eagle Ford Crude Oil Buy/Sell Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

REQUEST FOR PRODUCTION NO. 22. All Eagle Ford Crude Oil Transportation Agreements, including but not limited to any such agreements between or among Enterprise entities.

REQUEST FOR PRODUCTION NO. 23. All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Transportation Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

REQUEST FOR PRODUCTION NO. 24. All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution routing, and/or final

destination or delivery points. For clarity, this request seeks production of reports or analyses already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

REQUEST FOR PRODUCTION NO. 25. All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution routing, and/or final destination or delivery points. For clarity, this request seeks Documents sufficient to give Magellan the same assessment and reporting capability Enterprise has with respect to Eagle Ford Product.

REQUEST FOR PRODUCTION NO. 26. All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of Eagle Ford Product from any Origin Point to its final destination or delivery point, including by date, volume, shipper, transportation or distribution routing, and final destination or delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to Eagle Ford Product.

REQUEST FOR PRODUCTION NO. 27. All Documents showing any Enterprise tariffs, fees, charges or incentives for transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point.

REQUEST FOR PRODUCTION NO. 28. All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize actual transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point. For clarity, this request seeks production of reports or analyses

already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

REQUEST FOR PRODUCTION NO. 29.   All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point, including by date, volume, shipper, transportation or distribution routing, and/or final destination or delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to deliveries of crude oil from ECHO Terminal to any Destination Point or Future Destination Point.

REQUEST FOR PRODUCTION NO. 30.   All Documents which constitute, or reflect, Communications between any Non-Lawyer Employee(s) of Magellan and any Non-Lawyer Employee(s) of Enterprise, regarding any Magellan Audit.

REQUEST FOR PRODUCTION NO. 31.   All Documents which constitute, or reflect, Communications between Non-Lawyer Employees of Enterprise, regarding any Magellan Audit.

REQUEST FOR PRODUCTION NO. 32.   All Documents Enterprise provided to Magellan in connection with any Magellan Audit.

REQUEST FOR PRODUCTION NO. 33.   All Documents You do or may use or rely on to support the following affirmative defense alleged in ¶ 3 of Your Original Answer: "3. ECO is entitled to a credit or offset for any monies Plaintiff has received for the transport of crude that Plaintiff contends is subject to the Distribution Agreement, to the extent tariffs were paid by any third-party purchaser of such crude for transportation through the Magellan distribution system."

Plf Resp in Opp to Motion for Summary Judgment 228

SR300

This includes all Enterprise Documents purporting to show that Magellan received any such monies.

Dated July 21, 2017.

Respectfully submitted,

**GABLEGOTWALS**

By: /s/ David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,
Magellan Crude Oil Pipeline Company, L.P.**

Plf Resp in Opp to Motion for Summary Judgment 229

SR301

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on July 21, 2017, the foregoing document was served upon the following counsel of record by email, pursuant to Texas Rule of Civil Procedure 21a(a)(2):

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com

CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

**Attorneys for Defendant**

/s/ David L. Bryant
David L. Bryant

Exhibit 2-C
Plaintiff's Subpoena Duces Tecum to
Chesapeake Energy Corporation

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
                         )
          Plaintiff, )
                         )    Cause No. DC-17-07264
                         )
vs.                       )
                         )    In the District Court of Dallas County,
ENTERPRISE CRUDE OIL LLC, )   Texas, 101st Judicial District
a Texas limited liability company, )
                         )
                         )
          Defendant. )

## PLAINTIFF'S SUBPOENA DUCES TECUM

TO:    **Jim Webb**
        **EVP an General Counsel**
        **Chesapeake Energy Corporation**
        **6100 N. Western Ave.**
        **Oklahoma City, OK 73118**

GREETINGS:

On behalf of the above named Plaintiff, in the above referenced action pending in the District Court of Dallas County, Texas, 101st Judicial District, You are commanded to produce and permit inspection and copying of the documents described in the attached **Exhibit A**, at **9:30 a.m. on August 31, 2017**, at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, Oklahoma 73102-7101, attorneys for the above named Plaintiff.

In order to allow objections to the production of the documents and things to be filed, you should not produce them until the date specified in this subpoena, and if an objection is filed, until the court rules on the objection.

{1709266;}

This Subpoena is authorized and issued pursuant to 12 O.S. § 2004.1(A)(2)(b). Pursuant to Texas law, advance notice of service hereof has been provided to You and to the above named Defendant, as set forth on the attached **Exhibit B**.

Issued July 31, 2017.

Respectfully submitted,

**GABLEGOTWALS**

By:   /s/ David L. Bryant
David L. Bryant
OBA No. 1262
Texas Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
OBA No. 19239
Texas Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

**Attorneys for Plaintiff,
Magellan Crude Oil Pipeline Company, L.P.**

## CERTIFICATE OF SERVICE

I certify that on July 31, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

Plf Resp in Opp to Motion for Summary Judgment 234

SR306

## Definitions

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

    (a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

    (b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

    (i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    (ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

Plf Resp in Opp to Motion for Summary Judgment 235

SR307

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii) any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1. All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2. All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3. With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4. With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

   (a) For each sale by You: date, volume, product type, price, and point of sale.

   (b) For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5. With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

Plf Resp in Opp to Motion for Summary Judgment 236

SR308

Exhibit 2-D
Plaintiff's Subpoena Duces Tecum to
BHP Billiton Petroleum

# THE STATE OF TEXAS

## SUBPOENA DUCES TECUM

### PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176 AND 205

CAUSE NO. DC-17-07264 IN THE 101ST JUDICIAL DISTRICT COURT OF DALLAS COUNTY, TEXAS

MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., Plaintiff vs. ENTERPRISE CRUDE OIL LLC, Defendant

TO WITNESS: **Justin Stuhldreher**
**Associate General Counsel**
**BHP Billiton Petroleum**
**1360 Post Oak Blvd., Suite 150**
**Houston, TX 77056-3030**

THE ABOVE NAMED WITNESS IS HEREBY COMMANDED to produce, at **9:30 a.m. on August 31, 2017**, at the offices of the above named Plaintiff, 1111 Bagby Street, Suite 2330, Houston, TX 77002, the following books, papers, documents, or other tangible things:

**SEE EXHIBIT A, ATTACHED**

RULE 176.8(a) OF THE TEXAS RULES OF CIVIL PROCEDURE:

**(a) Contempt.** Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

ISSUED July 31, 2017, by the undersigned attorney, as an officer of the Court, on behalf of Plaintiff, Magellan Crude Oil Pipeline Company, L.P.

<div align="center">Respectfully submitted,</div>

<div align="center">GABLEGOTWALS</div>

By: /s/David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

Plf Resp in Opp to Motion for Summary Judgment 239

SR311

## SUBPOENA DUCES TECUM RETURN

This Subpoena Duces Tecum was served upon the above named Witness by U.S. certified mail, return receipt requested, addressed to its registered agent for service of process, _____, on _____, 2017, with Witness Fee of _____ pursuant to TEXAS CIVIL PRACTICE & REMEDIES CODE § 22.004.

By:_____

Person who is not a party to the suit, and is not less than 18 years of age.

OR

### ACCEPTANCE OF SERVICE BY WITNESS PER TEX.R.CIV.P. 176.5(b)(1)

I, the undersigned Custodian of Records of the Witness named in the Subpoena acknowledge receipt of a copy thereof, and hereby accept service of said Subpoena on behalf of said Witness.

_____

Printed Name:

DATE SIGNED: _____

## CERTIFICATE OF SERVICE

I certify that on July 31, 2017, the foregoing document was served upon the following

counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

Plf Resp in Opp to Motion for Summary Judgment 241

SR313

## Definitions

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

    (a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

    (b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

    (i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    (ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

Plf Resp in Opp to Motion for Summary Judgment 242

SR314

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii)     any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1.     All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2.     All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3.     With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4.     With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

    (a)     For each sale by You: date, volume, product type, price, and point of sale.

    (b)     For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5.     With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

Plf Resp in Opp to Motion for Summary Judgment 243

SR315

# Exhibit 2-E
## Plaintiff's Subpoena Duces Tecum to Devon Energy Corporation

SR316

# IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

MAGELLAN CRUDE OIL PIPELINE )
COMPANY, L.P., a Delaware limited partnership, )
)
           Plaintiff, )
)    Cause No. DC-17-07264
vs. )
)    In the District Court of Dallas County,
ENTERPRISE CRUDE OIL LLC, )    Texas, 101st Judicial District
a Texas limited liability company, )
)
)
)
          Defendant. )

## PLAINTIFF'S SUBPOENA DUCES TECUM

TO:   **Custodian of Records**
      **Devon Energy Corporation**
      **333 West Sheridan Avenue**
      **Oklahoma City, OK 73102-5015**

GREETINGS:

On behalf of the above named Plaintiff, in the above referenced action pending in the District Court of Dallas County, Texas, 101st Judicial District, You are commanded to produce and permit inspection and copying of the documents described in the attached **Exhibit A**, at **9:30 a.m. on August 31, 2017,** at the offices of GableGotwals, One Leadership Square, 15th Floor, 211 N. Robinson, Oklahoma City, Oklahoma 73102-7101, attorneys for the above named Plaintiff.

In order to allow objections to the production of the documents and things to be filed, you should not produce them until the date specified in this subpoena, and if an objection is filed, until the court rules on the objection.

{1709289;}

This Subpoena is authorized and issued pursuant to 12 O.S. § 2004.1(A)(2)(b). Pursuant to Texas law, advance notice of service hereof has been provided to You and to the above named Defendant, as set forth on the attached **Exhibit B**.

Issued July 31, 2017.

Respectfully submitted,

**GABLEGOTWALS**

By: /s/ David L. Bryant
David L. Bryant
OBA No. 1262
Texas Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
OBA No. 19239
Texas Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

**Attorneys for Plaintiff,**
**Magellan Crude Oil Pipeline Company, L.P.**

## CERTIFICATE OF SERVICE

I certify that on July 31, 2017, the foregoing document was served upon the following counsel of record via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

*Attorneys for Defendant*

/s/ David L. Bryant
David L. Bryant

## Definitions

For purposes of this Subpoena Duces Tecum, the following terms have the following meanings

**"Crude Oil Sales Agreement"** means an agreement providing for the sale to Enterprise of crude oil and/or condensate owned or controlled by You.

**"Crude Oil Buy/Sell Agreement"** means an agreement providing for Your sale of crude oil and/or condensate to Enterprise at one location, and Your purchase or repurchase from Enterprise of the same product or the same volume of product at another location.

**"Crude Oil Transportation Agreement"** means an agreement providing for transportation, on any Enterprise pipeline system, of crude oil and/or condensate You own or control.

**"Eagle Ford Product"** means crude oil and/or condensate which, at any time during the Relevant Period, You either:

    (a) sold to Enterprise, pursuant to any Crude Oil Sales Agreement or any Crude Oil Buy/Sell Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas); or

    (b) delivered to Enterprise for transportation, pursuant to any Crude Oil Transportation Agreement, at any of the following locations within the Eagle Ford Shale production area: Gardendale (LaSalle County, Texas), Lyssy (Wilson County, Texas), Marshall (Gonzales County, Texas), or Milton (Karnes County, Texas).

**"ECHO Terminal"** means the Enterprise-owned terminal facility by the same name, located in the Houston, Texas area.

**"Enterprise"** means Enterprise Crude Oil LLC and any and all of its affiliates, including without limitation Enterprise Crude Pipeline LLC, Enterprise Products Operating LLC, and Enterprise Products Partners L.P.

**"Document"** means and includes printed and electronically stored data and information, including writings, drawings, graphs, charts, photographs, sound recordings, images, spreadsheets, correspondence, emails, voicemails, text messages, and other data or data compilations stored in any medium from which information can be obtained.

**"Houston Area Destination"** means and includes:

    (i) any crude oil terminal or tank farm located in or near Houston, Texas, including without limitation: Enterprise ECHO Terminal; Magellan Galena Park Terminal; Seaway Galena Park Terminal; Seaway Texas City Terminal; Houston Fuel Oil Houston Terminal; Oil Tanking Houston Terminal; Pasadena Refining Red Bluff Tank Farm;

    (ii) any crude oil pipeline distribution system located in or near Houston, Texas, including any Enterprise pipeline extending between the Enterprise ECHO

Terminal and Genoa Junction, any facilities located at Genoa Junction, and any facilities located at Anahuac Junction; and

(iii)    any of the following refineries: Valero Houston Refinery; Valero Texas City Refinery; BP Texas City Refinery; Shell Deer Park Refinery; Marathon Texas City Refinery; Houston Refining LP Houston Refinery; Pasadena Refining Houston Refinery.

**"Magellan"** means Magellan Crude Oil Pipeline Company, L.P. and any and all of its affiliates.

**"Relevant Period"** means the period from January 1, 2011 to present.

**"You"** and **"Your"** mean and refer to the company to which this subpoena is directed and any and all of its affiliates and predecessors in interest.

## DOCUMENTS TO BE PRODUCED

1.    All drafts and all final signed versions of any Crude Oil Sales Agreement, Crude Oil Buy/Sell Agreement, or Crude Oil Transportation Agreement, between You and Enterprise, proposed or entered into during the Relevant Period, regarding Eagle Ford Product, and all amendments, supplements, assignments, terminations or cancellations thereof. For clarity, this request is not limited to contracts currently in effect but includes all contracts which were proposed or in effect at any time during the Relevant Period, whether or not any Eagle Ford Product was actually purchased, sold, exchanged, transported or delivered pursuant thereto.

2.    All correspondence (in any form, including email) between You and Enterprise, regarding (a) a proposal to enter any contract of a kind described in the preceding request No. 1, (b) the terms or conditions of any such contract, or (c) any amendment, supplement, assignment, termination or cancellation of any such contract.

3.    With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Sales Agreement, all Documents necessary to identify or determine the following for each such sale: date, volume, product type, price, and point of sale.

4.    With respect to Eagle Ford Product You sold to Enterprise during the Relevant Period, pursuant to a Crude Oil Buy/Sell Agreement, all Documents necessary to identify or determine the following:

(a)    For each sale by You: date, volume, product type, price, and point of sale.

(b)    For each purchase or repurchase by You: date, volume, product type, price, point of purchase or repurchase, final destination or delivery point, and transportation system(s) utilized for delivery to final destination. (For clarity, this request includes but is not limited to any such purchase or repurchase You made at ECHO Terminal, and any purchased or repurchased product You transported or caused to be transported from ECHO Terminal to any other Houston Area Destination.)

5.    With respect to Eagle Ford Product You delivered to Enterprise for transportation during the Relevant Period, all Documents necessary to identify or determine the following for each such delivery: date, volume, product type, point of delivery, transportation cost, and final destination.

Plf Resp in Opp to Motion for Summary Judgment 249

SR321

Exhibit 2-F
Motion for Protection and Stay Discovery
Pending Resolution of Defendant's Dispositive Motion
(exhibits have been omitted)

NO. DC-17-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § | |
| vs. | § § | 101st JUDICIAL DISTRICT |
| ENTERPRISE CRUDE OIL LLC, | § § | |
| *Defendant.* | § § | DALLAS COUNTY, TEXAS |

## MOTION FOR PROTECTION AND TO STAY DISCOVERY PENDING RESOLUTION OF DEFENDANT'S DISPOSITIVE MOTION

Defendant Enterprise Crude Oil LLC ("Enterprise") moves for an order protecting it against abusive and harassing discovery during the pendency of Enterprise's case-ending motion for summary judgment. This motion is brought pursuant to Rule 192.6 of the Texas Rules of Civil Procedure, and to give effect to Rule 1 which provides that the objective of the rules is to obtain a just, fair, equitable and impartial adjudication of the rights of the parties with as great expedition and dispatch and the **least expense** to the parties.

### I.    SUMMARY OF ARGUMENT

This Court should issue an Order staying discovery pending resolution of the threshold legal issues raised in Enterprise's Traditional Motion for Summary Judgment filed on August 4, 2017. Enterprise's summary judgment motion argues that the plain and unambiguous language of the parties' agreement precludes all of Magellan's claims a matter of law. Because the Court need not and indeed cannot consider any extraneous evidence in determining the threshold legal issue raised in Enterprise's motion for summary judgment, discovery at this juncture is unnecessary, premature and would only serve to increase the burden and expense of litigation.

Plf Resp in Opp to Motion for Summary Judgment 251

SR323

Not only is the discovery Magellan seeks from Enterprise and its customers unnecessary to resolve Enterprise's summary judgment motion, the requests are abusive in that they far exceed the scope of issues raised in the four corners of Magellan's Petition and Enterprise's Answer. Indeed, the sensitive business information Magellan seeks from both Enterprise in its Requests for Production and from Enterprise's customers in Magellan's third-party subpoenas show that Magellan's discovery requests are not meant to discover relevant facts, but rather to harass and impose undue burdens on Enterprise and its customers in an attempt to improve Magellan's bargaining position in the case. The Court should therefore enter an order protecting Enterprise from having to respond to Magellan's requests and quash the non-party subpoenas.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Enterprise and Magellan are parties to a Crude Oil Distribution Agreement[1] that provides as follows:

4.1    **Transportation Commitment.** Following the In-Service Date, Shipper agrees:

A.    to exclusively utilize the Magellan Facilities for all deliveries of Product that are Owned or Controlled by Shipper; and

B.    to use best efforts to cause Shipper's Affiliates to exclusively use the Magellan Facilities for all deliveries of Product that are Owned or Controlled by any of its Affiliates;

provided, that such deliveries are made from an Origin Point and are either:

(i) transported on the Eagle Ford Pipeline System through Echo Terminal to the Connection Point and delivered to any of the Destination Points, or

(ii) transported on the Eagle Ford Pipeline System to the Connection Point and delivered to any of the Destination Points.

---

[1] The Distribution Agreement is Exhibit A to Plaintiff's Original Petition.

Plf Resp in Opp to Motion for Summary Judgment 252

SR324

The Distribution Agreement defines each of the capitalized terms within Section 4.1 of the Distribution Agreement, including "Owned", "Controlled", "Origin Point", "Destination Point", and "Connection Point."

Applying the plain language of the Distribution Agreement, the transportation commitment applies only to crude oil volumes that do all of the following:

(a)    begin at an Origin Point;

(b)    flow through one of two Magellan-owned flanges located at Genoa Junction, which connect Magellan's pipeline facilities to either Enterprise's Eagle Ford pipeline facilities or to ECHO Terminal;

(c)    arrive at a Destination Point; and

(d)    have not been sold to an unaffiliated third-party at any time prior to reaching a Destination Point.

The Distribution Agreement imposes no restrictions on Enterprise's expansion of its crude oil storage and distribution system, nor does it prohibit the sale of crude to third parties at any point along the distribution system. Consistent with the plain language of the Distribution Agreement, Enterprise has spent hundreds of millions of dollars building its own crude oil distribution assets.

Beginning in 2015, Magellan commenced a series of audits seeking to force Enterprise to divulge its customer information and other data unnecessary to confirm payment of the agreed tariffs for crude meeting the criteria set out in the Distribution Agreement. Magellan's rights to audit under the Distribution Agreement are limited to documents necessary to determine whether barrels subject to the agreement have been treated properly. Thus, the only information Enterprise was required to provide Magellan was documentation sufficient to show the disposition of crude that came from an Origin Point up to the time when it ceased to be Owned or Controlled by Enterprise. As to any crude that Enterprise Owned or Controlled from Origin

Point to a Destination Point, and that also went through the Connection Point, Enterprise was required to demonstrate that the tariff was paid.[2]

Nevertheless, Magellan claimed that it was entitled to see data for all volumes coming from the Origin Points regardless whether the crude went through the Connection Point or whether the point of sale was a Destination Point as defined by the Distribution Agreement. As the audit progressed, it became apparent that although the Distribution Agreement specified precise criteria for what crude was subject to the Distribution Agreement, Magellan's position was that the criteria set out in Section 4.1 should be disregarded in favor of a supposed "intent" expressed nowhere within the four corners of the contract. To that end, Magellan demanded that Enterprise provide every contract or title transfer document for all product Enterprise owned at any Origin Point, and that Enterprise include all details about the transferee, the date and place of transfer, and volumes. Magellan then demanded that Enterprise identify all volumes shipped from any Origin Point on systems *other than* the Eagle Ford pipeline, as well as detailed explanations of *other systems* Enterprise used to transport crude, as well as the reasons those systems were used.[3]

The parties continued with the audit of years 2014 and 2015 for several months, and on June 6, 2017, Magellan commenced an audit for year 2016. By this time, Magellan had already instituted the dispute resolution procedure set out in the Distribution Agreement. Thereafter, on June 19, 2017, Magellan filed the instant lawsuit alleging breach of contract, reformation, declaratory judgment, promissory estoppel, and fraud.[4]

Enterprise maintains that the Distribution Agreement means only what the parties agreed it says: that crude starting at an Origin Point that goes through the Connection Point must travel

---

[2] *See* Def.'s Mot. for S. J., at 12 & Ex. 2-C (filed August 4, 2017).
[3] *Id.* at Ex. 2-C.
[4] *See generally*, Pl's Orig. Pet.

on Magellan pipelines if it is Owned or Controlled by Enterprise and going to a Destination Point. If, however, crude oil never gets to the Connection Point under Enterprise's ownership or control—whether because it is sold to a third party or is transported on a different pipeline—the Distribution Agreement's conditions are not met, and such transmissions are outside the agreement's scope.

Because the unambiguous language of the Distribution Agreement bars Magellan's claims as a matter of law, on August 4, 2017, Enterprise filed its motion for summary judgment The hearing on Enterprise's motion is set for August 29, 2017.

Nevertheless, Magellan seeks through discovery in this suit detailed information about the entirety of Enterprise's crude oil business in Eagle Ford and South Texas, without limitation to crude subject to the Distribution Agreement. It seeks communications and drafts of agreements between Enterprise and its customers, revealing Enterprise's negotiating strategies with respect to the same customers Magellan seeks. It seeks market analyses and data that would reveal Enterprise's entire business plans and strategies for these regions, and details about its operations outside the routes that are the subject of the Distribution Agreement. Its requests encompass attorney work-product and attorney-client communications, as well as parol evidence that the Court cannot consider in interpreting the unambiguous terms of the Distribution Agreement. And it seeks this information from both Enterprise and from non-parties with whom Enterprise is currently doing business.[5]

---

[5] Magellan's First Request for Production of Documents by Defendant Enterprise Crude Oil LLC is attached as **Exhibit A**. Magellan's third-party subpoenas are attached as **Exhibits B through D**.

# III. ARGUMENT

**A.     The Court Should Stay all Discovery Until it Resolves the Threshold Issue of Whether the Parties' Agreements Are Unambiguous.**

Because the resolution of a pending, threshold issue of contractual interpretation stands to dispose of the entire case and moot any need for factual discovery, the Court should enter an order staying all discovery until that threshold issue is resolved. Indeed, this case turns on a purely legal issue of contract interpretation and the discovery Magellan seeks is unnecessary to resolve this question. Trial courts have been given "broad discretion to schedule and define the scope of discovery," and should "limit discovery when 'the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.'" *Id.* (quoting Tex. R. Civ. P. 192.4(b)). Such discovery limitations are especially appropriate pending resolution of important threshold issues that may moot the need for further discovery, such as jurisdictional issues, *id.*; or issues of contract interpretation, *see, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

In *CBI Industries*, the Texas Supreme Court affirmed a trial court's judgment awarding summary judgment to the defendant-insurers on the plaintiff's declaratory judgment and breach of contract claims, even though the trial court granted the motion before allowing the plaintiff any discovery. *Id.* at 520–21. The plaintiff in *CBI Industries* sued various insurance companies for declaratory relief and breach of contract after the insurers denied plaintiff coverage for claims arising out of a toxic spill. *Id.* at 519. Before plaintiff had conducted any discovery, the insurers moved for summary judgment against the plaintiff's claims, arguing that they were entitled to judgment as a matter of law because an unambiguous policy exclusion exempted plaintiff's

---

DEF.'S MOT. FOR PROTECTIVE ORDER AND TO STAY DISCOVERY                                    PAGE 6

Plf Resp in Opp to Motion for Summary Judgment 256

SR328

insurance claims from coverage. *Id.* The trial court agreed and granted the insurers' motion. *Id.* On appeal, the court of appeals reversed the trial court's judgment because, in the court of appeals' view, the trial court could not decide the insurers' summary judgment motion without first giving the plaintiff "'sufficient time to make reasonable attempts to discover evidence on the issue of applying the contract to the subject matter with which it deals, and thereby raise a fact issue on latent ambiguity.'" *Id.* at 520 (quoting *CBI Indus.*, 860 S.W.2d 662, 666 (Tex. App.— Houston [1st Dist.] 1993)). The Texas Supreme Court disagreed with the court of appeals' reasoning, however, and reversed its decision. *Id.* at 520–21.

The Texas Supreme Court examined the language of the insurance agreement at issue and agreed with the trial court that such language unambiguously excluded the plaintiff's insurance claims from coverage. *Id.* The Court therefore held that there were no factual issues meriting discovery, and that the court of appeals erred in requiring the trial court to give the plaintiff a chance to obtain discovery from the insurers in the hopes of manufacturing contractual ambiguity with inadmissible parol evidence. *Id.* at 522; *see also In re Am. Home Assur. Co.*, 88 S.W.3d 370, 376–77 (Tex. App.—Texarkana 2002, no pet.) (holding that, on remand, the trial court should not permit plaintiff to obtain discovery of either the insurers' deliberations in drafting plaintiffs' insurance policy, or the insurers' communications with state insurance regulators regarding the policy, without first deciding whether the contract was ambiguous and therefore susceptible to the use of such parol evidence).

Like the defendants in *CBI Industries*, Enterprise has argued in its summary judgment motion that the plain and unambiguous language of the parties' agreements precludes Magellan from obtaining any of the relief it seeks.[6] If Enterprise's arguments are correct (and they are), then, as in *CBI Industries*, there are no factual issues meriting discovery, and therefore no reason

---

[6] Def.'s Mot. for S. J. at 14-31.

either to give Magellan a chance to manufacture an ambiguity based on inadmissible parol evidence through discovery, or to impose upon Enterprise the heavy burden of responding to Magellan's very broad discovery requests. The Court should therefore enter an order protecting Enterprise from the burden of having to respond to Magellan's discovery requests until the Court decides this threshold issue.

**B.      The Court Should Protect Enterprise from Magellan's Requests Seeking Inadmissible Parol Evidence Because the Information Sought is Not Relevant.**

Several of Magellan's requests seek parol evidence that has no legitimate bearing on the parties' dispute in light of the legal arguments raised in Enterprise's summary judgment motion. Discovery requests that seek production of patently irrelevant information are overbroad because such requests "impose[] a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." *In re CSX Corp.*, 124 S.W.3d 149, 153 (Tex. 2003). Moreover, because overbroad requests for irrelevant information are improper whether they are burdensome or not, a responding party is not required to detail what burdens such requests might encompass. *In re Allstate County Mut. Ins. Co.*, 227 S.W.3d 667, 670 (Tex. 2007). Nor is a responding party required to assert claims of privilege in response to overbroad discovery requests; assertions of privilege are required only after a party has served *proper* discovery requests and overbroad requests are *improper* by definition. *See Texaco, Inc. v. Sanderson*, 898 S.W.2d 813, 815 (Tex. 1995).

Parol evidence is inadmissible to alter the meaning of an unambiguous contract. Texas law prohibits "fishing expeditions" like those attempted by Magellan in the absence of a finding by the court that a contract is ambiguous. *CBI Industries, Inc.*, 907 S.W.2d at 520, 522 (Tex. 1995) (awarding summary judgment prior to any discovery because insurance contract was not ambiguous). Where, as here, a contract is ambiguous, discovery into prior drafts and other parol

---

evidence is improper. *See Tenneco Inc. v. Enter. Prod. Co.*, 925 S.W.2d 640, 647 (Tex. 1996) (holding trial court acted properly in denying additional discovery regarding unambiguous contract and granting summary judgment); *Executive Risk Indemnity, Inc. v. Integral Equity, L.P.*, No. 3:03-CV-0269, 2004 WL 438936, at *9 (N.D. Tex. March 10, 2004) (Appendix ("App.") at 12) (denying discovery into interpretation of "Related Claims" provision in insurance policy, because provision not ambiguous).

Despite these well-settled principles, Magellan has requested prior drafts, communications between itself and Enterprise, and Enterprise's internal communications leading up to three contracts between the parties.[7] Similarly, it seeks "all documents" that "contain an actual reference (in any form)" to the three contracts,[8] as well as "all documents" identifying "business or commercial considerations" contributing to Enterprise's interest in the three contracts and "any similar agreement."[9] It also requests Enterprise's internal evaluations of the Distribution Agreement's meaning (including by Enterprise's attorneys).[10] Because all of the information Magellan seeks in these requests constitute parole evidence which the Court may not consider in interpreting an unambiguous contract, it is patently irrelevant. The Court should not permit such discovery unless and until the Court has determined that the parties' agreement is ambiguous and requires extraneous evidence to determine its meaning and the parties' intent.

C.     The Court Should Protect Enterprise from Magellan's Blatant Attempt to Invade Enterprise's Trade Secrets in Order to Gain a Competitive Advantage

Courts are expressly empowered to issue protective orders to "'protect the [replying party] from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights.'" *In re Alford Chevrolet-Geo*, 997 S.W.2d at 180. A

---

[7] **Exhibit A** (Magellan RFP Nos. 1-3).
[8] *Id.*, Nos. 14-16.
[9] *Id.*, Nos. 4-6.
[10] *Id.*, Nos. 12-13.

9

Plf Resp in Opp to Motion for Summary Judgment 259

SR331

protective order is particularly appropriate here, where the requests are overly broad and invasive of Enterprise's proprietary business information and trade secrets. *See id.* at 181 (quoting Tex. R. Civ. P. 192.6(b)).

The vast majority of Magellan's requests seek information about Enterprise's business operations and strategies in the Gulf Coast region. This information constitutes trade secrets belonging to Enterprise. For example, the requests seek information about transportation and distribution of crude oil to any "Future Destination Point" – facilities it is undisputed that Magellan *never* constructed.[11] In their totality, the requests would require Enterprise to disclose its entire distribution network and pricing structure,[12] and lay open all of its customer arrangements in the region.[13]

The particulars of Enterprise's business plans and strategies, the terms of its contracts, and the routing of product through its distribution system are not known outside the business, except for the individual participants in a transaction. No one outside of Enterprise has a 360-degree view of the company's operations, which is what Magellan seeks here. Enterprise does not even make such information generally available to its employees. Only Enterprise's senior executives and the individuals within Enterprise participating in the transaction have access to customer contract terms, which also include confidentiality provisions. Only senior executives and the crude marketing group at Enterprise are privy to the company's business plans, and only executives charged with developing strategy and those employees executing them have access to such comprehensive information about the operations of Enterprise's crude oil business in this

---

[11] *E.g.,* **Exhibit A** (RFP Nos. 28-29).

[12] *Id.,* No. 10 (seeking "plans, proposals, goals, projections, budgets, estimates, statistics or histories" of marketing, transportation or delivery of crude); 24 (seeking "all existing Enterprise reports or analyses" relating to Eagle Ford crude, regardless of destination point), 25-26 (seeking information providing Magellan with same assessment and tracing capabilities as Enterprise maintains for its own internal use); 17-23 (documents relating to contracts between Enterprise and its customers, including Enterprise's own negotiating strategies; 27 (charges for crude transported out of ECHO terminal).

[13] *Id.,* Nos. 17-23, 27.

Plf Resp in Opp to Motion for Summary Judgment 260

SR332

region. Enterprise has invested substantial man-hours and capital in developing its contractual relations and operational systems, knowledge of which would give a competitor as substantial advantage in the Eagle Ford market. For this reason, Enterprise secures its information by maintaining tight security and visitor controls in its buildings, password protecting its computer system, including confidentiality clauses in its contracts, conditioning any joint venture on a nondisclosure agreement, and sharing information internally on a need-to-know basis. Enterprise's competitors are not able to recreate this information from public sources. *See In re Union Pac. R.R.*, 294 S.W.3d 589, 592 (Tex.2009) (orig. proceeding) (per curiam) (citing *In re Bass*, 113 S.W.3d 735, 739 (Tex.2003) (orig. proceeding)).

Because the information sought are trade secrets of Enterprise, Magellan bears the burden of establishing that the information is necessary for a fair adjudication of its claims. *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730, 732–34 (Tex. 2003) (orig. proceeding); *In re Cont'l Gen. Tire*, 979 S.W.2d 609, 610, 613 (Tex. 1998). General assertions of unfairness or relevance are insufficient to demonstrate necessity. *See In re Union Pac. R.R.*, 294 S.W.3d at 592–93; *In re Bridgestone/Firestone*, 106 S.W.3d at 732–33 (unfairness); *In re Cont'l Gen. Tire*, 979 S.W.2d at 613–14 (relevance). The requesting party "must demonstrate with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *In re Goodyear Tire & Rubber*, 392 S.W.3d 687, 696 (Tex. App.—Dallas 2010, orig. proceeding) (quoting *In re Bridgestone/Firestone*, 106 S.W.3d at 732–33). A trial court abuses its discretion if it orders disclosure of trade secrets when the requesting party has not carried its burden to show the information is necessary for a fair adjudication of its claim. *In re Bridgestone/Firestone*, 106 S.W.3d at 734; *In re Cont'l Gen. Tire*, 979 S.W.2d at 615.

None of the information sought by Magellan is necessary to the resolution of this case, and its disclosure would invade the property rights of Enterprise over its trade secrets. "Intrusive discovery measures . . . require, at a minimum, that the benefits of the discovery measure outweigh the burden imposed upon the discovered party." *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322 (Tex. 2009) (orig. proceeding); *In re CSX Corp.*, 124 S.W.3d at 153 (holding relator lacked adequate remedy by appeal where discovery order compelled production of "patently irrelevant" documents); *Tilton v. Marshall*, 925 S.W.2d 672, 683 (Tex. 1996) (orig. proceeding) (mandamus relief may be justified when burden on producing party is far out of proportion to any benefit to requesting party). Enterprise should not be required to lay open its entire operations and strategies within the Eagle Ford region in response to Magellan's fishing expedition.

**D.     The Court Should Protect Enterprise from Magellan's Subpoenas to Enterprise Customers Containing Unduly Burdensome and Duplicative Requests.**

While the discovery rules are intended to make litigation fair, the pragmatic reality is that discovery is often used as "a weapon capable of imposing large and unjustifiable costs on one's adversary." *In re Alford Chevrolet-Geo*, 997 S.W.2d 173, 180 (Tex. 1999) (internal quotation marks omitted). Indeed, "[b]ecause costs of compliance [with a requesting party's discovery requests] are usually borne solely by the replying party, a requesting party improves its bargaining position by maximizing those costs." *Id.* Thus it is often the case that "[l]itigants with weak cases . . . heap costs on the adverse party," in the hopes that "these higher costs lead[] the other side to settle on favorable terms." *Id.* (internal quotation marks omitted).

Consistent with its efforts to increase litigation costs and thus its bargaining position, Magellan served substantively identical subpoenas on three of Enterprise's customers.[14] The

---

[14] *See generally* **Exhibits B-D**.

Plf Resp in Opp to Motion for Summary Judgment 262

SR334

subpoenas seek all drafts and correspondence relating to agreements with Enterprise involving Eagle Ford crude; granular information about volumes and sales under those agreements; and negotiations leading up to those agreements—the same irrelevant, improper, and trade secret information Magellan has sought from Enterprise. For all the reasons stated above, a protective order is warranted.

Protection is additionally warranted as to the subpoenas because Enterprise's customers are strangers to this litigation. A party causing a subpoena to be served is required to take reasonable steps to avoid imposing undue burden or expense on the entity served. TEX. R. CIV. P. 176.7. The Texas rule, like its federal counterpart, "afford[s] nonparties special protection against the time and expense of complying with subpoenas." *Exxon Shipping Co. v. U.S. Dept. of Interior*, 34 F.3d 774, 780 (9th Cir. 1994). Indeed, the Texas rules require subpoenas to be curtailed if the discovery sought is: (i) unreasonably cumulative or duplicative; (ii) obtainable from some other source that is more convenient, less burdensome, or less expensive; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit. *See* TEX. R. CIV. P. 192.4. "[T]he word 'should' in Rule 192.4 is a directive to the trial court to limit discovery when either subsection is satisfied." *See In re Arras*, 24 S.W.3d 862, 864 (Tex. App.--El Paso 2000, orig. proceeding). Magellan's third-party subpoenas suffer from at least three of the infirmities listed in Rule 192.4.

What is more, the requests are duplicative and seek information obtainable from another source – i.e., Enterprise. A responding party is entitled to a protective order if a party's discovery requests require "the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." *Walker v. Packer*, 827

Plf Resp in Opp to Motion for Summary Judgment 263

SR335

S.W.2d 833, 843 (Tex. 1992). Instead of first attempting to obtain the information from Enterprise, Magellan's served subpoenas containing identical request for production to Enterprise's non-party customers. The fact that Magellan seeks the very same information from Enterprise as it does from these non-parties demonstrates that the information may be obtained from a less burdensome source. Accordingly, the Court should issue an order quashing the non-party subpoenas until Enterprise has been given a full opportunity to object and respond to the same requests for production, which in any event should be after the Court has resolved Enterprise's pending motion for summary judgment.

## IV.    CONCLUSION

Because the Court need not consider any extraneous evidence apart from the parties' unambiguous agreement in resolving this dispute, all discovery should be stayed until the Court has resolved the threshold issue raised in Enterprise's Motion for Summary Judgment. Moreover, despite the requirements that discovery requests be reasonably tailored to include only relevant matters and not used to fish for information, Magellan served facially overbroad and otherwise improper discovery requests on Enterprise and its customers that seek far more information than is relevant and fits the needs of this case. The Court should therefore enter a protective order absolving Enterprise of its burden to respond to Magellan's improper requests, and quash the non-party subpoenas.

SR336

Date:  August 10, 2017                        Respectfully submitted,

/s/ *Courtney Barksdale Perez*
E. Leon Carter
Texas Bar No. 03914300
lcarter@carterscholer.com
J. Robert Arnett II
Texas Bar No. 01332900
barnett@carterscholer.com
Joshua J. Bennett
Texas Bar No. 24059444
jbennett@carterscholer.com
Courtney Barksdale Perez
Texas Bar No. 24061135
cperez@carterscholer.com
**CARTER SCHOLER PLLC**
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206
Telephone: 214-550-8188
Facsimile:  214-550-8185

**ATTORNEYS FOR DEFENDANT
ENTERPRISE CRUDE OIL LLC**

## CERTIFICATE OF CONFERENCE

I certify that on August 7, 2017, counsel for defendants conferred telephonically with David Bryant, counsel for plaintiff, regarding the relief sought in this motion.  No agreement on the relief sought could be reached.

/s/ *E. Leon Carter*

Plf Resp in Opp to Motion for Summary Judgment 265

SR337

## CERTIFICATE OF SERVICE

This is to certify that on August 10, 2017, a true, correct and complete copy of the foregoing document has been served on all counsel of record electronically via a court-approved electronic filing system, in accordance with Rule 21a of the Texas Rules of Civil Procedure.

*/s/  Courtney Barksdale Perez*

# Exhibit G
## 08/11/2017 Rule 11 Agreement

SR339



David L. Bryant
*dbryant@gablelaw.com*

113 Pleasant Valley Dr.
Suite 204
Boerne, Texas 78006
Telephone (830) 336-4810
*www.gablelaw.com*

August 11, 2017

E. Leon Carter
CARTER SCHOLER
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

> Re:  *Magellan Crude Oil Pipeline Company, L.P. v. Enterprise Crude Oil LLC,*
> Cause No. DC-17-07264, 101st District Court, Dallas County, Texas

Dear Leon:

Pursuant to Rule 11 of the Texas Rules of Civil Procedure, this letter sets out an agreement between the above-referenced Plaintiff and Defendant, and their respective attorneys, regarding Defendant's Motion for Protection and to Stay Discovery Pending Resolution of Defendant's Dispositive Motion (the "Stay Motion"), filed on August 10, 2017.

Specifically, it is agreed that: (i) Defendant will have the Stay Motion set for hearing on September 25, 2017, at the same time as the hearing on Defendant's motion for summary judgment; and (ii) without prejudice to any argument of any party in connection with the motion for summary judgment and/or the Stay Motion, from this date until September 26, 2017 Plaintiff will not initiate any new discovery and will suspend and hold in abeyance any obligation of Defendant or any non-party to respond to Plaintiff's pending requests or subpoenas seeking discovery from Defendant or from non-parties. Plaintiff will advise subpoenaed non-parties of this agreement.

If this agreement is satisfactory, please sign and return the same to our office.

Sincerely yours,

David L. Bryant
Attorneys for Plaintiff

AGREED:

E. Leon Carter
CARTER SCHOLER
Attorneys for Defendant

{1726078;2}

Plf Resp in Opp to Motion for Summary Judgment 268

SR340

## CAUSE NO. DC-17-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., a Delaware limited partnership, | ) ) ) | |
| Plaintiff, | ) ) | IN THE DISTRICT COURT OF |
| vs. | ) ) | DALLAS COUNTY, TEXAS |
| ENTERPRISE CRUDE OIL LLC, a Texas limited liability company, | ) ) ) | 101st JUDICIAL DISTRICT |
| Defendant. | ) ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PROTECTION AND TO STAY DISCOVERY PENDING RESOLUTION OF DEFENDANT'S DISPOSITIVE MOTION

Defendant Enterprise Crude Oil LLC ("Enterprise") filed the above-referenced motion ("Stay Motion") on August 10, 2017, on the heels of filing its no-evidence Motion for Summary Judgment ("Motion for Summary Judgment") on August 4, 2017. That Motion for Summary Judgment, and the Stay Motion, are set for hearing on September 25, 2017. In the Stay Motion, Enterprise asks the Court to stay Enterprise's response to the document production requests Plaintiff ("Magellan") served on July 21, 2017[1] and to quash document subpoenas Magellan issued to three non-parties on July 31, 2017,[2] pending the outcome of the hearing on the Motion for Summary Judgment. Enterprise's main argument is that the Motion for Summary Judgment is a "case-ending" motion, and thus that Magellan's discovery requests are "premature," unnecessary, and burdensome. Stay Motion at 1. **Enterprise has everything backwards.** What is *premature* is the Enterprise no-evidence Motion for Summary Judgment, filed less than two months after Magellan sued and before it has had any discovery whatsoever. Both the Motion for Summary Judgment and the Stay Motion should be denied.

---

[1] *See* Ex. A to Stay Motion.

[2] *See* Exs. B-D to Stay Motion.

## SUMMARY OF ARGUMENT

The Stay Motion should be denied, first and foremost, because Enterprise's no-evidence Motion for Summary Judgment is *not* "case-ending" at all. In fact, it is premature and improper under Rule 166a(i) of the Texas Rules of Civil Procedure, and is otherwise unfounded for all the reasons explained in Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, which Magellan hereby adopts and incorporates in opposition to the Stay Motion. Further, the Stay Motion is meritless for other reasons, and Enterprise has not met its burden to show entitlement to the relief it requests. Indeed, Enterprise does not attempt to show that *any* particular discovery request by Magellan is improper, and relies on little more than unsupported incantations that Magellan's requests are "overbroad," "unduly burdensome," or invasive of Enterprise's "trade secret" information. Stay Motion at 8-12. In truth, Magellan's document production requests to Enterprise and the subpoenaed non-parties seek information that is (i) well within the scope of permissible discovery under Rule 192.3(a) of the Texas Rules of Civil Procedure, (ii) neither overly broad nor unduly burdensome, and (iii) not subject to any legitimate "trade secret" objection by Enterprise.

By virtue of the parties' Rule 11 agreement regarding the Stay Motion, expressly made "without prejudice to any argument of any party in connection with the motion for summary judgment and/or the Stay Motion,"[3] Enterprise obtained a blanket stay of all discovery pending the September 25, 2017 hearing on its Motion for Summary Judgment. If and to the extent Enterprise may have any colorable objection to any particular discovery request, or any legitimate concern over discovery of proprietary business information, such issues should be (and routinely area) resolved by conference between the parties and, if necessary, entry of a

---

[3] Ex. A, attached hereto.

suitable confidentiality agreement or order—not by a motion for a blanket stay of all discovery while Enterprise simultaneously urges the Court to grant a "case-ending" summary judgment motion based on its assertion that Magellan has "no evidence" to support its claims. Both the Motion for Summary Judgment and the Stay Motion should be denied, and discovery should proceed.

## ARGUMENT AND AUTHORITIES

### I.   ENTERPRISE HAS THE BURDEN OF PROOF ON ITS STAY MOTION

Enterprise's attempt to shift the burden of proof to Magellan is unavailing. As the party seeking a protective order under Rule 192.6, Enterprise bears the burden of proof. *See, e.g., Estate of Pollack v. McMurrey*, 858 S.W.2d 388, 392 (Tex. 1993) ("[A]s the party seeking protection from discovery, the Estate bears the burden of proof."). Specifically, "[a] party seeking a protective order must show particular, specific and demonstrable injury by facts sufficient to justify a protective order." *In re Collins*, 286 S.W.3d 911, 919 (Tex. 2009) (internal quotation and citation omitted). "So long as the discovery sought is *within the scope of Rule 166b [now Rule 192.3(a)]*, a trial court may not grant a protective order limiting discovery unless the party seeking such protection has met this burden." *Masinga v. Whittington*, 792 S.W.2d 940, 940–41 (Tex. 1990) (emphasis added); *accord, Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 466 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Furthermore, to meet its burden Enterprise "*may not simply make conclusory allegations* that the requested discovery is unduly burdensome or unnecessarily harassing" but "*must produce some evidence* supporting its request for a protective order when sought on that basis." *Blankinship v. Brown*, 399 S.W.3d 303, 312 (Tex. App.—Dallas 2013, pet. denied) (citations omitted, emphasis added)). Enterprise has not met those burdens of proof.

SR343

## II. MAGELLAN'S DISCOVERY REQUESTS ARE WELL WITHIN THE SCOPE OF RULE 192.3, AND NEITHER OVERBROAD NOR UNDULY BURDENSOME

Rule 192.3, Scope of Discovery, provides in pertinent part as follows:

> (a) **Generally.** In general, a party may obtain discovery regarding any matter that is not privileged and is *relevant to the subject matter* of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party. It is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

> (b) **Documents and tangible things.** A party may obtain discovery of the existence, description, nature, custody, condition, location, and contents of documents and tangible things (including papers, books, accounts, drawings, graphs, charts, photographs, electronic or videotape recordings, data, and data compilations) that constitute or contain matters *relevant to the subject matter* of the action. A person is required to produce a document or tangible thing that is within the person's possession, custody, or control.

*Id.* (bold italics added).

Magellan's discovery requests to date seek documents clearly relevant to *the subject matter* of the action—the relationships and dealings between Magellan and Enterprise arising from their Crude Oil Distribution Agreement dated October 31, 2011 ("COD Agreement").[4] And although that alone makes the requests permissible under Rule 192.3, the requests also seek information which is *directly relevant to the specific claims* alleged in Magellan's Original Petition, including its claims for breach of contract and fraud, and its alternative claims for reformation of contract and promissory estoppel.

First, Magellan's requests to Enterprise seek documents relevant to Enterprise' *liability* to Magellan, including documents showing: the circumstances surrounding the COD Agreement, such as the business reasons why Enterprise entered into the COD Agreement; the

---

[4] *See* Ex. B, attached hereto.

SR344

representations and promises Enterprise made to Magellan in connection with the COD Agreement; the Enterprise contract negotiators' understandings and intentions regarding the Enterprise transportation commitment made to Magellan in the COD Agreement (the commitment to "exclusively utilize" the Magellan Facilities[5]); whether the COD Agreement, as written, resulted from a mutual mistake in reducing the parties' actual agreement to writing; the communications between Enterprise and its Eagle Ford crude oil customers revealing which party initiated the replacement of Enterprise's purchase agreements with buy-sell agreements and why; all the ways and means Enterprise has used to bypass Magellan; and whether Enterprise had an intent not to perform when it entered into the COD Agreement or otherwise intentionally misled Magellan.

Second, Magellan's requests seek Enterprise business records necessary determine and quantify the extent of Enterprise's breach of the COD Agreement and thus the *damages* Magellan has suffered to date. Magellan's requests are no broader than is reasonably required to do that—to identify, determine, and quantify the Eagle Ford crude oil volumes that Enterprise should have shipped through Magellan's facilities but did not.

Through its subpoenas to the three non-party Enterprise customers currently known to Magellan—the customers for which, *after* entering into the COD Agreement with Magellan, Enterprise replaced pre-existing crude oil purchase-only (marketing) agreements with buy-sell agreements designed to circumvent Enterprise's transportation commitment to Magellan— Magellan seeks to discover the non-parties' documents relating to Enterprise's liability and Magellan's damages, including: copies of their original Eagle Ford crude oil marketing agreements with Enterprise, the replacement buy-sell agreements with Enterprise, or similar

---

[5] Ex. B at 6, Section 4.1.

SR345

agreements with Enterprise or its affiliates, relating *only to* Eagle Ford crude oil and to the time period relevant to the case; correspondence between the non-party and Enterprise regarding such agreements; and documents reasonably necessary to determine and quantify the volumes of Eagle Ford crude oil Enterprise should have transported through the Magellan Facilities to relevant Houston-area destinations, but did not.

None of Magellan's document production requests are "overbroad" or "unduly burdensome," as Enterprise blithely suggests without any specifics or any support. Stay Motion at 8-12. Indeed, Enterprise's entire argument about overbreadth and burden is premised on the very same assertion made in its Motion for Summary Judgment, that the COD Agreement allows Enterprise to deliberately circumvent its commitment to make exclusive use of the Magellan Facilities, and thus that Magellan has no right to discover the particulars about Enterprise's circumvention schemes or the extent of the resulting damages to Magellan. That is clearly wrong, for all the reasons explained in Magellan's response in opposition to the Motion for Summary Judgment.

Neither are Magellan's discovery requests improperly duplicative, as Enterprise says. Stay Motion at 13. While the non-parties may have *some* responsive documents identical to responsive documents in Enterprise's possession, that is far from a certainty, especially since some requested documents date back a number of years, and since Enterprise has previously represented to Magellan (in connection with Magellan's audits) that Enterprise no longer has certain important documents such as all of the original Eagle Ford marketing agreements with the non-parties currently known to Magellan. Moreover, no case cited by Enterprise supports the proposition that a subpoena to non-party is subject to being quashed merely because there is a

SR346

possibility that the non-party may possess *some* documents which duplicate those that a party itself possesses and *may eventually* produce in the action.

Finally, but importantly, Enterprise's argument that some of Magellan's requests seek inadmissible "parol evidence" is completely misguided. Stay Motion at 8. In the first place, Enterprise's argument that any "parol evidence" will be *inadmissible* at trial is incorrect, as shown by the authorities cited in Magellan's Response in Opposition to Defendant's Motion for Summary Judgment, at pages 22 and 45-46. Secondly, for discovery purposes the test is not whether the information will be admissible at trial but whether it is relevant to the *subject matter* of the action. *See* Rule 192.3(a) and (b) ("It is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.). In this regard, Enterprise's heavy reliance on *Nat'l Union Fire Ins. Co. v. CBI Industries*, 907 S.W.2d 517 (Tex. 1995) is misplaced. In that case, which involved only a claim for breach of contract, the court held that no further discovery of parol evidence was appropriate because the insurance contract provision at issue *was*

SR347

unambiguous as a matter of law. *Id.* at 521 (Tex. 1995). *CBI Industries* is readily distinguishable and inapplicable here, for several reasons. [6]

## III. ENTERPRISE HAS NO LEGITIMATE "TRADE SECRETS" OBJECTION TO ANY OF MAGELLAN'S DISCOVERY REQUESTS

Enterprise also argues that a protective order is warranted on the ground that "[t]he vast majority of Magellan's requests seek information about Enterprise's business operations and strategies in the Gulf coast region" and that "[t]his information constitutes trade secrets belonging to Enterprise." Stay Motion at 10. That, too, is completely false and unsupported.

Without pointing the Court to any particular requests made by Magellan, Enterprise offers only a sweeping conclusion that "[i]n their totality, the requests would require Enterprise to disclose its entire distribution network and pricing structure, and lay open all of its customer arrangements in the region." Stay Motion at 10. That is sheer nonsense. Any close examination of Magellan's actual requests shows that they are *carefully tailored* and *reasonably confined* to information plainly relevant to the subject matter of the action, the specific claims alleged, and/or

---

[6] **First**, the language of the COD Agreement does not unambiguously favor Enterprise's position. **Second**, unlike *CBI Industries*, Magellan's discovery requests seek evidence concerning the circumstances surrounding the parties' negotiation and entry into the COD Agreement—evidence the Court can and should consider in construing the COD Agreement, notwithstanding the parol evidence rule. *See First Bank v. Brumitt*, No. 15-0844, 2017 WL 1968830, at *10 (Tex. May 12, 2017); *Banker v. Breaux*, 128 S.W.2d 23, 24 (Tex. 1939) (contracting parties' intention must be ascertained from their agreement "in the light of the attending circumstances"); *Basic Capital Management v. Dynex Commercial*, 348 S.W.3d 894, 899 (Tex. 2011) (for contract interpretation, a court may consider "the undisputed evidence regarding [the contract's] negotiation and purpose"); *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981) (even when a court concludes that the parties' contract is unambiguous, it may consider the surrounding "facts and circumstances" as an "aid in the construction of the contract's language"). **Third**, in *CBI Industries* the surrounding circumstance were fully developed, whereas here (due to the Stay Motion) they are not. *See Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 664 (Tex. 2009) (noting that discovery was unnecessary in *CBI Industries* because "the facts in [that case] were sufficiently developed and all the relevant information was at hand"). **Fourth**, unlike the plaintiff in *CBI Industries*, Magellan also alleges claims for contract reformation, promissory estoppel, and fraud. For purposes of those claims, parol evidence is relevant and admissible regardless of any ambiguity in the written contract. *See, e.g., ISG State Operations, Inc. v. Nat'l Heritage Ins. Co.*, 234 S.W.3d 711, 719–20 (Tex. App.—Eastland 2007, pet. denied); *Probado Techs. Corp. v. Smartnet, Inc.*, No. CIV.A. C-09-349, 2010 WL 2232831, at *6 (S.D. Tex. June 2, 2010).

{1741854;}

information reasonably necessary to determine and quantify the damages Magellan has suffered as a result of Enterprise's wrongful crude oil transportation schemes designed to avoid Enterprise's legal obligation to "exclusively utilize" the Magellan Facilities in accordance with the COD Agreement.[7] Here, too, Enterprise's argument hinges on its assertion that such information is not discoverable because the COD Agreement permits Enterprise to engage in such schemes, with impunity. Again, that is wrong, for all the reasons explained in Magellan's response to the Motion for Summary Judgment.

Furthermore, to the extent any of the documents sought by Magellan may reveal information Enterprise deems "proprietary" or "trade secret," that is only because Enterprise entered into a contractual commitment which inevitably involves such information.[8] In Section 4.4 of the COD Agreement, Enterprise expressly granted Magellan the right to "audit Shipper's [Enterprise's] records necessary *to verify Shipper's compliance*" with its contractual obligations as set forth in Sections 4.1 and 4.2 of the contract.[9] Therefore, Enterprise has no valid basis for a protective order blocking discovery of all such records, regardless of whether they include any information Enterprise may reasonably consider to be proprietary or "trade secret."

Indeed, the case Enterprise cites for its "trade secret" argument, *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d 730 (Tex. 2003),[10] actually supports Magellan's position. In that case, the Texas Supreme Court observed: "Any analysis of the necessity of trade secret information to a fair adjudication must begin by examining *the relationship between the*

---

[7] *See* Ex. B at 6, Section 4.1.

[8] Of course, insofar as any non-party may possess information Enterprise shared with that non-party, the information cannot constitute an Enterprise "trade secret." It is worth noting, too, that none of the non-parties Magellan has subpoenaed to date have objected to Magellan's requests on the ground that they invade the non-party's trade secrets (or on any other ground, for that matter).

[9] Ex. B at 7, Section 4.4 (emphasis added).

[10] *See* Stay Motion at 11.

PLAINTIFF'S RESP. IN OPP. TO DEFENDANT'S MOTION FOR PROTECTION AND TO STAY DISCOVERY – Page 9
{1741854:}

SR349

*trade secret information sought and the material elements of the parties' claims and defenses.*" *Id.* at 735 (emphasis added). In so noting, the Court relied on a Delaware case which allowed discovery of the formula for Coca–Cola, "one of the best-kept trade secrets in the world," because it was necessary for the fair adjudication of the case. *Id.* In this case, it is abundantly clear that Enterprise's shipping records directly pertain to material elements of Magellan's claims and thus are discoverable, regardless of any proprietary nature of the records.

Under these circumstances, the mere fact that *some* of Magellan's discovery requests may reach business information in which Enterprise has a valid "trade secret" interest, cannot warrant an order prohibiting Magellan's discovery of such information, much less the blanket stay of all discovery sought by Enterprise. Any legitimate "trade secret" concerns are easily resolved through a confidentiality agreement/order containing appropriate limitations on the use of such information (*e.g.*, for purposes of this litigation only). Although such agreement/orders are commonplace in complex business litigation like this, neither Enterprise nor any subpoenaed non-party has presented any proposed confidentiality agreement/order for Magellan's consideration. Instead, and ironically, Enterprise has effectively blocked all Magellan discovery pending a hearing on the Motion for Summary Judgment, the motion in which Enterprise urges the Court to dispose of all Magellan claims on the merits, *before Magellan has any discovery whatsoever*, on the ground that Magellan has no evidence to support its claims.

## CONCLUSION

For the reasons stated above, and in Magellan's response to the Enterprise no-evidence Motion for Summary Judgment, the Court should deny the Stay Motion, deny the Motion for Summary Judgment, and permit Magellan to proceed with the discovery to which it is entitled.

SR350

Respectfully submitted,

**GABLEGOTWALS**

By: /s/ David L. Bryant
David L. Bryant
State Bar No. 24084344
dbryant@gablelaw.com
113 Pleasant Valley Drive, Suite 204
Boerne, Texas 78006
Telephone: (830) 336-4810
Facsimile: (918) 595-4990

Lisa T. Silvestri
State Bar No. 00797967
lsilvestri@gablelaw.com
100 W. Fifth St., Suite 1100
Tulsa, Oklahoma 74103
Telephone: (918) 595-4800
Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**ATTORNEYS FOR PLAINTIFF,
MAGELLAN CRUDE OIL
PIPELINE COMPANY, L.P.**

SR351

## CERTIFICATE OF SERVICE

I certify that on September 20, 2017, I forwarded a true and correct copy of the foregoing document to the following counsel via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

**Attorneys for Defendant
Enterprise Crude Oil, LLC**

/s/ David L. Bryant
David L. Bryant

SR352

# Ex. A
## 08/11/2017 Rule 11 Agreement

SR353



David L. Bryant
*dbryant@gablelaw.com*

113 Pleasant Valley Dr.
Suite 204
Boerne, Texas 78006
Telephone (830) 336-4810
*www.gablelaw.com*

August 11, 2017

E. Leon Carter
CARTER SCHOLER
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

      Re:    *Magellan Crude Oil Pipeline Company, L.P. v. Enterprise Crude Oil LLC,*
            Cause No. DC-17-07264, 101st District Court, Dallas County, Texas

Dear Leon:

Pursuant to Rule 11 of the Texas Rules of Civil Procedure, this letter sets out an agreement between the above-referenced Plaintiff and Defendant, and their respective attorneys, regarding Defendant's Motion for Protection and to Stay Discovery Pending Resolution of Defendant's Dispositive Motion (the "Stay Motion"), filed on August 10, 2017.

Specifically, it is agreed that: (i) Defendant will have the Stay Motion set for hearing on September 25, 2017, at the same time as the hearing on Defendant's motion for summary judgment; and (ii) without prejudice to any argument of any party in connection with the motion for summary judgment and/or the Stay Motion, from this date until September 26, 2017 Plaintiff will not initiate any new discovery and will suspend and hold in abeyance any obligation of Defendant or any non-party to respond to Plaintiff's pending requests or subpoenas seeking discovery from Defendant or from non-parties. Plaintiff will advise subpoenaed non-parties of this agreement.

If this agreement is satisfactory, please sign and return the same to our office.

Sincerely yours,

David Bryant

David L. Bryant
Attorneys for Plaintiff

AGREED:

E. Leon Carter
CARTER SCHOLER
Attorneys for Defendant

{1726078;2}

# Ex. B
# Crude Oil Distribution Agreement
# dated October 31, 2011

SR355

# CRUDE OIL DISTRIBUTION AGREEMENT

This Crude Oil Distribution Agreement ("**Agreement**") is made and entered into this 31st day of October, 2011(the "**Effective Date**") by and between Enterprise Crude Oil LLC, a Texas limited liability company ("**Shipper**"), and Magellan Pipeline Company, L.P., a Delaware limited partnership ("**Magellan**"). Shipper and Magellan are sometimes hereinafter referred to individually as a "**Party**" or collectively as the "**Parties**".

## RECITALS:

WHEREAS, Magellan owns and operates certain crude oil pipeline facilities in the Houston, Texas area, including pipeline facilities that extend from Genoa Junction to BP's Texas City Refinery in Galveston County (via an approximately 26.3 mile long, 26-inch diameter pipeline) and from Speed Junction to Valero's Houston Refinery (via an approximately 1.09 mile long, 24-inch diameter pipeline) (hereinafter collectively referred to as the "**Existing Magellan Facilities**");

WHEREAS, Magellan is contemplating the construction of a new 24-inch pipeline from Genoa Junction to Speed Junction, a new 24-inch pipeline from Speed Junction to Deer Park and construction of or improvements to other existing delivery points at Houston Refining LP's Refinery, Pasadena Refining System, Inc.'s Houston Refinery and Red Bluff Tank Farm, Shell's Deer Park Refinery and Enterprise Crude Pipeline LLC's ("**Enterprise Pipeline**") pipeline at Anahuac Junction (hereinafter collectively referred to as the "**New Magellan Facilities**", and, together with the Existing Magellan Facilities, the "**Magellan Facilities**");

WHEREAS, Enterprise Pipeline owns the 24-inch diameter crude oil pipeline facility ("**Eagle Ford Pipeline System**") that extends from the Origin Points (as hereinafter defined) in south Texas to the Connection Point (as hereinafter defined) with Magellan's Genoa Junction and owns the Webster-area terminal located south of Genoa Junction (the "**Echo Terminal**"); and

WHEREAS, Shipper, to facilitate Magellan's construction of the New Magellan Facilities, is willing to provide the commitment described in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and of the mutual covenants and agreements contained herein, and of other good and valuable consideration the receipt, adequacy and sufficiency of which are acknowledged, and intending to be legally bound hereby, Magellan and Shipper agree as follows:

1. **DEFINITIONS.** In addition to the definitions set forth in the foregoing preamble, the following terms shall have the definitions set forth below for the purposes of this Agreement:

   1.1 "**Affiliate**" means, in relation to a Party, any entity that (A) directly or indirectly controls such Party; (B) is directly or indirectly controlled by such Party; or (C) is directly or indirectly controlled by an entity that directly or indirectly controls such Party. For purposes of this definition, the term "control", including the terms "controlling" and "controlled by", means the possession, directly or indirectly, of

1

SR356

the power to direct or cause the direction of the management and policies of an entity.

1.2     **"Agreement"** has the meaning set forth in the first paragraph of this Agreement.

1.3     **"Barrel"** means forty-two (42) U.S. Gallons (each being 231 cubic inches) temperature corrected to sixty (60) degrees Fahrenheit.

1.4     **"Commitment Exceptions"** has the meaning set forth in Section 4.2(B).

1.5     **"Connection Point"** means each of the following points at which the Magellan Facilities are connected and capable of receiving Product as of the In-Service Date:

A.  Point of interconnection between the Magellan Facilities and Enterprise Pipeline's Eagle Ford Pipeline System at or near Genoa Junction; and

B.  Point of interconnection between the Magellan Facilities and Enterprise Pipeline's Echo Terminal at or near Genoa Junction.

1.6     **"Controlled"** shall mean, when referring to Product, Product that Shipper or its Affiliates, as the case may be, has the legal right to transport; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute Control.

1.7     **"Default Termination"** has the meaning set forth in Section 2.2.

1.8     **"Destination Point"** means the following points:

A.  Valero's Houston Refinery;
B.  BP's Texas City Refinery;
C.  Enterprise Pipeline's Anahuac Junction; and
D.  Shell's Deer Park Refinery.

Magellan may, but shall have no obligation to, construct additional points at which the Magellan Facilities will be connected and capable of delivering Product during the Term of this Agreement, including, without limitation, the following: Marathon's Texas City Refinery, Valero's Texas City Refinery, Seaway Crude Pipeline Company's Texas City Terminal, Seaway Crude Pipeline Company's Galena Park Terminal, Houston Fuel Oil Terminal Company's Houston Terminal, Oil Tanking's Houston Terminal, Houston Refining LP's Houston Refinery, Pasadena Refining, Inc.'s Houston Refinery, Pasadena Refining, Inc.'s Red Bluff Tank Farm and/or Magellan Terminal Holdings, L.P.'s Galena Park Terminal (the **"Future Destination Points"**). If connected, these Future Destination Points will be deemed added to this definition of Destination Points.

1.9     **"Dispute"** has the meaning set forth in Section 9.9.

1.10    **"Dispute Notice"** has the meaning set forth in Section 9.9.

2

SR357

1.11    **"Eagle Ford Pipeline System"** has the meaning set forth in the recitals.

1.12    **"Echo Terminal"** has the meaning set forth in the recitals.

1.13    **"Effective Date"** has the meaning set forth in the first paragraph of this Agreement.

1.14    **"Enterprise Pipeline"** has the meaning set forth in the recitals.

1.15    **"Enterprise Pipeline Local Tariff Rate"** means the rate charged by Enterprise Pipeline under the Joint Tariff.

1.16    **"Existing Magellan Facilities"** has the meaning set forth in the recitals.

1.17    **"Force Majeure"** has the meaning set forth in Section 6.1.

1.18    **"Future Destination Points"** has the meaning set forth in Section 1.8.

1.19    **"Governmental Authority"** means any governmental entity exercising executive, legislative, judicial, regulatory or administrative functions or pertaining to government, including any governmental authority, agency, department, board, commission or instrumentality, and any tribunal, court or arbitrator of competent jurisdiction.

1.20    **"In-Service Date"** has the meaning set forth in Section 2.1.

1.21    **"Incentive Program Rate"** means the rate in the Joint Tariff for shippers that qualify for the incentive program as set forth in the Joint Tariff.

1.22    **"Initial Incentive Magellan Rate"** means $0.2853.

1.23    **"Joint Tariff"** means that certain joint tariff (Texas Railroad Commission Tariff No. ____) together with all applicable rules and regulations, as each may be supplemented, amended or reissued from time to time.

1.24    **"Law"** means all applicable local, state and federal constitutions, laws (including common law), treaties, statutes, orders, decrees, rules, regulations, codes, and ordinances issued by any Governmental Authority, and including judicial or administrative orders, consents, decrees, and judgments, and determinations by, or interpretations of any of the foregoing by any Governmental Authority having jurisdiction over the matter in question and binding on a given Party.

1.25    **"Liabilities"** has the meaning set forth in Section 8.1.

1.26    **"Magellan"** has the meaning set forth in the first paragraph of this Agreement.

1.27    **"Magellan Facilities"** has the meaning set forth in the recitals.

1.28    **"Minimum Volume Threshold"** means 20,000 barrels per day per month.

3

SR358

1.29 **"New Magellan Facilities"** has the meaning set forth in the recitals.

1.30 **"Oil Pipeline Index"** has the meaning set forth in Section 3.3A.

1.31 **"Origin Point"** means the following points on the Eagle Ford Pipeline System:

    A. Gardendale (LaSalle County, Texas);
    B. Lyssy (Wilson County, Texas);
    C. Marshall (Gonzales County, Texas); and
    D. Milton (Karnes County, Texas).

1.32 **"Owned"** shall mean Product to which Shipper or its Affiliate holds title; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute being Owned.

1.33 **"Party"** and **"Parties"** have the meanings set forth in the first paragraph of this Agreement.

1.34 **"Product"** means crude oil and condensate meeting the specifications provided for in the Joint Tariff, as such tariff may be supplemented, amended or reissued from time to time.

1.35 **"Shipper"** has the meaning set forth in the first paragraph of this Agreement.

1.36 **"Tariff Escalation"** has the meaning set forth in Section 3.3(A).

1.37 **"Term"** has the meaning set forth in Section 2.1.

## 2. CONTRACT TERM AND DEFAULT

2.1 **Term.** The term of this Agreement ("Term") shall commence on the Effective Date and shall continue until the tenth (10th) anniversary of the In-Service Date (as hereinafter defined). Transportation services contemplated hereunder shall be available on the first day of the first calendar month after Magellan provides written notice to Shipper that the New Magellan Facilities are operational (the "**In-Service Date**"). Such notice must be provided at least fifteen (15) days prior to the In-Service Date. The In-Service Date is estimated to be approximately fourteen (14) months after the Effective Date.

2.2 **Default.** A Party shall be in default under this Agreement if it: (A) defaults in the payment or performance of any obligation in this Agreement; and/or (B) files or has filed against it a petition in bankruptcy, for reorganization, or for appointment of a receiver or trustee, which is not dismissed or withdrawn within sixty (60) days of filing. Unless a default under this section has been cured to the reasonable satisfaction of the non-defaulting Party within ten (10) days of the defaulting Party's receipt of written notice from the non-defaulting Party of such asserted default, then, in addition to all other available rights and remedies all of which are cumulative, this Agreement may be immediately terminated at the option of the

4

SR359

non-defaulting Party by delivery of written notice of termination to the defaulting Party (a "**Default Termination**").

## 3. JOINT TARIFF AND INCENTIVE PROGRAM RATES

3.1 **Joint Tariff.** Transportation services under this Agreement are subject to, and the Parties are required to comply with, the provisions of the Joint Tariff.

3.2 **Incentive Program Rate.** Subject to Section 3.3, during the Term of this Agreement, Magellan agrees that the Incentive Program Rate under the Joint Tariff will be equal to or less than the Enterprise Pipeline Local Tariff Rate plus the Initial Incentive Magellan Rate.

3.3 **Initial Incentive Magellan Rate Escalation and Adjustment.**

A. The Initial Incentive Magellan Rate may be increased by Magellan beginning on July 1, 2012, and each July 1st of thereafter during the Term (the "**Tariff Escalation**"); provided, however, that (A) any Tariff Escalation will not exceed the amount of any increase permitted in accordance with the indexing methodology set forth in 18 C.F.R. §342.3, or any successor thereto (the "**Oil Pipeline Index**") and (B) the Initial Incentive Magellan Rate will not decrease during the Term.

B. In the event Magellan elects not to increase its Initial Incentive Magellan Rate in any given year of the Term, Magellan reserves the right to increase its Initial Incentive Magellan Rate in any subsequent year during the Term by the allowable cumulative percentage increase foregone by Magellan in prior years.

C. In addition to and not subject to the limitations set forth above, in the event Magellan is required by a change from the Law as it existed on the Effective Date to: (i) make significant improvements to all or any portion of the Magellan Facilities or (ii) to incur significant additional expenses for public safety, pollution control or for any other reason with respect to the Magellan Facilities, and the effect of the cost and expense thereof to Magellan is not reflected in the Oil Pipeline Index, Magellan may increase the Initial Incentive Magellan Rate to reflect the effect of such costs and expenses incurred by Magellan to comply with such change in Law. Magellan shall notify Shipper, not less than ninety (90) days prior to the implementation of any increase in the Initial Incentive Magellan Rate under this Section 3.3(C), of the amount of such proposed increase, the reason for such increase and the method of calculating such increase. Shipper shall have the right to notify Magellan within thirty (30) days after Shipper receives Magellan's notice, of Shipper's decision not to pay such increase. If Shipper fails to timely notify Magellan of its decision, then it shall be deemed for purposes of this Agreement that Shipper accepts and approves such increase. If Shipper notifies Magellan that it will not accept such increase then such increase shall be null and void, but Magellan shall have the right to terminate this Agreement within thirty (30) days after Magellan receives Shipper's notice in which case neither Party shall have any further obligations to the other Party hereunder except as to obligations already accrued. Magellan

5

SR360

may, in its sole discretion, elect whether or not to request any such increase or fee allowed under this paragraph.

## 4. SHIPPER COMMITMENTS, EXCEPTIONS, AUDIT RIGHTS AND PENALTY

4.1 **Transportation Commitment.** Following the In-Service Date, Shipper agrees:

A. to exclusively utilize the Magellan Facilities for all deliveries of Product that are Owned or Controlled by Shipper; and

B. to use best efforts to cause Shipper's Affiliates to exclusively use the Magellan Facilities for all deliveries of Product that are Owned or Controlled by any of its Affiliates;

provided, that such deliveries are made from an Origin Point and are either:

(i) transported on the Eagle Ford Pipeline System through Echo Terminal to the Connection Point and delivered to any of the Destination Points, or

(ii) transported on the Eagle Ford Pipeline System to the Connection Point and delivered to any of the Destination Points.

4.2 **Transportation Commitment Exceptions.**

A. If, at any point during the Term hereof, Shipper requires more capacity than Magellan has available, Shipper may utilize third party facilities to transport such excess Product until such time that Magellan has capacity available; and

B. If a third party connects to a Future Destination Point before Magellan, and Magellan later connects to such Future Destination Point, then Magellan must offer Shipper a tariff rate to such Future Destination Point equal to or less than the third party tariff rate at such Future Destination Point or such Future Destination Point shall not be considered a Destination Point under Section 1.8 (the exceptions in Section 4.2(A) and (B) are hereinafter collectively referred to as the "Commitment Exceptions").

4.3 **Payments.** Subject to Section 3.3 and in accordance with the Joint Tariff, in any month that Shipper transports the Minimum Volume Threshold, or more than the Minimum Volume Threshold, Shipper will pay the Initial Incentive Magellan Rate for the volumes transported in such month. If Shipper fails to transport the Minimum Volume Threshold in a month, Shipper will pay the base rate under the Joint Tariff for the volumes transported in such month; provided, however, if Shipper nominates capacity in excess of the Minimum Volume Threshold, but Magellan is unable to provide the nominated capacity in such month, Shipper will pay the Initial Incentive Magellan Rate for the volumes actually transported in such month even if less than the Minimum Volume Threshold. All payments due by Shipper under this Agreement shall be made in accordance with the terms of the Joint Tariff.

6

SR361

4.4 **Magellan's Limited Right to Audit and Penalty.** Magellan shall have the right to audit Shipper's records necessary to verify Shipper's compliance with the provisions of Sections 4.1 and 4.2. This audit must be conducted during normal business hours, at a reasonable time and reasonable location and must be conducted within one (1) year after December 31st of each calendar year for such previous year's transportation services. The cost of such audit shall be borne by Magellan if Shipper is found to be in compliance with Section 4.1 and 4.2. If such audit concludes that Shipper is not in compliance with Sections 4.1 or 4.2, the cost of such audit shall be borne by Shipper, and Shipper shall pay to Magellan an amount equal to the Initial Incentive Magellan Rate multiplied by (A) the number of Barrels of Product Shipper transported during such calendar year on a third party pipeline minus (B) the number of Barrels of Product Shipper transported during such calendar year on a third party pipeline due to the Commitment Exceptions, as concluded by such audit.

5. **ASSIGNMENT AND SUCCESSION.** Neither Party may assign this Agreement, or any of its rights or obligations hereunder, without the prior written consent of the other Party, such consent not to be unreasonably withheld, delayed or conditioned. Subject to the foregoing provision, the terms and provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns and legal representatives of the Parties.

6. **FORCE MAJEURE**

6.1 **Defined.** The term "Force Majeure" means any cause, event or circumstance of whatever nature which is not within the reasonable control of the Party claiming to be adversely affected thereby including, but not limited to, acts of God or public enemy, the elements, fire, accident, explosions, freezing, breakdowns, strikes, other industrial, civil or public disturbance, inability to obtain permits, materials, equipment or labor, or any laws, rules, regulations, acts, prohibition or restraints of any government or governmental body or authority, civil or military. Neither Party will be entitled to the benefit of Force Majeure under any of the following circumstances: (A) to the extent the failure was caused by the gross negligence of the Party claiming relief; (B) to the extent the failure was caused by the Party claiming relief having failed to remedy the condition and to resume performance with reasonable dispatch; (C) the ability of either Party to obtain better consideration or lower cost for performance; or (D) economic hardship.

6.2 **Notice and Termination.** If any condition of Force Majeure should occur, the Party adversely affected thereby shall promptly give notice thereof to the other Party. Such notice shall (A) state the date that the Force Majeure began, (B) describe the Force Majeure and (C) provide an estimate of the date the condition of Force Majeure will cease. The Party experiencing the condition of Force Majeure will not be in default and will not be liable for any failure to perform while a condition of Force Majeure exists to the extent such failure is caused by the Force Majeure. At the conclusion of the condition of Force Majeure, the Party claiming Force Majeure will promptly notify the other Party that the condition of Force Majeure has concluded and provide the date of such conclusion. Any commitments within the Agreement will be suspended during the period of Force Majeure and at the conclusion of the Force Majeure period all commitments under the Agreement

7

SR362

will be reestablished and the Term will be extended by the same number of days as the Force Majeure was in effect. If an event of Force Majeure prevents a Party from the performance of its obligations hereunder for a period of at least 120 consecutive days, then the other Party may elect to terminate this Agreement with no further future obligation to the other Party; provided, however, that (i) Magellan must, to the extent not prevented by Force Majeure or the terms of the Joint Tariff, complete the transportation and delivery of any Product that was delivered by Shipper to Magellan at the Connection Point on or prior to such termination, and (ii) Shipper must pay any transportation charges due under the Joint Tariff as may have accrued prior to the occurrence of the condition of Force Majeure.

7. **NOTICES.** Notices under this Agreement shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the Party, or if sent by facsimile or electronic mail with a hard copy mailed on the same day, or if sent by confirmed overnight courier, in each case addressed to the Party as set forth below or to such other address as one Party may have directed in writing to the other Party prior to the delivery of any such notice.

If to Magellan:

Magellan Pipeline Company, L.P.
One Williams Center
P.O. Box 22186
Tulsa, Oklahoma 74121
Attention:     Scott Devers
Phone:         (918) 574-7712
Fax:           (918) 574-7264
E-mail:        scott.devers@magellanlp.com

If to Shipper:

Enterprise Crude Oil LLC
1100 Louisiana, Suite 1800
Houston, Texas 77002
Attention:     Senior Vice President – Crude Oil & Offshore
Phone:         (713) 381-6679
Fax:
E-mail:

8. **INDEMNIFICATION**

8.1     MAGELLAN SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS SHIPPER, ITS PARENTS AND AFFILIATES, AND ITS AND THEIR RESPECTIVE MEMBERS, MANAGERS, OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, AGENTS AND OTHER REPRESENTATIVES FROM AND AGAINST ANY CLAIMS, ACTIONS, JUDGMENTS, LIABILITIES, LOSSES, COSTS, DAMAGES, FINES, PENALTIES AND EXPENSES (COLLECTIVELY "**LIABILITIES**") ARISING IN CONNECTION WITH THIS AGREEMENT BUT ONLY AS TO THE EXTENT OF: (A) THE NEGLIGENCE OR WILLFUL MISCONDUCT OF MAGELLAN, ITS

8

SR363

EMPLOYEES, AGENTS, CONTRACTORS AND OTHER REPRESENTATIVES, OR (B) THE FAILURE OF MAGELLAN TO COMPLY WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT.

8.2 SHIPPER SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS MAGELLAN, ITS PARENTS AND AFFILIATES, AND ITS AND THEIR RESPECTIVE MEMBERS, MANAGERS, OFFICERS, DIRECTORS, PARTNERS, EMPLOYEES, AGENTS AND OTHER REPRESENTATIVES FROM AND AGAINST ANY LIABILITIES ARISING IN CONNECTION WITH THIS AGREEMENT BUT ONLY TO THE EXTENT OF: (A) THE NEGLIGENCE OR WILLFUL MISCONDUCT OF SHIPPER, ITS EMPLOYEES, AGENTS, CONTRACTORS AND OTHER REPRESENTATIVES, OR (B) THE FAILURE OF SHIPPER TO COMPLY WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT.

8.3 THE INDEMNITIES EXPRESSED IN SECTIONS 8.1 AND 8.2 OF THIS AGREEMENT SHALL SURVIVE THE EXPIRATION OR TERMINATION OF THIS AGREEMENT.

9. **GENERAL PROVISIONS**

9.1 **Changes and Waiver.** Neither this Agreement nor any term or provision hereof may be changed, waived, discharged or terminated except by an instrument in writing signed by the Party against which enforcement of such change, waiver, discharge or termination is sought.

9.2 **Governing Law.** THIS AGREEMENT, AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW.

9.3 **Confidentiality.** Each Party recognizes and acknowledges the other Party's proprietary interest in this Agreement, and agrees not to divulge any of the contents hereof to any other person, firm, corporation or other entity. Each party agrees to be responsible for enforcing the confidentiality of this Agreement and agrees to take such action as necessary to prevent any disclosure by any of its agents or employees. This Section 9.3 shall survive the termination of this Agreement for a period of two (2) years.

9.4 **No Third Party Beneficiary.** Nothing in this Agreement shall be considered or construed as conferring any right or benefits on persons not a party to this Agreement.

9.5 **Severability.** Both Parties expressly agree that it is not the intention of either Party to violate public policy or state or federal statutory or common laws and that if any sentence, paragraph, clause or combination thereof in this Agreement is in violation of the same, such paragraph, clause or sentence, or combination of the same shall be inoperative and the remainder of this Agreement shall remain binding upon the

9

SR364

Parties hereto, provided that the reasonable expectation of each Party at the time it entered into this Agreement is not materially impaired.

9.6 **Limitation of Liability.** Except as otherwise set forth herein, in no event shall either Party be liable to the other for any special, punitive, exemplary, consequential, incidental, indirect or similar losses or damages in respect of this Agreement howsoever caused (including, but not limited to, loss of revenue, loss of profits or loss of present or future opportunities), whether or not foreseeable, other than such damages as are awarded or paid to third parties and which an indemnified person is legally compelled to pay to such third parties and entitled to indemnification hereunder.

9.7 **Entirety.** This Agreement between the Parties comprises the entire agreement between the Parties with respect to the subject matter hereof, and there are no agreements, understandings, requirements, warranties or representations, oral or written, expressed or implied, that are not merged herein or superseded hereby, other than as set forth in the Joint Tariff.

9.8 **Records Retention.** Each Party agrees to maintain all records related to this Agreement for a period of at least sixty (60) months from the entry of such record.

9.9 **Dispute Resolution.** In the event of a dispute, controversy or claim arising out of or relating to this Agreement ("**Dispute**"), the Parties shall first undertake to settle their Dispute by good faith negotiations. Either Party may commence this process by serving the other Party with a written notice ("**Dispute Notice**") that concisely describes the nature of the Dispute and the relief or remedy requested. The Party receiving such Dispute Notice shall, within fifteen (15) days of its receipt thereof, provide the giver of the Dispute Notice a concise written response setting forth the responder's position with respect to the asserted Dispute. If for any reason whatsoever the Dispute has not been settled within thirty (30) days of service of the Dispute Notice, then the Parties agree to submit the Dispute to non-binding mediation with a neutral mediator selected by the Parties. If the Parties cannot agree on a mediator or if the Dispute cannot be settled by mediation within one hundred twenty (120) days of service of the Dispute Notice, then either Party may submit the Dispute to any state or federal court sitting in Dallas County, Texas. EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUCH PROCEEDING AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY ACTION OR PROCEEDING IN ANY SUCH COURT, ANY OBJECTION TO VENUE WITH RESPECT TO ANY SUCH ACTION OR PROCEEDING AND ANY RIGHT OF JURISDICTION ON ACCOUNT OF THE PLACE OF RESIDENCE OR DOMICILE OF EITHER PARTY. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO A DISPUTE UNDER THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

10

SR365

9.10    **Remedies Cumulative**. Each Party's rights and remedies under this Agreement shall be in addition to, and not in limitation or exclusion of, any other rights or remedies to which such Party may otherwise be entitled (whether by agreement, operation of law or otherwise).

9.11    **Course of Dealing, etc**. Neither course of performance, nor course of dealing, nor usage of trade shall be used to qualify, explain or supplement any of the terms of this Agreement.

9.12    **Headings and Sections**. All references to "Sections" herein pertain to Sections of this Agreement, unless expressly stated otherwise. Headings are for purposes of reference only and shall not be used to construe the meaning of this Agreement.

9.13    **No Interpretation Against Draftsman**. The Parties acknowledge and agree that the language used in this Agreement shall be deemed to be chosen by the joint action of the Parties hereto to express their mutual intent, and no rule of strict construction against any one Party shall be applied hereto. No implications or inferences shall be drawn from the deletion or addition to terms of previous drafts or versions of this Agreement. Each Party acknowledges for itself that it has had the opportunity to participate in the preparation of this Agreement, and that, therefore, in the event of any ambiguity in, or controversy with respect to, the meaning of any term or provision contained in this Agreement, no presumption or inference shall be drawn against either Party's interpretation or construction of this Agreement by reason of such Party's or its counsel's participation in the drafting of this Agreement.

   **IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

**Magellan Pipeline Company, L.P.**
By: Magellan Pipeline GP, LLC, its general partner

By: _Michael Mears_

Name: _Michael Mears_

Title: _CEO_

**Enterprise Crude Oil LLC**
By: Enterprise Crude GP LLC, its Sole Manager

By: _____

Name: Mark A. Hurley

Title: SVP, Crude and Offshore

11

SR366

CAUSE NO. DC-17-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., | § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § § | |
| vs. | § § | 101st JUDICIAL DISTRICT |
| ENTERPRISE CRUDE OIL, LLC, | § § § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant Enterprise Crude Oil, LLC files its reply in support of its motion for summary judgment, responding to the arguments made by Magellan Crude Oil Pipeline Company, L.P., as follows:

## INTRODUCTION

Despite Magellan's attempts to complicate this case and confuse the issues, the case presents a straightforward question of contract construction. As explained in Enterprise's motion and in the sections below, the plain and unambiguous language of the Distribution Agreement defeats Magellan's breach of contract claim as a matter of law, and Magellan's remaining claims also fail.

## ARGUMENTS AND AUTHORITIES

A.    **Enterprise's traditional summary judgment motion should be granted because the proper construction of the Distribution Agreement disposes of the entire case.**

Enterprise has filed a traditional summary judgment motion under Rule 166a(c). Enterprise attached supporting evidence to its motion—most significantly the subject contract—and invoked the standard for traditional summary judgment

---

DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT                    PAGE 1

SR367

motions.[1] Enterprise's motion does not invoke the no-evidence rule—Rule 166a(i)—and does not follow the procedures for no-evidence motions. Instead, Enterprise seeks an expeditious end to Magellan's frivolous lawsuit via traditional summary judgment, which is particularly appropriate when the controversy can be resolved by the proper construction of an unambiguous contract. *See Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 616, 617-18 (Tex. 2000).

Like a diligent propagandist, Magellan repeats over and over and over that Enterprise's motion is a "no-evidence" motion. It manifestly is not, and the Court should see through Magellan's transparent attempt to keep its lawsuit alive by claiming that an adequate time for discovery has not elapsed.

**B.    Magellan's breach of contract claim fails as a matter of law based on the plain and unambiguous language of the Distribution Agreement.**

    **1.    The language of the Distribution Agreement defeats Magellan's breach of contract claim because it defines the limits of Enterprise's obligation under this requirements contract.**

This is a contract interpretation case. Although the parties agree on the rules of contract construction, Magellan turns those rules upside down and backwards to twist the Distribution Agreement to state terms it manifestly does not state. The starting point for the analysis is the actual language of the Distribution Agreement. And the actual language unequivocally defeats Magellan's claims:

> **4.1    Transportation Commitment**. Following the In-Service Date, Shipper [Enterprise] agrees:
>
> > A.    to exclusively utilize the Magellan Facilities for all deliveries of Product that are ***Owned or Controlled by Shipper***; and

---

[1] Motion, at 13.

SR368

B. to use best efforts to cause Shipper's Affiliates to exclusively use the Magellan Facilities for all deliveries of Product that are ***Owned or Controlled by any of its Affiliates***;

***provided, that*** such deliveries are made from an ***Origin Point*** and are either:

(i) transported on the Eagle Ford Pipeline System through Echo Terminal to ***the Connection Point*** and delivered to any of ***the Destination Points***, or

(ii) transported on the Eagle Ford Pipeline System to ***the Connection Point*** and delivered to any of ***the Destination Points***[2]

That language is clear and unambiguous. The Distribution Agreement is a type of requirements contract, in which Enterprise agreed to use the Magellan Facilities to transport a subset of the crude oil coming out of the Eagle Ford Shale, i.e., those barrels that met the requirements expressly set forth in Section 4.1. Magellan's breach of contract claim does not allege that Enterprise failed to utilize the Magellan Facilities for crude oil that met the requirements of Section 4.1. Instead, Magellan alleges that Enterprise breached the Distribution Agreement by not paying Magellan for crude oil that does <u>not</u> meet the requirements of Section 4.1. Because Magellan's claim is based upon an invalid interpretation of the contract, as a matter of law Enterprise is entitled to judgment on that claim as a matter of law.

Magellan's unsupported and unexplained effort to evade the clear language of the Distribution Agreement, is wrong as a matter of law. As noted in a leading treatise, "[i]n a requirements contract the quantity term is not fixed at the time of contracting. The parties agree that the quantity will be the buyer's needs or

---

[2] Original Petition at Exhibit A, § 4.1 (emphasis added).

requirements of a specific commodity or service." J. Perillo & H. Bender, CORBIN ON CONTRACTS, § 6.5, p. 240 (West 1995). Here, the quantity of crude oil to be transported on the Magellan Facilities is <u>not</u> fixed in the Distribution Agreement, and Magellan tacitly concedes this point, making no contrary argument in its response. Instead, the parties agreed that Enterprise's crude oil shipments meeting certain requirements would be transported on the Magellan Facilities. Therefore, the Distribution Agreement necessarily is a requirements contract. Otherwise the Distribution Agreement would fail for indefiniteness. *See, e.g., Cox, Inc. v. Humble Oil & Refining Co.*, 16 S.W.2d 285, 286-87 (Tex. Com. App. 1929).

The reason Magellan fights so hard to deny that the Distribution Agreement is a requirements contract is because, with that understanding, the analysis is straightforward. The purpose of a requirements contract is to give the buyer an assured source of supply over an extended period of time without obligating him to purchase a specified quantity, thus enabling him to meet the fluctuating needs of his business. *Tenn. Valley Auth. v. Imperial Professional Coatings*, 599 F. Supp. 436, 438 (E.D. Tenn. 1984). Accordingly, courts have generally permitted buyers to cut back or eliminate entirely their orders if there is a bona fide decrease in the buyers' needs. *Tenn. Valley Auth.*, 599 F. Supp. at 439. It is generally held that a requirements buyer does not undertake to establish or maintain any particular level of requirements. *Lambert Corp. v. Evans*, 575 F.2d 132, 138 (7th Cir. 1978). The seller instead assumes the risk of all good faith variations in the buyer's requirements, even to the extent of a determination to liquidate or discontinue the business. *HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 (3rd Cir. 1966).

SR370

Thus, the buyer under a requirements contract for the paint required for nuclear power plants did not breach the contract when it cancelled construction of the plants and purchased no paint. *Tenn. Valley Auth.*, 599 F. Supp. at 439-40. And, the buyer under a requirements contract for limestone to be used in a specific construction project did not breach the contract when the project was cancelled and it purchased no limestone. *R.A. Weaver and Assoc., Inc. v. Asphalt Constr., Inc.*, 587 F.2d 1315, 1321 (D.C. Cir. 1978). Put differently, "a promise to buy from another person or company all of some commodity or service that the promisor may thereafter need or require in the promisor's business is not a promise to have any requirements." CORBIN, § 6.5, pp. 247-48. To the contrary, "a requirements buyer is privileged not to buy." *Id.*

Professor Corbin's treatise on contract law provides the following illustration:

> (1) S promises to sell on stated terms, and B promises to buy, all the coal that may be used by certain vessels then owned by B. Here, B is privileged to withdraw the vessels from service and buy no coal at all. B is privileged, also, to install oil burning boilers or a gas engine, and buy no coal. There must, however, be an honest business judgment for the withdrawal or conversion. But no coal for their use may be bought of anyone other than S. If the vessels use coal, it must be coal purchased from S.

CORBIN, § 6.5, p. 251; *see also Angelica Uniform Group, Inc. v. Ponderosa Systems, Inc.*, 636 F.2d 232 (8th Cir. 1980) (buyer under a requirements contract was entitled to order reduced quantities highly disproportionate to a stated estimate if the reductions were done in good faith).

Applied here, these principles preclude Magellan from prevailing on its claims as a matter of law. Under the Distribution Agreement, Enterprise is entitled

SR371

to engage in all of the following actions without breaching the agreement: (i) to accept deliveries of crude at points other than the Origin Points; (ii) to ship crude to destinations other than the Destination Points (*e.g.*, other refineries or terminals); (iii) to ship crude from an Origin Point to a Destination Point without going through the Connection Point; and (iv) to ship crude owned by its customers without taking ownership or control of the crude itself.[3]  In each case, Enterprise is not subject to the incentive tariff under the Distribution Agreement because it only obligates Enterprise to use the Magellan Facilities—and thus pay the incentive tariff—for crude that Enterprise owns or controls and ships from an Origin Point to the Connection Point and delivers to a Destination Point.

2. **The plain language of Section 4.1 has meaning and does not render the Distribution Agreement illusory.**

That Enterprise has some control over the specifics of its requirements does not render this requirements contract illusory as Magellan claims.

> The promisor's duty is conditional upon the existence of an objective need for the commodity or service, and ***the promisor may have a high degree of control over the happening of this condition***, but this does not render the promise illusory.  It states a limitation upon the promisor's future liberty of action.  The promisor no longer has an unlimited option.

CORBIN, § 6.5, pp. 249-50 (emphasis added).  For example, the fact that a city was free to purchase natural gas from other suppliers, and was free to purchase as much

---

[3] Magellan's reference to Section 4.2 does not change the language of Section 4.1.  Moreover, the language of Section 4.2 is not inconsistent with the proper interpretation of Section 4.1.  The "Magellan Facilities" are defined as specific pipelines running from the Connection Point to the Destination Points.  Section 4.2 merely states that if Magellan's pipelines are at capacity, Enterprise can utilize a third party's pipeline for ultimate delivery of the crude.  It has nothing to do with ECHO terminal, and does not preclude Enterprise from shipping crude to ECHO terminal.  In fact, the definition of "Connection Point" recognizes that Enterprise may ship crude to ECHO terminal.

or as little oil from one supplier as it chose, did not render its contract to purchase its requirements for oil from that supplier illusory. *City of Lakeland, Fla. v. Union Oil Co. of Calif.*, 352 F. Supp. 758, 764-65 (M.D. Fla. 1973).

The leading Texas case on requirements contracts illustrates this point. In *Northern Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 604-05 (Tex. 1998), a pipeline company (Northern) agreed to deliver for processing all of the natural gas that it purchased and received under specified gas purchase contracts to a gas processor for a period of twenty years. After gas prices were deregulated, Northern's purchases of natural gas dropped dramatically, eventually to zero, as it cancelled or declined to renew the gas purchase contracts. *Id.* at 605. In affirming the court of appeals' judgment reversing judgment for the gas processor, the Supreme Court stated:

> Northern was obligated to deliver for processing all gas that it bought under the dedicated gas purchase contracts for twenty years, and as long thereafter as purchases continued under those contracts, *but Northern was never obligated to perpetuate the gas purchase contracts or to deliver any gas for processing if no gas was purchased*.

*Id.* at 606 (emphasis added).

Similarly, in *Keyes Helium Co. v. Regency Gas Services, L.P.*, 393 S.W.3d 858, 860-61 (Tex. App.—Dallas 2012, no pet.), a midstream company (Regency) entered into a contract to sell to a helium processing company (Keyes) all crude helium produced at Regency's Lakin Plant for a period of twelve years. Regency shut down the Lakin Plant with three years remaining on the contract with Keyes due to changes or anticipated changes in its business, and Keyes sued Regency. *Id.* In

affirming a directed verdict for Regency, the Dallas Court of Appeals noted that a party to a requirements contract may reduce its output or requirements, even to zero, without breaching the contract so long as the reduction is made in good faith. *Id.* at 864.

The logic of cases like *Northern Natural Gas* and *Keyes Helium* is fatal to Magellan's claims. In this case, as in *Northern Natural Gas* and *Keyes Helium*, Enterprise was never obligated to ship crude from an Origin Point to a Destination Point only through the Connection Point, or to accept deliveries of crude solely at the Origin Points. As expressly recognized by the Texas Supreme Court, the fact that Enterprise had some control over its requirements does not render the contract illusory. [4] *Northern Natural Gas*, 986 S.W.2d at 607. Magellan's contrary arguments have no basis in the Distribution Agreement or in the law.

### 3. Magellan's interpretation of the Distribution Agreement is unreasonable.

Magellan argues that the Distribution Agreement is ambiguous because Section 4.1 is subject to another reasonable interpretation. But Magellan's interpretation Magellan is as unreasonable as it is absurd because it ignores the law, flouts common sense, and distorts the plain language of the contract. There is simply no language in the Distribution Agreement itself or law supporting Magellan's argument that the agreement requires Enterprise to use the Magellan Facilities exclusively for <u>all</u> deliveries of crude that are owned or controlled by Enterprise or its affiliates. The requirements in Section 4.1 are <u>not</u> "covenants"

---

[4] The fact that Enterprise has paid Magellan more than $8.2 million under the Distribution Agreement also defeats an argument that it is illusory. *See* Affidavit of Brent Secrest, ¶ 5.

binding Enterprise to accept deliveries of crude solely at an Origin Point, to transport crude solely to a Destination Point, or to route such deliveries solely through the Connection Point. If the parties had wanted to create such an exclusive arrangement, they would have used far different language—language that lacked any of the multiple requirements and limitations of Section 4.1.

Although Magellan devotes considerable energy in one portion of its response to arguing that the limitations or requirements in Section 4.1 are <u>not</u> conditions precedent, in another portion Magellan argues—inconsistently—that Section 4.1's requirements <u>are</u> conditions precedent and that Enterprise purportedly waived such conditions by not fulfilling them. Not so. Properly understood, these elements are the limitations or requirements that define what portion of Enterprise's shipments of crude oil will be transported on the Magellan Facilities. Such provisions are entirely common with requirements contracts—they cover <u>some</u> of the buyer's requirements, not <u>all</u> of the buyer's requirements. *See, e.g., Cox, Inc.*, 16 S.W.2d at 287 (all gasoline to be used by the buyer in operating a specific filling station, as opposed to all gasoline purchased by the buyer); *Texas Co. v. Pensacola Maritime Corp.*, 279 F. 19, 23-24 (5th Cir. 1922) (all oil to be supplied to ships in Pensacola during a fixed period, as opposed to all oil required by the buyer); *Pace Corp. v. Jackson*, 284 S.W.2d 340, 343-44 (Tex. 1955) (all cigarettes for the buyer's business selling cigarettes in Kerr and Bandera Counties, as opposed to all cigarettes to be sold anywhere).

Whether labeled a condition precedent or a limitation, the result is the same: "provided, that" does <u>not</u> mean "shall exclusively." The "provided, that" language

SR375

instead limits Enterprise's commitment and does <u>not</u> impose additional—and superfluous—obligations on the part of Enterprise *and its customers* to exclusively accept crude at Origin Points, exclusively route crude to the Connection Point, or exclusively deliver crude to Destination Points. To have imposed those kinds of obligations, the Distribution Agreement would need to state that "Enterprise shall exclusively accept deliveries of crude at Origin Points,"[5] that "Enterprise shall exclusively route crude through the Connection Point," or that "Enterprise shall exclusively deliver crude to Destination Points." But it doesn't say that. And any contrary conclusion would render an additional requirement to route through the Connection Point to a Destination Point superfluous because the function of the Magellan Facilities is to connect the Connection Point (Genoa Junction) with the Destination Points. As such, Magellan's interpretation must be rejected. *See Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Moreover, Magellan's interpretation would require Enterprise to abandon its business of transporting crude oil for its customers. It would require Enterprise to abandon any entry point on its Eagle Ford Pipeline system other than the four specified Origin Points. It would require routing the entirety of the crude volume transported by Enterprise through one point—Genoa Junction—regardless of the efficiencies or economics of that routing. In short, Magellan's argument would

---

[5] Magellan does not contend that Enterprise is obligated to only accept deliveries of all crude it purchases anywhere in the world at the Origin Points, but in so doing Magellan is being inconsistent in the application of what it terms "covenants," highlighting that its interpretation is fallacious. The references to Origin Point, Connection Point, and Destination Points all come after the language "provided, that," and according to Magellan's logic all of those terms would be "covenants." Requiring Enterprise to transport all crude that it buys anywhere in the world to an Origin Point would be an obviously absurd result, as Magellan tacitly recognizes. That, however, is the direct consequence of Magellan's interpretation—mandating that Magellan's interpretation be rejected.

require Enterprise to engage in an illegal boycott of all refineries and terminals in the Houston-Galveston area other than the four specified Destination Points. Enterprise would never have bound itself to such an <u>illegal</u> exclusive dealing arrangement.[6]

Finally, Magellan's interpretation of the Distribution Agreement can be correct only if *Northern Natural Gas* and *Keyes Helium* are wrong. In *Northern Natural Gas*, the decisions to cancel and not renew the dedicated gas purchase agreements were within Northern's control. *Northern Natural Gas Co.*, 986 S.W.2d at 604-05. Under Magellan's logic, however, Northern should have been obligated to keep those contracts in effect so that it would continue to buy gas it was obligated to send to Conoco for processing. That is not the law. The Texas Supreme Court flatly rejected Magellan's position. *Id.* at 606. Likewise, in *Keyes Helium*, the decision to close the Lakin Plant was within the control of Regency. *Keyes Helium Co.*, 393 S.W.3d at 860-61. Therefore, according to Magellan, Regency should have been obligated to keep the plant open so that it would continue to supply helium to Keyes. The Dallas Court of Appeals rejected that position. *Id.* at 864. Magellan's theory and interpretation of the Distribution Agreement is therefore directly contrary to controlling law, and must be rejected.

> **4.    Magellan's interpretation would render the Distribution Agreement an illegal restraint on trade.**

In an effort to manufacture ambiguity and create a fact issue, Magellan contends that crude "Owned" or "Controlled" by Enterprise at any Origin Point, or

---

[6] *See infra* Section B.4.

owned or controlled by Enterprise "at any time or place along the route between Origin Point and Destination Point," [7] must be transported on the Magellan Facilities. That is, Magellan argues that even if Enterprise sells the crude to a third party at ECHO Terminal, or buys Eagle Ford crude at ECHO Terminal and then sells it along the route, [8] Enterprise is *required to compel its buyer* to move the crude through Magellan's Genoa Junction and along the Magellan Facilities.[9] Further, Enterprise's affiliate, EPO, must *refuse to do business* with the buyer, because, according to Magellan, by entering into the Distribution Agreement Enterprise agreed to forego the use of "its own competing facilities" to transport the crude.[10]

The problem is that such an agreement is *per se* unlawful. What Magellan posits as "the only reasonable interpretation of Section 4.1" is in practical effect an agreement among horizontal competitors to divide the transportation market for crude produced in the Eagle Ford basin. Further, it is an agreement to induce or coerce crude producers and purchasers to boycott all transportation facilities other than the Magellan Facilities by conditioning an essential input–transport on Enterprise's Eagle Ford Pipeline–on doing business with Magellan to the exclusion of all others. Such an agreement would be a naked restraint on trade and unlawful

---

[7] Magellan Resp. Br. at 41.

[8] This is itself a practical impossibility, further refuting Magellan's interpretation. Crude is not segregated at ECHO based on the crude's origin; it is aggregated there based on quality with crude from various sources, and there is no way to determine whether any particular batch of crude purchased at ECHO was produced from an Origin Point.

[9] Notably, Magellan's position in this regard is directly contrary to the plain language of Section 4.1 of the Distribution Agreement stating that Enterprise shall use its "best efforts" to cause its customers to use the Magellan Facilities. It does not say Enterprise shall compel or require its customers to do so. *See* Original Petition, Ex. A, § 4.1.

[10] Magellan Resp. Br. at 33.

under Section 1 of the Sherman Act[11] and its Texas equivalent.[12] *See United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (holding it is *per se* violation of Section 1 for competitors at same level of market structure to allocate territories in order to minimize competition); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990) (same). "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." *Klor's, Inc. v. Broadway–Hale Stores, Inc.,* 359 U.S. 207 (1959). Boycott violations "have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294 (1985) (internal quotations and citations omitted). As *per se* antitrust violations, agreements to divide markets or engage in group boycotts are presumed to be anticompetitive. *See Northern Pac. Ry. Co. v. U.S.*, 356 U.S. 1 (1958) (collecting cases).

It is black-letter law that when presented with competing interpretations of a contract, a court may not choose the interpretation that renders it unlawful. *Lewis v. Davis*, 199 S.W.2d 146, 149 (Tex. 1947) ("When two constructions of a contract are possible, preference will be given to that which does not result in violation of law"). This is because contracting parties are presumed to know the law and intend

---

[11] Section 1 of the Sherman Act provides that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. §15.
[12] Texas Free Enterprise and Antitrust Act of 1983, Tex. Bus. & Com. Code §§ 15.05.

for their agreements to have legal effect. *Dewhurst v. Gulf Marine Inst. of Tech.*, 55 S.W.3d 91, 97 (Tex. App.—Corpus Christi 2001, pet. denied). Since the Court must presume an intention that the Distribution Agreement be lawful, Magellan's proposed reading violates the cardinal rule that agreements be interpreted to give rise to the parties' intent. Moreover, it places this Court in the position of having to enforce an unlawful, anticompetitive arrangement. *See Cayan v. Cayan,* 38 S.W.3d 161, 166 n. 8 (Tex.App.—Houston [14th Dist.] 2000, pet. denied) ("But because the purpose of the legal system is to combat unlawfulness, not promote it, we cannot construe a contract to impose or enforce an illegal obligation.").

5.  **Magellan cannot use parol evidence to change the meaning of the Distribution Agreement.**

As stated in Enterprise's Motion for Summary Judgment, parol evidence may not be used to create an ambiguity or "to show that the parties probably meant, or could have meant, something other than what the agreement stated." *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 447, 450-51 (Tex. 2011). Notwithstanding this well-settled rule of contract construction, Magellan has offered (1) a self-serving affidavit and (2) an email sent during the contract negotiations in an attempt to explain what Magellan claims the parties *really* intended despite what the plain language of the agreement actually says. This evidence is inadmissible because when, as here, the parties' negotiations have been memorialized in a written agreement, the parol evidence rule excludes other evidence of any prior or contemporaneous expressions of the parties relating to that

transaction. *Muhm v. Davis,* 580 S.W.2d 98, 101 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.).

Moreover, courts construe an unambiguous document as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). The Texas Supreme Court has made clear that courts are to give effect to the intention of the parties as is apparent in an unambiguous writing. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968). Only if the intention of the parties ***as expressed on the face of the document*** is doubtful may the court resort to parol evidence to resolve the doubt. *Miller v. Miller,*700 S.W.2d 941, 951 (Tex. App.—Dallas 1985, writ ref'd n.r.e.) (emphasis added). *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 732 (Tex. 1981) ("Only where a contract is first found to be ambiguous may the courts consider the parties' interpretation. Where the meaning of the contract is plain and unambiguous, a party's construction is immaterial."). Accordingly, this Court may not permissibly, as Magellan suggests, consider the affidavit or the email in determining whether an ambiguity exists. Instead, this Court must ***first*** determine as a matter of law based on the four corners of the Distribution Agreement itself, whether an ambiguity exists. And it must do so without consideration of the evidence Magellan has offered.

Because Magellan knows these basic rules of contract construction prohibit the Court from considering its evidence, Magellan characterizes its parol evidence as merely evidence of the "circumstances present when the contract was entered."[13] The cases Magellan cites in support of this proposition, however, do not support its

---

[13] Magellan's Resp. Br. at p. 49 (citing *Anglo-Dutch Petroleum Int'l, Inc.* 352 S.W.3d at 449-50).

position. For example, in *Anglo-Dutch Petroleum Int'l v. Greenberg Peden, P.C.*, the Texas Supreme Court expressly cautioned that while "circumstances surrounding the execution of a contract may inform its construction, [ ] there are limits." 352 S.W.3d at 451. Then the court did precisely what this Court should do here—it first focused solely on the language of the agreement itself. *Id.* at 452. In doing so, it concluded that the contract at issue was not ambiguous and that consequently, the extrinsic evidence the trial court considered in error was "of limited relevance" and "[could not] be used to show the parties' motives or intentions apart from the [ ] Agreement." *Id.*

The Texas Supreme Court reached a similar result in *First Bank v. Brum*, also cited by Magellan. 519 S.W.3d 95 (Tex. 2017). In that case, the court similarly construed the language of the contract at issue, determined that it was not ambiguous, and therefore concluded that the trial court erred in (1) submitting the issue to the jury at all; and (2) instructing the jury that it could consider extrinsic evidence to add an unwritten term to an unambiguous written agreement. *Id.* at 106 (holding that "when a written contract is unambiguous . . . extrinsic evidence is simply irrelevant and inadmissible on that issue. In such a case, the trial court can neither submit the issue to a jury nor rely on extrinsic evidence to add terms to the parties' unambiguous agreement."). The Court in *First Bank* did not stop there, however. It further clarified its holding in *Basic Capital Management v. Dynex Commercial*, upon which Magellan also relies for the erroneous proposition that its extrinsic evidence here may be considered as evidence of the circumstances surrounding the Distribution Agreement. Specifically, the Court stated:

. . . references to "circumstances" surrounding a contract recognize that evidence of the circumstances may assist courts in construing the language the parties used, but they do not authorize courts to rely on such evidence to add to or alter the terms contained within the agreement itself. When parties 'have a valid, integrated written agreement,' the parol-evidence rule 'precludes enforcement of prior or contemporaneous agreements." . . . courts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say.

*Id.* at 109-110 (internal citations omitted).

The same analyses that the Texas Supreme Court applied in the cases above when applied here demand a similar result. The Distribution Agreement expressly states that Enterprise is only obligated to exclusively use the Magellan Facilities when the crude being delivered is "owned or controlled by Enterprise," "made from an Origin Point," "transported on the Eagle Ford Pipeline System through Echo Terminal to the Connection Point," and is "delivered to any of the Destination Points."[14] This language, whose terms are expressly defined within the four corners of the Distribution Agreement itself, can be given definite and certain legal meaning. As such, it is not ambiguous. *Id.* at 104 ("If a written contract is so worded that it can be given definite or certain legal meaning, then it is not ambiguous.") (quoting *Natl' Union Fire Ins. Co. of Pittsburgh, P.A. v. CBI Indus. Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Magellan's extrinsic evidence that the intent of this plain, unambiguous language was "for *all of the marketing volume* to move *through these [Magellan] connections*"[15] and extrinsic affidavit testimony averring that the parties agreed that "crude oil could not be delivered to any Destination

---

[14] Orig. Pet. at Ex. A § 4.1.
[15] Magellan's Resp. Br., Ex. 1-A.

SR383

Point without utilizing Magellan's Houston area crude oil distribution system" [16] adds to, alters and directly contracts the express terms to which the parties' actually agreed. Accordingly, it is inadmissible parol evidence by any Texas Supreme Court standard and it would be reversible error for this Court to consider it.

**6. Contrary to Magellan's argument, the letter agreement relating to the Joint Tariff does not amend or alter the Distribution Agreement.**

Magellan's attempt to change the meaning of the Distribution Agreement by what it refers to as the "Joint Tariff Agreement" is disingenuous and baseless. Magellan falsely claims that the "Joint Tariff Agreement" expresses <u>Enterprise's</u> commitment and quotes a portion of that letter agreement. The full quote makes clear that the "shipper" referenced in the Joint Tariff Agreement refers to third-party shippers—not Enterprise:

> Magellan and Enterprise agree to offer an incentive program under the Joint Tariff to shippers that enter into a ten (10) year agreement with Magellan pursuant to which the shipper agrees to ship under the Joint Tariff all crude oil owned or controlled by it from an Origin Point through the Connection Point and to a Destination Point. The Joint Tariff rate under the incentive program will be equal to or less than the sum of the Enterprise local tariff and the Initial Incentive Magellan Rate (as hereinafter defined).[17]

Moreover, it identifies Enterprise as a "Participating Carrier," not as a "shipper." The letter agreement refers to an incentive program under which Magellan and Enterprise are the <u>carriers</u> and contemplates separate agreements with third party shippers. It does not purport to restate, modify, or amend Enterprise's obligation

---

[16] Magellan's Resp. Br., Ex. 1 at ¶ 9,11.
[17] Magellan's Resp. Br., Ex. 1-C, page 79.

SR384

under the Distribution Agreement. Indeed, it does not reference or mention the Distribution Agreement at all. Instead, the letter agreement expressly states that its purpose is to confirm an agreement to establish a joint tariff. The Joint Tariff itself does not purport to require **anyone**, let alone Enterprise, to transport crude on **any** particular routing.[18] Rather, it merely sets forth the rates that will be available to third party shippers who qualify as a "Participating Shipper." Magellan's argument is baseless.

**C.** **Magellan's declaratory judgment claim fails along with its breach of contract claim and also fails because it is merely duplicative of its breach of contract claim.**

Magellan's declaratory judgment claim is based on the same flawed interpretation of the Distribution Agreement that underlies its breach of contract claim. Because Magellan's interpretation is wrong as a matter of law, not only does its breach of contract claim fail, but also its declaratory judgment claim necessarily fails for the same reasons.

Additionally, Magellan's declaratory judgment claim is not justiciable because the issues sought to be resolved are already pending in this suit via Magellan's breach of contract claim. *See Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 726 (Tex. App.—Dallas 2015, no pet.); *Hydroscience Techs., Inc. v. Hydroscience, Inc.*, 401 S.W.3d 783, 801 (Tex. App.—Dallas 2013, pet denied). Accordingly, the declaratory judgment claim should be dismissed for this reason as well.

Magellan's cases do not support a different result. In *BHP Petroleum Co. Inc. v. Millard*, 800 S.W.2d 838, 842 (Tex. 1990), the Court considered whether a

[18] Magellan's Resp. Br., Ex. 1-C, page 85.

SR385

defendant could maintain a declaratory judgment counterclaim after the plaintiff non-suited its claims. *Continental Homes of Texas, L.P. v. City of San Antonio*, 275 S.W.3d 9, 21 (Tex. App.—San Antonio 2008, pet. denied), also dealt with a defendant's declaratory judgment counterclaim in the city's action for an injunction under an ordinance. *Indian Beach Property Owners' Ass'n v. Linden*, 222 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2007, no pet.) similarly involved a defensive counterclaim that raised issues beyond the plaintiff's claims. *Halliburton Energy Services, Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 262-63 (Tex. App.—Dallas 2014, no pet.) involved a declaratory judgment over ownership of materials that remained unresolved after a breach of contract claim was decided, and the defendants' argument was that this was a "double recovery," not that it was non-justiciable.

**D.    Magellan's promissory estoppel claim is precluded by the express contract between the parties.**

Enterprise is entitled to summary judgment regarding Magellan's promissory estoppel claim because under Texas law promissory estoppel is not applicable to a promise covered by a valid contract between the parties. *Richter v. Wagner Oil Co.*, 90 S.W.3d 890, 899 (Tex. App.—San Antonio 2002, no pet.). Simply put, a promise contained in a written contract cannot be the basis for a promissory estoppel claim. *Stable Energy, L.P. v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 336 (Tex. App—Austin 2001, pet. denied).

On June 19, 2017, Magellan filed this lawsuit acknowledging that Magellan and Enterprise executed the Distribution Agreement dated October 31, 2011.[19]

---

[19] Original Petition at Exhibit A.

SR386

Magellan claims that while it has fully performed and complied with all of its obligations under the Distribution Agreement, Enterprise breached the agreement by failing to and refusing to fulfill its commitment to Magellan as set forth in Section 4.1 to exclusively use the Magellan facilities.[20] In its response, Magellan asserts that Enterprise promised Magellan on October 18, 2011, thirteen (13) days before the Distribution Agreement was executed, that Enterprise would exclusively use the Magellan facilities for all Origin Point to Destination Point deliveries of Enterprise's "marketing" volumes of crude oil.[21] Magellan readily conceded that this alleged promise on October 18, 2011, "is synonymous with the Enterprise Transportation Commitment as expressed in Section 4.1 of the parties' written agreement."[22] Under Texas law, however, promissory estoppel is only available in the absence of a valid and enforceable contract. *Doctors Hosp. 1997, LP v. Sambuca Houston, L.P.*, 154 S.W.3d 634, 636 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

The Petition is devoid of any allegation that the Distribution Agreement is unenforceable for any reason. The problem with Magellan's theory of pleading its promissory estoppel claim asserted in the alternative is that promissory estoppel does not apply as a matter of law when a valid contract governs the subject matter of the promise. Enterprise does not dispute the validity and enforceability of the parties' Agreement and Magellan has sued to enforce it.[23] Indeed, Magellan expressly relies on the Distribution Agreement in asserting claims for breach of

---

[20] Original Petition, ¶¶ 70, 71.
[21] Magellan Resp. Br., at 43.
[22] Magellan Resp. Br., at 44.
[23] **Pleading in the alternative does not permit alleging a claim with no reasonable basis in fact or law 'in the alternative' of a claim that *does* have support. That is simply not permitted by Texas law**." *Low v. Henry*, 221 S.W.3d 609, 615 (Tex. 2007) (emphasis added).

contract and declaratory judgment. The Distribution Agreement clearly delineates, among other things, the scope of services provided, the parties' obligations, and the potential liability for breach.[24] Further, it contains an integration clause which provides that the agreement's terms are the final expression of the parties' intent, and supersedes prior agreements.[25] Magellan has not—and cannot—provide a plausible argument why the Distribution Agreement is not enforceable. For that reason, Magellan has not stated a valid promissory estoppel claim, and summary judgment is appropriate. *Birenbaum v. Option Care, Inc.*, 931 S.W.2d 497 (Tex. App.—Dallas 1997, pet. denied); *Trevino & Assocs. Mech., L.P. v. Frost Nat. Bank*, 400 S.W.3d 139 (Tex. App.—Dallas 2013, no pet.).

Magellan's cause of action for promissory estoppel also fails as a matter of law because it is predicated on an alleged promise it claims is contained in the Distribution Agreement. *Fertic v. Spencer*, 247 S.W.3d 242, 250 (Tex. App.—El Paso 2007, pet. denied); *see Subaru, Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002) (promissory-estoppel action presumes there is no contract). In other words, since the alleged promise is part of a valid contract, Magellan cannot disregard the contract and sue for reliance damages under the doctrine of promissory estoppel. *Stable Energy L.P. v. Kachina Oil & Gas, Inc.*, 52 S.W.3d 327, 336 (Tex. App.—Austin 2001, no pet.) (citing *Guaranty Bank v. Lone Star Life Ins. Co.*, 568 S.W.2d 431, 434 (Tex. Civ. App.—Dallas 1978, writ ref'd n.r.e.)). Magellan had the burden to raise a fact issue that the promise on which it relied to its

---

[24] Original Petition, Ex. A.
[25] Original Petition, Ex. A, § 9.7.

detriment was outside of the underlying Distribution Agreement. *Id.* Magellan does not and cannot make that allegation because the alleged promise falls squarely within the scope of Section 4.1 of the Distribution Agreement as Magellan readily concedes in its response.

**E.    Magellan cannot demonstrate a mutual mistake that would justify reformation of the Distribution Agreement.**

Magellan cannot maintain its reformation claim, as illustrated by one of the cases Magellan itself cites. In *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377, 381 (Tex. 1987), the Texas Supreme Court reversed a judgment granting reformation of a deed and rendered judgment for the defendant, recognizing that a mutual mistake as to the legal effect of language used in a writing, as opposed to a mutual mistake in reducing a prior agreement to writing, will not support reformation. 741 S.W.2d at 379-80. At most, Magellan's evidence is that its employee, Mark Daggett, and Enterprise's employee, Jake Everett,[26] were mistaken about the legal effect of the language used in the Distribution Agreement. That is insufficient for reformation.

Reformation requires two elements. First, the party seeking reformation must prove the true agreement of the parties—it is not enough to show that both parties were mistaken about some feature of their bargain. *National Resort Communities v. Cain,* 526 S.W.2d 510, 513 (Tex. 1975). Second, the party must show that the provision erroneously written, included, or omitted in the written

---

[26] Magellan has not shown that Everett was a decision-maker for Enterprise (and he did not sign the Distribution Agreement) or that Everett's subjective belief about the Distribution Agreement was shared by persons with authority to bind Enterprise.

agreement was there by mutual mistake—it is not enough that the writing differed from the oral agreement. *Id.* at 513-14. Magellan falls far short of making either showing.

Additionally, the Everett email and the alleged conversations between Everett and Daggett are in the nature of the back-and-forth characteristic of any negotiation process. They do not constitute evidence of a final agreement or evidence that the Distribution Agreement did not reflect the final agreement of the parties. *See, e.g., Capitol Rod & Gun Club v. Lower Colorado River Auth.*, 622 S.W.2d 887, 893 (Tex. App.—Austin 1981, writ ref'd n.r.e.). Magellan has failed to show that it has a valid reformation claim.

## F. The express language of the Distribution Agreement bars justifiable reliance, which precludes Magellan from maintaining a fraud claim.

Magellan makes three primary arguments in an effort to salvage its fraud claim, none of which is availing. First, Magellan contends (again) that Enterprise filed a "no-evidence" motion for summary judgment, which can be defeated through presentation of merely a scintilla of evidence. For the reasons noted above in Section A, this is incorrect. Enterprise has moved under Rule 166a(c), because the terms of the Distribution Agreement *affirmatively disprove* the element of justifiable reliance. Second, Magellan asserts that Enterprise's interpretation of the Distribution Agreement is unreasonable. As detailed in Enterprise's motion and in this reply, a review of the plain and unambiguous language of the agreement proves otherwise. And, third, Enterprise claims that the terms of the Distribution Agreement do not disprove reliance because the agreement's language does not

SR390

directly contradict the alleged representation that all of Enterprise's marketing volumes would move through Magellan's facilities. For the reasons below, that argument likewise fails.

As an initial matter, the statement Magellan claims to have relied upon, that "all marketing volumes" would be subject to the Distribution Agreement, is plainly not true under either party's reading of the agreement. Even Magellan recognizes that the subset of crude subject to the Distribution Agreement is defined and limited by the terms of Section 4.1. For this reason alone, Magellan's alleged reliance on such a statement is unreasonable and therefore unjustified. Indeed, this would be true even if the statement were "all marketing volumes originating from the Origin Points" (it was not), because crude arriving at places other than the Destination Points are unambiguously excluded. In this respect, then, Section 4.1—even as interpreted by Magellan—directly contradicts the claimed representation.

Nevertheless, Magellan contends that its subjective understanding[27] of the term "marketing volumes" can be a basis for fraud because the terms of the Distribution Agreement do not directly and expressly contradict its belief that these two words mean that any crude Enterprise owned or controlled at an Origin Point is forever subject to the agreement, regardless of any subsequent change in title, its ultimate destination, or its routing along the way. This is, of course, directly and expressly contradicted by the agreement, which defines "Owned" and "Controlled" to *exclude* crude transported "for the account of a party or parties other than

---

[27] *See* Magellan Resp. Br. at 45 (describing what "Magellan understood" the term "marketing volume" to mean).

[Enterprise] or its Affiliates."[28] And regardless of the mechanism used, whether buy/sell or otherwise, a sale transfers title to a third party, at which point it is not "Owned" or "Controlled" by Enterprise.

"[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.,* 112 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en banc). What Magellan appears to demand, and what the case law does not require, however, is mirror-image language contradicting the inferences it supposedly drew from the alleged representations. But courts applying the principles set out in *DRC Parts* have recognized that oral representations may "directly contradict" a contract even when the contract does not contain language that is the exact opposite, mirror image of the alleged representation. In *Rinard v. Bank of America,* 349 S.W.3d 148, 153 (Tex. App.—El Paso 2011, no pet.), for example, the court found no justifiable reliance based on the ***absence of*** a term. There, borrowers alleged that the lender represented that credit disability insurance would be purchased. The note, however, referred only to joint credit life insurance. A statement that "no credit disability insurance will be purchased" was not required—that could be deduced from the language of the agreement, and that was sufficient to negate justifiable reliance.

Similarly, in *Freedom Equity Grp., Inc. v. MTL Ins. Co.,* No. 01-14-00210-CV, 2015 WL 1135186, at *2-3 (Tex. App.—Houston [1st Dist.] Mar. 12, 2015, no pet.),

---

[28] Distribution Agreement, §§ 1.6, 1.32.

the Houston Court of Appeals dismissed a fraud claim for lack of justifiable reliance where the parties' agreement was inconsistent with, but not a mirror image of, the alleged representation. In that case, the plaintiff alleged that it was induced to enter a contract becoming a General Agent on a promise that, post-execution, it would become a Managing Agent and its contractor would be demoted to General Agent under it. The contract did not address—either positively or negatively—the changing of titles. Nevertheless, the fact that the plaintiff entered a contract to become a General Agent, combined with the contract's merger clause,[29] was sufficient to negate reliance on any promise. *Id.*

Here, Magellan entered into a contract that specified the requirements for crude to be subject to the agreement, and they are: (1) that the crude be Owned or Controlled by Enterprise or an affiliate; (2) that the crude come from an Origin Point; (3) that it travel through the Connection Point; and (4) that it arrive at a Destination Point. Any statement that crude not meeting these requirements would nevertheless be subject to the agreement directly contradicts these express terms, and is, as a matter of law, unjustifiable. *See DRC Parts*, 112 S.W.3d at 858-

---

[29] Here, too, the Distribution Agreement provides that "[t]his Agreement between the Parties comprises the entire agreement between the Parties with respect to the subject matter hereof, and there are no agreements, understandings, requirements, warranties or representations, oral or written, expressed or implied, that are not merged herein or superseded hereby, other than as set forth in the Joint Tariff." Distr. Agr. § 9.7. Where a contract is negotiated at arms-length by sophisticated businessmen represented by counsel, this type of "merger" clause, is enforceable and negates reliance on any alleged oral representations, an essential element of fraud as set out in the charge above. *See Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 258 (Tex. App.—Corpus Christi, 2006, pet. denied); *see also IKON Office Solutions, Inc. v. Eifert,* 125 S.W.3d 113, 126–28 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (providing that provisions that contract was "entire agreement" and requiring any modifications to be in writing barred fraudulent-inducement claim).

59; *Playboy Enters. Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 257-58 (Tex. App.—Corpus Christi 2006, pet. denied).

Furthermore, Magellan's attempt to rely on the Everett email as the basis for its fraud claim fails as a matter of law. To be actionable fraud, the individual who made the allegedly false statement must also have the requisite scienter, *i.e.*, the speaker must have known the statement was false and intended that the other party act in reliance on it. *Landers v. Aurora Loan Services, LLC*, 434 S.W.3d 291, 296 (Tex. App.—Texarkana 2014, no pet.); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). The Everett email contains a statement regarding an Enterprise engineer's belief about the intent of the Distribution Agreement.[30] Magellan offers nothing to suggest that statement was false, was known by Everett to be false, or that Everett intended that Magellan act in reliance on it.

Additionally, a representation about the legal effect of a document is a statement of opinion rather than a statement of fact and will not support a fraud claim. *Matheson Tri-Gas, Inc. v. Maxim Integrated Products, Inc.*, 444 S.W.3d 283, 290 (Tex. App.—Dallas 2014, pet. denied); *Cheung-Loon, LLC v. Cergon, Inc.*, 392 S.W.3d 738, 746 (Tex. App.—Dallas 2012, no pet.). Everett's statement cannot support a fraud claim because it merely expressed an opinion about the effect of the terms of the contract, a matter to which Magellan had equal access and about which Magellan would be expected to have its own opinion and exercise its own judgment.

---

[30] Magellan Resp. Br., Ex. 1-A, page 65.

SR394

*Matheson*, 444 S.W.3d at 290; *Cheung-Loon*, 392 S.W.3d at 746. There is no actionable fraud here, and summary judgment should be granted.

## G.    Magellan is not entitled to delay disposition of its meritless case.

There are two reasons the Court should reject any assertions by Magellan that Enterprise's summary judgment motion should be denied as "premature." First, Magellan's argument and its cursory request for a continuance on these grounds is unsupported under Texas Rule of Civil Procedure 166a(g). A continuance is appropriate only "if it appears 'from the affidavits of a party opposing the [summary judgment] motion that he cannot for reasons stated present *by affidavit* facts *essential* to justify his opposition.'" *Joe v. Two Thirty Nine J.V.*, 145 S.W.3d 150, 161 (Tex. 2004) (quoting Tex. R. Civ. P. 166a(g)) (emphasis added). Here, however, there are no affidavits attached to Magellan's summary judgment response explaining why Magellan cannot, by its own affidavit, present facts essential to justify its opposition. So Magellan is not entitled to a continuance.

Second, Magellan's request should be denied because discovery is unnecessary. As Enterprise has explained in its motion, and reinforced above, the Distribution Agreement is not ambiguous and must be construed as a matter of law. So there are no fact issues and no discovery is required. *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520–22 (Tex. 1995) (holding that the plaintiff was not entitled to a chance to conduct discovery, and thereby manufacture a contractual ambiguity with inadmissible parol evidence obtained through discovery, where there were no factual issues meriting discovery on meaning of unambiguous contractual language). The Court should therefore

deny Magellan's request to delay the Court's ruling on this motion, grant Enterprise's summary judgment motion, and dismiss this action in its entirety.

<u>CONCLUSION</u>

Summary judgment is appropriate in this case, which turns on the construction of an unambiguous contract. That proper construction vitiates all of Magellan's claims, and those patently unmeritorious claims should be eliminated through summary judgment. *See Swilley v. Hughes*, 488 S.W.2d 64, 68 (Tex. 1972). Enterprise respectfully requests that the Court grant its motion and enter summary judgment in favor of Enterprise on all of Magellan's claim.

Dated:  <u>September 20, 2017</u>                    Respectfully submitted,

*/s/ Courtney Barksdale Perez*
E. Leon Carter
Texas Bar No. 03914300
lcarter@carterscholer.com
J. Robert Arnett II
Texas Bar No. 01332900
barnett@carterscholer.com
Courtney Barksdale Perez
Texas Bar No. 24061135
cperez@carterscholer.com
**CARTER SCHOLER PLLC**
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206
Telephone: 214-550-8188
Facsimile:  214-550-8185

**ATTORNEYS FOR DEFENDANT
ENTERPRISE CRUDE OIL, LLC**

SR396

## CERTIFICATE OF SERVICE

This is to certify that on September 20, 2017, a true, correct and complete copy of the foregoing document has been served on all counsel of record electronically via a court-approved electronic filing system, in accordance with Rule 21a of the Texas Rules of Civil Procedure.

/s/ J. Robert Arnett II
J. Robert Arnett II

SR397

MAGELLAN CRUDE OIL PIPELINE ) 
COMPANY, L.P., a Delaware limited partnership, )
           )
                Plaintiff, )    IN THE DISTRICT COURT OF
           )
vs. )    DALLAS COUNTY, TEXAS
           )
ENTERPRISE CRUDE OIL LLC, a Texas limited )    101st JUDICIAL DISTRICT
liability company, )
           )
               Defendant. )

### PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEFENDANT'S MOTION FOR ENTRY OF A PROTECTIVE ORDER GOVERNING THE PRODUCTION OF CONFIDENTIAL INFORMATION

Both before and after the December 4, 2017 hearing, Magellan initiated discussions with Enterprise in an effort to agree upon an acceptable form of protective order. Magellan has always agreed that a protective order is appropriate and has remained willing to negotiate over reasonable terms that provide adequate protection while not preventing either party from preparing its case. But, through the use of hyperbole and unsupported accusations, Enterprise has attempted to turn the protective order discussions into a trial over Magellan's motives in seeking and using discovery.

Despite lengthy negotiations after the December 4, 2017 hearing on compromise forms of protective order proposed by Magellan, Enterprise's counsel failed to send the compromise revised form he promised, instead proposing that Magellan scrap all other proposals and agree to a form entered into in another unrelated case in a different jurisdiction that was based on the form of order accepted by that jurisdiction.

### At a Minimum, Revisions Are Necessary to Enterprise's Proposed Form

The protective order proposed by Enterprise is not appropriate in this case in the form in which Enterprise proposed it. Attached hereto as Exhibit 1 is a revised version of the protective

SR398

order proposed by Enterprise, and attached hereto as Exhibit 2 is a redline showing how the revised version differs from the proposal by Enterprise. To highlight, the following necessary revisions have been made:

- The list of "Qualified Persons" who have the ability to view information designated "For Counsel Only" or "Attorneys Eyes Only" has been expanded to include:

    o In-house counsel actively assisting in the litigation and whose job is to manage litigation. Specifically excluded are in-house counsel who make or participate in competitive business matters of the parties.
    o Auditors employed by the parties.
    o Witnesses currently employed by the parties or witnesses who were employed by the parties at the time the designated information was generated.
    o Court reporters, as well as litigation vendors and other litigation support personnel.

- The description of how material will be designated "For Counsel Only" or "Attorneys Eyes Only" has been clarified to describe that if only a portion of a document is "For Counsel Only" or "Attorneys Eyes Only", then only that portion will be noted as such, allowing the rest of the document that is either not "Classified Information" or is only "Confidential" to be treated as such.

- With the expansion of the list of "Qualified Persons" who can review "For Counsel Only" or "Attorneys Eyes Only" information, the provision requiring all materials designated as such be maintained at the offices of counsel or experts has been removed.

- The requirement that a party log all "For Counsel Only" or "Attorneys Eyes Only" documents shown to Qualified Persons has been removed.

- The procedure for challenging designation as a Qualified Person, which had no correlating procedure for designating someone as a Qualified Person, has been removed.

- The procedure for returning documents has been modified to allow retained counsel to maintain one copy of documents produced in this case and designated as Classified Information.

As noted in prior filings, this case centers on a Crude Oil Distribution ("COD") Agreement that specifically provides Magellan "the right to audit Shipper's [Enterprise's] records necessary to verify Shipper's [Enterprise's] compliance with the provisions of Sections 4.1 [Transportation

SR399

Commitment] and 4.2 [Transportation Commitment Exceptions]." The parties in this case agreed that Magellan has a right to inspect the information that is the subject of discovery in this case, and Enterprise agreed that an audit of the information is appropriate. Limiting access to information produced by Enterprise in this case to retained counsel will unfairly and unreasonably hamstring the ability of Magellan's retained counsel to consult with their client as necessary to prepare Magellan's case. Despite the attempt by Enterprise to portray this dispute as a simple issue of volumes, the filings to date and those attached to this supplement reveal that the issues are complicated and require persons who understand the business that is the subject of the COD Agreement to analyze the information to determine whether Enterprise has complied with its obligations under the COD Agreement.

And to the extent that Enterprise contends that the limits it seeks to impose will apply to a small subset of documents, that contention is counter to Enterprise's many filings in this case to date, including its filing with the Court of Appeals for the Fifth Judicial District. For example, in its response to Magellan's motion to compel Enterprise to produce documents responsive to its requests for production, Enterprise stated:

> Subject to the entry of a protective order, Enterprise has already agreed to produce any communications regarding the conversion of business arrangements for crude transported from the Origin Points, and any communications that discuss Magellan or the Distribution Agreement. Enterprise has also agreed to provide summary volume information for the "relevant period" defined in the requests (similar to information Enterprise already produced during the audits subject to a Confidentiality Agreement). The remaining documents, however, reveal Enterprise's trade secrets and they must be shielded from discovery under Texas Rule of Evidence 507 absent a showing by Magellan that such information is **necessary** to its case.

(Enter. Resp. to Mot. to Compel, p.6) (Emphasis added).

Accordingly, not only is it necessary that the list of Qualified Persons be slightly broader than retained counsel, it is necessary that the Protective Order require a party designating

PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER – Page 3
{1773121;}

SR400

information "For Counsel Only" or "Attorneys Eyes Only" be specific about its designations, designating only the portion of a document, or a page of a document, that the party believes warrants the restrictive designation.

The few remaining revisions are warranted to make the Protective Order manageable in the context of this case, where Enterprise has telegraphed its intent to designate most, if not everything, it is producing as Classified Information. This is shown by the fact that prior to the December 4, 2017 hearing on Magellan's Motion to Compel, Enterprise had not produced *one* document responsive to Magellan's requests. And, since that date, Enterprise has produced to Magellan only a small set of documents that appear to be the same as the documents previously provided to Magellan in its contractually-permitted audits.

## Enterprise's Shifting Positions May Require the Court to Revisit This Issue

Regardless of which form of Protective Order the Court enters, it may need to be modified once the details of Enterprise's production and confidentiality designations become clearer than they are now. To date, Enterprise's has made so many conflicting and inconsistent representations that it is impossible to know how much information Enterprise will be producing, from what source(s),[1] what *specific* information Enterprise deems to be "trade secret,"[2] and whether the trade

---

[1] In Magellan's pre-suit audits, Enterprise provided some information which apparently came from Enterprise Pipeline (its pipeline affiliate), and in its original responses to the discovery requests Magellan served on July 21, 2017, Enterprise did not object on the ground that the requests seek documents possessed or controlled by Enterprise Pipeline, although Enterprise objected on every other imaginable ground. See Ex. 3. However, in the Amended Objections Enterprise served on the eve of the December 4, 2017 discovery hearings, Enterprise stated for the first time that it will not produce its affiliates' documents. See Ex. 4.

[2] Enterprise has consistently refused to identify, specifically, the responsive information for which it claims trade secret protection, relying instead on a general "compilation" theory that practically all of its business information is trade secret. And even that is a moving target, as can be seen by comparing Enterprise's original objections to Magellan's discovery requests (Ex. 3) to its amended objections (Ex. 4). Among many other changes, the amended objections Enterprise served on the eve of the December 4, 2017 discovery hearing dropped its previously asserted trade secret objections to seven of Magellan requests for production, including RFPs 12, 13, 15, 16, 17, 30, and 31.

secret information Enterprise seeks to restrict to Magellan's outside counsel's eyes only, is minimal or *voluminous*.

For example, Enterprise never claimed that the any of the information it provided to Magellan during the course of Magellan's pre-suit audits is "trade secret" information, and it never sought to prevent any of Magellan's auditors or business personnel from reviewing that information.[3] However, Enterprise's discovery responses indicate that Enterprise *now* claims "trade secret" protection for *all the information it provided to Magellan during the pre-suit audits*, along with all other information necessary to trace the movement of Eagle Ford barrels from an Origin Point to a final destination point or to verify Enterprise's assertions; *i.e.*, that to the extent Enterprise is required to produce such information in this case, it seeks or may seek to restrict review to Magellan's outside counsel only.[1]

Enterprise's representations to this Court, and to the Court of Appeals, portend just such an overly broad designation of "trade secret" information, in an effort to unfairly and improperly hamstring Magellan's ability to understand and utilize discovery obtained in this litigation, for this

---

[3] Such information included copies of some transportation agreements and some Eagle Ford crude oil purchase contracts or buy-sell contracts between Enterprise and its customers, without redaction of customer identities and most of the terms of the contracts. By emails, Enterprise also provided partial information, or unverified assertions, that: (i) Enterprise batches a common stream barrel at the Origin Points and sells a common stream barrel at the applicable destination but does not tie a specific Origin Point to a barrel sold at a different location; (ii) Enterprise sells barrels that come from an Eagle Ford Origin Point to unaffiliated third parties at ECHO Terminal, Genoa Junction, or other destinations; (iii) deliveries Enterprise makes from an Origin Point to its ECHO Terminal do not go through the Magellan connection point [at Genoa Junction] prior to delivery to a final destination; and (iv) when Enterprise sells Eagle Ford barrels to a customer at ECHO Terminal, Enterprise does not track subsequent transportation thereof to any final destination. Yet Enterprise also asserted that certain barrels were delivered through Enterprise facilities (not Magellan facilities) based on transportation nominations made by Enterprise's customers, and that some product was transported by a customer from ECHO Terminal to a designated Destination Point, but not through the Magellan facilities, because that was "not the most direct routing." See emails identified as Ex. 5. *Pending determination whether and to what extent (if any) the Enterprise emails are properly designated as confidential information, Magellan has omitted them from the copy of this Supplement filed in the public record. Magellan will provide Exhibit 5 to the Court and will comply with the Court's direction regarding filing the same in some redacted version, or under seal if appropriate, following the hearing.*

litigation. Whenever Enterprise attempts to justify its refusal to produce the vast majority of the requested documents, or to persuade the Court of Appeals that this Court's order compelling production is an abuse of discretion, Enterprise represents that "most of Magellan's requests are aimed at obtaining discovery of Enterprise's trade secrets,"[4] and that this Court's order compelling production encompasses "*volumes* of proven trade secrets."[5] Yet when Enterprise urges this Court to impose draconian restrictions on Magellan's ability to use any "trade secret" information Enterprise may produce, it represents the opposite, that the trade secret documents will only amount to a "*select group* of highly sensitive information."[6]

## Conclusion

While a protective order is warranted in this case, the facts presented to this Court do not support entry of the protective order Enterprise seeks. Enterprise objected to almost all of Magellan's discovery requests to it and the nonparties as seeking trade secrets and is pursuing a writ of mandamus on the same grounds. To limit Magellan's review of this information to only Magellan's retained counsel would make preparation of this case extremely and unnecessarily difficult and expensive. Under Enterprise's proposal, only outside counsel or experts could review information Enterprise now claims to be "trade secret." Given the audit right provided in the contract at issue, and the fact Enterprise previously provided Magellan information in the audits did not claim (but now contends) is trade secret, the modestly broader list of authorized persons proposed by Magellan in the revised protective order is appropriate. For all of these reasons, and those previously described in its response to Enterprise's motion, Magellan respectfully urges the Court to approve the protective order attached hereto as Exhibit 1.

---

[4] See Defendant's Response to Motion to Compel, p. 1.

[5] Defendant's Petition for Writ of Mandamus, p. 25, excerpt attached as Ex. 6 (emphasis added).

[6] See Defendant's Motion for Entry of a Protective Order, p. 1 (emphasis added).

Dated December 27, 2017.

Respectfully submitted,

**GABLEGOTWALS**

By:    /s/ David L. Bryant
      David L. Bryant
      State Bar No. 24084344
      dbryant@gablelaw.com
      113 Pleasant Valley Drive, Suite 204
      Boerne, Texas 78006
      Telephone: (830) 336-4810
      Facsimile: (918) 595-4990

      Lisa T. Silvestri
      State Bar No. 00797967
      lsilvestri@gablelaw.com
      100 W. Fifth St., Suite 1100
      Tulsa, Oklahoma 74103
      Telephone: (918) 595-4800
      Facsimile: (918) 595-4990

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**ATTORNEYS FOR PLAINTIFF,
MAGELLAN CRUDE OIL
PIPELINE COMPANY, L.P.**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on December 27, 2017, I forwarded a true and correct copy of the foregoing

document to the following counsel via EFile:

**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

**Attorneys for Defendant
Enterprise Crude Oil, LLC**

/s/ David L. Bryant
David L. Bryant

SR405

Exhibit 1

NO. DC-17-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| vs. | § | 101st JUDICIAL DISTRICT |
| ENTERPRISE CRUDE OIL LLC, | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

## CONFIDENTIALITY AND PROTECTIVE ORDER

Before the court is the joint motion of the parties for the entry of a confidentiality and protective order ("Protective Order"). After careful consideration, it is hereby ORDERED as follows:

**1.    Classified Information**

"Classified Information" means any information of any type, kind, or character that is designated as "Confidential", "For Counsel Only", or "Attorneys Eyes Only" by any of the supplying or receiving persons, whether it be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer, or otherwise.

**2.    Qualified Persons**

"Qualified Persons" means:

a.    For Counsel or Attorneys Only information:

i.    retained counsel for the parties in this litigation and their respective staff;

ii.    in-house counsel for the receiving party who are actively involved in assisting counsel for the receiving party in the prosecution or defense of this action, and their paralegal, secretarial, and clerical assistants. This is limited to in-house counsel who manage litigation and do not make or participate in competitive business matters of the party for whom they work. Prior to receiving Classified Information,

any person described in this subsection must sign a document a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

iii. any employee of the receiving party currently or formerly serving as an auditor on behalf of the receiving party who, prior to receiving Classified Information, must sign a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

iv. a witness currently employed by the producing party or nonparty or a witness who was formerly employed by the producing party or nonparty at the time the Classified Information was generated who, prior to receiving Classified Information, must sign a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

v. actual or potential independent experts or consultants (and their administrative or clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, members, or agents of parties or affiliates of parties) who, prior to any disclosure of Classified Information to such person, have signed a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the attorney retaining such person);

vi. this court and its staff and any other tribunal or dispute resolution officer duly appointed or assigned in connection with this litigation.

vii. litigation vendors, court reporters, and other litigation support personnel;

b. For Confidential information:

i. the persons identified in subparagraph 2(a);

ii.     the party, if a natural person;

iii.     if the party is an entity, such officers or employees of the party who are actively involved in the prosecution or defense of this case who, prior to any disclosure of Confidential information to such person, have been designated in writing by notice to all counsel and have signed a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the attorney designating such person);

iv.     any person who was an author, addressee, or intended or authorized recipient of the Confidential information and who agrees to keep the information confidential, provided that such persons may see and use the Confidential information but not retain a copy.

c.     Such other person as this court may designate after notice and an opportunity to be heard.

3.     **Designation Criteria**

a.     *Nonclassified Information.* Classified Information shall not include information that either:

i.     is in the public domain at the time of disclosure, as evidenced by a written document;

ii.     becomes part of the public domain through no fault of the recipient, as evidenced by a written document;

iii.     the receiving party can show by written document was in its rightful and lawful possession at the time of disclosure; or

iv.     lawfully comes into the recipient's possession subsequent to the time of disclosure from another source without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.

b.      *Classified Information.* A party shall designate as Classified Information only such information that the party in good faith believes in fact is confidential. Information that is generally available to the public, such as public filings, catalogues, advertising materials, and the like, shall not be designated as Classified.

Information and documents that may be designated as Classified Information include, but are not limited to, trade secrets, confidential or proprietary financial information, operational data, business plans, and competitive analyses, personnel files, personal information that is protected by law, and other sensitive information that, if not restricted as set forth in this order, may subject the producing or disclosing person to competitive or financial injury or potential legal liability to third parties.

Correspondence and other communications between the parties or with nonparties may be designated as Classified Information if the communication was made with the understanding or reasonable expectation that the information would not become generally available to the public.

c.      *For Counsel or Attorneys Only.* The designation "For Counsel Only" or "Attorneys Eyes Only" shall be reserved for information that is believed to be unknown to the opposing party or parties, or any of the employees of a corporate party. For purposes of this order, so-designated information includes, but is not limited to, product formula information, design information, non- public financial information, pricing information, customer identification data, and certain study methodologies.

{1773126;}CONFIDENTIALITY AND PROTECTIVE ORDER     Page 4
PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 12

SR409

d.     *Ultrasensitive Information.* At this point, the parties do not anticipate the need for higher levels of confidentiality as to ultrasensitive documents or information. However, in the event that a court orders that ultrasensitive documents or information be produced, the parties will negotiate and ask the court to enter an ultrasensitive information protocol in advance of production to further protect such information.

## 4.     Use of Classified Information

All Classified Information provided by any party or nonparty in the course of this litigation shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose, and shall not be disclosed except in accordance with the terms hereof.

## 5.     Marking of Documents

Documents provided in this litigation may be designated by the producing person or by any party as Classified Information by marking each page of the documents so designated with a stamp indicating that the information is "Confidential", "For Counsel Only", or "Attorneys Eyes Only". If only part of a document is designated "For Counsel Only" or "Attorneys Eyes Only", the designating party shall produce two copies of the item—one copy with the "For Counsel Only" or "Attorneys Eyes Only" information noted but visible, and one copy with the "For Counsel Only" or "Attorneys Eyes Only" information shielded from visibility. In lieu of marking the original of a document, if the original is not provided, the designating party may mark the copies that are provided. Originals shall be preserved for inspection.

## 6.     Disclosure at Depositions

Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents, consultants, representatives, or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a nonparty may be designated by any party

as Classified Information by indicating on the record at the deposition that the testimony is "Confidential" or "For Counsel Only" and is subject to the provisions of this Order.

Any party also may designate information disclosed at a deposition as Classified Information by notifying all parties in writing not later than 10 days of receipt of the transcript of the specific pages and lines of the transcript that should be treated as Classified Information thereafter. Each party shall attach a copy of each such written notice to the face of the transcript and each copy thereof in that party's possession, custody, or control. All deposition transcripts shall be treated as For Counsel Only for a period of 10 days after initial receipt of the transcript.

To the extent possible, the court reporter shall segregate into separate transcripts information designated as Classified Information with blank, consecutively numbered pages being provided in a nondesignated main transcript. The separate transcript containing Classified Information shall have page numbers that correspond to the blank pages in the main transcript.

Counsel for a party or a nonparty witness shall have the right to exclude from depositions any person who is not authorized to receive Classified Information pursuant to this Protective Order, but such right of exclusion shall be applicable only during periods of examination or testimony during which Classified Information is being used or discussed.

### 7. Disclosure to Qualified Persons

Classified Information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons except as necessary to comply with applicable law or the valid order of a court of competent jurisdiction; provided, however, that in the event of a disclosure compelled by law or court order, the receiving party will so notify the producing party as promptly as practicable (if at all possible, prior to making such disclosure) and shall seek a protective order or confidential treatment of such information. Information designated as For Counsel Only shall be restricted in circulation to Qualified Persons described in subparagraph 2(a).

## 8. Unintentional Disclosures

Documents unintentionally produced without designation as Classified Information later may be designated and shall be treated as Classified Information from the date written notice of the designation is provided to the receiving party.

If a receiving party learns of any unauthorized disclosure of Confidential information or For Counsel Only information, the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure and shall make all reasonable efforts to prevent disclosure by each unauthorized person who received such information.

## 9. Documents Produced for Inspection Prior to Designation

In the event documents are produced for inspection prior to designation, the documents shall be treated as For Counsel Only during inspection. At the time of copying for the receiving parties, Classified Information shall be marked prominently "Confidential", "For Counsel Only", or "Attorneys Eyes Only" by the producing party.

## 10. Consent to Disclosure and Use in Examination

Nothing in this order shall prevent disclosure beyond the terms of this order if each party designating the information as Classified Information consents to such disclosure or if the court, after notice to all affected parties and nonparties, orders such disclosure. Nor shall anything in this order prevent any counsel of record from utilizing Classified Information in the examination or cross-examination of any person who is indicated on the document as being an author, source, or recipient of the Classified Information, irrespective of which party produced such information.

## 11. Challenging the Designation

A party shall not be obligated to challenge the propriety of a designation of Classified Information at the time such designation is made, and a failure to do so shall not preclude a subsequent challenge to the designation. In the event that any party to this litigation disagrees at any stage of these

proceedings with the designation of any information as Classified Information, the parties shall first try to resolve the dispute in good faith on an informal basis, such as by production of redacted copies. If the dispute cannot be resolved, the objecting party may invoke this Protective Order by objecting in writing to the party who designated the document or information as Classified Information. The designating party shall then have 14 days to move the court for an order preserving the designated status of the disputed information. The disputed information shall remain Classified Information unless and until the court orders otherwise.

Failure to move for an order shall constitute a termination of the status of such item as Classified Information.

### 12. Manner of Use in Proceedings

In the event a party wishes to use any Classified Information in affidavits, declarations, briefs, memoranda of law, or other papers filed in this litigation, the party shall do one of the following: (1) with the consent of the producing party, file only a redacted copy of the information; (2) where appropriate (e.g., in connection with discovery and evidentiary motions) provide the information solely for in camera review; or (3) file such information under seal with the court consistent with the sealing requirements of the court.

### 13. Filing Under Seal

The clerk of this court is directed to maintain under seal all documents, transcripts of deposition testimony, answers to interrogatories, admissions, and other papers filed under seal in this litigation that have been designated, in whole or in part, as Classified Information by any party to this litigation consistent with the sealing requirements and standards of Texas Rule of Civil Procedure 76a.

### 14. Return of Documents

Not later than 60 days after conclusion of this litigation and any appeal related to it, any Classified Information, all reproductions of such information, and any notes, summaries, or

SR413

descriptions of such information in the possession of any of the persons specified in paragraph 2 (except subparagraph 2(a)(iii)) shall be returned to the producing party or destroyed, except as this court may otherwise order or to the extent such information has been used as evidence at any trial or hearing. Notwithstanding this obligation to return or destroy information, counsel may retain one copy of Classified Information for their respective legal files and must describe to the producing party or nonparty the steps taken to ensure that such Classified Information will not be accessed, used, or disclosed inconsistently with the obligations under this Protective Order.

## 15. Ongoing Obligations

Insofar as the provisions of this Protective Order, or any other protective orders entered in this litigation, restrict the communication and use of the information protected by it, such provisions shall continue to be binding after the conclusion of this litigation, except that (a) there shall be no restriction on documents that are used as exhibits in open court unless such exhibits were filed under seal, and (b) a party may seek the written permission of the producing party or order of the court with respect to dissolution or modification of this, or any other, protective order.

## 16. Advice to Clients

This order shall not bar any attorney in the course of rendering advice to such attorney's client with respect to this litigation from conveying to any party client the attorney's evaluation in a general way of Classified Information produced or exchanged under the terms of this order; provided, however, that in rendering such advice and otherwise communicating with the client, the attorney shall not disclose the specific contents of any Classified Information produced by another party if such disclosure would be contrary to the terms of this Protective Order.

## 17. Duty to Ensure Compliance

Any party designating any person as a Qualified Person shall have the duty to reasonably ensure that such person observes the terms of this Protective Order and shall be responsible upon breach of such duty for the failure of such person to observe the terms of this Protective Order.

## 18. Legal Effect.

This Protective Order shall not abrogate or diminish any contractual, statutory, or other legal privilege or protection of a Party or person with respect to any information. The fact that any materials are designated Confidential Information pursuant to this Protective Order shall not affect or operate as a means of objection to the admissibility of any such material. The fact that materials are designated as Confidential Information pursuant to this Protective Order shall not affect what a trier of fact in the proceedings may find to be confidential or proprietary. Other than as specifically provided herein, this Protective Order does not expand or limit the scope of discovery or the rights and the obligations of any Party with respect thereto in the Lawsuit or any other proceeding.

## 19. Modification and Exceptions

The parties may, by written stipulation, provide for exceptions to this order and any party may seek an order of this court modifying this Protective Order.

It is SO ORDERED this _____ day of December 2017.

_____
Presiding Judge

{1773126;}CONFIDENTIALITY AND PROTECTIVE ORDER    Page 10
PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 18

SR415

NO. DC-17-07264

Exhibit 2

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § § § | |
| vs. | § § § | 101st JUDICIAL DISTRICT |
| ENTERPRISE CRUDE OIL LLC, | § § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

## CONFIDENTIALITY AND PROTECTIVE ORDER

Before the court is the joint motion of the parties for the entry of a confidentiality and protective order ("Protective Order"). After careful consideration, it is hereby ORDERED as follows:

### 1. Classified Information

"Classified Information" means any information of any type, kind, or character that is designated as "Confidential", "For Counsel Only", or "Attorneys Eyes Only" by any of the supplying or receiving persons, whether it be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer, or otherwise.

### 2. Qualified Persons

"Qualified Persons" means:

a. For Counsel or Attorneys Only information:

i. retained counsel for the parties in this litigation and their respective staff;

ii. in-house counsel for the receiving party who are actively involved in assisting counsel for the receiving party in the prosecution or defense of this action, and their paralegal, secretarial, and clerical assistants. This is limited to in-house counsel who manage litigation and do not make or participate in competitive business matters of the party for whom they work. Prior to receiving Classified Information, any person described in this subsection must sign a document a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

iii. any employee of the receiving party currently or formerly serving as an auditor

CONFIDENTIALITY AND PROTECTIVE ORDER – Page 3

on behalf of the receiving party who, prior to receiving Classified Information, must sign a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

iv. a witness currently employed by the producing party or nonparty or a witness who was formerly employed by the producing party or nonparty at the time the Classified Information was generated who, prior to receiving Classified Information, must sign a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

ii.v. actual or potential independent experts or consultants (and their administrative or clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, members, or agents of parties or affiliates of parties) who, prior to any disclosure of Classified Information to such person, have signed a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the attorney retaining such person) and have been designated in writing by notice to all counsel;);

iii.vi. this court and its staff and any other tribunal or dispute resolution officer duly appointed or assigned in connection with this litigation.

vii. litigation vendors, court reporters, and other litigation support personnel;

b. For Confidential information:

i. the persons identified in subparagraph 2(a);

ii. the party, if a natural person;

iii. if the party is an entity, such officers or employees of the party who are actively involved in the prosecution or defense of this case who, prior to any disclosure of Confidential information to such person, have been designated in writing by notice to all counsel and have signed a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the attorney designating such person);

iv.i. litigation vendors, court reporters, and other litigation support personnel;

heard.

<u>CONFIDENTIALITY AND PROTECTIVE ORDER</u> – Page 3

v.iv.    any person who was an author, addressee, or intended or authorized recipient of the Confidential information and who agrees to keep the information confidential, provided that such persons may see and use the Confidential information but not retain a copy.

c.    Such other person as this court may designate after notice and an opportunity to be heard.

**CONFIDENTIALITY AND PROTECTIVE ORDER – Page 3**

### 3. Designation Criteria

      a.     *Nonclassified Information.* Classified Information shall not include information that either:

          i.     is in the public domain at the time of disclosure, as evidenced by a written document;

          ii.     becomes part of the public domain through no fault of the recipient, as evidenced by a written document;

          iii.     the receiving party can show by written document was in its rightful and lawful possession at the time of disclosure; or

          iv.     lawfully comes into the recipient's possession subsequent to the time of disclosure from another source without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.

      b.     *Classified Information.* A party shall designate as Classified Information only such information that the party in good faith believes in fact is confidential. Information that is generally available to the public, such as public filings, catalogues, advertising materials, and the like, shall not be designated as Classified.

      Information and documents that may be designated as Classified Information include, but are not limited to, trade secrets, confidential or proprietary financial information, operational data, business plans, and competitive analyses, personnel files, personal information that is protected by law, and other sensitive information that, if not restricted as set forth in this order, may subject the producing or disclosing person to competitive or financial injury or potential legal liability to third parties.

      Correspondence and other communications between the parties or with nonparties may be designated as Classified Information if the communication was made with the understanding or reasonable expectation that the information would not become generally available to the public.

      c.     *For Counsel or Attorneys Only.* The designation "For Counsel Only" or "Attorneys Eyes Only" shall be reserved for information that is believed to be unknown to the opposing party or parties, or any of the employees of a corporate party. For purposes of this order, so-designated information includes, but is not limited to, product formula information, design information, non-public financial information, pricing information, customer identification data, and certain study methodologies.

{1773363;}

<u>**CONFIDENTIALITY AND PROTECTIVE ORDER**</u> **– Page 10**

**PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 23**

SR420

d.      *Ultrasensitive Information.* At this point, the parties do not anticipate the need for higher levels of confidentiality as to ultrasensitive documents or information. However, in the event that a court orders that ultrasensitive documents or information be produced, the parties will negotiate and ask the court to enter an ultrasensitive information protocol in advance of production to further protect such information.

### 4. Use of Classified Information

All Classified Information provided by any party or nonparty in the course of this litigation shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose, and shall not be disclosed except in accordance with the terms hereof.

### 5. Marking of Documents

Documents provided in this litigation may be designated by the producing person or by any party as Classified Information by marking each page of the documents so designated with a stamp indicating that the information is "Confidential", "For Counsel Only", or "Attorneys Eyes Only". If only part of a document is designated "For Counsel Only" or "Attorneys Eyes Only", the designating party shall produce two copies of the item—one copy with the "For Counsel Only" or "Attorneys Eyes Only" information noted but visible, and one copy with the "For Counsel Only" or "Attorneys Eyes Only" information shielded from visibility. In lieu of marking the original of a document, if the original is not provided, the designating party may mark the copies that are provided. Originals shall be preserved for inspection.

### 6. Disclosure at Depositions

Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents, consultants, representatives, or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a nonparty may be designated by any party as Classified Information by indicating on the record at the deposition that the testimony is "Confidential" or "For Counsel Only" and is subject to the provisions of this Order.

Any party also may designate information disclosed at a deposition as Classified Information by notifying all parties in writing not later than 10 days of receipt of the transcript of the specific pages and lines of the transcript that should be treated as Classified Information thereafter. Each party shall attach a copy of each such written notice to the face of the transcript and each copy thereof in that party's possession, custody, or control. All deposition transcripts shall be treated as For Counsel Only {1773363;}

**CONFIDENTIALITY AND PROTECTIVE ORDER – Page 10**

SR421

for a period of 10 days after initial receipt of the transcript.

To the extent possible, the court reporter shall segregate into separate transcripts information designated as Classified Information with blank, consecutively numbered pages being provided in a nondesignated main transcript. The separate transcript containing Classified Information shall have page numbers that correspond to the blank pages in the main transcript.

Counsel for a party or a nonparty witness shall have the right to exclude from depositions any person who is not authorized to receive Classified Information pursuant to this Protective Order, but such right of exclusion shall be applicable only during periods of examination or testimony during which Classified Information is being used or discussed.

## 7. Disclosure to Qualified Persons

*To Whom.* Classified Information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons except as necessary to comply with applicable law or the valid order of a court of competent jurisdiction; provided, however, that in the event of a disclosure compelled by law or court order, the receiving party will so notify the producing party as promptly as practicable (if at all possible, prior to making such disclosure) and shall seek a protective order or confidential treatment of such information. Information designated as For Counsel Only shall be restricted in circulation to Qualified Persons described in subparagraph 2(a).

a. *Retention of Copies During this Litigation.* Copies of For Counsel Only information shall be maintained only in the offices of outside counsel for the receiving party and, to the extent supplied to experts described in subparagraph 2(a)(ii), in the offices of those experts. Any documents produced in this litigation, regardless of classification, that are provided to Qualified Persons shall be maintained only at the office of such Qualified Person and only necessary working copies of any such documents shall be made. Copies of documents and exhibits containing Classified Information may be prepared by independent copy services, printers, or illustrators for the purpose of this litigation.

b. Each party's outside counsel shall maintain a log of all copies of For Counsel Only documents that are delivered to Qualified Persons.

## 8. Unintentional Disclosures

Documents unintentionally produced without designation as Classified Information later may be designated and shall be treated as Classified Information from the date written notice of the

{1773363;}

<u>CONFIDENTIALITY AND PROTECTIVE ORDER – Page 10</u>

**PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 25**

designation is provided to the receiving party.

If a receiving party learns of any unauthorized disclosure of Confidential information or For Counsel Only information, the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure and shall make all reasonable efforts to prevent disclosure by each unauthorized person who received such information.

## 9. Documents Produced for Inspection Prior to Designation

In the event documents are produced for inspection prior to designation, the documents shall be treated as For Counsel Only during inspection. At the time of copying for the receiving parties, Classified Information shall be marked prominently "Confidential", "For Counsel Only", or "Attorneys Eyes Only" by the producing party.

## 10. Consent to Disclosure and Use in Examination

Nothing in this order shall prevent disclosure beyond the terms of this order if each party designating the information as Classified Information consents to such disclosure or if the court, after notice to all affected parties and nonparties, orders such disclosure. Nor shall anything in this order prevent any counsel of record from utilizing Classified Information in the examination or cross-examination of any person who is indicated on the document as being an author, source, or recipient of the Classified Information, irrespective of which party produced such information.

## 11. Challenging the Designation

~~Classified Information.~~ A party shall not be obligated to challenge the propriety of a designation of Classified Information at the time such designation is made, and a failure to do so shall not preclude a subsequent challenge to the designation. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation of any information as Classified Information, the parties shall first try to resolve the dispute in good faith on an informal basis, such as by production of redacted copies. If the dispute cannot be resolved, the objecting party may invoke this Protective Order by objecting in writing to the party who designated the document or information as Classified Information. The designating party shall then have 14 days to move the court for an order preserving the designated status of the disputed information. The disputed information shall remain Classified Information unless and until the court orders otherwise.

Failure to move for an order shall constitute a termination of the status of such item as Classified Information.

{1773363;}

**CONFIDENTIALITY AND PROTECTIVE ORDER – Page 10**

SR423

a. ~~*Qualified Persons.* In the event that any party in good faith disagrees with the designation of a person as a Qualified Person or the disclosure of particular Classified Information to such person, the parties shall first try to resolve the dispute in good faith on an informal basis. If the dispute cannot be resolved, the objecting party shall have 14 days from the date of the designation or, in the event particular Classified Information is requested subsequent to the designation of the Qualified Person, 14 days from service of the request to move the court for an order denying the disposed person (a) status as a Qualified Person, or (b) access to particular Classified Information. The objecting person shall have the burden of demonstrating that disclosure to the disputed person would expose the objecting party to the risk of serious harm. Upon the timely filing of such a motion, no disclosure of Classified Information shall be made to the disputed person unless and until the court enters an order preserving the designation.~~

## 12. Manner of Use in Proceedings

In the event a party wishes to use any Classified Information in affidavits, declarations, briefs, memoranda of law, or other papers filed in this litigation, the party shall do one of the following: (1) with the consent of the producing party, file only a redacted copy of the information; (2) where appropriate (e.g., in connection with discovery and evidentiary motions) provide the information solely for in camera review; or (3) file such information under seal with the court consistent with the sealing requirements of the court.

## 13. Filing Under Seal

The clerk of this court is directed to maintain under seal all documents, transcripts of deposition testimony, answers to interrogatories, admissions, and other papers filed under seal in this litigation that have been designated, in whole or in part, as Classified Information by any party to this litigation consistent with the sealing requirements and standards of Texas Rule of Civil Procedure 76a.

## 14. Return of Documents

Not later than 60 days after conclusion of this litigation and any appeal related to it, any Classified Information, all reproductions of such information, and any notes, summaries, or descriptions of such information in the possession of any of the persons specified in paragraph 2 (except subparagraph 2(a)(iii)) shall be returned to the producing party or destroyed, except as this court may otherwise order or to the extent such information has been used as evidence at any trial or hearing. Notwithstanding this obligation to return or destroy information, counsel may retain ~~attorney work~~

{1773363;}

CONFIDENTIALITY AND PROTECTIVE ORDER – Page 10

PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 27

~~product, including document indices, so long as that work product does not duplicate verbatim~~ ~~substantial portions of the text of any Classified Information~~ <u>one copy of Classified Information for their respective legal files and must describe to the producing party or nonparty the steps taken to ensure that such Classified Information will not be accessed, used, or disclosed inconsistently with the obligations under this Protective Order</u>.

## 15. Ongoing Obligations

Insofar as the provisions of this Protective Order, or any other protective orders entered in this litigation, restrict the communication and use of the information protected by it, such provisions shall continue to be binding after the conclusion of this litigation, except that (a) there shall be no restriction on documents that are used as exhibits in open court unless such exhibits were filed under seal, and (b) a party may seek the written permission of the producing party or order of the court with respect to dissolution or modification of this, or any other, protective order.

## 16. Advice to Clients

This order shall not bar any attorney in the course of rendering advice to such attorney's client with respect to this litigation from conveying to any party client the attorney's evaluation in a general way of Classified Information produced or exchanged under the terms of this order; provided, however, that in rendering such advice and otherwise communicating with the client, the attorney shall not disclose the specific contents of any Classified Information produced by another party if such disclosure would be contrary to the terms of this Protective Order.

## 17. Duty to Ensure Compliance

Any party designating any person as a Qualified Person shall have the duty to reasonably ensure that such person observes the terms of this Protective Order and shall be responsible upon breach of such duty for the failure of such person to observe the terms of this Protective Order.

## 18. <u>Legal Effect</u>.

This Protective Order shall not abrogate or diminish any contractual, statutory, or other legal privilege or protection of a Party or person with respect to any information. The fact that any materials are designated Confidential Information pursuant to this Protective Order shall not affect or operate as a means of objection to the admissibility of any such material. The fact that materials are designated as Confidential Information pursuant to this Protective Order shall not affect what a trier of fact in the proceedings may find to be confidential or proprietary. Other than as specifically provided herein, this
{1773363;}

<u>**CONFIDENTIALITY AND PROTECTIVE ORDER**</u> **– Page 10**

Protective Order does not expand or limit the scope of discovery or the rights and the obligations of any Party with respect thereto in the Lawsuit or any other proceeding.

**19. Modification and Exceptions**

The parties may, by written stipulation, provide for exceptions to this order and any party may seek an order of this court modifying this Protective Order.

It is SO ORDERED this_____day of December, 2017.

_____
Presiding Judge

{1773363;}

**CONFIDENTIALITY AND PROTECTIVE ORDER – Page 10**

**PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 29**

Exhibit 3

CAUSE NO. DC-17-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P. a Delaware Limited Partnership, | § § § § | IN THE DISTRICT COURT |
| *Plaintiff*, | § § | |
| | § | 101st JUDICIAL DISTRICT |
| v. | § § | |
| ENTERPRISE CRUDE OIL LLC, A Texas Limited Liability Company, | § § § | |
| | § | |
| *Defendant*. | § | DALLAS COUNTY, TEXAS |

**DEFENDANT'S OBJECTIONS AND RESPONSES
TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION**

TO:     Plaintiff Magellan Crude Oil Pipeline Company, L.P., by and through their attorney of record, David L. Bryant, GableGotwals, 113 Pleasant Valley Drive, Suite 204, Boerne, Texas 78006; Lisa T. Silvestri, GableGotwals, 100 W. Fifth Street, Suite 1100, Tulsa, Oklahoma 74103; and Bill E. Davidoff, Figari & Davenport, LLP, 901 Main Street, Suite 3400, Dallas, Texas 75202.

Defendant Enterprise Crude Oil LLC ("Enterprise" or "Defendant") serves its Objections

and Responses to Plaintiff's First Request for Production, served on July 21, 2017, as follows:

## I.     INTRODUCTION

1.     These Responses and Objections are made solely for the purposes of this action.

Each Response is subject to all objections as to confidence, privilege, relevance, materiality,

propriety, admissibility, and any and all other objections and grounds that would require the

exclusion of any statement, admission, or document, if any requests were made, or any statement

contained herein were made by a witness present and testifying in court or at a hearing, or any

documents produced herein were proffered as evidence in court or at a hearing, all of which

objections and grounds are reserved and may be interposed at the time of trial or hearing.

2.      Discovery, independent investigation, legal research and analysis will lead to additional facts and evidence, and may establish entirely new factual conclusions and legal contentions, all of which may lead to additions to, changes in and variations from the present responses. Consequently, the following responses are given without prejudice to Enterprise's right to produce, at time of motions or trial, such further information or facts as may hereafter become known and available to it.

3.      The following Responses and Objections are based upon information presently available to Enterprise and, except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Enterprise has responded or objected to any of the requests, or part thereof, should not be taken as an admission that Enterprise accepts or admits the existence of any facts set forth or assumed by such requests and/or that such response constitutes admissible evidence. The fact that Enterprise has responded to all or part of a request is not intended and shall not be construed to be a waiver by Enterprise of all or any part of any objection(s) to any request. Enterprise reserves the right to amend or supplement the following responses in accordance with the Texas Rules of Civil Procedure as this matter proceeds.

4.      The responses given herein exclude from their scope all documents or tangible things (1) containing communications between counsel for Enterprise or between Enterprise and its counsel; (2) generated or prepared in anticipation of litigation by or for Enterprise or its representatives; and (3) reflecting the mental impressions, strategies, and analysis of Enterprise's counsel, and all such materials are being withheld. If Enterprise inadvertently produces any information or documents protected by the attorney-client privilege, the work-product doctrine, or any other privilege or protection, such production is not intended to and shall not operate as a waiver of its privileges.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S
FIRST REQUEST FOR PRODUCTION                                                          PAGE 2
**PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 31**

SR428

5.      Many of Magellan's requests seek production of documents already in Magellan's possession, custody, or control, such as communications exchanged between the parties, documents Enterprise has already provided to Plaintiff, or documents Magellan itself has provided to Enterprise. Enterprise will not reproduce such documents unless Magellan is willing to bear the cost of the production.

6.      By stating that it has produced or will produce documents within its possession, custody or control, Enterprise does not represent that any such documents exist. Rather, Enterprise is responding only that, to the extent such documents exist and are located, they have been or will be produced subject to and without waiver of any objection.

## II.      OBJECTIONS AND RESPONSES

**REQUEST FOR PRODUCTION NO. 1.** Regarding the COD Agreement, the following Documents created or generated on or before October 31, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives, intent or understanding in entering into the COD Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the COD Agreement and/or internal communications regarding the COD Agreement are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S
FIRST REQUEST FOR PRODUCTION                                           PAGE 3
**PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 32**

SR429

benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects that the request is overbroad because it uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Moreover, the request is overbroad and not reasonably limited in time to the extent it seeks information at any time "before" October 31, 2011, without any limitation whatsoever.

Enterprise further objects to subpart (b) of the request as unduly burdensome to the extent that the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise further objects to subpart (c) of the request because Enterprise's internal communications discuss, concern and/or contain Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 2.** Regarding the Joint Tariff Agreement, the following Documents created or generated on or before November 1, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (or the Joint Tariff Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives, intent or understanding in entering into the Joint Tariff Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the Joint Tariff agreement and/or internal communications regarding the Joint Tariff Agreement are not relevant.

Enterprise further objects because that request is not reasonably limited in time to the extent it seeks information at any time "before" November 1, 2011, without any limitation whatsoever and over the course of six years after that.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects that the request is overbroad because it uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise further objects to subpart (b) of the request as unduly burdensome to the extent that the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise further objects to subpart (c) of the request because Enterprise's internal communications discuss, concern and/or contain Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 3.** Regarding the Connection Agreement, the following Documents created or generated on or before December 16, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (or the Connection Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives, intent or understanding in entering into the COD Agreement, which evidence is inadmissible when, as here, the terms of

the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the Connection agreement and/or internal communications regarding the Connection Agreement are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects because the request is overbroad and not reasonably limited in time to the extent it seeks information at any time "before" December 16, 2011, without any limitation whatsoever.

Enterprise further objects that the request is overbroad because it uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise further objects to the request as unduly burdensome to the extent that the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise further objects to subpart (c) of the request because Enterprise's internal communications discuss, concern and/or contain Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 4.** All Documents, whether created before or after the COD Agreement, identifying any business or commercial considerations which led Enterprise Crude Oil LLC to enter into the COD Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the COD Agreement, which evidence inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the Connection agreement and/or internal communications regarding the Connection Agreement are not relevant.

Enterprise further objects because the request is overbroad and not reasonably limited in time. Such a request, seeking generally "all" documents relating to the business and commercial factors that led Enterprise to consider doing business with Magellan, without limitation, could encompass nearly every document and communication at Enterprise since the company's inception. For that reason, Enterprise also objects to the request as unduly burdensome.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects because the request is overbroad and not reasonably limited in scope or subject matter, and therefore constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 5.** All Documents, whether created before or after the Joint Tariff Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (or the Joint Tariff Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the COD Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, Enterprise's "interests" in entering into the Joint Tariff Agreement are not relevant.

Enterprise further objects because the request is overbroad and not reasonably limited in time to the extent it seeks information at any time "before or after" the Joint Tariff Agreement, without any limitation whatsoever. Such a request, seeking generally documents relating to the business and commercial factors that led Enterprise to consider doing business with Magellan, without limitation, could encompass nearly every document and communication at Enterprise since the company's inception. For that reason, Enterprise also objects to the request as unduly burdensome.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects because the request is overbroad and not reasonably limited in scope or subject matter, and therefore constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 6.** All Documents, whether created before or after the Connection Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Connection Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (or the Connection Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the COD Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, Enterprise's "interests" in entering into the Connection Agreement are not relevant.

Enterprise further objects because the request is overbroad and not reasonably limited in time to the extent it seeks information at any time "before" the Connection Agreement, without any limitation whatsoever and over the course of six years after that. Such a request, seeking generally documents relating to the business and commercial factors that led Enterprise to consider doing business with Magellan, without limitation, could encompass nearly every document and communication at Enterprise since the company's inception. For that reason, Enterprise also objects to the request as unduly burdensome.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects because the request is overbroad and not reasonably limited in time, scope or subject matter, and therefore constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 7.** All Documents regarding authorization for Enterprise Crude Oil LLC to enter into the COD Agreement.

**RESPONSE:**

Enterprise objects to the request as overbroad because it seeks "all documents regarding authorization." Neither Enterprise nor Magellan dispute the validity or enforceability of the COD Agreement. Therefore, documents concerning authority for Enterprise to enter into the COD Agreement are not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the request is unduly burdensome because the information being sought – presumably discovery of who was authorized to act on behalf of Enterprise in entering into the COD Agreement – can be obtained through a less burdensome means of discovery, namely interrogatories and depositions.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 8.** All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement.

**RESPONSE:**

Enterprise objects to the request as overbroad because it seeks "all documents regard authorization." Neither Enterprise nor Magellan dispute the validity or enforceability of the COD

Agreement (or the Joint Tariff Agreement for that matter). Therefore, documents concerning authority for Enterprise to enter into the Joint Tariff Agreement are not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the request is unduly burdensome because the information being sought – presumably discovery of who was authorized to act on behalf of Enterprise in entering into the Joint Tariff Agreement – can be obtained through a less burdensome means of discovery, namely interrogatories and depositions.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 9.** All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Connection Agreement.

**RESPONSE:**

Enterprise objects to the request as overbroad because it seeks "all documents regard authorization." Neither Enterprise nor Magellan dispute the validity or enforceability of the COD Agreement (or the Connection Agreement for that matter). Therefore, documents concerning authority for Enterprise to enter into the Connection Agreement are not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the request is unduly burdensome because the information being sought – presumably discovery of who was authorized to act on behalf of Enterprise in entering into the Connection Agreement – can be obtained through a less burdensome means of discovery, namely interrogatories and depositions.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the

benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 10.** Regarding the marketing, transportation and/or delivery of Eagle Ford Product to ECHO Terminal, to Genoa Junction, or to any other Houston Area Destination(s), all Documents containing or reporting upon any Enterprise plans, proposals, goals, projections, budgets, estimates, statistics, or histories thereof. This request is not limited to Documents which focus exclusively on Eagle Ford Product as defined above; any Document containing information applicable in whole or part to Eagle Ford Product, is included. For example, this request includes memos, reports or analyses regarding the intended, expected or actual utilization of the Rancho pipeline system and/or the Rancho II pipeline system for such purposes.

**RESPONSE:**

Enterprise objects to the request as overbroad and unduly burdensome because it seeks "all documents" "regarding" 14 distinct categories of documents contained within this request. Enterprise further objects that this request is not reasonably limited in time or scope. Indeed, it contains no temporal limitation whatsoever and seeks information touching upon 14 categories of documents that cumulatively encompass Enterprise's entire business within the Eagle Ford Basin. Such a request, without limitation, could encompass nearly every document and communication at Enterprise relating to the Eagle Ford Basin.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Because this request is not reasonably limited in its scope or subject matter, it also seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence on several fronts. First, information regarding Enterprise's entire business in the Eagle Ford Basin constitutes inadmissible parol evidence. Since neither Enterprise nor Magellan

contend there is any ambiguity in the COD Agreement, it could not reasonably be calculated to lead to the discovery of admissible evidence. Second, Enterprise does not dispute Magellan's contention that Enterprise has utilized the Rancho II pipeline system to transport crude during the term of the COD Agreement. The relevant question then, is whether Enterprise's utilization of Rancho II somehow constitutes a breach of COD Agreement. Because the discovery sought in this request would not answer this question, and instead seeks irrelevant information concerning a fact that is not in dispute, it constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 11.** All Documents which constitute, or reflect, Communications between Magellan and Enterprise, regarding (i) the construction of any New Magellan Facilities, (ii) the In-Service Date, (iii) the use or non-use of the Magellan Facilities by Enterprise following the In-Service Date, (iv) the disconnection of Enterprise facilities from Magellan facilities at Anahuac Junction, (v) the meaning, effect, or impact of the COD Agreement, the Joint Tariff Agreement or the Connection Agreement, and/or (vi) any dispute between Magellan and Enterprise arising from the COD Agreement, the Joint Tariff Agreement or the Connection Agreement. For clarity, recordings and notes of any phone calls or meetings between Magellan and Enterprise, regarding any of the above matters, are included. However, this request is not intended to include inter-party Communications specifically regarding any Magellan Audit, as those are the subject of a separate request.

**RESPONSE:**

Enterprise objects to the request as unduly burdensome because communications between Enterprise and Magellan are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 12.** All Documents which were authored by any Non-Lawyer Employee(s) of Enterprise, at any time during the Relevant Period, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Non-Lawyer Employee of Enterprise, about whether or how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

**RESPONSE:**

Enterprise objects to subpart (i) of the request. Neither Enterprise nor Magellan dispute the validity or enforceability of the COD Agreement. Therefore, documents concerning evaluations of the enforceability of the COD Agreement are not relevant or reasonably calculated to lead to the discovery of admissible evidence.

Enterprise objects to subparts (ii), (iii) and (iv) of the request to the extent. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, i.e., information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, information concerning the "meaning or effect of the COD Agreement," the "understanding or intention of any person or party with respect to the COD Agreement" and the "rights or obligations of either party with respect to the COD Agreement," are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 13.** All Documents which were authored by any Lawyer Employee of Enterprise, at any time prior to February 16, 2017, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Lawyer Employee of Enterprise, about whether or how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

**RESPONSE:**

Enterprise objects to subpart (i) of the request. Neither Enterprise nor Magellan dispute the validity or enforceability of the COD Agreement. Therefore, documents concerning enforceability of the COD Agreement are not relevant or reasonably calculated to lead to the discovery of admissible evidence.

Enterprise objects to subparts (ii), (iii) and (iv) of the request to the extent. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, i.e., information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the COD Agreement, which must be read together with the related-writings

that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, information concerning the "meaning or effect of the COD Agreement," the "understanding or intention of any person or party with respect to the COD Agreement" and the "rights or obligations of either party with respect to the COD Agreement", are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 14.** All other Documents which contain any reference (whether specific or general) to the COD Agreement or to any party's rights or obligations under the COD Agreement. For clarity, this request does not broadly request or require You to search for each and every Document that might arguably "relate" to the COD Agreement in some way. Rather, this request narrower: its object is to discover any Documents (not duplicative of Documents produced in response to one of the preceding requests) that contain an actual reference (in any form) to the COD Agreement or to a party's rights or obligations thereunder.

**RESPONSE:**

Enterprise objects because the request is global, overbroad and not reasonably limited in time or scope. Moreover, it is cumulative of each preceding request. It is not narrowly tailored to discover a discrete category of documents and instead, a global "catch-all" attempt to cast its net far and wide in furtherance of an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Because the request is global and so overbroad, Enterprise also objects that it is unduly burdensome as it would require Enterprise to search each and every document within Enterprise for documents that might contain a reference to the COD Agreement, whether or not such document is in fact "related" in any way to this dispute. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored

information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

This global request seeks information that contains a reference to the COD Agreement, however, neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This request seeks parol evidence, i.e., information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, information concerning the "meaning or effect of the COD Agreement," the "understanding or intention of any person or party with respect to the COD Agreement" and the "rights or obligations of either party with respect to the COD Agreement," are not relevant.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 15.** All other Documents which contain any reference (whether specific or general) to the Joint Tariff Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

**RESPONSE:**

Enterprise objects because the request is global, overbroad and not reasonably limited in time or scope. Moreover, it is cumulative of each preceding request. It is not narrowly tailored to discover a discrete category of documents and instead, a global "catch-all" attempt to cast its net far and wide in furtherance of an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Because the request is global and so overbroad, Enterprise also objects that it is unduly burdensome as it would require Enterprise to search each and every document within Enterprise for documents that might contain a reference to the Joint Tariff Agreement, whether or not such document is in fact "related" in any way to this dispute. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored

information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

This global request seeks information that contains a reference to the Joint Tariff Agreement, however, neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (of the Joint Tariff Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the COD Agreement. Parol evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Therefore, it seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, information concerning the "meaning or effect of the COD Agreement," the "understanding or intention of any person or party with respect to the COD Agreement" and the "rights or obligations of either party with respect to the COD Agreement," are not relevant.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.


**REQUEST FOR PRODUCTION NO. 16.** All other Documents which contain any reference (whether specific or general) to the Connection Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

**RESPONSE:**

Enterprise objects because the request is global, overbroad and not reasonably limited in time or scope. Moreover, it is cumulative of each preceding request. It is not narrowly tailored to discover a discrete category of documents and instead, a global "catch-all" attempt to cast its net far and wide in furtherance of an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Because the request is global and so overbroad, Enterprise also objects that it is unduly burdensome as it would require Enterprise to search each and every document within Enterprise

for documents that might contain a reference to the Connection Agreement, whether or not such document is in fact "related" in any way to this dispute. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

This global request seeks information that contains a reference to the Connection Agreement, however, neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (or the Connection Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the COD Agreement. Parol evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Therefore, it seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, information concerning the "meaning or effect of the COD Agreement," the "understanding or intention of any person or party with respect to the COD Agreement" and the "rights or obligations of either party with respect to the COD Agreement," are not relevant.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 17.** All Eagle Ford Crude Oil Purchase Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar agreements: Crude Oil Purchase Agreement between Enterprise and Petrohawk Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and GeoSouthern Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and Chesapeake Energy Corporation, dated April 28, 2011.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. The business terms of Enterprise's customer agreements have no bearing on the actual issues to be decided in this case. Contracts are not necessary to determine damages – an issue that is premature in any event – because volume information alone is sufficient. And to the extent Magellan seeks information relevant to the issue of bad faith, information regarding the business rationale for contract structure – not the contracts themselves – is more properly tailored to the needs of the case.

Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case.

Enterprise objects to the request as overbroad and unduly burdensome because it seeks "all" of Enterprise's agreements. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017). Further, the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 18.** All Eagle Ford Crude Oil Sale Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. The business terms of Enterprise's customer agreements have no bearing on the actual issues to be decided in this case. Contracts are not necessary to determine damages – an issue that is premature in any event – because volume information alone is sufficient. And to the extent Magellan seeks information relevant to the issue of bad faith, information regarding the business rationale for contract structure – not the contracts themselves – is more properly tailored to the needs of the case.

Enterprise objects to the request as overbroad and unduly burdensome because it seeks "all" of Enterprise's agreements. Enterprise also objects that this request is unduly burdensome because

it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017). Further, the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 19.** All Eagle Ford Crude Oil Buy/Sell Agreements, and all modifications, amendments or replacements of such agreements. This request includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether the agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar agreements: First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Chesapeake Energy Corporation, dated January 31, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Petrohawk Energy Corporation, dated June 29, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and GeoSouthern Energy Corporation, dated June 29, 2012.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. It essentially seeks information encompassing Enterprise's entire business in the Eagle Ford Basin. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements somehow constitutes a breach of COD agreement. Because the information Magellan seeks would not answer this question, and instead seeks irrelevant information concerning a fact that is not in dispute and does not concern any claim or defense at issue in this case, it constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise objects to the request as overbroad and unduly burdensome because it seeks "all" of Enterprise's agreements. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017). Further, the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 20.** All Documents which discuss or mention the business or commercial motivation(s) that led Enterprise Crude Oil LLC to enter into any Eagle Ford Buy/Sell Agreement.

**RESPONSE:**

Enterprise objects to this request because it is unduly vague and ambiguous. Within the context of Plaintiff's First Request for Production, it is unclear what Plaintiff means by "commercial motivation(s)."

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. It essentially seeks information encompassing Enterprise's entire business in the Eagle Ford Basin. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements somehow constitutes a breach of COD agreement. Because the information Magellan seeks would not answer this question, and instead seeks irrelevant information concerning a fact that is not in dispute and does not concern any claim or defense at issue in this case, it constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise further objects because the request is overbroad and not reasonably limited in time because it seeks information at any time, without any limitation whatsoever. Such a request,

without limitation, could encompass nearly every document and communication at Enterprise since the company's inception. For that reason, Enterprise also objects to the request as unduly burdensome.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 21.** All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Purchase Agreement, any Eagle Ford Crude Oil Sale Agreement, or any Eagle Ford Crude Oil Buy/Sell Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. It essentially seeks information encompassing Enterprise's entire business in the Eagle Ford Basin. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements somehow constitutes a breach of COD agreement. Because the information Magellan seeks would not answer this question, and instead seeks irrelevant information concerning a fact that is not in dispute and does not concern any claim or defense at issue in this case, it constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise objects to the request as overbroad and unduly burdensome because it seeks "all" of Enterprise's internal communications concerning "all" of its agreements concerning crude in the Eagle Ford Basin. This request is unduly burdensome because it would require the production of

electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case.

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 22.** All Eagle Ford Crude Oil Transportation Agreements, including but not limited to any such agreements between or among Enterprise entities.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. This request seeks information regarding all of Enterprise's transportation agreements in the Eagle Ford Basin, and thus its entire business in the Eagle Ford Basin. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement or that it has transported crude using routes that do not utilize Magellan's Facilities at the Connection Point. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements and/or its use of routes that do not utilize Magellan's Facilities at the Connection Point somehow constitutes a breach of COD agreement. Because the information Magellan seeks would not answer this question, and instead seeks irrelevant information concerning facts that are not in dispute and does not concern any claim or defense in issue in this case, it constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise further objects because the request is overbroad and not reasonably limited in time because it seeks information at any time, without any limitation whatsoever. Such a request, without limitation, could encompass nearly every document and communication at Enterprise since the company's inception. For that reason, Enterprise also objects to the request as unduly burdensome.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case.

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.


**REQUEST FOR PRODUCTION NO. 23.** All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Transportation Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. It seeks information regarding all of Enterprise's transportation agreements in the Eagle Ford Basin, and thus its entire business in the Eagle Ford Basin. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement or that it has transported crude using routes that do not utilize Magellan's Facilities at the Connection Point. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements and/or its use of routes that do not utilize Magellan's Facilities at the Connection Point somehow constitutes a breach of COD agreement. Because the information Magellan

seeks would not answer this question, and instead seeks irrelevant information concerning facts that are not in dispute and does not concern any claim or defense at issue in this case, it constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise also objects to this request as overbroad because the request uses omnibus terms, such as "regarding," to modify requests for general categories of documents, and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure. Taken literally, the request would require the production of thousands of pages of documents that have little, if anything, to do with the claims or defenses at issue in this case.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 24.** All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution routing, and/or final destination or delivery points. For clarity, this request seeks production of reports or analyses already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

**RESPONSE:**

Enterprise objects to this request because it is unduly vague and ambiguous. Within the context of Plaintiff's First Request for Production, it is unclear what Plaintiff means by "final destination or delivery points."

Enterprise objects that this request is overbroad, unduly burdensome and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell

agreements to facilitate the transport crude during the term of the COD Agreement or that it has transported crude using routes that do not utilize Magellan's Facilities at the Connection Point. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements and/or its use of routes that do not utilize Magellan's Facilities at the Connection Point somehow constitutes a breach of COD agreement. This request goes well beyond seeking information that could assist the court in answering that question and essentially seeks discover how Enterprise conducts its entire business in the Eagle Ford Basin. Because it seeks information concerning facts that are not in dispute it and does not concern any claim or defense at issue in this case, this request constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise objects because the case is cumulative of each preceding request. It is not narrowly tailored to discover a discrete category of documents and instead, a global "catch-all" attempt to cast its net far and wide in furtherance of an impermissible fishing expedition. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.


**REQUEST FOR PRODUCTION NO. 25.** All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution

routing, and/or final destination or delivery points. For clarity, this request seeks Documents sufficient to give Magellan the same assessment and reporting capability Enterprise has with respect to Eagle Ford Product.

**RESPONSE:**

Enterprise objects to this request because it is unduly vague and ambiguous. Within the context of Plaintiff's First Request for Production, it is unclear what Plaintiff means by "final destination or delivery points."

Enterprise objects that this request is overbroad, unduly burdensome and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement or that it has transported crude using routes that do not utilize Magellan's Facilities at the Connection Point. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements and/or its use of routes that do not utilize Magellan's Facilities at the Connection Point somehow constitutes a breach of COD agreement. This request goes well beyond seeking information that could assist a judge or jury in answering that question and essentially seeks discover how Enterprise conducts its entire business in the Eagle Ford Basin. Because it seeks information concerning facts that are not in dispute and does not concern any claim or defense at issue in this case, this request constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 26.** All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of Eagle Ford Product from any Origin Point to its final destination or delivery point, including by date, volume, shipper, transportation or distribution routing, and final destination or

delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to Eagle Ford Product.

**RESPONSE:**

Enterprise objects to this request because it is unduly vague and ambiguous. Within the context of Plaintiff's First Request for Production, it is unclear what Plaintiff means by information Enterprise "could utilize" or "final destination or delivery points."

Enterprise objects that this request is overbroad, unduly burdensome and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement or that it has transported crude using routes that do not utilize Magellan's Facilities at the Connection Point. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements and/or its use of routes that do not utilize Magellan's Facilities at the Connection Point somehow constitutes a breach of COD agreement. This request goes well beyond seeking information that could assist a judge or jury in answering that question and essentially seeks discover how Enterprise conducts its entire business in the Eagle Ford Basin. Because it seeks information concerning facts that are not in dispute and does not concern any claim or defense at issue in this case, this request constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 27.** All Documents showing any Enterprise tariffs, fees, charges or incentives for transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point.

**RESPONSE:**

Enterprise objects that this request is overbroad, unduly burdensome and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. This

request essentially seeks discover the entirety of Enterprise's business concerning crude routed via ECHO Terminal to any Destination Point or Future Destination Point. Because it seeks information concerning facts that are not in dispute and does not concern any claim or defense at issue in this case, this request constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 28.** All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize actual transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point. For clarity, this request seeks production of reports or analyses already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

**RESPONSE:**

Enterprise objects that this request is overbroad, unduly burdensome and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. This request essentially seeks to discover the entirety of Enterprise's business concerning crude routed via ECHO Terminal to any Destination Point or Future Destination Point. Because it seeks information concerning facts that are not in dispute and does not concern any claim or defense at issue in this case, this request constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request

is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 29.** All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point, including by date, volume, shipper, transportation or distribution routing, and/or final destination or delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to deliveries of crude oil from ECHO Terminal to any Destination Point or Future Destination Point.

**RESPONSE:**

Enterprise objects to this request because it is unduly vague and ambiguous. Within the context of Plaintiff's First Request for Production, it is unclear what Plaintiff means information Enterprise "could utilize" or by "final destination or delivery points."

Enterprise objects that this request is overbroad, unduly burdensome and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. This request essentially seeks to discover the entirety of Enterprise's business concerning crude routed via ECHO Terminal to any Destination Point. Because it seeks information concerning facts that are not in dispute and does not relate to any claim or defense at issue in this case, this request constitutes nothing more than an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects that this request is not reasonably limited in time.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 30.** All Documents which constitute, or reflect, Communications between any Non-Lawyer Employee(s) of Magellan and any Non-Lawyer Employee(s) of Enterprise, regarding any Magellan Audit.

**RESPONSE:**

Enterprise objects to this request as unduly burdensome because the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

**REQUEST FOR PRODUCTION NO. 31.** All Documents which constitute, or reflect, Communications between Non-Lawyer Employees of Enterprise, regarding any Magellan Audit.

**RESPONSE:**

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

Enterprise further objects the request because Enterprise's internal communications discuss, concern and/or contain Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 32.** All Documents Enterprise provided to Magellan in connection with any Magellan Audit.

**RESPONSE:**

Enterprise objects to this request as unduly burdensome to the extent that the documents sought are equally available to or are already in Magellan's possession, and therefore can be obtained from another source that is more convenient, less burdensome or less expensive, namely, Magellan.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information that is not reasonably available as requested and some of which Enterprise cannot retrieve without unreasonable effort and expense. The request is also unduly burdensome because it fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

**REQUEST FOR PRODUCTION NO. 33.** All Documents You do or may use or rely on to support the following affirmative defense alleged in ¶ 3 of Your Original Answer: "3. ECO is entitled to a credit or offset for any monies Plaintiff has received for the transport of crude that Plaintiff contends is subject to the Distribution Agreement, to the extent tariffs were paid by any third-party purchaser of such crude for transportation through the Magellan distribution system." This includes all Enterprise Documents purporting to show that Magellan received any such monies.

**RESPONSE:**

Enterprise objects to this request in that it is overly broad and unduly burdensome. Enterprise is not required to marshal its evidence in response to an overly broad request.

Enterprise further objects to this request as premature. Discovery is ongoing and Enterprise expects its own discovery efforts, if necessary, to result in Enterprise's receipt of documents and information relevant to its defenses, affirmative defenses, and responsive to this request. Subject to and without waiving the foregoing objections, Enterprise reserves the right to supplement this response as permitted by the Texas Rules of Civil Procedure.

Date:  <u>October  4, 2017</u>                              Respectfully submitted,

                                                            /s/ *J. Robert Arnett II*
                                                            E. Leon Carter
                                                            Texas Bar No. 03914300
                                                            lcarter@carterscholer.com
                                                            J. Robert Arnett II

Texas Bar No. 01332900
barnett@carterscholer.com
Joshua J. Bennett
Texas Bar No. 24059444
jbennett@carterscholer.com
Courtney Barksdale Perez
Texas Bar No. 24061135
cperez@carterscholer.com
**CARTER SCHOLER PLLC**
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206
Telephone: 214-550-8188
Facsimile:  214-550-8185

**ATTORNEYS FOR DEFENDANT
ENTERPRISE CRUDE OIL LLC**

## CERTIFICATE OF SERVICE

This is to certify that on October 4, 2017, a true, correct and complete copy of the foregoing document has been served on all counsel of record via a court-approved electronic filing system, in accordance with Rule 21a of the Texas Rules of Civil Procedure.

*/s/ J. Robert Arnett II*
J. Robert Arnett II

Exhibit 4

CAUSE NO. DC-17-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P. a Delaware Limited Partnership, | § § § § | IN THE DISTRICT COURT |
| *Plaintiff*, | § § § | |
| v. | § § | 101st JUDICIAL DISTRICT |
| ENTERPRISE CRUDE OIL LLC, A Texas Limited Liability Company, | § § § § | |
| *Defendant*. | § | DALLAS COUNTY, TEXAS |

## DEFENDANT'S AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION

TO: Plaintiff Magellan Crude Oil Pipeline Company, L.P., by and through their attorney of record, David L. Bryant, GableGotwals, 113 Pleasant Valley Drive, Suite 204, Boerne, Texas 78006; Lisa T. Silvestri, GableGotwals, 100 W. Fifth Street, Suite 1100, Tulsa, Oklahoma 74103; and Bill E. Davidoff, Figari & Davenport, LLP, 901 Main Street, Suite 3400, Dallas, Texas 75202.

Defendant Enterprise Crude Oil LLC ("Enterprise" or "Defendant") serves its Amended Objections and Responses to Plaintiff's First Request for Production, served on July 21, 2017, as follows:

## I. INTRODUCTION

1. Discovery, independent investigation, legal research and analysis will lead to additional facts and evidence, and may establish entirely new factual conclusions and legal contentions, all of which may lead to additions to, changes in and variations from the present responses. Consequently, the following responses are given without prejudice to Enterprise's right to produce, at time of motions or trial, such further information or facts as may hereafter become known and available to it.

DEFENDANT'S AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION         PAGE 1

PLAINTIFF'S SUPPLEMENT TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER - Page 64

SR461

2.     The following Responses and Objections are based upon information presently available to Enterprise and, except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Enterprise has responded or objected to any of the requests, or part thereof, should not be taken as an admission that Enterprise accepts or admits the existence of any facts set forth or assumed by such requests and/or that such response constitutes admissible evidence. The fact that Enterprise has responded to all or part of a request is not intended and shall not be construed to be a waiver by Enterprise of all or any part of any objection(s) to any request. Enterprise reserves the right to amend or supplement the following responses in accordance with the Texas Rules of Civil Procedure as this matter proceeds.

3.     Enterprise objects to the definition of "Enterprise" used by Magellan in its requests, which purports to impose discovery obligations upon corporate entities other than Enterprise Crude Oil, LLC.  As used in these objections and responses, "Enterprise" refers to Enterprise Crude Oil, LLC and its predecessors and successors only, and Enterprise assumes no obligation to produce documents in the care, custody and control of other entities in responding to these requests.

4.     By stating that it has produced or will produce documents within its possession, custody or control, Enterprise does not represent that any such documents exist. Rather, Enterprise is responding only that, to the extent such documents exist and are located, they have been or will be produced.

## II.     OBJECTIONS AND RESPONSES

**REQUEST FOR PRODUCTION NO. 1.**  Regarding the COD Agreement, the following Documents created or generated on or before October 31, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives, intent or understanding in entering into the COD Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the COD Agreement and/or internal communications regarding the COD Agreement are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information because it fails to identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Enterprise further objects to subpart (c) of the request because Enterprise's internal communications discuss, concern and/or contain Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 2.** Regarding the Joint Tariff Agreement, the following Documents created or generated on or before November 1, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (or the Joint Tariff Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives, intent or understanding in entering into the Joint Tariff Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD

Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the Joint Tariff agreement and/or internal communications regarding the Joint Tariff Agreement are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Enterprise further objects to subpart (c) of the request because Enterprise's internal communications discuss, concern and/or contain Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 3.** Regarding the Connection Agreement, the following Documents created or generated on or before December 16, 2011: (a) all drafts of said agreement; (b) all Documents constituting or reflecting Communications between Magellan and Enterprise, regarding said agreement; and (c) all Documents constituting or reflecting Enterprise internal Communications regarding said agreement.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement (or the Connection Agreement for that matter). As such, its terms are to be construed by the Court as a matter of law. This request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives, intent or understanding in entering into the COD Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the Connection agreement and/or internal communications regarding the Connection Agreement are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Enterprise further objects to subpart (c) of the request because Enterprise's internal communications discuss, concern and/or contain Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 4.** All Documents, whether created before or after the COD Agreement, identifying any business or commercial considerations which led Enterprise Crude Oil LLC to enter into the COD Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the COD Agreement, which evidence inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, drafts, documents between Magellan and Enterprise concerning the Connection agreement and/or internal communications regarding the Connection Agreement are not relevant.

Enterprise further objects because the request is overbroad and not reasonably limited in subject to the extent it seeks information about "similar" agreements not at issue in this lawsuit, or general factors that "led" Enterprise to enter into the Joint Tariff Agreement. Such a request, seeking generally "all" documents relating to the business and commercial factors that led Enterprise to consider doing business with Magellan (not just the agreements at issue in this suit), without limitation, could encompass nearly every document and communication at Enterprise regarding its Gulf Coast operations. Should the Court determine that the requested information is discoverable, and subject to an appropriate protective order, Enterprise will produce internal communications that discuss or set forth the business or commercial reasons for entering into the COD Agreement specifically, if any, but it will not produce information about general economic conditions, oil production and markets, or other Enterprise facilities or contemplated facilities that may have tangentially contributed to an interest in entering the COD Agreement.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that parol

evidence is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 5.** All Documents, whether created before or after the Joint Tariff Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in Joint Tariff Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the Joint Tariff Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous.

Enterprise further objects because the request is overbroad and not reasonably limited in subject to the extent it seeks information about "similar" agreements not at issue in this lawsuit, or general factors that "led" Enterprise to enter into the Joint Tariff Agreement. Such a request, seeking generally documents relating to the business and commercial factors that led Enterprise to consider doing business with Magellan, without limitation, could encompass nearly every document and communication at Enterprise regarding its Gulf Coase operations. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included ***only*** matters relevant to the case") (emphasis added) (internal citations omitted)). Should the Court determine that the requested information is discoverable, and subject to an appropriate protective order, Enterprise will produce internal communications that discuss or set forth the business or commercial reasons for entering into the Joint Tariff Agreement specifically, if any, but it will not produce information about general economic conditions, oil production and markets, or other Enterprise facilities or contemplated facilities that may have tangentially contributed to an interest in entering the Joint Tariff Agreement.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that parol

evidence is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 6.** All Documents, whether created before or after the Connection Agreement, identifying any business or commercial considerations which led Enterprise Crude Pipeline LLC to enter into the Connection Agreement or caused or contributed to its interest in pursuing that or any similar agreement with Magellan.

**RESPONSE:**

Enterprise objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in Connection Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, that is, extrinsic evidence relating to the parties' motives and intent in entering into the Connection Agreement, which evidence is inadmissible when, as here, the terms of the parties' agreement are unambiguous. Moreover, the Connection Agreement, which must be read together with the related-writings that give the effect to theonnectionOD Agreement (i.e. the COD Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the Connection Agreement's express terms, Enterprise's "interests" in entering into the Connection Agreement are not relevant.

Enterprise further objects because the request is overbroad and not reasonably limited in scope the extent it seeks information about agreements "similar" to the Connection Agreement but not in issue in this lawsuit, or general factors that "led" Enterprise to consider doing business with Magellan, which could encompass nearly every document and communication at Enterprise regarding its Gulf Coast operations. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)). Should the Court determine that the requested information is discoverable, and subject to an appropriate protective order, Enterprise will produce internal communications that discuss or set forth the business or commercial reasons for entering into the Connection Agreement specifically, if any, but it will not produce information about general economic conditions, oil production and markets, or other Enterprise facilities or contemplated facilities that may have tangentially contributed to an interest in entering the Joint Tariff Agreement.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians,

purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 7.** All Documents regarding authorization for Enterprise Crude Oil LLC to enter into the COD Agreement.

**RESPONSE:**

Enterprise objects to the request as overbroad because it seeks "all documents regarding authorization", and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure.

Enterprise further objects that the request seeks information not reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan dispute the validity or enforceability of the COD Agreement, rendering the information sought irrelevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Upon entry of an appropriate protective order, Enterprise will produce documents, if any, that indicate persons at Enterprise other than the signatory to the COD Agreement authorized the signatory to execute the agreement, or documents sufficient to confirm the authority of the signatory to execute the agreement.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 8.** All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Joint Tariff Agreement.

**RESPONSE:**

Enterprise objects to the request as overbroad because it seeks "all documents regarding authorization", and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure.

Enterprise further objects that the request seeks information not reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan dispute the validity or enforceability of the Joint Tariff Agreement, rendering the information sought irrelevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Upon entry of an appropriate protective order, Enterprise will produce documents, if any, that indicate persons at Enterprise other than the signatory to the Joint Tariff Agreement authorized the signatory to execute the agreement, or documents sufficient to confirm the authority of the signatory to execute the agreement.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.


**REQUEST FOR PRODUCTION NO. 9.** All Documents regarding authorization for Enterprise Crude Pipeline LLC to enter into the Connection Agreement.

**RESPONSE:**

Enterprise objects to the request as overbroad because it seeks "all documents regarding authorization", and therefore does not meet the "reasonable particularity" requirements of the Texas Rules of Civil Procedure.

Enterprise further objects that the request seeks information not reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan dispute the validity or enforceability of the COD Agreement, rendering the information sought irrelevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Upon entry of an appropriate protective order, Enterprise will produce documents, if any, that indicate persons at Enterprise other than the signatory to the Connection Agreement authorized

the signatory to execute the agreement, or documents sufficient to confirm the authority of the signatory to execute the agreement.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.


**REQUEST FOR PRODUCTION NO. 10.** Regarding the marketing, transportation and/or delivery of Eagle Ford Product to ECHO Terminal, to Genoa Junction, or to any other Houston Area Destination(s), all Documents containing or reporting upon any Enterprise plans, proposals, goals, projections, budgets, estimates, statistics, or histories thereof. This request is not limited to Documents which focus exclusively on Eagle Ford Product as defined above; any Document containing information applicable in whole or part to Eagle Ford Product, is included. For example, this request includes memos, reports or analyses regarding the intended, expected or actual utilization of the Rancho pipeline system and/or the Rancho II pipeline system for such purposes.

**RESPONSE:**

Enterprise objects to the request as overbroad and unduly burdensome because it seeks "all documents" "regarding" 14 distinct categories of documents contained within this request. Enterprise further objects that this request is not reasonably limited in scope to matters at issue in this lawsuit. Indeed, it seeks information touching upon 14 categories of documents that cumulatively encompass Enterprise's entire business within the Eagle Ford Basin. Such a request, without limitation, could encompass nearly every document and communication at Enterprise relating to its Gulf Coast operations.

Enterprise further objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Because this request is not reasonably limited in its scope or subject matter, it also seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. The only relevant issue in this case is whether Enterprise had good faith business reasons for the decisions Magellan alleges improperly reduced Enterprise's use of the Magellan facilities. These are: (1) conversion of marketing agreements to buy/sell arrangements; (2) building the Rancho II pipeline; (3) increasing the tariff between ECHO terminal and Genoa junction; and (4) disconnecting Anajuac Junction. Upon entry of an appropriate protective order, Enterprise will produce non-privileged internal and external communications that (1) were made in connection with the negotiation by Enterprise Crude Oil, LLC of agreements to transport

crude from an Origin Point on the Eagle Ford Pipeline to the extent such documents discuss either the Distribution Agreement, Magellan, or the reasons for changing any marketing agreement to a buy/sell agreement for crude transported from an Origin Point; (2) AFEs, presentations, studies and approvals for shutting down Rancho I and building the Rancho II pipeline; (3) documents submitted to the Railroad Commission in connection with any tariff increase on the bidirectional pipeline between ECHO terminal and Genoa Junction, or any internal communication that discusses jointly the tariff and either the Distribution Agreement, the Joint Tariff Agreement, or Magellan; and (4) AFEs, presentations, studies and approvals for disconnecting Anajuac Junction, if any.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 11.** All Documents which constitute, or reflect, Communications between Magellan and Enterprise, regarding (i) the construction of any New Magellan Facilities, (ii) the In-Service Date, (iii) the use or non-use of the Magellan Facilities by Enterprise following the In-Service Date, (iv) the disconnection of Enterprise facilities from Magellan facilities at Anahuac Junction, (v) the meaning, effect, or impact of the COD Agreement, the Joint Tariff Agreement or the Connection Agreement, and/or (vi) any dispute between Magellan and Enterprise arising from the COD Agreement, the Joint Tariff Agreement or the Connection Agreement. For clarity, recordings and notes of any phone calls or meetings between Magellan and Enterprise, regarding any of the above matters, are included. However, this request is not intended to include inter-party Communications specifically regarding any Magellan Audit, as those are the subject of a separate request.

**RESPONSE:**

Enterprise objects to subpart (v) of the request, which seeks communications regarding "the meaning, effect, or impact of the COD Agreement, the Joint Tariff Agreement or the Connection Agreement," because such information is irrelevant, insofar as parol evidence is not admissible to alter the terms or meaning of an unambiguous agreement. Upon entry of an appropriate protective order, Enterprise will produce communications between Magellan and Enterprise regarding the identified topics.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

**REQUEST FOR PRODUCTION NO. 12.** All Documents which were authored by any Non-Lawyer Employee(s) of Enterprise, at any time during the Relevant Period, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the

understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Non-Lawyer Employee of Enterprise, about whether or how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

**RESPONSE:**

Enterprise objects to this request because it seeks documents that are not relevant nor reasonably calculated to lead to the discovery of admissible evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, i.e., information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, information concerning the "meaning or effect of the COD Agreement," the "understanding or intention of any person or party with respect to the COD Agreement" and the "rights or obligations of either party with respect to the COD Agreement," are not relevant.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but does not identify particular custodians, purporting to require a search of the entire company. Should the Court determine that the requested information is discoverable, Enterprise will confer with Magellan regarding the proper custodians and search terms for responding to this request.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 13.** All Documents which were authored by any Lawyer Employee of Enterprise, at any time prior to February 16, 2017, and which analyze, discuss, comment on, question, or refer to (i) the enforceability of the COD Agreement or any of its provisions, (ii) the meaning or effect of the COD Agreement or any of its provisions, (iii) the understanding or intention of any person or party with respect to the COD Agreement or any of its provisions, and/or (iv) the rights or obligations of either party with respect to the COD Agreement or any of its provisions. This includes, for example, all Documents which raise any question, or discuss or mention any view or opinion of any Lawyer Employee of Enterprise, about whether or how the COD Agreement may affect Your purchase, sale, marketing or transportation of Eagle Ford Product or any other crude oil.

**RESPONSE:**

Enterprise objects on the ground that the information sought is protected by the attorney-client privilege and/or the work product privilege. Enterprise is withholding documents responsive to this request. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

Enterprise further objects to subpart (i) of the request. Neither Enterprise nor Magellan dispute the validity or enforceability of the COD Agreement. Therefore, documents concerning enforceability of the COD Agreement are not relevant or reasonably calculated to lead to the discovery of admissible evidence.

Enterprise objects to subparts (ii), (iii) and (iv) of the request on the ground that the information sought is not relevant. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. This Request seeks parol evidence, i.e., information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. Moreover, the COD Agreement, which must be read together with the related-writings that give the effect to the COD Agreement (i.e. the Connection Agreement, the Joint Tariff Agreement, etc.) contains a merger clause. Thus, by the COD Agreement's express terms, information concerning the "meaning or effect of the COD Agreement," the "understanding or intention of any person or party with respect to the COD Agreement" and the "rights or obligations of either party with respect to the COD Agreement", are not relevant.

**REQUEST FOR PRODUCTION NO. 14.** All other Documents which contain any reference (whether specific or general) to the COD Agreement or to any party's rights or obligations under the COD Agreement. For clarity, this request does not broadly request or require You to search for each and every Document that might arguably "relate" to the COD Agreement in some way. Rather, this request narrower: its object is to discover any Documents (not duplicative of Documents produced in response to one of the preceding requests) that contain an actual reference (in any form) to the COD Agreement or to a party's rights or obligations thereunder.

**RESPONSE:**

Enterprise objects because the request is global, overbroad and not reasonably limited in time or scope. Moreover, it is cumulative of each preceding request. It is not narrowly tailored to discover a discrete category of documents and instead, a global "catch-all" attempt to cast its net far and wide in furtherance of an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Because the request is global and so overbroad, Enterprise also objects that it is unduly burdensome as it would require Enterprise to search each and every document within Enterprise

for documents that might contain a reference to the COD Agreement, whether or not such document is in fact "related" in any way to this dispute. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

This global request, due to its breadth, also encompasses parol evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in COD Agreement. As such, its terms are to be construed by the Court as a matter of law. Accordingly, the requested information is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 15.** All other Documents which contain any reference (whether specific or general) to the Joint Tariff Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

**RESPONSE:**

Enterprise objects because the request is global, overbroad and not reasonably limited in time or scope. Moreover, it is cumulative of each preceding request. It is not narrowly tailored to discover a discrete category of documents and instead, a global "catch-all" attempt to cast its net far and wide in furtherance of an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Because the request is global and so overbroad, Enterprise also objects that it is unduly burdensome as it would require Enterprise to search each and every document within Enterprise for documents that might contain a reference to the Joint Tariff Agreement, whether or not such document is in fact "related" in any way to this dispute. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

This global request, due to its breadth, also encompasses parol evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in Joint Tariff Agreement. As such, its terms are to

be construed by the Court as a matter of law. Accordingly, the requested information is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 16.** All other Documents which contain any reference (whether specific or general) to the Connection Agreement. For clarity, please see comments on Request for Production No. 14, also applicable here.

**RESPONSE:**

Enterprise objects because the request is global, overbroad and not reasonably limited in time or scope. Moreover, it is cumulative of each preceding request. It is not narrowly tailored to discover a discrete category of documents and instead, a global "catch-all" attempt to cast its net far and wide in furtherance of an impermissible fishing expedition. *See In re Am. Optical Corp.*, 988 S.W.2d 711, 713 (Tex. 1998) (orig. proceeding) (per curiam) ("This Court has repeatedly emphasized that discovery may not be used as a fishing expedition. Rather requests must be reasonably tailored to included *only* matters relevant to the case") (emphasis added) (internal citations omitted)).

Because the request is global and so overbroad, Enterprise also objects that it is unduly burdensome as it would require Enterprise to search each and every document within Enterprise for documents that might contain a reference to the Connection Agreement, whether or not such document is in fact "related" in any way to this dispute. Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but fails to identify particular custodians, purporting to require a search of the entire company. Moreover, the burden imposed by this request far outweighs the benefit to Magellan and is disproportionate to the needs of this case. *In re State Farm Lloyds*, 520 S.W.3d 595 (Tex. 2017).

This global request, due to its breadth, also encompasses parol evidence. Neither Enterprise nor Magellan contend that there is any ambiguity in Connection Agreement. As such, its terms are to be construed by the Court as a matter of law. Accordingly, the requested information is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 17.** All Eagle Ford Crude Oil Purchase Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product

was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar agreements: Crude Oil Purchase Agreement between Enterprise and Petrohawk Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and GeoSouthern Energy Corporation, dated March 11, 2011; Crude Oil Purchase Agreement between Enterprise and Chesapeake Energy Corporation, dated April 28, 2011.

**RESPONSE:**

Enterprise objects to this request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise further objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. The business terms of Enterprise's customer agreements have no bearing on the actual issues to be decided in this case. Contracts are not necessary to determine damages – an issue that is premature in any event – because volume information alone is sufficient. And to the extent Magellan seeks information relevant to the issue of bad faith, information regarding the business rationale for contract structure – not the contracts themselves – is more properly tailored to the needs of the case. Accordingly, Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case. Upon entry of an appropriate protective order, and subject to receipt of consent by the contracting counterparty to waive any confidentiality provisions therein, Enterprise will produce Eagle Ford Crude Oil Purchase Agreements executed by Enterprise Crude Oil, LLC during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 18.** All Eagle Ford Crude Oil Sale Agreements, and all modifications, amendments or replacements of such agreements. This includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether such agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned.

**RESPONSE:**

Enterprise objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise further objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. The business terms of Enterprise's customer agreements have no bearing on the actual issues to be decided in this case. Contracts are not necessary to determine damages – an issue that is premature in any event – because volume information alone is sufficient. And to the extent Magellan seeks information relevant to the issue of bad faith, information regarding the business rationale for contract structure – not the contracts themselves – is more properly tailored to the needs of the case. Accordingly, Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case. Upon entry of an appropriate protective order, and subject to receipt of consent by the

contracting counterparty to waive any confidentiality provisions therein, Enterprise will produce Eagle Ford Crude Oil Sale Agreements executed by Enterprise Crude Oil, LLC during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 19.** All Eagle Ford Crude Oil Buy/Sell Agreements, and all modifications, amendments or replacements of such agreements. This request includes any and all such agreements ever in existence during the Relevant Period, even if no Eagle Ford Product was actually purchased or sold pursuant thereto and regardless of whether the agreement was subsequently amended, restated, terminated, rescinded, repealed, replaced or abandoned. So, for example, this request includes the following agreements as well as all similar agreements: First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Chesapeake Energy Corporation, dated January 31, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and Petrohawk Energy Corporation, dated June 29, 2012; First Amended and Restated Crude Oil Purchase and Sale Agreement between Enterprise and GeoSouthern Energy Corporation, dated June 29, 2012.

**RESPONSE:**

Enterprise objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise further objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. The business terms of Enterprise's customer agreements have no bearing on the actual issues to be decided in this case. Contracts are not necessary to determine damages – an issue that is premature in any event – because volume information alone is sufficient. And to the extent Magellan seeks information relevant to the issue of bad faith, information regarding the business rationale for contract structure – not the contracts themselves – is more properly tailored to the needs of the case. Accordingly, Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case. Upon entry of an appropriate protective order, and subject to receipt of consent by the contracting counterparty to waive any confidentiality provisions therein, Enterprise will produce Eagle Ford Crude Oil Buy/Sell Agreements executed by Enterprise Crude Oil, LLC during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 20.** All Documents which discuss or mention the business or commercial motivation(s) that led Enterprise Crude Oil LLC to enter into any Eagle Ford Buy/Sell Agreement.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise further objects that this request is overly broad to the extent it calls for production of information generally about the benefits of buy/sell arrangements or general commercial

circumstances or market conditions that may have had a tangential effect on Enterprise's business dealings. Upon entry of an appropriate protective order, Enterprise will produce documents that were made in connection with the negotiation of agreements made by Enterprise Crude Oil LLC to transport crude from an Origin Point on the Eagle Ford Pipeline to the extent such documents discuss either the Distribution Agreement, Magellan, or the reasons for changing any marketing agreement to a buy/sell agreement for crude transported from an Origin Point.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but fails to identify particular custodians, purporting to require a search of the entire company. Enterprise will confer with Magellan to identify appropriate custodians and search terms for responding to this request.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 21.** All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Purchase Agreement, any Eagle Ford Crude Oil Sale Agreement, or any Eagle Ford Crude Oil Buy/Sell Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise objects that this request is overly broad and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, to the extent it seeks the details of Enterprise's negotiations and negotiating strategy in general and is not limited to the matters at issue in this lawsuit, namely the good faith business justification for using forms of agreement that result in Enterprise neither owning or controlling crude oil from Origin Point to Destination Point. Upon entry of an appropriate protective order, Enterprise will produce documents that were made in connection with the negotiation of agreements made by Enterprise Crude Oil, LLC to transport crude from an Origin Point on the Eagle Ford Pipeline to the extent such documents discuss either the Distribution Agreement, Magellan, or the reasons for changing any marketing agreement to a buy/sell agreement for crude transported from an Origin Point.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but fails to identify particular custodians, purporting to require a search of the entire company. Enterprise will confer with Magellan to identify appropriate custodians and search terms for responding to this request.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 22.** All Eagle Ford Crude Oil Transportation Agreements, including but not limited to any such agreements between or among Enterprise entities.

**RESPONSE:**

Enterprise objects to the request in its entirety because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise further objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. The business terms of Enterprise's customer agreements have no bearing on the actual issues to be decided in this case. Contracts are not necessary to determine damages – an issue that is premature in any event – because volume information alone is sufficient. And to the extent Magellan seeks information relevant to the issue of bad faith, information regarding the business rationale for contract structure – not the contracts themselves – is more properly tailored to the needs of the case. Accordingly, Enterprise further objects because this request is not reasonably tailored to the claims and defenses in the case. Upon entry of an appropriate protective order, and subject to receipt of consent by the contracting counterparty to waive any confidentiality provisions therein, Enterprise will produce Eagle Ford Crude Oil Transportation Agreements executed by Enterprise Crude Oil, LLC during the Relevant Period.

**REQUEST FOR PRODUCTION NO. 23.** All Documents reflecting internal Enterprise Communications, or Communications between Enterprise and the other contracting party(ies), regarding any Eagle Ford Crude Oil Transportation Agreement, which occurred on or before the date of execution of such agreement. This includes, for example, emails or letters which shed light on which party initiated the contract discussions, the reasons for either party's interest in such contract, and/or negotiation of the terms of the contract.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise further objects that this request seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. It seeks information regarding the negotiation of all of Enterprise's transportation agreements in the Eagle Ford Basin, and thus its entire business in the Eagle Ford Basin. Enterprise does not dispute Magellan's contention that Enterprise has entered into buy/sell agreements to facilitate the transport crude during the term of the COD Agreement or that it has transported crude using routes that do not utilize Magellan's

Facilities at the Connection Point. The relevant question then, is whether Enterprise's utilization of such buy/sell agreements and/or its use of routes that do not utilize Magellan's Facilities at the Connection Point somehow constitutes a breach of COD agreement. Upon entry of an appropriate protective order, Enterprise will produce documents that were made in connection with the negotiation of agreements executed by Enterprise Crude Oil, LLC to transport crude from an Origin Point on the Eagle Ford Pipeline to the extent such documents discuss either the Distribution Agreement, Magellan, or the reasons for changing any marketing agreement to a buy/sell agreement for crude transported from an Origin Point.

Enterprise also objects that this request is unduly burdensome because it would require the production of electronically stored information but fails to identify particular custodians, purporting to require a search of the entire company. Enterprise will confer with Magellan to identify appropriate custodians and search terms for responding to this request.

Enterprise is withholding documents responsive to this request under the work product and/or attorney client privileges. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

**REQUEST FOR PRODUCTION NO. 24.** All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution routing, and/or final destination or delivery points. For clarity, this request seeks production of reports or analyses already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets, and is subject to contractual and regulatory restrictions on disclosure.

Enterprise further objects that this request is overbroad and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, in that even under Magellan's interpretation of the COD Agreement, only volumes that arrive at the contractually defined Destination Points are subject to the Agreement, but the request seeks information about all routing and destinations for Eagle Ford Product. Upon entry of an appropriate protective order, Enterprise will produce summary volume information for shipments of Eagle Ford Product, but only to the extent (i) Enterprise is the shipper of record, (ii) the shipments originated at an Origin Point, and (iii) the shipment was delivered to the ECHO Terminal, the Connection Point, or a Delivery Point. In addition, subject to (i) entry of an appropriate protective order, (ii) receipt of consent from third parties that purchased Eagle Ford Product from Enterprise, and (iii) only to the extent permitted by applicable law or regulations, Enterprise will also provide summary volume information for shipments of Eagle Ford Product that third parties purchased from Enterprise, but only to the extent such third-party shipments were delivered to the Connection Point.

**REQUEST FOR PRODUCTION NO. 25.** All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to identify, determine, quantify and/or summarize Eagle Ford Product volumes, ownership, transportation and distribution routing, and/or final destination or delivery points. For clarity, this request seeks Documents sufficient to give Magellan the same assessment and reporting capability Enterprise has with respect to Eagle Ford Product.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets, and is subject to contractual and regulatory restrictions on disclosure.

Enterprise further objects that this request is overbroad and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, in that even under Magellan's interpretation of the COD Agreement, only volumes that arrive at the contractually defined Destination Points are subject to the Agreement, but the request seeks information about all routing and destinations for Eagle Ford Product. Upon entry of an appropriate protective order, Enterprise will produce summary volume information for shipments of Eagle Ford Product, but only to the extent (i) Enterprise is the shipper of record, (ii) the shipments originated at an Origin Point, and (iii) the shipment was delivered to the ECHO Terminal, the Connection Point, or a Delivery Point. In addition, subject to (i) entry of an appropriate protective order, (ii) receipt of consent from third parties that purchased Eagle Ford Product from Enterprise, and (iii) only to the extent permitted by applicable law or regulations, Enterprise will also provide summary volume information for shipments of Eagle Ford Product that third parties purchased from Enterprise, but only to the extent such third-party shipments were delivered to the Connection Point.

**REQUEST FOR PRODUCTION NO. 26.** All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of Eagle Ford Product from any Origin Point to its final destination or delivery point, including by date, volume, shipper, transportation or distribution routing, and final destination or delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to Eagle Ford Product.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets, and is subject to contractual and regulatory restrictions on disclosure.

Enterprise further objects that this request is overbroad and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, in that even under Magellan's interpretation of the COD Agreement, only volumes that arrive at the contractually

defined Destination Points are subject to the Agreement, but the request seeks information about all routing and destinations for Eagle Ford Product. Upon entry of an appropriate protective order, Enterprise will produce summary volume information for shipments of Eagle Ford Product, but only to the extent (i) Enterprise is the shipper of record, (ii) the shipments originated at an Origin Point, and (iii) the shipment was delivered to the ECHO Terminal, the Connection Point, or a Delivery Point. In addition, subject to (i) entry of an appropriate protective order, (ii) receipt of consent from third parties that purchased Eagle Ford Product from Enterprise, and (iii) only to the extent permitted by applicable law or regulations, Enterprise will also provide summary volume information for shipments of Eagle Ford Product that third parties purchased from Enterprise, but only to the extent such third-party shipments were delivered to the Connection Point.

**REQUEST FOR PRODUCTION NO. 27.** All Documents showing any Enterprise tariffs, fees, charges or incentives for transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets, and is subject to contractual and regulatory restrictions on disclosure.

Enterprise objects that this request is overbroad and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence. This request essentially seeks discover the entirety of Enterprise's business concerning crude routed via ECHO Terminal to any Destination Point or Future Destination Point. Magellan's only specific allegation with respect to tariffs is that Enterprise increased the tariff on the bi-directional line connecting ECHO Terminal with Genoa Junction. Enterprise will produce all tariffs applicable to the bi-directional pipeline between ECHO terminal and Genoa Junction in effect during the Relevant Period as defined in the requests. Enterprise notes that tariffs are publicly available from the Texas Railroad Commission.

**REQUEST FOR PRODUCTION NO. 28.** All existing Enterprise reports or analyses which, for all or any part of the Relevant Period, identify, determine, quantify and/or summarize actual transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point. For clarity, this request seeks production of reports or analyses already in existence; it does not purport to require Enterprise to create any new reports or analyses for purposes of responding to the request.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets, and is subject to contractual and regulatory restrictions on disclosure.

Enterprise further objects that this request is overbroad, unduly burdensome and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, in that no Future Destination Point is operational and therefore none is subject to the COD Agreement. Enterprise further objects to production of "all" reports, insofar as reports may be distributed internally in draft form or exist in multiple copies across personnel. Enterprise therefore interprets the request to require production of a single copy of final reports only. Upon entry of an appropriate protective order, Enterprise will produce summary volume information for shipments of Eagle Ford Product, but only to the extent (i) Enterprise is the shipper of record, (ii) the shipments originated at an Origin Point, and (iii) the shipment was delivered to the ECHO Terminal, the Connection Point, or a Delivery Point. In addition, subject to (i) entry of an appropriate protective order, (ii) receipt of consent from third parties that purchased Eagle Ford Product from Enterprise, and (iii) only to the extent permitted by applicable law or regulations, Enterprise will also provide summary volume information for shipments of Eagle Ford Product that third parties purchased from Enterprise, but only to the extent such third-party shipments were delivered to the Connection Point.

**REQUEST FOR PRODUCTION NO. 29.** All Documents which Enterprise utilizes or could utilize, with respect to all or any part of the Relevant Period, to trace the transportation and distribution of crude oil from ECHO Terminal to any Destination Point or any Future Destination Point, including by date, volume, shipper, transportation or distribution routing, and/or final destination or delivery point. For clarity, this request seeks Documents sufficient to give Magellan the same tracing capability Enterprise has with respect to deliveries of crude oil from ECHO Terminal to any Destination Point or Future Destination Point.

**RESPONSE:**

Enterprise objects to the request because the information sought discusses, concerns and/or contains Enterprise's confidential and proprietary information and trade secrets.

Enterprise further objects that this request is overbroad and seeks information that is not relevant or reasonably calculated to lead to the discovery of admissible evidence, in that no Future Destination Point is operational and therefore none is subject to the COD Agreement. Enterprise further objects to production of "all" documents that Enterprise uses or "could use" to trace product, because use of such terms fails to identify the information sought with particularity, and could include voluminous information of little probative value, such as voluminous meter readings providing duplicative information. Enterprise will produce summary volume information for shipments of Eagle Ford Product, but only to the extent (i) Enterprise is the shipper of record, (ii) the shipments originated at an Origin Point, and (iii) the shipment was delivered to the ECHO Terminal, the Connection Point, or a Delivery Point. In addition, subject to (i) entry of an appropriate protective order, (ii) receipt of consent from third parties that purchased Eagle Ford Product from Enterprise, and (iii) only to the extent permitted by applicable law or regulations, Enterprise will also provide summary volume information for shipments of Eagle Ford Product that third parties purchased from Enterprise, but only to the extent such third-party shipments were delivered to the Connection Point.

**REQUEST FOR PRODUCTION NO. 30.** All Documents which constitute, or reflect, Communications between any Non-Lawyer Employee(s) of Magellan and any Non-Lawyer Employee(s) of Enterprise, regarding any Magellan Audit.

**RESPONSE:**

Upon entry of an appropriate protective order, Enterprise will produce responsive documents. For purposes of producing emails responsive to this request, Enterprise will conduct a search of emails of the following custodians: Jocelyn Truitt and Charles Stovall.

**REQUEST FOR PRODUCTION NO. 31.** All Documents which constitute, or reflect, Communications between Non-Lawyer Employees of Enterprise, regarding any Magellan Audit.

**RESPONSE:**

Enterprise objects to the request on the ground that it calls for production of documents protected by the work product privilege. Enterprise is withholding documents responsive to this request. Enterprise objects to any request for the production of a privilege log regarding documents prepared or created after November 13, 2015.

Upon entry of an appropriate protective order, Enterprise will produce non-privileged documents. For purposes of producing emails responsive to this request, Enterprise will conduct a search of emails of the following custodians: Jocelyn Truitt and Charles Stovall.

**REQUEST FOR PRODUCTION NO. 32.** All Documents Enterprise provided to Magellan in connection with any Magellan Audit.

**RESPONSE:**

Upon entry of an appropriate protective order, Enterprise will produce responsive documents. For purposes of producing emails responsive to this request, Enterprise will conduct a search of emails of the following custodians: Jocelyn Truitt and Charles Stovall.

**REQUEST FOR PRODUCTION NO. 33.** All Documents You do or may use or rely on to support the following affirmative defense alleged in ¶ 3 of Your Original Answer: "3. ECO is entitled to a credit or offset for any monies Plaintiff has received for the transport of crude that Plaintiff contends is subject to the Distribution Agreement, to the extent tariffs were paid by any third-party purchaser of such crude for transportation through the Magellan distribution system." This includes all Enterprise Documents purporting to show that Magellan received any such monies.

**RESPONSE:**

Enterprise will produce responsive documents.

Date: December 1, 2017          Respectfully submitted,

/s/ *Linda R. Stahl*
E. Leon Carter
Texas Bar No. 03914300
lcarter@carterscholer.com
J. Robert Arnett II
Texas Bar No. 01332900
barnett@carterscholer.com
Joshua J. Bennett
Texas Bar No. 24059444
jbennett@carterscholer.com
Courtney Barksdale Perez
Texas Bar No. 24061135
cperez@carterscholer.com
**CARTER SCHOLER PLLC**
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206
Telephone: 214-550-8188
Facsimile: 214-550-8185

**ATTORNEYS FOR DEFENDANT
ENTERPRISE CRUDE OIL LLC**

## CERTIFICATE OF SERVICE

This is to certify that on December 1, 2017, a true, correct and complete copy of the foregoing document has been served on all counsel of record via a court-approved electronic filing system, in accordance with Rule 21a of the Texas Rules of Civil Procedure.

*/s/ Linda R. Stahl*
Linda R. Stahl

Exhibit 5

# Exhibit 5

## (Omitted Pending Determination of Filing Under Seal)

{1773415;}

SR486

Exhibit 6

NO. 05-17-_____-CV

_____

IN THE COURT OF APPEALS
FOR THE FIFTH JUDICIAL DISTRICT
_____

**In Re Enterprise Crude Oil, LLC**
_____

Original Proceeding from Cause No. DC-17-7264,
101st Judicial District Court, Dallas County
Hon. Staci Williams, Presiding
_____

**PETITION FOR WRIT OF MANDAMUS
AND APPENDIX**
_____

E. Leon Carter
Texas Bar No. 03914300
lcarter@carterscholer.com
J. Robert Arnett II
Texas Bar No. 01332900
barnett@carterscholer.com
Linda R. Stahl
Texas Bar No. 00798525
lstahl@carterscholer.com
Joshua Bennett
Texas Bar No. 24059444
jbennett@carterscholer.com
**CARTER SCHOLER PLLC**
8150 N. Central Expy, Suite 500
Dallas, Texas 75206
Telephone: 214-550-8188
Facsimile:  214-550-8185

**EMERGENCY MOTION TO STAY FILED SEPARATELY**

**ORAL ARGUMENT REQUESTED**

SR487

**III. The Trial Court Abused Its Discretion as a Matter of Law When It Ordered Enterprise to Produce Its Trade Secrets, and Refused to Quash Subpoenas Requiring Enterprise's Customers to Do So, Without a Showing of Necessity and Without Adequate Protective Measures.**

Beyond failing to address the overbreadth of Magellan's requests, the trial court further erred when it failed to address the trade-secret issues adequately. The trial court compelled Enterprise to respond to requests that would encompass volumes of proven trade secrets, though Magellan made no showing that such information is necessary to the case. In competitive markets like the crude oil market at issue, an entity's commercial information—its strategies, techniques, goals and plans—can be its "life blood." *Duracell Inc. v. SW Consultants, Inc.*, 126 F.R.D. 576, 578 (N.D. Ga. 1989). However, "[t]he discovery rules are not intended to forfeit a party's ability to compete effectively in the market by opening up tangentially relevant financial and marketing information to competitors." *Id*. That is especially true in Texas, where courts are supposed to apply Texas Rule of Evidence 507.

Under Rule 507, Enterprise is entitled to withhold—and to prevent its customers from disclosing—its trade secrets to Magellan, an avowed competitor. Tex. R. Evid. 507(a). Once Enterprise establishes that the information Magellan is demanding is trade secret, such information cannot be produced until *Magellan* establishes that such information is necessary for a fair trial. *In re Cont'l Gen. Tire, Inc.*, 979 S.W.2d 609, 615 (Tex.1998) (orig. proceeding). In fact, trial courts

25

SR488

FILED
DALLAS COUNTY
1/2/2018 5:19 PM
FELICIA PITRE
DISTRICT CLERK

**CAUSE NO. DC-17-07264**

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., a Delaware limited partnership, | ) ) ) | |
| Plaintiff, | ) ) | IN THE DISTRICT COURT OF |
| vs. | ) ) | DALLAS COUNTY, TEXAS |
| ENTERPRISE CRUDE OIL LLC, a Texas limited liability company, | ) ) ) ) | 101st JUDICIAL DISTRICT |
| Defendant. | ) | |

## PLAINTIFF'S SECOND SUPPLEMENT TO RESPONSE TO DEFENDANT'S MOTION FOR ENTRY OF A PROTECTIVE ORDER, FILING EXHIBIT 5 IN REDACTED FORM

Magellan files this second supplement to its response to Enterprise's Motion for Entry of a Protective Order, for the sole purpose of filing, in redacted form, Exhibit 5 which was described in but not attached to Magellan's first supplement, filed on December 27, 2017. Exhibit 5 to Magellan's first supplement is attached hereto, in redacted form, and marked as Exhibit A hereto.

During the December 28, 2017 hearing, Magellan provided Exhibit 5 to the Court and to Enterprise, in unredacted form. At that time, Magellan's counsel inquired whether and to what extent Enterprise deems the content of Exhibit 5 confidential information, but the Enterprise attorney presenting Enterprise's Motion for Entry of a Protective Order, Mr. Bennett, stated that he was unable to answer and referred Magellan to another Enterprise attorney, Ms. Stahl. Immediately following the hearing, Magellan provided Exhibit 5 to Ms. Stahl, noting that one of the emails included in Exhibit 5 was recently produced by Enterprise without any legend or other indication that Enterprise deems it confidential, and that the content of the remaining inter-party emails included in Exhibit 5 is substantially similar to the email Enterprise produced without any indication of confidentiality. In her written response, Ms. Stahl stated that Enterprise's production of the above-referenced email without any indication of confidentiality was inadvertent; and that

SR489

Enterprise contends that other inter-party emails exchanged in the course of Magellan's pre-suit audits constitute or contain confidential information, as defined in the parties' audit-related Confidentiality Agreement, to the extent they consist of "non-public materials containing customer lists, operational information, and business and financial information." Exhibit B, attached. Then, in a subsequent email to Magellan's counsel, Ms. Stahl provided an Enterprise-redacted version of Exhibit 5 in a form said to be "acceptable for filing." Exhibit C, attached.

Magellan does not agree that the information contained in the inter-party emails included in Exhibit 5 constitutes "confidential information" as defined in the audit-related Confidentiality Agreement. Nor does Magellan agree with Enterprise's assertions that the audit-related Confidentiality Agreement precludes Magellan from using or disclosing in this action, for purposes of pursuing the claims Magellan discovered through its pre-suit audits and alleges in its Original Petition, any information falling within the Confidentiality Agreement's definition of "confidential information." However, to avoid other needless disputes with and threats from Enterprise, and reserving all rights, Magellan has redacted Exhibit 5 to eliminate any and all arguably "confidential information" including all references to a specific customer, to specific terms of any known agreement between Enterprise and a customer, to specific product volumes, or to specific contents of any product transaction data found in spreadsheets Enterprise provided in a pre-suit audit.

Magellan's redacted version of Exhibit 5 eliminates much of, but not all of, the same information Enterprise suggested be redacted as "confidential." Magellan has rejected some of Enterprise's redactions because they are unprincipled, inconsistent, and overly broad, including information that cannot conceivably be confidential, such as information of a kind that Enterprise itself has publicly disclosed and used in this action.

Dated January 2, 2018.

PLAINTIFF'S SECOND SUPP. TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER, FILING EX. 5 IN REDACTED FORM **–** Page 2
{1774000;}

SR490

Respectfully submitted,

**GABLEGOTWALS**

By:  /s/ David L. Bryant
    David L. Bryant
    State Bar No. 24084344
    dbryant@gablelaw.com
    113 Pleasant Valley Drive, Suite 204
    Boerne, Texas 78006
    Telephone: (830) 336-4810
    Facsimile: (918) 595-4990

    Lisa T. Silvestri
    State Bar No. 00797967
    lsilvestri@gablelaw.com
    100 W. Fifth St., Suite 1100
    Tulsa, Oklahoma 74103
    Telephone: (918) 595-4800
    Facsimile: (918) 595-4990

PLAINTIFF'S SECOND SUPP. TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER, FILING EX. 5 IN REDACTED FORM – Page 3
{1774000;}

SR491

And

**FIGARI + DAVENPORT, LLP**

Bill E. Davidoff
State Bar No. 00790565
bill.davidoff@figdav.com
Amanda Sotak
State Bar No. 24037530
amanda.sotak@figdav.com
901 Main Street, Suite 3400
Dallas, Texas 75202
Telephone: (214) 939-2000
Facsimile: (214) 939-2090

**ATTORNEYS FOR PLAINTIFF,**
**MAGELLAN CRUDE OIL**
**PIPELINE COMPANY, L.P.**

## CERTIFICATE OF SERVICE

I certify that on January 2, 2018, I forwarded a true and correct copy of the foregoing

document to the following counsel via EFile:


**E. Leon Carter**
lcarter@carterscholer.com
**J. Robert Arnett II**
barnett@carterscholer.com
**Joshua J. Bennett**
jbennett@carterscholer.com
**Courtney Barksdale Perez**
cperez@carterscholer.com
CARTER SCHOLER PLLC
8150 N. Central Expressway
Suite 500
Dallas, Texas 75206

**Attorneys for Defendant**
**Enterprise Crude Oil, LLC**


/s/ David L. Bryant
David L. Bryant

PLAINTIFF'S SECOND SUPP. TO RESPONSE TO DEF.'S MOT. FOR PROTECTIVE ORDER, FILING EX. 5 IN REDACTED FORM **–** Page 4
{1774000;}

SR492

# Exhibit A

Exhibit 5 to Plaintiff's Supplement to Response to
Defendant's Motion for Entry of a Protective Order
Governing the Production of Confidential Information
(Redacted Form)

SR493

Exhibit 5

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, October 19, 2015 10:36 AM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Subject:** Crude Oil Distribution Agreement Audit Data Request Follow-up

Karen,
Below is our reply (in red) to your latest request for additional information. We believe we have fully answered your questions and provided adequate documentation.

2. Inform us of any **Commitment Exceptions** [4] Enterprise Crude Oil LLC or its Affiliates are claiming. Enterprise Crude Oil LLC ("ECO") is not claiming any Commitment Exceptions under the Crude Oil Distribution Agreement (the "Agreement") applicable to shipments of Product by ECO during the 2014 calendar year.

3. Provide a listing of all title transfers of product by Enterprise Crude Oil LLC or its Affiliates, including but not limited to title transfers of product at the origins, Echo, or any other location, associated with product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015. ECO batches a common stream barrel at the Origin Points and sells a common stream barrel at the applicable destination. ECO does not tie a specific Origin Point to a barrel sold at a different location. All sales by ECO of Product shipped on the Eagle Ford Pipeline System during the 2014 calendar year were made by ECO to unaffiliated third parties at Echo, Genoa, or other destinations that are not Destination Points under the Agreement. Title to the applicable barrels transferred to the unaffiliated third party buyers at the points of sale. Information on the sales by ECO of Product shipped on the Eagle Ford Pipeline System during the 2014 calendar year, including the volumes sold and the applicable points of such sales, was previously provided by ECO to Magellan.

4. Provide a list of Enterprise Crude Oil LLC Affiliates that have shipped product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015. No ECO affiliates shipped Product on the Eagle Ford Pipeline System from the Origin Points during the 2014 calendar year or during the period from January 1, 2015 through July 31, 2015. .

**Questions**

1. Are there other systems being used to transport volumes from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) other than moving east on Eagle Ford Pipeline? Sections 4.1 and 4.2 of the Agreement cover only deliveries of Product that were made from an Origin Point and transported on the Eagle Ford Pipeline System. Accordingly, this question is not relevant to ECO's obligations under the Agreement.

2. For the Genoa numbers included in the 'Delivery' section of the spreadsheet you provided on July 23, 2015 (see the tab entitled "ECO STX 2014" in the attached document), did those volumes go through Genoa Jct MPL? If not Genoa Jct MPL, what connection point did they go through and an explanation as to why the volumes did not go through Genoa Jct MPL? Deliveries made by ECO to Echo did not go through the Connection Point prior to delivery. Deliveries made by ECO to destinations that are not Destination Points did not go through the Connection Point prior to delivery. All deliveries by ECO of Product that were made from an Origin Point and transported on the Eagle Ford Pipeline System were sold at the destination to unaffiliated third parties. ECO did not control subsequent transportation of such Product by such unaffiliated third parties. Sections 4.1 and 4.2 of the Agreement cover only deliveries of Product that were made from an Origin Point, transported on the Eagle Ford Pipeline System to the Connection Point, or through Echo Terminal to the Connection Point, and delivered to any of the Destination

Points. Accordingly, Magellan's last question in Section 2 is not relevant to ECO's obligations under the Agreement.

Regards,
Joslyn

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Monday, October 12, 2015 9:36 AM
**To:** Truitt, Joslyn
**Cc:** Graham, Rodger; Devers, Scott; Bridges, Trent
**Subject:** Crude Oil Distribution Agreement Audit Data Request Follow-up

Joslyn,

In response to your below email, the information we have requested is within our rights as provided by the Crude Oil Distribution Agreement. **Section 4.4 (Magellan's Limited Rights to Audit and Penalty)** of the Agreement broadly states *"Magellan shall have the right to audit Shipper's records necessary to verify Shipper's compliance with the provisions of Sections 4.1 and 4.2."* The information we have requested is necessary to verify Enterprise's compliance with **Section 4.1 (Transportation Commitment)** and **Section 4.2 (Transportation Commitment Exceptions)** of the Agreement. If there is concern regarding the confidentiality of information produced in connection with this audit, as a reminder note that a confidentiality agreement was executed on July 16, 2015.

We respectfully request a reply by Friday, October 16th stating 1) whether our information requests will be honored and 2) if honored, when we can expect to receive the information requested.

If Enterprise continues to assert that the information Magellan has requested is outside our audit rights in the Agreement, then Magellan's next course of action will be to serve Enterprise with a Dispute Notice pursuant to **Section 9.9 (Dispute Resolution)** of the Agreement.

Thank you,
Karen

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, September 21, 2015 10:19 AM
**To:** Flock, Karen
**Subject:** RE: Crude Oil Distribution Agreement Audit Data Request Follow-up

The remaining items in your request are not required for Enterprise to provide under the current Agreement. If you feel otherwise, please reference the section of the Agreement that corresponds to each of the requested items. We can review your request again with that information...

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Monday, September 21, 2015 10:03 AM
**To:** Truitt, Joslyn
**Subject:** RE: Crude Oil Distribution Agreement Audit Data Request Follow-up

Thank you for the data. This addresses Data Request item #1, what about Data Request items 2 – 4 and Questions 1-2?

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, September 21, 2015 9:56 AM
**To:** Flock, Karen
**Subject:** RE: Crude Oil Distribution Agreement Audit Data Request Follow-up

Karen –
I received the requested information….

On 2014 data was provided, due to the agreement stating,
*"…and must be conducted within one (1) year after December 31st of each calendar year for such previous*
*year's transportation services."*

So it is our understanding that you can request the 2015 data in 2016…

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, August 20, 2015 8:07 AM
**To:** Truitt, Joslyn
**Cc:** Graham, Rodger; Devers, Scott; Bridges, Trent
**Subject:** Crude Oil Distribution Agreement Audit Data Request Follow-up

We appreciate the information/data provided by Enterprise per our original request dated May 28, 2015. We have reviewed the data and Enterprise's explanation on how to read the data. Your email dated July 23, 2015 indicated that we should let you know if we had additional questions and based on our review of the data you provided, we do have a few follow-up data requests and questions that would assist in our review. They are indicated below.

**Data Requests**

1. Clarification regarding Magellan's initial data request: For January 1, 2014 through July 31, 2015 provide an electronic report/detailed listing (preferably Excel) of all product **Owned**[1] or

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 8

Controlled[2] by Enterprise Crude Oil LLC or its Affiliates shipped from each **Origin Point**[3] (Lyssy, Marshall, Milton, and Gardendale) and include Origin & destination pairings (all destinations regardless of inclusion in the Agreement), inter-connection points, and volume by product, by month, by shipper (see the tab entitled "Sample Worksheet" in the attached document). **Note:** This sample worksheet outlines the data we are requesting in a format that would enhance our review and our hope is that the data can be readily obtained through your internal systems. Our original data request asked for a detailed breakdown of shipments from January 1, 2014 through May 27, 2015 and we only received data for 2014. We would also like this data for 2015, specifically through July 31, 2015.

2. Inform us of any **Commitment Exceptions** [4] Enterprise Crude Oil LLC or its Affiliates are claiming.

3. Provide a listing of all title transfers of product by Enterprise Crude Oil LLC or its Affiliates, including but not limited to title transfers of product at the origins, Echo, or any other location, associated with product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015.

4. Provide a list of Enterprise Crude Oil LLC Affiliates that have shipped product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015.

**Questions**

1. Are there other systems being used to transport volumes from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) other than moving east on Eagle Ford Pipeline?

2. For the Genoa numbers included in the 'Delivery' section of the spreadsheet you provided on July 23, 2015 (see the tab entitled "ECO STX 2014" in the attached document), did those volumes go through Genoa Jct MPL? If not Genoa Jct MPL, what connection point did they go through and an explanation as to why the volumes did not go through Genoa Jct MPL?

We appreciate your prompt attention in providing the additional data and answers to our questions and request that we receive this data by September 18, 2015. We would be happy to discuss this request with you and if needed, schedule time, at your convenience, to come to Enterprise offices to clarify our request. If you have any questions regarding this request or would like us to come to your offices, please contact me or Scott Devers (918.574.7712).

*Thank you,*

**Karen Flock**
*Magellan Midstream Partners, L.P.*
*Audit Services*
*918.574.7664*

**Footnotes:**
*Crude Oil Distribution Agreement dated October 31st, 2011*

(1) *Section 1.32 "Owned" shall mean Product to which Shipper or its Affiliate holds title; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute being Owned.*

(2) *Section 1.6 "Controlled" shall mean, when referring to Product, Product that Shipper or its Affiliates, as the case may be, has the legal right to transport; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute Control.*

(3) *Section 1.31 "Origin Point" means the following points on the Eagle Ford Pipeline System: A. Gardendale (LaSalle County, Texas); B. Lyssy (Wilson County, Texas; Marshall (Gonzales County, Texas); and D. Milton (Karnes County, Texas).*

(4) *Section 4.2 Transportation Commitment Exceptions. A. If, at any point during the Term hereof, Shipper requires more capacity than Magellan has available, Shipper may utilize third party facilities to transport such excess Product until such time that Magellan has capacity available; and B. If a third party connects to a Future Destination Point before Magellan, and Magellan*

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 9

*later connects to such Future Destination Point, then Magellan must offer Shipper a tariff rate to such Future Destination Point equal to or less than the third party tariff rate at such Future Destination Point or such Future Destination Point shall not be considered a Destination Point under Section 1.8 (the exceptions in Section 4.2 (A) and (B) are hereinafter collectively referred to as the "Commitment Exceptions").*

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 10

SR498

| From: | Truitt, Joslyn |
| --- | --- |
| Sent: | Tuesday, March 29, 2016 5:20 PM CDT |
| To: | Flock, Karen |
| Subject: | RE: January 26 Site Visit Meeting Follow-up |

See response below in Red...

Thanks!

**Joslyn R. Truitt**
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 | Suite 4.112
jrtruitt@eprod.com | office: 713.381.3718 | fax: 713.381.3503 | cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, February 04, 2016 8:43 AM
**To:** Truitt, Joslyn
**Subject:** January 26 Site Visit Meeting Follow-up

Joslyn,

From our meeting on 1/26/16, there were several items that Brent and/or you were going to follow up on and provide additional information to us. Brent contacted Brett and provided information regarding the "Legacy" destinations. Other than that we have not received any additional information. Below are my notes from our meeting with Brent on 1/26/16. The items highlighted in yellow are the items noted from our meeting for which Brent stated that additional information needed to be obtained so that a complete response could be provided. Just wanted to follow up to see when you thought we might receive additional information and/or responses. If any of the additional information or responses are ready, can you please forward to me, and if not yet ready, can you provide an estimated timeline as to when we can expect to receive the information?

- Can you confirm if the original worksheets provided by Enterprise only included volumes for product owned/controlled by Enterprise?
  Response provided...
- Now that Enterprise has disconnected from MMP at Anahuac Jct. which was a destination point per the Crude Oil Distribution Agreement ('Agreement') (section 1.8), how does this action by your Affiliate impact Enterprise's ability to comply with the 'Agreement'?
  No Product controlled by Enterprise moves from the Origin Points to the Morgan's Point facility. ▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Disconnection of the connection at Anahuac Junction has
  no impact on Enterprise's ability to comply with the Agreement.

- 2015 Transaction worksheet provided by Enterprise (volumes are in barrels)
- Spreadsheet indicates that Enterprise owned STSWT transactions on the spreadsheet:

ECO000650

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 11



| Profile_Start_Date | Profile_End_Date | External_Lentity_Short_Name | Buy_Sell | Reference | deal_num | Location_Name | Grade | Actual_Volume |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

- October 2015 – two Enterprise to ▮ transactions that went to HSC Terminal (OTI) approximately ▮ – why didn't these go through MMP?:
  These transactions were with an unaffiliated third party at ECHO and were required to facilitate the ▮ ▮ The Product was shipped from ECHO to HSC by that unaffiliated third party. Unaffiliated third parties make their own shipping decisions.

| Profile_Start_Date | Profile_End_Date | External_Lentity_Short_Name | Buy_Sell | Reference | deal_num | Location_Name | Grade | Actual_Volume |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

- June 2015 – Enterprise to ▮ that went to Marathon Texas City – transaction worksheet shows volumes were scheduled, however it also shows actual volume of 0, were volumes shipped and if so, why didn't these go through MMP?:
  This was an ECPL over-delivery to ▮ in June. ECO sold the barrels to ▮ in July at June pricing to clear the imbalance. Unaffiliated third parties make their own shipping decisions.

| Profile_Start_Date | Profile_End_Date | External_Lentity_Short_Name | Buy_Sell | Reference | deal_num | Location_Name | Grade | Actual_Volume |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

- Several transaction at HSC (OTI) for ▮ and ▮ – did they go through MMP, if not, why not?
  These barrels did not go through MMP. The Product did not go through MMP because it was not the most direct routing. Please see the map that was previously provided to Magellan by Enterprise

| Profile_Start_Date | Profile_End_Date | External_Lentity_Short_Name | Buy_Sell | Reference | deal_num | Location_Name | Grade | Actual_Volume |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

- Can you confirm that Enterprises' position is that product was sold before it went to the final Destinations, as defined in the 'Agreement', so the joint tariff wasn't used?
  The Product did not go through MMP and was sold by Enterprise to non-affiliated third parties before it was shipped to any Destination Points. These shipments do not meet the criteria in Section 4.1 of the Agreement.

- Were any of the barrels that were sold, as outlined on the transaction spreadsheets, ultimately shipped to a final Destination as defined in the 'Agreement'?
  Enterprise sold the Product to unaffiliated third parties at ECHO. Enterprise does not track subsequent transportation of Product by unaffiliated third parties. Unaffiliated third parties make their own shipping decisions.

ECO000651

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 12

SR500

- Were customers given an incentive to buy at Genoa or Echo instead of the final Destination as defined in the 'Agreement'?

  ███

- Per the buy/sell contracts you have provided, Enterprise can acquire barrels at the Origin and sell back at re-delivery points which are defined as ███ or ███ but the buy/sell contracts exclude ███████████████████████

  ████████████████████████

  Unaffiliated third parties negotiated the terms of the agreement that they wanted.

- Are there any buy/sell contracts where the 'Agreement' final Destinations are included as re-delivery points? ███

  ████████████████████████████████████████████

Thank you,

**Karen Flock**
*Magellan Midstream Partners, L.P.*
*Audit Services*
918.574.7664

ECO000652

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 13

Message
_____

**From:** Truitt, Joslyn [JRTRUITT@eprod.com]
**Sent:** 6/24/2016 9:15:06 AM
**To:** Flock, Karen [Karen.Flock@magellanlp.com]
**Subject:** RE: Information Request Follow-up
**Attachments:** 2014 Volume Reconciliation Audit.xlsx

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

Karen –
Please refer to the responses below in RED. Let me know if you have any additional questions or concerns. We appreciate your patience in this matter.

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

 Enterprise
Products
1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

_____

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, May 12, 2016 9:28 AM
**To:** Truitt, Joslyn
**Subject:** Information Request Follow-up

Joslyn,

Just wanted to follow-up on the outstanding requests. Can you please provide an update regarding each individual request stating 1) if the requested item will be provided (yes/no) and 2) if yes, then when will we receive the item?

Thank you,
Karen

| Request Description | Date Requested | Last Response |
|---|---|---|
| Are there other systems being used to transport volumes from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) other than moving east on Eagle Ford Pipeline? Yes, there are other 3rd party pipelines originating in Gardendale. However, Enterprise has not used any of the other 3rd party pipelines originating in Gardendale for transportation of its equity owned crude. | 8/20/2015 | 3/22/16 - disputed; 5/3/16 'need to follow-up with appropriate parties' |
| For the Genoa numbers included in the 'Delivery' section of the spreadsheet you provided on July 23, 2015 (see the tab entitled "ECO STX 2014" in the attached document), did those volumes go through Genoa Jct MPL? No; If not Genoa Jct MPL, what connection point did they go through and an explanation as to why the volumes did not go through Genoa Jct MPL? These volumes went through Enterprise-Genoa Jct, ECHO Terminal, or Seaway – Texas City, based on the transportation nominations made by the applicable 3rd Parties. | 8/20/2015 | 3/22/16 - disputed; 5/3/16 'need to follow-up with appropriate parties' |

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 14

| | | |
|---|---|---|
| Volumes shipped on any system other than the Eagle Ford Pipeline System, by Enterprise Crude Oil LLC or any of its Affiliates from any Origin Point to any Destination Point. (Also see item #6 above) There are no other pipelines utilized by ECO to move crude from the 4 origination points listed in the Crude Oil Distribution Agreement. | 11/13/2015 | 3/22/16 - disputed; 5/3/16 'need to follow-up with appropriate parties' |
| Provide remaining [redacted] bbls of transactions that aren't included in the 2014 spreadsheet and whether Enterprise maintained ownership of these barrels (See reconciliation attached) | 1/25/2016 | 3/30/16 - sent updated request for all outstanding items; 5/3/16 OKC team working on this |
| To provide the date when product receipt was switched from pipe and truck to truck only at Anahuac Jct  September, 2013 | 1/26/2016 | 3/29/16 - response did not address this question; 5/3/16 'need to follow-up with appropriate parties' |
| Does the [redacted] contract govern the [redacted] or the [redacted] transactions and what contract governs the [redacted] company not governed by the [redacted] contract? The [redacted] contract governs the purchase and sale between ECO and [redacted] and its affiliates [redacted] at the lease in the Eagle Ford. Additional contracts are used to sell the bbls back to [redacted] or other parties. | 2/15/2016 | 3/22/16 - requested clarification which was sent on 3/28/16; 5/3/16 'need to follow-up with appropriate parties' |
| What transactions are governed by the [redacted] and [redacted] contracts? These contracts govern the purchase and sale between ECO and the counterparty at the lease in the Eagle Ford. Additional contracts are used to sell the bbls back to the counterparty or other parties. (Inquired as to why we received these contracts since there were not any corresponding transactions.) These documents are beyond the permitted scope of the audit, however, we provided these contracts as a good faith effort to show our volume commitments in the Eagle Ford. | 2/15/2016 | 3/22/16 - requested clarification which was sent on 3/28/16; 5/3/16 'need to follow-up with appropriate parties' |
| Requested copies of the Original Agreements with [redacted] and [redacted] both dated March 11, 2011 The original agreement has not been located after doing due diligence. The original contract never went into effect and as such, no product was ever purchased/transported under the original agreement. | 3/16/2016 | 3/22/16 - contract being redacted; 5/3/16 'need to follow-up with appropriate parties' |
| The counterparties on the 'Transfer Reports' have been redacted. How can I verify that the sales were to non-ECO affiliates? These reports were redacted to protect the customer's identity based on contractual obligations and/or applicable law. Enterprise is willing to pursue alternate methods of certifying that the redacted parties are neither ECO nor any of its Affiliates. | 3/28/2016 | no response; 5/3/16 'need to follow-up with appropriate parties' |

From: Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
Sent: Tuesday, May 03, 2016 7:54 AM
To: Flock, Karen <Karen.Flock@magellanlp.com>
Subject: RE: Voice Mail (30 seconds)

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 15

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

Karen –

I was copied on an email yesterday that indicated our team in OKC is working with scheduling on the project of reconciling the volumes. The email stated that they were getting close.

As for the other items sent in your "open items" list, I will need to follow-up with the appropriate parties to determine what the hold-up is. I will be out of the office for the rest of the week, but if I see anything pertaining to this review come through my email, I will forward to you.

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

 Enterprise
Products
1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Tuesday, May 03, 2016 7:26 AM
**To:** Truitt, Joslyn
**Subject:** RE: Voice Mail (30 seconds)

Joslyn,

Just wanted to follow up on the request below as well as the other outstanding items I sent to you on April 11th. Can you please give me a status update as to when we can expect the information?

Thanks,
Karen

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, April 25, 2016 8:36 AM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Subject:** RE: Voice Mail (30 seconds)

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

Thanks!! I should have something for you quickly.

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products
1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, April 21, 2016 7:54 AM
**To:** Truitt, Joslyn
**Subject:** RE: Voice Mail (30 seconds)

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 16

Per the original worksheet you provided, in 2014 ████████ bbls were supplied from the origins.

The 2014 detailed listing of individual transactions worksheet you provided only included transactions to Echo and Genoa (it appears that the worksheet was filtered by 'Location Name' only including Echo and Genoa with all other destinations filtered out) and totals ██████ bbls.

I am asking to see the transaction detail associated with the remaining ████████ bbls from the origins for 2014 that were not included on the 2014 detailed transactions listing that you provided.

Please call if you would like to discuss. I'd be happy to explain further if needed.

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Tuesday, April 19, 2016 11:06 PM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Subject:** FW: Voice Mail (30 seconds)

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

Karen – Can you please provide the document/worksheet that your group put together that illustrates the discrepancies in the 2014 volumes? The team in OKC is actively trying to get this issue resolved...

Provide remaining ████ bbls of transactions that aren't included in the 2014 spreadsheet and whether Enterprise maintained ownership of these barrels

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX  77002 l Suite 4.112
jrtruitt@eprod.com l office: 713.381.3718 l fax: 713.381.3503 l cell: 832.317.3642

**From:** Microsoft Outlook **On Behalf Of** 9185747664
**Sent:** Monday, April 18, 2016 8:22 AM
**To:** Truitt, Joslyn
**Subject:** Voice Mail (30 seconds)

**You received a voice mail from 9185747664**

Caller-Id:                                                        9185747664

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 17

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, June 19, 2017 3:00 PM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Cc:** Stovall, Charles <CStovall@eprod.com>
**Subject:** Open Magellan Request

Sent by an external sender. Use caution opening attachments, clicking web
links, or replying unless you have verified this email is legitimate.

Karen –
I have attached a response to all open items. Please let me know if you have any additional questions.

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 | Suite 4.112
jrtruitt@eprod.com | office: 713.381.3718 | fax: 713.381.3503 | cell: 832.317.3642

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 18



**Enterprise Houston Ship Channel,**
**Net Ticket**

Ticket Status   Verified

Ticket No
Customer Ref. No

### Schedule Information

### Net Measurement

| | Tank | Meter |
|---|---|---|

**Adjustment Type**

- ⊙ Custody Transfer
- ⊙ Regrade
- ⊙ Transmix
- ⊙ Balance
- ⊙ TightLine
- ⊙ Trade
- ● None

| Truck Rack | Trailer Number |
|---|---|
| Carrier Number | Load Number |
| Driver Number | Bill of Lading |
| Load Spot Number | |

GOV/GSV Vol.
S & W %
S & W Factor
S & W Vol.
Total NSV
Updated By
Updated on

### Dates and Signatures

| OPEN | 09/08/2016 04:11 | Enterprise Rep Name: | |
|---|---|---|---|
| | | Witness Name: | |
| CLOSE | 09/08/2016 08:18 | Enterprise Rep Name: | |
| | | Witness Name: | |

Comments:

Printed:   06/13/2017 12:57

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 19

SR507



**Enterprise Houston Ship Channel,**
**Net Ticket**

Ticket Status   Verified

Ticket No

Customer Ref. No

**Schedule Information**

**Net Measurement**

Tank                              Meter

**Adjustment Type**

○ Custody Transfer        ○ TightLine
○ Regrade                      ○ Trade
○ Transmix                     ● None
○ Balance

| | |
|---|---|
| Truck Rack | Trailer Number |
| Carrier Number | Load Number |
| Driver Number | Bill of Lading |
| Load Spot Number | |

GOV/GSV Vol.
S & W %
S & W Factor
S & W Vol.
Total NSV
Updated By
Updated on

**Dates and Signatures**

**OPEN**    09/08/2016 08:18    Enterprise Rep Name:
                                            Witness Name:

**CLOSE**   09/08/2016 11:44    Enterprise Rep Name:
                                            Witness Name:

**Comments:**

Printed:   06/13/2017 12:59

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 20

SR508



**Enterprise Crude Pipeline LLC**
**Meter Ticket**

Ticket Status   Verified

Ticket No
Customer Ref. No

**Schedule Information**

**Meter Measurement**

**Dates and Signatures**

| | | | |
|---|---|---|---|
| **OPEN** | 01/01/2016 18:27 | Enterprise Rep Name: | |
| | | Witness Name: | |
| **CLOSE** | 01/02/2016 05:13 | Enterprise Rep Name: | |
| | | Witness Name: | |

Printed:   06/13/2017 12:52

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 21

**Enterprise Crude Pipeline LLC**
**Meter Ticket**

Ticket Status  Verified

Ticket No
Customer Ref. No

## Schedule Information

## Meter Measurement

## Dates and Signatures

OPEN    01/19/2016 17:06    Enterprise Rep Name:

Witness Name:

CLOSE    01/20/2016 02:52    Enterprise Rep Name:

Witness Name:

Printed:  06/13/2017 12:52

**Enterprise Crude Pipeline LLC**
**Meter Ticket**

Ticket Status   Verified

Ticket No
Customer Ref. No

## Schedule Information

## Meter Measurement

## Dates and Signatures

| | | | |
|---|---|---|---|
| **OPEN** | 01/29/2016 18:20 | Enterprise Rep Name: | |
| | | Witness Name: | |
| **CLOSE** | 01/30/2016 16:10 | Enterprise Rep Name | |
| | | Witness Name: | |

Printed:   06/13/2017 12:53

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 23

SR511

**From:** Linda Stahl <lstahl@carterscholer.com>
**Sent:** Thursday, December 28, 2017 4:22 PM
**To:** David L. Bryant
**Cc:** Leon Carter; Joshua Bennett; Lisa T. Silvestri; Bob Arnett
**Subject:** Re: Magellan v. Enterprise - Exhibit 5 to Plaintiff's Supplement to Response to Defendant's Motion for Entry of Protective Order

David,

Thanks for sending the Exhibit 5 materials to me for review. The information contained within these documents is confidential information under the Confidentiality Agreement governing the audit, and will be designated as Confidential for purposes of this lawsuit as well. Most have already been withheld on this basis. Each of the documents in proposed Exhibit 5 were provided to Magellan in connection with the audit and are non-public materials containing customer lists, operational information, and business and financial information subject to the protections of the Agreement. As such, they must be held in strict confidence and not disclosed to anyone other than representatives of Magellan with a legitimate need to review them. Filing the documents of public record violates the terms of the Confidentiality Agreement, which Enterprise will not hesitate to enforce by way of injunction or other appropriate relief.

Moreover, under paragraph 5 of the Confidentiality Agreement, Magellan and its Representatives are required to "reasonably cooperate with [Enterprise] to assure that, to the extent possible, confidential treatment will be accorded to any such Confidential Information or Notes disclosed." Giving us less than 24 hours' notice of Magellan's intent to make Confidential Information public—right before a holiday weekend and without affording us any opportunity to seek appropriate relief under Texas Rule of Civil Procedure 76a—is not "reasonable cooperation" and would risk only further breach of the Confidentiality Agreement.

As indicated at the hearing, Enterprise does not object to the Court reviewing the materials in camera in connection with the pending Motion for Entry of Protective Order. By providing the material only for review, the document is not a "court record" for purposes of Rule 76a. *See General Tire, Inc. v. Kepple*, 970 S.W.2d 520, 525 (Tex. 1998).

With respect to ECO000650-652, the reviewer inadvertently failed to designate this correspondence – which contains customer information and volume data – as Confidential. The request from Ms. Flock that includes images of portions of the spreadsheet provided in the audit (and which has consistently been withheld from production on confidentiality grounds) appears in several emails, which Enterprise will designate as Confidential upon entry of a Protective Order. These are ECO 000561-563, ECO 000564-566, ECO 000567-570, ECO 000574-576, ECO 000579-581, ECO 000583-585, 000586-589, ECO 590-593, ECO 000594-597, ECO 000598-601, ECO 000610-613, ECO 614-618, ECO 000633-637, ECO 000638-642, ECO 000650-652, ECO 000653-656, and ECO 000657-659.

Pending entry of that order, the materials continue to be protected by the parties' Confidentiality Agreement, and Enterprise does not consent to filing of these materials publicly.

Regards,



**Linda R. Stahl | Partner**
lstahl@carterscholer.com
D: 214.736.3949
F: 214.550.8185
www.carterscholer.com

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 24

8150 N. Central Expressway, Suite 500, Dallas, Texas 75206

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you have received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

**From:** "David L. Bryant" <dbryant@gablelaw.com>
**Date:** Thursday, December 28, 2017 at 1:15 PM
**To:** Linda Stahl <lstahl@carterscholer.com>
**Cc:** Leon Carter <lcarter@carterscholer.com>, Joshua Bennett <jbennett@carterscholer.com>, "Lisa T. Silvestri" <lsilvestri@gablelaw.com>
**Subject:** Magellan v. Enterprise - Exhibit 5 to Plaintiff's Supplement to Response to Defendant's Motion for Entry of Protective Order

Linda,

When we filed Magellan's Supplement to Response to Defendant's Motion for Entry of Protective Order, late yesterday, we omitted Exhibit 5 pending a determination whether Enterprise believes there's a need for that Exhibit to be filed under seal. Though I was not present for the hearing this morning, I understand that Mr. Bennett was unable to answer that but indicated you can. So I'm attaching Exhibit 5 and requesting your prompt advice whether Enterprise thinks it needs to be filed under seal. The Exhibit includes 4 email chains, each ending in an email from Ms. Truitt to Ms. Flock. As indicated below, the chain ending in Ms. Truitt's 3/29/16 email was produced by Enterprise but not marked confidential. If you've produced the others, please advise, because we couldn't find them in your production. But their substance is similar to the one we found in your production.

| | | |
|---|---|---|
| 10/19/15 Truitt to Flock | Not produced by ECO | |
| 03/29/16 Truitt to Flock | ECO650 | NOT MARKED CONFIDENTIAL |
| 06/24/16 Truitt to Flock | Not produced by ECO | |
| 06/19/17 Truitt to Flock | Not produced by ECO | |

We'd like to file Exhibit 5 no later than tomorrow, one way or another, so please let us know today if possible. Thanks.

David

**David L. Bryant | GableGotwals**
San Antonio Area Office
113 Pleasant Valley Dr., Suite 204, Boerne, TX 78006
**Direct 830.336.4810** | Fax 918.595.4990 | dbryant@gablelaw.com
Tulsa Office Direct 918-595-4825

This message and any attachments are for the addressee(s) only and may contain privileged or confidential information.
If you have received this in error, please notify me immediately and permanently delete the message and any prints or other copies. Thank you.

2

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 25

SR513

Exhibit C

| | |
|---|---|
| **From:** | Linda Stahl <lstahl@carterscholer.com> |
| **Sent:** | Friday, December 29, 2017 12:30 PM |
| **To:** | David L. Bryant |
| **Cc:** | Leon Carter; Joshua Bennett; Lisa T. Silvestri |
| **Subject:** | Re: Magellan v. Enterprise - Exhibit 5 to Plaintiff's Supplement to Response to Defendant's Motion for Entry of Protective Order |
| **Attachments:** | Exhibit 5 - Plaintiff's Supplement to Response to Defendant's Motion for Entry of Protective Order (1773674x9DA4C)_Redacted[3].pdf |

David,

I am following up on my email from yesterday to see if you had decided to submit Exhibit 5 to the Court for *in camera* review. In an effort to work with you to resolve this matter, I have attached a redacted version of your proposed Exhibit 5 that would be acceptable for filing. If, however, you intend to file the unredacted exhibit, Enterprise needs additional time to prepare an appropriate sealing motion under Rule 76a. Because this is a holiday weekend and Enterprise personnel are on vacation, I am asking – and believe the Confidentiality Agreement would require – that you delay filing the exhibit until the end of next week so that I can prepare the motion.

Please let me know how you intend to proceed.

Regards,
Linda



**Linda R. Stahl | Partner**
lstahl@carterscholer.com
D: 214.736.3949
F: 214.550.8185
www.carterscholer.com

8150 N. Central Expressway, Suite 500, Dallas, Texas 75206

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you have received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

**From:** "David L. Bryant" <dbryant@gablelaw.com>
**Date:** Thursday, December 28, 2017 at 1:15 PM
**To:** Linda Stahl <lstahl@carterscholer.com>
**Cc:** Leon Carter <lcarter@carterscholer.com>, Joshua Bennett <jbennett@carterscholer.com>, "Lisa T. Silvestri" <lsilvestri@gablelaw.com>
**Subject:** Magellan v. Enterprise - Exhibit 5 to Plaintiff's Supplement to Response to Defendant's Motion for Entry of Protective Order

1

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 26

SR514

Linda,

When we filed Magellan's Supplement to Response to Defendant's Motion for Entry of Protective Order, late yesterday, we omitted Exhibit 5 pending a determination whether Enterprise believes there's a need for that Exhibit to be filed under seal. Though I was not present for the hearing this morning, I understand that Mr. Bennett was unable to answer that but indicated you can. So I'm attaching Exhibit 5 and requesting your prompt advice whether Enterprise thinks it needs to be filed under seal. The Exhibit includes 4 email chains, each ending in an email from Ms. Truitt to Ms. Flock. As indicated below, the chain ending in Ms. Truitt's 3/29/16 email was produced by Enterprise but not marked confidential. If you've produced the others, please advise, because we couldn't find them in your production. But their substance is similar to the one we found in your production.

| 10/19/15 Truitt to Flock | Not produced by ECO | |
| 03/29/16 Truitt to Flock | ECO650 | NOT MARKED CONFIDENTIAL |
| 06/24/16 Truitt to Flock | Not produced by ECO | |
| 06/19/17 Truitt to Flock | Not produced by ECO | |

We'd like to file Exhibit 5 no later than tomorrow, one way or another, so please let us know today if possible. Thanks.

David

**David L. Bryant | GableGotwals**
San Antonio Area Office
113 Pleasant Valley Dr., Suite 204, Boerne, TX 78006
**Direct 830.336.4810** | Fax 918.595.4990 | dbryant@gablelaw.com
Tulsa Office Direct 918-595-4825

This message and any attachments are for the addressee(s) only and may contain privileged or confidential information.
If you have received this in error, please notify me immediately and permanently delete the message and any prints or other copies. Thank you.

2

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 27

From: Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
Sent: Monday, October 19, 2015 10:36 AM
To: Flock, Karen <Karen.Flock@magellanlp.com>
Subject: Crude Oil Distribution Agreement Audit Data Request Follow-up

Karen,

Below is our reply (in red) to your latest request for additional information. We believe we have fully answered your questions and provided adequate documentation.

2. Inform us of any **Commitment Exceptions** [4] Enterprise Crude Oil LLC or its Affiliates are claiming. Enterprise Crude Oil LLC ("ECO") is not claiming any Commitment Exceptions under the Crude Oil Distribution Agreement (the "Agreement") applicable to shipments of Product by ECO during the 2014 calendar year.

3. Provide a listing of all title transfers of product by Enterprise Crude Oil LLC or its Affiliates, including but not limited to title transfers of product at the origins, Echo, or any other location, associated with product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015.

## REDACTED: CONFIDENTIAL

4. Provide a list of Enterprise Crude Oil LLC Affiliates that have shipped product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015.

## REDACTED: CONFIDENTIAL

### Questions

1. Are there other systems being used to transport volumes from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) other than moving east on Eagle Ford Pipeline? Sections 4.1 and 4.2 of the Agreement cover only deliveries of Product that were made from an Origin Point and transported on the Eagle Ford Pipeline System. Accordingly, this question is not relevant to ECO's obligations under the Agreement.

2. For the Genoa numbers included in the 'Delivery' section of the spreadsheet you provided on July 23, 2015 (see the tab entitled "ECO STX 2014" in the attached document), did those volumes go through Genoa Jct MPL? If not Genoa Jct MPL, what connection point did they go through and an explanation as to why the volumes did not go through Genoa Jct MPL?

## REDACTED: CONFIDENTIAL

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 28

Regards,
Joslyn

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Monday, October 12, 2015 9:36 AM
**To:** Truitt, Joslyn
**Cc:** Graham, Rodger; Devers, Scott; Bridges, Trent
**Subject:** Crude Oil Distribution Agreement Audit Data Request Follow-up

Joslyn,

In response to your below email, the information we have requested is within our rights as provided by the Crude Oil Distribution Agreement. **Section 4.4 (Magellan's Limited Rights to Audit and Penalty)** of the Agreement broadly states *"Magellan shall have the right to audit Shipper's records necessary to verify Shipper's compliance with the provisions of Sections 4.1 and 4.2."* The information we have requested is necessary to verify Enterprise's compliance with **Section 4.1 (Transportation Commitment)** and **Section 4.2 (Transportation Commitment Exceptions)** of the Agreement. If there is concern regarding the confidentiality of information produced in connection with this audit, as a reminder note that a confidentiality agreement was executed on July 16, 2015.

We respectfully request a reply by Friday, October 16th stating 1) whether our information requests will be honored and 2) if honored, when we can expect to receive the information requested.

If Enterprise continues to assert that the information Magellan has requested is outside our audit rights in the Agreement, then Magellan's next course of action will be to serve Enterprise with a Dispute Notice pursuant to **Section 9.9 (Dispute Resolution)** of the Agreement.

Thank you,
Karen

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, September 21, 2015 10:19 AM
**To:** Flock, Karen
**Subject:** RE: Crude Oil Distribution Agreement Audit Data Request Follow-up

The remaining items in your request are not required for Enterprise to provide under the current Agreement. If you feel otherwise, please reference the section of the Agreement that corresponds to each of the requested items. We can review your request again with that information...

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Monday, September 21, 2015 10:03 AM
**To:** Truitt, Joslyn
**Subject:** RE: Crude Oil Distribution Agreement Audit Data Request Follow-up

Thank you for the data. This addresses Data Request item #1, what about Data Request items 2 – 4 and Questions 1-2?

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, September 21, 2015 9:56 AM
**To:** Flock, Karen
**Subject:** RE: Crude Oil Distribution Agreement Audit Data Request Follow-up

Karen –
I received the requested information....

On 2014 data was provided, due to the agreement stating,
*"...and must be conducted within one (1) year after December 31st of each calendar year for such previous*
*year's transportation services."*

So it is our understanding that you can request the 2015 data in 2016...

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, August 20, 2015 8:07 AM
**To:** Truitt, Joslyn
**Cc:** Graham, Rodger; Devers, Scott; Bridges, Trent
**Subject:** Crude Oil Distribution Agreement Audit Data Request Follow-up

We appreciate the information/data provided by Enterprise per our original request dated May 28, 2015. We have reviewed the data and Enterprise's explanation on how to read the data. Your email dated July 23, 2015 indicated that we should let you know if we had additional questions and based on our review of the data you provided, we do have a few follow-up data requests and questions that would assist in our review. They are indicated below.

**Data Requests**

1. Clarification regarding Magellan's initial data request: For January 1, 2014 through July 31, 2015 provide an electronic report/detailed listing (preferably Excel) of all product **Owned**[1] or

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 30

Controlled[2] by Enterprise Crude Oil LLC or its Affiliates shipped from each Origin Point[3] (Lyssy, Marshall, Milton, and Gardendale) and include Origin & destination pairings (all destinations regardless of inclusion in the Agreement), inter-connection points, and volume by product, by month, by shipper (see the tab entitled "Sample Worksheet" in the attached document). **Note:** This sample worksheet outlines the data we are requesting in a format that would enhance our review and our hope is that the data can be readily obtained through your internal systems. Our original data request asked for a detailed breakdown of shipments from January 1, 2014 through May 27, 2015 and we only received data for 2014. We would also like this data for 2015, specifically through July 31, 2015.

2. Inform us of any **Commitment Exceptions** [4] Enterprise Crude Oil LLC or its Affiliates are claiming.

3. Provide a listing of all title transfers of product by Enterprise Crude Oil LLC or its Affiliates, including but not limited to title transfers of product at the origins, Echo, or any other location, associated with product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015.

4. Provide a list of Enterprise Crude Oil LLC Affiliates that have shipped product from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) from January 1, 2014 through July 31, 2015.

Questions

1. Are there other systems being used to transport volumes from the 4 Origin Points (Lyssy, Marshall, Milton, and Gardendale) other than moving east on Eagle Ford Pipeline?

2. For the Genoa numbers included in the 'Delivery' section of the spreadsheet you provided on July 23, 2015 (see the tab entitled "ECO STX 2014" in the attached document), did those volumes go through Genoa Jct MPL? If not Genoa Jct MPL, what connection point did they go through and an explanation as to why the volumes did not go through Genoa Jct MPL?

We appreciate your prompt attention in providing the additional data and answers to our questions and request that we receive this data by September 18, 2015. We would be happy to discuss this request with you and if needed, schedule time, at your convenience, to come to Enterprise offices to clarify our request. If you have any questions regarding this request or would like us to come to your offices, please contact me or Scott Devers (918.574.7712).

*Thank you,*

**Karen Flock**
*Magellan Midstream Partners, L.P.*
*Audit Services*
*918.574.7664*

Footnotes:
*Crude Oil Distribution Agreement dated October 31st, 2011*
(1) *Section 1.32 "Owned" shall mean Product to which Shipper or its Affiliate holds title; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute being Owned.*

(2) *Section 1.6 "Controlled" shall mean, when referring to Product, Product that Shipper or its Affiliates, as the case may be, has the legal right to transport; provided, however, the custody of Product by an Affiliate of Shipper that is transporting such Product for the account of a party or parties other than Shipper or its Affiliates does not constitute Control.*

(3) *Section 1.31 "Origin Point" means the following points on the Eagle Ford Pipeline System: A. Gardendale (LaSalle County, Texas); B. Lyssy (Wilson County, Texas; Marshall (Gonzales County, Texas); and D. Milton (Karnes County, Texas).*

(4) *Section 4.2 Transportation Commitment Exceptions. A. If, at any point during the Term hereof, Shipper requires more capacity than Magellan has available, Shipper may utilize third party facilities to transport such excess Product until such time that Magellan has capacity available; and B. If a third party connects to a Future Destination Point before Magellan, and Magellan*

*later connects to such Future Destination Point, then Magellan must offer Shipper a tariff rate to such Future Destination Point equal to or less than the third party tariff rate at such Future Destination Point or such Future Destination Point shall not be considered a Destination Point under Section 1.8 (the exceptions in Section 4.2 (A) and (B) are hereinafter collectively referred to as the "Commitment Exceptions").*

---

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 32

SR520

| From: | Truitt, Joslyn |
|---|---|
| Sent: | Tuesday, March 29, 2016 5:20 PM CDT |
| To: | Flock, Karen |
| Subject: | RE: January 26 Site Visit Meeting Follow-up |

See response below in Red...

Thanks!

**Joslyn R. Truitt**
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 | Suite 4.112
jrtruitt@eprod.com | office: 713.381.3718 | fax: 713.381.3503 | cell: 832.317.3642

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, February 04, 2016 8:43 AM
**To:** Truitt, Joslyn
**Subject:** January 26 Site Visit Meeting Follow-up

Joslyn,

From our meeting on 1/26/16, there were several items that Brent and/or you were going to follow up on and provide additional information to us. Brent contacted Brett and provided information regarding the "Legacy" destinations. Other than that we have not received any additional information. Below are my notes from our meeting with Brent on 1/26/16. The items highlighted in yellow are the items noted from our meeting for which Brent stated that additional information needed to be obtained so that a complete response could be provided. Just wanted to follow up to see when you thought we might receive additional information and/or responses. If any of the additional information or responses are ready, can you please forward to me, and if not yet ready, can you provide an estimated timeline as to when we can expect to receive the information?

- Can you confirm if the original worksheets provided by Enterprise only included volumes for product owned/controlled by Enterprise?
  Response provided...
- Now that Enterprise has disconnected from MMP at Anahuac Jct. which was a destination point per the Crude Oil Distribution Agreement ('Agreement') (section 1.8), how does this action by your Affiliate impact Enterprise's ability to comply with the 'Agreement'?          REDACTED: CONFIDENTIAL



- 2015 Transaction worksheet provided by Enterprise (volumes are in barrels)          REDACTED: CONFIDENTIAL
- 

ECO000650

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 33



REDACTED: CONFIDENTIAL

REDACTED: CONFIDENTIAL

REDACTED: CONFIDENTIAL

ECO000651

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 34

SR522

- Were customers given an incentive to buy at Genoa or Echo instead of the final Destination as defined in the 'Agreement'?
No.

REDACTED: CONFIDENTIAL

Thank you,

**Karen Flock**
*Magellan Midstream Partners, L.P.*
*Audit Services*
*918.574.7664*

ECO000652

Message
---

| | |
|---|---|
| **From:** | Truitt, Joslyn [JRTRUITT@eprod.com] |
| **Sent:** | 6/24/2016 9:15:06 AM |
| **To:** | Flock, Karen [Karen.Flock@magellanlp.com] |
| **Subject:** | RE: Information Request Follow-up |
| **Attachments:** | 2014 Volume Reconciliation Audit.xlsx |

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

Karen –

Please refer to the responses below in RED. Let me know if you have any additional questions or concerns. We appreciate your patience in this matter.

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

 Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

---

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, May 12, 2016 9:28 AM
**To:** Truitt, Joslyn
**Subject:** Information Request Follow-up

Joslyn,

Just wanted to follow-up on the outstanding requests. Can you please provide an update regarding each individual request stating 1) if the requested item will be provided (yes/no) and 2) if yes, then when will we receive the item?

Thank you,
Karen

| Request Description | Date Requested | Last Response |
|---|---|---|

## REDACTED: CONFIDENTIAL

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 36

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Tuesday, May 03, 2016 7:54 AM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Subject:** RE: Voice Mail (30 seconds)

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

Karen –

I was copied on an email yesterday that indicated our team in OKC is working with scheduling on the project of reconciling the volumes. The email stated that they were getting close.

As for the other items sent in your "open items" list, I will need to follow-up with the appropriate parties to determine what the hold-up is. I will be out of the office for the rest of the week, but if I see anything pertaining to this review come through my email, I will forward to you.

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

---

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Tuesday, May 03, 2016 7:26 AM
**To:** Truitt, Joslyn
**Subject:** RE: Voice Mail (30 seconds)

Joslyn,

Just wanted to follow up on the request below as well as the other outstanding items I sent to you on April 11th. Can you please give me a status update as to when we can expect the information?

Thanks,
Karen

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, April 25, 2016 8:36 AM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Subject:** RE: Voice Mail (30 seconds)

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

Thanks!! I should have something for you quickly.

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

---

**From:** Flock, Karen [mailto:Karen.Flock@magellanlp.com]
**Sent:** Thursday, April 21, 2016 7:54 AM
**To:** Truitt, Joslyn
**Subject:** RE: Voice Mail (30 seconds)

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 38

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Tuesday, April 19, 2016 11:06 PM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Subject:** FW: Voice Mail (30 seconds)

Sent by an external sender. Use caution opening attachments, clicking web links, or replying unless you have verified this email is legitimate.

**REDACTED: CONFIDENTIAL**

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

**From:** Microsoft Outlook **On Behalf Of** 9185747664
**Sent:** Monday, April 18, 2016 8:22 AM
**To:** Truitt, Joslyn
**Subject:** Voice Mail (30 seconds)

**You received a voice mail from 9185747664**

Caller-Id:                                                    9185747664

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

**From:** Truitt, Joslyn [mailto:JRTRUITT@eprod.com]
**Sent:** Monday, June 19, 2017 3:00 PM
**To:** Flock, Karen <Karen.Flock@magellanlp.com>
**Cc:** Stovall, Charles <CStovall@eprod.com>
**Subject:** Open Magellan Request

```
Sent by an external sender. Use caution opening attachments, clicking web
links, or replying unless you have verified this email is legitimate.
```

Karen –
I have attached a response to all open items. Please let me know if you have any additional questions.

Thanks,

*Joslyn R. Truitt*
Contract Compliance Audit

Enterprise
Products

1100 Louisiana St., Houston, TX 77002 I Suite 4.112
jrtruitt@eprod.com I office: 713.381.3718 I fax: 713.381.3503 I cell: 832.317.3642

---

This message (including any attachments) is confidential and intended for a specific individual and purpose. If you are not the intended recipient, please notify the sender immediately and delete this message.

**Enterprise Houston Ship Channel,**
**Net Ticket**

Ticket Status   Verified

Ticket No   ███████

Customer Ref. No   ███████

**Schedule Information**

# REDACTED: CONFIDENTIAL

**Net Measurement**

Tank   ██████   Meter   ██████

**Adjustment Type**

GOV/GSV Vol.

# REDACTED: CONFIDENTIAL

- ○ Custody Transfer     ○ TightLine
- ○ Regrade                    ○ Trade
- ○ Transmix                   ● None
- ○ Balance

S & W %

S & W Factor

S & W Vol.

| | |
|---|---|
| Truck Rack | Trailer Number |
| Carrier Number | Load Number |
| Driver Number | Bill of Lading |
| Load Spot Number | |

Total NSV

Updated By

Updated on

**Dates and Signatures**

| | | | |
|---|---|---|---|
| **OPEN** | 09/08/2016 04:11 | **Enterprise Rep Name:** | ████████ |
| | | **Witness Name:** | |
| **CLOSE** | 09/08/2016 08:18 | **Enterprise Rep Name:** | ████████ |
| | | **Witness Name:** | |

Comments:   # REDACTED: CONFIDENTIAL

Printed:   06/13/2017 12:57

**Enterprise Houston Ship Channel,**    Ticket Status   Verified      Ticket No   ▮
**Net Ticket**                                              Customer Ref. No   ▮

**Schedule Information**

# REDACTED: CONFIDENTIAL

---

**Net Measurement**

         Tank                    Meter

▮                   ▮              GOV/GSV Vol.

Adjustment Type            S & W %        # REDACTED: CONFIDENTIAL

- ○ Custody Transfer    ○ TightLine
- ○ Regrade             ○ Trade
- ○ Transmix         ● None
- ○ Balance

S & W Factor

S & W Vol.

| | | |
|---|---|---|
| Truck Rack | Trailer Number | Total NSV |
| Carrier Number | Load Number | Updated By |
| Driver Number | Bill of Lading | Updated on |
| Load Spot Number | | |

---

**Dates and Signatures**

| | | | |
|---|---|---|---|
| OPEN | 09/08/2016 08:18 | Enterprise Rep Name: | ▮ |
| | | Witness Name: | |
| CLOSE | 09/08/2016 11:44 | Enterprise Rep Name: | ▮ |
| | | Witness Name: | |

**Comments:**    # REDACTED: CONFIDENTIAL

---

Printed:   06/13/2017 12:59

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 42

SR530

**Enterprise Crude Pipeline LLC**
**Meter Ticket**

Ticket Status  Verified

Ticket No
Customer Ref. No

**Schedule Information**

# REDACTED: CONFIDENTIAL

**Meter Measurement**

# REDACTED: CONFIDENTIAL

**Dates and Signatures**

| | | |
|---|---|---|
| **OPEN** | 01/01/2016 18:27 | Enterprise Rep Name: ▮ |
| | | Witness Name: |
| **CLOSE** | 01/02/2016 05:13 | Enterprise Rep Name: ▮ |
| | | Witness Name: |

Printed:  06/13/2017 12:52

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 43

SR531

**Enterprise Crude Pipeline LLC**
**Meter Ticket**

Ticket Status  Verified

Ticket No  ███
Customer Ref. No  ██

Schedule Information

# REDACTED: CONFIDENTIAL

Meter Measurement

# REDACTED: CONFIDENTIAL

**Dates and Signatures**

| | | | |
|---|---|---|---|
| OPEN | 01/19/2016 17:06 | Enterprise Rep Name: | ██ |
| | | Witness Name: | |
| CLOSE | 01/20/2016 02:52 | Enterprise Rep Name: | ██ |
| | | Witness Name: | |

Printed:  06/13/2017 12:52

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 44

SR532



**Enterprise Crude Pipeline LLC**
**Meter Ticket**

Ticket Status   Verified

Ticket No   ████
Customer Ref. No   ████

**Schedule Information**

## REDACTED: CONFIDENTIAL

**Meter Measurement**

## REDACTED: CONFIDENTIAL

**Dates and Signatures**

| | | | |
|---|---|---|---|
| **OPEN** | 01/29/2016 18:20 | Enterprise Rep Name: |  |
| | | Witness Name: | |
| **CLOSE** | 01/30/2016 16:10 | Enterprise Rep Name: | ████ |
| | | Witness Name: | |

Printed:   06/13/2017 12:53

Plaintiff Second Supp. to Response to Def. Mot. For Protective Order, Filing Ex. 5 in Redacted Form - 45

NO. DC-17-07264

| | | |
|---|---|---|
| MAGELLAN CRUDE OIL PIPELINE COMPANY, L.P., | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| vs. | § | 101st JUDICIAL DISTRICT |
| ENTERPRISE CRUDE OIL LLC, | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

## CONFIDENTIALITY AND PROTECTIVE ORDER

Before the court ~~is the joint motion~~ *are* of the parties for the entry of a confidentiality and protective order ("Protective Order"). After careful consideration, it is hereby ORDERED as follows:

### 1. Classified Information

"Classified Information" means any information of any type, kind, or character that is designated as "Confidential", "For Counsel Only", or "Attorneys Eyes Only" by any of the supplying or receiving persons, whether it be a document, information contained in a document, information revealed during a deposition, information revealed in an interrogatory answer, or otherwise.

### 2. Qualified Persons

"Qualified Persons" means:

    a.    For Counsel or Attorneys Only information:

        i.    retained counsel for the parties in this litigation and their respective staff;

        ii.    in-house counsel for the receiving party who are actively involved in assisting counsel for the receiving party in the prosecution or defense of this action, and their paralegal, secretarial, and clerical assistants. This is limited to in-house counsel who manage litigation and do not make or participate in competitive business matters of the party for whom they work. Prior to receiving Classified Information,

SR534

any person described in this subsection must sign a document a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

iii.     any employee of the receiving party currently or formerly serving as an auditor on behalf of the receiving party who is actively involved in assisting counsel for the receiving party in the prosecution or defense of this action. This is limited to employees who do not make or participate in competitive business matters of the party for whom they work. Prior to receiving Classified Information, any person described in this subsection must sign a document a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

iv.     a person reasonably believed to have knowledge or information relevant to the litigation and who (a) is currently employed by the producing party or nonparty, or (b) was employed by the producing party or nonparty at the time the Classified Information was generated, provided that prior to receiving Classified Information, the person must sign a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

v.     actual or potential independent experts or consultants (and their administrative or clerical staff) engaged in connection with this litigation (which shall not include the current employees, officers, members, or agents of parties or affiliates of parties) who, prior to any disclosure of Classified Information to such person, have signed a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the attorney retaining such person);

SR535

vi. this court and its staff, court reporters, and any other tribunal or dispute resolution officer duly appointed or assigned in connection with this litigation.

vii. litigation vendors and other litigation support personnel who, prior to any disclosure of Classified Information to such person, have signed a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the attorney retaining such person);

b. For Confidential information:

i. the persons identified in subparagraph 2(a);

ii. the receiving party, if a natural person;

iii. if the receiving party is an entity, such officers or employees of the party who are actively involved in the prosecution or defense of this case who, prior to any disclosure of Confidential information to such person, have signed a document agreeing to be bound by the terms of this Protective Order (such signed document to be maintained by the retained counsel);

iv. any person who was an author, addressee, or intended or authorized recipient of the Confidential information and who agrees to keep the information confidential, provided that such persons may see and use the Confidential information but not retain a copy.

c. Such other person as this court may designate after notice and an opportunity to be heard.

3. **Designation Criteria**

a. *Nonclassified Information.* Classified Information shall not include information that either:

SR536

i. is in the public domain at the time of disclosure, as evidenced by a written document;

ii. becomes part of the public domain through no fault of the recipient, as evidenced by a written document;

iii. the receiving party can show by written document was in its rightful and lawful possession at the time of disclosure; or

iv. lawfully comes into the recipient's possession subsequent to the time of disclosure from another source without restriction as to disclosure, provided such third party has the right to make the disclosure to the receiving party.

b. *Classified Information.* A party shall designate as Classified Information only such information that the party in good faith believes in fact is confidential. Information that is generally available to the public, such as public filings, catalogues, advertising materials, and the like, shall not be designated as Classified.

Information and documents that may be designated as Classified Information include, but are not limited to, trade secrets, confidential or proprietary financial information, operational data, business plans, and competitive analyses, personnel files, personal information that is protected by law, and other sensitive information that, if not restricted as set forth in this order, may subject the producing or disclosing person to competitive or financial injury or potential legal liability to third parties.

Correspondence and other communications between the parties or with nonparties may be designated as Classified Information if the communication was made with the understanding or reasonable expectation that the information would not become generally available to the public.

SR537

c.    *For Counsel or Attorneys Only.* The designation "For Counsel Only" or "Attorneys Eyes Only" shall be reserved for information that is believed to be unknown to the opposing party or parties, or any of the employees of a corporate party. For purposes of this order, so-designated information may include, without limitation, product formula information, design information, non- public financial information, pricing information, and customer identification data.

d.    *Ultrasensitive Information.* At this point, the parties do not anticipate the need for higher levels of confidentiality as to ultrasensitive documents or information. However, in the event that a court orders that ultrasensitive documents or information be produced, the parties will negotiate and ask the court to enter an ultrasensitive information protocol in advance of production to further protect such information.

## 4.    Use of Classified Information

All Classified Information provided by any party or nonparty in the course of this litigation shall be used solely for the purpose of preparation, trial, and appeal of this litigation and for no other purpose, and shall not be disclosed except in accordance with the terms hereof.

## 5.    Marking of Documents

Documents provided in this litigation may be designated by the producing person or by any party as Classified Information by marking each page of the documents so designated with a stamp indicating that the information is "Confidential", "For Counsel Only", or "Attorneys Eyes Only". If only part of a document is designated "For Counsel Only" or "Attorneys Eyes Only", the designating party shall mark the document in manner which identifies the part(s) designated "For Counsel Only" or "Attorneys Eyes Only," except that if such a document is produced only in a native format not easily so marked, the producing party may identify the "For Counsel Only" or "Attorneys Eyes Only" part(s) by any other reasonable means.

SR538

## 6. Disclosure at Depositions

Information disclosed at (a) the deposition of a party or one of its present or former officers, directors, employees, agents, consultants, representatives, or independent experts retained by counsel for the purpose of this litigation, or (b) the deposition of a nonparty may be designated by any party as Classified Information by indicating on the record at the deposition that the testimony is "Confidential" or "For Counsel Only" and is subject to the provisions of this Order.

Any party also may designate information disclosed at a deposition as Classified Information by notifying all parties in writing not later than 10 days of receipt of the transcript of the specific pages and lines of the transcript that should be treated as Classified Information thereafter. Each party shall attach a copy of each such written notice to the face of the transcript and each copy thereof in that party's possession, custody, or control. All deposition transcripts shall be treated as For Counsel Only for a period of 10 days after initial receipt of the transcript.

To the extent possible, the court reporter shall segregate into separate transcripts information designated as Classified Information with blank, consecutively numbered pages being provided in a nondesignated main transcript. The separate transcript containing Classified Information shall have page numbers that correspond to the blank pages in the main transcript.

Counsel for a party or a nonparty witness shall have the right to exclude from depositions any person who is not authorized to receive Classified Information pursuant to this Protective Order, but such right of exclusion shall be applicable only during periods of examination or testimony during which Classified Information is being used or discussed.

## 7. Disclosure to Qualified Persons

Classified Information shall not be disclosed or made available by the receiving party to persons other than Qualified Persons except as necessary to comply with applicable law or the valid order of a court of competent jurisdiction; provided, however, that in the event of a disclosure

SR539

compelled by law or court order, the receiving party will so notify the producing party as promptly as practicable (if at all possible, prior to making such disclosure) and shall seek a protective order or confidential treatment of such information. Information designated as For Counsel Only shall be restricted in circulation to Qualified Persons described in subparagraph 2(a).

### 8. Unintentional Disclosures

Documents unintentionally produced without designation as Classified Information later may be designated and shall be treated as Classified Information from the date written notice of the designation is provided to the receiving party.

If a receiving party learns of any unauthorized disclosure of Confidential information or For Counsel Only information, the party shall immediately upon learning of such disclosure inform the producing party of all pertinent facts relating to such disclosure and shall make all reasonable efforts to prevent disclosure by each unauthorized person who received such information.

### 9. Documents Produced for Inspection Prior to Designation

In the event documents are produced for inspection prior to designation, the documents shall be treated as For Counsel Only during inspection. At the time of copying for the receiving parties, Classified Information shall be marked prominently "Confidential", "For Counsel Only", or "Attorneys Eyes Only" by the producing party.

### 10. Consent to Disclosure and Use in Examination

Nothing in this order shall prevent disclosure beyond the terms of this order if each party designating the information as Classified Information consents to such disclosure or if the court, after notice to all affected parties and nonparties, orders such disclosure. Nor shall anything in this order prevent any counsel of record from utilizing Classified Information in the examination or cross-examination of any person who is indicated on the document as being an author, source, or recipient of the Classified Information, irrespective of which party produced such information.

SR540

## 11.    Challenging the Designation

A party shall not be obligated to challenge the propriety of a designation of Classified Information at the time such designation is made, and a failure to do so shall not preclude a subsequent challenge to the designation. In the event that any party to this litigation disagrees at any stage of these proceedings with the designation of any information as Classified Information, the parties shall first try to resolve the dispute in good faith on an informal basis, such as by production of redacted copies. If the dispute cannot be resolved, the objecting party may invoke this Protective Order by objecting in writing to the party who designated the document or information as Classified Information. The designating party shall then have 14 days to move the court for an order preserving the designated status of the disputed information. The disputed information shall remain Classified Information unless and until the court orders otherwise.

Failure to move for an order shall constitute a termination of the status of such item as Classified Information.

## 12.    Manner of Use in Proceedings

In the event a party wishes to use any Classified Information in affidavits, declarations, briefs, memoranda of law, or other papers filed in this litigation, the party shall do one of the following: (1) with the consent of the producing party, file only a redacted copy of the information; (2) where appropriate (e.g., in connection with discovery and evidentiary motions) provide the information solely for in camera review; or (3) file such information under seal with the court consistent with the sealing requirements of the court.

## 13.    Filing Under Seal

The clerk of this court is directed to maintain under seal all documents, transcripts of deposition testimony, answers to interrogatories, admissions, and other papers filed under seal in this

SR541

litigation that have been designated, in whole or in part, as Classified Information by any party to this litigation consistent with the sealing requirements and standards of Texas Rule of Civil Procedure 76a.

**14.   Return of Documents**

Not later than 60 days after conclusion of this litigation and any appeal related to it, any Classified Information, all reproductions of such information, and any notes, summaries, or descriptions of such information in the possession of any of the persons specified in paragraph 2 (except subparagraph 2(a)(iii)) shall be returned to the producing party or destroyed, except as this court may otherwise order or to the extent such information has been used as evidence at any trial or hearing. Notwithstanding this obligation to return or destroy information, counsel may retain one copy of Classified Information for their respective legal files and must describe to the producing party or nonparty the steps taken to ensure that such Classified Information will not be accessed, used, or disclosed inconsistently with the obligations under this Protective Order.

**15.   Ongoing Obligations**

Insofar as the provisions of this Protective Order, or any other protective orders entered in this litigation, restrict the communication and use of the information protected by it, such provisions shall continue to be binding after the conclusion of this litigation, except that (a) there shall be no restriction on documents that are used as exhibits in open court unless such exhibits were filed under seal, and (b) a party may seek the written permission of the producing party or order of the court with respect to dissolution or modification of this, or any other, protective order.

**16.   Advice to Clients**

This order shall not bar any attorney in the course of rendering advice to such attorney's client with respect to this litigation from conveying to any party client the attorney's evaluation in a general way of Classified Information produced or exchanged under the terms of this order; provided, however, that in rendering such advice and otherwise communicating with the client, the attorney

SR542

shall not disclose the specific contents of any Classified Information produced by another party if such disclosure would be contrary to the terms of this Protective Order.

17.     **Duty to Ensure Compliance**

Any party designating any person as a Qualified Person shall have the duty to reasonably ensure that such person observes the terms of this Protective Order and shall be responsible upon breach of such duty for the failure of such person to observe the terms of this Protective Order.

18.     **Legal Effect.**

This Protective Order shall not abrogate or diminish any contractual, statutory, or other legal privilege or protection of a Party or person with respect to any information. The fact that any materials are designated Confidential Information pursuant to this Protective Order shall not affect or operate as a means of objection to the admissibility of any such material. The fact that materials are designated as Confidential Information pursuant to this Protective Order shall not affect what a trier of fact in the proceedings may find to be confidential or proprietary. Other than as specifically provided herein, this Protective Order does not expand or limit the scope of discovery or the rights and the obligations of any Party with respect thereto in the Lawsuit or any other proceeding.

19.     **Modification and Exceptions**

The parties may, by written stipulation, provide for exceptions to this order and any party may seek an order of this court modifying this Protective Order.

It is SO ORDERED this _____ day of January 2018.

_____
Presiding Judge

SR543